# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

IN RE:

ISLAND INDUSTRIES, INC.                    Case No. 22-20380-jdl
                                           Chapter 11
                                           Subchapter V
      Debtor.

SIGMA CORP.
          Plaintiff,        Adv. Pro. No. 22-00050-jdl

    v.

ISLAND INDUSTRIES, INC. AND R. GLENN
SANDERS,
          Defendants.

---

## DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

---

**GLANKLER BROWN, PLLC**                    BURCH, PORTER & JOHNSON, PLLC


By: /s/ Ricky L. Hutchens               /s/Douglas F. Halijan
Michael P. Coury (TN #7002)             Douglas F. Halijan (BPR # 016718)
Ricky L. Hutchens (TN #34750)           130 North Court Avenue
6000 Poplar Avenue, Suite 400           Memphis, Tennessee 38103
Memphis, TN  38119                      Phone: (901) 524-5000
(901) 525-1322                          Fax: (901) 524-5024
(901) 525-2389 – facsimile              dhalijan@bpjlaw.com
mcoury@glankler.com
rlhutchens@glankler.com

Attorneys for Island Industries, Inc.    Attorneys for R. Glenn Sanders

# TABLE OF CONTENTS

PARTIES ..................................................................................................................... 1

JURISDICTION AND VENUE ................................................................................. 1

FACTS ....................................................................................................................... 1

LAW AND ARGUMENT ......................................................................................... 7

   I.    STANDARD OF REVIEW ............................................................................ 7

   II.   SIGMA'S CLAIMS ARE ALL BARRED BY CLAIM PRECLUSION .......................... 10

     A.   SIGMA'S TRADE SECRET CLAIMS WERE COMPULSORY COUNTERCLAIMS WHICH IT WAS REQUIRED TO RAISE IN THE FCA LITIGATION. ................................................. 11

     B.   BOTH THE FCA ACTION AND THE SIGMA COMPLAINT INVOLVE THE SAME PARTIES OR THEIR PRIVIES. ................................................................................................ 16

   III.  SIGMA'S COMPLAINT FAILS TO STATE A CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS ......................................................................................... 17

     A.   SIGMA FAILS TO ADEQUATELY ALLEGE THAT ITS SUPPLIER LIST WAS ACTUALLY A TRADE SECRET ......................................................................................... 18

     B.   SIGMA FAILS TO ALLEGE WHAT REASONABLE MEASURES IT TOOK TO PROTECT ITS TRADE SECRETS ......................................................................................... 20

     C.   SIGMA FAILS TO ALLEGE THAT DEFENDANTS INTENDED TO CAUSE INJURY .................... 23

     D.   SIGMA HAS NOT IDENTIFIED ANY REMEDIES TO WHICH IT IS ENTITLED .......................... 24

   IV.  18 U.S.C. § 1833 BARS ALL THREE COUNTS OF SIGMA'S COMPLAINT. ............. 29

   V.   DEFENDANTS ARE ENTITLED TO AN AWARD OF REASONABLE ATTORNEY'S FEES .................................................................................................. 31

CONCLUSION ....................................................................................................... 32

## INTRODUCTION

Island Industries, Inc. ("Debtor" or "Island") and R. Glenn Sanders ("Sanders") (together "Defendants"), pursuant to Fed. R. Bank. P. 7012(b), file this motion to dismiss for failure to state a claim upon which relief can be granted.  In support of this motion to dismiss, Defendants would show the Court as follows:

## PARTIES

1.      The Debtor is a corporation organized and existing under the laws of the State of Tennessee.  The Debtor's headquarters and home office are in Memphis, Tennessee. [D.E. 1, Complaint ¶ 11.]

2.      Sanders is the President, CEO, and principal owner of Debtor.  Sanders resides in Memphis, TN. [Complaint ¶ 12.]

3.      Sigma Corporation ("Sigma") is a corporation organized and existing under the laws of the State of New Jersey.  Sigma's headquarters and home office are in Cream Ridge, NJ.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the relief requested in this action pursuant to 28 U.S.C. § 157(a) and 28 U.S.C. § 1334.

5.      Venue in this district and division is appropriate pursuant to 28 U.S.C. §§ 1391(b) and 1409(a).

## FACTS

6.      On June 13, 2017, Island filed under seal a complaint styled *United States of America ex. rel. Island Industries, Inc., v. Vandewater International Inc.; Neil Rubens, Anvil International, LLC; Sigma Corporation; Smith Cooper International; Allied Rubber & Gasket Company, and John Does* Nos. 1-10., Case No. CV 17-04393-RGK, in the U.S. District Court for

1

the Central District of California (the "FCA Action").  In the FCA Action, Island asserted claims

arising under the False Claim Act, 31 U.S.C. § 3729, *et seq.*, regarding the importation of welded

outlets from China by the defendants. More specifically, Island alleged that each of the FCA

defendants – including Sigma – was importing welded outlets from China ("Chinese Welded

Outlets") into the United States without paying the 182.9% anti-dumping duty imposed by the U.S.

Department of Commerce.  The FCA Action was unsealed on January 30, 2019, after the U.S.

Department of Justice declined to intervene in the FCA complaint. [D.E. 1, Complaint ¶ 16.]

7.      Island thereafter filed a First Amended Complaint on July 10, 2019 (the "FCA

Complaint"). Sigma filed an Answer to the First Amended Complaint on September 17, 2019. [*Id.*

at ¶ 17.] A copy of the FCA Complaint is attached hereto as Exhibit 1.

8.      As to Sigma's importation of Chinese Welded Outlets, the FCA Complaint

specifically alleged as follows:

> 16. In their marketing materials, Defendants (and their Chinese Manufacturers)
> virtually always describe their Chinese Welded Outlets accurately (e.g. each
> Defendant markets its products as "welded outlets"). By contrast in the public
> shipping records, Defendants never use the term "welded outlet".  On information
> and belief, Defendants avoid the term "welded outlet' in their shipping records
> because they know that phrase would be likely to cause the U.S. government to
> impose anti-dumping duties.
>
> . . .
>
> 55. SIGMA markets and sells at least three brands of Welded Outlets. Two
> of these threaded outlet brands, the "Uni-Let" and the "Safe-Let" brands,
> are sourced from China and marketed as import products. SIGMA also markets and
> sells grooved outlets. Historically, SIGMA imported some grooved outlets from
> China. More recently, SIGMA has been marketing grooved outlets that supposedly
> are manufactured in the United States. On information and belief, however,
> SIGMA's grooved outlets were actually manufactured in China. Attached hereto as
> Exhibit H are SIGMA's product specifications for its Chinese Welded Outlets.
>
> 56. In 2010, SIGMA hired Terry Clark ("Clark") as a Manager in its Fire
> Protection Division. Throughout his long career, Clark has advocated using
> Chinese Welded Outlets to develop product lines. In around 2005, for example,

Clark approached Relator with an offer to import the "Uni-Let" product from China. After Relator declined this offer, Clark went to work for the fire protection division of Unique Industrial Products Company ("Unique") in Sugarland, Texas, which was eventually acquired by SIGMA.

57. Around the time of Clark's hiring, SIGMA began importing its "Uni-Let" and "Safe-Let" products. Although these products are Chinese Welded Outlets, the shipping records suggest that SIGMA has not imported any Welded Outlets. Instead, the import record reflects that, in around 2010, SIGMA began importing "parts of pipe fitting" into Los Angeles, California. The volume of "parts of pipe fittings" imported by SIGMA is consistent with SIGMA's share of the Welded Outlets market.

58. SIGMA also has imported and marketed grooved outlets. In early 2011, for example, SIGMA's then-purchasing agent advised Relator that SIGMA had encountered extensive quality problems with its Chinese grooved outlets. SIGMA asked Relator to determine whether it would be plausible to repair the grooved outlets, which were manufactured by Shanghai Vision. After Relator advised that the products were not repairable, SIGMA began buying more domestically produced grooved outlets from Relator. In late 2015, however, SIGMA advised Relator that it would no longer purchase product from Relator because SIGMA had discovered a new "low cost" source that offered Welded Outlets at prices that were significantly below Relator's costs.

59. On information and belief, SIGMA's new "low cost" source was Ageis (sic). Notably, for many years, Clark served as a Vice President at Ageis (sic) and as a Manager at SIGMA. (In 2016, Clark retired from SIGMA, but he continued to be paid by SIGMA as a consultant for a period of time thereafter.)

60. A former SIGMA employee, who was in a position to know, has advised Relator that SIGMA sourced many of its Welded Outlets from Beijing Bell and that it used Wor-Biz Trading to facilitate the shipments. That same former SIGMA employee has advised Relator that SIGMA was working with Ageis (sic) to develop an alternative low cost source for Welded Outlets. To Relator's knowledge, Ageis (sic) does not own meaningful domestic manufacturing facilities. Even if it did, it would not have been economically feasible for Ageis (sic) to have supplied SIGMA with domestically produced Welded Outlets given the prices that SIGMA charged for grooved outlets in the marketplace.

61. Relator alleges, on information and belief, that Ageis (sic) supplied SIGMA with Chinese-made grooved outlets. Relator further alleges, on information and belief, that SIGMA evaded the antidumping duties applicable to such Chinese Welded Outlets. Based on Relator's examination of the import records, Relator believes that SIGMA (sometimes operating through its wholly-owned subsidiary Unique Industrial Product Company) has repeatedly and falsely described the grooved outlets as steel "couplings" so as to avoid the antidumping

duties.

      62. Moreover, in its scope ruling request, SIGMA confirmed what Relator had alleged all along: namely, that SIGMA imports Chinese Welded Outlets without paying the applicable antidumping duties. SIGMA thus has already admitted that it has long evaded the antidumping duty order applicable to Chinese Welded Outlets.

      63. Based on the foregoing facts and Relator's investigation, upon information and belief SIGMA and/or its subsidiaries entered into agreements with other individuals and entities (such as Shanghai Vision, Ageis (sic), Beijing Bell, Wor-Biz Trading, and others known to SIGMA and its subsidiaries but unknown at this time to Relator) to violate the False Claims Act by falsely declaring that the Chinese Welded Outlets were not subject to antidumping duties.

9.      Needless to say, an essential element of proof in the FCA Action was information regarding the source of the Chinese Welded Outlets that each FCA defendant was purchasing and importing into the United States.  Indeed, the liability (or innocence) of each FCA defendant could not be established without proof regarding sources of supply of the Chinese Welded Outlets, triggering the imposition of the anti-dumping duty.  *See* 31 U.S.C. § 3729(a)(1)(G) (and/or the prior version of such section, 31 U.S.C. § 3729(a)(7)).

10.     On July 24, 2019, Sigma filed a motion to dismiss the FCA Complaint, asserting, *inter alia*, that the FCA Complaint was based on allegations that it was based on ***public*** shipping records.  Such motion is attached hereto as Exhibit 2. [*See* Complaint ¶ 55.]

11.     On November 18, 2019, the parties to the litigation entered into a Stipulated Protective Order (the "Protective Order"). [Complaint ¶ 62-64.]  A copy of the Protective Order is attached hereto as Exhibit 3.  Paragraph 2.5 of the Protective Order defines the term "Designating Party" as "a Party or Non-Party that designates information or items ***that it produces in disclosures or in responses to discovery as "CONFIDENTIAL.***"(emphasis supplied).

12.     Island thereafter produced various documents from its own records in response to discovery which it deemed non-confidential and consequently did not designate as "Confidential."

4

[Complaint ¶ 62-63.]

13.    Sigma learned during discovery (to the extent it did not already know) that the former employee referred to in paragraphs 60 and following of the Amended FCA Complaint was Tom Paquette, who worked for Sigma from 2003 to 2015. [*Id*. at ¶ 19.]

14.    On February 4, 2020, as part of the FCA Action, Island produced documents to Sigma containing communications between Mr. Paquette and Mr. Sanders in which Mr. Paquette stated the identities of Sigma's Chinese suppliers of welded outlets. [*Id*. at ¶ 20.]

15.    It is thus indisputable that Sigma was aware, both from the allegations of the FCA Complaint and through documents produced in discovery, that Island had talked to its former employee, Tom Paquette, and obtained information about Sigma's suppliers in China from Paquette which it used in support of the FCA claim.

16.    At no point did Sigma ever file a motion in the FCA Action for a protective order to have any documents produced by Island designated as "Confidential" or otherwise sealed. *See* FCA Docket attached as Exhibit 4. Paragraph 3 of the Protective Order states that "This Order does not govern the use of Protected Material at trial." Exhibit 3.

17.    In addition, Sigma's import records, which listed its suppliers, were ultimately entered into evidence during the trial of the FCA Action, but Sigma never filed a motion asking that they be placed under seal. Sigma's Import Records which were entered as trial exhibits in the FCA Action are attached hereto as Exhibit 5.

18.    Mr. Sanders was deposed on February 12th and 13th, 2020, in the FCA Action. [Complaint ¶ 21.]

19.    Mr. Paquette was deposed by Sigma's counsel on February 28, 2020, in the FCA Action. [Complaint ¶ 22.]

20.    A jury trial in the FCA Action took place in October 2021.

21.    In his opening statement, counsel for Sigma admitted that Sigma no longer imported goods from the Chinese Suppliers and had not done so for more than a year: "Sigma imported these welded outlets from China just during the period 2010 to *early 2018*." FCA Action Day 1 Tr. Transcript 91:8-9, Oct. 5, 2021 (attached hereto as Exhibit 6). **Stated another way, by the time the complaint in the FCA Action was unsealed on January 30, 2019,** *Sigma was no longer even using the suppliers whose identities it now claims in this lawsuit were valuable trade secrets.*

22.    At trial, Sigma cross-examined Mr. Woehrel, Island's national sales manager, and unsuccessfully sought to elicit testimony that Island had obtained confidential trade secrets of Sigma. While Mr. Woehrel acknowledged that Island obtained information related to Sigma's suppliers, he denied that such information was a secret. Exhibit 6 at 142:23-144:24.

23.    In his closing statement, Sigma's attorney specifically argued to the jury that Island had engaged in "unethical behavior" by "contacting employees and former employees of competitors to get information to support this lawsuit." FCA Action Day 3 Tr. Transcript 119:7-12, Oct. 7, 2021 (attached hereto as Exhibit 7).

24.    On October 21, 2021, the jury found Sigma liable for knowingly making false statements to the U.S. Government and violating the False Claims Act. The Court awarded damages against Sigma in the amount of $24,256,638.09, plus civil monetary penalties of $1,824,145, plus attorneys' fees. Exhibit 4 at # 454. [Complaint ¶ 57.] Final judgment was entered against Sigma on February 8, 2022. Sigma has appealed the judgment to the U.S. Court of Appeals for the Ninth Circuit, where it remains pending. [Complaint ¶ 24.]

## LAW AND ARGUMENT

Sigma's Complaint amounts to nothing more than retaliation against Defendants for bringing and successfully litigating the FCA Action against Sigma. Aggrieved that it was found liable for failing to pay the 182.9% anti-dumping import duty required on its import of Chinese Welded Outlets and for lying to the U.S. government about it, Sigma seeks to assert a trade secret action against Defendants premised on the notion that the identities of its Chinese suppliers were somehow "trade secrets" under applicable law, despite its own allegations in the FCA Action that its import records are public and its own admissions that it ceased using these suppliers in early 2018, approximately a year prior to the unsealing of the FCA Complaint and over 4 years prior to the filing of this Adversary Proceeding. Defendants do not agree or concede that such information constitutes trade secrets.

Irrespective of Sigma's actual motive for filing this lawsuit *years* after the information in question was first disclosed in the FCA Action, Sigma's Complaint must be dismissed on at least three grounds. First, Sigma's Complaint is barred by the doctrine of claim preclusion (*res judicata*). Second, Sigma's Complaint fails to state a claim for misappropriation of trade secrets under any applicable statute. Finally, Sigma's Complaint is barred because Defendants are immune from such a lawsuit pursuant to 18 U.S.C. § 1833.

### I.     STANDARD OF REVIEW

"The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief if all the facts and allegations in the complaint are taken as true." *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 419 (6th Cir. 2001) (citing *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993)). Under Rule 12(b)(6), the complaint is viewed in the light most favorable to the plaintiff, the allegations in the complaint are accepted as true, and all reasonable

inferences are drawn in favor of the plaintiff. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). "However, while liberal, this standard of review does require more than the bare assertion of legal conclusions." *Columbia Nat. Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995); *Tackett v. M & G Polymers, USA, L.L.C.*, 561 F.3d 478, 488 (6th Cir. 2009). "To survive a motion to dismiss, [a plaintiff] must plead 'enough factual matter' that, when taken as true, 'state[s] a claim to relief that is plausible on its face.' *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007). Plausibility requires showing more than the "sheer possibility" of relief but less than a "probab[le]" entitlement to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 280 (6th Cir. 2010). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

In considering a Rule 12(b) motion following *Twombly* and *Iqbal*, pleaded facts must be accepted by the reviewing court, but conclusions must be rejected unless they are plausibly supported by the pleaded facts. *Mitchell through Mitchell v. Cmty. Mental Health of Cent. Michigan*, 243 F. Supp. 3d 822, 832 (E.D. Mich. 2017). "[B]are assertions," such as those that "amount to nothing more than a 'formulaic recitation of the elements'" of a claim, can provide context to the factual allegations, but are insufficient to state a claim for relief and must be disregarded. *Iqbal*, 556 U.S. at 681 (quoting *Twombly*, 550 U.S. at 555).

While consideration of a motion to dismiss under Rule 12(b)(6) is generally confined to the pleadings, *see Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008), "documents attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss." *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir.

2007) (citing Fed. R. Civ. P. 10(c)); *see also Koubriti v. Convertino*, 593 F.3d 459, 463 n.1 (6th Cir. 2010). Even if a document is not attached to a complaint or answer, "when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Commercial Money Ctr.*, 508 F.3d at 335–36; *see also Garton v. Crouch*, 2022 WL 275519 (M.D. Tenn. 2022) (citing *Brent v. Wayne Cyt. Dep't of Human Servs.*, 901 F.3d 656, 694 (6th Cir. 2018)) ("[I]t has long been the rule that a court may consider, not only the Complaint and exhibits attached to it, but also exhibits attached to a defendant's motion to dismiss, 'so long as they are referred to in the Complaint and are central to the claims contained therein.'"). If the plaintiff does not directly refer to a document in the pleadings, but that document governs the plaintiff's rights and is necessarily incorporated by reference, then the motion need not be converted to one for summary judgment. *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997).

In addition, "a court may consider matters of public record in deciding a motion to dismiss without converting the motion to one for summary judgment." *Northville Downs v. Granholm*, 622 F.3d 579 (6th Cir. 2010) (citing *Commercial Money Ctr., Inc.*, 508 F.3d 327, 335–36 (6th Cir. 2007)). Transcripts of judicial proceedings are a matter of public record. *See Tutstone v. Garner*, 2014 WL 991947, at *1 (N.D. Ohio 2014) (finding the transcript of a motion to suppress in criminal proceedings to be a "public record."); *Smith v. Maloon*, 2010 WL 2761344, at *6 (S.D. Ohio 2010) (concluding that "state court proceedings, which are a matter of public record, meet Federal Rule of Evidence 201(b)'s criteria" for judicial notice.). Courts may "take judicial notice of developments in related proceedings in other courts of record." *Chase Bank USA, N.A. v. City of Cleveland*, 695 F.3d 548, 553 n.2 (6th Cir. 2021); *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 972 n.5 (6th Cir. 2005); *Delozier v. Jacobs Engineering Group, Inc.*, 2021 WL 1538787

(M.D. Tenn. 2021). Federal courts may also take judicial notice of "the content of court records," including state court records. Fed. R. Evid. 201(b)(2); *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989); *White v. Mid-Atlantic Restaurant Corp.*, 2018 WL 5503913 (E.D. N.C. 2018) ("All four franchise agreements were trial exhibits in a related state action brought by plaintiff Musselwhite, New Hanover Superior Court File No. 16-CVS-301, so the Court may take judicial notice of them.")

## II.   SIGMA'S CLAIMS ARE ALL BARRED BY CLAIM PRECLUSION

Each of the three counts contained in the Complaint are barred by the doctrine of claim preclusion, also known as *res judicata*. "Res judicata and collateral estoppel are analyzed under Rule 12(b)(6) as a failure to state a claim on which relief may be granted." *Yelverton v. Yelverton Farms, Ltd.*, 2015 WL 847393, at *8 (E.D.N.C. Feb. 26, 2015), *aff'd*, 623 F. App'x 72 (4th Cir. 2015) (citing *Davani v. Va. Dep't of Transp.*, 434 F.3d 712, 720 (4th Cir. 2006)); *Rycoline Prod., Inc. v. C & W Unlimited*, 109 F.3d 883, 886 (3d Cir. 1997) (noting that res judicata can be considered on a 12(b)(6) motion if "apparent on the face of the complaint."); *Southall v. USF Holland, LLC*, 2021 WL 396688 at *2 (M.D. Tenn. February 3, 2021). A court may properly "take judicial notice of facts from a prior judicial proceeding when the defense raises no disputed issue of fact." *Andrews v. Daw*, 201 F.3d 521, 524 n. 1 (4th Cir. 2000).

The doctrine of claim preclusion provides that "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981) (citing to *Commissioner v. Sunnen*, 333 U.S. 591, 597 (1948); *Cromwell v. County of Sac*, 94 U.S. 351, 352–353 (1877). Claim preclusion requires the presence of three elements: (1) a final judgment on the merits of the earlier action; (2) the claims asserted in both suits are sufficiently related and founded

upon the same transaction, arise out of the same nucleus of operative facts, and seek redress for essentially the same basic wrong; and (3) both actions involve the same parties or their privies. *Coleman v. Martin*, 363 F. Supp. 2d 894, 901 (E.D. Mich. 2005). Res judicata "is central to the purpose for which civil courts have been established, *the conclusive resolution of disputes within their jurisdictions." Montana v. U.S.*, 440 U.S. 147, 154 (1979).

Because the final judgment in the FCA Action clearly satisfies the first element, *see* FCA Docket Entry 454 (attached hereto as Exhibit 4), this brief will focus on the second and third elements of claim preclusion.

    a.    **<u>Sigma's Trade Secret Claims Were Compulsory Counterclaims Which It Was Required To Raise In The FCA Litigation.</u>**

The claims asserted in the Sigma Complaint are sufficiently related and arise out of the same nucleus of operative facts as those at issue in the FCA Action, and they are thus barred by the doctrine of claim preclusion. "Under the doctrine of claim preclusion, a final judgment forecloses 'successive litigation of the very same claim, whether or not re-litigation of the claim raises the same issues as the earlier suit.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine,* 532 U.S. 742, 748 (2001)). "Federal *res judicata* bars not only all matters that were litigated in the first proceeding, but **also all issues that could have been litigated**." *Id*. (citing *Kale v. Combined Insurance Co. of America,* 924 F.2d 1161, 1164 (1st Cir. 1991); *Interstate Pipe Maintenance, Inc. v. FMC Corp.,* 775 F.2d 1495, 1497 (11th Cir. 1985); *Johnson v. United States,* 576 F.2d 606, 611 (5th Cir. 1978)) (emphasis added).

The rules defining what issues "could have been litigated" in an earlier matter are well-established:

> In determining whether the causes of action are the same, a court must compare the substance of the actions, not their form. It is now said, in general, that if a case arises out of the same nucleus of operative fact, or is based upon the same factual

predicate, as a former action, that the two cases are really the same 'claim' or 'cause of action' for purposes of res judicata.

*In re Piper Aircraft Corp.*, 244 F.3d 1289, 1297 (11th Cir. 2001) (quoting *Ragsdale v. Rubbermaid, Inc.,* 193 F.3d 1235, 1239 (11th Cir.1999) (internal citation and quotation marks omitted)).

Fed. R. Civ. P. 13(a)(1) embodies the principles of claim preclusion by requiring parties to assert compulsory counterclaims. *Transamerica Occidental Life Ins. Co. v. Aviation Office of Amer., Inc.,* 292 F.3d 384, 390 (3rd Cir.2002) ("Courts have recognized the close connection between Rule 13(a) and the doctrine of claim preclusion.").[1] Rule 13(a)(1) states:

> A pleading must state as a counterclaim any claim that – at the time of its service – the pleader has against an opposing party if the claim: (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction.

The parameters of a compulsory counterclaim are well-established in the Sixth Circuit:

> A counterclaim will be considered compulsory if a logical relationship exists between the two claims, if the issues of fact and law raised by the claim and counterclaim are largely the same, or if substantially the same evidence would support or refute both the claim and the counterclaim.

*Burch ex rel. U.S. v. Piqua Eng'g, Inc.*, 145 F.R.D. 452, 457 (S.D. Ohio 1992) (citing to *Ashbrook v. Block,* 917 F.2d 918, 923, 924 (6th Cir.1990); *Maddox v. Kentucky Finance Co.,* 736 F.2d 380, 382 (6th Cir. 1984)). Thus, a "logical relationship" exists where separate trials on each of the claims would "involve a substantial duplication of effort and time by the parties and the courts."

---

[1] *See also Publicis Communication v. True North Communications Inc.,* 132 F.3d 363, 365 (7th Cir. 1997) ("The definition of a compulsory counterclaim mirrors the condition that triggers a defense of claim preclusion (res judicata) if a claim was left out of a prior suit."); *Southern Construction Co. v. Pickard,* 371 U.S. 57, 60 (1962) (stating that the purpose of Rule 13(a) is "to prevent multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters"); *Aldens v. Packel,* 524 F.2d 38, 51 (3d Cir. 1975) (describing "the fundamental policy underlying Rule 13" as "the expeditious resolution of all controversies growing out of the same transaction or occurrence or between the same parties in a single suit").

*Transamerica Occidental Life Ins. Co. v. Aviation Office of Amer., Inc.,* 292 F.3d 384, 390 (3rd Cir. 2002) (citation omitted). "Such a duplication is likely to occur when claims involve the same factual issues, the same factual and legal issues, or are offshoots of the same basic controversy between the parties." *Id.* Failure to raise a compulsory counterclaim bars its assertion in a subsequent action. *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008); *Burch ex rel. U.S. v. Piqua Eng'g, Inc.*, 145 F.R.D. 452, 457 (S.D. Ohio 1992); Charles Alan Wright, *The Law of Federal Courts* § 79 at 527 (4th ed.1983); Restatement (Second) of Judgments § 22 (1982).

Rule 13 requires a party to not only bring compulsory counterclaims against an opposing party named in the matter, but also against any unnamed party who is in privity with a named party. *Transamerica Occidental Life Ins. Co. v. Aviation Office of Amer., Inc.,* 292 F.3d 384, 393 (3rd Cir. 2002). In *Transamerica*, the court dismissed an action brought by a plaintiff because said plaintiff had already been sued by defendant's privies in another forum and a logical relationship existed between the claims in the two lawsuits. *Id.* The Third Circuit noted specifically that "'opposing party' in Rule 13(a) should include parties in privity with the formally named opposing parties." *Id.*

Even a cursory review of Sigma's Complaint shows that a logical relationship exists between the claims made therein and the FCA action as both "arise out of the same nucleus of operative facts." *See Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). As previously noted, the FCA Complaint alleged on its face that Sigma was importing Chinese Welded Outlets without paying the antidumping duties, named Sigma's suppliers or brokers, and disclosed that Island had obtained such information from a former employee of Sigma. *See* FCA Complaint at ¶¶ 55-63.

Here, Sigma's entire Complaint is premised on essentially the same proof, including the following allegations: (1) that the identity of Sigma's Chinese suppliers from whom it imported

Chinese Welded Outlet without paying a 182.9% duty were somehow "trade secrets," (2) that such "trade secrets" were misappropriated by Island to bring its successful FCA Action, and (3) that these same "trade secrets" were disclosed in the FCA Action.[2]  Sigma alleges that "the court in the FCA Action relied on allegations that were based on confidential supplier information that Mr. Paquette provided;" that Island's employee "testified about the information that Mr. Sanders obtained from Mr. Paquette" and that Island used Sigma's trade secrets and confidential business information in the FCA Action against Sigma. [D.E. 1 at ¶ 55-57.]

The claims in the Sigma Complaint are thus inextricably linked to the FCA Action.  They require substantially the same evidence as the FCA Action, which Sigma clearly understood based on its attorney's cross-examination of Mr. Woehrel (Island's National Sales Manager) at trial:

Q. As part of your investigation with Mr. Sanders, into whether you had trade remedies available to Island, you undertook to determine whether Sigma and the other importers -- who their SUPPLIERS were in China?

A. Yeah. We knew they were in China, because the product is marked "Made in China." But, yeah, we wanted to find out who those suppliers were if we could.

Q. Different duties apply to different suppliers, right?

A. They do.

Q. And for you to know whether a particular duty was being imposed, you needed to know who that foreign supplier was?

A. Yes. If we could determine that.

Q. One of the ways that you undertook to determine that was by contacting former employees or current employees of the importers, correct?

A. Yes.

Q. And one of the former employees whom you and Mr. Sanders contacted was Tom Paquette, correct?

---

[2] Sigma's Complaint contains two paragraphs which mention unfair competitive advantage; however, these paragraphs are conclusory and are not supported by any specific allegations of fact as required by *Twombly* and *Iqbal*.  As explained below, the Court must disregard these two paragraphs.

A. I never contacted or talked to Mr. Piquet [sic]. But Mr. Sanders I believe did.

Q. You know he did because he told you, correct?

A. Correct.

Q. So as part of this investigation, Mr. Sanders was contacting a former employee of Sigma to get nonpublic information, right?

A. I'm not sure that it would necessarily be nonpublic across the industry. Some people freely share who they buy their products from on the website. So that type of information and who your vendors are, that information is shared freely. In fact, if you're a salesperson, that's one of the things you need to do is find out who your customers are buying from and what they are paying. And they will tell you.

Q. Well, if you knew the information about Sigma, you wouldn't -- Mr. Sanders wouldn't have needed to contact Tom Piquet [sic], right?

A. We knew -- Mr. Sanders was aware of the major Chinese manufacturers for a long time. Beijing Bell was one of them. That wasn't all of them. There was – Ji Ahn Nee (phonetic) was another. I think when Mr. Piquet [sic] said that Beijing Bell was a source of supplier from Sigma, that didn't surprise him. He already knew that. That was confirmation. And it was helpful to our investigation to confirm that.

Q. So is it your testimony that you contacted a former employee of Sigma to get confirmation of information that you knew or suspected?

A. Mr. Sanders contacted a former employee or – to get information that he willingly and freely gave to Mr. Sanders.

Exhibit 6 at 142:23-144:24.

Then, in his closing statements, Sigma's attorney told the jury:

And Mr. Woehrel acknowledged that as part of their pretrial investigation in this case, Island was contacting employees and former employees of competitors to get information to support this lawsuit. I ask you to consider whether that is ethical behavior on the part of Island.

Exhibit 7 at 119:7-12.

Thus, as the transcript makes clear, the evidence necessary to prove the claims brought in

the FCA Action (i.e., the identity of Sigma's foreign suppliers) is essentially the same proof that

15

would be necessary to establish the allegations in the Sigma Complaint (i.e., that the identities of Sigma's Chinese suppliers was somehow secret and "wrongfully" disclosed). Both the FCA Action and Sigma Trade Secret Complaint turns on the identities of Sigma's Chinese suppliers and Defendants' ability to establish same. Sigma admits as much in paragraphs 54 and 55 of its Complaint: "Island would not have been able to bring a claim against Sigma in the FCA Action without the information that Mr. Paquette provided to Island" and "In denying Sigma's motion to dismiss the Amended Complaint, the court in the FCA Action relied on allegations that were based on confidential supplier information that Mr. Paquette provided to Defendants."

Because the FCA Action and the Sigma Complaint are based on the same nucleus of operative facts, Sigma's claims were compulsory counterclaims under Fed. R. Civ. P. 13(a)(1). Because Sigma did not bring those claims in the FCA Action, it is precluded from doing so now, years later, in this forum. *See In re Piper Aircraft Corp.*, 244 F.3d 1289, 1297 (11th Cir. 2001). The second element of claim preclusion has been established.

**b.** **Both the FCA Action And The Sigma Complaint Involve The Same Parties Or Their Privies.**

The third element of claim preclusion is satisfied as well. Both Island and Sigma were parties in the FCA Action and are parties here. Moreover, Sanders was in privity with Island in the FCA Action. Privity for res judicata purposes "means a successor in interest to the party, one who controlled the earlier action, or one whose interests were adequately represented." *Sanders Confectionery Products, Inc. v. Heller Financial, Inc.*, 973 F.2d 474, 481 (6th Cir. 1992). A chairman of the board or president who controlled the actions of a prior corporate plaintiff are in privity with their corporations for purposes of res judicata. *Id.* Because Sanders, Island's president and majority owner, ran the company and controlled Island's decision making in the FCA Action, he was clearly in privity with Island in the FCA Action. *Confectionery Products* at 481; *Drier v.*

*Tarpon Oil Co.,* 522 F.2d. 199, 200 (5th Cir. 1975) (company president was in privity for collateral estoppel purpose).

Because Sigma failed to raise this compulsory counterclaim in the FCA Action, it is now barred from raising it, years later, in the instant retaliatory action against Defendants. *See, e.g., Taylor v. Sturgell*, 553 U.S. 880, 892 (2008); *Burch ex rel. U.S. v. Piqua Eng'g, Inc.*, 145 F.R.D. 452, 457 (S.D. Ohio 1992); Charles Alan Wright, *The Law of Federal Courts* § 79 at 527 (4th ed.1983); Restatement (Second) of Judgments § 22 (1982). Therefore, Defendants respectfully ask this Court to dismiss the Sigma Complaint with prejudice.

## III.  SIGMA'S COMPLAINT FAILS TO STATE A CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS

Sigma's Complaint must also be dismissed because it fails to allege sufficient facts to state a plausible claim for misappropriation of trade secrets as required by *Twombly* and *Iqbal*. *Twombly*, 550 U.S. at 557; *Iqbal*, 556 U.S. at 678.

The Sigma Complaint contains three counts: (I) violation of 18 U.S.C. § 1836(b) – Defend Trade Secrets Act ("DTSA"); (II) violation of the New Jersey Trade Secrets Act, N.J. Stat. § 56:15-1, et seq. ("NJTSA"); and (III) violation of the Tennessee Uniform Trade Secrets Act, Tenn. Code Ann. § 47-25-1701, et seq. ("TUTSA"). All three counts arise from exactly the same factual allegations—namely, the purported misappropriation of Sigma's trade secrets (the identities of its Chinese suppliers) by Island and Sanders. "Because the statutory schemes of the NJTSA and DTSA are 'substantially similar as a whole,' courts often combine the analyses of the two schemes." *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 905 n.11 (3d Cir. 2021). Likewise, the elements of a DTSA claim are "largely the same" as the elements of a TUTSA claim. *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, No., 2019 WL 5964531, at *5 (M.D. Tenn. Nov. 13, 2019); *BNA Assocs., LLC v. Goldman Sachs Specialty Lending Grp., L.P.*, No., 2022

WL 1449707, at *4 (M.D. Tenn. May 9, 2022). Sigma's Complaint fails to adequately plead the elements necessary to establish a violation of any of these statutes, and each count should therefore be dismissed.

### a. Sigma Fails To Adequately Allege That Its Supplier List Was Actually a Trade Secret

"Generally speaking, a trade secret is information that derives economic value from not being generally known or readily ascertainable. . . ." *ATS Grp., LLC v. Legacy Tank & Indus. Servs. LLC*, 407 F. Supp. 3d 1186, 1196 (W.D. Okla. 2019) (citing 18 U.S.C. § 1839). Failure to adequately allege that the "trade secret" has independent economic value is grounds for dismissing a DTSA claim pursuant to a 12(b)(6) motion. *See id.* at 1200. Obsolete or stale information does not have independent economic value. *See WebMD Health Corp. v. Dale*, No. 11-5827, 2012 WL 3263582, at *8 (E.D. Pa. Aug. 10, 2012) (preliminary injunction would not extend to information that was "updated on at least a yearly basis, if not more frequently," such that it "becomes obsolete or is otherwise discarded, replaced or merely dated"); *HUB Grp., Inc. v. Clancy*, No. Civ.A. 05-2046, 2006 WL 208684, at *5 (E.D. Pa. Jan. 25, 2006) (denying preliminary injunction and dissolving temporary restraining order where "[t]he evidence indicate[d] that the pricing data taken by [the employee] [was] already obsolete due to fluctuating fuel prices and other general rate changes"); *see also Fox Sports Net N., LLLC v. Minn. Twins P'ship*, 319 F.3d 329 (8th Cir. 2003) ("obsolete information cannot form the basis for a trade secret claim because the information has no economic value"); *Katch, LLC v. Sweetser*, 143 F.Supp.3d 854 (Minn. 2015) ("[I]nformation that has or will quickly become obsolete does not have the independent economic value to be considered a trade secret."). Therefore, obsolete or stale information cannot satisfy the definition of "trade secret" under any of the trade secret acts at issue.

18

Nowhere in its Complaint does Sigma allege that it was still utilizing the Chinese suppliers at the time the FCA Action was unsealed in 2019.   The reason for this is obvious – its own counsel *admitted* in the FCA Action that Sigma had imported the Chinese Welded Outlets "just during the period 2010 to early 2018." Exhibit 6 at 91:8-9.   Therefore, by the time the FCA Action was unsealed in 2019 and discovery began, Sigma's allegedly-confidential list of Chinese suppliers was already stale or obsolete *because Sigma was no longer even using those suppliers.*   Thus, the supplier list lacked any independent economic value by the time the FCA complaint was unsealed.

Additionally, Sigma fails to adequately allege how its now former Chinese suppliers were not either generally known or readily ascertainable.   While Sigma alleges in paragraph 39 that the "suppliers are not commonly known," the record in the FCA Action contradicts this allegation. Sigma filed a motion to dismiss in the FCA Action in which Sigma stated that Island's claims were based on publicly available government shipping records.  *See* Exhibit 2.   At trial, the uncontested testimony of Mr. Woehrel established that Defendants subscribed to a publicly-available third-party service called Import Genius and obtained Sigma's import records, which identify Sigma's suppliers in China.   Exhibit 6 at 130:12-131:12.   Sigma's import  records were admitted as trial exhibits in the FCA Action and are attached hereto as Exhibit 5.

Mr. Woehrel also testified, again uncontested, that Defendants simply "did internet searches.  And looked up all the Chinese Manufacturers." Exhibit 6 at 131:6-7.   It has been noted that where the identity of a party's "suppliers is publicly available through customs reports and industry resources [such as] Import Genius," the identity of the suppliers cannot be considered a "trade secret." *PrimeSource Bldg. Prod., Inc. v. Huttig Bldg. Prod., Inc,* 2017 WL 7795125, at *13 (N.D. Ill. Dec. 9, 2017).   Given that the FCA Action, which is relied upon by Sigma in its Complaint, contradicts its allegations that its suppliers are not known, such allegations should be

disregarded. *See Kreipke v. Wayne State Univ.,* 807 F.3d 768, 782 (6th Cir. 2015) (noting that when a document contradicts allegations in a complaint, the document trumps the complaint); *Williams v. CitiMortgage, Inc.,* 498 Fed. Appx. 532, 536 (6th Cir. 2012) (same). Again, Sigma has failed to adequately allege that it gained any economic value from keeping its suppliers secret (because the suppliers were never actually a secret). Therefore, Sigma has failed to allege a required element of a trade secret claim, and its complaint should be dismissed.

b.    **Sigma Fails To Allege What Reasonable Measures It Took To Protect Its Trade Secrets**

To qualify as a "trade secret" under the DTSA, its owner must show that it took "reasonable measure[s] to keep such information secret." 18 U.S.C. § 1839. Similarly, the definitional provisions of both the NJTSA and TUTSA provide that, to qualify as a trade secret, the information must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." N.J.S.A. 56:15-2; T.C.A. § 47-25-1702(4)(B).

A trade secret plaintiff's failure to adequately allege that it took reasonable measures to protect its purported trade secrets may be decided on a motion to dismiss. A recent decision by the U.S. District Court for the Southern District of New York on a motion to dismiss plaintiff's DTSA claim is particularly instructive:

> [T]o adequately allege a trade secret, Plaintiff must show that (i) it took reasonable measures to keep it secret; and (ii) the product derives independent economic value. Plaintiff's claim fails at the first prong.
>
> The [Proposed Amended Complaint ("PAC")] merely alleges that engineers working on the Grow Light were informed by Defendant to not discuss the project with anyone inside or outside the company. (PAC ¶ 42.) "There is not a single definition for what constitutes 'reasonable measures,' though [courts have] looked to physical security measures at facilities and confidentiality agreements relating to sensitive information." *Charles Ramsey Co., Inc. v. Fabtech-NY LLC*, No. 1:18-CV-0546 (LEK/CFH), 2020 WL 352614, at *15 (N.D.N.Y. Jan. 21, 2020) (citing *United States v. Shanshan Du*, 570 F. App'x 490, 500 (6th Cir. 2014)). Here,

the PAC is silent as to any security measures or confidentiality agreements Plaintiff required Defendant and other employees to adhere to.

Further, while informing employees that certain information is a trade secret can be a reasonable measure, this is generally not sufficient without more, and Plaintiff has cited no case law to the contrary. *See id.* ("While advising employees that certain information is a trade secret can be an example of a reasonable measure . . . the Court has found no case in which this measure alone was sufficient to state a [Defend Trade Secrets Act] claim."). While Plaintiff alleges employees were instructed not to discuss the Grow Light, without more, the PAC has failed to allege or show Plaintiff took reasonable measures to keep the product secret.

*Altman Stage Lighting, Inc., v. Julie Smith,* 2022 WL 374590, at *5 (S.D.N.Y. Feb. 8, 2022).

Similarly, the United States District Court for the Middle District of Tennessee has recently dismissed a complaint for failure to state a claim under both TUTSA and DSTA because the plaintiff had failed to adequately allege that it had taken reasonable measures to protect its alleged trade secret, the purchase price of particular real estate. *BNA Assocs., LLC v. Goldman Sachs Specialty Lending Grp., L.P.*, 2022 WL 1449707, at *4 (M.D. Tenn. May 9, 2022) ("Here, BNA did not make reasonable efforts to maintain the secrecy of the Proposed Price.") In *BNA*, the court noted that Plaintiff's allegations that it "required prospective investors to keep that information secret and only disclosed the price to its employees on a need-to-know basis" was not sufficient to state a claim under DTSA and TUTSA, particularly when the Complaint indicated that Plaintiff made the information available to other parties. *Id.*

Here, Sigma's Complaint contains nothing beyond a few, very conclusory paragraphs regarding the measures it purportedly took to maintain the secrecy of its Chinese suppliers:

- "Sigma takes reasonable measures to keep its trade secrets and confidential business information secret." [D.E. 1, Complaint ¶ 29.]

- "Sigma took reasonable steps to protect these secrets." [*Id*. at ¶¶ 81 & 94.]

21

- "Mr. Paquette owed an implicit and explicit fiduciary duty to Sigma to maintain the confidentiality of the trade secrets and confidential business information he learned during the course of his employment with Sigma. . . ." [*Id.* at ¶ 36.]

- "Mr. Paquette had a duty to maintain the secrecy of these trade secrets. . . ." [*Id.* at ¶¶ 82 & 95.]

Nowhere does Sigma identify even a single step it took to protect its purported trade secrets. Nowhere does Sigma allege how its former employee, Mr. Paquette, owed any "fiduciary duty" that would be applicable here, much less explain how such duty would extend beyond the termination of his employment. Moreover, even if Sigma had pled that it had an actual non-disclosure or confidentiality agreement with Mr. Paquette (which, notably, it does not), that fact alone would not be enough to adequately plead that Sigma took reasonable measures to protect its purported trade secrets. *See Altman Stage Lighting, Inc., v. Julie Smith,* 2022 WL 374590, at *5 (S.D.N.Y. Feb. 8, 2022).

Finally, not only does Sigma's Complaint fail to adequately allege any "reasonable measures" it took to protect its alleged "trade secrets," it acknowledges that it refrained from taking such measures during the FCA Action when it had the opportunity to do so. Specifically, Sigma alleges that it was somehow damaged because Island revealed its trade secrets – the identities of its former Chinese suppliers – in the FCA Action. But Sigma's allegations that Island violated the Protective Order in the FCA Action in doing so is contrary to the plain language of that order. [Complaint ¶ 62-66.] *See* Exhibit 3.

The purpose of the Protective Order was to allow a party producing documents to designate them as confidential. The Protective Order defines a "Designating Party" as "a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as

'Confidential.'" *See* Exhibit 3.  Nothing in the Protective Order allows a party receiving documents from another party to require the producing party to designate those particular documents as "Confidential."  While Sigma alleges that it requested that Island mark certain documents as "Confidential" and that Island refused to do so, the express language of the Protective Order contains no such requirement.  And more importantly, Sigma never filed a motion with the court in the FCA Action to have such documents marked as "Confidential."  Filing a motion would have been the appropriate response to such a discovery dispute. *See* Fed. R. Civ. P. 26(c)(1); Exhibit 4.  Instead, Sigma chose to do nothing about this "disclosure" of its purported trade secrets until now, two years later.

It is clear that under *Twombly* and *Iqbal*, Sigma's bare, conclusory allegations regarding the measures it took to protect its purported trade secrets must be disregarded by the court because they are not plausibly supported by the facts as pled. *See Mitchell through Mitchell v. Cmty. Mental Health of Cent. Michigan*, 243 F. Supp. 3d 822, 832 (E.D. Mich. 2017). Because Sigma's Complaint fails to adequately allege the reasonable measures it took to protect its supplier list and because it disclosed its foreign suppliers in public import records, it fails to state a claim under the DTSA, NJTSA, and TUTSA.  The Complaint should therefore be dismissed.

### c.  Sigma Fails To Allege That Defendants Intended to Cause Injury

To prevail on a claim of misappropriation of trade secrets under the DTSA, a plaintiff must show (i) that it held a protectable trade secret, (ii) that defendants misappropriated that secret and (iii) that it suffered damages as a result. *MWG Enterprises, LLC v. ETS Wound Care, LLC,* 2022 WL 503727 (E.D. Mo. February 18, 2022).  In addition, liability under the DTSA attaches only when a trade secret – one that satisfies the statutory definition – is misappropriated by a party

"intending or knowing that the offense will[,] injure any owner of that trade secret." 18 U.S.C.
§ 1832

Sigma alleges that the identity of its suppliers from whom it purchased Chinese Welded
Outlets without paying a 182.9% anti-dumping duty is a trade secret, and that Island and Sanders
somehow misappropriated this information. However, Sigma does *not* allege that Defendants ever
purchased a single product from these Chinese suppliers or in any way prevented such suppliers
from continuing to sell Chinese Welded Outlets to Sigma. Similarly, Sigma does not allege that
any of Sigma's other competitors began purchasing Chinese Welded Outlets from Sigma's
Chinese suppliers as a result of any "disclosure" of this information in the FCA Action.

Instead, Sigma alleges only that Island and Sanders used their knowledge of the identities
of Sigma's Chinese suppliers to bring the FCA Action "so that Island could gain a competitive
advantage," [D.E. 1 at ¶ 6], and that Defendants "acquired Sigma's trade secrets to injure Sigma."
[D.E. 1 at ¶ 84.] There are no other allegations that Defendants sought information about the
identities of Sigma's suppliers in China for any reason whatsoever other than to prove the elements
of its cause of action under the False Claims Act which, as noted above, was ultimately successful.
Given that a judgment was entered against Sigma in the FCA Action, Defendants' filing of the
FCA Action was clearly justified.

Thus, Sigma has failed to adequately plead that Island or Sanders intended to cause injury
or knew that Sigma would be injured, and the Complaint should also be dismissed for that reason.

### d.    Sigma Has Not Identified Any Remedies To Which It Is Entitled

To state a claim under DTSA, a complaint must allege (1) that plaintiff owned a trade
secret, (2) that defendant misappropriated the trade secret, and (3) that plaintiff was damaged by
defendant's actions. *Navigation Holding, LLC v. Molavi*, 445 F.Supp.3d 69, *78 (N.D. Cal. 2020)

24

(citing *Alta Devices, Inc.* 343 F.Supp.3d 868, 880-81 (N.D. Cal. 2018). In paragraphs 69-75 of the Sigma Complaint, Sigma alleges that it was "damaged" in three ways: (1) it was damaged because it was found liable by the jury in the FCA Action for failing to pay required duties; (2) it was damaged because Island and Sanders disclosed the identities of its suppliers in the FCA Action; and (3) it was damaged because Island and Sanders somehow received a competitive advantage when information about its suppliers was so disclosed. None of these conclusory allegations regarding its alleged damages is sufficient to state a claim under applicable law.

The DTSA, the NJTSA and the TUTSA allow for the same remedies: injunctive relief to protect the trade secret going forward[3] and monetary damages for actual loss plus any unjust enrichment caused by the misappropriation that is not addressed in the calculation of damages for actual loss or a reasonable royalty. *See* 18 U.S.C.A. § 1836 (West); N.J.S.A. 56:15-4; T.C.A. § 47-25-1704.

Sigma's assertion that "[e]very dollar awarded to Island in the FCA Action constitutes unjust enrichment as a result of misappropriated trade secrets," [Complaint at ¶ 72], defies reason. Unjust enrichment is measured by the profits obtained by the defendant from using the trade secret. *LinkCo, Inc. v. Fujitsu Ltd.*, 232 F.Supp.2d 182, 185 (S.D.N.Y. 2002); *Electro-Miniatures Corp. v. Wendon Co.,* 771 F.2d 23, 27 (2d Cir. 1985). Sigma fails to allege how Island profited by using its alleged trade secrets, other than in prevailing in the FCA Action.

The FCA reflects Congress judgment that awarding whistleblowers helps to protect the government's fiscal interest. The FCA also contains provisions regarding when and how Courts should limit or entirely deny an award based on the whistleblower's misconduct (e.g., if the

---

[3] Defendants are aware that Sigma's complaint also seeks injunctive relief "compelling Defendants to return or destroy Sigma's trade secrets that are in Defendants' possession" and "barring Defendants from using or disclosing Sigma's trade secrets in the future," Sigma pleads no facts which state a plausible claim that it would be irreparably damaged if the names of suppliers which it ceased using four years ago were used or disclosed by Island.

whistleblower is charged criminally). Allowing adjudicated fraudsters to recoup from whistleblowers would frustrate Congress's purpose in providing for financial awards in the first place. Sigma's contention that the judgment amounts to "unjust enrichment" is essentially an invitation to have this Court re-decide the FCA Action.

Moreover, as noted above, Sigma asked the jury in the FCA Action to consider Defendants' own "behavior" in "contacting employees and former employees of competitors to get information to support this lawsuit;" however, the jury still found Sigma liable on Island's claims. Exhibit 7 at 119:7-12. Thus, a jury has already decided that Sigma was liable under the FCA despite Sigma's allegation of wrongdoing by Defendants, and this Court is not the appropriate forum for reviewing the propriety of the jury's decision in the FCA Action. Indeed, from a policy perspective, the idea that a party can lose a case in one court and then sue the prevailing party in another court, alleging that the prevailing party was "unjustly enriched" by the amount of the judgment would completely undermine the entire legal system.

Second, Sigma's assertion that it is entitled to damages based on Defendants' disclosure of its "trade secrets" in the FCA Action is, quite frankly, absurd. If Sigma believed the documents identifying its Chinese suppliers discussed in paragraphs 61-68 of its Complaint were entitled to protection, the correct course of action would have been to file a motion *in the FCA Action* requesting that that court enter an order protecting the documents from disclosure. If Sigma believed that Defendants violated a protective order in the FCA Action, then the correct course of action would have been to file a motion for contempt in that case. But Sigma never filed anything in the FCA Action – as this Court can see by reviewing the docket in the FCA Action which is attached hereto as Exhibit 4. *See Northville Downs v. Granholm*, 622 F.3d 579 (6th Cir. 2010) ("a

court may consider matters of public record in deciding a motion to dismiss without converting the motion to one for summary judgment.").

Third, many of the documents identifying its Chinese suppliers which Sigma now complains about were ultimately entered as evidence and are thus a matter of public record. *See id.* Once again, Sigma took no action to protect those documents from disclosure. *See* Exhibit 4. Yet, Sigma seeks to have this Court determine that the discovery and admitted evidence presented in the FCA Action before a U.S. District Court in California should have been treated confidentially, even though Sigma sat on its hands and took no action to prevent such disclosure. Nowhere in the Sigma Complaint are there any allegations that explain why Defendants were responsible for Sigma's inaction in protecting its own "trade secrets."

Fourth, Sigma's 109-paragraph Complaint contains only two paragraphs (¶¶ 74 & 75) that suggest that Defendants damaged Sigma in a manner unrelated to the FCA Action. Both paragraphs are made "upon information and belief" and contain nothing more than conclusory statements that somehow Defendants have obtained a "competitive advantage." Sigma has not made a single specific allegation as to *how* Defendants have used Sigma's purported "trade secrets" about the identifies of its Chinese suppliers, other than in connection with its successful prosecution of the FCA Action, much less how Defendants gained any "competitive advantage" thereby. Similarly, Sigma makes no factual allegations that the alleged disclosure of the names of its *former suppliers* in discovery in the FCA Action were used by any of its FCA co-defendants to Sigma's detriment. In fact, Sigma does not allege that Defendants or the FCA co-defendants have made use of Sigma's suppliers or interfered with Sigma's relationship with those suppliers in any way. Under *Twombly* and *Iqbal*, conclusions may not be accepted as true unless they are plausibly supported by the pleaded facts. Sigma has pled no facts to support its conclusion that Defendants

have used its "trade secrets" for competitive advantage. Therefore, those allegations in paragraphs 74 and 75 must be disregarded by the Court in determining this motion. *See Mitchell through Mitchell v. Cmty. Mental Health of Cent. Michigan*, 243 F. Supp. 3d 822, 832 (E.D. Mich. 2017).

Finally, Sigma's allegations that Island was found liable for misappropriation of trade secrets in a wholly-separate lawsuit filed by Anvil, another competitor in the industry, does nothing to rescue Sigma's facially-deficient Complaint. To begin with, Defendants have appealed that judgment to the U.S. Court of Appeals for the Sixth Circuit, which appeal is still pending. Second, Anvil was dismissed from the FCA Action before trial so that, unlike Sigma, Anvil's claims could not have been considered by a jury in the FCA Action and are not barred by the doctrine of claim preclusion like Sigma's are. Finally, the fact that Defendants were found liable to Anvil in a separate lawsuit is not enough to satisfy the standard established by *Twombly* and *Iqbal*. There were no findings in the Anvil matter that Defendants were liable to Sigma for anything. Simply stated, Sigma's allegations that Defendants were found liable for trade secret misappropriation in a separate lawsuit *that did not involve Sigma or information about Sigma's Chinese suppliers* is irrelevant and inadmissible here.[4]

Because Sigma has failed to satisfy the requirements of Rule 12(b)(6), its Complaint should be dismissed. Sigma has failed to allege any damages allowed by the trade secrets acts. Sigma's attempt to tack on a claim that Defendants have used its "trade secrets" to gain a competitive advantage is totally devoid of any factual content, and the reasoning is clear from the other 107 paragraphs of the Complaint: this is nothing more than an attempt to retaliate against Defendants for successfully litigating the FCA Action. Sigma's Complaint should be dismissed with prejudice.

---

[4] Sigma attempted the same tactic in the FCA Action but as the Court noted there: "What another jury did has nothing to do with what this jury has to decide, Counsel." Exhibit 6 at 152:23-24.

## IV.     18 U.S.C. § 1833 BARS ALL THREE COUNTS OF SIGMA'S COMPLAINT.

Finally, separate and apart from the grounds described above, Sigma's Complaint should also be dismissed because Defendants are immune from liability in this case pursuant to 18 U.S.C. § 1833.

Specifically, 18 U.S.C. § 1833(b) provides as follows:

(b) Immunity from liability for confidential disclosure of a trade secret to the government or in a court filing.—

> (1) **Immunity.**--An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that—
>
> > **(A)** is made—
> >
> > > **(i)** in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and
> > >
> > > **(ii)** solely for the purpose of reporting or investigating a suspected violation of law; or
> >
> > **(B)** is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

Section 1833 codifies "the strong public policy in favor of protecting whistleblowers who report fraud against the government."[5]  Such an exemption is necessary given that the FCA requires that a relator turn over all material evidence and information to the government when bringing a *qui tam* action. *See* 31 U.S.C. § 3730(b)(2).  By providing immunity, Congress was attempting to safeguard whistleblowers from the very type of retaliation that Sigma is attempting here.  Section 1833 reflects Congress's decision that the benefit provided by whistleblowers such

---

[5] *See United States v. Cancer Treatment Ctrs. of Am.,* 350 F.Supp.2d 765, 773 (N.D. Ill. 2004) (holding that a relator was exempt from liability for breach of a confidentiality agreement for the disclosure to the government of documents that showed employer had engaged in fraudulent healthcare billing practices); *U.S. ex rel. Ruhe v. Masimo Corp.*, 929 F. Supp. 2d 1033, 1039 (C.D. Cal. 2012) (holding that plaintiffs could not be held liable for violating non-disclosure agreements when such disclosure occurs in order to expose a fraud against the government.)

as Defendants outweighs any harm that might have been caused by such a whistleblower's

violation of *any* trade secrets act, federal or state. Allowing companies that are found liable in

FCA actions for defrauding the federal government – as Sigma was shown to have done – to turn

around and sue the whistleblower would obviously have a chilling effect on enforcement.

Congress intended to avoid this result by granting immunity to whistleblowers who successfully

pursue FCA claims within the parameters of § 1833. As a result, courts have held that defendants

found liable for FCA violations may not seek indemnification or contribution for their own

wrongful acts. *See, e.g., Cell Therapeutics, Inc. v. Lash Group, Inc.*, 586 F.3d 1204, 1209 (9th

Cir. 2009); *United States ex rel. Madden v. General Dynamics Corp.*, 4 F.3d 827, 830-31 (9th Cir.

1993); *Mortgages, Inc. v. United States Dist. Ct. for the Dist. Of Nev. (Las Vegas)*, 934 F.2d 209,

213 (9th Cir. 1991); *United States ex rel. Rigsby v. State Farm Fire and Casualty Co.*, 2015 WL

13649420, *5 (S.D. Miss. 2015).

As addressed more fully above, Sigma alleges that Defendants misappropriated its trade

secrets by disclosing the identity of its Chinese suppliers *in the course of the FCA action*. Indeed,

Sigma's entire Complaint is predicated on the contention that it was damaged by the alleged

disclosure of its "trade secrets" through Island's filing and prosecution of the FCA Action in which

Sigma was ultimately held liable for damages in excess of $26 million.[6]

The FCA Action was a *qui tam* action filed by Island *under seal* on behalf of the U.S.

Government. [*See* Complaint ¶ 16.] Exhibit 4. As in all such cases, after filing, the U.S.

---

[6]Sigma's Complaint contains sections titled "Defendants Obtained Information in an Effort to Develop a Claim Against Sigma **in the FCA Action**" and "Defendants Were Unjustly Enriched By Their Misappropriation of Sigma's Trade Secrets **in the FCA Action**." [*Id*. at ¶¶ 43-49 and ¶¶ 54-60 (emphasis added).] Paragraph 6 states that Defendants used the "trade secrets" to develop and maintain the FCA Action against Sigma. [*Id*.] Paragraph 72 specifically states that "Every dollar awarded to Island **in the FCA Action** constitutes unjust enrichment as a result of misappropriated trade secrets." [*Id*. (emphasis added).] The only other damages complained of with any specificity by Sigma are disclosure of "trade secrets" within documents that were filed as part of the FCA Action. Thus, it could not be clearer that all of Sigma's claims arise from the FCA Action.

government investigated the matter and determined whether to formally intervene as a plaintiff. If the government declines to intervene, the plaintiff may proceed on behalf of the government as a relator, which is exactly what happened here. Sigma does *not* allege that Defendants' purported acquisition, disclosure or use of these alleged trade secrets occurred other than specifically in connection with the disclosures made in the course of the FCA Action. Both subsections (A) and (B) of § 1833 are applicable here.

Accordingly, to the extent Sigma's Complaint seeks damages from Defendants for disclosing information in confidence – whether trade secret or not – to the U.S. government in connection with the FCA Action, Defendants are immune to suit under ***any*** federal or state trade secret law under subsection A. Likewise, because the FCA Action itself was indisputably filed under seal, subsection (B) is also satisfied. The fact that the complaint was later unsealed is irrelevant given that subsection (B) only requires that the complaint be *filed* under seal.

In summary, because Defendants are expressly immune from suit under ***any*** Federal or State trade secret law under 18 U.S.C. § 1833, Sigma's Complaint fails to state a claim upon which relief can be granted and should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) made applicable to this proceeding by Fed. R. Bank. P. 7012.

## V. DEFENDANTS ARE ENTITLED TO AN AWARD OF REASONABLE ATTORNEY'S FEES

Under DTSA, a prevailing party is entitled to an award of reasonable attorney's fees if the "claim of misappropriation is made in bad faith." 18 U.S.C.A. § 1836. As Defendants have outlined above, Sigma's claims are barred by well-established principles of claim preclusion and statute. Additionally, Sigma fails to allege any facts to support a claim under any of the three trade secret acts cited in the Sigma Complaint. After reviewing the Sigma Complaint in light of the FCA Action, it should be clear that Sigma is attempting to relitigate a case in which it was found

31

liable to the U.S. Government in excess of $26 million because it had knowingly submitted false importation documents to avoid paying a duty on its imported goods.

The Sigma Complaint is an attempt to derail Island's bankruptcy and force Defendants to pay for Sigma's unlawful behavior. In short, the Sigma Complaint is simply a deliberate strategic attempt to minimize the FCA Judgment which Defendants successfully obtained against Sigma. Given that there is clearly no viable claim in the Sigma Complaint, it should be clear that it was brought in bad faith.

Defendants would ask that the Court award them their reasonable attorneys' fees (to be decided at a separate hearing), or, in the alternative, grant Defendants leave to file a motion seeking such fees.

## CONCLUSION

WHEREFORE, Defendants pray that the Court dismiss Sigma's Complaint with prejudice for the reasons provided above, and award Defendants their reasonable attorneys' fees, and grant Defendants such relief as is consistent with this motion.

**GLANKLER BROWN, PLLC**

By: /s/ Ricky L. Hutchens
Michael P. Coury (TN #7002)
Ricky L. Hutchens (TN #34750)
6000 Poplar Avenue, Suite 400
Memphis, TN 38119
(901) 525-1322
(901) 525-2389 – facsimile
mcoury@glankler.com

Attorneys for Island Industries, Inc.

BURCH, PORTER & JOHNSON, PLLC

/s/Douglas F. Halijan
Douglas F. Halijan (BPR # 016718)

130 North Court Avenue
Memphis, Tennessee 38103
Phone: (901) 524-5000
Fax: (901) 524-5024
dhalijan@bpjlaw.com

Attorneys for R. Glenn Sanders

<u>CERTIFICATE OF SERVICE</u>

I, Ricky L. Hutchens, hereby certify that a true and correct copy of the foregoing  objection was sent via first class mail, postage prepaid, to parties listed on the court's matrix on the 27th day of June 2022:

Matrix

/s/ Ricky L. Hutchens_____
Ricky L. Hutchens

4862-7578-9606, v. 1

4862-7578-9606, v. 1

# EXHIBIT 1

1  Matthew H. Marmolejo (SBN 242964)
2   mmarmolejo@mayerbrown.com
   MAYER BROWN LLP
3  350 South Grand Avenue, 25th Floor
4  Los Angeles, CA 90071-1503
   Tel: (213) 229-9500
5  Fax: (213) 576-8185

6
   Kelly B. Kramer (pro hac vice)
7   kkramer@mayerbrown.com
8  MAYER BROWN LLP
   1999 K Street, NW
9  Washington, D.C. 20006
   Tel: (202) 263-3007
10 Fax: (202) 263-5207

11
   Attorneys for Relator
12 ISLAND INDUSTRIES, INC.

13

14

15              **UNITED STATES DISTRICT COURT**

16              **CENTRAL DISTRICT OF CALIFORNIA**

17 UNITED STATES OF AMERICA *ex*      Case No. 2:17-cv-04393 (RGK-KS)
18 *rel.* ISLAND INDUSTRIES, INC.,

19              Plaintiff,

20     vs.                            **FIRST AMENDED COMPLAINT
                                       FOR VIOLATIONS OF THE
21                                     FALSE CLAIMS ACT**
   VANDEWATER INTERNATIONAL
22 INC.; NEIL REUBENS; ANVIL
   INTERNATIONAL, LLC.; SIGMA
23 CORPORATION; SMITH COOPER
24 INTERNATIONAL; ALLIED RUBBER
   & GASKET COMPANY, and JOHN
25 DOES Nos. 1-10.,

26              Defendants.

27

28

731991839

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

EXHIBIT
Sanders 5
2-12-20
PENGAD 800-631-6989

1　　　　The United States of America *ex rel.* Island Industries, Inc. ("Relator"),

2　complaining of VANDEWATER INTERNATIONAL, INC. ("VANDEWATER");

3　NEIL REUBENS ("REUBENS"); ANVIL INTERNATIONAL, LLC ("ANVIL");

4　SIGMA CORPORATION ("SIGMA"); SMITH COOPER INTERNATIONAL

5　("SMITH COOPER"); ALLIED RUBBER & GASKET CO., INC. ("ARGCO");

6　and JOHN DOES NOS. 1-10 (collectively "Defendants"), alleges and says as

7　follows:

8　　　　　　　　　　　　　**INTRODUCTION**

9　　　　1.　　Relator is an American manufacturer of fire protection and steel piping

10　system supplies. Among other things, it manufactures carbon steel butt-weld pipe

11　fittings for use in fire protection systems. Specifically, Relator manufactures

12　grooved welded outlets. Others in the market manufacture grooved and female

13　threaded outlets. Because all of these products are designed to be welded to another

14　piece of pipe, they are all commonly referred to as "Welded Outlets." Relator

15　estimates that the domestic market for Welded Outlets is roughly $25 million

16　annually.

17　　　　2.　　Several Chinese companies, including, but not limited to, Beijing Bell

18　Plumbing Manufacturing Ltd. ("Beijing Bell"), Jinan Meide Casting Co., Ltd.

19　("Jinan Meide"), and Shanghai Vision Mechanical Joint Co., Ltd. ("Shanghai

20　Vision") (collectively, the "Chinese Manufacturers"), also manufacture Welded

21　Outlets ("Chinese Welded Outlets"). Other Chinese companies, including the

22　China-East Resources Import and Export Company, which is owned and controlled

23　by the Chinese government, assist the Chinese Manufacturers to export their

24　Chinese Welded Outlets to the United States.

25　　　　3.　　For more than 25 years, Chinese carbon steel butt-weld pipe fittings,

26　including Chinese Welded Outlets, have been subject to substantial antidumping

27　duties. In particular, as the Department of Commerce recently reiterated, Chinese

28　Welded Outlets are subject to antidumping duties of 182.9 percent. Obviously, this

731991839

- 1 -

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

substantial antidumping duty creates a powerful incentive for persons and companies to seek to evade its application when importing Chinese Welded Outlets.

4.    For more than a decade, Defendants, working in concert with the Chinese Manufacturers, the China-East Resources Import and Export Company, and JOHN DOES NOS. 1-10, have knowingly and intentionally evaded and avoided the substantial antidumping duties on Chinese Welded Outlets.  Defendants have used various and shifting means to evade the antidumping duties, including: (a) by falsely describing the Chinese Welded Outlets as steel products that are not subject to antidumping duties; (b) by falsely claiming that the Chinese Welded Outlets originated in countries (e.g., Vietnam or South Korea) that are not subject to antidumping duty orders; and (c) by co-mingling the Chinese Welded Outlets with larger shipments of similar products that are not subject to antidumping duties.  In all such cases, however, Defendants and their agents have made knowingly false statements to United States Customs and Border Protection ("CBP"), to wit, that shipments containing Chinese Welded Outlets were not subject to antidumping duties when, in truth and fact, they were.

5.    On information and belief, during the past five years alone, Defendants imported or facilitated the importation of at least $50 million of Chinese Welded Outlets without paying the applicable 182.9 percent antidumping duty; indeed, Defendants imported these products without paying *any* antidumping duties. Accordingly, in just the past five years, Defendants' false statements and unlawful actions have deprived the United States of more than $90 million in antidumping duties.  Moreover, the damage to the United States dating back to 2004 likely exceeds $200 million.

## PARTIES, JURISDICTION, AND VENUE

6.    Relator is a corporation organized and existing under the laws of the State of Tennessee.  Relator's headquarters and home office is in Memphis, Tennessee.  Relator, through its officers, directors, agents, and employees, is the

731991839                                   - 2 -
**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

Case 2:22-cv-00306-JRM-19-1  Document 61-2  Filed 06/27/22  Page 4 of 26  Page ID #:539
Case 2:17-cv-04393-RGK-KS  Document 62  Filed 06/23/22  Page 5 of 27  Page ID #:156
FCA Complaint

1 | original source of the allegations delineated herein, which it bases upon its own

2 | knowledge, investigation, and observation.

3 |      7.     VANDEWATER is a corporation organized and existing under the

4 | laws of the State of Florida. VANDEWATER's headquarters and home office is in

5 | Plantation, Florida. VANDEWATER transacts substantial business throughout the

6 | United States and imported the goods at issue here through this and other judicial

7 | districts. REUBENS is the President and Chief Executive Officer of

8 | VANDEWATER and a resident of Florida.

9 |      8.     ANVIL is a limited liability company organized and existing under the

10 | laws of the State of Delaware. ANVIL's headquarters and home office is in Exeter,

11 | New Hampshire. ANVIL transacts substantial business throughout the United

12 | States and imported the goods at issue here through this and other judicial districts.[1]

13 |      9.     SIGMA is a corporation organized and existing under the laws of the

14 | State of New Jersey. SIGMA's headquarters and home office is in Cream Ridge,

15 | New Jersey. SIGMA transacts substantial business throughout the United States

16 | and imported the goods at issue here through this and other judicial districts.

17 |      10.    SMITH COOPER is a corporation organized and existing under the

18 | laws of the State of California. SMITH COOPER's headquarters and home office

19 | is in Commerce, California. SMITH COOPER transacts substantial business

20 | throughout the United States and imported the goods at issue here through this and

21 | other judicial districts.

22 |      11.    ARGCO is a corporation organized and existing under the laws of the

23 | State of California. ARGCO's headquarters and home office is in Carlsbad,

24 | California. ARGCO transacts substantial business throughout the United States and

25 | imported the goods at issue here through this and other judicial districts.

26 |      12.    Upon information and belief, JOHN DOES #1-10 are entities and

27 |

28 |

---

[1] In April 2019, ANVIL and SMITH COOPER announced that they intended to merge. In May, ANVIL and SMITH COOPER announced that they had successfully completed the merger.

731991839

- 3 -

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

1   individuals whose names and addresses are unknown. JOHN DOES #1-10 include,

2   but are not limited to, the customs brokers, freight forwarders, and logistics

3   companies that facilitate the Defendants' efforts to evade and avoid the

4   antidumping duties on Chinese Welded Outlets.

5       13.   This Court has original federal question jurisdiction over the claims

6   asserted herein pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3730(b).

7       14.   Venue is proper here pursuant to 28 U.S.C. § 1391(b)(2) and 31 U.S.C.

8   § 3732(a) because a substantial part of the events giving rise to the claim and many

9   of the false claims occurred in this judicial district. Specifically, it appears from

10   Import Genius records that Defendants imported the bulk of the Chinese Welded

11   Outlets at issue here through the Ports of Long Beach and Los Angeles, California.

12               **FACTUAL ALLEGATIONS**

13                   **The Products**

14       15.   Welded Outlets are typically used in fire protection systems.

15   Accordingly, they are always tested, listed, and approved by Underwriters

16   Laboratory ("UL") and FM Global ("FM"). Welded Outlets are or have been

17   marketed in the United States under a variety of names, including "Sprink-let,"

18   "Weld-Out-Let," "Weld-O-Let," "Welding Outlet," "Pipe Outlet," "Safe-Let,"

19   "Uni-Let," "COOPLET," "UL-FM O-Let," "T-Let," "SPF-OLET," "Groove-O-

20   Let," "Grooved Outlet," "Grooved Shaped Nipples," and others.

21       16.   In their marketing materials, Defendants (and the Chinese

22   Manufacturers) virtually *always* describe their Chinese Welded Outlets accurately

23   (*e.g.*, each Defendant markets its products as "welded outlets"). By contrast, in the

24   public shipping records, Defendants virtually *never* use the term "welded outlet."

25   On information and belief, Defendants avoid the term "welded outlet" in their

26   shipping records because they know that phrase would be likely to cause the U.S.

27   government to impose antidumping duties.

28

731991839                        - 4 -

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

**The Antidumping Duty Orders**

17.     In December 1986, the U.S. International Trade Commission
("Commission") determined that a U.S. industry was materially injured or
threatened with material injury by reason of carbon steel butt-weld pipe fittings
from Taiwan that the Department of Commerce ("Commerce") had determined
were priced at less than fair value.  In June 1992, the Commission made the same
determination with respect to Chinese carbon steel butt-weld pipe fittings.

18.     Relying on these findings, Commerce imposed antidumping duties on
Taiwanese butt-weld pipe fittings in December 1986, *see* 51 Fed. Reg. 45152 (Dec.
17, 1986), and on Chinese butt-weld pipe fittings in July 1992, *see* 57 Fed. Reg.
29702, 29703 (July 6, 1992).  Commerce imposed antidumping duties of 182.9
percent on most Chinese suppliers, including all of the known suppliers of Chinese
Welded Outlets. *See id.*

19.     The scope of the antidumping duty orders against Taiwan and China is
substantively identical.  Both orders cover:

> carbon steel butt-weld pipe fittings, having an inside
> diameter of less than 14 inches, imported in either
> finished or unfinished form. *These formed or forged pipe
> fittings are used to join sections in piping systems where
> conditions require permanent, welded connections*, as
> distinguished from fittings based on other fastening
> methods (*e.g.*, threaded, grooved, or bolted fittings).

57 Fed. Reg. 29702, 29703 (July 6, 1992) (China) (emphasis added); 51 Fed. Reg.
45152 (Dec. 17, 1986) (Taiwan) (stating that the order applies to "carbon steel butt-
weld type fittings, other than couplings, under 14 inches in diameter, whether
finished or unfinished").

20.     Commerce has repeatedly renewed these antidumping duties.  In 2016,
Commerce elected to maintain the existing antidumping duty orders on carbon steel
butt-weld pipe fittings from China, Taiwan, and elsewhere. *See* 81 Fed. Reg. 57562
(Aug. 23, 2016) (announcing decision).  Accordingly, at all times relevant to this

1    Complaint, the 182.9% antidumping duty on most Chinese butt-weld pipe fittings,

2    including Chinese Welded Outlets, has been in effect.

3        21.    The antidumping duty is assessed at the time of import. Every entry of

4    goods into the United States requires the importer, shipper, or customs broker to

5    complete an "Entry Summary," known as CBP Form 7501, that asks for (among

6    other things) an "Entry Type." Imported goods subject to an antidumping or

7    countervailing duty must be identified as such in the "Entry Type" field.

8        22.    Assessment of the antidumping duty largely relies on self-reporting.

9    Because Customs only inspects a very small percentage of all foreign imports that

10   come through U.S. ports, there is ample opportunity to evade the antidumping duty

11   by falsely completing the CBP Form 7501.

12                **A 1992 Scope Ruling Confirms That Welded Outlets Are**
13                **Within The Scope Of The Antidumping Duty Orders**

14       23.    In October 1991, following a meeting with Customs, Lloyd Perkins

15   ("Perkins") wrote Commerce to request a formal ruling that Welded Outlets—

16   specifically, Welded Outlets that were being marketed under the "Sprink-let" brand

17   name—were beyond the scope of the antidumping duty order against Taiwan. A

18   copy of that request is attached hereto as Exhibit A.

19       24.    Commerce rejected Perkins's request. Instead, Commerce ruled that

20   Welded Outlets were within the scope of the order because of their physical

21   characteristics (specifically, because they were used in piping systems where

22   conditions require permanent, welded connections).[2]

23       25.    The Chinese Welded Outlets at issue here are physically identical to

24   the "Sprink-Let" brand Welded Outlets. *Compare* Exhibit A (Sprink-Let) *with*

---

26   [2] *See* Memorandum from Roland MacDonald to Joseph Spetrini, Final Scope Ruling
     on Request by Sprink, Inc. to Exclude Sprink-let Carbon Steel Butt Weld Pipe
27   Fittings from the Antidumping Duty Order on Carbon Steel Butt-Weld Pipe Fittings
     from Taiwan at 2 (Mar. 18, 1992) ("Scope Ruling") (attached as Exhibit B); *see*
28   *also* 57 Fed. Reg. 19602, 19603 (May 7, 1992) (providing notice of the ruling).

731991839

                                    - 6 -

                **FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

1    Exhibits C (Beijing Bell), D (Jinan Meide), E (Shanghai Vision), F (Vandewater),

2    G (Anvil), H (Sigma) I (Smith Cooper) & J (ARGCO). They are used for an

3    identical purpose (i.e., in piping systems where conditions require permanent,

4    welded connections).

5        26.    Notwithstanding this Scope Ruling, Chinese Welded Outlets have

6    come to dominate the market. As described herein, Chinese Welded Outlets have

7    achieved their dominant market position only because Defendants and others have

8    avoided and evaded the applicable antidumping duties.

9                         **Relator's Investigation**

10        27.    To prepare its initial Complaint, Relator analyzed the historic

11    antidumping duty orders and scope rulings; undertook a painstaking review of

12    public and private import data; collected information and documents from the

13    Defendants' current and former agents, employees, and consultants; secured the

14    assistance of a confidential source; met with a variety of market players; and

15    assessed the significance and veracity of the information it collected based on its

16    historic experience in the Welded Outlet market.

17        28.    Relator's efforts revealed that the Defendants and their conspirators

18    have been knowingly and intentionally evading the antidumping duties applicable

19    to Chinese Welded Outlets since at least 2004. Tellingly, Relator's investigation

20    also revealed that Defendants price their Chinese Welded Outlets within pennies of

21    one another. Defendants' price levels are far too low to permit payment of the

22    antidumping duties. It would not be economically feasible for Defendants to price

23    their products at the levels at which they do unless they are all avoiding and

24    evading the antidumping duties.

25          **The 2018 Scope Rulings Reaffirm That Welded Outlets Are**

26            **Within The Scope Of The Antidumping Duty Orders**

27        29.    In 2017 and 2018, on information and belief, the Defendants became

28    aware of the United States' investigation into evasion of the antidumping duties

731991839

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

Case 2:22-cv-00386-JDW-1 Document 1 Filed 06/23/22 Page 45 of 58 Desc Exhibit 161
Case 2:17-cv-04393-RGK-KS Document 17 Filed 06/27/22 Page 10 of 27 Page ID #:544
FCA Complaint Page 9 of 26

1   applicable to Welded Outlets.  On information and belief, in 2018,

2   VANDEWATER, SIGMA, and SMITH COOPER sought to defeat the United

3   States' investigation by seeking formal scope ruling requests from Commerce.  In

4   their respective scope ruling requests, VANDEWATER, SIGMA, and SMITH

5   COOPER admitted both that they imported fully-finished Chinese Welded Outlets

6   and that they did not pay any antidumping duties when doing so.

7       30.   ISLAND opposed these scope ruling requests.  ANVIL, which

8   historically imported *unfinished* Chinese Welded Outlets, also opposed these scope

9   ruling requests.  After due consideration, Commerce ruled that Chinese Welded

10   Outlets are within the scope of the Chinese antidumping duty order.  Specifically,

11   Commerce found that the Welded Outlets imported from China by

12   VANDEWATER, SIGMA, and SMITH COOPER were all subject to the

13   antidumping duty order.[3]

14                 **Specific Allegations Regarding Vandewater**

15       31.   VANDEWATER is an importer and distributor of Chinese Welded

16   Outlets.  Although VANDEWATER historically purchased some American

17   Welded Outlets from Relator, it began exclusively importing and distributing

18   Chinese Welded Outlets in 2013.  Attached hereto as Exhibit F are

19   VANDEWATER product specifications for its Chinese Welded Outlets.

20       32.   VANDEWATER pioneered the importation of Chinese Welded

21   Outlets.  REUBENS began exploring the potential to import Chinese Welded

22   Outlets in 2003.  To determine the business plan's feasibility, REUBENS relied

23   heavily on a business associate ("CS1") who more recently agreed to provide

24

25

26

27

28

---

[3] *See* Memorandum from James Doyle to James Maeder, Final Scope Ruling on Smith-Cooper International Inc.'s Cooplet Weld Outlets (Dec. 20, 2018) (attached as Exhibit K); Memorandum from Christian Llinas to James Maeder, Final Scope Ruling on SIGMA Corporation's Fire-Protection Weld Outlets (Dec. 11, 2018) (attached as Exhibit L); Memorandum from Annathea Cook to James Maeder, Final Scope Ruling on Vandewater International Inc.'s Steel Branch Outlets (Sept. 10, 2018) (attached as Exhibit M).

731991839

- 8 -

1 information to Relator on a confidential basis. CS1, in turn, recruited Perkins to

2 assist in assessing REUBENS' business plan.

3      33.    In 2004, as part of this effort, REUBENS, CS1, and Perkins developed

4 documents reflecting VANDEWATER's anticipated costs, pricing, and profits for

5 Chinese Welded Outlets. REUBENS, CS1, and Perkins concluded that it would be

6 profitable for VANDEWATER to import and distribute Chinese Welded Outlets—

7 *but only if it paid no antidumping duties*.

8      34.    REUBENS, CS1, and Perkins knew that Chinese Welded Outlets were

9 subject to antidumping duties. After all, Perkins personally requested the "Sprink-

10 let" scope ruling and knew that Welded Outlets were subject to antidumping duties.

11 Nevertheless, REUBENS, CS1, and Perkins agreed to work together to import

12 Chinese Welded Outlets, to market them, and to share the profits from their sale.

13      35.    Over the years, Relator's President has personally observed

14 REUBENS, CS1, and Perkins promoting VANDEWATER's Chinese Welded

15 Outlets at trade shows.

16      36.    VANDEWATER began importing Chinese Welded Outlets under the

17 "CERIECO" brand name in 2004. Since that time, VANDEWATER has engaged

18 in various intentionally deceptive practices to avoid paying antidumping duties.

19 Those practices, which have evolved over time, include, but are not limited to, the

20 following:

21      a)    In February, April, and December of 2007, VANDEWATER imported

22           from China at least five shipments of "U-L FM Approved Steel Pipe-

23           O-Lets." Although these were Chinese Welded Outlets, the product

24           description includes a Harmonized Tariff Schedule ("HTS") code that

25           applied only to "Parts and Accessories for Motor Vehicles."

26           VANDEWATER has never supplied the automotive market.

27      b)    Between 2007 and 2012, VANDEWATER imported from China more

28           than 40 shipments of products it described as "UL FM Approved Steel

731991839

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

1   Pipe-O-Lets." Although these products were Chinese Welded Outlets
2   that were subject to the antidumping duty order, VANDEWATER paid
3   no such antidumping duties.

4   c)   In 2013, VANDEWATER began importing products it described as
5   "Grooved Outlets." Although these products were Chinese Welded
6   Outlets produced by Beijing Bell, VANDEWATER never paid the
7   antidumping duties. Based on Import Genius import records, it
8   appears that VANDEWATER sometimes evaded these duties in part
9   by falsely claiming that they were made in South Korea—a country
10   whose Welded Outlets are not subject to antidumping duties.

11   d)   On information and belief, VANDEWATER began falsely describing
12   Chinese Welded Outlets as "BLK Steel Coupling Blanks" in 2011.
13   Coupling blanks are beyond the scope of the antidumping duty order
14   on Chinese Welded Outlets. Although importation records reflect that
15   VANDEWATER imported more than 145,000 pounds of coupling
16   blanks between 2011 and 2015, VANDEWATER did not advertise
17   coupling blanks during this era.

18   e)   On information and belief, VANDEWATER imported more than five
19   million pounds of Chinese Welded Outlets that it falsely described as
20   "adaptors" between 2013 and 2016. (Adaptors are not subject to
21   antidumping duties.)

22   37.   All told, between 2013 and 2017, VANDEWATER imported more
23   than 180 shipments of Chinese Welded Outlets that collectively weighed more than
24   *eight million pounds.* Relator estimates that the import value of these products well
25   exceeded $10 million. All of these Chinese Welded Outlets were subject to
26   antidumping duties. On the relevant importation documentation, however,
27   VANDEWATER falsely described the products and falsely represented to the U.S.
28   government that the products were not subject to antidumping duties.

38.    REUBENS' behavior raises multiple red flags. Around 2004, REUBENS began making frequent trips to China. During these visits, he met with representatives of the state-owned China-East Resources Import and Export Company. On information and belief, the China-East Resources Import and Export Company authorized VANDEWATER to use the "CERIECO" brand name. ("CERIECO" is an acronym for the China-East Resources Import and Export Company.) Accordingly, in 2004, VANDEWATER filed a U.S. Trademark Application to use the "CERIECO" brand name, which was registered in 2005. VANDEWATER has used that trademarked name ever since.

39.    REUBENS's relationship with the China-East Resources Import and Export Company appears suspicious. The International Consortium of Investigative Journalists' Offshore Leaks Database reflects that REUBENS and Xing Guo, a Chinese national, own a Hong Kong Company known as Fonlingtel, Ltd. Moreover, Guo appears to have profited from the relationship: in 2013, she purchased an expensive villa in Florida and, in July 2015, she incorporated a for-profit corporation named "CERIECO INC." in the State of Florida.

40.    REUBENS' statements to Relator also raise red flags. For example, in February 2013, REUBENS telephoned Relator to advise that he would no longer purchase any Welded Outlets from Relator because VANDEWATER had its own factory in China. REUBENS then suggested that Relator could purchase Chinese Welded Outlets from VANDEWATER, finished or unfinished, with no "Made in China" markings. REUBENS suggested that Relator could stamp the product "Made in the USA" and sell it in the United States as domestic Welded Outlets. REUBENS stated that no one would ever find out about this arrangement because the Customs inspectors at the receiving ports were too busy to check the incoming shipments. Relator rejected this proposal.

41.    Around this same time, Perkins passed away, and REUBENS advised CS1 that he would no longer share profits from importing Chinese Welded Outlets.

Case 2:22-cv-00306-JDW-1 Document 19-1 Filed 06/27/22 Page 14 of 27 Page ID #:548
FCA Complaint
Case 2:17-cv-04393-RGK-KS Document 23 Filed 06/22/22 Page 13 of 26 Page ID #:548

1   CS1 then provided Relator with documents reflecting VANDEWATER's initial

2   pricing and profit assumptions. (Copies are attached as Exhibit N.) As noted

3   above, those pricing documents confirmed that VANDEWATER never intended to

4   pay any antidumping duties when importing Chinese Welded Outlets.

5       42.    After receiving these materials, Relator analyzed VANDEWATER's

6   pricing. After taking inflation in the steel markets into account, Relator confirmed

7   that VANDEWATER's pricing for "CERIECO" Welded Outlets in 2013 was

8   consistent with its initial pricing assumptions from 2003. In other words,

9   VANDEWATER could not have profited from importing and selling Chinese

10  Welded Outlets at the prices it quoted unless VANDEWATER was evading and

11  avoiding the antidumping duties.

12      43.    In 2016, as part of its investigation, Relator emailed Beijing Bell

13  directly to request a quote on Chinese Welded Outlets. REUBENS responded by

14  email several days later. He advised Relator that Beijing Bell had asked him to

15  respond because VANDEWATER held "the UL FM approval on the product" and

16  that it had an "exclusive relationship" with Beijing Bell. REUBENS further stated

17  that VANDEWATER would be willing to sell Relator Chinese Welded Outlets

18  bearing "the 'CERIECO' brand on them" and that they would be "shipped in

19  CERIECO cartons." REUBENS provided price quotes for Welded Outlets that

20  supposedly reflected the "duty, brokerage and handling."

21      44.    As it had in 2013, Relator again analyzed VANDEWATER's price

22  quote in 2016. After considering inflation in the steel markets, Relator determined

23  that VANDEWATER's pricing in 2016 was consistent with the pricing

24  assumptions from 2003. Relator further determined that it would not have been

25  economically feasible for VANDEWATER to sell Chinese Welded Outlets at the

26  prices it had quoted unless it was evading and avoiding the antidumping duties.

27      45.    In its May 2018 scope ruling request, VANDEWATER confirmed

28  what Relator alleged in the initial complaint: namely, that VANDEWATER

731991839

- 12 -

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

1  imports Chinese Welded Outlets without paying the applicable antidumping duties.

2  VANDEWATER has thus already admitted that it has long avoided paying the

3  antidumping duty order applicable to Chinese Welded Outlets.

4      46.    Based on the foregoing facts and Relator's investigation, upon

5  information and belief VANDEWATER and REUBENS entered into agreements

6  between themselves and with other individuals and entities (such as Beijing Bell,

7  China-East Resources Import and Export Company, and others known to

8  VANDEWATER and REUBENS but unknown at this time to Relator) to violate

9  the False Claims Act by falsely declaring that the Chinese Welded Outlets were not

10 subject to antidumping duties.

11                    **Specific Allegations Regarding Anvil**

12     47.    ANVIL has historically marketed several lines of Welded Outlets:  its

13 "Merit" brand was sourced in the United States while its SPF brand was

14 "internationally sourced."  On information and belief, the bulk of these

15 internationally-sourced products are manufactured, in whole or part, in China.

16 Attached hereto as Exhibit G are ANVIL's product specifications for its domestic

17 and Chinese Welded Outlets.

18     48.    Since 2012, Anvil has imported more than $5 million of Chinese

19 Welded Outlets every year.  Before that date, Anvil imported a lesser, but still

20 substantial, amount of Chinese Welded Outlets.  On information and belief, most of

21 the Chinese Welded Outlets that Anvil purchased were manufactured by Beijing

22 Bell or Jinan Meide.

23     49.    Despite its substantial purchases of Chinese Welded Outlets, the

24 import record suggests that ANVIL did not import *any* Chinese Welded Outlets.

25 The records instead reflect that one of ANVIL's subsidiaries has been importing

26 significant volumes of "merchant coupling blanks," "pipe fittings," "pipe nipples,"

27 and other products that are beyond the scope of the antidumping duty order on

28 Chinese Welded Outlets.  On information and belief, ANVIL avoids the

- 13 -

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

1  antidumping duties on its Chinese Welded Outlets by, among other things, falsely

2  describing its import products.

3      50.    Relator's investigation uncovered several reasons to believe that

4  ANVIL's import documentation was false and fraudulent.  First, as noted, ANVIL's

5  website describes its SPF-branded Welded Outlets as "internationally sourced."

6  Second, ANVIL's SPF-branded Welded Outlets do not feature country-of-origin

7  markings.  Third, unlike the other defendants, ANVIL has the technical ability to

8  thread or otherwise machine an unfinished product, which would make it easy for

9  ANVIL to import *unfinished* Chinese Welded Outlets (which are nevertheless

10  subject to antidumping duties) without accurately stating as much.  Fourth, the

11  publicly-available import records do not reflect any instance where ANVIL has

12  described its imported products as Welded Outlets (finished or unfinished).  Fifth,

13  ANVIL's own statements confirm that it imports Welded Outlets from China.

14      51.    For example, in September 2018, ANVIL announced that it would

15  increase its prices for certain products, including its "SPF Fire Protection O-Lets,"

16  as a result of the United States' decision to impose "a 10% tariff on a number of

17  goods imported from China; *including the ones Anvil imports from China*."  (Copy

18  attached as Exhibit O.)  ANVIL further noted that, because the tariff was

19  "immediate" and because it included "all product not already landed at a port of

20  entry," ANVIL would not be able to provide its customers with 30-days' notice.

21  Similarly, in October 2018, ANVIL announced that, in anticipation of a further

22  15% increase in tariffs on goods from China, it would be imposing a 15% price

23  increase on the same product lines, including its SPF Fire Protection O-Lets.  (Copy

24  attached as Exhibit P.)

25      52.    An ANVIL representative also orally advised an ISLAND

26  representative, as recently as January 2019, that its "internationally-sourced"

27  Welded Outlet is made in China, imported to the United States, and then threaded at

28  one of ANVIL's facilities in the United States.  On information and belief, when

731991839                                    - 14 -

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

1    ANVIL's Chinese Welded Outlets are imported, the contour and bevel are already

2    formed or forged into the product.

3         53.     Finally, Relator has confirmed that ANVIL's pricing for Chinese

4    Welded Outlets has been virtually identical to VANDEWATER's. Accordingly, it

5    would be economically infeasible for ANVIL to sell Chinese Welded Outlets at the

6    prices it charges unless it was evading and avoiding the antidumping duties.

7         54.     Based on the foregoing facts and Relator's investigation, upon

8    information and belief ANVIL entered into agreements with other individuals and

9    entities (such as Beijing Bell, Jinan Meide, and others known to ANVIL but

10    unknown at this time to Relator) to violate the False Claims Act by falsely

11    declaring that the Chinese Welded Outlets were not subject to antidumping duties.

12                     **Specific Allegations Regarding Sigma**

13         55.     SIGMA markets and sells at least three brands of Welded Outlets.

14    Two of these threaded outlet brands, the "Uni-Let" and the "Safe-Let" brands, are

15    sourced from China and marketed as import products. SIGMA also markets and

16    sells grooved outlets. Historically, SIGMA imported some grooved outlets from

17    China. More recently, SIGMA has been marketing grooved outlets that supposedly

18    are manufactured in the United States. On information and belief, however,

19    SIGMA's grooved outlets were actually manufactured in China. Attached hereto as

20    Exhibit H are SIGMA's product specifications for its Chinese Welded Outlets.

21         56.     In 2010, SIGMA hired Terry Clark ("Clark") as a Manager in its Fire

22    Protection Division. Throughout his long career, Clark has advocated using

23    Chinese Welded Outlets to develop product lines. In around 2005, for example,

24    Clark approached Relator with an offer to import the "Uni-Let" product from

25    China. After Relator declined this offer, Clark went to work for the fire protection

26    division of Unique Industrial Products Company ("Unique") in Sugarland, Texas,

27    which was eventually acquired by SIGMA.

28         57.     Around the time of Clark's hiring, SIGMA began importing its "Uni-

731991839

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

Let" and "Safe-Let" products.  Although these products are Chinese Welded Outlets, the shipping records suggest that SIGMA has not imported any Welded Outlets.  Instead, the import record reflects that, in around 2010, SIGMA began importing "parts of pipe fitting" into Los Angeles, California.  The volume of "parts of pipe fittings" imported by SIGMA is consistent with SIGMA's share of the Welded Outlets market.

58.    SIGMA also has imported and marketed grooved outlets.  In early 2011, for example, SIGMA's then-purchasing agent advised Relator that SIGMA had encountered extensive quality problems with its Chinese grooved outlets.  SIGMA asked Relator to determine whether it would be plausible to repair the grooved outlets, which were manufactured by Shanghai Vision.  After Relator advised that the products were not repairable, SIGMA began buying more domestically produced grooved outlets from Relator.  In late 2015, however, SIGMA advised Relator that it would no longer purchase product from Relator because SIGMA had discovered a new "low cost" source that offered Welded Outlets at prices that were significantly below Relator's costs.

59.    On information and belief, SIGMA's new "low cost" source was Ageis.  Notably, for many years, Clark served as a Vice President at Ageis and as a Manager at SIGMA.  (In 2016, Clark retired from SIGMA, but he continued to be paid by SIGMA as a consultant for a period of time thereafter.)

60.    A former SIGMA employee, who was in a position to know, has advised Relator that SIGMA sourced many of its Welded Outlets from Beijing Bell and that it used Wor-Biz Trading to facilitate the shipments.  That same former SIGMA employee has advised Relator that SIGMA was working with Ageis to develop an alternative low cost source for Welded Outlets.  To Relator's knowledge, Ageis does not own meaningful domestic manufacturing facilities.  Even if it did, it would not have been economically feasible for Ageis to have supplied SIGMA with domestically produced Welded Outlets given the prices that

731991839

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

SIGMA charged for grooved outlets in the marketplace.

61.    Relator alleges, on information and belief, that Ageis supplied SIGMA with Chinese-made grooved outlets. Relator further alleges, on information and belief, that SIGMA evaded the antidumping duties applicable to such Chinese Welded Outlets. Based on Relator's examination of the import records, Relator believes that SIGMA (sometimes operating through its wholly-owned subsidiary Unique Industrial Product Company) has repeatedly and falsely described the grooved outlets as steel "couplings" so as to avoid the antidumping duties.

62.    Moreover, in its scope ruling request, SIGMA confirmed what Relator had alleged all along: namely, that SIGMA imports Chinese Welded Outlets without paying the applicable antidumping duties. SIGMA thus has already admitted that it has long evaded the antidumping duty order applicable to Chinese Welded Outlets.

63.    Based on the foregoing facts and Relator's investigation, upon information and belief SIGMA and/or its subsidiaries entered into agreements with other individuals and entities (such as Shanghai Vision, Ageis, Beijing Bell, Wor-Biz Trading, and others known to SIGMA and its subsidiaries but unknown at this time to Relator) to violate the False Claims Act by falsely declaring that the Chinese Welded Outlets were not subject to antidumping duties.

### Specific Allegations Regarding Smith Cooper

64.    SMITH COOPER is an importer and marketer of Chinese Welded Outlets. Since 2003 or 2004, SMITH COOPER has sold Chinese Welded Outlets in the United States under the "Cooplet" brand name. Attached hereto as Exhibit I are SMITH COOPER's product specifications for its Chinese Welded Outlets.

65.    SMITH COOPER began importing Chinese Welded Outlets more than 10 years ago. On information and belief, SMITH COOPER purchases its Chinese Welded Outlets from Jinan Meide. As part of larger shipments of products (which often are characterized as steel pipe nipples), SMITH COOPER regularly imports

731991839

1 Chinese Welded Outlets under its "Cooplets" brand name. (Steel pipe nipples are
2 not subject to antidumping duties.) On information and belief, SMITH COOPER
3 does not pay antidumping duties on the Chinese Cooplets that are imported along
4 with these other products.

5     66. In or around late 2017 and early 2018, SMITH COOPER imported, or
6 caused its agents to import, several shipments of Chinese Welded Outlets that it
7 described as "Butt Weld Outlets." On information and belief, SMITH COOPER
8 began describing Cooplets as "Butt Weld Outlets" because SMITH COOPER was
9 concerned that Cooplets could be subject to antidumping duties as the result of a
10 then-ongoing trade case involving forged fittings. On information and belief,
11 SMITH COOPER stopped describing its products as "Butt Weld Outlets" a few
12 months later in light of the scope requests to Commerce in which VANDEWATER,
13 SMITH COOPER, and SIGMA argued that Welded Outlets were not butt-weld
14 pipe fittings.

15     67. Through its investigation, Relator discovered that SMITH COOPER's
16 pricing for Chinese Welded Outlets was virtually identical to VANDEWATER's.
17 Relator further determined that it would be economically infeasible for SMITH
18 COOPER to sell Chinese Welded Outlets at these prices unless it was evading and
19 avoiding the antidumping duties.

20     68. Moreover, in its scope ruling request, SMITH COOPER confirmed
21 what Relator had alleged all along: namely, that SMITH COOPER imports
22 Chinese Welded Outlets without paying the applicable antidumping duties. SMITH
23 COOPER thus has already admitted that it has long avoided the antidumping duty
24 order applicable to Chinese Welded Outlets.

25     69. Based on the foregoing facts and Relator's investigation, on
26 information and belief SMITH COOPER entered into agreements with other
27 individuals and entities (such as Jinan Meide and others known to SMITH
28 COOPER but unknown at this time to Relator) to violate the False Claims Act by

731991839

- 18 -

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

1   falsely declaring that the Chinese Welded Outlets were not subject to antidumping

2   duties.

### Specific Allegations Regarding ARGCO

4       70.    ARGCO is an importer and marketer of Chinese Welded Outlets.

5   Based on markings on ARGCO product samples that Relator obtained as part of its

6   investigation, Relator determined that ARGCO is supplied by Shanghai Vision.

7   Attached hereto as Exhibit J are ARGCO's product specifications for its Chinese

8   Welded Outlets.

9       71.    In April 2017, ARGCO's supplier—Shanghai Vision—e-mailed a

10  solicitation to Relator regarding Chinese Welded Outlets.  As part of its

11  investigation, Relator responded to the solicitation by requesting detailed

12  information about the costs of importing the Chinese Welded Outlets.  Shanghai

13  Vision's International Sales Representative responded by providing a detailed cost

14  break-down.  That break-down does not include any provision for paying

15  antidumping duties.  A copy of that e-mail exchange is attached as Exhibit Q.

16      72.    As a further part of its investigation, Relator met with Shanghai

17  Vision's International Sales Representative on May 1, 2017.  During that meeting,

18  Vision's International Sales Representative informed Relator that Vision sells

19  Chinese Welded Outlets to ARGCO.  As the meeting progressed, Relator asked

20  detailed questions about the potential costs of importing the Chinese Welded

21  Outlets.  Shanghai Vision's sales representative became defensive.  He advised

22  Relator to allow Shanghai Vision to handle the arrangements for importing the

23  Chinese Welded Outlets.

24      73.    Through its investigation, Relator determined that ARGCO's pricing

25  for Chinese Welded Outlets was consistent with (indeed, slightly lower than)

26  VANDEWATER's pricing.  Relator additionally determined that ARGCO's pricing

27  was consistent with the prices quoted by Shanghai Vision (i.e., it did not allow for

28  the payment of antidumping duties).  Relator further determined that it would be

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

1  economically infeasible for ARGCO to sell Chinese Welded Outlets at these prices

2  unless it were evading and avoiding the antidumping duties.

3  74. Based on the foregoing facts and Relator's investigation, upon

4  information and belief ARGCO entered into agreements with other individuals and

5  entities (such as Shanghai Vision and others known to ARGCO but unknown at this

6  time to Relator) to violate the False Claims Act by falsely declaring that the

7  Chinese Welded Outlets were not subject to antidumping duties.

8  **The False Records And Statements—All Defendants**

9  75. To import the Chinese Welded Outlets, Defendants (or a broker acting

10  on their behalf) completed a CBP Form 7501. On that form, Defendants (or a

11  broker acting on their behalf) were obligated to disclose in the "Entry Type" field

12  (Block 2) whether the goods at issue were subject to an antidumping or

13  countervailing duty.

14  76. Defendants knew that the Chinese Welded Outlets were subject to an

15  antidumping duty order. Nonetheless, Defendants falsely represented (or caused a

16  broker acting on their behalf falsely to represent) that the goods qualified for Entry

17  Type 01, meaning they were not subject to an antidumping duty. At the very least,

18  Defendants were deliberately indifferent to, or acted with reckless disregard of, the

19  truth of those representations. By falsely marking the entry type, Defendants made

20  or caused to be made a false record or statement material to their obligation to pay

21  money to the United States.

22  **FIRST CAUSE OF ACTION**

23  **Violation of the False Claims Act –**

24  **31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7))**

25  77. The preceding paragraphs are re-alleged and incorporated by reference

26  as if fully set forth herein.

27  78. Relator, as the original source of information regarding Defendants'

28  violations of the False Claims Act, has direct and independent knowledge of the

Case 2:22-cv-00306-JPM-tmp Document 1 Filed 06/23/22 Page 34 of 58 PageID 174
Case 2:17-cv-04393-RGK-KS Document 57 Filed 03/04/21 Page 22 of 26 Page ID #:557
FCA Complaint Page 23 of 27

information on which the allegations contained herein are based.

79.   Upon the arrival of the Chinese Welded Outlets in the United States, Defendants, knowing that the goods were subject to antidumping duties, claimed, or instructed their brokers to claim, that the Chinese Welded Outlets were not subject to antidumping duties.

80.   At all times material to this Complaint, Defendants had actual knowledge of the falsity, acted in deliberate ignorance of the truth or falsity, or acted in reckless disregard of the truth or falsity of their records and statements regarding whether the Chinese Welded Outlets were subject to antidumping duties.

81.   By falsely claiming that the Chinese Welded Outlets were not subject to antidumping duties, Defendants avoided paying an antidumping duty of 182.9 percent.

82.   Defendants were obligated to pay the antidumping duties on their entries of Chinese Welded Outlets as a matter of law.

83.   Defendants' aforementioned false statements had the predictable and intended effect of inducing CBP to assess Defendants no antidumping duties on their entries of Chinese Welded Outlets into the United States.

84.   By falsely declaring that the Chinese Welded Outlets were not subject to antidumping duties, Defendants made or caused to be made a false record or statement material to their obligation to pay money to the United States.  Further, Defendants knowingly concealed and knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States.

85.   Defendants' false records or statements, concealment, and avoidance violate 31 U.S.C. § 3729.  Through their violations of 31 U.S.C. § 3729, Defendants gained entry and release of their Chinese Welded Outlets into the United States without paying millions of dollars due to the United States. Defendants have knowingly or recklessly damaged the United States in an amount to be determined at trial, but believed to exceed $175 million.

**SECOND CAUSE OF ACTION**

**Conspiracy to Violate the False Claims Act –**
**31 U.S.C. § 3729(a)(1)(C) (formerly 31 U.S.C. § 3729(a)(3))**

86. The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

87. Defendants, along with the Chinese Manufacturers and others, acted in concert to violate the False Claims Act by knowingly making, using, or causing to be made or used a false record or statement material to their obligation to pay money to the United States by falsely declaring that the Chinese Welded Outlets were not subject to antidumping duties. Defendants also acted in concert to violate the False Claims Act by knowingly concealing or knowingly and improperly avoiding or decreasing their obligation to pay or transmit money or property to the United States.

88. Defendants committed the overt acts described above in furtherance of the conspiracy, including but not limited to, by avoiding their obligation to pay antidumping duties.

89. Defendants' conspiracy violates 31 U.S.C. § 3729(a)(1)(C), by which Defendants gained entry and release of their Chinese Welded Outlets into the United States without paying sums due to the United States. Defendants have knowingly or recklessly damaged the United States in an amount to be determined at trial, but believed to exceed $175 million.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff United States *ex rel.* Island Industries, Inc., prays for the following:

1. An award of treble damages, civil penalties, expenses, fees, and costs against Defendants, jointly and severally, in accordance with 31 U.S.C. § 3729 *et seq.* for Defendants' violations of 31 U.S.C. § 3729(a)(1)(G) (and/or the preceding version of such statutory section, 31 U.S.C. § 3729(a)(7));

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

2.      An award of treble damages, civil penalties, expenses, fees, and costs
against Defendants, jointly and severally, in accordance with 31 U.S.C. § 3729 *et
seq.* for Defendants' conspiracy and violation of 31 U.S.C. § 3729(a)(1)(C) (and/or
the preceding version of such statutory section, 31 U.S.C. § 3729(a)(3));

3.      An award of a trial by jury on all issues so triable; and

4.      An award of such other and further relief, legal or equitable, that the
Court deems just and proper.

MOREOVER, Relator Island Industries, Inc., on its own behalf, demands
and prays that an award be made in its favor as follows:  for 25 percent (25%) of
the proceeds collected by the United States if it intervenes in and conducts this
action, or for 30 percent (30%) of the proceeds if the United States does not
intervene; for an amount for reasonable expenses necessarily incurred by the
Relator in prosecution of this action; for all reasonable attorneys' fees and costs
incurred by the Relator; and such other and further relief to which the Relator may
show itself justly entitled.

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

1

## JURY DEMAND

2      Pursuant to FRCP 38, Plaintiff-Relator demands a trial by jury on all issues

3  so triable.

4

5

6  Dated: July 10, 2019                MAYER BROWN LLP

7

8                                          /s/Matthew H. Marmolejo
                                           Matthew H. Marmolejo
9                                       Attorneys for Relator
                                        ISLAND INDUSTRIES, INC.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

731991839

- 24 -

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

**CERTIFICATE OF SERVICE**

Pursuant to 31 U.S.C. § 3730(c)(3) and the request of the United States to receive pleadings filed in this action, the foregoing First Amended Complaint was served on counsel for the Government via the Court's ECF system.

Dated: July 10, 2019

By:  /s/Matthew H. Marmolejo
Matthew H. Marmolejo

731991839

1

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

# EXHIBIT 2

Case 2:22-cv-00896-JRK-AS   Document 142-2   Filed 06/23/22   Page 2 of 27   Page ID #:190
Case 2:17-cv-04393-RGK-AS   Document 163   Filed 01/16/23   Page 2 of 26   Page ID #:1751
Sigmas motion to dismiss the FCA Complaint    Page 2 of 27

1   Carmen Lo (SBN 280441)
    Email: carmen.lo@whitecase.com
2   WHITE & CASE LLP
    555 South Flower Street, Suite 2700
3   Los Angeles, CA  90071-2433
    Telephone:  (213) 620-7700
4   Facsimile:   (213) 452-2329

5   Lucius B. Lau (*pro hac vice*)
    Email: alau@whitecase.com
6   James P. Gagen (*pro hac vice*)
    Email: jgagen@whitecase.com
7   WHITE & CASE LLP
    701 13th Street, N.W.
8   Washington, DC 20005-3807
    Telephone:  (202) 626-3600
9   Facsimile:   (202) 639-9355

10  Attorneys for Defendant,
    SIGMA CORPORATION
11

12              UNITED STATES DISTRICT COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14

15  UNITED STATES OF AMERICA *ex*      Case No. 2:17-cv-04393-RGK-
    *rel.* ISLAND INDUSTRIES, INC.,     KS
16
                 Plaintiffs,           **DEFENDANT SIGMA**
17                                     **CORPORATION'S NOTICE**
                 v.                    **OF MOTION TO DISMISS**
18                                     **THE FIRST AMENDED**
    VANDEWATER INTERNATIONAL           **COMPLAINT AND**
19  INC., et al.,                      **MEMORANDUM IN**
                                       **SUPPORT**
20               Defendant.
                                       Date: August 26, 2019
21                                     Time: 9:00 a.m.
                                       Courtroom: 850
22                                     Judge: Hon. R. Gary Klausner

23

24

25

26

27

28

| 1 | **TO THE CLERK AND ALL INTERESTED PARTIES:** |

PLEASE TAKE NOTICE that on August 26, 2019, or as soon thereafter as counsel may be heard in Courtroom 850 of the United States District Court, Central District of California, located at 255 East Temple Street, Los Angeles, CA 90012, Defendant Sigma Corporation will respectfully request that the Court dismiss this case pursuant to (1) 31 U.S.C. § 3730(e)(4)(A) for violation of the public disclosure bar; and (2) Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.

Pursuant to Local Rule 7-3, Sigma certifies that this motion is made following the conference with counsel for Plaintiff-Relator Island Industries, Inc. that took place on July 16, 2019.

This motion is based on this notice of motion, the memorandum of points and authorities attached hereto, the pleadings and records on file with this Court, and on such oral and documentary evidence as may be presented at the hearing of this motion.

Dated:  July 24, 2019

WHITE & CASE LLP

By: _/s/ Lucius B. Lau_
Lucius B. Lau
James P. Gagen
Carmen Lo

Attorneys for Defendant
SIGMA CORPORATION

- i -

# **TABLE OF CONTENTS**

**Page(s)**

MEMORANDUM OF POINTS AND AUTHORITIES.............................................1

I.     INTRODUCTION.................................................................1

II.    BACKGROUND AND STATEMENT OF FACTS ...................................2

III.   LEGAL STANDARD .............................................................5

       A.    The Public Disclosure Bar ...................................................5

       B.    Rule 12(b)(6):  Failure To State A Claim ................................6

IV.    ARGUMENT .....................................................................7

       A.    The Public Disclosure Bar Requires Dismissal Of Island's Action As To Sigma...................................................7

       B.    Rule 12(b)(6) Requires Dismissal Of Island's First Cause Of Action As To Sigma Because Island Does Not Sufficiently Allege A Violation Of The False Claims Act......................................11

             1.    Island Fails To Sufficiently Allege That Sigma Made A False Statement...........................................12

             2.    Island Fails To Sufficiently Allege That Sigma Acted With Scienter .........................................14

       C.    Rule 12(b)(6) Requires Dismissal Of Island's Second Cause Of Action As To Sigma Because Island Does Not Sufficiently Allege A Conspiracy To Violate The False Claims Act......................16

V.     CONCLUSION .................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................ 6, 15, 16

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................... 6, 17, 18, 20

*Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047 (9th Cir. 2011) ................... 6, 14

*Calisesi ex rel. United States v. Hot Chalk, Inc.*, No. 2:13-cv-001150-
PHX-NVW, 2015 U.S. Dist. LEXIS 57509 (D. Ariz. May 1, 2015) ................. 16

*Lesnik v. Se*, No. 5:16-cv-01120-LHK, 2018 U.S. Dist. LEXIS 170373
(N.D. Cal. Oct. 1, 2018) .............................................................................. 17

*Malhotra v. Steinberg*, 770 F.3d 853 (9th Cir. 2014) .................................................. 5

*Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097 (9th Cir.
2008) ............................................................................................................... 6

*Metalmark Nw., LLC v. Stewart*, No. 3:04-cv-00682-KI, 2006 U.S.
Dist. LEXIS 55518 (D. Or. Aug. 8, 2006) ............................................... 18

*Prather v. AT&T, Inc.*, 847 F.3d 1097 (9th Cir. 2017) ................................................ 5

*Sams v. Yahoo! Inc.*, 713 F.3d 1175 (9th Cir. 2013) ................................................... 5

*Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401
(2011) ............................................................................................................. 8

*Tianjin Mach. Imp. & Exp. Corp. v. United States*, 394 F. Supp. 2d
1369 (Ct. Int'l Trade 2005) ........................................................................ 16

*United States ex rel. Aflatooni v. Kitsap Physicians Servs.*, 163 F.3d
516 (9th Cir. 1998) ................................................................................ 7, 14

*United States ex rel. Customs Fraud Investigations, LLC v. Victaulic
Co.*, No. 5:13-cv-02983, 2014 U.S. Dist. LEXIS 123182 (E.D. Pa.
Sep. 4, 2014) ................................................................................................. 9

*United States ex rel. Doe v. Staples, Inc.*, 773 F.3d 83 (D.C. Cir. 2014) ......... 8, 9, 10

DEFENDANT SIGMA CORPORATION'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT
(Case No. 2:17-cv-04393-RGK-KS)

*United States ex rel. Farmer v. City of Hous.*, 523 F.3d 333 (5th Cir. 2008) ................................................................................................... 17

*United States ex rel. Fisher v. IASIS Healthcare LLC*, No. 2:15-cv-00872-PHX-JJT, 2016 U.S. Dist. LEXIS 155517 (D. Ariz. Nov. 8, 2016) ........................................................................................... 17, 19

*United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984 (9th Cir. 2011) ................................................................................................... 11

*United States ex rel. Marion v. Heald Coll., LLC*, No. 5:12-cv-02067-PSG, 2015 U.S. Dist. LEXIS 97767 (N.D. Cal. July 24, 2015) ........................ 18

*United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565 (9th Cir. 2016) ..................................................................................................... 7

*United States ex rel. Mistick PBT v. Housing Authority of Pittsburgh*, 186 F.3d 376 (3d Cir. 1999) ......................................................... 8

*United States ex rel. Silingo v. Wellpoint, Inc.*, 904 F.3d 667 (9th Cir. 2018) ................................................................................................... 16

*United States v. Kinetic Concepts, Inc.*, No. 2:08-cv-01885-BRO, 2017 U.S. Dist. LEXIS 221777 (C.D. Cal. Mar. 6, 2017) ..................................... 11, 14

*United States v. United Healthcare Ins. Co.*, 848 F.3d 1161 (9th Cir. 2015) ................................................................................................... 14

## STATUTES AND REGULATIONS

False Claims Act, 31 U.S.C. § 3729, *et seq.* ....................................................... passim

Freedom of Information Act, 5 U.S.C § 552 ......................................................... 8, 9

19 C.F.R. § 4.7a (2011) ......................................................................................... 8

19 C.F.R. § 103.31 (2010) ................................................................................. 8, 9

19 C.F.R. § 141.90 (2009) ................................................................................... 12

19 C.F.R. § 351.225 (1997) ....................................................................... 10, 11, 16

## OTHER AUTHORITIES

57 Fed. Reg. 29702 ................................................................................. 12

Fed. R. Civ. P. 8 ..................................................................................... 17

Fed. R. Civ. P. 9(b) .................................................................. 6, 14, 17, 18

Fed. R. Civ. P. 12(b)(6) ........................................................ 1, 6, 11, 16

U.S. Customs and Border Protection, *What Every Member of the Trade Community Should Know About: Tariff Classification* (May 2004) ....................... 12

DEFENDANT SIGMA CORPORATION'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT
(Case No. 2:17-cv-04393-RGK-KS)

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Plaintiff-Relator, Island Industries, Inc. ("Island"), commenced this action pursuant to the False Claims Act, 31 U.S.C. § 3729, *et seq.*, seeking treble damages, civil penalties, expenses, fees, and costs — jointly and severally — against several defendants, all of whom allegedly imported "welded outlets" from the People's Republic of China ("PRC") but failed to pay antidumping duties imposed by the U.S. Department of Commerce ("Commerce").  As to defendant Sigma Corporation ("Sigma"), the amended complaint should be dismissed for two separate reasons.

First, Island's amended complaint violates the public disclosure bar of 31 U.S.C. § 3730(e)(4)(A).  The public disclosure bar of the False Claims Act encourages suits by whistle-blowers with genuinely valuable information while discouraging litigation by plaintiffs with no significant information of their own.  Island alleges that Sigma evaded the imposition of antidumping duties by falsely describing its merchandise on import documentation.  But Island has reached this conclusion by relying upon public information.  The fact that Island allegedly conducted its own investigation with the assistance of a confidential source does not change the fact that Island's key allegation of wrongdoing is based upon public information.  The public disclosure bar was designed to stop plaintiffs like Island that have no significant information of their own to offer.

Second, Island's amended complaint should be dismissed as to Sigma pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, because Island fails to sufficiently allege either that Sigma violated the False Claims Act or that Sigma entered into a conspiracy to violate the False Claims Act.  Once Island's complaint is reduced to its factual allegations about Sigma, ignoring conclusory statements, there are insufficient allegations for the Court to reasonably infer that Sigma could be liable for violations of the False Claims Act.

## II.     BACKGROUND AND STATEMENT OF FACTS

1    Island's complaint was originally filed, under seal, on June 13, 2017.  ECF
No. 1.  In January 2019, the Court unsealed the action and directed Island to serve
the complaint on the defendants.  ECF No. 34.

During the 19 months that this action was under seal, the United States
requested five separate extensions of the seal as well as the United States' election
period.  The Court granted the first four requests, but denied the fifth-and-final
request.  ECF No. 27.

On December 3, 2018, the United States filed a notice with the Court stating
that it was declining intervention with respect to defendant Anvil International,
LLC, but was "not intervening at this time" with respect to the other defendants
because it did not have sufficient information to make an informed decision
whether to proceed with respect to those defendants.  ECF No. 28.

On June 19, 2019, Sigma filed a motion to dismiss Island's original
complaint.  ECF No. 81.  On July 10, 2019, Island filed its First Amended
Complaint, with few substantive changes as to Sigma.  ECF No. 97.

Island's amended complaint purports to set forth two causes of action.  The
first cause of action alleges a violation of the False Claims Act.  Am. Compl. ¶¶ 77-
85.  The second cause of action alleges a conspiracy to violate the False Claims
Act.  Am. Compl. ¶¶ 86-89.

As relevant to Sigma's motion to dismiss, Island alleges the following.

Island alleges that it is an American manufacturer of fire protection and steel
piping system supplies.  Am. Compl. ¶ 1.  Island manufactures grooved welded
outlets.  Am. Compl. ¶ 1.  "Others in the market manufacture grooved and female
threaded outlets."  Am. Compl. ¶ 1.  "Because all of these products are designed to
be welded to another piece of pipe, they are all commonly referred to as 'Welded
Outlets.'"  Am. Compl. ¶ 1.

Since 1992, there has been an antidumping duty order on butt-weld pipe

Case 2:22-00503-JRK-AS    Document 183    Filed 06/27/22    Page 34 of 58    Page ID #:103
Case 2:17-cv-04393-JRK-AS    Document 103    Filed 04/16/27    Page 24 of 27    Page ID #:788
Sigmas motion to dismiss the FCA Complaint    Page 10 of 27

1    fittings from China.  Am. Compl. ¶ 18.  Island alleges that this antidumping duty

2    order covers "Chinese Welded Outlets."  Am. Compl. ¶ 3.  Island further alleges

3    that defendants "have used various and shifting means to evade the antidumping

4    duties, including: (a) by falsely describing the Chinese Welded Outlets as steel

5    products that are not subject to antidumping duties; (b) by falsely claiming that the

6    Chinese Welded Outlets originated in countries (e.g., Vietnam or South Korea) that

7    are not subject to antidumping duty orders; and (c) by co-mingling the Chinese

8    Welded Outlets with larger shipments of similar products that are not subject to

9    antidumping duties."  Am. Compl. ¶ 4.

10         In paragraph 16 of its amended complaint, Island alleges that:

11              In their marketing materials, Defendants (and the

12              Chinese Manufacturers) virtually *always* describe their

13              Chinese Welded Outlets accurately (*e.g.*, each Defendant

14              markets its products as "welded outlets").  By contrast, in

15              the ***public*** shipping records, Defendants virtually *never*

16              use the term "welded outlet."  On information and belief,

17              Defendants avoid the term "welded outlet" in their

18              shipping records because they know that phrase would be

19              likely to cause the U.S. government to impose

20              antidumping duties.

21    Am. Compl. ¶ 16 (italics in original; bold italics added).

22         One part of Island's amended complaint is devoted to specific allegations

23    concerning Sigma.  Am. Compl. ¶ 55-63.  In this section, Island alleges that Sigma

24    markets and sells at least three brands of "Welded Outlets":  two of these brands

25    (Uni-Let and Safe-Let) are described by Island as "threaded outlet brands" and the

26    third is described by Island as "grooved outlets."  Am. Compl. ¶ 55.

27         With respect to Uni-Let and Safe-Let, Island alleges that "[a]lthough these

28    products are Chinese Welded Outlets, the shipping records suggest that Sigma has

Case 3:22-cv-00306-RGK-KS   Document 73-2   Filed 06/27/22   Page 11 of 27   Page ID #:869
Case 2:17-cv-04393-RGK-KS   Document 103   Filed 04/06/18   Page 10 of 26   Page ID #:869
Sigmas motion to dismiss the FCA Complaint    Page 11 of 27

1   not imported any Welded Outlets." Am. Compl. ¶ 57. "Instead, the import record

2   reflects that, in around 2010, SIGMA began importing 'parts of pipe fitting' into

3   Los Angeles, California." Am. Compl. ¶ 57. "The volume of 'parts of pipe

4   fittings' imported by SIGMA is consistent with SIGMA's share of the Welded

5   Outlets market." Am. Compl. ¶ 57.

6        With respect to grooved outlets, Island alleges that a company called "Ageis

7   [sic] supplied SIGMA with Chinese-made grooved outlets." Am. Compl. ¶ 61.

8   Island alleges that "SIGMA evaded the antidumping duties applicable to such

9   Chinese Welded Outlets" and that Sigma "repeatedly and falsely described the

10   grooved outlets as steel 'couplings' so as to avoid the antidumping duties." Am.

11   Compl. ¶ 61.

12        Concerning all defendants, Island alleges that "Defendants knew that the

13   Chinese Welded Outlets were subject to an antidumping duty order." Am. Compl.

14   ¶ 76. "Nonetheless, Defendants falsely represented (or caused a broker acting on

15   their behalf falsely to represent) that the goods qualified for Entry Type 01,

16   meaning they were not subject to an antidumping duty." Am. Compl. ¶ 76. "By

17   falsely marking the entry type, Defendants made or caused to be made a false

18   record or statement material to their obligation to pay money to the United States."

19   Am. Compl. ¶ 76.

20        In its first cause of action, Island alleges a violation of the False Claims Act.

21   Am. Compl. ¶¶ 77-85. In pertinent part, Island alleges that "[u]pon the arrival of

22   the Chinese Welded Outlets in the United States, Defendants, knowing that the

23   goods were subject to antidumping duties, claimed, or instructed their brokers to

24   claim, that the Chinese Welded Outlets were not subject to antidumping duties."

25   Am. Compl. ¶ 79.

26        In its second cause of action, Island alleges a conspiracy to violate the False

27   Claims Act. Am. Compl. ¶¶ 86-89. In pertinent part, Island alleges that

28   "[d]efendants, along with the Chinese Manufacturers and others, acted in concert to

1   violate the False Claims Act by knowingly making, using, or causing to be made or

2   used a false record or statement material to their obligation to pay money to the

3   United States by falsely declaring that the Chinese Welded Outlets were not subject

4   to antidumping duties."  Am. Compl. ¶ 87.  "Defendants also acted in concert to

5   violate the False Claims Act by knowingly concealing or knowingly and

6   improperly avoiding or decreasing their obligation to pay or transmit money or

7   property to the United States."  Am. Compl. ¶ 87.

8   **III.   LEGAL STANDARD**

9            **A.     The Public Disclosure Bar**

10           In relevant part, the False Claims Act provides that "[t]he court shall dismiss

11   an action or claim under this section, unless opposed by the Government, if

12   substantially the same ***allegations or transactions*** as alleged in the action or claim

13   were ***publically disclosed*** –  .  .  .  (ii) in a congressional, Government

14   Accountability Office, ***or other Federal report***, hearing, audit, or investigation."

15   31 U.S.C. § 3730(e)(4)(A) (emphasis added).  This provision is known as the

16   "public disclosure bar."  "The public disclosure bar is triggered if three things are

17   true:  (1) the disclosure at issue occurred through one of the channels specified in

18   the statute; (2) the disclosure was 'public'; and (3) the relator's action is 'based

19   upon' the allegations or transactions publically disclosed."  *Malhotra v. Steinberg*,

20   770 F.3d 853, 858 (9th Cir. 2014).

21           The public disclosure bar is an affirmative defense.  *See Prather v. AT&T,*

22   *Inc.*, 847 F.3d 1097, 1103 (9th Cir. 2017) ("After the 2010 Amendments, a court

23   could assert jurisdiction over the relator's complaint and entertain public disclosure

24   as a defense.").  "[T]he assertion of an affirmative defense may be considered

25   properly on a motion to dismiss where the 'allegations in the complaint suffice to

26   establish' the defense."  *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013)

27   (citations omitted).

28

## B.     Rule 12(b)(6):  Failure To State A Claim

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a motion to dismiss an action due to a complaint's "failure to state a claim upon which relief can be granted."

To survive dismissal under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In particular, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This test "asks for more than a sheer possibility that a defendant has acted unlawfully" and treats "plead[ed] facts that are 'merely consistent with' a defendant's liability" as "stop[ping] short of the line between possibility and plausibility of 'entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557). Under this standard, the Court need not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Id.*

Additionally, "[b]ecause the FCA is an anti-fraud statute and requires fraud allegations, complaints alleging a FCA violation must fulfill the requirements of Rule 9(b)."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008) (citation omitted).  According to the Ninth Circuit "[t]o satisfy Rule 9(b), a pleading must identify 'the who, what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent] statement, and why it is false.'"  *Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (alteration in original) (citation omitted).

1  IV.  **ARGUMENT**

2      A.   **The Public Disclosure Bar Requires Dismissal Of Island's Action**
3           **As To Sigma**

4           According to Island, Sigma has evaded the imposition of antidumping duties

5  by falsely describing its merchandise on import documentation as "parts of pipe

6  fittings" (for its Uni-Let and Safe-Let brands) and as "couplings" (for its grooved

7  outlets).  Am. Compl. ¶¶ 57, 61.  In each case, Island has reached this conclusion by

8  its own examination of: (1) shipping records that are made available to the public,

9  and (2) a recent Scope Ruling from Commerce.  *See* Am. Compl. ¶ 16 ("[I]n the

10 ***public*** shipping records, Defendants virtually *never* use the term 'welded outlet.'")

11 (italics in original; bold italics added); Am. Compl.  ¶¶ 29-30, 62.  Because Island's

12 allegations are based upon "allegations or transactions" that were "publicly

13 disclosed" in a "Federal report" (31 U.S.C. § 3730(e)(4)(A)), Island's action must

14 be dismissed pursuant to the public disclosure bar of the False Claims Act.

15          The purpose of the False Claims Act "is to encourage individuals with true

16 'knowledge' of alleged wrongdoing to come forward and provide such information

17 to the Government . . . ."  *United States ex rel. Aflatooni v. Kitsap Physicians*

18 *Servs.*, 163 F.3d 516, 526 (9th Cir. 1998).  The public disclosure bar of the False

19 Claims Act seeks to preclude claims based on mere examinations of public records;

20 instead, the bar "is intended to encourage suits by whistle-blowers with genuinely

21 valuable information, while discouraging litigation by plaintiffs who have no

22 significant information of their own to contribute."  *United States ex rel. Mateski v.*

23 *Raytheon Co.*, 816 F.3d 565, 570 (9th Cir. 2016).  Island's claim runs counter to

24 these principles.

25          ***First***, the shipping records presumably relied upon by Island are made

26 available to the public by U.S. Customs and Border Protection ("Customs"), part of

27 the United States Department of Homeland Security.  Customs has promulgated

28 regulations mandating that certain information be submitted when merchandise is

1   imported into the United States.  For example, merchandise that is imported into the

2   United States must be listed on a manifest that includes several types of

3   information, including a "Cargo Declaration."  19 C.F.R. § 4.7a (2011).  "The

4   Cargo Declaration . . . must list all the inward foreign cargo on board the vessel

5   regardless of the U.S. port of discharge."  19 C.F.R. § 4.7a(c)(1).  The Cargo

6   Declaration must contain certain information, including information contained in

7   the bills of lading associated with the shipment in question, as well as "a precise

8   description . . . of the cargo".  19 C.F.R. § 4.7a(c)(4), (c)(4)(vii).

9        Members of the press (including newspapers, commercial magazines, trade

10   journals, and similar publications) are permitted to examine vessel manifests.  19

11   C.F.R. § 103.31(a) (2010).  "All the information appearing on the cargo declaration

12   . . . of the inward vessel manifest may be copied and published."  19 C.F.R.

13   § 103.31(a)(3).  This information is made available to members of the public on

14   CD-ROMS, provided that a written request is made for this material.  19 C.F.R.

15   § 103.31(e).  There are certain commercial entities, like PIERS, that obtain

16   Customs data through this regulatory mechanism and then sell that data to others.

17   *See generally United States ex rel. Doe v. Staples, Inc.*, 773 F.3d 83, 85 (D.C. Cir.

18   2014).

19        The Supreme Court has held that a "written agency response to a FOIA

20   [Freedom of Information Act] request falls within the ordinary meaning of 'report'"

21   under the public disclosure bar.  *Schindler Elevator Corp. v. United States ex rel.

22   Kirk*, 563 U.S. 401, 410 (2011).  In addition, "[a]ny records the agency produces

23   along with its written FOIA response are part of that response, 'just as if they had

24   been reproduced as an appendix to a printed report.'"  *Id.* at 411 (quoting *United

25   States ex rel. Mistick PBT v. Housing Authority of Pittsburgh*, 186 F.3d 376, 384

26   n.5 (3d Cir. 1999)).  Thus, "[i]f an allegation or transaction is disclosed in a record

27   attached to a FOIA response, it is disclosed 'in' that FOIA response and, therefore,

28   disclosed 'in' a report for purposes of the public disclosure bar."  *Id.*

1       The Customs regulation that allows members of the press to obtain cargo

2   declarations (including the description of merchandise imported into the United

3   States) (19 C.F.R. § 103.31(a)) is the functional equivalent of a FOIA request.  Just

4   like a FOIA request, a written request must be made to Customs.  19 C.F.R.

5   § 103.31(e)(2).  That agency then responds to the request by providing the

6   requested data on a CD-ROM.  19 C.F.R. § 103.31(e).  Data that is "collected and

7   made available for purchase to both the press and the public by CBP itself" is

8   considered "publicly disclosed in either the 'news media' or 'administrative

9   reports' or 'federal reports' within the meaning of 31 U.S.C. § 3730(e)(4)(A)."

10  *United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, No. 5:13-

11  cv-02983, 2014 U.S. Dist. LEXIS 123182, at *31-32 (E.D. Pa. Sep. 4, 2014)

12  (finding that the data relied upon by plaintiff-relator had been publicly disclosed

13  under the public disclosure bar because "CBP collects and disseminates to the

14  public all the information that [plaintiff-relator] relied upon in formulating its

15  'Import Analysis.'").

16      Island never specifies the exact source of the "public shipping records" it

17  utilized for purposes of its analysis.  Nonetheless, Island itself acknowledges that

18  the records are public and the law seemingly provides only one route to obtain that

19  information (*i.e.*, the procedure specified in the regulations promulgated by

20  Customs).

21      The D.C. Circuit's decision in *Doe*, 773 F.3d 83, illustrates how and why the

22  public disclosure bar should apply to this case.  The relator in *Doe* alleged fraud on

23  the United States through false statements made to Customs to avoid the imposition

24  of antidumping duties.  *Id*. at 84.  The relator learned of these alleged

25  misrepresentations "by examining manifest data that all shippers must submit to

26  Customs."  *Id.* at 85.  Specifically, the relator obtained the manifest data from a

27  company called PIERS, which compiled the Customs data in an online database.

28  *Id.*  On appeal, the relator conceded that the Customs information he obtained

- 9 -

1  through PIERS was publically disclosed.  *Id.* at 86-87.  Nonetheless, the relator

2  argued that the public disclosure bar did not apply because he confirmed the false

3  statements through his "own investigation," aided by the help of informants.  *Id.* at

4  85.  The D.C. Circuit disagreed: "In short, Relator's suit is 'based upon' publicly

5  disclosed 'allegations or transactions,' thus triggering the public disclosure bar."

6  *Id.* at 88 (citing 31 U.S.C. § 3730(e)(4)(A)).

7          Island is like the relator in *Doe* in all material respects.  Island alleges that

8  Sigma evaded antidumping duties "by falsely describing the Chinese Welded

9  Outlets as steel products that are not subject to antidumping duties."  Am. Compl. ¶

10  4.  (The others means of evasion described by Island — false declaration of

11  country-of-origin and co-mingling with products not covered by the antidumping

12  duty order (Am. Compl. ¶ 4) — apply to other defendants, not Sigma.  Am. Compl.

13  ¶¶ 51-63).  Island believes that Sigma has falsely described its merchandise based

14  upon Island's examination of "shipping records" (Am. Compl. ¶ 57) and "import

15  records" (Am. Compl. ¶ 61), but Island itself has conceded that these records are

16  "public" in nature (Am. Compl. ¶ 16), a concession made by the relator in *Doe*.

17  Like the relator in *Doe*, Island conducted an investigation.  *See* Am. Compl. at 7

18  ("Relator's Investigation").  Like the relator in *Doe*, Island utilized the assistance of

19  an informant.  *See* Am. Compl. ¶ 27 (describing the "assistance of a confidential

20  source").  These other steps undertaken by Island, however, do not change the

21  fundamental fact that Island's key allegation of fraud (*i.e.*, that Sigma falsely

22  described its imports from China) is based upon public information.  Accordingly,

23  the public disclosure bar requires dismissal of Island's action with respect to Sigma.

24          ***Second***, Island relies on a recent scope ruling, which is also public.

25  Commerce regulations provide that when there is a question as to whether imported

26  merchandise is subject to an antidumping duty order, interested parties may file a

27  "Scope Ruling Request" with that agency.  19 C.F.R. § 351.225 (1997).  Commerce

28  will then issue a scope ruling that "clarify[ies] the scope of an order . . . with

1    respect to particular products."  19 C.F.R. § 351.225(a).

2          According to Island, Commerce found that the "Welded Outlets" imported

3    by Sigma were subject to the antidumping duty order.  Am. Comp. ¶ 30.  In so

4    doing, Island relies on Commerce's "Final Scope Ruling" in the inquiry requested

5    by Sigma (which is currently being challenged before the Court of International

6    Trade).  *See* Am. Compl. ¶ 30 n.3, Ex. L; *see also* Defs.' Mot. to Stay 4-6, ECF No.

7    100-1.  The documents relied on by Island are thus subject to the public disclosure

8    bar, as they were "publically disclosed" in a "Federal report."  31 U.S.C.

9    § 3730(e)(4)(A)(ii).

10

11         **B.    Rule 12(b)(6) Requires Dismissal Of Island's First Cause Of**
           **Action As To Sigma Because Island Does Not Sufficiently Allege A**
12         **Violation Of The False Claims Act**

13         By its first cause of action, Island alleges a violation of the False Claims Act.

14   Specifically, Island alleges a violation of 31 U.S.C. § 3729(a)(1)(G), which

15   establishes liability for any person who "knowingly makes, uses, or causes to be

16   made or used, a false record or statement material to an obligation to pay or

17   transmit money or property to the Government, or knowingly conceals or

18   knowingly and improperly avoids or decreases an obligation to pay or transmit

19   money or property to the Government . . . ."  Stated differently, the "essential

20   elements of [a False Claims Act] claim," including claims under 31 U.S.C.

21   § 3729(a)(1)(G), are: "(1) a false statement or fraudulent course of conduct,

22   (2) made with requisite scienter, (3) that was material, causing (4) the government

23   to pay out money or forfeit moneys due."  *United States v. Kinetic Concepts, Inc.*,

24   No. 2:08-cv-01885-BRO-AGRx, 2017 U.S. Dist. LEXIS 221777, at *12-13 (C.D.

25   Cal. Mar. 6, 2017) (quoting *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d

26   984, 992 (9th Cir. 2011)).  Island's amended complaint does not contain sufficient

27   allegations to establish that Sigma violated the False Claims Act.

28

**1.** **Island Fails To Sufficiently Allege That Sigma Made A False Statement**

Island's allegations that Sigma made false statements to the United States are not plausible on their face.

***First***, Island asserts that Sigma evaded the imposition of antidumping duties by "falsely describing the Chinese Welded Outlets as steel products that are not subject to antidumping duties" (Am. Compl. ¶ 4), but Island never explains why the descriptions of the merchandise provided to Customs are inaccurate in any way (specifically, the use of "parts of pipe fitting" to describe Uni-Let and Safe-Let and the use of "couplings" to describe grooved outlets).

Indeed, the antidumping duty order that Island alleges is relevant to Sigma's products (Am. Compl. ¶ 18) states that "[c]arbon steel butt-weld pipe fittings are currently classified under subheading *7307*.93.30 of the Harmonized Tariff Schedule (HTS)."  Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China, 57 Fed. Reg. 29702, 29703 (July 6, 1992) (emphasis added). The HTS is a "product classification system" adopted at the international level that contains "approximately 5,000 article descriptions which appear as headings and subheadings."  U.S Customs and Border Protection, *What Every Member of the Trade Community Should Know About: Tariff Classification*, at 10 (May 2004), https://www.cbp.gov/sites/default/files/documents/icp017r2_3.pdf.  The HTS is presented in a chart form, which contains 4-digit numbers known as "headings," followed by 6-digit and 8-digit "subheadings" to further classify the product. *Id.* at 33.  In the United States, the tariff rate for a given product is found at the 8-digit level of the HTS product classification. *Id.* at 34.  When importing products into the United States, importers are required to identify the product by the appropriate HTS subheading, in a process referred to as "[c]lassification."  19 C.F.R. § 141.90(b) (2009).

The 4-digit heading listed in the antidumping duty order identified by Island,

Case 3:22-cv-00306-RDM-DB   Document 19-2   Filed 06/27/22   Page 20 of 54
Case 2:17-cv-04393-RGK-KS   Document 103   Filed 04/06/17   Page 20 of 27   Page ID #:808
Sigmas motion to dismiss the FCA Complaint    Page 20 of 27

1  "7307," is described in the HTS as "[t]ube or *pipe fittings* (for example, *couplings*,

2  elbows, sleeves), of iron or steel."  Harmonized Tariff Schedule Excerpt, Lau Decl.,

3  Ex. A at p. 5, ECF No. 103-2.  This 4-digit heading contains twenty different 8-

4  digit subheadings that an importer can use to classify its merchandise, including

5  7307.93.30, the 8-digit subheading identified in the antidumping duty order for

6  butt-weld pipe fittings.  *Id.* at 73-19–73-22.

7       Here, Island alleges that Sigma described its merchandise as "parts of *pipe*

8  *fittings*" and "*couplings*" (Am. Compl. ¶¶ 57, 61), which would be consistent with

9  importing merchandise into the United States under either the same 8-digit

10  subheading identified in the antidumping duty order or one of the nineteen other 8-

11  digit subheadings that are classified under the "7307" heading.  Thus, even if Island

12  is correct and Sigma's products should have been classified under the HTS

13  subheading 7307.93.30 (which Sigma disputes), Island's allegation that Sigma

14  "falsely described" its imported merchandise (Am. Compl. ¶ 62; *see also id.* ¶¶ 16,

15  57) is incorrect.

16       *Second*, Island fails to identify false statements made by Sigma with respect

17  to the alleged "Chinese-made grooved outlets" sourced from Aegis.  Am. Compl.

18  ¶ 61.  In particular, Island alleges that "Ageis [sic] supplied SIGMA with Chinese-

19  made grooved outlets," but alleges "on information and belief, that SIGMA evaded

20  the antidumping duties applicable to such Chinese Welded Outlets."  Am. Compl. ¶

21  61.  However, Island also attached alleged "product specifications for [Sigma's]

22  Chinese Welded Outlets" to the amended complaint at Exhibit H.  Am. Compl.

23  ¶ 55.  Exhibit H contains a product specification sheet for the "Branchlet Welding

24  Outlet" from Aegis.  Am. Compl. Ex. H at 10-11.  This material indicates that

25  Aegis, with its address in Pennsylvania, markets these outlets as "Made in the

26  USA," with "USA" engraved on the product.  Am. Compl. Ex. H at 10.

27       To the extent that Island alleges that *Aegis* imported Chinese-made grooved

28  outlets into the United States and subsequently marketed and sold them to Sigma as

1    products that were U.S.-made, which appears to be Island's theory based on the

2    amended complaint, Island fails to allege a "false statement" attributable to Sigma.

3    *See Kinetic Concepts, Inc.*, 2017 U.S. Dist. LEXIS 221777, at *12 (establishing that

4    "a false statement or fraudulent course of conduct" is a necessary element to a False

5    Claims Act claim).

6         ***Third***, Island's allegations that Sigma made false statements to the United

7    States also have not been stated "with particularity," as is required by Rule 9(b).

8    One aspect of Rule 9(b) is that the plaintiff must specify "the who, what, when,

9    where, and how of the misconduct charged." *Cafasso*, 637 F.3d at 1055.  In its

10   amended complaint, Island never specifies "when" Sigma purportedly engaged in

11   fraudulent conduct.  Island's amended complaint is also deficient in terms of

12   "where" Sigma purportedly engaged in fraudulent conduct.  The most that Island

13   states is that Sigma "imported the goods at issue here through this and other judicial

14   districts."  Am. Compl. ¶ 9.  That blanket statement, however, hardly satisfies the

15   heightened pleading standard demanded by Rule 9(b).  The purpose of the False

16   Claims Act is not served "by allowing a relator to maintain a qui tam suit based on

17   pure speculation or conjecture." *Aflatooni*, 163 F.3d at 526.  Yet, as to Sigma, that

18   is all that Island has: speculation and conjecture.

19
20        **2.    Island Fails To Sufficiently Allege That Sigma Acted With
                   Scienter**

21        Island's amended complaint fails to allege scienter with particularity.  "The

22   False Claims Act's scienter requirement is 'rigorous.'" *United States v. United*

23   *Healthcare Ins. Co.*, 848 F.3d 1161, 1176 (9th Cir. 2015) (citation omitted).

24        ***First***, Island's amended complaint contains one section devoted to specific

25   allegations concerning Sigma.  Am. Compl. at 15-17.  That section does not even

26   attempt to allege that Sigma (1) had "actual knowledge" of its purportedly false

27   statements; (2) acted "in deliberate ignorance of the truth or falsity of" its

28   statements; or (3) acted "in reckless disregard of the truth or falsity of" its

1    statements.  31 U.S.C. § 3729(b)(1)(A).

2         Island's allegation that Sigma "avoid[ed] the term 'welded outlet' in [its]

3    shipping records because [it] know[s] that phrase would be likely to cause the U.S.

4    government to impose antidumping duties," and instead imported merchandise as

5    "parts of pipe fitting" or "couplings" (Am. Compl.  ¶¶ 16, 57, 61) fails because, as

6    explained above, the HTS considers butt-weld fittings to be a type of "pipe fitting"

7    or "coupling" (the descriptions allegedly used by Sigma).  Moreover, in the HTS,

8    there is no 6- or 8-digit subheading for "welded outlets" that falls under the "7307"

9    heading.  *See* Harmonized Tariff Schedule Excerpt, Lau Decl., Ex. A at p. 5-8, ECF

10   No. 103-2.  In short, Island's allegation lacks "facial plausibility," because Island

11   failed to "plead[] factual content that allows the court to draw the reasonable

12   inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S.

13   at 678.

14        ***Second***, Island makes general statements concerning the state-of-mind of all

15   of the defendants.  In paragraph 76 of the amended complaint, Island alleges that

16   "Defendants knew that the Chinese Welded Outlets were subject to an antidumping

17   duty order" or "[a]t the very least, Defendants were deliberately indifferent to, or

18   acted with reckless disregard of, the truth of those representations."  In paragraph

19   79 of the amended complaint, Island alleges that, "[u]pon arrival of the Chinese

20   Welded Outlets in the United States, Defendants, knowing that the goods were

21   subject to antidumping duties, claimed, or instructed their brokers to claim, that the

22   Chinese Welded Outlets were not subject to antidumping duties."  Then, in

23   paragraph 80 of the amended complaint, Island further alleges that, "[a]t all times

24   material to this Complaint, Defendants had actual knowledge of the falsity, acted in

25   deliberate ignorance of the truth or falsity, or acted in reckless disregard of the truth

26   or falsity of their records and statements regarding whether the Chinese Welded

27   Outlets were subject to antidumping duties."  These boilerplate statements,

28   however, are utterly lacking in specificity.  No plaintiff may rely upon "mere

Case 2:22-cv-00306-RGK-JCS Document 102 Filed 06/27/22 Page 23 of 27 Page ID #:801
Case 2:17-cv-04393-RGK-KS Document 103 Filed 10/06/17 Page 23 of 27 Page ID #:612
Sigmas motion to dismiss the FCA Complaint    Page 23 of 27

1  conclusory statements" or "[t]hreadbare recitals of the elements of a cause of

2  action." *Iqbal*, 556 U.S. at 678.

3      ***Third***, Island's suggestion that Commerce's 1992 Scope Ruling regarding the

4  antidumping duty order for "Carbon Steel Butt-Weld Pipe Fittings from Taiwan"

5  somehow serves as precedent for interpreting the antidumping duty order alleged to

6  be applicable to Sigma (Am. Compl. ¶¶ 23-26) is inaccurate as a matter of law.  *See*

7  *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 394 F. Supp. 2d 1369, 1377-78

8  (Ct. Int'l Trade 2005) ("A prior scope ruling on a particular product, even if falling

9  within the ambit of the 'prior scope determinations' identified in § 351.225(k)(1) as

10  sources to be consulted by Commerce, is not designated by that regulation as

11  controlling or precedential in a scope ruling on a different product.").  Thus, to the

12  extent that Island intends to frame this decision as an indicator of Sigma's

13  "knowledge" of the scope of the antidumping duty order for Chinese product, such

14  an allegation is improper.

15

16      **C.    Rule 12(b)(6) Requires Dismissal Of Island's Second Cause Of Action As To Sigma Because Island Does Not Sufficiently Allege A Conspiracy To Violate The False Claims Act**

17

18      By its second cause of action, Island alleges a conspiracy to violate the False

19  Claims Act.  In this cause of action, Island alleges a violation of 31 U.S.C.

20  § 3729(a)(1))(C), which establishes liability for any person who "conspires to

21  commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)."  As with its first

22  cause of action, Island's amended complaint does not contain sufficient allegations

23  to establish that Sigma conspired to violate the False Claims Act.

24      With respect to 31 U.S.C. § 3729(a)(1)(C), the general principles of civil

25  conspiracy apply.  *See United States ex rel. Silingo v. Wellpoint, Inc.*, 904 F.3d 667,

26  678 (9th Cir. 2018) (citing the 10th edition of Black's Law Dictionary to explain the

27  types of conspiracies in a False Claims Act case); *Calisesi ex rel. United States v.*

28  *Hot Chalk, Inc.*, No. 2:13-cv-01150-PHX-NVW, 2015 U.S. Dist. LEXIS 57509, at

Case 3:22-cv-00306-RDM-JFS Document 132 Filed 01/06/23 Page 24 of 27
Case 2:17-cv-04393-RGK-KS Document 132 Filed 01/06/23 Page 24 of 27 Page ID #:913
Sigmas motion to dismiss the FCA Complaint    Page 24 of 27

1  *34 (D. Ariz. May 1, 2015) ("General civil conspiracy principles apply to

2  conspiracy claims under the False Claims Act."). Thus, in order to properly state a

3  claim for conspiracy under the False Claims Act, a plaintiff must allege that: (1) the

4  defendant entered into an agreement to violate the False Claims Act; and (2) the

5  defendant committed an act in furtherance of that conspiracy. *See United States ex*

6  *rel. Farmer v. City of Hous.*, 523 F.3d 333, 343 (5th Cir. 2008) ("To prove a

7  conspiracy, [plaintiff-relator] ultimately must be able to show (1) the existence of

8  an unlawful agreement between defendants to get a false or fraudulent claim

9  allowed or paid by [the government agency] and (2) at least one act performed in

10  furtherance of that agreement.").

11  Under the plausibility requirements of Rule 8 of the Federal Rules of Civil

12  Procedure, "an allegation of parallel conduct and a bare assertion of conspiracy will

13  not suffice," because "parallel conduct does not suggest conspiracy, and a

14  conclusory allegation of agreement at some unidentified point does not supply facts

15  adequate to show illegality." *Twombly*, 550 U.S. at 556-57 (addressing a

16  conspiracy claim under the Sherman Act). As such, mere allegations of parallel

17  conduct "stop[] short of the line between possibility and plausibility of entitlement

18  to relief." *Id.* (internal quotations and citation omitted).

19  Moreover, the heightened pleading requirements of Rule 9(b) of the Federal

20  Rules of Civil Procedure also apply to allegations that a defendant conspired to

21  violate the False Claims Act. Thus, the plaintiff in such a case "must allege the

22  existence of an agreement between the defendants to violate the FCA." *Lesnik v.*

23  *Se*, No. 5:16-cv-01120-LHK, 2018 U.S. Dist. LEXIS 170373, at *23 (N.D. Cal.

24  Oct. 1, 2018) (internal quotations and citations omitted). This allegation of an

25  agreement must be pled with particularity. *See United States ex rel. Fisher v. IASIS*

26  *Healthcare LLC*, No. 2:15-cv-00872-PHX-JJT, 2016 U.S. Dist. LEXIS 155517, at

27  *52 (D. Ariz. Nov. 8, 2016) (dismissing a False Claims Act conspiracy claim where

28  "[r]elators not only fail to plead who at each Defendant agreed with whom to

- 17 -

Case 2:22-cv-00306-RGK-JC   Document 103   Filed 04/06/27   Page 25 of 27   Page ID #:803
Case 2:17-cv-04393-RGK-KS   Document 133   Filed 07/10/17   Page 24 of 26   Page ID #:804
Sigmas motion to dismiss the FCA Complaint    Page 25 of 27

1    violate the FCA, or how, but what acts were done by each Defendant in furtherance

2    of such agreement(s)"); *United States ex rel. Marion v. Heald Coll., LLC*, No. 5:12-

3    cv-02067-PSG, 2015 U.S. Dist. LEXIS 97767, at *14 (N.D. Cal. July 24, 2015)

4    (dismissing a False Claims Act conspiracy claim under Rule 9(b) because the

5    complaint contained "no factual allegations about the time, place or specific

6    language used by the defendants to form then [sic] agreement").  Island does not

7    satisfy these requirements.

8          ***First***, Island does not actually allege that Sigma entered into an agreement to

9    violate the False Claims Act with any other Defendant.  Instead, Island broadly

10   alleges that: (1) "Defendants, along with the Chinese Manufacturers and others,

11   acted in concert to violate the False Claims Act by knowingly making, using, or

12   causing to be made or used a false record or statement material to their obligation to

13   pay money to the United States by falsely declaring that the Chinese Welded

14   Outlets were not subject to antidumping duties"; and (2) "Defendants also acted in

15   concert to violate the False Claims Act by knowingly concealing or knowingly and

16   improperly avoiding or decreasing their obligation to pay or transmit money or

17   property to the United States."  Am. Compl. ¶ 87.  Island fails to back these

18   conclusory statements with even a single allegation of fact suggesting an agreement

19   between Sigma and any of the other defendants.  This failure is fatal to its theory

20   that Sigma entered into a conspiracy with any of the other defendants.  *See*

21   *Twombly*, 550 U.S. at 556 (establishing that "an allegation of parallel conduct and a

22   bare assertion of conspiracy will not suffice" to state a claim of conspiracy).  At

23   best, Island alleges that certain defendants *separately* violated the False Claims Act.

24   As such, Island's claim that Sigma is "jointly and severally" liable for the damages

25   allegedly caused by other defendants (Am. Compl. at 22-23) must also fail.  *See*

26   *Metalmark Nw., LLC v. Stewart*, No. 3:04-cv-00682-KI, 2006 U.S. Dist. LEXIS

27   55518, at *3 (D. Or. Aug. 8, 2006) (denying request to enter joint and several

28   liability against two defendants after the jury failed to find that they were co-

Case 3:17-cv-00306-RGK-KS Document 12-2 Filed 06/27/22 Page 26 of 27 Page ID #:804
Case 2:17-cv-04393-RGK-KS Document 11-2 Filed 10/16/17 Page 26 of 27 Page ID #:615
Sigmas motion to dismiss the FCA Complaint    Page 26 of 27

1    conspirators with the third defendant).

2    **Second**, Island's bare allegation that "SIGMA and/or its subsidiaries entered

3    into agreements with other individuals and entities (such as Shanghai Vision, Ageis

4    [sic], Beijing Bell, Wor-Biz Trading, and others known to SIGMA and its

5    subsidiaries but unknown at this time to Relator) to violate the False Claims Act by

6    falsely declaring that the Chinese Welded Outlets were not subject to antidumping

7    duties" (Am. Compl. ¶ 63) is insufficient to satisfy the requisite pleading standard.

8    *See Fisher*, 2016 U.S. Dist. LEXIS 155517, at *52.

9    Island's sparse factual allegations concerning the entities that it alleges

10   Sigma conspired with fail to remedy this pleading deficiency.  As to Shanghai

11   Vision, Island alleges only that "[i]n early 2011, . . . SIGMA asked Relator to

12   determine whether it would be plausible to repair [its Chinese grooved outlets],

13   which were manufactured by Shanghai Vision."  Am. Compl. ¶ 58.  As to Beijing

14   Bell and Wor-Biz Trading, Island alleges only that, at an unknown time, "SIGMA

15   sourced many of its Welded Outlets from Beijing Bell and that it used Wor-Biz

16   Trading to facilitate the shipments."  Am. Compl. ¶ 60.  It is entirely unclear how,

17   if at all, Island contends that these facts relate to the alleged conspiracy, but it is

18   clear that these allegations fall well short of adequately alleging a conspiracy

19   between Sigma and Shanghai Vision, Sigma and Beijing Bell, or Sigma and Wor-

20   Biz Trading.

21   Island's factual allegations as to Sigma and Aegis are equally insufficient,

22   alleging only that:  (1) "[i]n late 2015 . . . SIGMA advised Relator that it would no

23   longer purchase product from Relator because SIGMA had discovered a new 'low

24   cost' source that offered Welded Outlets at prices that were significantly below

25   Relator's costs" and this source was Aegis (Am. Compl. ¶¶ 58-59); (2) that "for

26   many years" Terry Clark "served as a Vice President at Ageis [sic] and as a

27   Manager at SIGMA" (Am. Compl. ¶ 59); (3) "SIGMA was working with Ageis

28   [sic] to develop an alternative low cost source for Welded Outlets" (Am. Compl. ¶

60); and (4) "Ageis [sic] supplied SIGMA with Chinese-made grooved outlets" (Am. Compl. ¶ 61). Island separately alleges that "[t]o Relator's knowledge, Ageis [sic] does not own meaningful domestic manufacturing facilities" and that "it would not have been economically feasible for Ageis [sic] to have supplied SIGMA with domestically produced Welded Outlets given the prices that SIGMA charged for grooved outlets." Am. Compl. ¶ 60. Island does not allege that Sigma was aware of, much less played any role relating to, these two allegations. At bottom, Island's allegations merely indicate that Sigma stopped buying product from Plaintiff-Relator after finding a new source with a lower price. Island thus fails to meet the "threshold requirement" of pleading "allegations plausibly suggesting (not merely consistent with) agreement" (*Twombly*, 550 U.S. at 557), much less the heightened requirements of Rule 9 of the Federal Rules of Civil Procedure.

Accordingly, the Court should dismiss Island's second cause of action.

## V.   CONCLUSION

For these reasons, the Court should dismiss Island's action as it pertains to Sigma.

Dated:  July 24, 2019

WHITE & CASE LLP

By:  */s/ Lucius B. Lau*
Lucius B. Lau (*pro hac vice*)
James P. Gagen (*pro hac vice*)
701 13th Street NW
Washington, DC 20005
alau@whitecase.com
jgagen@whitecase.com

Carmen Lo (SBN 280441)
555 South Flower Street, Suite 2700
Los Angeles, CA 90071-2433
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
carmen.lo@whitecase.com

Attorneys for Defendant
SIGMA CORPORATION

# EXHIBIT 3

Case 2:22-00006-RGK-KS Document 142 Filed 06/27/22 Page 2 of 19 Page D #:1697
Case 2:17-cv-04393-RGK-KS Document 142 Filed 06/27/22 Page 24 of 58 Page ID #:1693
Stipulated Protective Order in the FCA    Page 2 of 19



**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ISLAND INDUSTRIES, INC., <br><br> Plaintiff-Relator, <br><br> v. <br><br> VANDEWATER INTERNATIONAL INC.; NEIL REUBENS; ANVIL INTERNATIONAL, LLC; SIGMA CORPORATION; SMITH COOPER INTERNATIONAL; ALLIED RUBBER & GASKET COMPANY; and JOHN DOES Nos. 1–10, <br><br> Defendants. | Case No. 2:17-CV-04393-RGK-KS <br><br> ~~[PROPOSED]~~ STIPULATED PROTECTIVE ORDER <br><br><br> Trial Date:  June 23, 2020 <br> Judge:        Hon. R. Gary Klausner |

1.    A.  PURPOSES AND LIMITATIONS

Discovery in this action is likely to involve production of confidential, proprietary, and/or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted. Accordingly, the parties hereby stipulate to and petition the Court to enter the following Stipulated Protective Order. The parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to

1   discovery and that the protection it affords from public disclosure and use extends

2   only to the limited information or items that are entitled to confidential treatment

3   under the applicable legal principles. The parties further acknowledge, as set forth

4   in Section 12.3, below, that this Stipulated Protective Order does not entitle them

5   to file confidential information under seal; Civil Local Rule 79-5 sets forth the

6   procedures that must be followed and the standards that will be applied when a

7   party seeks permission from the court to file material under seal.

8       B.    GOOD CAUSE STATEMENT

9       1.1    This action is likely to involve purchasing, shipping, and import

10  records; pricing lists; trade secrets; customer and other valuable research;

11  production practices; and development, commercial, financial and/or technical

12  information for which special protection from public disclosure and from use for

13  any purpose other than prosecution of this action is warranted. Such confidential

14  materials and information consist of, among other things, confidential business or

15  financial information, information regarding purchase and sale prices of material

16  inputs and products by suppliers, manufacturers, importers, distributors, or

17  retailers; information regarding the manufacture, purchase, or sale of inputs and

18  products; or other confidential commercial information (including information

19  implicating privacy rights of third parties), information generally  unavailable to

20  the public, or which may be privileged or otherwise protected from disclosure

21  under state or federal statutes, rules, court rules, case decisions, or common law.

22  Accordingly, to expedite the flow of information, to facilitate the prompt resolution

23  of disputes over confidentiality of discovery materials, to adequately protect

24  information the parties are entitled to keep confidential, to ensure that the parties

25  are permitted reasonable necessary uses of such material in preparation for and in

26  the conduct of trial, to address their handling at the end of the litigation, and serve

27  the ends of justice, a protective order for such information is justified in this

28

matter. It is the intent of the parties that information will not be designated as confidential for tactical reasons and that nothing be so designated without a good faith belief that it has been maintained in a confidential, non-public manner, and there is good cause why it should not be part of the public record of this case.

2.    DEFINITIONS

2.1    Action: The United States of America ex rel. v. Island Industries, Inc., v. Vandewater International Inc., Neil Reubens, Anvil International LLC, Sigma Corporation, Smith Cooper International, Allied Rubber & Gasket Company, and John Does Nos. 1-10, Case No. 2:17-cv-04393 (RGK-KS).

2.2    Challenging Party: A Party or Non-Party that challenges the designation of information or items under this Order.

2.3    "CONFIDENTIAL" Information or Items: information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c), and as specified above in the Good Cause Statement.  Entry packages and import documents, other than data included in publicly-released ship manifest data or in summary statistical reports, are presumptively confidential, consistent with U.S. Customs and Border Protection's treatment of CBP information.  See 19 C.F.R. Part 103.

2.4    Counsel: Outside Counsel of Record and In-House Counsel (as well as their respective support staff).

2.5    Designating Party: A Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL."

2.6    Disclosure or Discovery Material: All items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

1    2.7    Expert: A person with specialized knowledge or experience in a

2    matter pertinent to the litigation who has been retained by a Party or its counsel to

3    serve as an expert witness or as a consultant in this Action.

4    2.8    In-House Counsel: Attorneys who are employees of a party to this

5    Action with responsibility for managing this Action.  In-House Counsel does not

6    include Outside Counsel of Record or any other outside counsel.

7    2.9    "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY":

8    sensitive "CONFIDENTIAL" Information or Items, the disclosure of which to

9    another Party or Non-Party would create a substantial risk of serious harm that

10   could not be avoided by less restrictive means.

11   2.10   Non-Party: Any natural person, partnership, corporation, association,

12   or other legal entity not named as a Party to this action.

13   2.11   Outside Counsel of Record: Attorneys who are not employees of a

14   party to this Action but are retained to represent or advise a party to this Action

15   and have appeared in this Action on behalf of that party or are affiliated with a law

16   firm that has appeared on behalf of that party and includes support staff.

17   2.12   Party: Any party to this Action, including all officers, directors,

18   employees, consultants, retained experts, and Outside Counsel of Record (and their

19   support staffs).

20   2.13   Producing Party: A Party or Non-Party that produces Disclosure or

21   Discovery Material in this Action.

22   2.14   Professional Vendors: Persons or entities that provide litigation

23   support services (e.g., photocopying, videotaping, translating, preparing exhibits or

24   demonstrations, and organizing, storing, or retrieving data in any form or medium)

25   and their employees and subcontractors.

26   2.15   Protected Material: Any Disclosure or Discovery Material that is

27   designated as "CONFIDENTIAL" or "HIGH CONFIDENTIAL – ATTORNEY'S

28

1    EYES ONLY"

2       2.16 Receiving Party: A Party that receives Disclosure or Discovery

3    Material from a Producing Party.

4       3.      SCOPE

5       The protections conferred by this Stipulated Protective Order cover not only

6    Protected Material (as defined above), but also (1) any information copied or

7    extracted from Protected Material; (2) all copies, excerpts, summaries, or

8    compilations of Protected Material; and (3) any testimony, conversations, or

9    presentations by Parties or their Counsel that might reveal Protected Material. Any

10    use of Protected Material at trial shall be governed by the orders of the trial judge.

11    This Order does not govern the use of Protected Material at trial.

12       4.      DURATION

13       Even after final disposition of this litigation, the confidentiality obligations

14    imposed by this Order shall remain in effect until a Designating Party agrees

15    otherwise in writing or a court order otherwise directs. Final disposition shall be

16    deemed to be the later of (1) dismissal of all claims and defenses in this Action,

17    with or without prejudice; and (2) final judgment herein after the completion and

18    exhaustion of all appeals, rehearings, remands, trials, or reviews of this Action,

19    including the time limits for filing any motions or applications for extension of

20    time pursuant to applicable law.

21       5.      DESIGNATING PROTECTED MATERIAL

22       5.1    Exercise of Restraint and Care in Designating Material for Protection.

23       Each Party or Non-Party that designates information or items for

24    protection under this Order must take care to limit any such designation to specific

25    material that qualifies under the appropriate standards. The Designating Party must

26    designate for protection only those parts of material, documents, items, or oral or

27    written communications that qualify so that other portions of the material,

28

---

1  documents, items, or communications for which protection is not warranted are not

2  swept unjustifiably within the ambit of this Order. Mass, indiscriminate, or

3  routinized designations are prohibited. Designations that are shown to be clearly

4  unjustified or that have been made for an improper purpose (e.g., to unnecessarily

5  encumber the case development process or to impose unnecessary expenses and

6  burdens on other parties) may expose the Designating Party to sanctions.

7      If it comes to a Designating Party's attention that information or items that it

8  designated for protection do not qualify for protection, that Designating Party must

9  promptly notify all other Parties that it is withdrawing the inapplicable designation.

10     5.2     Manner and Timing of Designations. Except as otherwise provided in

11 this Order (see, e.g., second paragraph of Section 5.2(a) below), or as otherwise

12 stipulated or ordered, Disclosure or Discovery Material that qualifies for protection

13 under this Order must be clearly so designated before the material is disclosed or

14 produced.

15     Designation in conformity with this Order requires:

16     (a)     For information in documentary form (e.g., paper or electronic

17 documents, but excluding transcripts of depositions or other pretrial or trial

18 proceedings), that the Producing Party affix at a minimum, the legend

19 "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES

20 ONLY", to each page that contains protected material. If only a portion or portions

21 of the material on a page qualifies for protection, the Producing Party also must

22 clearly identify the protected portion(s) (e.g., by placing brackets around the

23 material qualifying for protection or by making appropriate markings in the

24 margins).

25     A Party or Non-Party that makes original documents available for inspection

26 need not designate them for protection until after the inspecting Party has indicated

27 which documents it would like copied and produced. During the inspection and

28

before the designation, all of the material made available for inspection shall be deemed "CONFIDENTIAL." After the inspecting Party has identified the documents it wants copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, the Producing Party must affix the "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" designations to each page that contains Protected Material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).

(b)    Deposition transcripts and portions thereof taken in this Action may be designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" during the deposition or after, in which case the portion of the transcript containing Designated Material shall be identified in the transcript by the Court Reporter as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." The designated testimony shall be bound in a separate volume and marked by the reporter accordingly. Where testimony is designated during the deposition, the Designating Party shall have the right to exclude, at those portions of the deposition, all persons not authorized by the terms of this Stipulated Protective Order to receive such Designated Material.

Within fifteen (15) days after a deposition transcript is certified by the court reporter, any party may designate pages of the transcript and/or its exhibits as Designated Material. During such fifteen (15) day period, the transcript in its entirety shall be treated as "CONFIDENTIAL" (except for those portions identified earlier as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" which shall be treated accordingly from the date of designation). If any party so

Case 2:22-cv-00306-RGK-JCS   Document 142   Filed 06/27/22   Page 9 of 16   Page ID #:1262
Case 2:17-cv-04393-RGK-KS   Document 142   Filed 06/27/22   Page 9 of 16   Page ID #:1262
Stipulated Protective Order in the FCA    Page 9 of 19

1  designates such material, the parties shall provide written notice of such
2  designation to all parties within the fifteen (15) day period. Designated Material
3  within the deposition transcript or the exhibits thereto may be identified in writing
4  by page and line, or by underlining and marking such portions "CONFIDENTIAL"
5  "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" and providing such
6  marked-up portions to all Counsel.

7      (c)    For information produced in some form other than documentary and
8  for any other tangible items, that the Producing Party affix in a prominent place on
9  the exterior of the container or containers in which the information is stored the
10 "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES
11 ONLY" designations. If only a portion or portions of the information warrants
12 protection, the Producing Party, to the extent practicable, shall identify the
13 protected portion(s).

14     5.3    Inadvertent Failures to Designate. If timely corrected, an inadvertent
15 failure to designate qualified information or items does not, standing alone, waive
16 the Designating Party's right to secure protection under this Order for such
17 material. Upon timely correction of a designation, the Receiving Party must make
18 reasonable efforts to assure that the material is treated in accordance with the
19 provisions of this Order.

20     6.    CHALLENGING CONFIDENTIALITY DESIGNATIONS

21     6.1    Timing of Challenges. Any Party or Non-Party may challenge a
22 designation of confidentiality at any time that is consistent with the Court's
23 Scheduling Order.

24     6.2    Meet and Confer. The Challenging Party shall initiate the dispute
25 resolution process under Local Rule 37.1.  The burden of persuasion in any such
26 challenge proceeding shall be on the Designating Party. Frivolous challenges, and
27 those made for an improper purpose (e.g., to harass or impose unnecessary

28

Case 2:22-cv-00306-RGK-JCS   Document 17-4   Filed 06/27/22   Page 11 of 15   Page ID #:245
Case 2:17-cv-04393-RGK-JCS   Document 142   Filed 10/06/22   Page 10 of 19   Page ID #:1363
Stipulated Protective Order in the FCA    Page 10 of 19

expenses and burdens on other parties) may expose the Challenging Party to sanctions. Unless the Designating Party has waived or withdrawn the confidentiality designation, all parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation until the Court rules on the challenge.

7.    ACCESS TO AND USE OF PROTECTED MATERIAL

7.1    Basic Principles. A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this Action only for prosecuting, defending, or attempting to settle this Action. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the Action has been terminated, a Receiving Party must comply with the provisions of Section 13 below (FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

7.2    Disclosure of "CONFIDENTIAL" Information or Items. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

(a)    the Receiving Party's Outside Counsel of Record in this Action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this Action;

(b)    officers, directors, and employees (including In-House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this Action, provided that any such officer, director, or employee has signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

Case 2:22-cv-00509-RGK-KS Document 242-1 Filed 06/27/22 Page 11 of 19 Page ID #:964
Case 2:17-cv-04393-RGK-KS Document 210 Filed 05/18/18 Page 16 of 43 Page ID #:964
Stipulated Protective Order in the FCA    Page 11 of 19

(c)    Counsel to the parties in this Action, including any Outside Counsel of Record and In-House Counsel, and their respective associates, clerks, legal assistants, stenographic, videographic and support personnel, and other employees of such outside litigation attorneys, and organizations retained by such attorneys to provide litigation support services in this Action and the employees of said organizations. Counsel herein explicitly include any In-House Counsel, whether or not they are attorneys of record in this Action;

(d)    Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(e)    The court and its personnel;

(f)    Court reporters and their staff;

(g)    Professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(h)    The author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information;

(i)    During their depositions, witnesses, and attorneys for witnesses, in the Action to whom disclosure is reasonably necessary provided: (1) the deposing party requests that the witness sign the form attached as Exhibit A hereto; and (2) they will not be permitted to keep any confidential information unless they sign Exhibit A, unless otherwise agreed by the Designating Party or ordered by the court. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material may be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order; and

(j)    any mediator or settlement officer, and their supporting personnel,

1    mutually agreed upon by any of the parties engaged in settlement discussions.

2        7.3    Disclosure of "HIGHLY CONFIDENTIAL- ATTORNEYS' EYES

3    ONLY" Information or Items.

4        Materials designated "HIGHLY CONFIDENTIAL – ATTORNEYS'

5    EYES ONLY" may be disclosed only to the following Designees:

6        (a)    Any person who appears on the face of the Designated Material

7    marked "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" as an

8    author, addressee, or recipient thereof;

9        (b)    Outside Counsel of Record for the parties in this Action, and their

10   respective associates, clerks, legal assistants, stenographic, videographic and

11   support personnel, and other employees of such outside litigation attorneys, and

12   organizations retained by such attorneys to provide litigation support services in

13   this Action and the employees of said organizations;

14       (c)    Experts for the parties to this Action, as defined herein; and

15       (d)    The Court, its clerks, Court officials, employees, any special master,

16   referee, expert, technical advisor or third-party consultant appointed by the Court,

17   to the jury in this Action, and any interpreters interpreting on behalf of any party or

18   deponent;

19       (e)    Court reporters retained to transcribe depositions and/or retained to

20   record proceedings before the Court; and

21       (f)    Any mediator or settlement officer, and their supporting personnel,

22   mutually agreed upon by those parties engaged in settlement discussions provided

23   that he or she sign a certification that he or she has read this Stipulated Protective

24   Order, will abide by its provisions, and will submit to the jurisdiction of this Court

25   regarding the enforcement of this Stipulated Protective Order's provisions.

26       8.    PROTECTED MATERIAL SUBPOENAED OR ORDERED

27   PRODUCED IN OTHER LITIGATION

28   

STIPULATED PROTECTIVE ORDER                      Case No. 2:17-CV-04393-RGK-KS

Case 2:22-cv-00509-RGK-KS Document 142-1 Filed 06/27/22 Page 13 of 19 Page ID #:1566
Case 2:17-cv-04393-RGK-KS Document 214 Filed 09/18/19 Page 13 of 19 Page ID #:9366
Stipulated Protective Order in the FCA    Page 13 of 19

1    If a Party is served with a subpoena or a court order issued in other litigation

2  that compels disclosure of any information or items designated in this Action as

3  "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES

4  ONLY" that Party must:

5    (a)    Promptly notify in writing the Designating Party. Such notification

6  shall include a copy of the subpoena or court order;

7    (b)    Promptly notify in writing the party who caused the subpoena or order

8  to issue in the other litigation that some or all of the material covered by the

9  subpoena or order is subject to this Protective Order. Such notification shall

10  include a copy of this Stipulated Protective Order; and

11    (c)    Cooperate with respect to all reasonable procedures sought to be

12  pursued by the Designating Party whose Protected Material may be affected. If the

13  Designating Party timely seeks a protective order, the Party served with the

14  subpoena or court order shall not produce any information designated in this action

15  as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES

16  ONLY" before a determination by the court from which the subpoena or order

17  issued, unless the Party has obtained the Designating Party's permission. The

18  Designating Party shall bear the burden and expense of seeking protection in that

19  court of its confidential material and nothing in these provisions should be

20  construed as authorizing or encouraging a Receiving Party in this Action to

21  disobey a lawful directive from another court.

22    9.    A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE

23  PRODUCED IN THIS LITIGATION

24    (a)    The terms of this Order are applicable to information produced by a

25  Non-Party in this Action and designated as "CONFIDENTIAL" or "HIGHLY

26  CONFIDENTIAL – ATTORNEYS' EYES ONLY".  Such information produced

27  by Non-Parties in connection with this litigation is protected by the remedies and

28

relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

(b)     In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

(1)     Promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

(2)     Promptly provide the Non-Party with a copy of the Stipulated Protective Order in this Action, the relevant discovery request(s), and a reasonably specific description of the information requested; and

(3)     make the information requested available for inspection by the Non-Party, if requested.

(c)     If the Non-Party fails to seek a protective order from this court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the court. Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

10.     UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately:

(a)     notify in writing the Designating Party of the unauthorized

Case 2:22-00450-DJP-MS-3c Document 242-1 Filed 06/27/22 Page 104 of 587 Exhibit D
Case 2:17-cv-04393-RGK-KS Document 242-1 Filed 05/19/19 Page 14 of 18 Page ID #:1868
Stipulated Protective Order in the FCA     Page 15 of 19

1   disclosures;

2       (b)    use its best efforts to retrieve all unauthorized copies of the Protected

3   Material;

4       (c)    inform the person or persons to whom unauthorized disclosures were

5   made of all the terms of this Order; and

6       (d)    request such person or persons to execute the "Acknowledgment and

7   Agreement to Be Bound" that is attached hereto as Exhibit A.

8       11.    INADVERTENT   PRODUCTION   OF   PRIVILEGED   OR

9   OTHERWISE  PROTECTED MATERIAL

10       When a Producing Party gives notice to Receiving Parties that certain

11   inadvertently produced material is subject to a claim of privilege or other

12   protection, the obligations of the Receiving Parties are those set forth in Federal

13   Rule of Civil Procedure 26(b)(5)(B). This provision is not intended to modify

14   whatever procedure may be established in an e-discovery order that provides for

15   production without prior privilege review. Pursuant to Federal Rule of Evidence

16   502(d) and (e), insofar as the parties reach an agreement on the effect of disclosure

17   of a communication or information covered by the attorney-client privilege or

18   work product protection, the parties may incorporate their agreement in the

19   stipulated protective order submitted to the court.

20       12.    MISCELLANEOUS

21       12.1   Right to Further Relief. Nothing in this Order abridges the right of any

22   person to seek its modification by the Court in the future.

23       12.2   Right to Assert Other Objections. By stipulating to the entry of this

24   Protective Order no Party waives any right it otherwise would have to object to

25   disclosing or producing any information or item on any ground not addressed in

26   this Stipulated Protective Order. Similarly, no Party waives any right to object on

27   any ground to use in evidence of any of the material covered by this Protective

28

Case 2:22-00450-RGK-KS  Document 242-1  Filed 06/27/22  Entered 06/27/22 17:04:41  Desc Exhibit
Case 2:17-cv-04393-RGK-KS  Document 242-1  Filed 06/27/22  Page 16 of 19  Page ID #:369
Stipulated Protective Order in the FCA    Page 16 of 19

1   Order.

2         12.3   Filing Protected Material. A Party that seeks to file under seal any

3   Protected Material must comply with Civil Local Rule 79-5. Protected Material

4   may only be filed under seal pursuant to a court order authorizing the sealing of the

5   specific Protected Material at issue. If a Party's request to file Protected Material

6   under seal is denied by the court, then the Receiving Party may file the information

7   in the public record unless otherwise instructed by the court.

8         13.    FINAL DISPOSITION

9         After the final disposition of this Action, as defined in Section 4, within 60

10  days of a written request by the Designating Party, each Receiving Party must

11  return all Protected Material to the Producing Party or destroy such material. As

12  used in this subdivision, "all Protected Material" includes all copies, abstracts,

13  compilations, summaries, and any other format reproducing or capturing any of the

14  Protected Material. Whether the Protected Material is returned or destroyed, the

15  Receiving Party must submit a written certification to the Producing Party (and, if

16  not the same person or entity, to the Designating Party) by the 60 day deadline that

17  (1) identifies (by category, where appropriate) all the Protected Material that was

18  returned or destroyed and (2) affirms that the Receiving Party has not retained any

19  copies, abstracts, compilations, summaries or any other format reproducing or

20  capturing any of the Protected Material. Notwithstanding this provision, Counsel

21  are entitled to retain an archival copy of all pleadings, motion papers, trial,

22  deposition, and hearing transcripts, legal memoranda, correspondence, deposition

23  and trial exhibits, expert reports, attorney work product, and consultant and expert

24  work product, even if such materials contain Protected Material. Any such archival

25  copies that contain or constitute Protected Material remain subject to this

26  Protective Order as set forth in Section 4.

27        14.    VIOLATIONS OF THE ORDER

28

Case 2:22-cv-00750-DJP-MG-3   Document 142-1   Filed 06/27/22   Entered 06/27/22 17:04:54 of 557-c   Exhibit 15
Case 2:17-cv-04393-RGK-KS   Document 142-1   Filed 11/18/19   Page 16 of 48   Page ID #:1970
Stipulated Protective Order in the FCA    Page 17 of 19

1     Any violation of this Order may be punished by any and all appropriate
2 measures including, without limitation, contempt proceedings and/or monetary
3 sanctions.

4

5     FOR GOOD CAUSE SHOWN, IT IS SO ORDERED.

6

7 DATED: November 18, 2019

8

9                _____
10                KAREN L. STEVENSON
              UNITED STATES MAGISTRATE JUDGE

STIPULATED PROTECTIVE ORDER         Case No. 2:17-CV-04393-RGK-KS

1

# EXHIBIT A

2

3

## ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

4

5     I, _____[print   or

6  type full name], of _____ [print or type

7  full address], declare under penalty of perjury that I have read in its entirety and

8  understand the Stipulated Protective Order that was issued by the United States

9  District Court for the Central District of California on _____[date] in

10  the case of The United States of America ex rel. v. Island Industries, Inc., v.

11  Vandewater International Inc., Neil Reubens, Anvil International LLC, Sigma

12  Corporation, Smith Cooper International, Allied Rubber & Gasket Company, and

13  John Does Nos. 1-10, Case No. 2:17-cv-04393 (RGK-KS). I agree to comply with

14  and to be bound by all the terms of this Stipulated Protective Order and I

15  understand and acknowledge that failure to so comply could expose me to

16  sanctions and punishment in the nature of contempt. I solemnly promise that I will

17  not disclose in any manner any information or item that is subject to this Stipulated

18  Protective Order to any person or entity except in strict compliance with the

19  provisions of this Order.

20

21     I further agree to submit to the jurisdiction of the United States

22  District Court for the Central District of California for the purpose of enforcing the

23  terms of this Stipulated Protective Order, even if such enforcement proceedings

24  occur   after   termination   of   this   action.   I   hereby   appoint

25  _____[print  or  type  full

26  name]  of  _____[print or type

27  full address and telephone number] as my California agent for service of process in

28

STIPULATED PROTECTIVE ORDER                         Case No. 2:17-CV-04393-RGK-KS

Case 2:22-cv-00450-DJP-MS-3 Document 142-1 Filed 06/27/22 Entered 06/27/22 17:04:53 of 587 Exhibit 15
Case 2:17-cv-04393-RGK-KS Document 242 Filed 11/13/19 Page 16 of 18 Page ID #:1972
Stipulated Protective Order in the FCA    Page 19 of 19

1 connection with this action or any proceedings related to enforcement of this

2 Stipulated Protective Order.

3

4

5      Date:

6      City and State where sworn and signed:

7      Printed name:

8      Signature:

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STIPULATED PROTECTIVE ORDER                      Case No. 2:17-CV-04393-RGK-KS

# EXHIBIT 4

(KSx),APPEAL,CLOSED,DISCOVERY,MANADR,PROTORD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
### CIVIL DOCKET FOR CASE #: 2:17-cv-04393-RGK-KS

| | |
|---|---|
| United States of America et al v. Vandewater International Inc. et al | Date Filed: 06/13/2017 |
| Assigned to: Judge R. Gary Klausner | Date Terminated: 05/18/2022 |
| Referred to: Magistrate Judge Karen L. Stevenson | Jury Demand: Plaintiff |
| Case in other court: 9th CCA, 22-55063 | Nature of Suit: 375 Other Statutes: False Claims Act |
| Cause: 31:3729 False Claims Act | Jurisdiction: Federal Question |

**Plaintiff**

**United States of America**
*ex rel Island Industries, Inc.*

represented by **Jennifer Lynn Chorpening**
US Department of Justice
175 N. Street NE Suite 10.212
Washington, DC 20002
202-514-8112
Email: jennifer.chorpening@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Zoila Hinson**
US Department of Justice
601 D Street NW Room 522
Washington, DC 20001
202-353-1286
Email: zhinson@relmanlaw.com
*ATTORNEY TO BE NOTICED*

**Matthew Henry Marmolejo**
Mayer Brown LLP
350 South Grand Avenue 25th Floor
Los Angeles, CA 90071-1503
213-229-9500
Fax: 213-576-8185
Email: mmarmolejo@mayerbrown.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Island Industries, Inc.**
*Relator*

represented by **Matthew Henry Marmolejo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexus B Payton**
White and Case LLP
555 South Flower Street, Suite 2700
Los Angeles, CA 90071

213-620-7849
Email: alexus.payton@whitecase.com
*TERMINATED: 10/28/2020*

**Christopher Mitchell Hendy**
Mayer Brown LLP
350 South Grand Avenue Suite 2500
Los Angeles, CA 90071
213-229-9500
Fax: 213-625-0248
Email: mhendy@mayerbrown.com
*ATTORNEY TO BE NOTICED*

**Kelly B Kramer**
Mayer Brown LLP
1999 K Street NW
Washington, DC 20006
202-263-3007
Fax: 202-263-5207
Email: kkramer@mayerbrown.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Reginald R Goeke**
Mayer Brown LLP
1999 K Street NW
Washington, DC 20006
202-263-3241
Email: rgoeke@mayerbrown.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

Vandewater International Inc.                    represented by **Ryan Matthew Salzman**
Faegre Drinker Biddle and Reath LLP
1800 Century Park East Suite 1500
Los Angeles, CA 90067-1504
310-203-4000
Fax: 310-229-1285
Email: ryan.salzman@faegredrinker.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian E. Klein**
Waymaker LLP
515 South Flower Street Suite 3500
Los Angeles, CA 90071
424-652-7800
Fax: 424-652-7850
Email: bklein@waymakerlaw.com
*ATTORNEY TO BE NOTICED*

Joie Christine Hand
Faegre Drinker Biddle and Reath LLP
1800 Century Park East Suite 1500
Los Angeles, CA 90067
202-230-5108
Email: joie.hand@faegredrinker.com
*ATTORNEY TO BE NOTICED*

**Joseph A Rillotta**
Miller and Chevalier Chartered
900 16th Street NW
Washington, DC 20006
202-626-5951
Fax: 202-626-5801
Email: jrillotta@milchev.com
*TERMINATED: 10/21/2021*
*PRO HAC VICE*

**Thomas J Kelly , Jr**
Faegre Drinker Biddle and Reath LLP
1500 K Street NW Suite 1100
Washington, DC 20005
202-230-5360
Fax: 202-842-8465
Email: thomas.kelly@faegredrinker.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Neil Reubens**                    represented by  **Ryan Matthew Salzman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian E. Klein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joie Christine Hand**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph A Rillotta**
(See above for address)
*TERMINATED: 10/21/2021*
*PRO HAC VICE*

**Thomas J Kelly , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Anvil International, LLC**         represented by  **Blythe G Kochsiek**
*TERMINATED: 03/18/2021*                            King and Spalding LLP

633 West 5th Street Suite 1600
Los Angeles, CA 90071
213-443-4350
Fax: 213-443-4310
Email: bkochsiek@kslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher C Burris**
King and Spalding LLP
1180 Peachtree Street NE
Atlanta, GA 30309
404-572-4708
Fax: 404-572-5100
Email: cburris@kslaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel L Schneiderman**
King and Spalding LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
202-661-7847
Fax: 202-626-3737
Email: dschneiderman@kslaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**J Michael Taylor**
King and Spalding LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
202-626-2385
Fax: 202-626-3737
Email: jmtaylor@kslaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephen P Cummings**
King and Spalding LLP
1180 Peachtree Street Suite 1600
Atlanta, GA 30309
404-572-4600
Fax: 404-572-5140
Email: scummings@kslaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Sigma Corporation**                    represented by   **Brian E. Klein**
*TERMINATED: 02/08/2022*                                  (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Christopher M. Curran**

White and Case LLP
601 Thirteenth Street NW
Washington, DC 20005-3807
202-626-3643
Fax: 202-639-9355
Email: ccurran@whitecase.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cristina Brayton-Lewis**
White and Case LLP
701 - 13th Street N.W.
Washington, DC 20005
202-729-2407
Fax: 202-639-9355
Email: cbraytonlewis@whitecase.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James P Gagen**
White and Case LLP
701 13th Street NW
Washington, DC 20005
202-626-3600
Fax: 202-639-9355
Email: jgagen@whitecase.com
*TERMINATED: 08/30/2021*
*PRO HAC VICE*

**Lucius B Lau**
White and Case LLP
701 - 13th Street NW
Washington, DC 20005-3807
202-626-3600
Fax: 202-639-9355
Email: alau@whitecase.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Maria Celeste Lattanzi**
White and Case LLP
555 South Flower Street Suite 2700
Los Angeles, CA 90071-2433
213-620-7754
Fax: 213-452-2329
Email: mia.lattanzi@whitecase.com
*ATTORNEY TO BE NOTICED*

**Mark E. Gustafson**
White and Case LLP
555 South Flower Street Suite 2700
Los Angeles, CA 90071-2433
213-620-7700
Fax: 213-452-2329

Email: mgustafson@whitecase.com
*ATTORNEY TO BE NOTICED*

**Ryan Matthew Salzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sadie Gardner Pulliam**
White and Case LLP
701 13th Street NW
Washington, DC 20005
202-626-3658
Fax: 202-639-9355
Email: sadie.pulliam@whitecase.com
*TERMINATED: 05/13/2021*

**Shannon Katherine Lane**
White and Case LLP
701 13th Street NW
Washington, DC 20005-3807
202-729-2464
Fax: 202-639-9355
Email: shannon.lane@whitecase.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Carmen K Lo**
White and Case LLP
555 South Flower Street Suite 2700
Los Angeles, CA 90071-2433
213-620-7700
Fax: 213-452-2329
Email: clo@whitecase.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Smith Cooper International**          represented by   **Brian E. Klein**
*TERMINATED: 04/05/2021*                                (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Marc J Tobak**
Davis Polk and Wardwell LLP
450 Lexington Avenue
New York, NY 10017
212-450-4000
Fax: 212-701-5800
Email: marc.tobak@davispolk.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Micah G Block**
Davis Polk and Wardwell LLP
1600 El Camino Real

Menlo Park, CA 94025
650-752-2000
Fax: 650-752-2111
Email: micah.block@davispolk.com
*ATTORNEY TO BE NOTICED*

**Neil H MacBride**
Davis Polk and Wardwell LLP
450 Lexington Avenue
New York, NY 10017
212-450-4000
Fax: 212-701-5800
Email: neil.macbride@davispolk.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Paul S Mishkin**
Davis Polk and Wardwell LLP
450 Lexington Avenue
New York, NY 10017
212-450-4000
Fax: 212-701-5800
Email: paul.mishkin@davispolk.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Matthew Salzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Teresa Lenore Huggins**
Baker Marquart LLP
777 South Figueroa Street Suite 2850
Los Angeles, CA 90017
424-652-7800
Fax: 424-652-7850
Email: thuggins@waymakerlaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Allied Rubber and Gasket Company**
*TERMINATED: 08/05/2020*

represented by **Aaron M May**
Halpern May Ybarra Gelberg LLP
550 South Hope Street Suite 2330
Los Angeles, CA 90071
213-402-1900
Fax: 213-402-1901
Email: Aaron.May@halpernmay.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Heather Lynn Mayer**
Halpern May Ybarra Gelberg LLP
550 South Hope Street, Suite 2330
Los Angeles, CA 90071

213-402-1917
Fax: 213-402-1901
Email: heather.mayer@halpernmay.com
*ATTORNEY TO BE NOTICED*

**Ryan Matthew Salzman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**John Does 1-10**

| Date Filed | # | Docket Text |
|---|---|---|
| 06/13/2017 | 1 | COMPLAINT against Defendants Allied Rubber and Gasket Company, Anvil International, LLC, John Does 1-10, Neil Reubens, Sigma Corporation, Smith Cooper International, Vandewater International Inc. Case assigned to Judge R. Gary Klausner for all further proceedings. Discovery referred to Magistrate Judge Karen L Stevenson. (Filing fee $ 400: PAID) Jury Demanded., filed by plaintiff Island Industries, Inc. No Summons issued on 6/13/2017 (Attachments: # 1 Part 1 Complaint, # 2 CV-71) (ghap) Modified on 6/14/2017 (ghap). (Entered: 06/14/2017) |
| 06/13/2017 | 2 | CERTIFICATION AND NOTICE of Interested Parties filed by Plaintiff Island Industries, Inc. (ghap) (Entered: 06/14/2017) |
| 06/13/2017 | 3 | CERTIFICATE OF SERVICE filed by plaintiff Island Industries, Inc., re Complaint - (Discovery), 1 served on 6/13/2017. (ghap) (Entered: 06/14/2017) |
| 06/14/2017 | 4 | NOTICE OF ASSIGNMENT to District Judge R. Gary Klausner and Magistrate Judge Karen L. Stevenson. (ghap) (Entered: 06/14/2017) |
| 06/14/2017 | 5 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (ghap) (Entered: 06/14/2017) |
| 06/14/2017 | 6 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Kelly B Kramer. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (ghap) (Entered: 06/14/2017) |
| 06/20/2017 | 7 | Notice Update: Judge Stevenson will conduct all Court appearances in Courtroom 580, 5th floor located at the Roybal Federal Building, 255 E. Temple Street, Los Angeles, California 90012. Please update your records to reflect this change. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (rrp) TEXT ONLY ENTRY (Entered: 06/20/2017) |
| 06/20/2017 | 8 | APPLICATION of Non-Resident Attorney To Appear in Specific Case Pro Hac Vice (Pro Hac Vice Fee - Paid) filed by Plaintiff Island Industries, Inc.. (bp) (Additional attachment(s) added on 6/21/2017: # 1 Proposed Order) (bp). (Entered: 06/21/2017) |
| 06/20/2017 | 9 | CERTIFICATE OF SERVICE filed by Plaintiff Island Industries, Inc. (bp) (Entered: |

| | | |
|---|---|---|
| | | 06/21/2017) |
| 06/20/2017 | 10 | CERTIFICATE OF SERVICE filed by Plaintiff Island Industries, Inc. (bp) (Entered: 06/21/2017) |
| 06/20/2017 | 11 | AMENDED CERTIFICATE OF SERVICE filed by Plaintiff Island Industries, Inc., served on 6/14/17. (bp) (Entered: 06/21/2017) |
| 06/21/2017 | 12 | ORDER ON APPLICATION OF NON-RESIDENT ATTORNEY TO APPEAR IN A SPECIFIC CASE PRO HAC VICE by Judge R. Gary Klausner. (bp) (Entered: 06/22/2017) |
| 08/03/2017 | 13 | STIPULATION REQUESTING EXTENSION OF SEAL AND UNITED STATES' ELECTION PERIOD filed by Plaintiff United States of America.(Attorney Jennifer Chorpening added to party United States of America(pty:pla))(bp) (Entered: 08/09/2017) |
| 08/03/2017 | 14 | MEMORANDUM of Points and Authorities in Support filed by Plaintiff United States of America. Re: Stipulation for Order 13 (bp) (Entered: 08/09/2017) |
| 08/08/2017 | 15 | ORDER EXTENDING SEAL AND UNITED STATES' ELECTION PERIOD by Judge R. Gary Klausner, re Stipulation for Order 13 (bp) (Entered: 08/09/2017) |
| 02/05/2018 | 16 | STIPULATION REQUESTING EXTENSION OF SEAL AND UNITED STATES' ELECTION PERIOD filed by Plaintiff United States of America.(Attorney Zoila E Hinson added to party United States of America(pty:pla))(bp) (Entered: 02/07/2018) |
| 02/05/2018 | 17 | MEMORANDUM of Points and Authorities in Support filed by Plaintiff United States of America. Re: Stipulation for Order 16 (bp) (Entered: 02/07/2018) |
| 02/07/2018 | 18 | ORDER EXTENDING SEAL AND UNITED STATES' ELECTION PERIOD by Judge R. Gary Klausner, (bp) (Entered: 02/07/2018) |
| 05/04/2018 | 19 | **SEALED**STIPULATION REQUESTING EXTENSION OF SEAL AND UNITED STATED ELECTION PERIOD filed by United States of America.(bp) (Entered: 05/10/2018) |
| 05/04/2018 | 20 | **SEALED**MEMORANDUM of Points and Authorities in Support filed by Plaintiff United States of America. Re: Stipulation for Order 19 (bp) (Entered: 05/10/2018) |
| 05/09/2018 | 21 | **SEALED**ORDER EXTENDING SEAL AND UNITED STATES ELECTION PERIOD by Judge R. Gary Klausner, re Stipulation for Order 19 (bp) (Entered: 05/10/2018) |
| 08/06/2018 | 22 | STIPULATION REQUESTING EXTENSION OF SEAL AND UNITED STATES' ELECTION PERIOD filed by Plaintiff United States of America.(bp) (Entered: 08/17/2018) |
| 08/06/2018 | 23 | MEMORANDUM of Points and Authorities in Support filed by Plaintiff United States of America. Re: Stipulation for Order 22 (bp) (Entered: 08/17/2018) |
| 08/09/2018 | 24 | ORDER EXTENDING SEAL AND UNITED STATES' ELECTION PERIOD by Judge R. Gary Klausner, re Stipulation for Order 22 (bp) (Entered: 08/17/2018) |
| 11/09/2018 | 25 | SEALED - STIPULATION REQUESTING EXTENSION OF SEAL AND UNITED STATES' ELECTION PERIOD filed by Plaintiff United States of America. Lodged Lodged Proposed Order. (bp) (Entered: 11/19/2018) |
| 11/09/2018 | 26 | SEALED - MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF STIPULATION REQUESTING EXTENSION OF SEAL AND UNITED STATES' ELECTION PERIOD; DECLARATION OF ZOILA E. HINSON IN SUPPORT THEREOF. Filed by Plaintiff United States of America. (bp) (Entered: 11/19/2018) |

| 11/16/2018 | 27 | SEALED - ORDER EXTENDING SEAL AND UNITED STATES ELECTION PERIOD by Judge R. Gary Klausner, (bp) (Entered: 11/19/2018) |
|---|---|---|
| 12/03/2018 | 28 | NOTICE OF THE UNITED STATES THAT IT IS NOT INTERVENING AT THIS TIME AND ELECTION TO DECLINE INTERVENTION IN-PART AND APPLICATION TO UNSEAL (bp). Modified on 1/30/2019 (bp). (Entered: 12/18/2018) |
| 12/04/2018 | 29 | SEALED DECLARATION OF KELLY B. KRAMER IN SUPPORT OF REQUEST TO MAINTAIN ACTION UNDER SEAL FOR 30 DAYS (bp). (Entered: 12/18/2018) |
| 12/04/2018 | 30 | SEALED OPPOSITION TO APPLICATION TO UNSEAL COMPLAINT AND UNOPPOSED REQUEST TO MAINTAIN ACTION UNDER SEAL FOR 30 DAYS. (bp) (Entered: 12/18/2018) |
| 12/04/2018 | 31 | SEALED CERTIFICATE OF SERVICE. (bp) (Entered: 12/18/2018) |
| 12/14/2018 | 32 | SEALED ORDER by Judge R. Gary Klausner. (bp) (Entered: 12/18/2018) |
| 12/28/2018 | 33 | SEALED NOTICE OF NON-OPPOSITION TO APPLICATION TO UNSEAL COMPLAINT filed by Plaintiff Island Industries, Inc.. (bp) (Entered: 01/04/2019) |
| 01/30/2019 | 34 | ORDER UNSEALING CASE by Judge R. Gary Klausner. It is therefore ORDERED that:The seal is lifted from this action in all respects, except as specified in Paragraph 3 below. The complaint is unsealed and will be served upon the defendants by the relator. This Order and the Notice of the United States that it is Not Intervening at this Time and Election to Decline Intervention In-Part and Application to Unseal are both unsealed, and the relator will serve both upon Defendants only after service of the complaintAll other contents of the Court's file in this action, filed and lodged to date, shall remain permanently under seal and not be made public or served upon the defendants. (bp) (Entered: 01/30/2019) |
| 04/25/2019 | 35 | Request for Clerk to Issue Summons on Complaint - (Discovery),, 1 filed by Plaintiff-Relator Island Industries, Inc.. (Attachments: # 1 Summons Request (Neil Reubens), # 2 Summons Request (Anvil), # 3 Summons Request (Sigma), # 4 Summons Request (Smith), # 5 Summons Request (Allied))(Marmolejo, Matthew) (Entered: 04/25/2019) |
| 04/26/2019 | 36 | 21 DAY Summons Issued re Complaint 1 as to Defendant Vandewater International Inc. (lom) (Entered: 04/26/2019) |
| 04/26/2019 | 37 | 21 DAY Summons Issued re Complaint 1 as to Defendant Neil Reubens. (lom) (Entered: 04/26/2019) |
| 04/26/2019 | 38 | 21 DAY Summons Issued re Complaint 1 as to Defendant Anvil International, LLC. (lom) (Entered: 04/26/2019) |
| 04/26/2019 | 39 | 21 DAY Summons Issued re Complaint 1 as to Defendant Sigma Corporation. (lom) (Entered: 04/26/2019) |
| 04/26/2019 | 40 | 21 DAY Summons Issued re Complaint 1 as to Defendant Smith Cooper International. (lom) (Entered: 04/26/2019) |
| 04/26/2019 | 41 | 21 DAY Summons Issued re Complaint 1 as to Defendant Allied Rubber and Gasket Company. (lom) (Entered: 04/26/2019) |
| 05/01/2019 | 42 | PROOF OF SERVICE Executed by Plaintiff Island Industries, Inc., upon Defendant Sigma Corporation served on 4/29/2019, answer due 5/20/2019. Service of the Summons and Complaint were executed upon Jeffrey Marcus, Chief Financial Officer in compliance with Federal Rules of Civil Procedure by substituted service on a domestic |

| | | corporation, unincorporated association, or public entity and by also mailing a copy.Original Summons NOT returned. (Marmolejo, Matthew) (Entered: 05/01/2019) |
|---|---|---|
| 05/02/2019 | 43 | PROOF OF SERVICE Executed by Plaintiff Island Industries, Inc., upon Defendant Allied Rubber and Gasket Company served on 4/29/2019, answer due 5/20/2019. Service of the Summons and Complaint were executed upon Siy Belfi, Director in compliance with Federal Rules of Civil Procedure by substituted service on a domestic corporation, unincorporated association, or public entity and by also mailing a copy.Original Summons NOT returned. (Marmolejo, Matthew) (Entered: 05/02/2019) |
| 05/02/2019 | 44 | WAIVER OF SERVICE Returned Executed filed by Plaintiff-Relator Island Industries, Inc.. upon Vandewater International Inc. waiver sent by Plaintiff on 4/29/2019, answer due 6/28/2019. Waiver of Service signed by Joseph A. Rillotta. (Marmolejo, Matthew) (Entered: 05/02/2019) |
| 05/02/2019 | 45 | WAIVER OF SERVICE Returned Executed filed by Plaintiff-Relator Island Industries, Inc.. upon Neil Reubens waiver sent by Plaintiff on 4/29/2019, answer due 6/28/2019. Waiver of Service signed by Joseph A. Rillotta. (Marmolejo, Matthew) (Entered: 05/02/2019) |
| 05/03/2019 | 46 | PROOF OF SERVICE Executed by Plaintiff Island Industries, Inc., upon Defendant Anvil International, LLC served on 4/29/2019, answer due 5/20/2019. Service of the Summons and Complaint were executed upon CT Corporation System, Registered Agent, By Serving Gabriela Sanchez, Authorized Agent in compliance with Federal Rules of Civil Procedure by personal service.Original Summons NOT returned. (Marmolejo, Matthew) (Entered: 05/03/2019) |
| 05/03/2019 | 47 | PROOF OF SERVICE Executed by Plaintiff Island Industries, Inc., upon Defendant Smith Cooper International served on 4/29/2019, answer due 5/20/2019. Service of the Summons and Complaint were executed upon National Registered Agents, Inc., Registered Agent, by Serving Daisy Montenegro, Authorized Agent in compliance with Federal Rules of Civil Procedure by service on a domestic corporation, unincorporated association, or public entity.Original Summons NOT returned. (Marmolejo, Matthew) (Entered: 05/03/2019) |
| 05/15/2019 | 48 | STIPULATION Extending Time to Answer the complaint as to Sigma Corporation answer now due 6/19/2019, re Complaint - (Discovery),, 1 , Service of Summons and Complaint Returned Executed (21 days), 42 filed by Defendant Sigma Corporation. (Attorney Carmen K Lo added to party Sigma Corporation(pty:dft))(Lo, Carmen) (Entered: 05/15/2019) |
| 05/16/2019 | 49 | APPLICATION of Non-Resident Attorney J. Michael Taylor to Appear Pro Hac Vice on behalf of Defendant Anvil International, LLC (Pro Hac Vice Fee - $400 Fee Paid, Receipt No. 0973-23751078) filed by Defendant Anvil International, LLC. (Attachments: # 1 Supplement Certificates of Good Standing, # 2 Proposed Order) (Attorney Blythe G Kochsiek added to party Anvil International, LLC(pty:dft)) (Kochsiek, Blythe) (Entered: 05/16/2019) |
| 05/16/2019 | 50 | STIPULATION Extending Time to Answer the complaint as to Anvil International, LLC answer now due 6/19/2019, re Complaint - (Discovery),, 1 filed by Defendant Anvil International, LLC.(Kochsiek, Blythe) (Entered: 05/16/2019) |
| 05/17/2019 | 51 | Notice of Appearance or Withdrawal of Counsel: for attorney Brian E Klein counsel for Defendant Smith Cooper International. Adding Brian E, Klein as counsel of record for Smith Cooper International, Inc. for the reason indicated in the G-123 Notice. Filed by Defendant Smith Cooper International, Inc.. (Attorney Brian E Klein added to party Smith Cooper International(pty:dft))(Klein, Brian) (Entered: 05/17/2019) |

| 05/17/2019 | 52 | Notice of Appearance or Withdrawal of Counsel for attorney Teresa Lenore Huggins counsel for Defendant Smith Cooper International. Adding Teresa L. Huggins as counsel of record for Smith Cooper International, Inc. for the reason indicated in the G-123 Notice. Filed by Defendant Smith Cooper International, Inc.. (Attorney Teresa Lenore Huggins added to party Smith Cooper International(pty:dft))(Huggins, Teresa) (Entered: 05/17/2019) |
| 05/17/2019 | 53 | STIPULATION Extending Time to Answer the complaint as to Smith Cooper International answer now due 6/19/2019, re Complaint - (Discovery),, 1 filed by Defendant Smith Cooper International.(Klein, Brian) (Entered: 05/17/2019) |
| 05/23/2019 | 54 | APPLICATION of Non-Resident Attorney Neil H. MacBride to Appear Pro Hac Vice on behalf of Defendant Smith Cooper International (PHV fee of $400 paid.) filed by Defendant Smith Cooper International. (Attachments: # 1 Proposed Order) (Klein, Brian) (Entered: 05/23/2019) |
| 05/23/2019 | 55 | APPLICATION of Non-Resident Attorney Paul S. Mishkin to Appear Pro Hac Vice on behalf of Defendant Smith Cooper International (PHV fee of $400 paid.) filed by Defendant Smith Cooper International. (Attachments: # 1 Proposed Order) (Klein, Brian) (Entered: 05/23/2019) |
| 05/23/2019 | 56 | APPLICATION of Non-Resident Attorney Marc J. Tobak to Appear Pro Hac Vice on behalf of Defendant Smith Cooper International (PHV fee of $400 paid.) filed by Defendant Smith Cooper International. (Attachments: # 1 Proposed Order) (Klein, Brian) (Entered: 05/23/2019) |
| 05/23/2019 | | PHV FEE PAID for Non-Resident Attorney Neil H. MacBride Application to Appear Pro Hac Vice. Receipt No. 0973-23795389 for $400 pro hac vice fee. (Klein, Brian) (Entered: 05/23/2019) |
| 05/23/2019 | | PHV FEE PAID for Non-Resident Attorney Paul S. Mishkin Application to Appear Pro Hac Vice. Receipt No. 0973-23795518 for $400 pro hac vice fee. (Klein, Brian) (Entered: 05/23/2019) |
| 05/23/2019 | | PHV FEE PAID for Non-Resident Attorney Marc J. Tobak Application to Appear Pro Hac Vice. Receipt No. 0973-23795574 for $400 pro hac vice fee. (Klein, Brian) (Entered: 05/23/2019) |
| 05/23/2019 | 57 | CORPORATE DISCLOSURE STATEMENT *Defendant Smith Cooper International, Inc.'s Rule 7.1 Corporate Disclosure Statement* filed by Defendant Smith Cooper International identifying BP SCI, LLC as Corporate Parent. (Klein, Brian) (Entered: 05/23/2019) |
| 05/23/2019 | 58 | NOTICE of Interested Parties filed by Defendant Smith Cooper International, identifying BP SCI, LLC; Tailwind Capital; Tailwind Smith Cooper Investor, LP; Tailwind Management LP; North American Capacity Insurance, Co.; Interstate Fire and Casualty Co.; Aspen Specialty Insurance Co.; BCBP Management II, L.P.. (Klein, Brian) (Entered: 05/23/2019) |
| 05/23/2019 | 59 | ORDER by Judge R. Gary Klausner: granting 49 Non-Resident Attorney J Michael Taylor APPLICATION to Appear Pro Hac Vice on behalf of Defendant Anvil International, LLC, designating Blythe Kochsiek as local counsel. (jp) (Entered: 05/24/2019) |
| 05/24/2019 | 60 | APPLICATION of Non-Resident Attorney Daniel L. Schneiderman to Appear Pro Hac Vice on behalf of Defendant Anvil International, LLC (Pro Hac Vice Fee - $400 Fee Paid, Receipt No. 0973-23800850) filed by Defendant Anvil International, LLC. |

|            |    | (Attachments: # 1 Supplement, # 2 Proposed Order) (Kochsiek, Blythe) (Entered: 05/24/2019) |
|------------|----|---|
| 05/24/2019 | 61 | *CORPORATE DISCLOSURE STATEMENT AND* NOTICE of Interested Parties filed by Defendant Anvil International, LLC, (Kochsiek, Blythe) (Entered: 05/24/2019) |
| 05/28/2019 | 62 | APPLICATION of Non-Resident Attorney Lucius B. Lau to Appear Pro Hac Vice on behalf of Defendant Sigma Corporation (Pro Hac Vice Fee - $400 Fee Paid, Receipt No. 0973-23811162) filed by Defendant Sigma Corporation. (Attachments: # 1 Proposed Order) (Lo, Carmen) (Entered: 05/28/2019) |
| 05/28/2019 | 63 | APPLICATION of Non-Resident Attorney James P. Gagen to Appear Pro Hac Vice on behalf of Defendant Sigma Corporation (Pro Hac Vice Fee - $400 Fee Paid, Receipt No. 0973-23811975) filed by Defendant Sigma Corporation. (Attachments: # 1 Proposed Order) (Lo, Carmen) (Entered: 05/28/2019) |
| 05/28/2019 | 64 | APPLICATION of Non-Resident Attorney Christopher C. Burris to Appear Pro Hac Vice on behalf of Defendant Anvil International, LLC (Pro Hac Vice Fee - $400 Fee Paid, Receipt No. 0973-23812523) filed by Defendant Anvil International, LLC. (Attachments: # 1 Supplement, # 2 Proposed Order) (Kochsiek, Blythe) (Entered: 05/28/2019) |
| 05/30/2019 | 65 | Pursuant to Local Rule 5-4.4.2, counsel for defendant Smith Cooper International, Inc. shall immediately submit the proposed order in connection with Docket Entries 54-56 (to the Judge's generic email address) in Word or Word Perfect format. TEXT ONLY ENTRY THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 05/30/2019) |
| 05/31/2019 | 66 | ORDER by Judge R. Gary Klausner: granting 56 Non-Resident Attorney Marc J Tobak APPLICATION to Appear Pro Hac Vice on behalf of Defendant Smith Cooper International, designating Brian E Klein as local counsel. (jp) (Entered: 06/03/2019) |
| 05/31/2019 | 67 | ORDER by Judge R. Gary Klausner: granting 55 Non-Resident Attorney Paul S Mishkin APPLICATION to Appear Pro Hac Vice on behalf of Defendant Smith Cooper International, designating Brian E Klein as local counsel. (jp) (Entered: 06/03/2019) |
| 05/31/2019 | 69 | ORDER by Judge R. Gary Klausner: granting 54 Non-Resident Attorney Neil H MacBride APPLICATION to Appear Pro Hac Vice on behalf of Smith Cooper International, designating Brian E Klein as local counsel. (lom) (Entered: 06/04/2019) |
| 06/03/2019 | 68 | CORPORATE DISCLOSURE STATEMENT *and Notice of Interested Parties* filed by Defendant Sigma Corporation identifying Sigma Companies International Corp. as Corporate Parent. (Lo, Carmen) (Entered: 06/03/2019) |
| 06/11/2019 | 70 | ORDER by Judge R. Gary Klausner: granting 60 Non-Resident Attorney Daniel L Schneiderman APPLICATION to Appear Pro Hac Vice on behalf of Defendant Anvil International, LLC, designating Blythe Kochsiek as local counsel. (jp) (Entered: 06/11/2019) |
| 06/11/2019 | 71 | ORDER by Judge R. Gary Klausner: granting 62 Non-Resident Attorney Lucius B Lau APPLICATION to Appear Pro Hac Vice on behalf of Defendant Sigma Corporation, designating Carmen Lo as local counsel. (jp) (Entered: 06/11/2019) |
| 06/11/2019 | 72 | ORDER by Judge R. Gary Klausner: granting 63 Non-Resident Attorney James P Gagen APPLICATION to Appear Pro Hac Vice on behalf of Defendant Sigma Corporation, designating Carmen Lo as local counsel. (jp) (Entered: 06/11/2019) |
| 06/11/2019 | 73 | ORDER by Judge R. Gary Klausner: granting 64 Non-Resident Attorney Christopher C Burris APPLICATION to Appear Pro Hac Vice on behalf of Defendant Anvil |

| | | International, LLC, designating Blythe Kochsiek as local counsel. (jp) (Entered: 06/11/2019) |
|---|---|---|
| 06/11/2019 | 74 | APPLICATION of Non-Resident Attorney Joie C. Hand to Appear Pro Hac Vice on behalf of Defendants Neil Reubens, Vandewater International Inc. (Pro Hac Vice Fee - $400.00 Previously Paid on 6/11/2019, Receipt No. 2613489R) filed by Defendants Neil Reubens, Vandewater International Inc.. (Attachments: # 1 Proposed Order) (Attorney Ryan Matthew Salzman added to party Neil Reubens(pty:dft), Attorney Ryan Matthew Salzman added to party Vandewater International Inc.(pty:dft)) (Salzman, Ryan) (Entered: 06/11/2019) |
| 06/11/2019 | 75 | APPLICATION of Non-Resident Attorney Thomas J. Kelly to Appear Pro Hac Vice on behalf of Defendants Neil Reubens, Vandewater International Inc. (Pro Hac Vice Fee - $400.00 Previously Paid on 6/11/2019, Receipt No. 26134BR4) filed by Defendants Neil Reubens, Vandewater International Inc.. (Attachments: # 1 Proposed Order) (Salzman, Ryan) (Entered: 06/11/2019) |
| 06/11/2019 | 76 | APPLICATION of Non-Resident Attorney Joseph A. Rillotta to Appear Pro Hac Vice on behalf of Defendants Neil Reubens, Vandewater International Inc. (Pro Hac Vice Fee - $400.00 Previously Paid on 6/11/2019, Receipt No. 26134C5L) filed by Defendants Neil Reubens, Vandewater International Inc.. (Attachments: # 1 Proposed Order) (Salzman, Ryan) (Entered: 06/11/2019) |
| 06/13/2019 | 77 | STIPULATION Extending Time to Answer the complaint as to Vandewater International Inc. answer now due 7/29/2019, re Complaint - (Discovery),, 1 filed by Plaintiff-Relator Island Industries, Inc..(Marmolejo, Matthew) (Entered: 06/13/2019) |
| 06/14/2019 | 78 | STIPULATION Extending Time to Answer the complaint as to Sigma Corporation answer now due 7/19/2019, re Complaint - (Discovery),, 1 filed by Plaintiff-Relator Island Industries, Inc.. (Attachments: # 1 Proposed Order)(Marmolejo, Matthew) (Entered: 06/14/2019) |
| 06/14/2019 | 79 | STIPULATION Extending Time to Answer the complaint as to Smith Cooper International answer now due 7/19/2019, re Complaint - (Discovery),, 1 filed by Plaintiff-Relator Island Industries, Inc.. (Attachments: # 1 Proposed Order)(Marmolejo, Matthew) (Entered: 06/14/2019) |
| 06/14/2019 | 80 | STIPULATION for Extension of Time to File Answer to August 15, 2019 re Complaint - (Discovery),, 1 filed by Plaintiff-Relator Island Industries, Inc.. (Attachments: # 1 Proposed Order)(Marmolejo, Matthew) (Entered: 06/14/2019) |
| 06/19/2019 | 81 | First NOTICE OF MOTION AND MOTION to Dismiss Case *as to Sigma Corporation* filed by Defendant Sigma Corporation. Motion set for hearing on 7/29/2019 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Proposed Order Dismissing Sigma Corporation) (Lau, Lucius) (Entered: 06/19/2019) |
| 06/19/2019 | 82 | JOINDER in First NOTICE OF MOTION AND MOTION to Dismiss Case *as to Sigma Corporation* 81 *(Defendant Smith Cooper International, Inc.'s Notice of Joinder in Motion to Dismiss Complaint)* filed by Defendant Smith Cooper International. (Tobak, Marc) (Entered: 06/19/2019) |
| 06/19/2019 | 83 | Defendant Smith Cooper International, Inc.'s Notice of Motion to Dismiss the Complaint re First NOTICE OF MOTION AND MOTION to Dismiss Case *as to Sigma Corporation* 81 filed by Defendant Smith Cooper International. (Attachments: # 1 Proposed Order)(Tobak, Marc) (Entered: 06/19/2019) |
| 06/19/2019 | 84 | NOTICE OF ERRATA filed by Defendant Smith Cooper International. correcting Motion Related Document, 83 (Tobak, Marc) (Entered: 06/19/2019) |

| 06/19/2019 | 85 | Corrected NOTICE OF MOTION AND MOTION to Dismiss Case filed by Defendant Smith Cooper International. Motion set for hearing on 7/29/2019 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Proposed Order) (Tobak, Marc) (Entered: 06/19/2019) |
| 06/21/2019 | 86 | DENIED BY ORDER OF THE COURT by Judge R. Gary Klausner, re Stipulation to Extend Time to Answer (More than 30 days) 80 . (jp) (Entered: 06/21/2019) |
| 06/21/2019 | 87 | DENIED BY ORDER OF THE COURT by Judge R. Gary Klausner, re Stipulation Extending Time to Answer (30 days or less) 78 . (jp) (Entered: 06/21/2019) |
| 06/21/2019 | 88 | DENIED BY ORDER OF THE COURT by Judge R. Gary Klausner, re Stipulation Extending Time to Answer (30 days or less) 79 (jp) (Entered: 06/21/2019) |
| 06/25/2019 | 89 | NOTICE OF MOTION AND MOTION to Dismiss Case filed by Defendant Anvil International, LLC. Motion set for hearing on 7/29/2019 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Proposed Order) (Kochsiek, Blythe) (Entered: 06/25/2019) |
| 06/26/2019 | 90 | CORPORATE DISCLOSURE STATEMENT filed by Defendant Vandewater International Inc. (Salzman, Ryan) (Entered: 06/26/2019) |
| 06/26/2019 | 91 | NOTICE of Interested Parties filed by Defendants Neil Reubens, Vandewater International Inc., identifying The Hartford Insurance; All State Insurance. (Salzman, Ryan) (Entered: 06/26/2019) |
| 06/26/2019 | 92 | Notice of Appearance or Withdrawal of Counsel: for attorney Christopher Mitchell Hendy counsel for Plaintiff Island Industries, Inc.. Adding C. Mitchell Hendy as counsel of record for Island Industries, Inc. for the reason indicated in the G-123 Notice. Filed by Plaintiff Island Industries, Inc.. (Attorney Christopher Mitchell Hendy added to party Island Industries, Inc.(pty:pla))(Hendy, Christopher) (Entered: 06/26/2019) |
| 07/02/2019 | 93 | Joint STIPULATION to Reschedule Briefing Schedule and Hearing Date filed by Defendant Sigma Corporation. (Attachments: # 1 Proposed Order)(Lau, Lucius) (Entered: 07/02/2019) |
| 07/03/2019 | 94 | NOTICE of Intent to File Amended Complaint filed by Plaintiff-Relator Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 07/03/2019) |
| 07/08/2019 | 95 | ORDER SETTING SCHEDULING CONFERENCE by Judge R. Gary Klausner. A Scheduling Conference has been placed on calendar for September 16, 2019 at 9:00 a.m. The Conference will be held pursuant to F.R.Civ. P. 16(b). Trial counsel must be present and there are no telephonic appearances. Counsel are ordered to file a joint statement providing a brief factual summary of the case, including the claims being asserted. The parties are reminded of their obligations to disclose information and confer on a discovery plan not later than 21 days prior to the scheduling conference, and to file a joint statement with the Court not later than 14 days after they confer, as required by F.R. Civ.P. 26 and the Local Rules of this Court. Failure to comply may lead to the imposition of sanctions. Plaintiff's counsel is directed to give notice of the scheduling conference to each party that makes an initial appearance in the action after this date. Rule 26 Meeting Report due by 9/9/2019. (sw) (Entered: 07/08/2019) |
| 07/10/2019 | 96 | ORDER by Judge R. Gary Klausner DENIED Joint Stipulation Regarding Brief Schedule and Hearing Date 93 . (jp) (Entered: 07/10/2019) |
| 07/10/2019 | 97 | FIRST AMENDED COMPLAINT against Defendants Allied Rubber and Gasket Company, Anvil International, LLC, Neil Reubens, Sigma Corporation, Smith Cooper International, Vandewater International Inc. amending Complaint - (Discovery),, 1 , filed by Plaintiff-Relator Island Industries, Inc.. (Attachments: # 1 Exhibit A - 1991 Ruling |

Request, # 2 Exhibit B - 1992 Scope Ruling, # 3 Exhibit C - Beijing Bell Welded Outlets, # 4 Exhibit D - Jinan Meide Welded Outlets, # 5 Exhibit E - Shanghai Vision Welded Outlets, # 6 Exhibit F - Vandewater Welded Outlets, # 7 Exhibit G - Anvil Welded Outlets, # 8 Exhibit H - Sigma Welded Outlets, # 9 Exhibit I - Smith Cooper Welded Outlets, # 10 Exhibit J - ARGCO Welded Outlets, # 11 Exhibit K - Smith Cooper Scope Ruling, # 12 Exhibit L - Sigma Scope Ruling, # 13 Exhibit M - Vandewater Scope Ruling, # 14 Exhibit N - Vandewater Pricing Documents, # 15 Exhibit O - Sept. 2018 Anvil Price Increase Announcement, # 16 Exhibit P - Oct. 2018 Anvil Price Increase Announcement, # 17 Exhibit Q - E-mail Exchange with Shanghai Vision)(Marmolejo, Matthew) (Entered: 07/10/2019)

| 07/10/2019 | 98 | PROOF OF SERVICE filed by Plaintiff-Relator Island Industries, Inc., re Amended Complaint/Petition,,,, 97 served on 7/10/2019. (Marmolejo, Matthew) (Entered: 07/10/2019) |
| 07/11/2019 | 99 | According to court records, on July 10, 2019, plaintiff(s) filed a First Amended Complaint. Therefore, the motions to dismiss, filed at docket entries 81, 85 and 89 are denied as moot. Text Only Entry THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 07/11/2019) |
| 07/15/2019 | 100 | NOTICE OF MOTION AND MOTION to Stay Case pending concurrent lawsuits in the U.S. Court of International Trade filed by Defendant Sigma Corporation. Motion set for hearing on 8/12/2019 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Memorandum in support of Motion to Stay, # 2 Proposed Order) (Gagen, James) (Entered: 07/15/2019) |
| 07/22/2019 | 101 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION to Stay Case pending concurrent lawsuits in the U.S. Court of International Trade 100 filed by Plaintiff Island Industries, Inc.. (Attachments: # 1 Exhibit 1 - Letter, # 2 Proposed Order) (Marmolejo, Matthew) (Entered: 07/22/2019) |
| 07/24/2019 | 102 | [DOCUMENT STRICKEN PER ORDER DATED 7/25/2019, SEE DOCKET ENTRY NO. 106 ] NOTICE OF MOTION AND MOTION to Dismiss Plaintiff-Relator's First Amended Complaint filed by Defendant Anvil International, LLC. Motion set for hearing on 8/26/2019 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Proposed Order) (Kochsiek, Blythe) Modified on 7/25/2019 (jp). (Entered: 07/24/2019) |
| 07/24/2019 | 103 | Second NOTICE OF MOTION AND MOTION to Dismiss Case *as to Sigma Corporation* filed by Defendant Sigma Corporation. Motion set for hearing on 8/26/2019 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Declaration of Lucius B. Lau, # 2 Exhibit Exhibit A - Harmonized Tariff Schedule Excerpt, # 3 Proposed Order Granting Sigma Corporation's Motion to Dismiss) (Lau, Lucius) (Entered: 07/24/2019) |
| 07/24/2019 | 104 | [DOCUMENT STRICKEN PER ORDER DATED 7/25/2019, SEE DOCKET ENTRY NO. 106 ]. NOTICE OF MOTION AND MOTION to Dismiss Case filed by Defendants Neil Reubens, Vandewater International Inc.. Motion set for hearing on 8/26/2019 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Exhibit 1 - Butt-Weld Order, # 3 Exhibit 2 - Taiwan Butt-Weld Order, # 4 Exhibit 3 - CIT's Letter, # 5 Proposed Order) (Salzman, Ryan). Modified on 7/25/2019 (jp). (Entered: 07/24/2019) |
| 07/24/2019 | 105 | NOTICE OF MOTION AND MOTION to Dismiss Case filed by Defendant Smith Cooper International. Motion set for hearing on 8/26/2019 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Request for Judicial Notice, # 2 Exhibit 1 to Request for Judicial Notice, # 3 Exhibit 2 to Request for Judicial Notice, # 4 Exhibit 3 to Request for Judicial Notice, # 5 Proposed Order) (Klein, Brian) (Entered: 07/24/2019) |

| 07/25/2019 | [106](#) | ORDER TO STRIKE ELECTRONICALLY-FILED DOCUMENTS by Judge R. Gary Klausner: the following document(s) be STRICKEN for failure to comply with the Local Rules, General Order and/or the Courts Case Management Order: NOTICE OF MOTION AND MOTION to Dismiss Plaintiff-Relator's First Amended Complaint [102](#) , NOTICE OF MOTION AND MOTION to Dismiss Case [104](#) , for the following reasons: Memorandum of Points and Authorities contain single-spaced text. LR 11-3.6. (jp) (Entered: 07/25/2019) |
| 07/25/2019 | [107](#) | NOTICE OF MOTION AND MOTION to Dismiss Plaintiff-Relator's First Amended Complaint filed by Defendant Anvil International, LLC. Motion set for hearing on 8/26/2019 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # [1](#) Proposed Order) (Kochsiek, Blythe) (Entered: 07/25/2019) |
| 07/25/2019 | [108](#) | NOTICE OF MOTION AND MOTION to Dismiss Case filed by Defendants Neil Reubens, Vandewater International Inc.. Motion set for hearing on 8/26/2019 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # [1](#) Memorandum of Points and Authorities, # [2](#) Exhibit 1 - Butt-Weld Order, # [3](#) Exhibit 2 - Taiwan Butt-Weld Order, # [4](#) Exhibit 3 - CIT's Letter, # [5](#) Proposed Order) (Salzman, Ryan) (Entered: 07/25/2019) |
| 07/26/2019 | [109](#) | PROOF OF SERVICE filed by Defendant Sigma Corporation, re Second NOTICE OF MOTION AND MOTION to Dismiss Case *as to Sigma Corporation* [103](#) *on Allied Rubber & Gasket Company* served on 07/24/2019. (Lau, Lucius) (Entered: 07/26/2019) |
| 07/29/2019 | [110](#) | REPLY in support of NOTICE OF MOTION AND MOTION to Stay Case pending concurrent lawsuits in the U.S. Court of International Trade [100](#) filed by Defendant Sigma Corporation. (Attachments: # [1](#) Exhibit A (CIT Scheduling Order), # [2](#) Exhibit B (Letter from J. Gordon))(Gagen, James) (Entered: 07/29/2019) |
| 07/29/2019 | [111](#) | PROOF OF SERVICE filed by Defendant Sigma Corporation, re Reply (Motion related), [110](#) *on Allied Rubber & Gasket Company* served on July 29, 2019. (Gagen, James) (Entered: 07/29/2019) |
| 07/31/2019 | [112](#) | ORDER by Judge R. Gary Klausner: granting [74](#) Non-Resident Attorney Joie C Hand APPLICATION to Appear Pro Hac Vice on behalf of Defendants Neil Reubens, Vandewater International Inc., designating Ryan M Salzman as local counsel. (jp) (Entered: 07/31/2019) |
| 07/31/2019 | [113](#) | ORDER by Judge R. Gary Klausner: granting [75](#) Non-Resident Attorney Thomas J Kelly APPLICATION to Appear Pro Hac Vice on behalf of Defendants Neil Reubens, Vandewater International Inc., designating Ryan M Salzman as local counsel. (jp) (Entered: 07/31/2019) |
| 07/31/2019 | [114](#) | ORDER by Judge R. Gary Klausner: granting [76](#) Non-Resident Attorney Joseph A Rillotta APPLICATION to Appear Pro Hac Vice on behalf of Defendants Neil Reubens, Vandewater International Inc., designating Ryan M Salzman as local counsel. (jp) (Entered: 07/31/2019) |
| 08/02/2019 | 115 | SCHEDULING NOTICE TO ALL PARTIES AND ORDER by Judge R. Gary Klausner. The Scheduling Conference, calendared for hearing on September 16, 2019 at 9:00 a.m., HAS BEEN CONTINUED to October 7, 2019 at 9:00 a.m. The joint report shall be filed by September 30, 2019.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 08/02/2019) |
| 08/02/2019 | [116](#) | REQUEST for Leave to file Consolidated Brief in Opposition to Motions to Dismiss filed by Plaintiff-Relator Island Industries, Inc.. (Attachments: # [1](#) Proposed Order) (Marmolejo, Matthew) (Entered: 08/02/2019) |
| 08/05/2019 | [117](#) | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION to Dismiss |

| | | |
|---|---|---|
| | | Case 108 , Second NOTICE OF MOTION AND MOTION to Dismiss Case *as to Sigma Corporation* 103 , NOTICE OF MOTION AND MOTION to Dismiss Case 105 , NOTICE OF MOTION AND MOTION to Dismiss Plaintiff-Relator's First Amended Complaint 107 filed by Plaintiff Island Industries, Inc.. (Attachments: # 1 Declaration of Glenn Sanders, # 2 Proposed Order)(Marmolejo, Matthew) (Entered: 08/05/2019) |
| 08/06/2019 | 118 | PROOF OF SERVICE filed by Plaintiff-Relator Island Industries, Inc., re MEMORANDUM in Opposition to Motion, 117 served on August 6, 2019. (Marmolejo, Matthew) (Entered: 08/06/2019) |
| 08/06/2019 | 119 | ORDER GRANTING LEAVE TO FILE ONE CONSOLIDATED BRIEF IN OPPOSITION TO MOTIONS TO DISMISS 116 by Judge R. Gary Klausner, hereby GRANTS the Request. Island Industries, Inc. may file one consolidated brief, not to exceed 30 pages, in opposition to the pending Motions to Dismiss filed by Sigma Corporation (Dkt. No. 103 ), Smith-Cooper International (Dkt. No. 105 ), Anvil International, LLC (Dkt. No. 107 ) and Vandewater International Inc. and Neil Reubens (Dkt. No. 108 ). Defendants may file separate reply briefing in accordance with Rule 6 of the Courts Standing Order Regarding Newly Assigned Cases. (jp) (Entered: 08/07/2019) |
| 08/07/2019 | 120 | SCHEDULING NOTICE TO ALL PARTIES AND ORDER by Judge R. Gary Klausner. Defendant Sigma Corporation's Motion to Stay Case 100 , calendared for hearing on August 12, 2019, has been taken under submission and off the motion calendar. No appearances by counsel are necessary. The Court will issue a ruling after full consideration of properly submitted pleadings. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 08/07/2019) |
| 08/12/2019 | 121 | REPLY NOTICE OF MOTION AND MOTION to Dismiss Plaintiff-Relator's First Amended Complaint 107 filed by Defendant Anvil International, LLC. (Kochsiek, Blythe) (Entered: 08/12/2019) |
| 08/12/2019 | 122 | REPLY in support of Second NOTICE OF MOTION AND MOTION to Dismiss Case *as to Sigma Corporation* 103 filed by Defendant Sigma Corporation. (Lau, Lucius) (Entered: 08/12/2019) |
| 08/12/2019 | 123 | PROOF OF SERVICE filed by Defendant Sigma Corporation, re Reply (Motion related) 122 *on Allied Rubber & Gasket Company* served on August 12, 2019. (Lau, Lucius) (Entered: 08/12/2019) |
| 08/12/2019 | 124 | REPLY in support of NOTICE OF MOTION AND MOTION to Dismiss Plaintiff-Relator's First Amended Complaint 107 filed by Defendants Neil Reubens, Vandewater International Inc.. (Salzman, Ryan) (Entered: 08/12/2019) |
| 08/12/2019 | 125 | REPLY Support of Motion NOTICE OF MOTION AND MOTION to Dismiss Case 105 *DEFENDANT SMITH-COOPER INTERNATIONAL, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS* filed by Defendant Smith Cooper International. (Klein, Brian) (Entered: 08/12/2019) |
| 08/20/2019 | 126 | MINUTES (IN CHAMBERS) Order Re: Defendants' Motion to Stay (DE 100) by Judge R. Gary Klausner: The Court DENIES without prejudice Defendants' Motion to Stay 100 . (SEE CIVIL MINUTES FOR FURTHER SPECIFICS). (jp) (Entered: 08/20/2019) |
| 08/21/2019 | 127 | SCHEDULING NOTICE TO ALL PARTIES AND ORDER by Judge R. Gary Klausner. Defendant Sigma Corporation's Second Motion to Dismiss 103 ; Defendant Smith Cooper International's Motion to Dismiss 105 ; Defendant Anvil International LLC's Motion to Dismiss 107 ; and Defendants Neil Reubens and Vandewater International's Motion to Dismiss 108 , calendared for hearing on August 26, 2019, have been taken under submission and off the motion calendar. No appearances by counsel are necessary. The Court will issue a ruling after full consideration of properly submitted pleadings. |

| | | THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 08/21/2019) |
|---|---|---|
| 09/03/2019 | [128](#) | MINUTES (IN CHAMBERS) Order Re: Defendant Sigma's Motion to Dismiss (DE [103](#)); Defendant SCI's Motion to Dismiss (DE [105](#)); Defendant Anvil's Motion to Dismiss (DE [107](#)); Defendants Reubens and Vandewater's Motion to Dismiss (DE [108](#)) by Judge R. Gary Klausner: The Court GRANTS in part and DENIES in part Defendants' Motions to Dismiss. The Court DENIES Defendants' Motions to Dismiss the first cause of action. The Court GRANTS with leave to amend Defendants' Motions to Dismiss the second cause of action. Any amended complaint must be filed within ten (10) calendar days of this Order. (SEE CIVIL MINUTES FOR FURTHER SPECIFICS). (jp) (Entered: 09/03/2019) |
| 09/17/2019 | [129](#) | ANSWER to Amended Complaint/Petition,,,, [97](#) filed by Defendant Sigma Corporation. (Lau, Lucius) (Entered: 09/17/2019) |
| 09/17/2019 | [130](#) | PROOF OF SERVICE filed by Defendant Sigma Corporation, re Answer to Complaint (Discovery) [129](#) *on Allied Rubber & Gasket Company* served on September 17, 2019. (Lau, Lucius) (Entered: 09/17/2019) |
| 09/17/2019 | [131](#) | ANSWER to Amended Complaint/Petition,,,, [97](#) filed by Defendants Neil Reubens, Vandewater International Inc..(Salzman, Ryan) (Entered: 09/17/2019) |
| 09/17/2019 | [132](#) | ANSWER to Amended Complaint/Petition,,,, [97](#) filed by Defendant Anvil International, LLC.(Kochsiek, Blythe) (Entered: 09/17/2019) |
| 09/17/2019 | [133](#) | ANSWER to Amended Complaint/Petition,,,, [97](#) with JURY DEMAND *Defendant Smith-Cooper International, Inc.'s Answer to First Amended Complaint* filed by Defendant Smith Cooper International.(Klein, Brian) (Entered: 09/17/2019) |
| 09/30/2019 | [134](#) | JOINT REPORT Rule 26(f) Discovery Plan ; estimated length of trial 4 weeks, filed by Plaintiff Island Industries, Inc... (Attachments: # [1](#) Proposed Order of Scheduling Order) (Marmolejo, Matthew) (Entered: 09/30/2019) |
| 10/04/2019 | [135](#) | NOTICE of Subpoena filed by Plaintiff-Relator Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 10/04/2019) |
| 10/07/2019 | [138](#) | MINUTES OF SCHEDULING CONFERENCE before Judge R. Gary Klausner: The Scheduling Conference is held. The Court orders the following dates: Jury Trial (Est. 20 days): 06/23/2020 at 9:00 AM. Pretrial Conference: 6/8/2020 at 9:00 AM. Motion Cut-Off Date: 4/8/2020. Discovery Cut-Off Date: 3/25/2020.Last day to motion the Court to amend the complaint or add parties is 11/30/2019. The Court orders the parties to participate in settlement option 3. Court Reporter: Anne Kielwasser. (jp) (Entered: 10/09/2019) |
| 10/09/2019 | [136](#) | ORDER RE JURY TRIAL by Judge R. Gary Klausner. Pretrial Conference set for 6/8/2020 at 9:00 am; Jury Trial set for 6/23/2020 at 9:00 am. See Order for details. (sw) (Entered: 10/09/2019) |
| 10/09/2019 | [137](#) | ORDER/REFERRAL to ADR Procedure No. 3 by Judge R. Gary Klausner. Case ordered to a private mediator based upon a stipulation of the parties or by the court order. ADR Proceeding to be held no later than April 24, 2020. (sw) (Entered: 10/09/2019) |
| 10/15/2019 | [139](#) | NOTICE of Subpoena filed by Plaintiff-Relator Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 10/15/2019) |
| 10/23/2019 | [140](#) | Notice of Appearance or Withdrawal of Counsel: for attorney Alexus B Payton counsel for Plaintiff Island Industries, Inc.. Filed by Plaintiff-Relator Island Industries, Inc.. |

| | | (Attorney Alexus B Payton added to party Island Industries, Inc.(pty:pla))(Payton, Alexus) (Entered: 10/23/2019) |
|---|---|---|
| 11/15/2019 | 141 | STIPULATION for Protective Order Anvil International, LLC. (Attachments: # 1 Proposed Order)(Kochsiek, Blythe) (Entered: 11/15/2019) |
| 11/18/2019 | 142 | STIPULATED PROTECTIVE ORDER by Magistrate Judge Karen L. Stevenson re Stipulation for Protective Order 141 . [See Order for details.] (et) (Entered: 11/18/2019) |
| 12/11/2019 | 143 | APPLICATION of Non-Resident Attorney Stephen P. Cummings to Appear Pro Hac Vice on behalf of Defendant Anvil International, LLC (Pro Hac Vice Fee - $400 Fee Paid, Receipt No. 0973-24932156) filed by Defendant Anvil International, LLC. (Attachments: # 1 Supplement Certificate of Good Standing, # 2 Proposed Order) (Kochsiek, Blythe) (Entered: 12/11/2019) |
| 12/13/2019 | 144 | ORDER GRANTING APPLICATION of Non-Resident Attorney Stephen P. Cummings to Appear Pro Hac Vice on behalf of Defendant Anvil International, LLC and designating Blythe Kochsiek as local counsel 143 by Judge R. Gary Klausner (lc) (Entered: 12/13/2019) |
| 12/30/2019 | 145 | STIPULATION for Discovery as to DISCOVERY MATTER Stipulated Order re: Discovery of Electronically Stored Information filed by Defendant Sigma Corporation. (Attachments: # 1 Proposed Order)(Lau, Lucius) (Entered: 12/30/2019) |
| 01/02/2020 | 146 | STIPULATED ORDER RE: DISCOVERY OF ELECTRONICALLY STORED INFORMATION [As Amended by the Court] by Magistrate Judge Karen L. Stevenson re Stipulation for Discovery 145 . (see document for details) (hr) (Entered: 01/02/2020) |
| 01/10/2020 | 147 | APPLICATION of Non-Resident Attorney Shannon K. Lane to Appear Pro Hac Vice on behalf of Defendant Sigma Corporation (Pro Hac Vice Fee - $400 Fee Paid, Receipt No. 0973-25100652) filed by defendant Sigma Corporation. (Attachments: # 1 Proposed Order) (Lo, Carmen) (Entered: 01/10/2020) |
| 01/21/2020 | 148 | ORDER by Judge R. Gary Klausner: granting 147 Non-Resident Attorney Shannon K Lane APPLICATION to Appear Pro Hac Vice on behalf of Defendant Sigma Corporation, designating Carmen Lo as local counsel. (jp) (Entered: 01/21/2020) |
| 02/04/2020 | 149 | NOTICE of Change of Firm Name and Email Addresses filed by Defendants Neil Reubens, Vandewater International Inc.. (Salzman, Ryan) (Entered: 02/04/2020) |
| 02/05/2020 | 150 | NOTICE of Appearance filed by attorney Sadie Gardner Pulliam on behalf of Defendant Sigma Corporation (Attorney Sadie Gardner Pulliam added to party Sigma Corporation(pty:dft))(Pulliam, Sadie) (Entered: 02/05/2020) |
| 02/07/2020 | 151 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: Notice of Appearance 150 . The following error(s) was/were found: Incorrect event selected. Correct event to be used is: Notice of Appearance or Withdrawal of Counsel G123. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (ak) (Entered: 02/07/2020) |
| 02/21/2020 | 152 | STIPULATION for Discovery as to Expert Reports filed by Defendant Sigma Corporation. (Attachments: # 1 Proposed Order)(Lau, Lucius) (Entered: 02/21/2020) |
| 03/03/2020 | 153 | APPLICATION of Non-Resident Attorney Reginald R. Goeke to Appear Pro Hac Vice on behalf of Plaintiff Island Industries, Inc. (Pro Hac Vice Fee - $400 Fee Paid, Receipt No. ACACDC-25597294) filed by plaintiff Island Industries, Inc.. (Attachments: # 1 Proposed Order) (Marmolejo, Matthew) (Entered: 03/03/2020) |

| 03/04/2020 | [154](#) | NOTICE of Deficiency in Electronically Filed Pro Hac Vice Application RE: APPLICATION of Non-Resident Attorney Reginald R. Goeke to Appear Pro Hac Vice on behalf of Plaintiff Island Industries, Inc. (Pro Hac Vice Fee - $400 Fee Paid, Receipt No. ACACDC-25597294) [153](#) . The following error(s) was/were found: Local Rule 83-2.1.3.3(d) Certificate of Good Standing not attached for every state court listed to which the applicant has been admitted. Other error(s) with document(s): NY missing. (Thrasher, Lupe) (Entered: 03/04/2020) |
|---|---|---|
| 03/04/2020 | 155 | Text Only Entry: Pursuant to Local Rule 5-4.4.2, counsel for defendant Sigma shall immediately submit the proposed order in connection with Docket Entry 152 (to the Judge's generic email address) in Word or Word Perfect format. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 03/04/2020) |
| 03/04/2020 | [157](#) | STIPULATED ORDER RE: EXPERT REPORT DEADLINE [152](#) by Judge R. Gary Klausner that the date for expert disclosures pursuant to Rule 26(a)(2)(D)(i) of the Federal Rules of Civil Procedure will be 3/2/2020. It is further stipulated that Plaintiff-Relator can file a supplement its report, which will be limited to incorporating information gathered from the Sigma Corporation depositions held on the week of 3/2/2020, no later than 3/12/2020. (jp) (Entered: 03/09/2020) |
| 03/06/2020 | [156](#) | APPLICATION of Non-Resident Attorney Reginald R. Goeke to Appear Pro Hac Vice on behalf of Plaintiff Island Industries, Inc. (Pro Hac Vice Fee - $400 Fee Paid, Receipt No. ACACDC-25641379) filed by Plaintiff Island Industries, Inc.. (Attachments: # [1](#) Proposed Order) (Marmolejo, Matthew) (Entered: 03/06/2020) |
| 03/06/2020 | [158](#) | ORDER by Judge R. Gary Klausner: GRANTING [156](#) Non-Resident Attorney Reginald R Goeke APPLICATION to Appear Pro Hac Vice on behalf of Plaintiff Island Industries, Inc., designating Matthew H Marmolejo as local counsel. (jp) (Entered: 03/09/2020) |
| 03/10/2020 | [159](#) | APPLICATION to file document *Memorandum* under seal filed by Defendant Anvil International, LLC. (Attachments: # [1](#) Proposed Order, # [2](#) Redacted Document Redacted Memorandum, # [3](#) Redacted Document Redacted Ex. E, # [4](#) Redacted Document Redacted Counterclaims)(Kochsiek, Blythe) (Entered: 03/10/2020) |
| 03/10/2020 | [160](#) | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document *Memorandum* under seal [159](#) filed by Defendant Anvil International, LLC. (Attachments: # [1](#) Unredacted Document Memorandum, # [2](#) Unredacted Document Ex. D, # [3](#) Unredacted Document Ex. E, # [4](#) Unredacted Document Ex. F, # [5](#) Unredacted Document Ex. G, # [6](#) Unredacted Document Ex. H, # [7](#) Unredacted Document Ex. I, # [8](#) Unredacted Document Ex. J, # [9](#) Unredacted Document Ex. K, # [10](#) Unredacted Document Ex. L, # [11](#) Unredacted Document Ex. M, # [12](#) Unredacted Document Counterclaims)(Kochsiek, Blythe) (Entered: 03/10/2020) |
| 03/17/2020 | 161 | Text Only Entry: Pursuant to Local Rule 5-4.4.2, counsel for defendant Anvil International, LLC shall immediately submit the proposed order in connection with Docket Entry 159 (to the Judge's generic email address) in Word or Word Perfect format. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 03/17/2020) |
| 03/17/2020 | [162](#) | ORDER GRANTING Defendant Anvil's Application for Leave to File Under Seal [159](#) by Judge R. Gary Klausner. (jp) (Entered: 03/18/2020) |
| 03/18/2020 | [163](#) | NOTICE OF MOTION AND MOTION to Amend Answer to Complaint [132](#) filed by Defendant Anvil International, LLC. Motion set for hearing on 4/27/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # [1](#) Proposed Order, # [2](#) Memorandum |

| | | Redacted, # 3 Exhibit Amended Answer Redacted, # 4 Exhibit A, # 5 Exhibit B, # 6 Exhibit C, # 7 Exhibit E Redacted) (Kochsiek, Blythe) (Entered: 03/18/2020) |
|---|---|---|
| 03/18/2020 | 164 | SEALED DOCUMENT *Memorandum In Support* re NOTICE OF MOTION AND MOTION to Amend Answer to Complaint 132 163 , Order on Motion for Leave to File Document Under Seal 162 filed by Defendant Anvil International, LLC. (Attachments: # 1 Exhibit Amended Answer, # 2 Exhibit D, # 3 Exhibit E, # 4 Exhibit F, # 5 Exhibit G, # 6 Exhibit H, # 7 Exhibit I, # 8 Exhibit J, # 9 Exhibit K, # 10 Exhibit L, # 11 Exhibit M) (Kochsiek, Blythe) (Entered: 03/18/2020) |
| 03/18/2020 | 165 | Joint STIPULATION to Dismiss Defendant Anvil International, LLC filed by Plaintiffs Island Industries, Inc., United States of America.(Attorney Matthew Henry Marmolejo added to party United States of America(pty:pla))(Marmolejo, Matthew) (Entered: 03/18/2020) |
| 03/21/2020 | 166 | MINUTES (IN CHAMBERS) Order re: Anvil's Motion to Amend Answer to Complaint (DE 163) by Judge R. Gary Klausner: The Court DENIES as moot Anvils Motion for Leave to Amend 163 . (SEE CIVIL MINUTES FOR FURTHER SPECIFICS). (jp) (Entered: 03/23/2020) |
| 04/08/2020 | 167 | NOTICE OF MOTION AND MOTION for Summary Judgment as to Sigma Corporation filed by Defendant Sigma Corporation. Motion set for hearing on 5/18/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Statement of Uncontroverted Facts and Conclusions of Law, # 2 Declaration of Siddharth Bhattacharji, # 3 Exhibit A - Entry Packet, # 4 Exhibit B - Entry Packet, # 5 Exhibit C - Focused Assessment, # 6 Declaration of Walter Sperko, # 7 Exhibit Att. 1 - Sperko Expert Report, # 8 Declaration of Shannon Lane, # 9 Exhibit D - Bhattacharji Deposition, # 10 Exhibit E - Velazacez Deposition, # 11 Exhibit F - Rona Deposition, # 12 Exhibit G - Clark Deposition, # 13 Exhibit H - Thompson Deposition, # 14 Exhibit I - Liquidation Entry 9348, # 15 Exhibit J - Liquidation Entry 9719, # 16 Request for Judicial Notice, # 17 Exhibit K - Reasonable Care Publication, # 18 Exhibit L - Focused Assessment Publication, # 19 Exhibit M - Harmonized Tariff Schedule Ch. 73, # 20 Exhibit N - Scope Ruling, # 21 Exhibit O - Commerce Instructions, # 22 Exhibit P - Form 7501 Instructions, # 23 Exhibit Q - Sigma's Ct. Int'l Trade Complaint, # 24 Proposed Order Proposed Judgment, # 25 Proposed Order) (Lau, Lucius) (Entered: 04/08/2020) |
| 04/08/2020 | 168 | Renewed NOTICE OF MOTION AND MOTION to Stay Case filed by Defendants Neil Reubens, Smith Cooper International, Vandewater International.. Motion set for hearing on 5/18/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Declaration, # 2 Exhibit, # 3 Proposed Order) (Attorney Ryan Matthew Salzman added to party Smith Cooper International(pty:dft)) (Salzman, Ryan) (Entered: 04/08/2020) |
| 04/08/2020 | 169 | NOTICE OF MOTION AND MOTION for Summary Judgment as to Vandewater International, Inc. and Neil Ruebens filed by Defendant Vandewater International Inc.. Motion set for hearing on 5/18/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Memorandum Statement of Undisputed Facts and Conclusions of Law, # 2 Declaration Salzman Declaration, # 3 Exhibit Salzman Decl. Ex. 1, # 4 Exhibit Salzman Decl. Ex. 2, # 5 Exhibit Salzman Decl. Ex. 3, # 6 Exhibit Salzman Decl. Ex. 4, # 7 Exhibit Salzman Decl. Ex. 5, # 8 Exhibit Salzman Decl. Ex. 6, # 9 Exhibit Salzman Decl. Ex. 7, # 10 Exhibit Salzman Decl. Ex. 8, # 11 Exhibit Salzman Decl. Ex. 9, # 12 Exhibit Salzman Decl. Ex. 10, # 13 Exhibit Salzman Decl. Ex. 11, # 14 Exhibit Salzman Decl. Ex. 12, # 15 Exhibit Salzman Decl. Ex. 13, # 16 Declaration N. Ruebens Declaration, # 17 Exhibit Ruebens Decl. Ex. 1, # 18 Declaration Sperko Declaration, # 19 Exhibit Sperko Decl. Ex. 1, # 20 Praecipe on Confidentiality, # 21 Proposed Order Proposed Order) (Salzman, Ryan) (Entered: 04/08/2020) |
| 04/09/2020 | 170 | [DOCUMENT STRICKEN PER ORDER DATED ON 4/9/2020, SEE DOCKET ENTRY |

| | | |
|---|---|---|
| | | NO. 173 ] - APPLICATION to file document under seal filed by Defendant Smith Cooper International. (Attachments: # 1 Proposed Order Granting to File Under Seal, # 2 Redacted Document Memorandum ISO Defendant Smith-Cooper International, Inc.'s Motion for Summary Judgment, # 3 Redacted Document Exhibit B to Tobak Declaration (Exhibit 1 to Mishkin Declaration), # 4 Redacted Document Exhibit C to Tobak Declaration (Exhibit 19 to Mishkin Declaration))(Klein, Brian) Modified on 4/9/2020 (jp). (Entered: 04/09/2020) |
| 04/09/2020 | 171 | [DOCUMENT STRICKEN PER ORDER DATED ON 4/9/2020, SEE DOCKET ENTRY NO. 173 ] - SEALED DECLARATION IN SUPPORT OF APPLICATION to file document under seal 170 filed by Defendant Smith Cooper International. (Attachments: # 1 Exhibit A to Tobak Declaration, # 2 Exhibit B to Tobak Declaration (Unredacted Exhibit 1 to Mishkin Declaration), # 3 Exhibit C to Tobak Declaration (Unredacted Exhibit 19 to Mishkin Declaration), # 4 Exhibit D to Tobak Declaration, # 5 Exhibit E to Tobak Declaration, # 6 Memorandum Unredacted Version of the Memorandum ISO Defendant Smith-Cooper International, Inc.'s Motion for Summary Judgment)(Klein, Brian). Modified on 4/9/2020 (jp). (Entered: 04/09/2020) |
| 04/09/2020 | 172 | [DOCUMENT STRICKEN PER ORDER DATED 4/9/2020, SEE DOCKET ENTRY NO. 174 ] - NOTICE OF MOTION AND MOTION for Summary Judgment as to Smith-Cooper International, Inc. filed by Defendant Smith Cooper International. Motion set for hearing on 5/18/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Redacted Document Memorandum of Points and Authorities in Support of Motion for Summary Judgment, # 2 Supplement Separate Statement of Undisputed Facts in Support of Motion for Summary Judgment, # 3 Exhibit Exhibit #2 to Motion for Summary Judgment, # 4 Exhibit Exhibit #3 to Motion for Summary Judgment, # 5 Exhibit Exhibit #4 to Motion for Summary Judgment, # 6 Exhibit Exhibit #5 to Motion for Summary Judgment, # 7 Exhibit Exhibit #6 to Motion for Summary Judgment, # 8 Exhibit Exhibit #7 to Motion for Summary Judgment, # 9 Exhibit Exhibit #8 to Motion for Summary Judgment, # 10 Exhibit Exhibit #9 to Motion for Summary Judgment, # 11 Exhibit Exhibit #10 to Motion for Summary Judgment, # 12 Exhibit Exhibit #11 to Motion for Summary Judgment, # 13 Exhibit Exhibit #12 to Motion for Summary Judgment, # 14 Exhibit Exhibit #13 to Motion for Summary Judgment, # 15 Exhibit Exhibit #14 to Motion for Summary Judgment, # 16 Exhibit Exhibit #15 to Motion for Summary Judgment, # 17 Exhibit Exhibit #16 to Motion for Summary Judgment, # 18 Exhibit Exhibit #17 to Motion for Summary Judgment, # 19 Exhibit Exhibit #18 to Motion for Summary Judgment, # 20 Exhibit Exhibit #20 to Motion for Summary Judgment, # 21 Exhibit Exhibit #21 to Motion for Summary Judgment, # 22 Exhibit Exhibit #22 to Motion for Summary Judgment, # 23 Exhibit Exhibit #23 to Motion for Summary Judgment, # 24 Exhibit Exhibit #24 to Motion for Summary Judgment, # 25 Exhibit Exhibit #25 to Motion for Summary Judgment, # 26 Exhibit Exhibit #26 to Motion for Summary Judgment, # 27 Exhibit Exhibit #27 to Motion for Summary Judgment, # 28 Exhibit Exhibit #28 to Motion for Summary Judgment, # 29 Exhibit Exhibit #29 to Motion for Summary Judgment, # 30 Exhibit Exhibit #30 to Motion for Summary Judgment, # 31 Exhibit Exhibit #31 to Motion for Summary Judgment, # 32 Proposed Order Proposed Order Granting Smith-Cooper International, Inc.'s Motion for Summary Judgment) (Huggins, Teresa). Modified on 4/9/2020 (jp). (Entered: 04/09/2020) |
| 04/09/2020 | 173 | ORDER TO STRIKE ELECTRONICALLY FILED DOCUMENT(S) by Judge R. Gary Klausner: the following document(s) be STRICKEN for failure to comply with the Local Rules, General Order and/or the Courts Case Management Order: APPLICATION for Leave to File Under Seal 170 , Sealed Declaration in Support 171 , for the following reasons: Signatures are missing. [DE 170] - Pages 6 and 7; DE 170-1; [DE 171] - Page 4; DE 171-6. (jp) (Entered: 04/09/2020) |

| 04/09/2020 | 174 | ORDER TO STRIKE ELECTRONICALLY FILED DOCUMENT(S) by Judge R. Gary Klausner: the following document(s) be STRICKEN for failure to comply with the Local Rules, General Order and/or the Courts Case Management Order: NOTICE OF MOTION AND MOTION for Summary Judgment as to Smith-Cooper International, Inc 172 , for the following reasons: Signatures are missing. [DE 172] - DE 172-1; DE 172-2. (jp) (Entered: 04/09/2020) |
|---|---|---|
| 04/09/2020 | 175 | APPLICATION for Leave to file to File Under Seal filed by Defendant Smith Cooper International. (Attachments: # 1 Redacted Document Redacted Memorandum in Support of SCI's Motion for Summary Judgment, # 2 [Proposed] Order Granting SCI's Application for Leave to File Under Seal) (Huggins, Teresa) (Entered: 04/09/2020) |
| 04/09/2020 | 176 | SEALED DOCUMENT *(Revised) Unredacted Memorandum of Points and Authorities in Support of Motion for Summary Judgment* re Striking Electronically Filed Documents (G-106), 173 filed by Defendant Smith Cooper International.(Huggins, Teresa) (Entered: 04/09/2020) |
| 04/09/2020 | 177 | NOTICE NOTICE OF ERRATA RE SCIS: 1 APPLICATION TO FILE UNDER SEAL; 2 [PROPOSED] ORDER ISO APPLICATION TO FILE UNDER SEAL; 3 DECLARATION OF MARC TOBAK; 4 MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY JUDGMENT (REDACTED); 5 MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY JUDGMENT (UNREDACTED); 6 SEPARATE STATEMENT OF UNDISPUTED FACTS; 7 NOTICE OF MOTION FOR SUMMARY JUDGMENT; 8 DECLARATION OF PAUL MISHKIN filed by Defendant Smith Cooper International. (Attachments: # 1 Exhibit Ex. 1 to Notice of Errata (Dkt. 170) Updated Application to File Under Seal, # 2 Exhibit Ex. 2 to Notice of Errata (Dkt. 171) Updated Tobak Declaration in Support of Application to File Under Seal, # 3 Exhibit Ex. 3 to Notice of Errata (Dkt. 171-6) Updated Unredacted Memorandum in Support of Motion for Summary Judgment, # 4 Exhibit Ex. 4 to Notice of Errata (Dkt. 172) Updated Notice of Motion for Summary Judgement, # 5 Exhibit Ex. 5 to Notice of Errata (Dkt. 172-1) Updated Redacted Memorandum in Support of Motion for Summary Judgment, # 6 Exhibit Ex. 6 to Notice of Errata (Dkt. 172-2) Updated Separate Statement of Unconverted Facts & Conclusions of Law in Support of Motion for Summary Judgment, # 7 Exhibit Ex. 7 to Notice of Errata - Proof of Service by Federal Express on Allied Rubber & Gasket Company Only, # 8 Exhibit Ex. 8 to Notice of Errata - Declaration of Paul Mishkin in Support of Motion for Summary Judgment, # 9 Exhibit Ex. 1 to Declaration of Paul Mishkin, # 10 Exhibit Ex. 2 to Declaration of Paul Mishkin, # 11 Exhibit Ex. 3 to Declaration of Paul Mishkin, # 12 Exhibit Ex. 4 to Declaration of Paul Mishkin, # 13 Exhibit Ex. 5 to Declaration of Paul Mishkin, # 14 Exhibit Ex. 6 to Declaration of Paul Mishkin, # 15 Exhibit Ex. 7 to Declaration of Paul Mishkin, # 16 Exhibit Ex. 8 to Declaration of Paul Mishkin, # 17 Exhibit Ex. 9 to Declaration of Paul Mishkin, # 18 Exhibit Ex. 10 to Declaration of Paul Mishkin, # 19 Exhibit Ex. 11 to Declaration of Paul Mishkin, # 20 Exhibit Ex. 12 to Declaration of Paul Mishkin, # 21 Exhibit Ex. 13 to Declaration of Paul Mishkin, # 22 Exhibit Ex. 14 to Declaration of Paul Mishkin, # 23 Exhibit Ex. 15 to Declaration of Paul Mishkin, # 24 Exhibit Ex. 16 to Declaration of Paul Mishkin, # 25 Exhibit Ex. 17 to Declaration of Paul Mishkin, # 26 Exhibit Ex. 18 to Declaration of Paul Mishkin, # 27 Exhibit Ex. 19 to Declaration of Paul Mishkin, # 28 Exhibit Ex. 20 to Declaration of Paul Mishkin, # 29 Exhibit Ex. 21 to Declaration of Paul Mishkin, # 30 Exhibit Ex. 22 to Declaration of Paul Mishkin, # 31 Exhibit Ex. 23 to Declaration of Paul Mishkin, # 32 Exhibit Ex. 24 to Declaration of Paul Mishkin, # 33 Exhibit Ex. 25 to Declaration of Paul Mishkin, # 34 Exhibit Ex. 26 to Declaration of Paul Mishkin, # 35 Exhibit Ex. 27 to Declaration of Paul Mishkin, # 36 Exhibit Ex. 28 to Declaration of Paul Mishkin, # 37 Exhibit Ex. 29 to Declaration of Paul Mishkin, # 38 Exhibit Ex. 30 to Declaration of Paul |

| | | |
|---|---|---|
| | | Mishkin, # [39](#) Exhibit Ex. 31 to Declaration of Paul Mishkin)(Huggins, Teresa) (Entered: 04/09/2020) |
| 04/27/2020 | [178](#) | MEMORANDUM in Opposition to Renewed NOTICE OF MOTION AND MOTION to Stay Case [168](#) filed by Plaintiff Island Industries, Inc.. (Attachments: # [1](#) Proposed Order, # [2](#) Proof of Service)(Marmolejo, Matthew) (Entered: 04/27/2020) |
| 04/27/2020 | [179](#) | APPLICATION to file document under seal filed by Plaintiff Island Industries, Inc.. (Attachments: # [1](#) Redacted Document Opposition to SCI MSJ, # [2](#) Redacted Document Separate Statement (SCI), # [3](#) Redacted Document Opposition to Sigma MSJ, # [4](#) Redacted Document Separate Statement (Sigma), # [5](#) Redacted Document Opposition to Vandewater MSJ, # [6](#) Redacted Document Separate Statement (Vandewater), # [7](#) Redacted Document Exhibit 18 to Marmolejo Decl., # [8](#) Redacted Document Exhibit 23 to Marmolejo Decl., # [9](#) Redacted Document Exhibit 24 to Marmolejo Decl., # [10](#) Redacted Document Exhibit 38 to Marmolejo Decl., # [11](#) Redacted Document Exhibit 39 to Marmolejo Decl., # [12](#) Redacted Document Exhibit 53 to Marmolejo Decl., # [13](#) Proposed Order)(Hendy, Christopher) (Entered: 04/27/2020) |
| 04/27/2020 | [180](#) | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document under seal [179](#) filed by Plaintiff Island Industries, Inc.. (Attachments: # [1](#) Unredacted Document Opposition to SCI MSJ, # [2](#) Unredacted Document Separate Statement (SCI), # [3](#) Unredacted Document Opposition to Sigma MSJ, # [4](#) Unredacted Document Separate Statement (Sigma), # [5](#) Unredacted Document Opposition to Vandewater MSJ, # [6](#) Unredacted Document Separate Statement (Vandewater), # [7](#) Unredacted Document Ex 18 to Marmolejo Decl., # [8](#) Unredacted Document Ex 23 to Marmolejo Decl., # [9](#) Unredacted Document Ex 24 to Marmolejo Decl., # [10](#) Unredacted Document Ex 27 to Marmolejo Decl., # [11](#) Unredacted Document Ex 28 to Marmolejo Decl., # [12](#) Unredacted Document Ex 29 to Marmolejo Decl., # [13](#) Unredacted Document Ex 30 to Marmolejo Decl., # [14](#) Unredacted Document Ex 31 to Marmolejo Decl., # [15](#) Unredacted Document Ex 32 to Marmolejo Decl., # [16](#) Unredacted Document Ex 33 to Marmolejo Decl., # [17](#) Unredacted Document Ex 34 to Marmolejo Decl., # [18](#) Unredacted Document Ex. 35 to Marmolejo Decl., # [19](#) Unredacted Document Ex 37 to Marmolejo Decl., # [20](#) Unredacted Document Ex 38 to Marmolejo Decl., # [21](#) Unredacted Document Ex 39 to Marmolejo Decl., # [22](#) Unredacted Document Ex 51 to Marmolejo Decl., # [23](#) Unredacted Document Ex 53 to Marmolejo Decl., # [24](#) Unredacted Document Ex 58 to Marmolejo Decl., # [25](#) Unredacted Document Ex 59 to Marmolejo Decl., # [26](#) Unredacted Document Ex 60 to Marmolejo Decl., # [27](#) Unredacted Document Ex. 61 to Marmolejo Decl., # [28](#) Unredacted Document Ex. 62 to Marmolejo Decl., # [29](#) Unredacted Document Ex. 63 to Marmolejo Decl., # [30](#) Unredacted Document Ex. 64 to Marmolejo Decl.)(Hendy, Christopher) (Entered: 04/27/2020) |
| 04/27/2020 | [181](#) | OPPOSITION to NOTICE OF MOTION AND MOTION for Summary Judgment as to Smith-Cooper International, Inc. [172](#) filed by Plaintiff Island Industries, Inc.. (Attachments: # [1](#) Separate Statement)(Marmolejo, Matthew) (Entered: 04/27/2020) |
| 04/27/2020 | [182](#) | OPPOSITION to NOTICE OF MOTION AND MOTION for Summary Judgment as to Sigma Corporation [167](#) filed by Plaintiff Island Industries, Inc.. (Attachments: # [1](#) Separate Statement)(Marmolejo, Matthew) (Entered: 04/27/2020) |
| 04/27/2020 | [183](#) | OPPOSITION to NOTICE OF MOTION AND MOTION for Summary Judgment as to Vandewater International, Inc. and Neil Ruebens [169](#) filed by Plaintiff Island Industries, Inc.. (Attachments: # [1](#) Separate Statement)(Marmolejo, Matthew) (Entered: 04/27/2020) |
| 04/28/2020 | [184](#) | REQUEST FOR JUDICIAL NOTICE *in support of opposition to Defendants' Motions for Summary Judgment* filed by Plaintiff Island Industries, Inc.. (Attachments: # [1](#) |

| | | |
|---|---|---|
| | | Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Proposed Order)(Marmolejo, Matthew) (Entered: 04/28/2020) |
| 04/28/2020 | 185 | DECLARATION of Matthew H. Marmolejo in support of Island's Oppositions to Defendants' Motions for Summary Judgment NOTICE OF MOTION AND MOTION for Summary Judgment as to Smith-Cooper International, Inc. 172 , NOTICE OF MOTION AND MOTION for Summary Judgment as to Vandewater International, Inc. and Neil Ruebens 169 , NOTICE OF MOTION AND MOTION for Summary Judgment as to Sigma Corporation 167 filed by Plaintiff Island Industries, Inc.. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit, # 26 Exhibit, # 27 Exhibit, # 28 Exhibit, # 29 Exhibit, # 30 Exhibit, # 31 Exhibit, # 32 Exhibit, # 33 Exhibit, # 34 Exhibit, # 35 Exhibit, # 36 Exhibit, # 37 Exhibit, # 38 Exhibit, # 39 Exhibit, # 40 Exhibit, # 41 Exhibit, # 42 Exhibit, # 43 Exhibit, # 44 Exhibit, # 45 Exhibit, # 46 Exhibit, # 47 Exhibit, # 48 Exhibit, # 49 Exhibit, # 50 Exhibit, # 51 Exhibit, # 52 Exhibit, # 53 Exhibit, # 54 Exhibit, # 55 Exhibit, # 56 Exhibit, # 57 Exhibit, # 58 Exhibit, # 59 Exhibit, # 60 Exhibit, # 61 Exhibit, # 62 Exhibit, # 63 Exhibit, # 64 Exhibit, # 65 Exhibit)(Marmolejo, Matthew) (Entered: 04/28/2020) |
| 04/29/2020 | 186 | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document under seal 170 filed by Plaintiff Island Industries, Inc..(Marmolejo, Matthew) (Entered: 04/29/2020) |
| 05/01/2020 | 187 | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document under seal 179 filed by Defendant Sigma Corporation.(Lau, Lucius) (Entered: 05/01/2020) |
| 05/03/2020 | 188 | JOINT REPORT of ADR PROCEEDINGS filed by Plaintiff Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 05/03/2020) |
| 05/04/2020 | 189 | REPLY in Support of Renewed NOTICE OF MOTION AND MOTION to Stay Case 168 filed by Defendants Neil Reubens, Vandewater International Inc.. (Salzman, Ryan) (Entered: 05/04/2020) |
| 05/04/2020 | 190 | APPLICATION to file document *Reply to Statement of Disputed Facts* under seal filed by Defendant Sigma Corporation. (Attachments: # 1 Redacted Document Redacted Reply to Statement of Disputed Facts, # 2 Proposed Order)(Lau, Lucius) (Entered: 05/04/2020) |
| 05/04/2020 | 191 | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document *Reply to Statement of Disputed Facts* under seal 190 filed by Defendant Sigma Corporation. (Attachments: # 1 Unredacted Document Unredacted Reply to Statement of Disputed Facts)(Lau, Lucius) (Entered: 05/04/2020) |
| 05/04/2020 | 192 | REPLY In Support Of NOTICE OF MOTION AND MOTION for Summary Judgment as to Sigma Corporation 167 filed by Defendant Sigma Corporation. (Attachments: # 1 Redacted Document Reply to Statement of Facts, # 2 Memorandum Objections to Evidence)(Lau, Lucius) (Entered: 05/04/2020) |
| 05/04/2020 | 193 | REPLY in Support of NOTICE OF MOTION AND MOTION for Summary Judgment as to Vandewater International, Inc. and Neil Ruebens 169 filed by Defendants Neil Reubens, Vandewater International Inc.. (Attachments: # 1 Declaration, # 2 Exhibit to Salzman Decl., # 3 Exhibit to Salzman Decl., # 4 Exhibit to Salzman Decl., # 5 Exhibit to Salzman Decl., # 6 Exhibit to Salzman Decl., # 7 Exhibit to Salzman Decl., # 8 Exhibit to Salzman Decl., # 9 Exhibit to Salzman Decl., # 10 Exhibit to Salzman Decl., # 11 Unredacted Document Praecipe De-Designating Confidentiality for Vandewater Reply, # |

| | | |
|---|---|---|
| | | 12 Redacted Document Vandewater Responses to Statement of Facts)(Salzman, Ryan) (Entered: 05/04/2020) |
| 05/04/2020 | 194 | REPLY Reply In Support NOTICE OF MOTION AND MOTION for Summary Judgment as to Vandewater International, Inc. and Neil Ruebens 169 *Reply Memorandum of Points and Authorities in Further Support of Defendant Smith-Cooper International, Inc.'s Motion for Summary Judgment* filed by Defendant Smith Cooper International. (Huggins, Teresa) (Entered: 05/04/2020) |
| 05/04/2020 | 195 | REPLY Reply NOTICE OF MOTION AND MOTION for Summary Judgment as to Vandewater International, Inc. and Neil Ruebens 169 *Reply Statement of Uncontroverted Facts and Conclusions of Law in Support of Motion for Summary Judgment (PUBLIC REDACTED VERSION)* filed by Defendant Smith Cooper International. (Huggins, Teresa) (Entered: 05/04/2020) |
| 05/04/2020 | 196 | DECLARATION of Paul Mishkin In Support Of NOTICE OF MOTION AND MOTION for Summary Judgment as to Vandewater International, Inc. and Neil Ruebens 169 *Reply Declaration of Paul Mishkin in Support of Smith-Cooper International, Inc.'s Motion for Summary Judgment* filed by Defendant Smith Cooper International. (Huggins, Teresa) (Entered: 05/04/2020) |
| 05/04/2020 | 197 | APPLICATION to File Under Seal *Defendant Smith-Cooper International, Inc.'s Application for Leave to File Under Seal Pursuant to Protective Order* filed by Defendant Smith Cooper International. (Huggins, Teresa) (Entered: 05/04/2020) |
| 05/04/2020 | 198 | DECLARATION of Marc Tobak in Support of APPLICATION to File Under Seal *Defendant Smith-Cooper International, Inc.'s Application for Leave to File Under Seal Pursuant to Protective Order* 197 *(PUBLIC REDACTED VERSION)* filed by Defendant Smith Cooper International. (Huggins, Teresa) (Entered: 05/04/2020) |
| 05/04/2020 | 199 | APPLICATION to file document *Declaration of Marc Tobak in Support of Smith-Cooper International, Inc.'s Application to File Under Seal Pursuant to the Protective Order (UNREDACTED VERSION)* under seal filed by Defendant Smith Cooper International. (Huggins, Teresa) (Entered: 05/04/2020) |
| 05/04/2020 | 200 | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document *Reply to Statement of Disputed Facts* under seal 190 filed by Defendant Smith Cooper International.(Huggins, Teresa) (Entered: 05/04/2020) |
| 05/04/2020 | 201 | DECLARATION of Paul Mishkin in support of NOTICE OF MOTION AND MOTION for Summary Judgment as to Vandewater International, Inc. and Neil Ruebens 169 *Reply Declaration of Paul Mishkin in Support of Smith-Cooper International's Motion for Summary Judgment* filed by Defendant Smith Cooper International. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3)(Huggins, Teresa) (Entered: 05/04/2020) |
| 05/04/2020 | 202 | DECLARATION of Marc Tobak in support of APPLICATION to File Under Seal *Defendant Smith-Cooper International, Inc.'s Application for Leave to File Under Seal Pursuant to Protective Order* 197 *(PUBLIC REDACTED VERSION)* filed by Defendant Smith Cooper International. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B) (Huggins, Teresa) (Entered: 05/04/2020) |
| 05/04/2020 | 203 | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document *Declaration of Marc Tobak in Support of Smith-Cooper International, Inc.'s Application to File Under Seal Pursuant to the Protective Order (UNREDACTED VERSION)* under seal 199 filed by Defendant Smith Cooper International. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B)(Huggins, Teresa) (Entered: 05/04/2020) |

| 05/04/2020 | 204 | REPLY in support of NOTICE OF MOTION AND MOTION for Summary Judgment as to Smith-Cooper International, Inc. 172 *Reply Memorandum of Points and Authorities in Further Support of Defendant Smith-Cooper International, Inc.'s Motion for Summary Judgment* filed by Defendant Smith Cooper International. (Huggins, Teresa) (Entered: 05/04/2020) |
|---|---|---|
| 05/04/2020 | 205 | REPLY in support of NOTICE OF MOTION AND MOTION for Summary Judgment as to Smith-Cooper International, Inc. 172 *Defendant Smith-Cooper International, Inc.'s Reply Statement of Uncontroverted facts and Conclusions of Law in Support of Motion for Summary Judgment* filed by Defendant Smith Cooper International. (Huggins, Teresa) (Entered: 05/04/2020) |
| 05/04/2020 | 206 | DECLARATION of Paul Mishkin in support of NOTICE OF MOTION AND MOTION for Summary Judgment as to Smith-Cooper International, Inc. 172 *Reply Declaration of Paul Mishkin in Support of Smith-Cooper International, Inc.'s Motion for Summary Judgment* filed by Defendant Smith Cooper International. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3)(Huggins, Teresa) (Entered: 05/04/2020) |
| 05/05/2020 | 207 | CERTIFICATE OF SERVICE filed by Defendant Smith Cooper International, re Declaration (Motion related), 202 , Declaration (Motion related), 206 , Reply (Motion related), 205 , Reply (Motion related), 204 , APPLICATION to File Under Seal *Defendant Smith-Cooper International, Inc.'s Application for Leave to File Under Seal Pursuant to Protective Order* 197 served on 5/4/2020. (Huggins, Teresa) (Entered: 05/05/2020) |
| 05/05/2020 | 208 | PROOF OF SERVICE filed by Defendant Smith Cooper International, re Declaration (Motion related), 202 , Declaration (Motion related), 206 , Reply (Motion related), 205 , Reply (Motion related), 204 , APPLICATION to File Under Seal *Defendant Smith-Cooper International, Inc.'s Application for Leave to File Under Seal Pursuant to Protective Order* 197 served on 5/04/2020. (Huggins, Teresa) (Entered: 05/05/2020) |
| 05/05/2020 | 209 | NOTICE filed by Defendant Smith Cooper International. *Notice of Withdrawal of Incorrectly Linked Documents (Docket Nos. 194, 195, 196, 198, 199, 200 and 201) Filed on May 4, 2020* (Huggins, Teresa) (Entered: 05/05/2020) |
| 05/06/2020 | 210 | EX PARTE APPLICATION for Leave to file Response to Sigma's Evidentiary Objections filed by Plaintiff-Relator Island Industries, Inc.. (Attachments: # 1 Memorandum in response to Sigma's Objections, # 2 Declaration of C. Mitchell Hendy, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Proposed Order) (Hendy, Christopher) (Entered: 05/06/2020) |
| 05/07/2020 | 211 | ORDER GRANTING Plaintiff Relator Island industries, Inc., Ex Parte Application for Leave to File a Response to Sigma Corporation's Evidentiary Objection (ECF #192-2) 210 by Judge R. Gary Klausner, the Court GRANTS the Application and ORDERS that Islands Response and supporting papers (ECF # 210-1, 210-2, 210-3, and 210-4) are deemed properly filed and considered. (jp) (Entered: 05/07/2020) |
| 05/08/2020 | 212 | NOTICE OF MOTION AND First MOTION IN LIMINE (#1) to Exclude Evidence Relating to Sigma Corporation's Total Net Worth and Total Importations filed by Defendant Sigma Corporation. Motion set for hearing on 6/23/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Proposed Order)(Lau, Lucius) (Entered: 05/08/2020) |
| 05/08/2020 | 213 | NOTICE OF MOTION AND Second MOTION IN LIMINE (#2) to Exclude Evidence of Sigma Corporation's Subsequent Remedial Measures filed by Defendant Sigma Corporation. Motion set for hearing on 6/23/2020 at 09:00 AM before Judge R. Gary |

| | | |
|---|---|---|
| | | Klausner. (Attachments: # 1 Declaration of Shannon Lane, # 2 Exhibit A: Deposition of Siddharth Bhattacharji, # 3 Proposed Order)(Lau, Lucius) (Entered: 05/08/2020) |
| 05/08/2020 | 214 | NOTICE OF MOTION AND Third MOTION IN LIMINE (#3) to Exclude Evidence on "Double Invoicing" filed by Defendant Sigma Corporation. Motion set for hearing on 6/23/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Declaration of Shannon Lane, # 2 Exhibit A: Expert Report of Kelli Thompson, # 3 Exhibit B: Deposition of Patricia Velazquez, # 4 Exhibit C: Entry Packet, # 5 Proposed Order)(Lau, Lucius) (Entered: 05/08/2020) |
| 05/08/2020 | 215 | NOTICE OF MOTION AND MOTION IN LIMINE (#4) to Exclude Evidence on Professional Broker Employment filed by Defendant Sigma Corporation. Motion set for hearing on 6/23/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Declaration of Shannon Lane, # 2 Exhibit A: CBP Informed Compliance Publication, # 3 Proposed Order)(Lau, Lucius) (Entered: 05/08/2020) |
| 05/08/2020 | 216 | NOTICE OF MOTION AND MOTION IN LIMINE (#5) to Exclude Evidence and Argument on the Sprink-let Scope Ruling filed by Defendant Sigma Corporation. Motion set for hearing on 6/23/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Declaration of Shannon Lane, # 2 Exhibit A: Sprink-let Scope Ruling, # 3 Exhibit B: Sigma Scope Ruling, # 4 Proposed Order)(Lau, Lucius) (Entered: 05/08/2020) |
| 05/08/2020 | 217 | REQUEST for Order for Request for Order to Permanently Seal Docket No. 199 filed by Defendant Smith Cooper International. (Huggins, Teresa) (Entered: 05/08/2020) |
| 05/08/2020 | 218 | [DOCUMENT STRICKEN PER ORDER DATED ON 5/11/2020, SEE DOCKET ENTRY NO. 235 ] REQUEST for Order for [Proposed] Order to Permanently Seal Docket No. 199 filed by Defendant Smith Cooper International. (Huggins, Teresa) Modified on 5/11/2020 (et). (Entered: 05/08/2020) |
| 05/08/2020 | 219 | NOTICE OF LODGING filed *NOTICE OF LODGING OF PROPOSED ORDER GRANTING SMITH-COOPER INTERNATIONAL, INC.S APPLICATION TO FILE UNDER SEAL PURSUANT TO PROTECTIVE ORDER* re APPLICATION to File Under Seal *Defendant Smith-Cooper, Inc.'s Application for Leave to File Under Seal Pursuant to Protective Order* 197 (Huggins, Teresa) (Entered: 05/08/2020) |
| 05/08/2020 | 220 | NOTICE OF MOTION AND Joint MOTION IN LIMINE (#1) to Exclude The Opinion of Plaintiff-Relator's Expert Kelli Thompson filed by Defendants Neil Reubens, Sigma Corporation, Smith Cooper International, Vandewater International Inc.. Motion set for hearing on 6/23/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Proposed Order)(Salzman, Ryan) (Entered: 05/08/2020) |
| 05/08/2020 | 221 | NOTICE OF MOTION AND Joint MOTION IN LIMINE (#2) to Exclude Testimony Regarding the Mod Act filed by Defendants Neil Reubens, Smith Cooper International, Vandewater International Inc.. Motion set for hearing on 6/23/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Proposed Order)(Salzman, Ryan) (Entered: 05/08/2020) |
| 05/08/2020 | 222 | DECLARATION of Marc Tobak re APPLICATION to file document under seal 179 *Marc Tobak's Declaration in Support of Application to File Under Seal Pursuant to Protective Order* filed by Defendant Smith Cooper International. (Huggins, Teresa) (Entered: 05/08/2020) |
| 05/08/2020 | 223 | NOTICE OF MOTION AND MOTION IN LIMINE (#3) to Exclude Speculation Regarding Lloyd Perkins filed by Defendants Neil Reubens, Vandewater International Inc.. Motion set for hearing on 6/23/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Proposed Order)(Salzman, Ryan) (Entered: 05/08/2020) |

| 05/08/2020 | 224 | NOTICE OF MOTION AND MOTION IN LIMINE (#4) to Exclude The Term "Confidential Source" filed by Defendants Neil Reubens, Vandewater International Inc.. Motion set for hearing on 6/23/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Proposed Order)(Salzman, Ryan) (Entered: 05/08/2020) |
|---|---|---|
| 05/08/2020 | 225 | NOTICE OF MOTION AND MOTION IN LIMINE (#5) to Exclude Immaterial Matters, Inflammatory Character Evidence, and Previous Acts filed by Defendants Neil Reubens, Vandewater International Inc.. Motion set for hearing on 6/23/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Proposed Order)(Salzman, Ryan) (Entered: 05/08/2020) |
| 05/08/2020 | 226 | DECLARATION of Ryan M. Salzman In Support of Motions in Limine Nos. 1 - 5; Joint MOTION IN LIMINE (#2) to Exclude Testimony Regarding the Mod Act 221 , MOTION IN LIMINE (#3) to Exclude Speculation Regarding Lloyd Perkins 223 , MOTION IN LIMINE (#4) to Exclude The Term "Confidential Source" 224 , MOTION IN LIMINE (#5) to Exclude Immaterial Matters, Inflammatory Character Evidence, and Previous Acts 225 , Joint MOTION IN LIMINE (#1) to Exclude The Opinion of Plaintiff-Relator's Expert Kelli Thompson 220 filed by Defendants Neil Reubens, Vandewater International Inc.. (Attachments: # 1 Exhibit 1 - G. Sanders Testimony, # 2 Exhibit 2 - H. Zawada Testimony, # 3 Exhibit 3 - J. Ruebens Testimony, # 4 Exhibit 4 - K. Thompson Testimony, # 5 Exhibit 5 - Thompson Report PUBLIC REDACTED VERSION, # 6 Exhibit 6 - N. Ruebens Testimony, # 7 Exhibit 7 - S. Ruebens Testimony) (Salzman, Ryan) (Entered: 05/08/2020) |
| 05/08/2020 | 227 | NOTICE OF MOTION AND MOTION IN LIMINE (#1) to Exclude Report and Testimony of Walter Sperko filed by Plaintiff-Relator Island Industries, Inc.. Motion set for hearing on 6/23/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Declaration of C. Mitchell Hendy, # 2 Exhibit 1 to Hendy Declaration, # 3 Exhibit 2 to Hendy Declaration, # 4 Proposed Order)(Marmolejo, Matthew) (Entered: 05/08/2020) |
| 05/08/2020 | 228 | NOTICE OF MOTION AND MOTION IN LIMINE (#2) to Exclude Argument Regarding Objective Reasonableness filed by Plaintiff-Relator Island Industries, Inc.. Motion set for hearing on 6/23/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Proposed Order)(Marmolejo, Matthew) (Entered: 05/08/2020) |
| 05/08/2020 | 229 | NOTICE OF MOTION AND MOTION IN LIMINE (#3) to Exclude Evidence that the Government has not Intervened filed by Plaintiff-Relator Island Industries, Inc.. Motion set for hearing on 6/23/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Proposed Order)(Marmolejo, Matthew) (Entered: 05/08/2020) |
| 05/08/2020 | 230 | NOTICE OF MOTION AND MOTION IN LIMINE (#4) to Preclude References to Recoveries Under the False Claims Act filed by Plaintiff-Relator Island Industries, Inc.. Motion set for hearing on 6/23/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Proposed Order)(Marmolejo, Matthew) (Entered: 05/08/2020) |
| 05/08/2020 | 231 | NOTICE OF MOTION AND MOTION IN LIMINE (#5) to Exclude Evidence of Inability to Satisfy Judgment filed by Plaintiff-Relator Island Industries, Inc.. Motion set for hearing on 6/23/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Proposed Order)(Marmolejo, Matthew) (Entered: 05/08/2020) |
| 05/08/2020 | 232 | NOTICE OF MOTION AND MOTION IN LIMINE 1 to Exclude Financial Condition & Related Information filed by Defendant Smith Cooper International. Motion set for hearing on 6/23/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Declaration Declaration of Marc Tobak in Support of Motion in Limine #1 to Exclude Evidence of Financial Condition and Related Information, # 2 Proposed Order)(Huggins, Teresa) (Entered: 05/08/2020) |

| 05/08/2020 | 233 | NOTICE OF MOTION AND MOTION IN LIMINE (2) to Exclude Certain Import Values filed by Defendant Smith Cooper International. Motion set for hearing on 6/23/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Declaration Declaration of Marc Tobak, # 2 Proposed Order)(Huggins, Teresa) (Entered: 05/08/2020) |
|---|---|---|
| 05/08/2020 | 234 | JOINDER in MOTION IN LIMINE (#5) to Exclude Evidence and Argument on the Sprink-let Scope Ruling 216 filed by Defendant Smith Cooper International. (Huggins, Teresa) (Entered: 05/08/2020) |
| 05/11/2020 | 235 | ORDER by Judge R. Gary Klausner: the following document(s) be STRICKEN for failure to comply with the Local Rules, General Order and/or the Courts Case Management Order: REQUEST for Order for [Proposed] Order to Permanently Seal Docket No. 199 218 , for the following reasons: Proposed Order is to be attached to a Notice of Lodging. See LR 5-4.4.1. (et) (Entered: 05/11/2020) |
| 05/11/2020 | 236 | NOTICE OF LODGING filed *[PROPOSED] ORDER GRANTING DEFENDANT SMITH-COOPER INTERNATIONAL INC.S REQUEST TO PERMANENTLY SEAL DOCKET NO. 199* re REQUEST for Order for Request for Order to Permanently Seal Docket No. 199 217 (Attachments: # 1 Proposed Order Granting Defendant Smith-Cooper International Inc.'s Request to Permanently Seal Docket No. 199, # 2 Certificate of Service)(Klein, Brian) (Entered: 05/11/2020) |
| 05/11/2020 | 237 | ORDER GRANTING Defendant Smith-Cooper International inc.'s Request to Permanently Seal Docket No. 199 217 by Judge R. Gary Klausner that Docket No. 199 will be filed permanently under seal. (jp) (Entered: 05/11/2020) |
| 05/12/2020 | 238 | SCHEDULING NOTICE TO ALL PARTIES AND ORDER by Judge R. Gary Klausner. The following motions have been taken under submission and off the motion calendar: (1) Defendants' Vandewater International, Inc., Neil Ruebens, and Smith-Cooper International, Inc.'s Renewed Motion to Stay 168 ; (2) Defendant Sigma Corporation's Motion for Summary Judgment 167 ; (3) Defendants' Vandewater International, Inc. and Neil Ruebens' Motion for Summary Judgment 169 ; and (4) Defendant Smith-Cooper International, Inc.'s Motion for Summary Judgment [177-4]. No appearances by counsel are necessary. The Court will issue a ruling after full consideration of properly submitted pleadings. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 05/12/2020) |
| 05/12/2020 | 239 | SUPPLEMENT to Renewed NOTICE OF MOTION AND MOTION to Stay Case 168 filed by Plaintiff Island Industries, Inc.. (Attachments: # 1 Declaration of Matthew McConkey, # 2 Exhibit 1)(Marmolejo, Matthew) (Entered: 05/12/2020) |
| 05/15/2020 | 240 | SCHEDULING NOTICE TO ALL PARTIES AND ORDER by Judge R. Gary Klausner. The Jury Trial is HEREBY CONTINUED TO 8/18/2020 at 9:00 am; and the Pretrial Conference is HEREBY CONTINUED TO 8/3/2020 at 9:00 am. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 05/15/2020) |
| 05/15/2020 | 241 | MINUTES (IN CHAMBERS) Order Re: Defendant Smith Cooper International's Application to Seal [DE 17] by Judge R. Gary Klausner: In sum, it appears that there are several defects with SCI's Application to Seal. Nevertheless, in the interests of justice, the Court will give SCI the opportunity to refile its Application to Seal one final time. SCI must refile its Application to Seal in accordance with this Court's Local Rules no later than May 19, 2020. If the Application is filed under LR 79-5.2.2(b), Island must file the requisite declaration within 4 days, required the Local Rules. Otherwise, the Application will be denied. (See minutes for further details) (yl) (Entered: 05/15/2020) |
| 05/15/2020 | 242 | MINUTES (IN CHAMBERS) Order RE: Plaintiff Island's Application to Seal 179 by |

| | | | |
|---|---|---|---|
| | | Judge R. Gary Klausner: Defendant's Vandewater International Inc., and Neil Reubens have not filed a declaration in support of Island's Application to Seal. In the interests of judstice, the Court shall give Vandewater until May 19, 2020 to file such a declaration. IT IS SO ORDERED. (See minutes for further details) (yl) (Entered: 05/15/2020) |
| 05/15/2020 | 243 | | MINUTES (IN CHAMBERS) Order Re Defendant Smith Cooper's International's Application to Seal 197 by Judge R. Gary Klausner: Upon review, the Court GRATS SCI's Application. IT IS SO ORDERED. (See minutes for further details) (yl) (Entered: 05/18/2020) |
| 05/18/2020 | 244 | | (IN CHAMBERS) Order Re: Defendant Sigma's Application to Seal [DE 190 ] by Judge R. Gary Klausner: Upon review, the Court GRANTS Sigma's Application. (jp) (Entered: 05/18/2020) |
| 05/18/2020 | 245 | | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document under seal 179 filed by Defendants Neil Reubens, Vandewater International Inc.. (Attachments: # 1 Exhibit 1 - (Marmolejo Exh 59), # 2 Exhibit 2 - (Marmolejo Decl 62), # 3 Exhibit 3 - (Marmolejo Decl 64))(Salzman, Ryan) (Entered: 05/18/2020) |
| 05/18/2020 | 246 | | DECLARATION of Matthew Marmolejo SUPPLEMENTAL DECLARATION IN SUPPORT OF OPPOSITION TO DEFENDANTS' Renewed NOTICE OF MOTION AND MOTION to Stay Case 168 filed by Plaintiff Island Industries, Inc.. (Attachments: # 1 Exhibit)(Marmolejo, Matthew) (Entered: 05/18/2020) |
| 05/18/2020 | 247 | | SUPPLEMENT to Renewed NOTICE OF MOTION AND MOTION to Stay Case 168 filed by Defendants Neil Reubens, Smith Cooper International, Vandewater International Inc.. (Attachments: # 1 Declaration of R. Salzman ISO Supplement, # 2 Exhibit 1 to Decl of R. Salzman)(Salzman, Ryan) (Entered: 05/18/2020) |
| 05/19/2020 | 248 | | SEALED DOCUMENT *Reply to Statement of Facts* re Reply (Motion related), 192 , Order on Motion for Leave to File Document Under Seal 244 filed by Defendant Sigma Corporation.(Lau, Lucius) (Entered: 05/19/2020) |
| 05/19/2020 | 249 | | APPLICATION to file document under seal filed by Defendant Smith Cooper International. (Attachments: # 1 Declaration Declaration of Marc Tobak, # 2 Exhibit Exhibit A, # 3 Exhibit Exhibit B (Redacted), # 4 Exhibit Exhibit C (Redacted), # 5 Exhibit Exhibit D, # 6 Exhibit Exhibit E, # 7 Exhibit Exhibit F (Redacted), # 8 Proposed Order Granting Application to File Under Seal Pursuant to Protective Order)(Huggins, Teresa) (Entered: 05/19/2020) |
| 05/19/2020 | 250 | | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document under seal 249 filed by Defendant Smith Cooper International. (Attachments: # 1 Exhibit A, # 2 Exhibit B (Unredacted), # 3 Exhibit C (Unredacted), # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F (Unredacted))(Huggins, Teresa) (Entered: 05/19/2020) |
| 05/21/2020 | 251 | | (IN CHAMBERS) Order Re: Plaintiff Island's Application to Seal [DE 179 ] by Judge R. Gary Klausner: The Court DENIES Island's Application to Seal. (SEE CIVIL MINUTES FOR FURTHER SPECIFICS). (jp) (Entered: 05/21/2020) |
| 05/21/2020 | 252 | | (IN CHAMBERS) Order Re: Defendant Smith Cooper International's Application to Seal [DE 175] by Judge R. Gary Klausner: The Court GRANTS SCI's Application 175 . The following may be filed with proposed redaction: (1) Deposition Transcript of Glen Sanders, as set forth at ECF No. 249-3. (2) Deposition Transcript of Mark Woehrel, as set forth as ECF No. 249-4. (3) SCI's Memorandum of Points and Authorities in support of Motion for Summary Judgment, as set forth as ECF No. 249-7. (jp) (Entered: 05/21/2020) |
| 05/25/2020 | 253 | | REQUEST for Leave to file to Refile May 8, 2020 Designating Party's Declaration in |

| | | Support of Application to File Under Seal Pursuant to Protective Order an Associated Documents filed by Defendant Smith Cooper International. (Attachments: # [1] Exhibit A, # [2] Exhibit B, # [3] Exhibit C, # [4] Proposed Order, # [5] Certificate of Service) (Huggins, Teresa) (Entered: 05/25/2020) |
|---|---|---|
| 05/29/2020 | [254] | STATEMENT of Interest NOTICE OF MOTION AND MOTION for Summary Judgment as to Vandewater International, Inc. and Neil Ruebens [169] , NOTICE OF MOTION AND MOTION for Summary Judgment as to Smith-Cooper International, Inc. [172] , NOTICE OF MOTION AND MOTION for Summary Judgment as to Sigma Corporation [167] filed by Plaintiff United States of America. (Hinson, Zoila) (Entered: 05/29/2020) |
| 06/05/2020 | [255] | NOTICE of Supplemental Authority Regarding Defendants' Renewed Motion to Stay (ECF #168) filed by Plaintiff Island Industries, Inc.. (Attachments: # [1] Exhibit A, # [2] Exhibit B, # [3] Exhibit C)(Marmolejo, Matthew) (Entered: 06/05/2020) |
| 06/05/2020 | [256] | (IN CHAMBERS) Order Re: Supplemental Briefing by Judge R. Gary Klausner: Defendants shall file a consolidated supplemental brief not to exceed 5 pages no later than 6/10/2020. Island shall file a response not to exceed 5 pages no later than 6/12/2020. (See Civil Minutes for Further Specifics). (jp) (Entered: 06/05/2020) |
| 06/09/2020 | [257] | EX PARTE APPLICATION for Order for Granting Defendants Leave to File a Response to the United States' Statement of Interest filed by Defendants Neil Reubens, Sigma Corporation, Smith Cooper International, Vandewater International Inc.. (Attachments: # [1] Defendants' Joint Response to the United States' Statement of Interest, # [2] Declaration of Marc Tobak in Support of Defendants' Joint Ex Parte Application for an Order Granting Defendants Leave to File a Response to the United States' Statement of Interest, # [3] Proposed Order re Defendants' Joint Ex Parte Application for an Order Granting Defendants Leave to File a Response to the United States' Statement of Interest, # [4] Certificate of Service) (Attorney Brian E Klein added to party Neil Reubens(pty:dft), Attorney Brian E Klein added to party Sigma Corporation(pty:dft), Attorney Brian E Klein added to party Vandewater International Inc.(pty:dft)) (Klein, Brian) (Entered: 06/09/2020) |
| 06/10/2020 | [258] | SUPPLEMENT to NOTICE OF MOTION AND MOTION for Summary Judgment as to Vandewater International, Inc. and Neil Ruebens [169] , NOTICE OF MOTION AND MOTION for Summary Judgment as to Smith-Cooper International, Inc. [172] , NOTICE OF MOTION AND MOTION for Summary Judgment as to Sigma Corporation [167] *Defendants' Consolidated Supplemental Brief* filed by Defendant Sigma Corporation. (Lau, Lucius) (Entered: 06/10/2020) |
| 06/12/2020 | [259] | DENIED BY ORDER OF THE COURT by Judge R. Gary Klausner: Re: Request for Leave to file to Refile May 8, 2020 Designating Party's Declaration in Support of Application to File Under Seal Pursuant to Protective Order an Associated Documents [253] . The request is DENIED. (et) (Entered: 06/12/2020) |
| 06/12/2020 | [260] | ORDER RE DEFENDANTS JOINT EX PARTE APPLICATION FOR AN ORDER GRANTING DEFENDANTS LEAVE TO FILE A RESPONSE TO THE UNITED STATES STATEMENT OF INTEREST [257] by Judge R. Gary Klausner: The Court GRANTS the application and ORDERS that Defendants Response filed therewith is deemed properly filed and considered. (lc) (Entered: 06/12/2020) |
| 06/12/2020 | [261] | SUPPLEMENT to NOTICE OF MOTION AND MOTION for Summary Judgment as to Vandewater International, Inc. and Neil Ruebens [169] , NOTICE OF MOTION AND MOTION for Summary Judgment as to Smith-Cooper International, Inc. [172] , NOTICE OF MOTION AND MOTION for Summary Judgment as to Sigma Corporation [167] |

| | | *Island's Supplemental Brief in Opposition* filed by Plaintiff Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 06/12/2020) |
|---|---|---|
| 06/18/2020 | [262](#) | OPPOSITION to NOTICE OF MOTION AND MOTION for Summary Judgment as to Smith-Cooper International, Inc. [172](#) filed by Plaintiff Island Industries, Inc.. (Attachments: # [1](#) Statement of Genuine Disputes of Material Fact)(Marmolejo, Matthew) (Entered: 06/18/2020) |
| 06/18/2020 | [263](#) | OPPOSITION to NOTICE OF MOTION AND MOTION for Summary Judgment as to Vandewater International, Inc. and Neil Ruebens [169](#) *(REDACTED)* filed by Plaintiff Island Industries, Inc.. (Attachments: # [1](#) Statement of Genuine Disputes of Material Fact)(Marmolejo, Matthew) (Entered: 06/18/2020) |
| 06/18/2020 | [264](#) | DECLARATION of Matthew H. Marmolejo re Response in Opposition to Motion [181](#) , Response in Opposition to Motion [182](#) , Response in Opposition to Motion, [183](#) filed by Plaintiff Island Industries, Inc.. (Attachments: # [1](#) Exhibit 1, # [2](#) Exhibit 2, # [3](#) Exhibit 3, # [4](#) Exhibit 4, # [5](#) Exhibit 5, # [6](#) Exhibit 6, # [7](#) Exhibit 7, # [8](#) Exhibit 8, # [9](#) Exhibit 9, # [10](#) Exhibit 10, # [11](#) Exhibit 11, # [12](#) Exhibit 12, # [13](#) Exhibit 13, # [14](#) Exhibit 14, # [15](#) Exhibit 15, # [16](#) Exhibit 16, # [17](#) Exhibit 17, # [18](#) Exhibit 18, # [19](#) Exhibit 19, # [20](#) Exhibit 20, # [21](#) Exhibit 21, # [22](#) Exhibit 22, # [23](#) Exhibit 23, # [24](#) Exhibit 24, # [25](#) Exhibit 25, # [26](#) Exhibit 26, # [27](#) Exhibit 27, # [28](#) Exhibit 28, # [29](#) Exhibit 29, # [30](#) Exhibit 30, # [31](#) Exhibit 31, # [32](#) Exhibit 32, # [33](#) Exhibit 33, # [34](#) Exhibit 34, # [35](#) Exhibit 35, # [36](#) Exhibit 36, # [37](#) Exhibit 37, # [38](#) Exhibit 38, # [39](#) Exhibit 39, # [40](#) Exhibit 40, # [41](#) Exhibit 41, # [42](#) Exhibit 42, # [43](#) Exhibit 43, # [44](#) Exhibit 44, # [45](#) Exhibit 45, # [46](#) Exhibit 46, # [47](#) Exhibit 47, # [48](#) Exhibit 48, # [49](#) Exhibit 49, # [50](#) Exhibit 50, # [51](#) Exhibit 51, # [52](#) Exhibit 52, # [53](#) Exhibit 53, # [54](#) Exhibit 54, # [55](#) Exhibit 55, # [56](#) Exhibit 56, # [57](#) Exhibit 57, # [58](#) Exhibit 58, # [59](#) Exhibit 59, # [60](#) Exhibit 60, # [61](#) Exhibit 61, # [62](#) Exhibit 62, # [63](#) Exhibit 63, # [64](#) Exhibit 64, # [65](#) Exhibit 65)(Marmolejo, Matthew) (Entered: 06/18/2020) |
| 06/18/2020 | [265](#) | SEALED OPPOSITION RE NOTICE OF MOTION AND MOTION for Summary Judgment as to Vandewater International, Inc. and Neil Ruebens [169](#) , Order on Motion for Leave to File Document Under Seal [251](#) filed by Plaintiff Island Industries, Inc.. (Attachments: # [1](#) Statement of Genuine Disputes of Material Fact)(Marmolejo, Matthew) (Entered: 06/18/2020) |
| 06/18/2020 | [266](#) | SEALED OPPOSITION RE NOTICE OF MOTION AND MOTION for Summary Judgment as to Sigma Corporation [167](#) , Minutes of In Chambers Order/Directive - no proceeding held, [242](#) filed by Plaintiff Island Industries, Inc.. (Attachments: # [1](#) Statement of Genuine Disputes of Material Fact)(Marmolejo, Matthew) (Entered: 06/18/2020) |
| 06/18/2020 | [267](#) | SEALED DOCUMENT *Exhibit 51* re Declaration,,,,, [264](#) , Minutes of In Chambers Order/Directive - no proceeding held, [242](#) filed by Plaintiff Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 06/18/2020) |
| 06/18/2020 | [268](#) | SEALED DOCUMENT *Exhibit 58* re Declaration,,,,, [264](#) , Order on Motion for Leave to File Document Under Seal [251](#) filed by Plaintiff Island Industries, Inc..(Marmolejo, Matthew) (Entered: 06/18/2020) |
| 06/23/2020 | [269](#) | (IN CHAMBERS) Order Re: Defendants' Motion to Stay [DE [168](#) ] by Judge R. Gary Klausner the Court DENIES Defendants' Motion to Stay. (SEE CIVIL MINUTES FOR FURTHER SPECIFICS). (et) (Entered: 06/23/2020) |
| 06/23/2020 | [270](#) | (IN CHAMBERS) Order Re: Defendant Sigma's Motion for Summary Judgment [DE [167](#) ]; Defendants Ruebens and Vandewater's Motion for Summary Judgment [DE [169](#) ]; Defendant SCI's Motion for Summary Judgment [DE [177-5]] by Judge R. Gary |

| | | Klausner the Court GRANTS in part and DENIES in part Defendants' Motions. (SEE CIVIL MINUTES FOR FURTHER SPECIFICS). (et) (Entered: 06/23/2020) |
|---|---|---|
| 07/02/2020 | 271 | NOTICE OF MOTION AND MOTION IN LIMINE (#6) to Exclude Evidence Contrary to the Court's Summary Judgment Order as to Falsity filed by Plaintiff-Relator Island Industries, Inc.. Motion set for hearing on 8/18/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Proposed Order)(Marmolejo, Matthew) (Entered: 07/02/2020) |
| 07/06/2020 | 272 | NOTICE OF MOTION AND MOTION to Dismiss for Lack of Jurisdiction *for lack of ripeness over questions integral to Realtor's Claim or, in the alternative*, NOTICE OF MOTION AND MOTION to Stay Case *for lack of ripeness over questions integral to Realtor's Claim* filed by Defendants Neil Reubens, Vandewater International Inc.. Motion set for hearing on 8/3/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Declaration of R. Salzman ISO Motion to Dismiss or Stay, # 2 Proposed Order) (Salzman, Ryan) (Entered: 07/06/2020) |
| 07/06/2020 | 273 | NOTICE of Joinder by Smith-Cooper International, Inc. to Vandewater Defendants' Motion to Dismiss or Stay for Lack of Ripeness filed by Defendant Smith Cooper International. (Huggins, Teresa) (Entered: 07/06/2020) |
| 07/07/2020 | 274 | SCHEDULING NOTICE TO ALL PARTIES AND ORDER by Judge R. Gary Klausner. The Court deems Defendants Neil Reubens and Vandewater International, Inc.'s Motion to Dismiss for Lack of Jurisdiction for lack of ripeness over questions integral to Realtor's Claim or, in the alternative, NOTICE OF MOTION AND MOTION to Stay Case for lack of ripeness over questions integral to Realtor's Claim 272 as an ex parte. Plaintiff shall file any opposition not later than 4:00 pm on Friday, July 10, 2020. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 07/07/2020) |
| 07/09/2020 | 275 | ANSWER to Amended Complaint/Petition,,,, 97 with JURY DEMAND filed by Defendant Allied Rubber and Gasket Company.(Attorney Heather Lynn Mayer added to party Allied Rubber and Gasket Company(pty:dft))(Mayer, Heather) (Entered: 07/09/2020) |
| 07/10/2020 | 276 | CERTIFICATE of Interested Parties filed by Defendant Allied Rubber and Gasket Company, identifying Allied Rubber & Gasket Company. (Attorney Aaron M May added to party Allied Rubber and Gasket Company(pty:dft))(May, Aaron) (Entered: 07/10/2020) |
| 07/10/2020 | 277 | OPPOSITION to NOTICE OF MOTION AND MOTION to Dismiss for Lack of Jurisdiction *for lack of ripeness over questions integral to Realtor's Claim or, in the alternative* NOTICE OF MOTION AND MOTION to Stay Case *for lack of ripeness over questions integral to Realtor's Claim* 272 filed by Plaintiff Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 07/10/2020) |
| 07/13/2020 | 278 | MEMORANDUM of CONTENTIONS of FACT and LAW filed by Defendant Sigma Corporation. (Lau, Lucius) (Entered: 07/13/2020) |
| 07/13/2020 | 279 | MEMORANDUM of CONTENTIONS of FACT and LAW filed by Plaintiff Island Industries, Inc.. (Attachments: # 1 Proof of Service)(Marmolejo, Matthew) (Entered: 07/13/2020) |
| 07/13/2020 | 280 | MEMORANDUM of CONTENTIONS of FACT and LAW filed by Defendants Neil Reubens, Vandewater International Inc.. (Salzman, Ryan) (Entered: 07/13/2020) |
| 07/13/2020 | 281 | Defendant Smith-Cooper International, Inc.'s Memorandum of Contentions of Fact and Law filed by Defendant Smith Cooper International (Klein, Brian) (Entered: 07/13/2020) |

| 07/13/2020 | 282 | Joint Exhibit List *(Joint Trial Exhibit List)* filed by Plaintiff Island Industries, Inc... (Marmolejo, Matthew) (Entered: 07/13/2020) |
| 07/13/2020 | 283 | Witness List filed by Plaintiff Island Industries, Inc... (Marmolejo, Matthew) (Entered: 07/13/2020) |
| 07/13/2020 | 284 | MEMORANDUM of CONTENTIONS of FACT and LAW filed by Defendant Allied Rubber and Gasket Company. (May, Aaron) (Entered: 07/13/2020) |
| 07/13/2020 | 285 | JOINDER in Joint MOTION IN LIMINE (#2) to Exclude Testimony Regarding the Mod Act 221 , Joint MOTION IN LIMINE (#1) to Exclude The Opinion of Plaintiff-Relator's Expert Kelli Thompson 220 , MOTION IN LIMINE (#5) to Exclude Evidence and Argument on the Sprink-let Scope Ruling 216 filed by Defendant Allied Rubber and Gasket Company. (May, Aaron) (Entered: 07/13/2020) |
| 07/17/2020 | 286 | EX PARTE APPLICATION for Leave to file Response to Opposition to Jurisdictional Motion filed by Defendants Neil Reubens, Vandewater International Inc.. (Attachments: # 1 Unredacted Document, # 2 Declaration of R. Salzman, # 3 Proposed Order) (Salzman, Ryan) (Entered: 07/17/2020) |
| 07/17/2020 | 287 | NOTICE of Settlement *as to Defendant Allied Rubber and Gasket Company* filed by Plaintiff-Relator Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 07/17/2020) |
| 07/20/2020 | 288 | NOTICE OF MOTION AND MOTION to Sever Sigma Corporation filed by Defendant Sigma Corporation. Motion set for hearing on 8/17/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Proposed Order) (Lau, Lucius) (Entered: 07/20/2020) |
| 07/20/2020 | 289 | ORDER GRANTING Vandewater and Neil Ruebens' Ex Part Application for an Order Granting Leave to File a Response to Plaintiff's Opposition to Defendants' Motion to Dismiss or Stay (Dkt. No. 277) 286 by Judge R. Gary Klausner, the Court hereby GRANTS Defendants' Application and ORDERS that Defendants' Response (Dkt. No. 286-1] is to be electronically filed by counsel no later than 7/22/2020. (jp) (Entered: 07/20/2020) |
| 07/20/2020 | 290 | RESPONSE filed by Defendant Sigma Corporationto Notice of Settlement 287 (Lau, Lucius) (Entered: 07/20/2020) |
| 07/20/2020 | 291 | RESPONSE TO PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS OR STAY [DKT. 277] re NOTICE OF MOTION AND MOTION to Dismiss for Lack of Jurisdiction *for lack of ripeness over questions integral to Realtor's Claim or, in the alternative* NOTICE OF MOTION AND MOTION to Stay Case *for lack of ripeness over questions integral to Realtor's Claim* 272 filed by Defendants Neil Reubens, Vandewater International Inc.. (Salzman, Ryan) (Entered: 07/20/2020) |
| 07/21/2020 | 292 | SCHEDULING NOTICE TO ALL PARTIES AND ORDER by Judge R. Gary Klausner. The Court has reviewed the Notice of Settlement filed on July 17, 2020 287 . The parties are hereby notified that they are not relieved of any deadlines (including the filing of responsive documents, scheduled mediation, etc.) or Court appearances until a dismissal of the action is filed. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 07/21/2020) |
| 07/21/2020 | 293 | (IN CHAMBERS) Scheduling Order by Judge R. Gary Klausner: The Court alters the briefing schedule as follows: Sigma's Motion is calendared for 8/3/2020. Island shall file an Opposition no later than 7/24/2020. On this same date, the remaining Defendants must either file (1) a Joint Opposition, or (2) a Statement of Non-Opposition to Sigma's Motion. Sigma shall file a Reply no later than 7/28/2020. (jp) (Entered: 07/21/2020) |
| 07/21/2020 | 294 | (IN CHAMBERS) Order Re: Motion to Dismiss or Stay for Lack of Ripeness [DE 272 ] by Judge R. Gary Klausner: The Court DENIES Defendants' Ex Parte Application. (SEE |

CIVIL MINUTES FOR FURTHER SPECIFICS). (jp) (Entered: 07/21/2020)

| 07/23/2020 | 295 | NOTICE OF LODGING Proposed Pretrial Conference Order Plaintiff Island Industries, Inc.. (Attachments: # 1 [Proposed] Final Pretrial Conference Order)(Marmolejo, Matthew) (Entered: 07/23/2020) |
| --- | --- | --- |
| 07/24/2020 | 296 | Joint APPLICATION to file document under seal filed by Plaintiff Island Industries, Inc.. (Attachments: # 1 Proposed Order Granting Joint Application for Leave to File Under Seal, # 2 Redacted Document Declaration of Aaron M. May, # 3 Redacted Document Exhibit A)(Marmolejo, Matthew) (Entered: 07/24/2020) |
| 07/24/2020 | 297 | SEALED DECLARATION IN SUPPORT OF Joint APPLICATION to file document under seal 296 filed by Plaintiff Island Industries, Inc.. (Attachments: # 1 Exhibit A) (Marmolejo, Matthew) (Entered: 07/24/2020) |
| 07/24/2020 | 298 | Joint NOTICE OF MOTION AND MOTION to Dismiss Defendant Allied Rubber and Gasket Company filed by Plaintiff Island Industries, Inc.. Motion set for hearing on 8/24/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Proposed Order Dismissing Defendant Allied Rubber And Gasket Company From Action) (Marmolejo, Matthew) (Entered: 07/24/2020) |
| 07/24/2020 | 299 | OPPOSITION to MOTION IN LIMINE (#5) to Exclude Evidence and Argument on the Sprink-let Scope Ruling 216 filed by Plaintiff Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 07/24/2020) |
| 07/24/2020 | 300 | OPPOSITION to NOTICE OF MOTION AND MOTION to Sever Sigma Corporation 288 *Fed. R. CIV. P. 21* filed by Plaintiff Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 07/24/2020) |
| 07/24/2020 | 301 | OPPOSITION to Joint MOTION IN LIMINE (#2) to Exclude Testimony Regarding the Mod Act 221 filed by Plaintiff Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 07/24/2020) |
| 07/24/2020 | 302 | OPPOSITION to MOTION IN LIMINE (2) to Exclude Certain Import Values 233 filed by Plaintiff Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 07/24/2020) |
| 07/24/2020 | 303 | OPPOSITION to MOTION IN LIMINE (#3) to Exclude Speculation Regarding Lloyd Perkins 223 filed by Plaintiff Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 07/24/2020) |
| 07/24/2020 | 304 | OPPOSITION to MOTION IN LIMINE (#4) to Exclude The Term "Confidential Source" 224 filed by Plaintiff Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 07/24/2020) |
| 07/24/2020 | 305 | OPPOSITION to MOTION IN LIMINE 1 to Exclude Financial Condition & Related Information 232 filed by Plaintiff Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 07/24/2020) |
| 07/24/2020 | 306 | OPPOSITION to MOTION IN LIMINE (#4) to Exclude Evidence on Professional Broker Employment 215 filed by Plaintiff Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 07/24/2020) |
| 07/24/2020 | 307 | OPPOSITION to Third MOTION IN LIMINE (#3) to Exclude Evidence on "Double Invoicing" 214 filed by Plaintiff Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 07/24/2020) |
| 07/24/2020 | 308 | OPPOSITION to Joint MOTION IN LIMINE (#1) to Exclude The Opinion of Plaintiff-Relator's Expert Kelli Thompson 220 filed by Plaintiff Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 07/24/2020) |

| 07/24/2020 | 309 | OPPOSITION to MOTION IN LIMINE (#6) to Exclude Evidence Contrary to the Court's Summary Judgment Order as to Falsity 271 filed by Defendant Sigma Corporation. (Lau, Lucius) (Entered: 07/24/2020) |
|---|---|---|
| 07/24/2020 | 310 | EX PARTE APPLICATION to Continue Trial from August 18, 2020 filed by Defendant Smith Cooper International. (Attachments: # 1 Declaration of Neil MacBride, # 2 [PROPOSED] Order re Defendants' ExParte Application) (Klein, Brian) (Entered: 07/24/2020) |
| 07/24/2020 | 311 | MEMORANDUM in Opposition to MOTION IN LIMINE (#2) to Exclude Argument Regarding Objective Reasonableness 228 *Defendants' Joint Memorandum in Opposition to Plaintiff's Motion in Limine No. 2 to Exclude Argument Regarding Objective Reasonableness* filed by Defendant Smith Cooper International. (Klein, Brian) (Entered: 07/24/2020) |
| 07/24/2020 | 312 | NOTICE OF NON-OPPOSITION to NOTICE OF MOTION AND MOTION to Sever Sigma Corporation 288 *Defendant Smith-Cooper International, Inc's Statement of Non-Opposition to Defendant Sigma Corporation's Motion to Sever Trial* filed by Defendant Smith Cooper International. (Klein, Brian) (Entered: 07/24/2020) |
| 07/24/2020 | 313 | OPPOSITION to Second MOTION IN LIMINE (#2) to Exclude Evidence of Sigma Corporation's Subsequent Remedial Measures 213 filed by Plaintiff Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 07/24/2020) |
| 07/24/2020 | 314 | DECLARATION of Matthew H. Marmolejo re Response in Opposition to Motion 313 *(Declaration of Matthew H. Marmolejo in Support of Island's Opposition to Sigma's Motion in Limine No 2 [ECF #213])* filed by Plaintiff Island Industries, Inc.. (Attachments: # 1 Exhibit A)(Marmolejo, Matthew) (Entered: 07/24/2020) |
| 07/24/2020 | 315 | OPPOSITION to First MOTION IN LIMINE (#1) to Exclude Evidence Relating to Sigma Corporation's Total Net Worth and Total Importations 212 filed by Plaintiff Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 07/24/2020) |
| 07/24/2020 | 316 | OPPOSITION to MOTION IN LIMINE (#5) to Exclude Immaterial Matters, Inflammatory Character Evidence, and Previous Acts 225 filed by Plaintiff Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 07/24/2020) |
| 07/24/2020 | 317 | DECLARATION of Matthew H. Marmolejo re Response in Opposition to Motion 316 *(Declaration of Matthew H. Marmolejo in Support of Island's Opposition to Vandewater and Neil Ruebens' Motion in Limine No. 5 [ECF#225])* filed by Plaintiff Island Industries, Inc.. (Attachments: # 1 Exhibit A)(Marmolejo, Matthew) (Entered: 07/24/2020) |
| 07/24/2020 | 318 | OPPOSITION to MOTION IN LIMINE (#1) to Exclude Report and Testimony of Walter Sperko 227 filed by Defendants Allied Rubber and Gasket Company, Neil Reubens, Sigma Corporation, Smith Cooper International, Vandewater International Inc.. (Attorney Ryan Matthew Salzman added to party Allied Rubber and Gasket Company(pty:dft), Attorney Ryan Matthew Salzman added to party Sigma Corporation(pty:dft))(Salzman, Ryan) (Entered: 07/24/2020) |
| 07/24/2020 | 319 | OPPOSITION to MOTION IN LIMINE (#3) to Exclude Evidence that the Government has not Intervened 229 filed by Defendants Allied Rubber and Gasket Company, Neil Reubens, Sigma Corporation, Smith Cooper International, Vandewater International Inc.. (Salzman, Ryan) (Entered: 07/24/2020) |
| 07/24/2020 | 320 | OPPOSITION to MOTION IN LIMINE (#4) to Preclude References to Recoveries Under the False Claims Act 230 filed by Defendants Allied Rubber and Gasket Company, |

|  |  | Neil Reubens, Sigma Corporation, Smith Cooper International, Vandewater International Inc.. (Salzman, Ryan) (Entered: 07/24/2020) |
|------------|-----|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 07/24/2020 | 321 | OPPOSITION to MOTION IN LIMINE (#5) to Exclude Evidence of Inability to Satisfy Judgment 231 filed by Defendants Neil Reubens, Vandewater International Inc.. (Salzman, Ryan) (Entered: 07/24/2020) |
| 07/24/2020 | 322 | DECLARATION of Ryan M. Salzman in Opposition to MOTION IN LIMINE (#3) to Exclude Evidence that the Government has not Intervened 229 , MOTION IN LIMINE (#1) to Exclude Report and Testimony of Walter Sperko 227 , MOTION IN LIMINE (#4) to Preclude References to Recoveries Under the False Claims Act 230 filed by Defendants Allied Rubber and Gasket Company, Neil Reubens, Sigma Corporation, Smith Cooper International, Vandewater International Inc.. (Attachments: # 1 Exhibit No. 1 - Sperko Transcript, # 2 Exhibit No. 2 - Proposed Jury Instructions, # 3 Exhibit No. 3 - Thompson Transcript, # 4 Exhibit No. 4 - CBP Survey Audit Program)(Salzman, Ryan) (Entered: 07/24/2020) |
| 07/24/2020 | 323 | NOTICE OF NON-OPPOSITION to NOTICE OF MOTION AND MOTION to Sever Sigma Corporation 288 filed by Defendants Neil Reubens, Vandewater International Inc.. (Salzman, Ryan) (Entered: 07/24/2020) |
| 07/24/2020 | 324 | NOTICE OF NON-OPPOSITION to NOTICE OF MOTION AND MOTION to Sever Sigma Corporation 288 filed by Defendant Allied Rubber and Gasket Company. (May, Aaron) (Entered: 07/24/2020) |
| 07/27/2020 | 325 | STATEMENT of Response to EX PARTE APPLICATION to Continue Trial from August 18, 2020 310 filed by Plaintiff Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 07/27/2020) |
| 07/27/2020 | 326 | Proposed Voir Dire Questions filed by Defendant Sigma Corporation.. (Lau, Lucius) (Entered: 07/27/2020) |
| 07/27/2020 | 327 | Proposed Voir Dire Questions filed by Plaintiff-Relator Island Industries, Inc... (Marmolejo, Matthew) (Entered: 07/27/2020) |
| 07/28/2020 | 328 | REPLY in Support of NOTICE OF MOTION AND MOTION to Sever Sigma Corporation 288 filed by Defendant Sigma Corporation. (Lau, Lucius) (Entered: 07/28/2020) |
| 07/28/2020 | 329 | (IN CHAMBERS) Order Re: Joint Motion to Dismiss Defendant Allied Rubber and Gasket Company [DE 298 ] by Judge R. Gary Klausner: The Court DENIES the Motion without prejudice. Should the parties re-file their Motion, they must lodge copy of the United States' written consent with the Court. (See Civil Minutes for further specifics). (jp) (Entered: 07/28/2020) |
| 07/28/2020 | 330 | NOTICE of Appearance filed by attorney Micah G Block on behalf of Defendant Smith Cooper International (Attorney Micah G Block added to party Smith Cooper International(pty:dft))(Block, Micah) (Entered: 07/28/2020) |
| 07/28/2020 | 331 | EX PARTE APPLICATION for Order for to Conduct the August 3, 2020 Pretrial Conference Telephonically or by Videoconference, or, in the Alternative, to Allow Defense Counsel to Appear Remotely filed by Defendants Neil Reubens, Sigma Corporation, Smith Cooper International, Vandewater International Inc.. (Attachments: # 1 Declaration of Neil MacBride in Support of Defendants' Ex Parte Application, # 2 Proposed Order Granting Defendants' Ex Parte Application) (Klein, Brian) (Entered: 07/28/2020) |
| 07/29/2020 | 332 | SCHEDULING NOTICE TO ALL PARTIES AND ORDER by Judge R. Gary Klausner. Because of the unavailability of jurors during this pandemic, the Court will only be able |

| | | to conduct bench trials at this time. Consequently, the Pretrial Conference is continued to January 25, 2021 at 9:00 a.m., and the Jury Trial is continued to February 9, 2021 at 9:00 a.m. If the parties wish to proceed with a bench trial on the current trial date of August 18, 2020, a stipulation to waive jury should be filed no later than August 6, 2020. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 07/29/2020) |
|---|---|---|
| 07/29/2020 | 333 | RESPONSE IN SUPPORT *Motion to Dismiss Defendant ARGCO* filed by Plaintiff United States of America. (Hinson, Zoila) (Entered: 07/29/2020) |
| 07/29/2020 | 334 | Renewed NOTICE OF MOTION AND MOTION to Dismiss Defendant Allied Rubber and Gasket Company filed by Plaintiff-Relator Island Industries, Inc.. Motion set for hearing on 8/31/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 United States' Consent, # 2 Proposed Order) (Marmolejo, Matthew) (Entered: 07/29/2020) |
| 07/30/2020 | 335 | ORDER GRANTING Joint Application for Leave to File Under Seal 296 by Judge R. Gary Klausner. See Order for further specifics. (jp) (Entered: 07/30/2020) |
| 07/30/2020 | 336 | SEALED DOCUMENT *Confidential Settlement Agreement* re Renewed NOTICE OF MOTION AND MOTION to Dismiss Defendant Allied Rubber and Gasket Company 334 , Order on Motion for Leave to File Document Under Seal 335 filed by Plaintiff Island Industries, Inc..(Marmolejo, Matthew) (Entered: 07/30/2020) |
| 08/03/2020 | 337 | SCHEDULING NOTICE TO ALL PARTIES AND ORDER by Judge R. Gary Klausner. Defendant Sigma Corporation's Motion to Sever 288 , has been taken under submission by the Court. The Court will issue a determination after review and consideration of all properly submitted pleadings. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 08/03/2020) |
| 08/05/2020 | 338 | ORDER Dismissing Defendant Allied Rubber and Gasket Company from Action 334 by Judge R. Gary Klausner. (See Order for Further Specifics). (jp) (Entered: 08/05/2020) |
| 08/05/2020 | 339 | DENIED BY ORDER OF THE COURT by Judge R. Gary Klausner re EX PARTE APPLICATION for Trial Continuance or, in the Alternative, a Telephonic Status conference With All Parties and the Court 310 . DENIED AS MOOT. (jp) (Entered: 08/05/2020) |
| 08/05/2020 | 340 | DENIED BY ORDER OF THE COURT by Judge R. Gary Klausner re Joint Ex Parte Application to Conduct the August 3, 2020 Pretrial Conference Telephonically or by Videoconference, or, in the Alternative, to Allow Defense Counsel to Appear Remotely 331 . DENIED AS MOOT. (jp) (Entered: 08/05/2020) |
| 08/17/2020 | 341 | SCHEDULING NOTICE TO ALL PARTIES AND ORDER by Judge R. Gary Klausner. The Joint Motion to Dismiss Defendant Allied Rubber and Gasket Company 298 , calendared for hearing on August 24, 2020 has been taken under submission and off the motion calendar. No appearances by counsel are necessary. The Court will issue a ruling after full consideration of properly submitted pleadings. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 08/17/2020) |
| 08/17/2020 | 342 | Text Only Entry: The Text Only Scheduling Notice 341 was issued in error. Allied Rubber and Gasket Company has been dismissed from this action. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 08/17/2020) |
| 09/01/2020 | 343 | (IN CHAMBERS) Order Re: Motion to Sever Sigma [DE 288 ] by Judge R. Gary Klausner: The Court DENIES Sigma's Motion without prejudice. The Court will be in a |

| | | |
|---|---|---|
| | | better position to determine the merits of Sigma's Motion closer to the trial date. (SEE CIVIL MINUTES FOR FURTHER SPECIFICS). (jp) (Entered: 09/02/2020) |
| 10/28/2020 | 344 | Notice of Appearance or Withdrawal of Counsel: for attorney Alexus B Payton counsel for Plaintiff Island Industries, Inc.. Alexus B. Payton is no longer counsel of record for the aforementioned party in this case for the reason indicated in the G-123 Notice. Filed by Plaintiff-Relator Island Industries, Inc.. (Payton, Alexus) (Entered: 10/28/2020) |
| 11/09/2020 | 345 | NOTICE OF MOTION AND MOTION for Reconsideration re Order on Motion to Dismiss/Lack of Jurisdiction, Order on Motion to Stay Case 294 , Order on Motion for Summary Judgment,,, 270 filed by Defendants Neil Reubens, Vandewater International Inc.. Motion set for hearing on 12/7/2020 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Memorandum, # 2 Declaration, # 3 Proposed Order) (Salzman, Ryan) (Entered: 11/09/2020) |
| 11/16/2020 | 346 | OPPOSITION to NOTICE OF MOTION AND MOTION for Reconsideration re Order on Motion to Dismiss/Lack of Jurisdiction, Order on Motion to Stay Case 294 , Order on Motion for Summary Judgment,,, 270 345 filed by Plaintiff Island Industries, Inc.. (Attachments: # 1 Request for Judicial Notice, # 2 Exhibit A to Request for Judicial Notice)(Hendy, Christopher) (Entered: 11/16/2020) |
| 11/20/2020 | 347 | JOINDER in NOTICE OF MOTION AND MOTION for Reconsideration re Order on Motion to Dismiss/Lack of Jurisdiction, Order on Motion to Stay Case 294 , Order on Motion for Summary Judgment,,, 270 345 filed by Defendant Sigma Corporation. (Lau, Lucius) (Entered: 11/20/2020) |
| 11/23/2020 | 348 | REPLY in Support of NOTICE OF MOTION AND MOTION for Reconsideration re Order on Motion to Dismiss/Lack of Jurisdiction, Order on Motion to Stay Case 294 , Order on Motion for Summary Judgment,,, 270 345 filed by Defendants Neil Reubens, Vandewater International Inc.. (Salzman, Ryan) (Entered: 11/23/2020) |
| 12/04/2020 | 349 | SCHEDULING NOTICE TO ALL PARTIES AND ORDER (IN CHAMBERS) by Judge R. Gary Klausner: The Motion for Reconsideration by Vandewater Defendants 345 , calendared for hearing on December 7, 2020, has been taken under submission and off the motion calendar. No appearances by counsel are necessary. The Court will issue a ruling after full consideration of properly submitted pleadings. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jre) TEXT ONLY ENTRY (Entered: 12/04/2020) |
| 12/04/2020 | 350 | NOTICE OF MOTION AND MOTION to Sever Sigma Corporation filed by Defendant Sigma Corporation. Motion set for hearing on 1/4/2021 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Proposed Order) (Lau, Lucius) (Entered: 12/04/2020) |
| 12/14/2020 | 351 | OPPOSITION to NOTICE OF MOTION AND MOTION to Sever Sigma Corporation 350 filed by Plaintiff Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 12/14/2020) |
| 12/14/2020 | 352 | (IN CHAMBERS) Order Re: Defendants Ruebens and Vandewater's Motion for Reconsideration [DE 345 ] by Judge R. Gary Klausner: The Court DENIES Defendants Vandewater's and Reuben's Motion. (SEE CIVIL MINUTES FOR FURTHER SPECIFICS). (jp) (Entered: 12/15/2020) |
| 12/18/2020 | 353 | Joint REQUEST to Stay Case pending DOC's issuance of a final scope ruling by March 1, 2021 filed by Plaintiff-Relator Island Industries, Inc.. (Attachments: # 1 Proposed Order) (Marmolejo, Matthew) (Entered: 12/18/2020) |
| 12/21/2020 | 354 | REPLY In Support Of NOTICE OF MOTION AND MOTION to Sever Sigma Corporation 350 filed by Defendant Sigma Corporation. (Lau, Lucius) (Entered: |

| | | 12/21/2020) |
|---|---|---|
| 12/30/2020 | 355 | (IN CHAMBERS) SCHEDULING NOTICE TO ALL PARTIES AND ORDER by Judge R. Gary Klausner. The Motion to Sever Sigma Corporation 350 , calendared for hearing on January 4, 2021 has been taken under submission and off the motion calendar. No appearances by counsel are necessary. The Court will issue a ruling after full consideration of properly submitted pleadings. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 12/30/2020) |
| 01/04/2021 | 356 | Joint Trial Exhibit List filed by Plaintiff Island Industries, Inc., United States of America.. (Marmolejo, Matthew) (Entered: 01/04/2021) |
| 01/04/2021 | 357 | MEMORANDUM of CONTENTIONS of FACT and LAW filed by Defendant Sigma Corporation. (Lau, Lucius) (Entered: 01/04/2021) |
| 01/05/2021 | 358 | ORDER by Judge R. Gary Klausner. This Court, having considered the Parties' joint request to stay this case until March 1, 2021 (Dkt. 353 ) hereby ORDERS as follows: Trial is continued to May 18, 2021 at 9:00 a.m. The Pretrial Conference is continued to May 3, 2021 at 9:00 a.m. 2. The parties are ordered to file the Department of Commerce's final scope ruling with this Court within five business days of its issuance. If Commerce does not issue its scope ruling by March 1, 2021, the parties are directed to submit a status report by March 5, 2021. (lom) (Entered: 01/06/2021) |
| 01/19/2021 | 359 | (IN CHAMBERS) Order Re: Motion to Sever Signma [DE 350 ] by Judge R. Gary Klausner: The Court GRANTS Sigma's Motion. (See Civil Minutes for further specifics). (jp) (Entered: 01/19/2021) |
| 01/25/2021 | 360 | NOTICE of Change of Attorney Business or Contact Information: for attorney Brian E Klein counsel for Defendant Smith Cooper International. Changing firm name to Waymaker LLP. Changing e-mail to bklein@waymakerlaw.com. Filed by Defendant Smith Cooper International. (Klein, Brian) (Entered: 01/25/2021) |
| 02/24/2021 | 361 | (IN CHAMBERS) NOTICE TO ALL PARTIES AND ORDER by Judge R. Gary Klausner. Due to the unavailability of jurors during this pandemic, the Pretrial Conference is continued to August 2, 2021 at 9:00 a.m., and the Jury Trial is continued to August 17, 2021 at 9:00 a.m. Because of the need to continue the trial and the uncertainty of when the Court will resume jury trials, the Court strongly recommends that the parties participate in a further, meaningful mediation.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 02/24/2021) |
| 03/04/2021 | 362 | JOINT REPORT of Parties re Department of Commerce Proceedings filed by Plaintiff Island Industries, Inc.. (Attachments: # 1 Exhibit A)(Marmolejo, Matthew) (Entered: 03/04/2021) |
| 03/05/2021 | 363 | (IN CHAMBERS) Order Re: Joint Status Report by Judge R. Gary Klausner: In light of the joint status report filed on 3/5/2021, (ECF No. 362 ), the Court orders the parties to file the Department of Commerce's final scope ruling within five business days of its issuance. If Commerce does not issue its ruling by 4/15/2021, the parties are directed to submit a status report by 4/20/2021. (jp) (Entered: 03/05/2021) |
| 03/29/2021 | 364 | Joint APPLICATION to file document *Confidential Settlement Agreement* under seal filed by Plaintiff Island Industries, Inc.. (Attachments: # 1 Proposed Order)(Marmolejo, Matthew) (Entered: 03/29/2021) |
| 03/29/2021 | 365 | SEALED DECLARATION IN SUPPORT OF Joint APPLICATION to file document *Confidential Settlement Agreement* under seal 364 filed by Plaintiff Island Industries, Inc.. (Attachments: # 1 Sealed Settlement Agreement)(Marmolejo, Matthew) (Entered: 03/29/2021) |

| 03/29/2021 | 366 | Joint NOTICE OF MOTION AND MOTION to Dismiss Defendant Smith Cooper International *By Confidential Settlement* filed by Plaintiff-Relator Island Industries, Inc.. Motion set for hearing on 4/26/2021 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Proposed Order) (Marmolejo, Matthew) (Entered: 03/29/2021) |
|---|---|---|
| 03/31/2021 | 367 | RESPONSE IN SUPPORT of Joint NOTICE OF MOTION AND MOTION to Dismiss Defendant Smith Cooper International *By Confidential Settlement* 366 *Consent to Dismissal of Smith Cooper International* filed by Plaintiff United States of America. (Chorpening, Jennifer) (Entered: 03/31/2021) |
| 04/01/2021 | 368 | ORDER by Judge R. Gary Klausner GRANTING Joint Application for Leave to File Under Seal 364 . (See Order for further specifics). (jp) (Entered: 04/01/2021) |
| 04/02/2021 | 369 | AMENDED PROPOSED ORDER re Joint NOTICE OF MOTION AND MOTION to Dismiss Defendant Smith Cooper International *By Confidential Settlement* 366 filed by Plaintiff Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 04/02/2021) |
| 04/05/2021 | 370 | ORDER DISMISSING DEFENDANT SMITH COOPER INTERNATIONAL, INC 366 by Judge R. Gary Klausner, the Court hereby ORDERS as follows:(1) As to Relator Island Industries, Inc., the claims against Smith Cooper International, Inc., are dismissed in their entirety with prejudice. (See Order for further specifics). (jp) (Entered: 04/06/2021) |
| 04/16/2021 | 371 | SECOND JOINT REPORT of Parties re Department of Commerce Proceedings filed by Plaintiff Island Industries, Inc.. (Attachments: # 1 Exhibit)(Marmolejo, Matthew) (Entered: 04/16/2021) |
| 04/21/2021 | 372 | NOTICE of Commerce's Draft Results of Redetermination filed by Plaintiff-Relator Island Industries, Inc.. (Attachments: # 1 Commerce's Draft Results of Redetermination) (Marmolejo, Matthew) (Entered: 04/21/2021) |
| 04/29/2021 | 373 | *Vandewater Defendants' Suggestion of Bankruptcy* (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Salzman, Ryan) (Entered: 04/29/2021) |
| 04/30/2021 | 374 | ORDER STAYING CASE AS TO DEFENDANTS VANDEWATER INTERNATONAL, INC. AND NEIL REUBENS ONLY. All dates and/or deadlines as to all other parties remain 373 by Judge R. Gary Klausner (lc) Modified on 4/30/2021 (lc). (Entered: 04/30/2021) |
| 05/14/2021 | 375 | Notice of Appearance or Withdrawal of Counsel: for attorney Lucius B Lau counsel for Defendant Sigma Corporation. Sadie G. Pulliam is no longer counsel of record for the aforementioned party in this case for the reason indicated in the G-123 Notice. Filed by Defendant Sigma Corporation. (Lau, Lucius) (Entered: 05/14/2021) |
| 06/12/2021 | 376 | THIRD JOINT REPORT of Parties re Department of Commerce Proceedings filed by Plaintiff Island Industries, Inc.. (Attachments: # 1 Letter)(Marmolejo, Matthew) (Entered: 06/12/2021) |
| 07/02/2021 | 377 | NOTICE OF MOTION AND Seventh MOTION IN LIMINE (#7) to Exclude Evidence of Sigma Corp.'s Alleged Routine Practice (Fed. R. Evid. 406) filed by Plaintiff-Relator Island Industries, Inc.. Motion set for hearing on 8/17/2021 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Declaration, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Proposed Order)(Marmolejo, Matthew) (Entered: 07/02/2021) |
| 07/08/2021 | 378 | FOURTH JOINT REPORT of Department of Commerce Proceedings filed by Plaintiff Island Industries, Inc.. (Attachments: # 1 Letter)(Marmolejo, Matthew) (Entered: 07/08/2021) |

| 07/12/2021 | 379 | MEMORANDUM of CONTENTIONS of FACT and LAW filed by Defendant Sigma Corporation. (Lau, Lucius) (Entered: 07/12/2021) |
| 07/12/2021 | 380 | Witness List filed by Relator Island Industries, Inc... (Marmolejo, Matthew) (Entered: 07/12/2021) |
| 07/12/2021 | 381 | PLAINTIFF-RELATOR ISLAND INDUSTRIES, INC.S MEMORANDUM OF CONTENTIONS OF FACT AND LAW BRIEF filed by Relator Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 07/12/2021) |
| 07/12/2021 | 382 | Joint Trial Exhibit List filed by Relator Island Industries, Inc... (Marmolejo, Matthew) (Entered: 07/12/2021) |
| 07/16/2021 | 383 | Notice of Appearance or Withdrawal of Counsel: for attorney Mark E Gustafson counsel for Defendant Sigma Corporation. Adding Mark E. Gustafson as counsel of record for Sigma Corporation for the reason indicated in the G-123 Notice. Filed by Defendant Sigma Corporation. (Attorney Mark E Gustafson added to party Sigma Corporation(pty:dft))(Gustafson, Mark) (Entered: 07/16/2021) |
| 07/20/2021 | 384 | APPLICATION of Non-Resident Attorney Christopher M. Curran to Appear Pro Hac Vice on behalf of Defendant Sigma Corporation (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-31662366) filed by Defendant Sigma Corporation. (Attachments: # 1 Proposed Order) (Gustafson, Mark) (Entered: 07/20/2021) |
| 07/22/2021 | 385 | NOTICE OF LODGING Proposed Pretrial Conference Order Plaintiff Island Industries, Inc.. (Attachments: # 1 Pretrial Conference Order)(Marmolejo, Matthew) (Entered: 07/22/2021) |
| 07/23/2021 | 386 | OPPOSITION to Seventh MOTION IN LIMINE (#7) to Exclude Evidence of Sigma Corp.'s Alleged Routine Practice (Fed. R. Evid. 406) 377 filed by Defendant Sigma Corporation. (Attachments: # 1 Declaration of Shannon Lane, # 2 Exhibit A - Bhattacharji Deposition, # 3 Exhibit B - Rona Deposition, # 4 Exhibit C - Velazquez Deposition)(Lau, Lucius) (Entered: 07/23/2021) |
| 07/26/2021 | 387 | ORDER by Judge R. Gary Klausner granting 384 Non-Resident Attorney Christopher M Curran APPLICATION to Appear Pro Hac Vice on behalf of Defendant Sigma Corporation, designating Mark E Gustafson as local counsel. (jp) (Entered: 07/26/2021) |
| 07/26/2021 | 388 | Proposed Voir Dire Questions filed by Defendant Sigma Corporation.. (Lau, Lucius) (Entered: 07/26/2021) |
| 07/27/2021 | 389 | (IN CHAMBERS) NOTICE TO ALL PARTIES AND ORDER by Judge R. Gary Klausner. The Pretrial Conference remains on calendar for August 2, 2021, however, the time of the hearing is CONTINUED TO 10:00 a.m.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 07/27/2021) |
| 07/27/2021 | 390 | (IN CHAMBERS) NOTICE TO ALL PARTIES AND ORDER by Judge R. Gary Klausner. On July 8, 2021, the parties filed a joint status report notifying the Court that the Department of Commerce would "complete the scope inquiry and file the remand results with the Court of International Trade" by July 14, 2021. (ECF No. 378). As it has now been almost two weeks since that purported deadline, the Court orders the parties to file another joint status report regarding the current status of the scope inquiry within two days of this Order's issuance. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 07/27/2021) |
| 07/27/2021 | 391 | FIFTH JOINT REPORT REPORT of Parties re Department of Commerce Proceedings filed by Plaintiff Island Industries, Inc.. (Attachments: # 1 Exhibit 1)(Marmolejo, Matthew) (Entered: 07/27/2021) |

| 07/28/2021 | 392 | EX PARTE APPLICATION for Summary Judgment *Based on the July 23, 2021 Dep't of Commerce Ruling* filed by Defendant Sigma Corporation. (Attachments: # 1 Statement of Uncontested Facts, # 2 Declaration of Lucius B. Lau, # 3 Request for Judicial Notice, # 4 Exhibit A, # 5 Exhibit B, # 6 Exhibit C, # 7 Proposed Order) (Lau, Lucius) (Entered: 07/28/2021) |
|---|---|---|
| 07/28/2021 | 393 | Narrative Statement of Expert Witness Qualifications and Expected Testimony Pursuant to the Court's Order for Jury Trial [Dkt. 136] WITNESS TESTIMONY SUMMARIES filed by Defendant Sigma Corporation. (Lau, Lucius) (Entered: 07/28/2021) |
| 07/28/2021 | 394 | Island's Expert Narrative per Court Order for Jury Trial (Dkt. 136) WITNESS TESTIMONY SUMMARIES filed by Plaintiff-Relator Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 07/28/2021) |
| 07/29/2021 | 395 | OPPOSITION to EX PARTE APPLICATION for Summary Judgment *Based on the July 23, 2021 Dep't of Commerce Ruling* 392 filed by Plaintiff Island Industries, Inc.. (Attachments: # 1 Response to Sigma's Second SSUF)(Marmolejo, Matthew) (Entered: 07/29/2021) |
| 08/01/2021 | 396 | PROPOSED JURY INSTRUCTIONS (Joint Annotated set) filed by Defendant Sigma Corporation.. (Lau, Lucius) (Entered: 08/01/2021) |
| 08/01/2021 | 397 | PROPOSED JURY INSTRUCTIONS (Disputed Annotated set) filed by Defendant Sigma Corporation.. (Lau, Lucius) (Entered: 08/01/2021) |
| 08/01/2021 | 398 | PROPOSED JURY INSTRUCTIONS (Disputed Annotated set) filed by Plaintiff-Relator Island Industries, Inc... (Marmolejo, Matthew) (Entered: 08/01/2021) |
| 08/02/2021 | 399 | MINUTES OF PRETRIAL CONFERENCE before Judge R. Gary Klausner: The Court gives tentative rulings on motions in limine. Counsel shall submit a joint statement of the case, not to exceed one paragraph, to be read to the jury. Each day of trial, counsel shall provide the court with a list of witnesses to be called, in order that they will be called. Court and counsel confer re voir dire, jury impanelment and court hours. The parties are ordered to attend a further settlement conference before 8/17/2021. The Court informs the parties that it intends to impose time limits of 4 to 5 hours per side. Court Reporter: Sherri Kleeger. (jp) (Entered: 08/04/2021) |
| 08/06/2021 | 400 | NOTICE filed by Defendant Sigma Corporation. *Lodging Designated Deposition Transcripts Pursuant to L.R. 32-1* (Attachments: # 1 Index of Deposition Designations, # 2 Exhibit A - Clark Deposition, # 3 Exhibit B - Minamyer Deposition, # 4 Exhibit C - Paquette Deposition)(Lau, Lucius) (Entered: 08/06/2021) |
| 08/10/2021 | 401 | TRIAL BRIEF filed by Defendant Sigma Corporation.. (Lau, Lucius) (Entered: 08/10/2021) |
| 08/10/2021 | 402 | STATEMENT of the Case filed by Plaintiff Island Industries, Inc. *(Joint)* (Marmolejo, Matthew) (Entered: 08/10/2021) |
| 08/10/2021 | 403 | PROPOSED SPECIAL JURY VERDICT filed by Defendant Sigma Corporation. (Lau, Lucius) (Entered: 08/10/2021) |
| 08/10/2021 | 404 | TRIAL BRIEF filed by Plaintiff-Relator Island Industries, Inc... (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Marmolejo, Matthew) (Entered: 08/10/2021) |
| 08/11/2021 | 405 | Notice of Appearance or Withdrawal of Counsel: for attorney Maria Celeste Lattanzi counsel for Defendant Sigma Corporation. Adding Maria C. Lattanzi as counsel of record for Sigma Corporation for the reason indicated in the G-123 Notice. Filed by Defendant Sigma Corporation. (Attorney Maria Celeste Lattanzi added to party Sigma Corporation(pty:dft))(Lattanzi, Maria) (Entered: 08/11/2021) |

| 08/13/2021 | 406 | (IN CHAMBERS) NOTICE TO ALL PARTIES AND ORDER by Judge R. Gary Klausner. Due to an ongoing criminal jury trial and the Court's calendar, the jury trial in this action is HEREBY CONTINUED TO 9/28/2021 at 9:00 am. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 08/13/2021) |
|---|---|---|
| 08/13/2021 | 407 | NOTICE of Lodging of Deposition Transcripts filed by Plaintiff Island Industries, Inc.. (Marmolejo, Matthew) (Entered: 08/13/2021) |
| 08/30/2021 | 408 | Notice of Appearance or Withdrawal of Counsel: for attorney Lucius B Lau counsel for Defendant Sigma Corporation. James P. Gagen is no longer counsel of record for the aforementioned party in this case for the reason indicated in the G-123 Notice. Filed by Defendant Sigma Corporation. (Lau, Lucius) (Entered: 08/30/2021) |
| 09/08/2021 | 409 | (IN CHAMBERS) Order Re: Ex Parte Application for Summary Judgment [DE 392 ] by Judge R. Gary Klausner: The Court DENIES Sigma's Ex Parte Application. (See Civil Minutes for further specifics). (jp) (Entered: 09/08/2021) |
| 09/20/2021 | 410 | APPLICATION of Non-Resident Attorney Christina Brayton-Lewis to Appear Pro Hac Vice on behalf of Defendant Sigma Corporation (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. CCACDC-32011024) filed by Defendant Sigma Corporation. (Attachments: # 1 Proposed Order) (Gustafson, Mark) (Entered: 09/20/2021) |
| 09/23/2021 | 411 | TRANSCRIPT ORDER as to Defendant Sigma Corporation for Court Reporter. Court will contact Shannon Lane at shannon.lane@whitecase.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Lau, Lucius) (Entered: 09/23/2021) |
| 09/23/2021 | 412 | ORDER by Judge R. Gary Klausner granting 410 Non-Resident Attorney Cristina Brayton-Lewis APPLICATION to Appear Pro Hac Vice on behalf of Defendant Sigma Corporation, designating Mark E Gustafson as local counsel. (jp) (Entered: 09/24/2021) |
| 09/24/2021 | 413 | TRANSCRIPT ORDER as to Relator Island Industries, Inc. for Court Reporter. Court will contact Jenny Lee at jlee8@mayerbrown.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Hendy, Christopher) (Entered: 09/24/2021) |
| 09/28/2021 | 414 | AMENDED JOINT Exhibit List filed by plaintiff-relator Island Industries, Inc... (Hendy, Christopher) (Entered: 09/28/2021) |
| 09/28/2021 | 415 | (IN CHAMBERS) NOTICE TO ALL PARTIES AND ORDER by Judge R. Gary Klausner. Due to a criminal jury trial, the jury trial in this matter is HEREBY CONTINUED to 10/5/2021 at 9:00 am. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sw) TEXT ONLY ENTRY (Entered: 09/28/2021) |
| 09/30/2021 | 416 | NOTICE of Objections and Counter-Designations filed by Plaintiff-Relator Island Industries, Inc.. *re Sigma's Index of Deposition Designations (ECF #400)* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Hendy, Christopher) (Entered: 09/30/2021) |
| 10/05/2021 | 417 | MINUTES OF Jury Trial - 1st Day Held and Continued before Judge R. Gary Klausner: Jury impaneled and sworn. Opening statements made. Witnesses called, sworn and testified. Exhibits identified and admitted. Case continued to 10/6/2021 at 8:30 AM., for further trial/further jury deliberation. Court Reporter: Sherri Kleeger. (jp) (Entered: 10/05/2021) |
| 10/06/2021 | 418 | NOTICE OF MOTION AND MOTION for Judgment as a Matter of Law filed by Defendant Sigma Corporation. Motion set for hearing on 10/7/2021 at 08:30 AM before |

| | | Judge R. Gary Klausner. (Attachments: # 1 Proposed Order) (Lau, Lucius) (Entered: 10/06/2021) |
|---|---|---|
| 10/06/2021 | 419 | MINUTES OF Jury Trial - 2nd Day Held and Continued before Judge R. Gary Klausner: Witnesses called, sworn and testified. Exhibits identified and admitted. Case continued to 10/7/2021 at 08:30 AM. Defense Rule 50 (a) Motion for Judgment as a Matter of Law is reserved. Court Reporter: Miriam Baird. (jp) (Entered: 10/06/2021) |
| 10/07/2021 | 420 | MINUTES OF Jury Trial - 3rd Day held and completed before Judge R. Gary Klausner. Witnesses called, sworn and testified. Exhibits identified and admitted. Plaintiff(s) and Defendant(s) rest. Closing arguments made by plaintiff(s) and defendant(s). Court instructs jury. Bailiff(s) sworn. Jury retires to deliberate. Jury Verdict in favor of plaintiff(s). Filed Witness & Exhibit Lists. Filed jury notes. Filed jury instructions. Clerk reviewed admitted exhibits with counsel to be submitted to the Jury/Court for deliberation/findings. Counsel stipulate to the return of exhibits upon the conclusion of trial. Exhibit Release Form prepared and filed. Rule 50 motions to be filed by 10 am on October 12, 2021; oppositions to be filed by 4 pm on October 14, 2021. Plaintiff shall lodge a proposed judgment by October 12, 2021. Court Reporter: Miriam Baird. (lom) (Entered: 10/07/2021) |
| 10/07/2021 | 421 | REDACTED JURY VERDICT FORM filed. (et) (Entered: 10/08/2021) |
| 10/07/2021 | 422 | REDACTED Jury Notes # 1 filed. (et) (Entered: 10/08/2021) |
| 10/07/2021 | 423 | JURY INSTRUCTIONS (Given) by Judge R. Gary Klausner. (et) (Entered: 10/08/2021) |
| 10/07/2021 | 424 | RECEIPT FOR RELEASE OF EXHIBITS to Counsel Upon Verdict/Judgment at Trial; Pursuant to stip of counsel and/or by Order of the Court, all exhibits listed on Joint exhibits list are returned to counsel for respective party(ies). (et) (Entered: 10/08/2021) |
| 10/07/2021 | 425 | LIST OF EXHIBITS AND WITNESSES at trial. (et) (Entered: 10/08/2021) |
| 10/07/2021 | 426 | SEALED UNREDACTED Jury Note 1 filed; re: Redacted Jury Note #1 422 . (lom) (Entered: 10/08/2021) |
| 10/07/2021 | 427 | SEALED UNREDACTED JURY VERDICT FORM filed re: Redacted Jury Verdict Form 421 (lom) (Entered: 10/08/2021) |
| 10/08/2021 | 428 | TRANSCRIPT ORDER as to Defendant Sigma Corporation for Court Reporter. Court will contact Maria Lattanzi at mia.lattanzi@whitecase.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Lattanzi, Maria) (Entered: 10/08/2021) |
| 10/08/2021 | 429 | TRANSCRIPT ORDER as to Defendant Sigma Corporation for Court Reporter. Court will contact Maria Lattanzi at mia.lattanzi@whitecase.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Lattanzi, Maria) (Entered: 10/08/2021) |
| 10/12/2021 | 430 | NOTICE OF MOTION AND MOTION for Judgment as a Matter of Law on the basis of: Federal Rules of Civil Procedure 50(b) and 59 filed by Defendant Sigma Corporation. Motion set for hearing on 11/8/2021 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Proposed Order) (Lau, Lucius) (Entered: 10/12/2021) |
| 10/12/2021 | 431 | NOTICE OF LODGING filed *Proposed Judgment* re Jury Trial - Completed,,, 420 (Attachments: # 1 Proposed Judgment, # 2 Hendy Declaration, # 3 Exhibit A (Trial Exhibit 65A), # 4 Exhibit B (Trial Exhibit 42), # 5 Exhibit C (Trial Transcript Excerpt)) (Hendy, Christopher) (Entered: 10/12/2021) |
| 10/13/2021 | 432 | (IN CHAMBERS) ORDER CONTINUING DEFENDANT SIGMA CORPORATION'S |

| | | MOTION FOR JUDGMENT AS A MATTER OF LAW AND ALTERNATIVE MOTION FOR A NEW TRIAL by Judge R. Gary Klausner: The Court on its own motion, continues Defendant Sigma Corporation's Motion for Judgment as a Matter of Law and Alternative Motion for a New Trial [430] from November 8, 2021 to November 15, 2021 at 9:00 a.m. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (vv) (Entered: 10/13/2021) |
|---|---|---|
| 10/14/2021 | 433 | OBJECTIONS to Notice of Lodging, 431 *Proposed Judgment* filed by Defendant Sigma Corporation. (Lau, Lucius) (Entered: 10/14/2021) |
| 10/14/2021 | 434 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION for Judgment as a Matter of Law 418 , NOTICE OF MOTION AND MOTION for Judgment as a Matter of Law on the basis of: Federal Rules of Civil Procedure 50(b) and 59 430 filed by Plaintiff Island Industries, Inc.. (Hendy, Christopher) (Entered: 10/14/2021) |
| 10/21/2021 | 435 | Notice of Appearance or Withdrawal of Counsel: for attorney Joseph A Rillotta counsel for Defendants Neil Reubens, Vandewater International Inc.. Joseph A. Rillotta is no longer counsel of record for the aforementioned party in this case for the reason indicated in the G-123 Notice. Filed by defendants Vandewater International Inc. and Neil Ruebens. (Rillotta, Joseph) (Entered: 10/21/2021) |
| 10/26/2021 | 436 | [DOCUMENT STRICKEN PER ORDER DATED ON 10/27/2021, SEE DOCKET ENTRY N. 439 ] - REPLY In Support of NOTICE OF MOTION AND MOTION for Judgment as a Matter of Law on the basis of: Federal Rules of Civil Procedure 50(b) and 59 430 filed by Defendant Sigma Corporation. (Lau, Lucius). Modified on 10/27/2021 (jp). (Entered: 10/26/2021) |
| 10/26/2021 | 437 | NOTICE of Unauthorized Reply filed by Relator Island Industries, Inc.. (Hendy, Christopher) (Entered: 10/26/2021) |
| 10/27/2021 | 438 | RESPONSE filed by Defendant Sigma Corporationto Notice (Other) 437 (Lau, Lucius) (Entered: 10/27/2021) |
| 10/27/2021 | 439 | ORDER TO STRIKE ELECTRONICALLY FILED DOCUMENT(S) by Judge R. Gary Klausner: the following document(s) be STRICKEN for failure to comply with the Local Rules, General Order and/or the Courts Case Management Order: Reply 436 , for the following reasons: Filed without leave of Court. (jp) (Entered: 10/27/2021) |
| 11/10/2021 | 440 | SCHEDULING NOTICE TO ALL PARTIES AND ORDER (IN CHAMBERS) by Judge R. Gary Klausner: Defendant Sigma Corporation's Renewed Motion for Judgment as a Matter of Law and Alternative Motion for a New Trial Under Rules 50(b) and 59 of the Federal Rules of Civil Procedure 430 ,calendared for hearing on 11/15/2021, has been taken under submission and off the motion calendar. No appearances by counsel are necessary. The Court will issue a ruling after full consideration of properly submitted pleadings. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jre) TEXT ONLY ENTRY (Entered: 11/10/2021) |
| 12/10/2021 | 441 | MINUTES (IN CHAMBERS) Order re: Defendant Sigma Corporation's Renewed Motion for Judgment as a Matter of Law & Alternative Motion for a New Trial [DE 430] by Judge R. Gary Klausner. For the foregoing reasons, the Court DENIES Sigma's Motion. IT IS SO ORDERED. (lom) (Entered: 12/10/2021) |
| 01/07/2022 | | FILING FEE PAID for Notice of Appeal to Ninth Circuit Court of Appeals. Receipt No. ACACDC-32585813 for $505 filing fee. (Lau, Lucius) (Entered: 01/07/2022) |
| 01/07/2022 | 442 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Defendant Sigma Corporation. Appeal of Order on Motion for Judgment as a Matter of Law, 441 . (Appeal Fee - $505 Previously Paid on 01/07/2022, Receipt No. ACACDC-32585813.) |

| | | |
|---|---|---|
| | | (Attachments: # 1 Order re: Motion for Judgment as a Matter of Law, # 2 Representation Statement)(Lau, Lucius) (Entered: 01/07/2022) |
| 01/10/2022 | 443 | NOTIFICATION from Ninth Circuit Court of Appeals of case number assigned and briefing schedule. Appeal Docket No. 22-55063 assigned to Notice of Appeal to 9th Circuit Court of Appeals 442 as to Defendant Sigma Corporation. (jp) (Entered: 01/11/2022) |
| 01/28/2022 | 444 | TRANSCRIPT for proceedings held on 8/02/2021. Court Reporter/Electronic Court Recorder: SHERI S. KLEEGER, phone number 213-894-6604. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 2/18/2022. Redacted Transcript Deadline set for 2/28/2022. Release of Transcript Restriction set for 4/28/2022. (Kleeger, Sheri) (Entered: 01/28/2022) |
| 01/28/2022 | 445 | NOTICE OF FILING TRANSCRIPT filed for proceedings 8/02/2021 re Transcript 444 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Kleeger, Sheri) TEXT ONLY ENTRY (Entered: 01/28/2022) |
| 01/28/2022 | 446 | TRANSCRIPT for proceedings held on 10/05/2021. Court Reporter/Electronic Court Recorder: SHERI S. KLEEGER, phone number 213-894-6604. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 2/18/2022. Redacted Transcript Deadline set for 2/28/2022. Release of Transcript Restriction set for 4/28/2022. (Kleeger, Sheri) (Entered: 01/28/2022) |
| 01/28/2022 | 447 | NOTICE OF FILING TRANSCRIPT filed for proceedings 10/05/2021 re Transcript 446 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Kleeger, Sheri) TEXT ONLY ENTRY (Entered: 01/28/2022) |
| 02/01/2022 | 448 | TRANSCRIPT for proceedings held on 10/6/21 Day 2. Court Reporter/Electronic Court Recorder: Miriam V. Baird, phone number MVB11893@AOL.COM. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 2/22/2022. Redacted Transcript Deadline set for 3/4/2022. Release of Transcript Restriction set for 5/2/2022. (Baird, Miriam) (Entered: 02/01/2022) |
| 02/01/2022 | 449 | TRANSCRIPT for proceedings held on 10/7/21 Day 3. Court Reporter/Electronic Court Recorder: Miriam V. Baird, phone number MVB11893@AOL.COM. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 2/22/2022. Redacted Transcript Deadline set for 3/4/2022. Release of Transcript Restriction set for 5/2/2022. (Baird, Miriam) (Entered: 02/01/2022) |
| 02/01/2022 | 450 | NOTICE OF FILING TRANSCRIPT filed for proceedings 10/6/21 Day2 & 10/7/21 Day 3 re Transcript 449 , 448 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Baird, Miriam) TEXT ONLY ENTRY (Entered: 02/01/2022) |
| 02/02/2022 | 451 | Amended REQUEST for Entry of Judgment pursuant to Rule 54(b) filed by Plaintiff-Relator Island Industries, Inc.. (Attachments: # 1 Proposed Judgment) (Hendy, Christopher) (Entered: 02/02/2022) |

| 02/03/2022 | 452 | DESIGNATION of Record on Appeal by Defendant Sigma Corporation re 442 (Lau, Lucius) (Entered: 02/03/2022) |
|---|---|---|
| 02/08/2022 | 453 | ORDER by Judge R. Gary Klausner DENIED Request for Entry of Judgment pursuant to Rule 54(b) 451 AS MOOT. (jp) (Entered: 02/08/2022) |
| 02/08/2022 | 454 | FINAL JUDGMENT FOLLOWING JURY VERDICT IN FAVOR OF PLAINTIFF UNITED STATES OF AMERICA AGAINST DEFENDANT SIGMA CORPORATION by Judge R. Gary Klausner that: (1) Judgment is hereby entered in favor of the United States. (2) Defendant Sigma Corporation is liable to the United States for treble damages under the False Claims Act in the amount of $24,256,638.09. 31 USC 3729(a)(1 ). (3) Defendant Sigma Corporation is further liable to the United States for civil monetary penalties in the amount of $1,824,145.00. (4) Post-judgment interest shall accrue pursuant to 28 USC 1961.The Court determines there is no just reason for delay and enters this final judgment with respect to Sigma Corporation pursuant to FRCP 54(b). Related to: Notice of Lodging 431 . (jp) (Entered: 02/08/2022) |
| 03/04/2022 | 455 | NOTICE OF MOTION AND MOTION for Bond Approval and Stay of Execution of Judgment filed by Defendant Sigma Corporation. Motion set for hearing on 4/11/2022 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Declaration of Lucius Lau, # 2 Executed Bond, # 3 Proposed Order) (Lau, Lucius) (Entered: 03/04/2022) |
| 03/04/2022 | 456 | FIRST AMENDED NOTICE OF APPEAL to 9th CIRCUIT filed by Defendant Sigma Corporation. Amending Notice of Appeal to 9th Circuit Court of Appeals, 442 Filed On: January 7, 2022; Entered On: January 7, 2022; (Attachments: # 1 Amended Representation Statement, # 2 Final Judgment Following Jury Verdict)(Lau, Lucius) (Entered: 03/04/2022) |
| 03/04/2022 | 457 | SCHEDULING NOTICE TO ALL PARTIES AND (IN CHAMBERS) ORDER by Judge R. Gary Klausner : The hearing on the MOTION for Bond Approval and Stay of Execution of Judgment 455 is hereby ADVANCED AND RESET to 4/4/2022 at 09:00 AM. IT IS SO ORDERED. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jre) TEXT ONLY ENTRY (Entered: 03/04/2022) |
| 03/08/2022 | 458 | NOTICE OF MOTION AND MOTION for Attorney Fees *and Reasonable Expenses* filed by Relator Island Industries, Inc.. Motion set for hearing on 4/4/2022 at 09:00 AM before Judge R. Gary Klausner. (Attachments: # 1 Declaration of Kelly B. Kramer, # 2 Exhibit A (Sigma Letter), # 3 Exhibit B (Attorney Bios), # 4 Exhibit C (CD Cal Spreadsheet), # 5 Exhibit D (Scope Matter Spreadsheet), # 6 Exhibit E (Historic Rates), # 7 Exhibit F (Thompson Invoices), # 8 Declaration of Robert K. Sall, # 9 Exhibit A (Resume), # 10 Exhibit B (List of Documents), # 11 Exhibit C (Summary Chart CD Cal), # 12 Exhibit D (Summary Chart SRM), # 13 Exhibit E (White and Case Fee App), # 14 Exhibit F (2021 Real Rate Report), # 15 Exhibit G (2020 Real Rate Report), # 16 Exhibit H (Legal Billing Report), # 17 Exhibit I (Legal Billing Report), # 18 Exhibit J (Legal Billing Report), # 19 Exhibit K (Legal Billing Report), # 20 Proposed Order) (Marmolejo, Matthew) (Entered: 03/08/2022) |
| 03/09/2022 | 459 | SCHEDULING NOTICE TO ALL PARTIES AND ORDER (IN CHAMBERS) by Judge R. Gary Klausner re: NOTICE OF MOTION AND MOTION for Attorney Fees *and Reasonable Expenses* 458 . The hearing on the motion is reset for 4/11/2022 at 09:00 AM before Judge R. Gary Klausner. IT IS SO ORDERED.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jre) TEXT ONLY ENTRY (Entered: 03/09/2022) |
| 03/14/2022 | 460 | NOTICE OF NON-OPPOSITION to NOTICE OF MOTION AND MOTION for Bond Approval and Stay of Execution of Judgment 455 filed by Plaintiff Island Industries, Inc.. (Hendy, Christopher) (Entered: 03/14/2022) |

| 03/21/2022 | 461 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION for Attorney Fees *and Reasonable Expenses* 458 filed by Defendant Sigma Corporation. (Attachments: # 1 Declaration of Shannon Lane, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Proposed Order)(Lau, Lucius) (Entered: 03/21/2022) |
| 03/28/2022 | 462 | REPLY in support of NOTICE OF MOTION AND MOTION for Attorney Fees *and Reasonable Expenses* 458 filed by Plaintiff Island Industries, Inc.. (Attachments: # 1 Supplemental Reply Declaration of Kelly B. Kramer, # 2 Exhibit 1 (Revised chart of attorneys' fees), # 3 Exhibit 2 (Emails between counsel), # 4 Declaration of Kelli Thompson, # 5 Amended Proposed Order)(Marmolejo, Matthew) (Entered: 03/28/2022) |
| 03/30/2022 | 463 | SCHEDULING NOTICE TO ALL PARTIES AND ORDER (IN CHAMBERS) by Judge R. Gary Klausner: Defendant Sigma Corporation's Motion for Bond Approval and Stay of Execution of Judgment 455 , calendared for hearing on 4/4/2022, has been taken under submission and off the motion calendar. No appearances by counsel are necessary. The Court will issue a ruling after full consideration of properly submitted pleadings. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jre) TEXT ONLY ENTRY (Entered: 03/30/2022) |
| 04/06/2022 | 464 | SCHEDULING NOTICE TO ALL PARTIES AND ORDER (IN CHAMBERS) by Judge R. Gary Klausner: Plaintiff's Motion for Attorney Fees and Reasonable Expenses 458 , calendared for hearing on 4/11/2022, has been taken under submission and off the motion calendar. No appearances by counsel are necessary. The Court will issue a ruling after full consideration of properly submitted pleadings.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jre) TEXT ONLY ENTRY (Entered: 04/06/2022) |
| 05/05/2022 | 465 | ORDER GRANTING SIGMA CORPORATION'S MOTION TO APPROVE SUPERSEDEAS BOND AND STAY EXECUTION OF JUDGMENT 455 by Judge R. Gary Klausner The Court approves the supersedeas bond in the amount of $30 million, with surety United States Fire Insurance Company, and stays execution of the judgment pending Sigma's appeal to the United States Court of Appeals for the Ninth Circuit, pursuant to Rule 62(b) of the FRCP. Sigma shall lodge the bond with the Court by 5/12/2022. ***NOTE: CHANGE MADE BY THE COURT***. (jp) (Entered: 05/05/2022) |
| 05/13/2022 | 466 | MINUTES (IN CHAMBERS) Order re: Plaintiff's Motion for an Award of Attorneys Fees, Costs, and Expenses [DE 458 ] by Judge R. Gary Klausner: The Court GRANTS in part Island's Motion, awarding to Island $2,535,660.57 in attorneys fees and costs, and $230,506.90 in expenses. (See Civil Minutes for further specifics). (jp) (Entered: 05/16/2022) |
| 05/18/2022 | 467 | MINUTE IN CHAMBERS by Judge R. Gary Klausner: Case should have been closed on entry dated 5/13/2022. **See Order at docket entry 466 ***. (Made JS-6. Case Terminated.) (jp) (Entered: 05/18/2022) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 05/20/2022 10:04:04 | | | |
| PACER Login: | rlhutchens13 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 2:17-cv-04393-RGK-KS End date: 5/20/2022 |
| Billable | 30 | Cost: | 3.00 |

# EXHIBIT 5

| DEPARTMENT OF HOMELAND SECURITY<br>U.S. Customs and Border Protection<br>**ENTRY SUMMARY** | 1. Filer Code/Entry No.<br>605 7525890-4 | 2. Entry Type<br>01 ABI/A | 3. Summary Date<br>02/03/2014 |
|---|---|---|---|

| 4. Surety No.<br>036 | 5. Bond Type<br>8 | 6. Port Code<br>5301 | 7. Entry Date<br>01/21/2014 |
|---|---|---|---|

| 8. Importing Carrier 178E<br>APL PHILIPPINES HDMU | 9. Mode of Transport<br>10 | 10. Country of Origin<br>CN | 11. Import Date<br>01/06/2014 |
|---|---|---|---|

| 12. B/L or AWB No.<br>HDMUQSLB4914328 | 13. Manufacturer ID<br>CNANHWOR677HEF | 14. Exporting Country<br>CN | 15. Export Date<br>12/23/2013 |
|---|---|---|---|

| 16. I.T. No.<br>931766080 | 17. I.T. Date<br>01/06/2014 | 18. Missing Docs | 19. Foreign Port of Lading<br>57035 | 20. U.S. Port of Unlading<br>2704 |
|---|---|---|---|---|

| 21. Location of Goods / G.O. No.<br>S806 SOUTHWEST FRE | 22. Consignee No.<br>22-266537500 | 23. Importer No.<br>22-266537500 | 24. Reference No. |
|---|---|---|---|

| 25. Ultimate Consignee Name and Address | 26. Importer of Record Name and Address    SIGMAC<br>SIGMA CORPORATION<br>700 GOLDMAN DR |
|---|---|

Dest: TX

| City | State | Zip | City CREAM RIDGE | State NJ | Zip 08514 |
|---|---|---|---|---|---|

| 27.<br>Line<br>No. | 28. Description of Merchandise<br>29.<br>A. HTSUS No.<br>B. ADA/CVD Case No. | 30.<br>A. Gross Weight<br>B. Manifest Qty. | 31.<br>Net Quantity in<br>HTSUS Units | 32.<br>A. Entered Value<br>B. CHGS<br>C. Relationship | 33.<br>A. HTSUS Rate<br>B. ADA/CVD Rate<br>C. IRC Rate<br>D. Visa No. | 34.<br>Duty and I.R. Tax<br>Dollars    Cents |
|---|---|---|---|---|---|---|
| | I 931766080   01/06/14<br>M HDMUQSLB4914328  H FCCJUS130191N<br>STEEL COUPLING, ANCHOR FLANGES<br>5  CTNS   STEEL COUPLING, ANCHOR FLANGES<br>Invoice Number - AHWB13A761 12/16/13<br>39803 | 5  CTNS | | | | |
| 001 | PIPE FIT,OTH:NO NIPPLES,ST<br>7307.99.5045<br>RLNG INVREQ<br>Merchandise Processing Fee | 2632 | 2498 KG | NOT-RELATED<br>16039<br>C 549 | 4.30%<br>.3464% | 689.68<br>55.56 |
| 002 | PIPE FIT,OTH:FLNG,DIA=>360<br>7307.91.5050 | 392 | 372 KG | NOT-RELATED<br>707 | 5.50% | 38.89 |
| | Harbor Maintenance | | | | .125% | 21.68 |

| Other Fee Summary for Block 39<br>501 Harbor      21.68<br>499 M.P.F.      60.09 | 35. Total Entered Value<br>$       17347<br>Total Other Fees<br>$       81.77 | **CBP USE ONLY** | | **TOTALS** |
|---|---|---|---|---|

| | | A. LIQ CODE | B. Ascertained Duty | 37. Duty<br>761.63 |
|---|---|---|---|---|
| | | REASON CODE | C. Ascertained Tax | 38. Tax<br>0.00 |
| | | | D. Ascertained Other | 39. Other<br>81.77 |
| | | | E. Ascertained Total | 40. Total<br>843.40 |

36. DECLARATION OF IMPORTER OF RECORD
(OWNER OR PURCHASER) OR AUTHORIZED AGENT

I declare that I am the ☐ Importer of record and that the actual owner, purchaser, or consignee for CBP purposes is as shown above, **OR** ☒ owner or purchaser or agent thereof. I further declare that the merchandise ☒ was obtained pursuant to a purchase or agreement to purchase and that the prices set forth in the invoices are true, **OR** ☐ was not obtained pursuant to a purchase or agreement to purchase and the statements in the invoices as to value or price are true to the best of my knowledge and belief. I also declare that the statements in the documents herein filed fully disclose to the best of my knowledge and belief the true prices, values, quantities, rebates, drawbacks, fees, commissions, and royalties are true and correct, and that all goods or services provided to the seller of the merchandise either free or at reduced cost are fully disclosed.
I will immediately furnish to the appropriate CBP officer any information showing a different statement of facts.

| 41. DECLARANT NAME<br>C.H.POWELL CO. | TITLE<br>Attorney-In-Fact | SIGNATURE<br>C.H.POWELL | DATE<br>01/17/2014 |
|---|---|---|---|

| 42. Broker/Filer Information (Name, address, phone number)<br>C.H.POWELL CO.<br>3663 North Sam Houston Pkwy East<br>HOUSTON TX 77032  281-442-5363 | 43. Broker/Importer File No.<br>7011    7525890   JKR |
|---|---|

**EXHIBIT**
BHATTACHARJI
9
LVF  03-04-20

CBP Form 7501 (06/09)

Produced by Kewill Inc.

SIGMA CONFIDENTIAL - NOT FOR DISCLOSURE
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SIG-DOJ-00001667
SIGMA-00002318

**TRIAL EXHIBIT 1009, PAGE 1**

DEPARTMENT OF HOMELAND SECURITY
U.S. Customs and Border Protection

**ENTRY SUMMARY CONTINUATION SHEET**

OMB No. 1651-0022

| 1. Filer Code / Entry No. |
|---|
| 605 7525890-4 |

7525890

| 27. Line No. | 28. Description of Merchandise | | | 32. A. Entered Value B. CHGS C. Relationship | 33. A. HTSUS Rate B. ADA/CVD Rate C. IRC Rate D. Visa No. | 34. Duty and I.R. Tax | |
|---|---|---|---|---|---|---|---|
| | 29. A. HTSUS No. B. ADA/CVD Case No. | 30. A. Gross Weight B. Manifest Qty. | 31. Net Quantity in HTSUS Units | | | Dollars | Cents |
| | RLNG INVREQ | | | C 24 | | | |
| | Merchandise Processing Fee | | | | .3464% | | 2.45 |
| 003 | PIPE FIT,OTH:FLNG,DIA.<360 | | | NOT-RELATED | | | |
| | 7307.91.5010 | 335 | 320 KG | 601 | 5.50% | | 33.06 |
| | RLNG INVREQ | | | C 21 | | | |
| | Merchandise Processing Fee | | | | .3464% | | 2.08 |
| | I.V. 17941.12 USD @ 1.000000 | | | | | | |
| | - NDC 593.68 | | | | | | |
| | E.V. 17347.44 As 17347 | | | | | | |

Produced by Kewill Inc.

CBP Form 7501 (06/09)

** Last Page **

SIGMA CONFIDENTIAL - NOT FOR DISCLOSURE
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SIG-DOJ-00001668
SIGMA-00002319

**TRIAL EXHIBIT 1009, PAGE 2**

Case 2:22-cv-00050-RWS-RSP Document 195-5 Filed 06/27/23 Page 4 of 16 PageID
Case 2:22-cv-00050-RWS-RSP Document 116-72 Filed 06/12/23 Page 164 of 587 Doc ExhEID
Select FCA Trial Exhibits    Page 4 of 16

DEPARTMENT OF HOMELAND SECURITY
Bureau of Customs and Border Protection

Form Approved
OMB No. 1651-0024

# ENTRY/IMMEDIATE DELIVERY

CST#
PAPERLESS

C.H.POWELL CO.
3663 North Sam Houston Pkwy Ea
Suite 150
HOUSTON, TX 77032
PH: 281-442-5363
FAX:281-442-5365

CUSTOMS BOX 42
19 CFR 142.3, 142.16, 142.22, 142.24

ABI Certified

Broker Code: 605

| 1. ARRIVAL DATE | 2. ELECTED ENTRY DATE | 3. ENTRY TYPE CODE NAME | | 4. ENTRY NUMBER |
|---|---|---|---|---|
| 01/21/2014 | | 01    Consumption | | 605-7525890-4 |
| 5. PORT | 6. SINGLE TRANS. BOND | 7. BROKER/IMPORTER FILE NUMBER | | |
| 5301 | | 7525890  JKR  7011 | | |
| | 8. CONSIGNEE NUMBER | | | 9. IMPORTER NUMBER |
| | 22-266537500 | | | Same |
| 10. ULTIMATE CONSIGNEE NAME | | 11. IMPORTER OF RECORD NAME | | |
| SIGMA CORPORATION 700 GOLDMAN DR CREAM RIDGE, NJ 08514 | | Same | | |
| 12. CARRIER CODE | 13. VOYAGE/FLIGHT/TRIP | 14. LOCATION OF GOODS-CODE(S)/NAME(S) | | |
| HDMU | 178E | S806 SOUTHWEST FREIGHT | | |
| 15. VESSEL CODE/NAME | | | | |
| APL PHILIPPINES | | | | |
| 16. U.S. PORT OF UNLADING | 17. MANIFEST NUMBER | 18. G.O. NUMBER | | 19. TOTAL VALUE |
| 2704 | | | | 17347 |

20. DESCRIPTION OF MERCHANDISE

STEEL COUPLING, ANCHOR FLANGES

| 21. IT/BL/AWB CODE | 22. IT/BL/AWB NO. | 23. MANIFEST QUANTITY | 24. H.S. NUMBER | 25. COUNTRY OF ORIGIN | 26. MANUFACTURER NO. |
|---|---|---|---|---|---|
| I | 931766080 | | 7307.99.5045 | CN | CNANHWOR677HEF |
| M 57035 | HDMUQSLB4914328 | | 7307.91.5050 | CN | CNANHWOR677HEF |
| H | FCCJUS130191N | 5 | 7307.91.5010 | CN | CNANHWOR677HEF |
| | | | | | |
| | | | | | |
| | | | | | |

| 27. CERTIFICATION | 28. CBP USE ONLY |
|---|---|

I hereby make application for entry/immediate delivery. I certify that the above information is accurate, the bond is sufficient, valid, and current, and that all requirements of 19 CFR Part 142 have been met.

OTHER AGENCY ACTION REQUIRED, NAMELY:

SIGNATURE OF APPLICANT    Attorney-In-Fact
X [signature] C.H.POWELL

PHONE NO. (country code, if applicable)     DATE (mm/dd/yyyy)
281-442-5363          01/17/2014

☐ CBP EXAMINATION REQUIRED.

29. BROKER OR OTHER GOVT. AGENCY USE

☐ ENTRY REJECTED, BECAUSE:

Exam Site:  S903  WORLD TRADE DISTRIB
Container #:
LCL           5

| DELIVERY AUTHORIZED: | SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|---|

## ABI Electronic Release ##
I certify that proper release for this
cargo has been received from CBP
C.H.POWELL CO.
Authorized by [signature]
Released:  1/21/14

Statement Required by 5 CFR 1320.21: The estimated average burden associated with this collection of information is 15 minutes per respondent or record keeper depending on individual circumstances.

According to the Paperwork Reduction Act, no persons are required to respond to a Collection of Information unless it displays a valid OMB Control Number. The valid OMB Control Number for this information collection is 1651-0024. The time required to complete this information collection is estimated to average 5 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection.

CBP Form-3461 (5-03)

SIGMA CONFIDENTIAL - NOT FOR DISCLOSURE
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SIG-DOJ-00001669
SIGMA-00002320

**TRIAL EXHIBIT 1009, PAGE 3**

WOR-BIZ TRADING CO., LTD
(ANHUI)
18/F CHANGHE KECHUANG MANSION,
NO.677 WEST CHANGJIANG ROAD,
HIGH-TECH ZONE, HEFEI, ANHUI, CHINA
TEL: +86-551-5339821 FAX: +86-551-5339828

SIGMA CORPORATION
P.O.BOX 300,700 GOLDMAN DRIVE, CREAM RIDGE, NJ
08514,USA

商 业 发 票
COMMERCIAL INVOICE

| No. AHWB13-A761 | Date DEC.16, 2013 |
|---|---|
| S/C No. AHWB/E13-A761 | L/C No. |

FROM SHANGHAI, CHINA  TO  HOUSTON, TX, USA
VIA LOS ANGELES, CA
BY SEA

Terms of payment
D/P

| Marks and numbers | Number and kind of packages; description of goods | Quantity | Unit price | Amount |
|---|---|---|---|---|
| | | | CFR  HOUSTON, USA | |
| A | HTS#7307995045-STEEL COUPLING 4PACKAGES | 21430PCS@USD774.0653/1000PCS GR.WT.2632KGS NT.WT.2498KGS | | USD16588.219 |
| B | BELOW GOODS ARE IN ONE PACKAGE: HTS#7307915050-ANCHOR FLANGES 1PACKAGE | 20PCS@USD36545/1000PCS GR.WT.392KGS NT.WT.372KGS | | USD730,900 |
| C | HTS#7307915010-ANCHOR FLANGES | 100PCS@USD6220/1000PCS GR.WT.335KGS NT.WT.320KGS | | USD622,000 |
| | TOTAL:5PACKAGES (21550PCS) | GR.WT.3359KGS NT.WT.3190KGS | | USD17941.12 |

OCEAN FREIGHT:USD593.68
FOB AMOUNT:USD17347.44
PURCHASE ORDER:77303/77640/76796/77304/77642/78105
SCAC CODE:FCCJ

SGM
HOUSTON,USA
MADE IN CHINA

USD 17.347
USD

安徽省荣商贸易有限公司
Wor-Biz Trading Co., Ltd.
(Anhui)

A. 7307.99.5045/KG/4.3%

B. 7307.91.5050/KG/5.5%

C. 7307.91.5010/KG/5.5%

SIGMA CONFIDENTIAL - NOT FOR DISCLOSURE
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SIG-DOJ-00001670
SIGMA-00002321

**TRIAL EXHIBIT 1009, PAGE 4**

Case 2:22-cv-00050-RWS Document 19-5 Filed 06/27/22 Page 4 of 5 PageID
Case 2:22-cv-00050-RWS Document 115 Filed 11/22/22 Page 167 of 587 PageID
Select FCA Trial Exhibits    Page 6 of 16

# COMMERCIAL INVOICE

WOR-BIZ TRADING CO.,LTD (ANHUI)
18/F CHANGHE KECHUANG MANSION,
NO.677 WEST CHANGJIANG ROAD,
HIGH-TECH ZONE,HEFEI,ANHUI,CHINA.
TEL:+86-551-5339321 CONTACT PERSON: HUANG ZHIGANG

AHWB13-A761
DEC 23,2013
CFR HOUSTON,TX,USA
DIP

CONSIGNEE:
SIGMA CORPORATION
P.O.BOX 300, 700 Goldman Drive, Cream Ridge, NJ 08514
TEL:+1-609-758-9800 FAX:+1-609-758-1158/1158

US130191N
SHANGHAI
FROM SHANGHAI TO HOUSTON,TX,USA
BY SEA

| | | DESCRIPTION | ORIGIN | CTNS | | | | MEAS | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| 77303 | UL0009 | 2"UNI-LET 2-1/2"-3" WELDED | CHINA | 1 | PLYWOOD | 744 | 248 | 100*80*80 | $2.5740 | $1,915.06 |
| 77640 | UL0007 | 1-1/2"UNI-LET 2"-3" WELDED | CHINA | | | 720 | 195 | 536 | $1.7760 | $1,278.00 |
| 76796 | UL0007 | 1-1/2"UNI-LET 2"-3" WELDED | CHINA | | | 176 | 48 | | $1.7760 | $312.40 |
| 77304 | UL0002N | 3/4"UNI-LET 1-1/4"-8" WELDED OUTLET FITTING | CHINA | 1 | PLYWOOD | 8640 | 612 | 842 | $0.5520 | $4,769.28 |
| 77640 | UL0002N | 3/4"UNI-LET 1-1/4"-8" WELDED OUTLET FITTING | CHINA | | | 5400 | 508 | 101*77*76 | $0.5520 | $2,980.80 |
| 77640 | UL0006 | 1-1/4"UNI-LET 2-1/2"-3" WELDED | CHINA | 1 | PLYWOOD | 540 | 102 | 724 | $1.3200 | $712.80 |
| 77640 | UL0008 | 1-1/2"UNI-LET 4"-5" WELDED | CHINA | | | 330 | 85 | 101*77*76 | $1.7630 | $588.39 |
| 77642 | UL0004N | 1"UNI-LET 3"-5"WELDED OUTLET | CHINA | 1 | PLYWOOD | 4440 | 417 | 530 | $0.7313 | $3,246.97 |
| 77642 | UL0008 | 1-1/2"UNI-LET 4"-5" WELDED | CHINA | | | 440 | 83 | 101*77*76 | $1.7030 | $784.52 |
| 78105 | AF20 | DI 20"ANCHOR FLANGE | CHINA | 1 | WOODEN | 10 | 100 | 112*112*55 | $19.1600 | $191.60 |
| 78106 | AF36 | DI 36"ANCHOR FLANGE | CHINA | | | 10 | 272 | 727 | $53.9330 | $539.30 |
| 78105 | AF8 | 8"ANCHOR FLANGE | CHINA | | | 100 | 320 | | $6.2200 | $622.00 |
| | | TOTAL | | 5 | | 21550 | 3190 | 3359 | | $17,941.12 |

INVOICE TOTAL $17,941.12

I/we hereby certify that the information on this invoice is true and correct and that the contents of this shipment are as stated above.
安徽省某某贸易有限公司
Wor-Biz Trading Co., Ltd.
(Anhui)
PAGE 1/1

AUTHORIZED SIGNATURE AND DATE
ADDITIONAL NOTES OR COMMENTS:

SIGMA CONFIDENTIAL - NOT FOR DISCLOSURE
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SIG-DOJ-00001671
SIGMA-00002322

**TRIAL EXHIBIT 1009, PAGE 5**

WOR-BIZ TRADING CO.,LTD
(ANHUI)
18/F CHANGHE KECHUANG MANSION,
NO.677 WEST CHANGJIANG ROAD,
HIGH-TECH ZONE, HEFEI, ANHUI, CHINA
TEL: +86-551-5339821 FAX: +86-551-5339828

To  SIGMA CORPORATION
P.O.BOX 300,700 GOLDMAN DRIVE, CREAM RIDGE, NJ
08514,USA

装　箱　单

PACKING LIST

| Invoice No. | Date |
|---|---|
| AHWB13-A761 | DEC.16,2013 |

| Marks and numbers | Number and kind of packages, description of goods | |
|---|---|---|
| HTS#7307995045-STEEL COUPLING | | 4PACKAGES (21430PCS)<br>GR.WT.2832KGS  / NT.WT.2498KGS<br>MEASUREMENT:2.41M3 |
| BELOW GOODS ARE IN ONE PACKAGE:<br>HTS#7307915050-ANCHOR FLANGES | | 1PACKAGE (20PCS)<br>GR.WT.392KGS  / NT.WT.372KGS<br>MEASUREMENT:0.39M3 |
| HTS#7307915010-ANCHOR FLANGES | | (100PCS)<br>GR.WT.335KGS  / NT.WT.320KGS<br>MEASUREMENT:0.3M3 |
| | | TOTAL:5PACKAGES (21550PCS)<br>GR.WT.3359KGS  / NT.WT.3190KGS<br>MEASUREMENT:3.1M3 |

SGM
HOUSTON, USA
MADE IN CHINA



安徽省荣商贸易有限公司
Wor-Biz Trading Co., Ltd.
(Anhui)

荣信阳

SIGMA CONFIDENTIAL - NOT FOR DISCLOSURE
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SIG-DOJ-00001672
SIGMA-00002323

**TRIAL EXHIBIT 1009, PAGE 6**

No: A  0000012

**BILL OF LADING**

# FCC LOGISTICS INC.

| SHIPPER/EXPORTER (Complete Name and Address) | DOCUMENT NO. | BOOKING NO. |
|---|---|---|
| WOR-BIZ TRADING CO., LTD (ANHUI) 18/F CHANGHE KECHUANG MANSION, NO. 677 WEST CHANGJIANG ROAD, HIGH-TECH ZONE, HEFEI, ANHUI, CHINA TEL: +86-551-5339821 FAX: +86-551-5339828 | | US130191N |
| | EXPORT REFERENCES | |

| CONSIGNEE (Complete Name and Address) | FORWARDING AGENT-REFERENCES |
|---|---|
| TO ORDER | FCC LOGISTICS INC. 18747 S. LAUREL PARK RD. RANCHO DOMINGUEZ, CA 90220 T-310-670-6688 F-310-670-6600 ATTN: |
| | COUNTRY OF ORIGIN |

| NOTIFY PARTY (Complete Name and Address) | DOMESTIC ROUTING/EXPORT INSTRUCTIONS |
|---|---|
| 1. SIGMA CORPORATION P.O. BOX 300, 700 GOLDMAN DRIVE, CREAM RIDGE, NJ 08514, USA  TEL: 609-758-0800 EXT.305 SORE | |

| *PLACE OF RECEIPT | | | |
|---|---|---|---|
| OCEAN VESSEL  APL PHILIPPINES  V. 178E | Flag | PORT OF LOADING SHANGHAI, CHINA | ONWARD INLAND ROUTING | PLACE OF DELIVERY |
| PORT OF DISCHARGE LOS ANGELES, CA | | FOR TRANSSHIPMENT TO HOUSTON, TX, USA | |

| CARRIER'S RECEIPT | | PARTICULARS FURNISHED BY SHIPPER | | |
|---|---|---|---|---|
| MARKS AND NUMBERS | NO. OF CONT OR OTHER PKGS. | DESCRIPTION OF GOODS | GROSS WEIGHT | MEASUREMENT |
| | 5 PACKAGES | | 3359 KGS | 3. 1CBM |
| SGM HOUSTON, USA MADE IN CHINA | | HTS#7307995045-STEEL COUPLING HTS#7307915050-ANCHOR FLANGES HTS#7307915010-ANCHOR FLANGES SCAC CODE:FCCJ | | |
| | | **. 2. SIGMA CORPORATION-M35 DR CENTRAL WAREHOUSE, 1307 HIGHWAY 290 WEST, BRENHAM, TX 77833, USA ATTN:DAVID TALLEY 3. CH POWELL COMPANY 3693 NORTH SAM HOUSTON PARKWAY WEST, SUITE 500 HOUSTON, TX 77060, USA TEL:(281)442-5365 FAX (281)442-5365 HOUCLRDOCS@CHPOWELL.COM | 23 DEC 2013 | |
| | LCL CFS-CFS | | SHIPPED ON BOARD | |
| | | FREIGHT PREPAID | | |

FREIGHT and CHARGES PAYABLE BY SAY FIVE PACKAGES ONLY.

| | (Complete Name and Address) | AT |
|---|---|---|

| FREIGHT AND CHARGES REVENUE TONS RATE PER | PREPAID | COLLECT | |
|---|---|---|---|
| TTNU8302951/HD3063746/40' HQ | | | IN ACCEPTING THIS BILL OF LADING, the Shipper, Consignee, Holder hereof, and Owner of the goods agrees to be bound by all of its stipulations, exceptions and conditions, whether written, printed or stamped on the front or back hereof, as well as the provisions of the above Carrier's published Tariff Rules and Regulations, as fully as if they were signed by such Shipper, Consignee, Holder or Owner, and the further agreed that Containers may be stowed on Deck, as per Clause 8. IN WITNESS WHEREOF, the master of the said vessel has vessel has affirmed this Bill of Lading and Authorized signature. |

23 DEC 2013

FCC LOGISTICS INC.

A.S. CAMBER, Jr.
As Agent for the Carrier Named Above

| | THREE | | SHANGHAI |
|---|---|---|---|
| | Number of originals Issued (if more than one original issued, the others stand void when ONE is accomplished) | | |
| TOTAL CHARGES | US130191N BILL OF LADING NO. | | DATED |

TERMS OF BILL OF LADING CONTINUED ON REVERSE SIDE.

SIGMA CONFIDENTIAL - NOT FOR DISCLOSURE
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SIG-DOJ-00001673
SIGMA-00002324

**TRIAL EXHIBIT 1009, PAGE 7**

18747 S. LAUREL PARK RD., RANCHO DOMINGUEZ, CA 90220
TEL: 310-679-6688 FAX: 310-679-6699 EMAIL: jessec@fcclax.com

## ARRIVAL NOTICE / FREIGHT INVOICE

| SHIPPER | REFERENCE NO. | DATE |
|---|---|---|
| WOR-BIZ TRADING CO., LTD. 18/FL CHANGHE MANSION, NO.677 WEST CHANGJIANG RD. HEFEI ANHUI, CHINA | OI-2140092 | 12/31/13 3:33 PM |

| | MASTER B/L NO. | PREPARED BY |
|---|---|---|
| | HDMUQSLB4914328 | gracel@fcclax.com |

| CONSIGNEE | SUB B/L NO. | HOUSE B/L NO. |
|---|---|---|
| SIGMA CORP. 700 GOLDMAN DR. CREAMRIDGE, NJ 08514 U.S.A. ATTN:INGE TEL:609-385-1354 FAX:609-935-0600 | | US130191N |

| | AMS B/L No. | CUSTOMER REF. NO. |
|---|---|---|
| | FCCJUS130191N | |

| NOTIFY PARTY | VESSEL & VOY NO. |
|---|---|
| SIGMA CORP. 700 GOLDMAN DR. CREAMRIDGE, NJ 08514 U.S.A. ATTN:INGE TEL:609-385-1354 FAX:609-935-0600 | APL PHILIPPINES 178E |

| | PORT OF LOADING | ETD |
|---|---|---|
| | SHANGHAI,CHINA | 12/23/13 |

| BROKER | PORT OF DISCHARGE | ETA |
|---|---|---|
| CH POWELL CO. 3340-D GREENS RD. STE 710 HOUSTON, TX 77032 TEL:281-442-5363 FAX:281-442-5365 | LOS ANGELES, CA | 01/06/14 |

| | PLACE OF DELIVERY | |
|---|---|---|
| | LOS ANGELES, CA | |
| | FINAL DESTINATION | ETA |
| | HOUSTON,TX | |

| FREIGHT LOCATION | FIRM CODE | AVAILABLE DATE |
|---|---|---|
| SOUTHWEST FREIGHT INC   TEL:713-631-1800 | S806 | |
| DEVAN LOCATON | LAST FREE DATE | G.O. DATE |
| SALSON   TEL:310-328-6800 | | |

| I.T. NO : 931,766,080 | DATE: 01/06/14 | PLACE: LOS ANGELES, CA |
|---|---|---|

PARTICULARS FURNISHED BY SHIPPER

| CONTAINER NO./SEAL NO. (MARKS & NOS.) | NO.OF CONT. NO.OF PKGS. | DESCRIPTION OF PACKAGES AND GOODS | GROSS WEIGHT | MEASUREMENT |
|---|---|---|---|---|
| | 5 PKGS | STEEL COUPLING, ANCHOR FLANGES, ETC | 3359.00 KGS 7405.25 LBS | 3.100 CBM 109 CFT |

* Container No.
TTNU9302951 / 40'HC

"ORIGINAL B/L REQUIRED"

CFS/CFS

REMARK:   *** FOR FREIGHT RELEASE, PLEASE EMAIL FREIGHT CASHIER AT freightcashier@fcclax.com ***

Invoice No : 315728 Due date:1/6/2014

TO ALL CUSTOMERS:
1. Please, send money order or cashier's check payable to "FCC LOGISTICS INC."
   * Only Broker's check will be accepted.
   * $35.00 will be charge for returned check.
2. We can only release the freight to you upon receipt of charges shown below and properly endorsed Original House Bill Of Lading.
3. Prior to cargo pick-up, consignee must clear customs and confirm freight release with PIER/CFS. Please, pick up your cargo as soon as possible to avoid unnecessary charges.
4. These charges are for the account of ultimate consignee to whom this freight is released.
5. Shipment needs 24hours to 48hours to be released upon receipt full amount of payments.

Please check availability with warehouse or terminal upon final E.T.A. shows on arrival notice. (Consignee's Responsibility)

| DESCRIPTION OF CHARGES | PREPAID | COLLECT |
|---|---|---|
| PIER PASS | | 20.15 |
| CLEAN TRUCK FEE | | 13.45 |
| CHASSIS | | 10.08 |
| AMS FEE | | 25.00 |
| HANDLING CHARGE | | 75.00 |
| TOTAL AMOUNT    USD | | 143.68 |

SIGMA CONFIDENTIAL - NOT FOR DISCLOSURE
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SIG-DOJ-00001674
SIGMA-00002325

TRIAL EXHIBIT 1009, PAGE 8

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. Customs and Border Protection**

**ENTRY SUMMARY**

| 1. Filer Code/Entry No. | 2. Entry Type | 3. Summary Date |
|---|---|---|
| 605 7527094-1 | 01 ABI/A | 06/17/2014 |

| 4. Surety No. | 5. Bond Type | 6. Port Code | 7. Entry Date |
|---|---|---|---|
| 036 | 8 | 1904 | 06/04/2014 |

| 8. Importing Carrier | 028E | 9. Mode of Transport | 10. Country of Origin | 11. Import Date |
|---|---|---|---|---|
| NYK REMUS | NYKS | 10 | CN | 05/14/2014 |

| 12. B/L or AWB No. | 13. Manufacturer ID | 14. Exporting Country | 15. Export Date |
|---|---|---|---|
| NYKS2374328640 | CNANHWOR677HEF | CN | 04/26/2014 |

| 16. I.T. No. | 17. I.T. Date | 18. Missing Docs | 19. Foreign Port of Lading | 20. U.S. Port of Unlading |
|---|---|---|---|---|
| 998966205 | 05/14/2014 | | 57035 | 4601 |

| 21. Location of Goods / G.O. No. | 22. Consignee No. | 23. Importer No. | 24. Reference No. |
|---|---|---|---|
| R219 DIVERSIFIED C | 22-266537500 | 22-266537500 | |

| 25. Ultimate Consignee Name and Address | 26. Importer of Record Name and Address   SIGMAC |
|---|---|
| | SIGMA CORPORATION |
| | 700 GOLDMAN DR |
| Dest: AL | |

| City | State | Zip | City CREAM RIDGE | State NJ | Zip 08514 |
|---|---|---|---|---|---|

| 27. Line No. | 28. Description of Merchandise | | | 32. A. Entered Value  B. CHGS  C. Relationship | 33. A. HTSUS Rate  B. ADA/CVD Rate  C. IRC Rate  D. Visa No. | 34. Duty and I.R. Tax |
|---|---|---|---|---|---|---|
| | 29. A. HTSUS No.  B. ADA/CVD Case No. | 30. A. Gross Weight  B. Manifest Qty. | 31. Net Quantity in HTSUS Units | | | Dollars   Cents |
| | I 998966205   05/14/14 | | | | | |
| | M NYKS2374328640   H FCCJUS140106B | | | 15   CTNS | | |
| | STEEL COUPLING | | | | | |
| | 15   CTNS   STEEL COUPLINGS | | | | | |
| | Invoice Number - AHWB14A739 04/21/14 | | | | | |
| | 40842 | | | | | |
| 001 | PIPE FIT,OTH:NO NIPPLES,ST | | | NOT-RELATED | | |
| | 7307.99.5045 | 10645 | 10207 KG | 56086 | 4.30% | 2411.70 |
| | RLNG INVREQ | | | C 1562 | | |
| | Merchandise Processing Fee | | | | .3464% | 194.28 |
| | I.V. | 57648.16 | USD @ | 1.000000 | | |
| | - NDC | 1561.93 | | | | |
| | E.V. | 56086.23 | As | 56086 | | |
| | | | | | | |
| | Harbor Maintenance | | | | .125% | 70.11 |

| Other Fee Summary for Block 39 | | 35. Total Entered Value | **CBP USE ONLY** | | **TOTALS** | |
|---|---|---|---|---|---|---|
| 501 Harbor | 70.11 | | A. LIQ CODE | B. Ascertained Duty | 37. Duty | |
| 499 M.P.F. | 194.28 | $   56086 | | | | 2411.70 |
| | | Total Other Fees  $   264.39 | REASON CODE | C. Ascertained Tax | 38. Tax | 0.00 |
| | | | | D. Ascertained Other | 39. Other | 264.39 |
| | | | | E. Ascertained Total | 40. Total | 2676.09 |

**36. DECLARATION OF IMPORTER OF RECORD (OWNER OR PURCHASER) OR AUTHORIZED AGENT**

I declare that I am the ☐ Importer of record and that the actual owner, purchaser, or consignee for CBP purposes is as shown above, **OR** ☒ owner or purchaser or agent thereof. I further declare that the merchandise ☒ was obtained pursuant to a purchase or agreement to purchase and that the prices set forth in the invoices are true, **OR** ☐ was not obtained pursuant to a purchase or agreement to purchase and the statements in the invoices are true to value or price are true to the best of my knowledge and belief. I also declare that the statements in the documents herein filed fully disclose to the best of my knowledge and belief the true prices, values, quantities, rebates, drawbacks, fees, commissions, and royalties and are true and correct, and that all goods or services provided to the seller of the merchandise either free or at reduced cost are fully disclosed.

I will immediately furnish to the appropriate CBP officer any information showing a different statement of facts.

| 41. DECLARANT NAME | TITLE | SIGNATURE | DATE |
|---|---|---|---|
| C.H.POWELL CO. | Attorney-In-Fact | C.H. POWELL | 06/04/2014 |

| 42. Broker/Filer Information (Name, address, phone number) | 43. Broker/Importer File No. |
|---|---|
| C.H.POWELL CO. | 7011   7527094   JKR |
| 3663 North Sam Houston Pkwy East | |
| HOUSTON TX 77032   281-442-5363 | |

CBP Form 7501 (06/09)

Produced by Kewill Inc.

** Last Page **

SIGMA CONFIDENTIAL - NOT FOR DISCLOSURE
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SIG-DOJ-00001866
SIGMA-00002517

**TRIAL EXHIBIT 1010, PAGE 1**

DEPARTMENT OF HOMELAND SECURITY
Bureau of Customs and Border Protection

Form Approved
OMB No. 1651-0024

# ENTRY/IMMEDIATE DELIVERY

C.H.POWELL CO.
3663 North Sam Houston Pkwy Ea
Suite 150
HOUSTON, TX 77032
PH: 281-442-5363
FAX:281-442-5365

CST# 572
PAPERLESS

ABI Certified

19 CFR 142.3, 142.16, 142.22, 142.24

Broker Code: 605

| 1. ARRIVAL DATE | 2. ELECTED ENTRY DATE | 3. ENTRY TYPE CODE NAME | 4. ENTRY NUMBER |
|---|---|---|---|
| 06/05/2014 | | 01   Consumption | 605-7527094-1 |
| 5. PORT | 6. SINGLE TRANS. BOND | 7. BROKER/IMPORTER FILE NUMBER | |
| 1904 | | 7527094  JKR  7011 | |
| | 8. CONSIGNEE NUMBER | | 9. IMPORTER NUMBER |
| | 22-266537500 | | Same |

| 10. ULTIMATE CONSIGNEE NAME | 11. IMPORTER OF RECORD NAME |
|---|---|
| SIGMA CORPORATION<br>700 GOLDMAN DR<br>CREAM RIDGE, NJ 08514 | Same |

| 12. CARRIER CODE | 13. VOYAGE/FLIGHT/TRIP | 14. LOCATION OF GOODS-CODE(S)/NAME(S) |
|---|---|---|
| NYKS | 028E | R219 DIVERSIFIED CONTRATOR |

| 15. VESSEL CODE/NAME |
|---|
| NYK REMUS |

| 16. U.S. PORT OF UNLADING | 17. MANIFEST NUMBER | 18. G.O. NUMBER | 19. TOTAL VALUE |
|---|---|---|---|
| 4601 | | | 56086 |

20. DESCRIPTION OF MERCHANDISE

STEEL COUPLING

| 21. IT/BL/AWB CODE | 22. IT/BL/AWB NO. | 23. MANIFEST QUANTITY | 24. H.S. NUMBER | 25. COUNTRY OF ORIGIN | 26. MANUFACTURER NO. |
|---|---|---|---|---|---|
| I | 998966205 | | 7307.99.5045 | CN | CNANHWOR677HEF |
| M | 57035    NYKS2374328640 | | | | |
| H | FCCJUS140106B | 15 | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| 27. CERTIFICATION | 28. CBP USE ONLY |
|---|---|
| I hereby make application for entry/immediate delivery. I certify that the above information is accurate, the bond is sufficient, valid, and current, and that all requirements of 19 CFR Part 142 have been met. | ☐ OTHER AGENCY ACTION REQUIRED, NAMELY: |
| SIGNATURE OF APPLICANT   Attorney-In-Fact<br>X  C.H. POWELL CO. | |
| PHONE NO. (country code, if applicable)   DATE (mm/dd/yyyy)<br>281-442-5363          06/04/2014 | ☐ CBP EXAMINATION REQUIRED. |

| 29. BROKER OR OTHER GOVT. AGENCY USE | |
|---|---|
| Exam Site:  R219  DIVERSIFIED CONTRAT<br>Container #:<br>LCL                    15 | ☐ ENTRY REJECTED, BECAUSE: |

| DELIVERY AUTHORIZED: | SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|---|

## ABI Electronic Release ##
I certify that proper release for this
cargo has been received from CBP
C.H.POWELL CO.
Authorized by
Released:  6/04/14  12:57

Statement Required by 5 CFR 1320.21: The estimated average burden associated with this collection of information is 16 minutes  per respondent or record keeper depending on individual circumstances.

According to the Paperwork Reduction Act, no persons are required to respond to a Collection of Information unless it displays a valid OMB Control Number. The valid OMB Control Number for this information collection is 1651-0024. The time required to complete this information collection is estimated to average 5 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection.

CBP Form-3461 (5-03)

SIGMA CONFIDENTIAL - NOT FOR DISCLOSURE
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SIG-DOJ-00001867
SIGMA-00002518

**TRIAL EXHIBIT 1010, PAGE 2**

| Issuer | WOR-BIZ TRADING CO.,LTD (ANHUI) 18/F CHANGHE KECHUANG MANSION, NO.677 WEST CHANGJIANG ROAD, HIGH-TECH ZONE, HEFEI, ANHUI, CHINA TEL:+86-551-5339821 FAX:+86-551-5339823 | |

| To | SIGMA CORPORATION P.O.BOX 300, 700 Goldman Drive, Cream Ridge, NJ 08514 |

商 业 发 票
**COMMERCIAL INVOICE**

| No. | AHWB14-A739 | Date | APR.21,2014 |
|-----|-------------|------|-------------|
| S/C No. | AHWB/E14-A739 | L/C No. | |

**Transport details**

FROM SHANGHAI,CHINA TO BIRMINGHAM,USA VIA NEW YORK, NY(1446) BY SEA

**Terms of payment**

D/P

7307.99.3045/ K.J/ 4.3%

| Marks and numbers | Number and kind of packages; description of goods | Quantity | Unit price | Amount |
|-------------------|---------------------------------------------------|----------|------------|--------|
| | | CFR  BIRMINGHAM, USA | | |
| HTS#7307995045-STEEL COUPLING 15PACKAGES | | 83391PCS@USD691.2995/1000PCS GR.WT.10645KGS NT.WT.10207KGS | | USD57648.16 |
| SGM BIRMINGHAM, USA MADE IN CHINA | OCEAN FREIGHT: USD1561.93 FOB AMOUNT: USD56086.23 SCAC CODE: FCCJ PURCHASE ORDER: 79129/REPLACEMENT | | | |

安徽省崇商贸易有限公司
Wor-Biz Trading Co., Ltd.
(Anhui)

宋信阳

SIGMA CONFIDENTIAL - NOT FOR DISCLOSURE
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SIG-DOJ-00001868
SIGMA-00002519

**TRIAL EXHIBIT 1010, PAGE 3**

# COMMERCIAL INVOICE

**INVOICE NO:** AHW814-A739
**DATE OF SHIPMENT:** APR 26,2014

**SUPPLIER/SELLER:**
WOR-BIZ TRADING CO.,LTD (ANHUI)
18/F CHANGHE KECHUANG MANSION,
NO.677 WEST CHANGJIANG ROAD,
HIGH-TECH ZONE,HEFEI,ANHUI,CHINA
TEL:+86-551-5339821 CONTACT PERSON: HUANG ZHIGANG

**INVOICE NO:** US140106B
SHANGHAI,CHINA

**BUYER:**
**PORT TO LOAD:**

**CONSIGNEE:**
SIGMA CORPORATION
P.O.BOX 300, 700 Goldman Drive, Cream Ridge, NJ 08514
TEL: +1-609-758-0800 FAX:+1-609-758-1159/1158

**SHIP FROM:** CFR BIRMINGHAM,USA
**PAYMENT TERMS:** D/P

FROM SHANGHAI,CHINA TO BIRMINGHAM,USA
BY SEA

| REF | ITEM CODE | DETAILED DESCRIPTION OF MERCHANDISE | COUNTRY OF ORIGIN | PKGS | KIND OF PLATE | N.W. (KGS) | G.W. (KGS) | QTY | DIMENSION (cm) | UNIT PRICE | TOTAL VALUE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 79129 | UL0001N | 1/2"UNI-LET 1"-1/4"-3" WELDED | CHINA | | | 1575 | 100 | | | $0.4360 | $686.70 |
| 79129 | UL0003N | 1"UNI-LET 1/1/2"-2-1/2" WELD | CHINA | 1 | PLYWOOD | 1440 | 196 | 394 | 100*80*90 | $0.7140 | $1,028.16 |
| 78499 | UL0009 | 2"UNI-LET 2-1/2"-3"WELD | CHINA | | | 96 | 35 | 35 | | $2.5740 | $247.10 |
| 79129 | UL0009 | 2"UNI-LET 2-1/2"-3"WELD | CHINA | | | 96 | 35 | 35 | | $2.5740 | $247.10 |
| 79129 | UL0003N | 1"UNI-LET 1/1/2"-2-1/2" WELD | CHINA | 6 | PLYWOOD | 34560 | 4700 | 4880 | 100*80*80 | $0.7140 | $24,675.84 |
| 79129 | UL0009 | 2"UNI-LET 2-1/2"-3"WELD | CHINA | 2 | PLYWOOD | 2304 | 825 | 885 | 100*80*80 | $2.5740 | $5,930.50 |
| Replacement | | | | | | | | | | | |
| | UL0002N | 3/4"UNI-LET 1-1/4"-3" WELD | CHINA | | | 360 | 34 | | | $0.0000 | $0.00 |
| 78499 | UL0002N | 3/4"UNI-LET 1-1/4"-8" WELD | CHINA | | | 492 | 46 | | | $0.5520 | $271.58 |
| 79129 | UL0002N | 3/4"UNI-LET 1-1/4"-8" WELD | CHINA | 1 | PLYWOOD | 1668 | 157 | 321 | 80*60*60 | $0.5520 | $920.74 |
| 79129 | UL0004N | 1"UNI-LET 3'-8" WELDED OUT | CHINA | | | 480 | 64 | | | $0.7313 | $351.02 |
| 79129 | UL0002N | 3/4"UNI-LET 1-1/4"-8" WELDED OUT | CHINA | 4 | PLYWOOD | 34560 | 3249 | 3369 | 101*77*76 | $0.5520 | $19,077.12 |
| 79129 | UL0004N | 1"UNI-LET 3'-8" WELDED OUT | CHINA | 1 | PLYWOOD | 5760 | 766 | 796 | 101*77*76 | $0.7313 | $4,212.29 |
| | | TOTAL | | 15 | | 83391 | 10207 | 10645 | | | $57,648.16 |
| | | | | | | | | | | INVOICE TOTAL | $57,648.16 |

I/we hereby certify that the information on this invoice is true and correct and that the contents of this shipment are as stated above.

芜湖沃比兹商贸有限公司
For-Biz Trading Co., Ltd.
(Anhui)

**AUTHORIZED SIGNATURE AND DATE**
ADDITIONAL NOTES OR COMMENTS:

PAGE 1/3

SIGMA CONFIDENTIAL - NOT FOR DISCLOSURE
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SIG-DOJ-00001869
SIGMA-00002520

**TRIAL EXHIBIT 1010, PAGE 4**

| Issuer | | | |
|---|---|---|---|

WOR-BIZ TRADING CO.,LTD
(ANHUI)
18/F CHANGHE KECHUANG MANSION,
NO.677 WEST CHANGJIANG ROAD,
HIGH-TECH ZONE, HEFEI, ANHUI, CHINA
TEL: +86-551-5339821 FAX: +86-551-5339828

To

SIGMA CORPORATION
P.O.BOX 300, 700 Goldman Drive, Cream
Ridge, NJ 08514

装　箱　单
PACKING LIST

| Invoice No. | Date |
|---|---|
| AHWB14-A739 | APR.21,2014 |

| Marks and numbers | Number and kind of packages; description of goods |
|---|---|
| HTS#7307995045-STEEL COUPLING | 15PACKAGES(83391PCS) |
| | GR.WT.10645KGS  / NT.WT.10207KGS |
| | MEASUREMENT:9M3 |
| SGM | |
| BIRMINGHAM, USA | |
| MADE IN CHINA | |



安徽省崇商贸易有限公司
Wor-Biz Trading Co., Ltd.
(Anhui)

宋信阳

SIGMA CONFIDENTIAL - NOT FOR DISCLOSURE
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SIG-DOJ-00001870
SIGMA-00002521
TRIAL EXHIBIT 1010, PAGE 5

# BILL OF LADING

## FCC LOGISTICS INC.

| | |
|---|---|
| PER/EXPORTER (Complete Name and Address) | DOCUMENT NO. |
| WOR-BIZ TRADING CO.,LTD (ANHUI) 18/F CHANGHE KECHUANG MANSION, NO.677 WEST CHANGJIANG ROAD, HIGH-TECH ZONE, HEFEI, ANHUI, CHINA | BOOKING NO. US140106B |
| TEL: +86-551-5339828 FAX: +86-551-5339828 | EXPORT REFERENCES |

CONSIGNEE (Complete Name and Address)

TO ORDER

FORWARDING AGENT REFERENCES
FCC LOGISTICS INC.
18747 S. LAUREL PARK RD.
RANCHO DOMINGUEZ, CA 90220
T:310.679.6688 F:310.679.6699

POINT AND COUNTRY OF ORIGIN
jessec@fcclax.com; petery@fcclax.com

NOTIFY PARTY (Complete Name and Address)

1. SIGMA CORPORATION
P.O. BOX 300, 700 GOLDMAN DRIVE, CREAM RIDGE, NJ
08514, USA  TEL: 609-758-0800 EXT.305

DOMESTIC ROUTING/EXPORT INSTRUCTIONS

PLACE OF RECEIPT*

| OCEAN VESSEL | Flag | PORT OF LOADING | ONWARD INLAND ROUTING | PLACE OF DELIVERY |
|---|---|---|---|---|
| NYK REMUS  V.028B | | SHANGHAI, CHINA | | |
| PORT OF DISCHARGE | | FOR TRANSSHIPMENT TO | | |
| NEW YORK NY (1446) | | BIRMINGHAM, USA | | |

| CARRIER'S RECEIPT | | PARTICULARS FURNISHED BY SHIPPER | | |
|---|---|---|---|---|
| MARKS AND NUMBERS | NO.OF CONT OR OTHER PKGS: | DESCRIPTION OF GOODS | GROSS WEIGHT | MEASUREMENT |
| | 15PACKAGES | | 10645KGS | 9CBM |
| SGM BIRMINGHAM, USA MADE IN CHINA | | HTS#7307995045-STEEL COUPLING SCAC CODE: FCCJ | | |
| | | **2. SIGMA CORPORATION- 1500 HIGHWAY 22 WEST, ALEXANDER CITY, AL 35010, USA 3. CH POWELL COMPANY 3663 NORTH SAM HOUSTON PARKWAY EAST SUITE 150 HOUSTON, TX 77060, USA TEL:(281)442-5363, FAX:(281)442-5365 HOUCURDOCS@CHPOWELL.COM | | |
| | | ORIGINAL | 26 APR 2014 | |
| | | | SHIPPED ON BOARD | |
| | | | FREIGHT PREPAID | |
| LCL CFS-CFS | | | AT | |

FREIGHT and CHARGES PAYABLE BY

(Complete Name and Address)

SAY FIFTEEN PACKAGES ONLY

| FREIGHT AND CHARGES REVENUE TONS RATE PER | PREPAID | COLLECT |
|---|---|---|
| SZLU9667023/CN0126253/40RH | | |

IN ACCEPTING THIS BILL OF LADING the Shipper, Consignee, Holder hereof, and Owner of the goods, agree to be bound by all of its stipulations, exceptions and conditions, whether written, printed or stamped on the front or back hereof, as well as the provisions of the above Carrier's published Tariff Rules and Regulations, as fully as if they were all signed by such Shipper, Consignee, Holder or Owner, and it is further agreed that Containers may be stowed on Deck, as per Clause 6.

IN WITNESS WHEREOF the Master of the said vessel has signed ____ of this Bill of Lading and Authorized signature.

26 APR 2014

FCC LOGISTICS INC
SHANGHAI
AS CARRIER
As Agent For the Carrier Named Above

US140106B .......... THREE

Number of originals Issued
(If more than one original Issued, the others stand void when ONE is accomplished)

| BILL OF LADING NO. | DATED |
|---|---|
| | |

TOTAL CHARGES

TERMS OF BILL OF LOADING CONTINUED ON REVERSE SIDE.

44

SIGMA CONFIDENTIAL - NOT FOR DISCLOSURE
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SIG-DOJ-00001871
SIGMA-00002522

## FCC LOGISTICS, INC.
18747 S. LAUREL PARK RD., RANCHO DOMINGUEZ, CA 90220
TEL: 310-679-6688  FAX: 310-679-6699  EMAIL: jonl@fccusa.net
## ARRIVAL NOTICE / FREIGHT INVOICE

| | | |
|---|---|---|
| SHIPPER<br>WOR-BIZ TRADING CO., LTD.<br>18/FL CHANGHE MANSION, NO.677<br>WEST CHANGJIANG RD. HEFEI<br>ANHUI, CHINA | REFERENCE NO.<br>OI-2144290 | DATE<br>5/30/14 9:32 AM |
| | MASTER B/L NO.<br>NYKS2374328640 | PREPARED BY<br>jonl@fccusa.net |
| CONSIGNEE<br>SIGMA CORP.<br>700 GOLDMAN DR.<br>CREAMRIDGE, NJ 08514 U.S.A.<br>ATTN:IMPORT<br>TEL:609-385-1354  FAX:609-935-0600 | SUB B/L NO.<br>JF14041200NYC | HOUSE B/L NO.<br>US140106B |
| | AMS B/L No.<br>FCCJUS140106B | CUSTOMER REF. NO. |
| NOTIFY PARTY<br>SIGMA CORP.<br>700 GOLDMAN DR.<br>CREAMRIDGE, NJ 08514 U.S.A.<br>ATTN:IMPORT<br>TEL:609-385-1354  FAX:609-935-0600 | VESSEL & VOY NO.<br>NYK REMUS V.028E | |
| | PORT OF LOADING<br>SHANGHAI,CHINA | ETD<br>04/26/14 |
| | PORT OF DISCHARGE<br>NEW YORK, NY | ETA<br>05/22/14 |
| BROKER<br>CH POWELL CO.<br>3340-D GREENS RD. STE 710<br>HOUSTON, TX 77032<br>TEL:281-442-5363 FAX:281-442-6365 | PLACE OF DELIVERY<br>BIRMINGHAM,AL | |
| | FINAL DESTINATION<br>BIRMINGHAM,AL | ETA |
| FREIGHT LOCATION<br>DIVERSIFIED CONTRACTORS INC.    TEL:205-322-2868 | FIRM CODE<br>R219 | AVAILABLE DATE |
| DEVAN LOCATON<br>SALSON CFS(E614)    TEL:973-986-0200 | LAST FREE DATE | G.O. DATE |
| I.T. NO : 998,966,205 | DATE : 05/14/14    PLACE : NEW YORK, NY | |

PARTICULARS FURNISHED BY SHIPPER

| CONTAINER NO./SEAL NO.<br>MARKS & NOS. | NO. OF CONT.<br>NO. OF PKGS. | DESCRIPTION OF PACKAGES AND GOODS | GROSS WEIGHT | MEASUREMENT |
|---|---|---|---|---|
| * Container No.<br>SZLU9667023 | 15 PKGS | STEEL COUPLING | 10645.00 KGS<br>23467.97 LBS | 9.000 CBM<br>318 CFT |

"O B/L RECEIVED"

CFS/CFS

REMARK:    Salson need charge overweight fee if any cargo is over 15,000lbs, and the weight of your cargo is 23,468lbs. In order to move the cargo to Birmingham, there are extra charge $225 and pls see the attached Inv.

*** FOR FREIGHT RELEASE, PLEASE EMAIL THE PERSON LISTED ON "PREPARED BY" ***

TO ALL CUSTOMERS:
1. Please, send money order or cashier's check payable to "FCC LOGISTICS INC."
   * Only Broker's check will be accepted.
   * $35.00 will be charge for returned check.
2. We can only release the freight to you upon receipt of charges shown below and properly endorsed Original House Bill Of Lading.
3. Prior to cargo pick-up, consignee must clear customs and confirm freight release with PIER/CFS.  Please, pick up your cargo as soon as possible to avoid unnecessary charges.
4. These charges are for the account of ultimate consignee to whom this freight is released.
5. Shipment needs 24hours to 48hours to be released upon receipt full amount of payments.
**************************************************
Please check availability with warehouse or terminal upon final E.T.A. shows on arrival notice. (Consignee's Responsibility)

Invoice No : 331268 Due date:5/22/2014

| DESCRIPTION OF CHARGES | PREPAID | COLLECT |
|---|---|---|
| DOCUMENT CHARGE | 0.00 | 75.00 |
| AMS | 0.00 | 25.00 |
| TOLL | 0.00 | 21.29 |
| CHASSIS | 0.00 | 21.29 |
| OVERWEIGHT | 0.00 | 225.00 |
| TOTAL AMOUNT    USD | 0.00 | 367.58 |

SIGMA CONFIDENTIAL - NOT FOR DISCLOSURE
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

SIG-DOJ-00001872
SIGMA-00002523

**TRIAL EXHIBIT 1010, PAGE 7**

# EXHIBIT 6

1

```
 1                    UNITED STATES OF AMERICA
                   UNITED STATES DISTRICT COURT
 2                 CENTRAL DISTRICT OF CALIFORNIA
                        WESTERN DIVISION
 3
                            - - -
 4               HONORABLE R. GARY KLAUSNER,
              UNITED STATES DISTRICT JUDGE PRESIDING
 5                          - - -

 6
     UNITED STATES OF AMERICA ex  )
 7   rel. ISLAND INDUSTRIES,      )    CERTIFIED COPY
     INC.,                        )
 8                                )
                                  )    CV 17-04393-RGK-KS
 9              PLAINTIFFS,        )
                                  )
10   VS.                          )
                                  )
11   VANDEWATER INTERNATIONAL     )
     INC.; NEIL RUEBENS; SIGMA    )
12   CORPORATION; SMITH COOPER    )
     INTERNATIONAL; ALLIED        )
13   RUBBER & GASKET COMPANY,     )
     and JOHN DOES Nos. 1-10,     )
14                                )
                                  )
15              DEFENDANTS.        )
     _____)
16

17

18                       TRIAL - DAY 1
               REPORTER'S TRANSCRIPT OF PROCEEDINGS
19                 TUESDAY, OCTOBER 5, 2021
                    LOS ANGELES, CALIFORNIA
20

21

22

23             SHERI S. KLEEGER, CSR 10340
               FEDERAL OFFICIAL COURT REPORTER
24             312 NORTH SPRING STREET, ROOM 402
               LOS ANGELES, CALIFORNIA 90012
25                   PH:  (213)894-6604
```

```
 1

 2

 3

 4
     APPEARANCES OF COUNSEL:
 5
     ON BEHALF OF PLAINTIFF:
 6
             MAYER BROWN LLP
 7           BY:  KELLY B. KRAMER, ESQUIRE
                  C. MITCHELL HENDY, ESQUIRE
 8                350 SOUTH GRAND AVENUE
                  25TH FLOOR
 9                LOS ANGELES, CA 90071-1503

10
     ON BEHALF OF DEFENDANT:
11           WHITE and CASE
             BY:  CHRISTOPHER M. CURRAN, ESQUIRE
12                LUCIUS LAU, ESQUIRE
                  SHANNON LANE, ATTORNEY AT LAW
13                701 THIRTEENTH STREET, NW
                  WASHINGTON, DC 20005-3807
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          I  N  D  E  X

 2    WITNESS:            DIRECT    CROSS    REDIRECT    RECROSS

 3     WOEHREL, Mark       104       132       154

 4  RONA, Mitchell        156

 5

 6                        E X H I B I T S

 7                        NUMBER      PAGE

 8                        66          110

 9                        1013        119

10                        1012        121

11                        5           124

12                        4           127

13                        58          164

14                        8           167

15                        52          175

16                        1088        193

17                        28          197

18                        1010        201

19                        29          206

20

21

22

23

24

25
```

```
  1                LOS ANGELES, CALIFORNIA; OCTOBER 5, 2021

  2                          A.M SESSION

  3

  4                THE CLERK:  Calling item two, Case number

  5    civil 17-04393 RGK United States of America versus

  6    Vandewater International, Inc., et al.

  7                Counsel, please state your appearances.

  8                MR. KRAMER:  Good morning, Your Honor.

  9    Kelly Kramer and Mitchell Hendy on behalf of Island

 10    Industries.

 11                THE COURT:  Thank you, Counsel.

 12                MR. CURRAN:  Good morning, Your Honor.

 13    Christopher Curran of White & Case for Sigma.

 14                Joined at counsel table by Mr. Lucius Lau,

 15    Ms. Shannon Lane.  We also have a courtroom

 16    representative here, Patricia Velasquez.

 17                THE COURT:  In this particular matter,

 18    Counsel, both sides ready for trial?

 19                MR. KRAMER:  Correct.

 20                MR. CURRAN:  Yes, Your Honor.

 21                THE COURT:  We may get off the ground.  I'm

 22    going to order them in for 10:00 o'clock today so we get

 23    started with the voir dire at 10:00 o'clock today.

 24                I've gone over in pretrial the motions in

 25    limine.  They stand the same as the tentatives were.
```

```
 1    I think I mentioned to you before, four hours per side,
 2    is what I said?
 3              MR. KRAMER:  You said it would be between
 4    four and five hours.
 5              THE COURT:  Okay.  I'm going to give you
 6    four and a half then.
 7              MR. KRAMER:  Perfect.
 8              THE COURT:  We'll split the baby in half.
 9    Four and a half hours per side.
10              Remember what I told you at the pretrial
11    that once the time is up, you are out of questions.
12              So if one side finishes early and the other
13    side is asking questions, you're not going to be able to
14    cross-examine.  So once the time is up, it's up.
15              In this particular matter, I don't know
16    if -- I do want to mention a few things, one is that
17    when you're addressing the jury -- and I may have
18    mentioned this in pretrial, always at the podium, behind
19    the glass, and right next to the microphone so that she
20    can hear what's going on.
21              The other things I went over at pretrial
22    with you.  So if you're ready to go, I will order the
23    panel in now.
24              MR. CURRAN:  I don't think you indicated how
25    long openings and closings.
```

```
 1                    THE COURT:  Oh, I'm sorry.  20 minutes on

 2   opening -- excuse me.  20 minutes on opening statements.

 3   Excuse me.  Argument at the end is something different.

 4   We will find out how the jury -- normally it's 30 to

 5   35 minutes.  You could do it 20 minutes.

 6                    We just had a case, very similar, both of

 7   you probably know, it's a criminal case, almost dealing

 8   with the same issue, except it was much more complicated

 9   because we had other counts there, we had fraud counts

10   and all kind of counts, with four defendant corporations

11   involved.

12                    But -- so I -- you know, I'm fairly familiar

13   with what we're going to be talking about.  I think 20

14   minutes is appropriate.

15                    MR. KRAMER:  One quick logistical question.

16   When we're at the podium, are we allowed to remove our

17   mask?

18                    THE COURT:  If you're behind the plexiglass,

19   you're allowed to remove the mask, yes.  Or if you're 6

20   distance.  But basically if you're behind the

21   plexiglass.  Okay?

22                    MR. KRAMER:  Understood.

23                    THE COURT:  And witnesses will be testifying

24   behind the plexiglass without a mask.

25                    MR. KRAMER:  Without a mask.
```

```
 1                THE COURT:  Okay.  We will give you a chance
 2    to get started.  And we'll bring the jury down.
 3    Hopefully we can start right at 10:00 o'clock.
 4                (Prospective Jurors in courtroom.)
 5                THE CLERK:  Call case number civil 17, 4393
 6    RGK, United States of America versus Vandewater
 7    International.
 8                Counsel, please state your appearances.
 9                MR. KRAMER:  Good morning.  It's Kelly
10    Kramer and Mitch Hendy for Island Industries.
11                MR. CURRAN:  Good morning, again, Your
12    Honor.  Christopher Curran of White & Case for Sigma.
13    Joined at counsel table by Mr. Lucius Lau, and Ms.
14    Shannon Lane.  Also with us, a courtroom representative,
15    Ms. Patricia Velasquez.
16                THE COURT:  Thank you, Counsel.  Ladies and
17    gentlemen, we are going to be calling the names of 14
18    jurors.  When we do that, we want the first juror to
19    come all the way up, and go all the way down to the end
20    of the back row.  And then the rest of the jurors go up
21    this row going all the way down to the end, filling it
22    up.
23                And as soon as they do that, I'll talk to
24    you a little bit further.  Do you want to go ahead?
25                THE CLERK:  Seat No. 1.  Soraya,
```

 1   S-o-r-a-y-a, Romero, R-o-m-e-r-o.
 2              Number 2.  I'll spell the -- first name is
 3   Monchil, M-o-n-c-h-i-l.  Last name, Vaneh, V-a-n-e-h.
 4              Alejandro Gomez, G-o-m-e-z.
 5              If you could come through this side.  Thank
 6   you.
 7              Juror No. 4.  First name is spelled
 8   N-i-n-g-s-i-h.  Last name Wijaya, W-i-j-a-y-a.
 9              Jurors, once again, just so we don't trip
10   over anyone, enter through the doors on this side.
11              Number 5.  Lisa Beachy, B-e-a-c-h-y.
12              David Muldoon, M-u-l-d-o-o-n.
13              Orel, O-r-e-l.  Last name's Golan,
14   G-o-l-a-n.
15              Kathleen, last name's spelled T-i-n-a-p-a-y.
16              Then No. 9 for the first seat in the front
17   row, Dena Zillmer, Z-i-l-l-m-e-r.
18              Fermin Diaz, Junior.  D-i-a-z.
19              Christine Dyer, D-y-e-r.
20              Joshua Resendez, R-e-s-e-n-d-e-z.
21              Esmeralda de Santiago.  D-e S-a-n-t-i-a-g-o.
22              And Steven Scott, S-c-o-t-t.
23              THE COURT:  Okay.  Ladies and gentlemen, we
24   have 14 people in the box.  We have those jurors that
25   are still out there in the audience.  I am going to be

1    asking questions of the 14 up here in the box.

2              I will ask those of you that are out in the

3    audience, pay just as close attention as you would if

4    you were in the box up here to all the questions we ask.

5              One of the reasons is because if you're

6    called to take the place of one of these jurors, I will

7    ask you whether or not there's anything you should bring

8    to our attention.  If you haven't been listening, then I

9    will have to go through all the questions again with

10   each that juror comes up.

11             So remember you're part of the jury.  If you

12   can't hear something or see something, raise your hand,

13   let us know.  But pay just as much attention if you're

14   one of the jurors up here.

15             Okay.  Ladies and gentlemen, the case before

16   the Court today is the United States of America versus

17   Sigma.  The allegation is that the -- well, let me see

18   if I can get it here, be more specific on it.  That

19   Sigma imported products into the United States or is

20   subject to antidumping duty, falsely described the

21   products and falsely stated that they were not subject

22   to antidumping duties.

23             Sigma maintains that it complied with all

24   the rules and denies any allegation to the contrary.  So

25   that's basically what it's about.  We'll get much more

```
 1   into detail when we get into trial.  But I wanted to let
 2   you know a little bit about what this is about.
 3            And at this time I'm going to ask the
 4   attorneys to introduce to you who will be participating
 5   in the case and any possible witnesses they may call
 6   during the case.
 7            The reason we are doing this, and the reason
 8   we gave you an outline of the trial is to see if you
 9   know anything about this case or anybody involved in
10   this case.  So listen carefully.
11            Counsel.
12            MR. KRAMER:  Thank you, Your Honor.
13            Ladies and gentlemen, my name is Kelly
14   Kramer.  I'm joined at counsel table by Mitch Hendy.
15            In terms of possible witnesses, Island
16   expects that it will call Mark Woehrel, who's from
17   Tennessee.  Mitch Rona, who's from New Jersey.
18   Siddharth Bhattacharji, who I believe is in New Jersey.
19   And I hope I didn't butcher his name.  Kelly Thompson,
20   who's from Florida.  I think that's the full extent of
21   the Island witnesses.
22            THE COURT:  Thank you, Counsel.
23            Counsel.
24            MR. CURRAN:  Thank you, Your Honor.
25            I'm Christopher Curran.  Joined at counsel
```

```
 1   table with Lucius Lau who's a native of the area.   And
 2   Shannon Lane.
 3            Some of witnesses we intend to rely on have
 4   already been named by Mr. Kramer:  Siddharth
 5   Bhattacharji and Mitchell Rona, both from New Jersey.
 6   And Patricia Velasquez, also from New Jersey.
 7            Thank you, Your Honor.
 8            THE COURT:  Thank you, Counsel.
 9            Ladies and gentlemen, I am anticipating, God
10   willing and the creek don't rise, that we'll finish this
11   case by the end of this week.  So it's going to be a
12   short case is what I'm telling you.
13            Now, the -- what the case is about and the
14   witnesses and the parties have been introduced to you.
15   So let me ask you this question:  Does anybody know
16   anybody involved in this case or anything about this
17   case at all?
18            Okay.
19            Let me ask this question:  How many of you
20   have sat on jury trials through deliberation before?
21            One person -- two people.  Okay.  That's
22   kind of what I thought.
23            There's two ways to ask questions.  I can
24   ask every single question of every single juror, and
25   forget about this week, we could probably finish by
```

 1    Thanksgiving maybe.  Or I can ask general questions.
 2    And that way it will go much faster.  The only problem
 3    is if I ask general questions, I need a response from
 4    all 14 of you.  You can either stand up, raise your
 5    hand, say yes, say no.  As long as each person responds,
 6    then I don't have to go through each person and ask you
 7    individually.  So let me try that question again.
 8              Does anybody know anything about this case
 9    or anything involved in this case?
10              THE PROSPECTIVE JUROR:  No.
11              THE COURT:  Perfect.  Since we do have new
12    jurors, let me explain to you a little bit about what
13    your function's going to be here.  The duties of a jury
14    is basically twofold.  Your first duty is, you must
15    determine what the facts of the case are.  Well, you've
16    already told me you don't know anything about this case,
17    how you determine the facts.
18              The law is quite simple.  You must determine
19    the facts of the case from and only from the evidence
20    that's received here in the Court.
21              Now you may say, okay, well, what's
22    evidence?  Evidence is the testimony of witnesses here
23    under oath, physical exhibits that are introduced to you
24    during the course of the trial, and anything the two
25    attorneys -- that both sides agree on or stipulate to.

 1                  From those three things, only from those

 2      three things, you determine what the facts of the case

 3      are.

 4                  Let me give you an example.  How many of

 5      you -- indicate how many of you have done a jigsaw

 6      puzzle once in your life?

 7                  Everybody?

 8                  What do you do when you have a jigsaw

 9      puzzle?  You take the box, you put the pieces out there

10      on the table and you put the box top up there and you

11      start putting the pieces together.

12                  I know this sounds subtle, but nobody's

13      asking you what's on the box top.  We're asking:  What's

14      depicted when you put the pieces together.

15                  It may have been mislabeled.  You may have a

16      boat on the box top and a dog when you put it together.

17      We're asking you, what is presented once you put the

18      pieces together?

19                  The analogy is in this case, nobody's going

20      to ask you what happened at a certain time on a certain

21      date in a certain place.  We are going to ask you:  What

22      does the evidence show happened at the certain time and

23      place and certain date.

24                  So you got to put the pieces together.  You

25      can't add pieces from the outside that aren't part of

1    the evidence.  Just like you can't on a jigsaw puzzle.

2    You can't throw some pieces out.  You have to take those

3    pieces of evidence together.  Take a look at them.  And

4    then tell us what the facts are.  Whether, by the way,

5    you agree with the facts or not.

6              I've tried hundreds of cases where I've not

7    agreed and have not liked what the verdict is on it, but

8    I'm not asking that.  It's a very humbling experience.

9    Nobody cares really what we think.  What we care about

10   is if you can be fair and impartial and just tell us

11   what the evidence says whether you like it or not.

12             Now, that's the first duty that you have.

13             Second duty you have is that once you get

14   all that evidence together, you are to apply the law

15   that I give to you at the end of the case to those facts

16   and reach a verdict.

17             It's important that you realize, again, it's

18   not what you think the law should be.  If you disagree

19   with the law, go up to Sacramento and change it, and go

20   back to Washington, D.C. and change it.

21             But it's not what you think the law should

22   be.  If it were, we would have 14 people here -- I'd

23   have 14 different interpretations of what the law should

24   be.  Because everybody thinks differently.

25             We can't try a case that way.  For

```
 1   consistency you have to apply one set of laws to it, and

 2   that's the law that I give to you at the end of the case

 3   whether you disagree with the law or not.

 4            So tell us what the evidence is, whether you

 5   like it or not, what the facts are.  Apply the law to

 6   it.  And tell us what the verdict is.  And let the cards

 7   fall where they may.  That's basically what you have to

 8   do as jurors.  Almost like being a computer.  Everybody

 9   understand that duty that you have?

10            THE PROSPECTIVE JURORS:  Yes.

11            THE COURT:  I know it's a little subtle, but

12   everybody understands my explanation is what we are

13   looking for.

14            THE PROSPECTIVE JURORS:  Yes.

15            THE COURT:  I told I was going to ask

16   questions of you as a whole, and I am.  But before I do

17   that, I'm going to ask specific questions of each juror,

18   basically four questions.  They're not really tough.  I

19   think most of you will know the answers.  One is:  What

20   is your name?  Number 2 is:  Where do you live?  We

21   don't want a street address, just a city that you live

22   in.  Number 3 is, if you're employed, what is your

23   employment.

24            Keep in mind that if you're retired, please

25   don't say retired, because all that does is make me
```

```
 1    jealous.  Tell me what your employment was before you

 2    were retired.

 3              And No. 4, is there anyone that lives in the

 4    home that works outside the home?  And if so, what is

 5    their occupation.

 6              Then I may ask one or two follow-up

 7    questions.  Don't take any of them personally, because

 8    the follow-up questions are normally used by me to kind

 9    of instruct the jury as to where we're going, et cetera.

10              But basically that's it on the individual

11    questions.  And then I'll get back to the general

12    questions.

13              By the way, I apologize but I will refer to

14    the jurors by number rather than name.  Quite simply

15    because during the process you may be moving around in

16    the jury box and everything else.  So I always go by

17    numbers.  So we're Juror No. 1 down to Juror No. 8.

18    Juror No. 9 through 14.

19              So let me start with Juror No. 1.  What is

20    your occupation?

21              THE PROSPECTIVE JUROR:  My name is Soraya

22    Romero.  I work for Social Security.

23              THE COURT:  By the way, you don't have to

24    stand.  We're more informal than that.

25              What location do you live in?
```

```
 1                   THE PROSPECTIVE JUROR:  I live in Sylmar.

 2                   THE COURT:  Is there anyone -- you gave us

 3   your occupation.  But I was too busy asking you if you

 4   wanted to sit down.

 5                   What was your occupation again?

 6                   THE PROSPECTIVE JUROR:  I work for Social

 7   Security Administration.

 8                   THE COURT:  Okay.  And is there anyone in

 9   the home that works outside the home?

10                   THE PROSPECTIVE JUROR:  No.  (Inaudible.)

11                   THE COURT:  You know nothing about the case

12   yet other than what we told you.

13                   Is there anything you can think of at this

14   time why you would have any problem being a good juror

15   in a case like this?

16                   THE PROSPECTIVE JUROR:  No problem.

17                   THE COURT:  You can be fair to both sides?

18                   THE PROSPECTIVE JUROR:  Correct.

19                   THE COURT:  Okay.  Next juror.

20                   THE PROSPECTIVE JUROR:  Hello.

21                   THE COURT:  Hello.  Name.

22                   THE JUROR:  Momchil Zanev.

23                   THE COURT:  And what city do you live in?

24                   THE PROSPECTIVE JUROR:  Woodland Hills.

25                   THE COURT:  And what is your occupation?
```

```
 1                    THE PROSPECTIVE JUROR:  I'm a self-employed
 2    violin teacher.
 3                    THE COURT:  I'm sorry.  Self-employed...
 4                    THE PROSPECTIVE JUROR:  Violin teacher.
 5                    THE COURT:  Is there anyone that works
 6    outside the home that lives with you?
 7                    THE PROSPECTIVE JUROR:  Yes.
 8                    THE COURT:  What is their employment?
 9                    THE PROSPECTIVE JUROR:  Teacher.  And my
10    partner, she is a teacher.
11                    THE COURT:  Okay.  Teacher at what level;
12    like college, high school?
13                    THE PROSPECTIVE JUROR:  Middle school.
14                    THE COURT:  Middle school.  Okay.  I'm
15    assuming if it's middle school, they don't get into the
16    subject of law or anything like that?
17                    THE PROSPECTIVE JUROR:  No.
18                    THE COURT:  Can you think of any reason why
19    you would not be a good juror?
20                    THE PROSPECTIVE JUROR:  I don't think so.
21                    THE COURT:  You understand when I was
22    talking about, you've got to limit yourself just to the
23    evidence and tell us what it says whether we like it or
24    not.  You can do that?
25                    THE PROSPECTIVE JUROR:  Yes.
```

```
 1                  THE COURT:  Next juror.
 2                  THE PROSPECTIVE JUROR:  Hello.
 3                  THE COURT:  Can we have your name, please.
 4                  THE PROSPECTIVE JUROR:  Alejandro Gomez.
 5                  THE COURT:  And the city you live in?
 6                  THE PROSPECTIVE JUROR:  Norwalk, California.
 7                  THE COURT:  And your occupation?
 8                  THE PROSPECTIVE JUROR:  Machine operator.
 9                  THE COURT:  And anyone in the home that
10  works outside the home?
11                  THE PROSPECTIVE JUROR:  No.
12                  THE COURT:  You've heard the questions I
13  just asked.  Is there any reason why you think you
14  cannot be a good juror in a case like this?
15                  THE PROSPECTIVE JUROR:  No.
16                  THE COURT:  You can just tell us what the
17  evidence says, whether you like it or not, you can be
18  objective and tell us what the evidence says?
19                  THE PROSPECTIVE JUROR:  I think so.
20                  THE COURT:  By the way that's a good answer,
21  I think so.  Let me tell you why.  That's all anybody
22  can say is I think so.
23                  If something comes up during the trial where
24  you cannot fulfill that obligation, you would tell us;
25  is that correct?
```

```
 1                    THE PROSPECTIVE JUROR:  Yes.

 2                    THE COURT:  Okay.  Juror No. 5.

 3                    No, Number 4.  Almost skipped over you.

 4    Your name, please.

 5                    THE PROSPECTIVE JUROR:  Ningsih Wijaya.

 6                    THE COURT:  And your occupation?

 7                    THE PROSPECTIVE JUROR:  Purchasing manager.

 8                    THE COURT:  Project manager?

 9                    THE PROSPECTIVE JUROR:  No.  Purchasing.

10                    THE COURT:  Is there -- excuse me.  What

11    city do you live in?

12                    THE PROSPECTIVE JUROR:  Monterey Park.

13                    THE COURT:  Anybody that works outside the

14    home that lives with you?

15                    THE PROSPECTIVE JUROR:  No.

16                    THE COURT:  Anything you can think of why

17    you wouldn't be a good juror?

18                    THE PROSPECTIVE JUROR:  I think this case is

19    kind of like -- I have past experience or knowledge

20    about this case about the importation so that's what --

21                    THE COURT:  About this specific case or

22    about importation in general?

23                    THE PROSPECTIVE JUROR:  Importation

24    procedures.

25                    THE COURT:  In general?
```

```
 1                 THE PROSPECTIVE JUROR:  Yes.

 2                 THE COURT:  And I'm going to get back to

 3      those questions.

 4                 That's one of the general questions I will

 5      be talking to you about.  I will get back to you on

 6      that.

 7                 THE PROSPECTIVE JUROR:  Okay.

 8                 THE COURT:  Anything else you want to call

 9      to our attention?

10                 THE PROSPECTIVE JUROR:  No.

11                 THE COURT:  Juror No. 5.

12                 THE PROSPECTIVE JUROR:  My name is Lisa

13      Beachy.

14                 THE COURT:  Okay.

15                 THE PROSPECTIVE JUROR:  I live in Santa

16      Clarita.

17                 THE COURT:  Okay.

18                 THE PROSPECTIVE JUROR:  And I am a

19      self-employed psychic medium.  My husband works as USC

20      as a wireless engineer.

21                 THE COURT:  That's a long drive.

22                 THE PROSPECTIVE JUROR:  Well, he is at home

23      now.

24                 THE COURT:  You've heard everything we've

25      talked about.  Can you do the same thing and just tell
```

1    us what the evidence says, whether you like it or not,

2    just tell us what the facts of the case are?

3                    THE PROSPECTIVE JUROR:  I think so.

4                    THE COURT:  You're limited to the evidence

5    that's presented.  We can't try cases on what might have

6    happened to somebody else or you might have some outside

7    experience, because you can't be cross-examined or

8    anything.

9                    THE PROSPECTIVE JUROR: Yes, I think so.

10                   THE COURT:  Thank you very much.

11                   Next juror.

12                   THE PROSPECTIVE JUROR:  Hello, Judge.  My

13   name is David Muldoon.  I live in Long Beach.  I'm a

14   supervisory Customs and Border Protection officer.

15                   THE COURT:  Okay.  Anyone in the home that

16   works outside the home?

17                   THE PROSPECTIVE JUROR:  No. My wife is

18   currently unemployed.

19                   THE COURT:  Was she employed.

20                   THE PROSPECTIVE JUROR:  Phlebotomist.  Drew

21   blood.

22                   THE COURT:  Okay.  We'll get back to you

23   with general questions because you may be somewhat

24   connected or have some experience in this area.

25                   But absent that, is there any reason why you

```
 1    cannot be fair to both sides?

 2                THE PROSPECTIVE JUROR:  No, Judge.

 3                THE COURT:  I love to ask this question:  If

 4    you hear the plaintiff saying somebody did something,

 5    could you be satisfied that 12 people like you are --

 6    excuse me.  Eight people in this case.  We're going to

 7    have an eight-person jury.  Eight people like you would

 8    give you a fair trial.  Not necessarily you would win,

 9    but would give you a fair trial.

10                THE PROSPECTIVE JUROR:  Yes judge.

11                THE COURT:  If you were the defendant and

12    you say, No, no, I'm not -- I didn't do anything wrong

13    at all.  Would you be satisfied that 12 people, again,

14    would give you a fair trial?

15                THE PROSPECTIVE JUROR:  Yes, Judge.

16                THE COURT:  So you'd be fair to both sides?

17                Next juror, please.

18                THE PROSPECTIVE JUROR:  Morning, Judge.

19                THE COURT:  Good morning.

20                THE PROSPECTIVE JUROR:  My name Orel Golan.

21    I'm living Tarzana.  I'm a security guard at a Jewish

22    school.

23                THE COURT:  Anyone that works outside the

24    home?

25                THE PROSPECTIVE JUROR:  No.  I'm the only
```

1    one.  I'm taking care of my father and my son.

2                THE COURT:  Thank you very much, sir.

3                Anything that you can think of as to why you

4    would not be a good juror?

5                THE PROSPECTIVE JUROR:  Hopefully my English

6    is going to be okay.

7                THE COURT:  You have been clear as far as

8    language goes coming in.  But if anything happens where

9    you can't hear or understand something that was said,

10   will you raise your hand so that we can clear that up?

11               THE PROSPECTIVE JUROR:  Yes.  Because most

12   of the things that you're saying I'm not really

13   understanding.

14               THE COURT:  If you can't understand them,

15   let me know.  Okay?

16               THE PROSPECTIVE JUROR:  Yes.

17               THE COURT:  Okay.  Next juror.

18               THE PROSPECTIVE JUROR:  Hi.  My name is

19   Kathleen Tinapay.  I live in West Covina.  And I'm

20   currently unemployed.

21               THE COURT:  Were you working before?

22               THE PROSPECTIVE JUROR:  Yes.  I used to be a

23   supervisor at LAX.  But due to the pandemic, yeah.

24               THE COURT:  I'm with you.  Anyone in the

25   home that works outside the home?

      1                THE PROSPECTIVE JUROR:  Yes.  My sister is a

      2    registered nurse in ICU.

      3                THE COURT:  Anything about this case that

      4    makes you feel you could not be a good juror?

      5                THE PROSPECTIVE JUROR:  Not at the moment, I

      6    don't think so.

      7                THE COURT:  You think you could be fair to

      8    both sides?

      9                THE PROSPECTIVE JUROR:  I believe so.  Yes.

     10                THE COURT:  Now, let me ask you.  Can you

     11    figure out a way to get that microphone down to Juror

     12    No. 9.  Just pass it down.

     13                Okay.  Juror No. 9.  Your name, please.

     14                THE PROSPECTIVE JUROR:  Good morning, Judge.

     15    My name is Dena Zillmer.  I live in Pomona, California.

     16    I am a bookkeeper.  And no one outside the home works.

     17    My husband's retired.  He was a janitorial service

     18    person.

     19                THE COURT:  Okay.  You've been on jury

     20    before, haven't you?

     21                THE PROSPECTIVE JUROR:  I have.

     22                THE COURT:  Because you had all four

     23    questions just nailed.  Didn't give me a chance to ask

     24    you anything.

     25                But I will ask you the same question I asked

 1  everybody else.  Knowing what you don't know about this
 2  case, any reason why you will not be a good juror in a
 3  case like this?
 4            THE PROSPECTIVE JUROR:  I don't believe so.
 5            THE COURT:  Pass to the next juror, please.
 6            THE PROSPECTIVE JUROR:  Hello.  My name is
 7  Fermin Diaz.  I live in Norwalk, California.  And I'm a
 8  machinist.
 9            THE COURT:  Anyone in the home that works
10  outside the home?
11            THE PROSPECTIVE JUROR:  No.
12            THE COURT:  We've asked these other jurors
13  the same question.  Can you limit yourself and just hear
14  this case and tell us what the evidence says without
15  bringing extra stuff into it?
16            THE PROSPECTIVE JUROR:  Yes.
17            THE COURT:  You can give both sides a fair
18  trial?
19            THE PROSPECTIVE JUROR:  Yes.
20            THE COURT:  Thank you very much sir.
21            Next.
22            THE PROSPECTIVE JUROR:  My name is
23  Christine Dyer.  I'm a registered nurse.  I currently
24  work for a university as a nurse instructor.  I live in
25  Agora Hills, California.

```
 1                   THE COURT:  What university?

 2                   THE PROSPECTIVE JUROR:  I work for West

 3    Coast University as a nurse instructor.

 4                   THE COURT:  Okay.  And is there anybody in

 5    the home that works outside the home?

 6                   THE PROSPECTIVE JUROR:  Yes.  My husband

 7    works for State Farm Insurance.  But he's currently

 8    working from home.

 9                   THE COURT:  That's what I meant.

10                   Anything that you can think of that you

11    would not be able to fulfill the duties that we

12    mentioned?

13                   THE PROSPECTIVE JUROR:  No.

14                   THE COURT:  You think you'd be a good juror

15    for both sides?

16                   THE PROSPECTIVE JUROR:  I think so.

17                   THE COURT:  Next juror.

18                   THE PROSPECTIVE JUROR:  Good morning.  My

19    name is Joshua Resendez.  I work in the brush

20    manufacturing.  And I live in east Los Angeles.

21                   THE COURT:  Anyone in the home that works

22    outside the home?

23                   THE PROSPECTIVE JUROR:  No.

24                   THE COURT:  How about you, can you fulfill

25    that two-fold duty, be fair and impartial and just tell
```

```
 1   us what the evidence says, whether you like it or not

 2   and apply the law and give us an objective verdict?

 3              THE PROSPECTIVE JUROR:  Yes.

 4              THE COURT:  Thank you very much.

 5              THE PROSPECTIVE JUROR:  Esmeralda De

 6   Santiago.  I live in El Monte, California.  And I work

 7   in the environmental services.  And my step-dad works in

 8   construction.

 9              THE COURT:  Okay.  Anything about this case

10   that bothers you that you feel you cannot be fair?

11              THE PROSPECTIVE JUROR:  No, I don't think

12   so.

13              THE COURT:  You think you can be fair to

14   both sides?

15              THE PROSPECTIVE JUROR:  Yes.

16              THE COURT:  Next juror.

17              THE PROSPECTIVE JUROR:  Steven Scott from

18   Los Angeles.

19              THE COURT:  Okay.

20              THE PROSPECTIVE JUROR:  Independent audio

21   producer.  My wife is a clinical psychologist.  She

22   works out of the house.

23              THE COURT:  Okay.  Last, but not least.

24              THE PROSPECTIVE JUROR:  I think I can be

25   fair.
```

Case 2:22-cr-00054-DCN-9 Document 9-6 Filed 06/27/22 Entered 06/27/22 Page 264 of 585 Exhibit ID
Case 2:22-cr-00054-DCN-9 Document 9-6 Filed 06/27/22 Page 264 of 585 Exhibit ID
Transcript of Day 1 of Trial   Page 30 of 244                                29

```
 1                  THE COURT:  You see -- and you understand
 2      the twofold duty that we have.  And, again, I'm talking
 3      to everybody.  But you understand the twofold duty we
 4      have and how important it is that we try it just on
 5      that, without other people's experiences and views
 6      coming into it?
 7                  THE PROSPECTIVE JUROR:  Yes.
 8                  THE COURT:  You can do that?
 9                  THE PROSPECTIVE JUROR:  Yes, sir.
10                  THE COURT:  Let me ask some questions as a
11      whole.  And if we talk to individual jurors, we'll be
12      passing the mic around to you.
13                  Because the reporter has to take down
14      everything that's being said by us or by you.
15                  We mentioned earlier anyone that has
16      experience with customs or duties being paid, any
17      knowledge or work history or experience with that?
18                  We had a couple people.  Can you raise your
19      hand, the two of you.
20                  Juror No. 4, first of all.  What is your
21      experience with that?
22                  THE PROSPECTIVE JUROR:  Well, I do the --
23                  THE COURT:  Wait.
24                  THE PROSPECTIVE JUROR:  Well, I'm doing the
25      purchasing for my company as an import company.  So I'm
```

1   responsible of ordering and then make sure that the

2   importation, the paperwork, logistics and everything

3   is -- is the law --

4           THE COURT:  Okay.  And it shows me that you

5   do have experience in that.  It is kind of like when I

6   was trying cases like driving under the influence or

7   something like that, people were driving, you know, they

8   were doing the same thing that we're talking about, but

9   they still could be fair about saying whether or not the

10  law was followed and whether -- what the facts were from

11  the evidence.

12          I understand the experience that you have.

13  Can you see any reason why you cannot just tell us what

14  the evidence says happened here and not bring in outside

15  things we can't cross-examine?

16          THE PROSPECTIVE JUROR:  Well, the thing is

17  I'm not too sure if I can see it as a fact but not like

18  subconsciously mix it with my knowledge or past

19  experience before.

20          THE COURT:  You do understand -- this is to

21  all the jurors.  You understand how important it is that

22  we're not trying the case based on outside experiences

23  that don't come up in front of the Court.

24          How important it is for us just to ask you

25  the question:  What does the evidence show?  And just

```
 1   tell us what the facts are, what the evidence shows.
 2              You understand how important that is?
 3              THE PROSPECTIVE JUROR:  Yes.
 4              THE COURT:  I know that might be difficult
 5   for you, but do you think you can do that?
 6              THE PROSPECTIVE JUROR:  I think so.
 7              THE COURT:  And if you can't, will you raise
 8   your hand and let us know?
 9              THE PROSPECTIVE JUROR:  Yes.
10              THE COURT:  Okay.  Next juror.
11              THE PROSPECTIVE JUROR:  Hello, Judge.
12              THE COURT:  You know I'm going to ask the
13   same questions of you.  Why don't you describe your
14   experience with importations.
15              THE PROSPECTIVE JUROR:  I'm a Customs and
16   Border Protection officer since 1996.  So I have quite a
17   bit of experience dealing with importations and exports.
18              THE COURT:  Okay.
19              THE PROSPECTIVE JUROR:  Please don't tell my
20   boss, but I don't know anything about antidumping
21   duties.  I work predominantly in antiterrorism and
22   narcotics smuggling.
23              THE COURT:  So your experience is not really
24   in the area of paying duties and antidumping duties?
25              THE PROSPECTIVE JUROR:  I'm shamefully
```

```
 1   ignorant of most trade issues at my job.
 2              THE COURT:  Well, everybody promise they
 3   won't tell his boss.
 4              THE PROSPECTIVE JUROR:  Thank you.
 5              THE COURT:  Are you telling me you will be
 6   able to tell us what the evidence says and then apply
 7   the law to it?  And you have no steak in the game?
 8              THE PROSPECTIVE JUROR:  That is correct,
 9   Judge.
10              THE COURT:  Thank you, sir.
11              Anybody -- now, we talked about importation
12   and duties, et cetera.
13              Has anybody in the business of where you are
14   importing things from outside the United States?
15              Is anybody involved in any case or any
16   action where you're being charged with or somebody is
17   saying you owe the federal government money or you
18   don't?
19              THE PROSPECTIVE JURORS:  No.
20              THE COURT:  Even in the area of taxes,
21   anybody have any problems that way?
22              THE PROSPECTIVE JURORS:  No.
23              THE COURT:  Anybody have any experience
24   with -- and I think we already talked about this,
25   involved with cases dealing with trade or imports other
```

```
 1   than just duty?

 2                THE PROSPECTIVE JUROR:  No.

 3                THE COURT:  Okay.  So it is important, and

 4   we want to make sure and talk about the fact that it's

 5   important that you don't bring in outside information

 6   into this case and you try it just on the evidence.

 7                And so it really goes towards if you have

 8   any friends or relatives in any of those occupations

 9   that I mentioned that may have talked to you about their

10   work.  Anybody here?

11                I know you do, sir.  Let me ask you:  Would

12   that affect you one way or the other in this case?

13                THE PROSPECTIVE JUROR:  No, judge.

14                THE COURT:  So it's important that we don't

15   bring and try a case, as I said before, by evidence

16   that's not in Court here.  It's only fair to the parties

17   on it.

18                How many of you have sued or been sued in

19   the last ten years?

20                Any friends or relatives where you were

21   involved in their lawsuit where they've been sued in the

22   last ten years?

23                THE PROSPECTIVE JUROR:  I have.

24                THE COURT:  Number 1.  We'll get the mic

25   down to you.
```

```
 1                    THE PROSPECTIVE JUROR:  I have the process
 2   of suing someone.
 3                    THE COURT:  Okay.  And does that happen to
 4   be a relationship between you and this other person;
 5   like a contract or something?
 6                    THE PROSPECTIVE JUROR:  Kind of.  It was a
 7   contract for machinery.
 8                    THE COURT:  Okay.  I don't want to get too
 9   much in the facts of this case so we don't confuse it
10   with this the case.
11                    But I guess my question is, is there
12   anything about that case that would make you side one
13   way or the other in a case like this?
14                    THE PROSPECTIVE JUROR:  No.
15                    THE COURT:  Let me also indicate to you
16   that -- and Counsel, correct me if I misstate this.  The
17   plaintiff here is an individual corporation that is
18   suing on behalf of the government.  It's called a qui
19   tam matter.  That's why you will hear the name United
20   States versus.  It's because they're suing on behalf of
21   the government.
22                    Does that bother anybody?
23                    THE PROSPECTIVE JURORS:  No.
24                    THE COURT:  And there -- there may be other
25   names with the defendants that you may or may not
```

```
 1   recognize that are not in front of the Court today.

 2             It's just Sigma; is that correct?

 3             MR. CURRAN:  That's correct, Your Honor.

 4             THE COURT:  So you can't get into why

 5   somebody else is not here or anything else.  It's just

 6   two people that -- or two parties that are bringing this

 7   action to you to decide between these two parties.

 8   Okay?

 9             Can you tell me again, there's two of you

10   that have been on jury duty before.  Can you raise your

11   hands again?

12             Okay.  Juror No. 9, first of all, how many

13   cases?

14             THE PROSPECTIVE JUROR:  Three.

15             THE COURT:  Were they criminal or civil?

16             THE PROSPECTIVE JUROR:  Criminal.

17             THE COURT:  In a criminal case, the burden

18   of proof is -- you have to prove -- the government has

19   to prove that the defendant is guilty beyond a

20   reasonable doubt.  Pretty high standard.

21             THE PROSPECTIVE JUROR:  Yes.

22             THE COURT:  This is a civil case.  And the

23   burden of proof will be preponderance of the evidence.

24   You know, one side proves their case by 51 percent.

25   They take all the marbles and go home.
```

Case 2:22-cv-00050-JPM-cgc  Document 19-6  Filed 06/27/22  Entered 06/27/22 11:45:21  Desc Exhibit
Transcript of Day 1 of FCA Trial    Page 37 of 244

36

```
 1                  THE PROSPECTIVE JUROR:  Okay.
 2                  THE COURT:  So it's a different standard.
 3      You won't have any problem following the Court's
 4      instruction at the end of the case about preponderance
 5      of the evidence rather than a reasonable and doubt
 6      standard.
 7                  THE PROSPECTIVE JUROR:  I don't believe so.
 8                  THE COURT:  Were they able to reach a
 9      verdict in those three cases?
10                  THE PROSPECTIVE JUROR:  Yes.
11                  THE COURT:  There is nothing about those
12      cases that you bring into this case?
13                  THE PROSPECTIVE JUROR:  No.
14                  THE COURT:  Okay.  Let's see if we can get
15      it back to Juror No. 4.  Okay.
16                  Can we have how many juries you been on.
17                  THE PROSPECTIVE JUROR:  One.
18                  THE COURT:  Was it criminal or civil?
19                  THE PROSPECTIVE JUROR:  Criminal.
20                  THE COURT:  Same questions to you.
21      Different burden of proof.  That won't confuse you at
22      all, will it?
23                  THE PROSPECTIVE JUROR:  No.
24                  THE COURT:  You understand this one is a
25      civil case, preponderance of the evidence?
```

```
 1                    THE PROSPECTIVE JUROR:  Yes.

 2                    THE COURT:  Were they able to reach a

 3    verdict in your case?

 4                    THE PROSPECTIVE JUROR:  Yeah.

 5                    THE COURT:  Is there anything about that

 6    case you think you would bring into a case like this?

 7                    THE PROSPECTIVE JUROR:  No.

 8                    THE COURT:  Ladies and gentlemen, I'm going

 9    to be talking with the attorneys over here at the side

10    bench pretty soon.  I do want to make sure -- I want to

11    ask it one more time:  The duty is to tell us what the

12    facts are whether we like them or not, just tell us what

13    the evidence is, the facts are, apply the law to it at

14    the end of the case and give us an objective verdict as

15    to whether or not the case has been proven or not.

16                    In light of that, as to all 14 of you, if

17    you are sitting on the defendant's side, would you be

18    satisfied not that you're going to win but that eight

19    people like you would give you a fair trial?

20                    THE PROSPECTIVE JURORS:  Yes.

21                    THE COURT:  If you're the plaintiff, would

22    you be satisfied that eight people like you would give

23    you a fair trial?

24                    THE PROSPECTIVE JURORS:  Yes.

25                    THE COURT:  So you're telling me you're
```

1    perfect jurors.

2              Okay.  I'm going to be over here talking

3    with the attorneys.  Should be no more than two

4    attorneys coming on over.  We're going to be having a

5    bench conference over here, which means we're going to

6    be talking on the side here.

7              Two things I want you to remember about

8    that.  One is, when we're over here talking, we're going

9    to be whispering.  Is anybody going to feel offended

10   about being left out?  We don't particularly want you to

11   hear what's going on.  And you would be bored to death

12   if you heard what we're talking about anyway.

13             Can I have everybody's promise not to try to

14   read lips or eavesdrop or anything like that?

15             THE PROSPECTIVE JURORS:  Yes.

16             THE COURT:  Second thing is, you probably

17   will be happy to know, during the trial I don't have

18   bench conferences.  This is the only time we'll have a

19   bench conference.

20             During the trial we will not interrupt the

21   jury for bench conferences.  I should tell you one more

22   thing before we get there.

23             We run this Court very much on -- it's

24   almost like a clock.  We start every morning -- starting

25   tomorrow, not today, but starting tomorrow, every day we

1    start at 8:30 in the morning and we go until

2    4:00 o'clock in the afternoon.  I will even be more

3    specific than that.  We'll start at 8:30 in the morning

4    and go to 11:30, which is a three-hour block.  And I'll

5    give you a 15-minute intermission there.  From 11:30

6    until 1:00 you'll be on lunch break.  1:00 o'clock until

7    4:00 o'clock we'll be in session, which means three

8    hours, with a 15-minute break there.  We'll be

9    religiously adhering to that.

10              At 4:00 o'clock if the attorneys are halfway

11    through a question, or they say, my witness is going

12    back to New York, it will only take me one minute to

13    finish this, I will say, Too bad.  I promised the jury

14    at 4:00 o'clock you're free to do whatever you have to

15    do, pick up children, whatever it is, you can be

16    guaranteed at 4:00 o'clock we quit.

17              The down side of that is at 8:30 in the

18    morning, we start right at 8:30.  We don't start at

19    8:31.  We don't start at 8:29.

20              That's true all the way through.  So you can

21    program this case as far as time goes.  You will know

22    exactly where you are as far your commitment goes on it.

23    You may say, Well, why at 8:30?  Some courts start at

24    9:00.  They go from 9:00 until 4:30.  I've been told by

25    jurors they would much prefer to get out at 4:00 rather

1    than 4:30 because of traffic.  That's why we go from

2    8:30 until 4:00 o'clock.  You can set your watch on

3    that.  That's exactly how the trial will be proceeding.

4    Okay.

5                Any questions on that?

6                Okay.  Then, Counsel, may I see you at side

7    bench?

8                (SIDEBAR.)

9                First of all, can you hear us?

10                THE REPORTER:  Yes.

11                As you state whatever your position is give

12    your name before so she can hear who's talking okay.

13                Any challenges for cause before we get

14    started?

15                MS. LANE:  Yes.  This is Shannon Lane for

16    defendant Sigma.  We would like to challenge Juror No. 6

17    for cause.

18                THE COURT:  Number 6.  Okay.

19                MS. LANE:  He worked for Customs and Border

20    Protection for 25 years.  We are concerned he may be

21    bias in a case where the accusation is fraud against his

22    employer.

23                Do you want to be heard?

24                MR. KRAMER:  Yes, Your Honor.  This is Kelly

25    Kramer.  And it's Juror No. 6 is pretty clear he could

```
 1   be fair to both sides.  He said no experience whatsoever
 2   with antidumping duties.  And he had no steak in the
 3   game, as I think you put it.
 4             THE COURT:  Do you have any challenges for
 5   cause?
 6             MR. KRAMER:  We do have one which is Juror
 7   No. 4.  Juror No. 4 indicated she --
 8             THE COURT:  Keep your voice down.
 9             MR. KRAMER:  Juror No. 4 indicated that she
10   might have subconscious problems setting aside her own
11   experience with import law and compliance.  She is a
12   purchasing manager and importing products.  She
13   ultimately thought she could be fair.  But I think there
14   was a significant amount of reluctance from both body
15   language and first statement.
16             THE COURT:  Do you have any input on that?
17             MS. LANE:  Juror No. 4 hasn't indicated any
18   experience in the fraud area at all.  Just in imports
19   purchasing.  And she said at the end that she thought
20   she could be fair.
21             THE COURT:  Both those challenges for cause
22   will be denied.
23             You can still use them on peremptory
24   challenges.  They will be denied at this time.
25             Now peremptory challenge, let me go toward
```

 1  the first eight.  Wait until -- exercise 9 through 14.

 2              First peremptory challenge is with the

 3  plaintiff.

 4              MR. KRAMER:  Your Honor, we would excuse

 5  Juror No. 4.

 6              THE COURT:  Okay.  And so No. 9 goes into

 7  that position.

 8              So now the peremptory challenge is with the

 9  defense.

10              MS. LANE:  This is Shannon Lane.  We would

11  excuse Juror No. 6.

12              THE COURT:  Okay.  Okay.  So 6 and 10 goes

13  into that position.  And we are back with the plaintiff.

14  Each one gets four challenges because we are going to

15  pick eight.

16              Also, remember, if you pass you don't lose

17  it unless the other side passes.

18              MR. KRAMER:  Your Honor, we would ask to

19  excuse Juror No. 8.

20              THE COURT:  8?

21              MR. KRAMER:  Yes, please.

22              THE COURT:  I thought you guys were going to

23  go for 7.

24              MR. KRAMER:  The language issues and --

25              THE COURT:  8 will be excused.  And we will

```
 1   put No. 11 in 8's position.
 2               And the peremptory challenge is back with
 3   the defendants.
 4               MS. LANE:  The defendant would like to
 5   excuse the new Juror No. 6, former Juror No. 10.
 6               THE COURT:  Sure.  Sure.
 7               MR. KRAMER:  Sorry.  Juror No. 10?
 8               MS. LANE:  Yes.
 9               THE COURT:  Juror No. 12 will go into Juror
10   6 position.
11               So we are back with the plaintiff.
12               MR. KRAMER:  Yeah, Your Honor.  I think we
13   are going to ask Juror No. 7.
14               THE COURT:  13 will go in that position.
15               And the peremptory challenge is with the
16   defense.
17               MS. LANE:  We would like to excuse Juror No.
18   3.
19               THE COURT:  Juror No. 3.
20               14 will go into 3's position.
21               Each side has one peremptory challenge left.
22               With the plaintiff.
23               MR. KRAMER:  14 is now in 3.
24               THE COURT:  Well, we'll bring in seven --
25               MR. KRAMER:  Thank you, Your Honor.
```

```
 1                THE COURT:  It's always a -- we don't know
 2   who's out there.
 3                MR. KRAMER:  We don't.  Your Honor, we are
 4   going to pass.
 5                THE COURT:  You don't lose it unless they
 6   pass.
 7                MS. LANE:  Okay.  Defense would like to
 8   excuse Juror No. 5.
 9                THE COURT:  Juror No. 5.
10                And when we come back, you will have one
11   left.  Okay.  Okay.
12                THE CLERK:  How many are we going to call?
13                THE COURT:  I think there is only six left.
14                (SIDEBAR CONCLUDED.)
15                THE COURT:  I'm going to ask the following
16   jurors to please stand up when I call your number.
17                Juror No. 4, Juror No. 3.  Juror No. 5,
18   Juror No. 6.  Do we have -- we didn't call 2, right?
19                THE CLERK:  No.
20                THE COURT:  Okay.  Good.  Juror No. 7.
21   That's you.  Juror No. 8.  Juror No. 10.
22                At this time, I'm going to excuse you to go
23   back to the jury room.  Remember the admonishment --
24   well, forget the admonishment.  You're going to be free
25   at this time to go back to the jury room.
```

```
 1                    If you want to come back in and sit in the
 2      trial, see what's going on, that's fine.  You probably
 3      won't.  If you can get out early, you'll get out early.
 4                    But it's been a pleasure having you with us.
 5                    You're excused to go back there at this
 6      time.
 7                    THE CLERK:  The jury room --
 8                    THE COURT:  Hold on.
 9                    THE CLERK:  The jurors can go home since
10      they're excused before noon.  They should contact their
11      employer in case they have to go to work.
12                    THE COURT:  Jurors, you don't have to go
13      back to the jury room.  You can go home.
14                    Juror No. 14, if you could go back to seat
15      No. 3.
16                    Juror No. 9, take seat No. 4, please.
17                    Juror No. 12, if you could take seat No. 6.
18                    We'll leave 5 empty.
19                    Juror No. 13, if you could take seat No. 7.
20                    And Juror No. 11, if you could take seat No.
21      8.  Back here.  8's the last seat here.
22                    Okay.  We're going to call the name of
23      additional jurors.  And if you'd come up, if you could
24      first take seat No. 5, the first person called, fill in
25      the front row 9, through the rest of the front row.
```

```
1                THE CLERK:  Irene Wong, W-o-n-g.  Middle of

2    the back row.

3                For seat No. 9 in the front row, Maximiliano

4    Montes, M-o-n-t-e-s.

5                Lexie Johnson, J-o-h-n-s-o-n.

6                Richard Herr, H-e-r-r.

7                Isaiah.  Last name spelled Espiritu,

8    E-s-p-i-r-i-t-u.

9                And Gloria Herrera, H-e-r-r-e-r-a.

10               THE COURT:  Okay.  I'm going to be directing

11   my question just to the six new jurors that have sat

12   down here.

13               Have the six of you been listening carefully

14   to the questions I asked?  I've got to get a response.

15               THE PROSPECTIVE JURORS:  Yes.

16               THE COURT:  Okay.  I don't want to waste

17   time going individually.

18               Is there any one of you who thinks there's

19   anything you should call to our attention as far as your

20   ability to hear this case?

21               THE PROSPECTIVE JURORS:  No.

22               THE COURT:  Let me start with Juror No. 5.

23   Can we have your name, please.

24               THE PROSPECTIVE JUROR:  Irene Wong.

25               THE COURT:  And the city you live in?
```

```
 1                    THE PROSPECTIVE JUROR:  Diamond Bar.

 2                    THE COURT:  And your occupation.

 3                    THE PROSPECTIVE JUROR:  Accounting

 4      department.

 5                    THE COURT:  And anyone in the home that

 6      works outside the home?

 7                    THE PROSPECTIVE JUROR:  My husband is a

 8      financial analyst.

 9                    THE COURT:  You've heard all the questions

10      we've asked.  I don't want to get redundant on it.

11                    But is there anything that you've heard that

12      would make you think you could not be a good juror in a

13      case like this?

14                    THE PROSPECTIVE JUROR:  Honestly, because

15      I'm doing -- the company that I work for, they are doing

16      imports.  So most of the stuff we do, we just follow all

17      the custom border like the ruling and everything so not

18      sure whether there is a --

19                    THE COURT:  So do you get into -- yourself,

20      in your work, do you get into what is part of the duties

21      or what's not?

22                    THE PROSPECTIVE JUROR:  No.  We just called

23      and they tell us what to pay and then we just pay.

24                    THE COURT:  You don't get into saying what's

25      coming in or what's not or whether or not it's subject
```

1    to duties or not?

2                  THE PROSPECTIVE JUROR:  No.

3                  THE COURT:  So that's really the area that

4    we are addressing.  Not the area you were talking about.

5                  Can you see of any reason why you could not

6    be fair to both sides in a case like this?

7                  THE PROSPECTIVE JUROR:  We always follow the

8    custom and we don't dispute, so I don't know.

9                  THE COURT:  One's saying they didn't follow

10   the customs procedures, the other one's saying, I did.

11   It's a dispute whether they did or didn't.  That is

12   going to depend on whatever the evidence is that comes

13   into Court.  It's like -- you know, I can remember when

14   I was -- I hate telling war stories, but I can remember

15   when I was trying drunk driving cases.  I'd have people

16   say, Well, I can't be fair because I don't like drunk

17   drivers.  I'd say, Well, duh.  I mean, that is -- it's

18   not whether or not you like drunk drivers or not, it's

19   whether or not you can be fair in saying whether the

20   evidence says there was a violation or not.  That's what

21   we are talking about.

22                  So in this case -- I guess that's my

23   question:  Can you be fair in telling us, does the

24   evidence say there's a violation or not?

25                  THE PROSPECTIVE JUROR:  I don't know.

 1                    THE COURT:  Okay.  Well, you do understand

 2    how important that is?  I mean, one side's saying yes;

 3    one side's saying no.  They got to bring it to you, they

 4    got to present the evidence, and you tell us whether the

 5    evidence says yes or no.  That's what we are talking

 6    about.

 7                    THE PROSPECTIVE JUROR:  Okay.  Yes.

 8                    THE COURT:  Let me go to Juror No. 9.

 9                    Can we have your name, please.

10                    THE PROSPECTIVE JUROR:  It's Maximiliano

11    Montes.

12                    THE COURT:  What area do you live in?

13                    THE PROSPECTIVE JUROR:  I live in Gardena.

14                    THE COURT:  And what's your occupation?

15                    THE PROSPECTIVE JUROR:  Well, recently

16    retired.  But I was a utility worker.  I worked as a ETR

17    for SoCalGas.

18                    THE COURT:  Is there anyone in the home that

19    works outside the home?

20                    THE PROSPECTIVE JUROR:  No.  My wife is

21    retired now.

22                    THE COURT:  How about you, anything we

23    talked about that you should call to our attention why

24    you would not be a good juror?

25                    THE PROSPECTIVE JUROR:  No.

```
 1                   THE COURT:  Fair to both sides?

 2                   THE PROSPECTIVE JUROR:  Yes.

 3                   THE COURT:  Number 10.

 4                   THE PROSPECTIVE JUROR:  Lexie Johnson.  I

 5       live in Woodland Hills.  I work for Cedar Sinai as a

 6       coder specialist.

 7                   THE COURT:  Anyone in the home work outside

 8       the home?

 9                   THE PROSPECTIVE JUROR:  No.

10                   THE COURT:  Same question to you.  I hate to

11       get boring on this.  Can you be fair and just tell us

12       what the evidence says whether you like it or not?

13                   THE PROSPECTIVE JUROR:  Yes.

14                   THE COURT:  Which means you can be fair to

15       both sides?

16                   THE PROSPECTIVE JUROR:  Yes.

17                   THE COURT:  Next juror.

18                   THE PROSPECTIVE JUROR:  My name is Richard

19       Herr.  Pasadena, California.  I was a certified public

20       accountant.  I'm currently retired.

21                   THE COURT:  Okay.  Anybody in --

22                   THE PROSPECTIVE JUROR:  No.

23                   THE COURT:  Just taking account here, you're

24       right to the point.

25                   THE PROSPECTIVE JUROR:  You can move on.
```

```
 1                  THE COURT:  Anything you can think of as to

 2      why you'd not be fair to both sides?

 3                  THE PROSPECTIVE JUROR:  No.  I just want to

 4      make it clear that in my audit days, I have done audits

 5      of import, exports.  Looking at title transfers, you

 6      know, currency and, you know, chasing who owns what at

 7      what time.  So I have had -- obviously it's been a

 8      number of years I'm retired.  But I have had some

 9      experience in that particular area.

10                  THE COURT:  And two things.  Number one is

11      that -- can you still be fair telling us what the facts

12      are in this case?  We don't care about --

13                  THE PROSPECTIVE JUROR:  Yeah, I understand.

14      I just wanted to make sure I --

15                  THE COURT:  I understand that.

16                  THE PROSPECTIVE JUROR:  I will try my best.

17                  THE COURT:  If you couldn't, you would raise

18      your hand and let us know?

19                  THE PROSPECTIVE JUROR:  Yes, okay.

20                  THE COURT:  There was another question I was

21      going to ask you.

22                  Oh, the other one is self-obvious.  You

23      understand how important it is we try this case on just

24      the evidence here.  We don't want a jury going back in

25      there and saying, Hey, it was never mentioned in the
```

```
 1   trial, but let me tell you what really happens in the

 2   real world.  You would avoid that?

 3               THE PROSPECTIVE JUROR:  Yeah.

 4               THE COURT:  Okay.

 5               THE PROSPECTIVE JUROR:  Try to.

 6               THE COURT:  Next juror.

 7               THE PROSPECTIVE JUROR:  My name is Isaiah

 8   Espiritu.  I'm a registered nurse.  I live in

 9   Long Beach.  My wife is a caregiver.

10               THE COURT:  How about you, what is it about

11   you that might cause you not to be a good juror?

12               THE PROSPECTIVE JUROR:  I don't believe

13   there's anything that would cause me not to be a good

14   juror.

15               THE COURT:  I should have asked it the other

16   way around:  Could you be a good juror for both sides?

17               THE PROSPECTIVE JUROR:  I believe I can.

18               THE COURT:  Thank you very much.

19               Next juror.

20               THE PROSPECTIVE JUROR:  Gloria Herrera.

21               THE COURT:  And the city do you live in?

22               THE.

23               THE PROSPECTIVE JUROR:  South Los Angeles.

24               THE COURT:  Los Angeles?

25               THE PROSPECTIVE JUROR:  Yes.
```

```
 1                   THE COURT:  What is your employment?
 2                   THE PROSPECTIVE JUROR:  I'm unemployed right
 3   now.
 4                   THE COURT:  I'm sorry.
 5                   THE PROSPECTIVE JUROR:  I'm unemployed right
 6   now.
 7                   THE COURT:  Have you been employed before?
 8                   THE PROSPECTIVE JUROR:  No.
 9                   THE COURT:  And is there anyone in the home
10   that works outside the home?
11                   THE PROSPECTIVE JUROR:  Yes.  My sister.
12                   THE COURT:  What type of work does she do?
13                   THE PROSPECTIVE JUROR:  Works with children.
14                   THE COURT:  Is there anything you can think
15   of as to why -- something you might bring into this
16   trial?
17                   THE PROSPECTIVE JUROR:  (No response.)
18                   THE COURT:  In other words, do you have any
19   experience in any of these areas, importation or
20   anything like that?
21                   THE PROSPECTIVE JUROR:  No.
22                   THE COURT:  And can you think of -- can you
23   tell us any reason why you would not be a good juror?
24                   THE PROSPECTIVE JUROR:  No.
25                   THE COURT:  Sorry.  Didn't hear.  Again, do
```

```
 1   you understand the question?
 2              THE PROSPECTIVE JUROR:  Yeah.
 3              THE COURT:  Is there any reason why you
 4   would not be a good juror that you can think of?
 5              THE PROSPECTIVE JUROR:  No.
 6              THE COURT:  No?  Is that -- you're shaking
 7   your head no.  I can't hear you.
 8              Do you want me to ask the question again?
 9   Did you understand the question that I asked?
10              THE PROSPECTIVE JUROR:  Yes.
11              THE COURT:  What did I ask?
12              THE PROSPECTIVE JUROR:  (No response.)
13              THE COURT:  Okay.  Let's go on.
14              General questions.  I've already asked --
15   you already know where I'm going.  Has anybody had any
16   experience in the area of importations, duties that
17   hadn't been paid, along those lines?
18              THE PROSPECTIVE JUROR:  No.
19              THE COURT:  I know as an accountant you have
20   had some experience on that.  But that was an accounting
21   viewpoint; is that correct?
22              THE PROSPECTIVE JUROR:  To produce an audit.
23              THE COURT:  Is there anybody in -- I've
24   asked these general questions.  So anybody has any close
25   friend or relatives or anybody that's in the area that
```

1    we were talking about as far as importation goes, of the

2    six of you?

3              THE PROSPECTIVE JURORS:  No.

4              THE COURT:  Anybody that has a lawsuit going

5    or is involved with a lawsuit or the government feels

6    that you owe them money and you haven't paid them yet?

7              THE PROSPECTIVE JUROR:  No.

8              THE COURT:  Anybody had active civil case in

9    the last ten years where you were sued or been sued?

10             THE PROSPECTIVE JUROR:  No.

11             THE COURT:  How many of the six of you have

12   sat on juries before?

13             Juror Number 9.  Let's get the microphone

14   down here.  Let's go to Number 9 first.  We have to do

15   it in order.

16             How many have you been on?

17             THE PROSPECTIVE JUROR:  I've lost count.

18   About five.  Four -- five over the last 30 years.

19             THE COURT:  We have a professional juror

20   here.

21             Was it all criminal or civil or what?

22             THE JUROR:  Five criminal, one civil.

23             THE COURT:  You understand the difference

24   between the burden of proof?  You have no problem with

25   that?

```
 1                    THE PROSPECTIVE JUROR:  Yes, I do.

 2                    THE COURT:  Nothing about those cases you

 3   bring into this case?

 4                    THE PROSPECTIVE JUROR:  No.

 5                    THE COURT:  Next juror that's had jury duty.

 6                    THE PROSPECTIVE JUROR:  Just one.  They

 7   settled before we got started.

 8                    THE COURT:  Do you know if it was criminal,

 9   civil?

10                    THE PROSPECTIVE JUROR:  Civil.

11                    THE COURT:  Okay.  But you weren't asked to

12   decide the case?

13                    THE PROSPECTIVE JUROR:  No.  They --

14                    THE COURT:  Nothing about that case that

15   relates to this case?

16                    THE PROSPECTIVE JUROR:  No.

17                    THE COURT:  Next juror.

18                    THE PROSPECTIVE JUROR:  I've been at Clara

19   Shortridge about three times; Stanley Moss, a couple;

20   Glendale, once; Pasadena, once; and El Monte, once.

21                    THE COURT:  You got competition.

22                    The ones obviously at Clara Shortridge were

23   criminal cases.  The other ones were civil, I'm

24   assuming.

25                    You have no problem making the distinction
```

```
 1    between criminal and civil cases -- the burden of proof?
 2    You understand --
 3                THE PROSPECTIVE JUROR:  Yes.
 4                THE COURT:  You understand that?
 5                Okay.
 6                And nothing about those cases you've been on
 7    were similar to this case?
 8                THE PROSPECTIVE JUROR:  Yes.
 9                THE COURT:  Anybody else have jury duty?
10                THE PROSPECTIVE JUROR:  Hello, Your Honor.
11    I've been on one criminal case.
12                THE COURT:  And you realize this one is
13    civil, different burden of proof?
14                THE PROSPECTIVE JUROR:  Correct.
15                THE COURT:  Anything about that case that
16    relates to this case?
17                THE PROSPECTIVE JUROR:  No.
18                THE COURT:  And you feel you could be fair
19    and impartial in this case?
20                THE PROSPECTIVE JUROR:  That's correct.
21                THE COURT:  As to all of you, the six new
22    jurors, do you feel you could be fair and impartial to
23    both sides; give the defendant a fair trial and the
24    plaintiff a fair trial?
25                THE PROSPECTIVE JURORS:  Yes.
```

```
 1                 THE COURT:  Okay.  Counsel, let me see you

 2  over at the side bench.

 3                 Yes.

 4                 THE PROSPECTIVE JUROR:  Is this on?

 5                 THE COURT:  Just keep your voice up.

 6                 THE PROSPECTIVE JUROR:  There it is.  I was

 7  involved in a Lemon law case --

 8                 THE COURT:  Okay.

 9                 THE PROSPECTIVE JUROR:  -- about five years

10  ago.

11                 THE COURT:  That's what I want to know.  It

12  doesn't seem like that would have anything to do with a

13  case like this.

14                 THE PROSPECTIVE JUROR:  No, sir.  I just

15  wanted to say that.

16                 THE COURT:  And any experiences you had in

17  that case you would leave out in this case?

18                 THE PROSPECTIVE JUROR:  Yes, sir.

19                 THE COURT:  Sounds to me not similar at all.

20                 THE PROSPECTIVE JUROR:  No.

21                 THE COURT:  Thank you.

22                 (SIDEBAR.)

23                 THE COURT:  Okay.  Challenges for cause.

24                 MR. KRAMER:  Yes.  This is Kelly Kramer.

25  Challenge Juror No. 5 for cause.  She indicated that she
```

```
 1   was experienced in importation.  She did not know if she

 2   could be fair.  And that ultimately acknowledged it was

 3   possible, but I think there is substantial hesitation.

 4                THE COURT:  She hindered quite a bit.

 5                MS. LANE:  I think she's has a better

 6   understanding about rules about bias and everything to

 7   her sounded much more confident.

 8                THE COURT:  Anybody else for cause?

 9                MS. LANE:  We would challenge Juror No. 14,

10   the last one.

11                THE COURT:  13?

12                Any comment on that?

13                MR. KRAMER:  I don't have anything to say.

14                THE COURT:  Okay.  I am convinced that both

15   of those are a problem.  So they both will be excused.

16                The Juror No. 9 will go into 5.

17                And we have one peremptory challenge left,

18   and that's with the government -- not government.

19   Sorry.

20                MR. KRAMER:  Pseudo government.

21                Your Honor, we would ask to strike Juror No.

22   9.

23                THE COURT:  Okay.

24                MR. KRAMER:  I think we are out.  That's it.

25   We have --
```

```
 1                  THE COURT:  We have a jury.  Let me tell you
 2     what we'll do on this.  I don't know if you're
 3     comfortable or not to go into opening statement before
 4     lunch.  We'll break in about 45 minutes.
 5                  Maybe we take a short break now, give
 6     preinstructions, and have the lunch hour to think about
 7     your opening statement.  Okay?
 8                  MR. KRAMER:  Okay.  Sounds good.
 9                  (SIDEBAR CONCLUDED.)
10                  THE COURT:  Okay.  The following jurors can
11     stand up, please.
12                  Juror No. 5, Juror No. 9, and Juror No. 13.
13     Let me see what we have here.  Okay.  You're excused at
14     this time.  Thank you very much for being with us.
15                  Juror No. 10, I will have you see if you can
16     get back to seat No. 5 back there.  The best way is to
17     come all the way out.  Otherwise, somebody is going to
18     fall and we're going to have a lawsuit on our hands.
19                  Okay.  I'm going to have the eight jurors in
20     the back rows please stand up.  And if you could be
21     sworn in at this time as the jury.
22                  THE CLERK:  Okay.  Please raise your right
23     hand.
24                  Ladies and gentlemen of the jury, do you
25     solemnly swear that you will well and truly try the
```

```
 1   cause now before the Court and a true verdict therein
 2   render, according to the evidence and the instructions
 3   of this Court so help you God?
 4               THE JUROR:  I do.
 5               THE COURT:  Thank you.
 6               The eight of you feel comfortable -- you can
 7   have seats.
 8               The eight of you feel comfortable trying
 9   this case?  Is that correct?  Anybody not?
10               Juror No. 11 and Juror No. 12, I'm going to
11   excuse you to go -- well not to go back to the jury
12   room.  Excuse you to get lunch or whatever you want to
13   do.  You're excused at this time.  Thank you very much.
14               Okay.  Ladies and gentlemen, you're now the
15   jury in this case.
16               I'm going to be instructing you.  It's
17   called preinstructions.  It's instructions I'm going to
18   give to you so you can understand what's happening as
19   the evidence comes in and what your conduct should be.
20               And then we'll get into the opening
21   statements, et cetera.
22               But I'm not going to do that now because
23   we've been here for a while.  So I give you a ten-minute
24   break -- 15-minute break.
25               When you come back in, I'll preinstruct you
```

1   on -- and then we will cut you loose for lunch.  And

2   then we'll come back in about 1:00 o'clock.

3                Remember the admonishment -- well, I didn't

4   give you the admonishment yet.  I will be instructing

5   you every time you break that you not discuss this case

6   among yourselves or with anybody else or form or express

7   any opinions about the matter until it's submitted to

8   you and retire to the jury room.

9                You may say, what do you mean, don't form or

10  express any opinions about the matter?  I'm the juror in

11  this case.  It's kind of technical, but we have to

12  understand what a jury is all about.

13               The jury is where eight people will listen

14  to the evidence, do not form an opinion.  You go back to

15  the jury room, you listen to all the input of the other

16  jurors before you form an opinion.  That's when you form

17  your opinion, after you've heard everybody else in the

18  jury speak.

19               Otherwise, you may form an opinion at this

20  time, and because you formed it, you're not going to

21  change that opinion no matter what, not even if they

22  convince you you're wrong or not.  So that's why we ask

23  you not to form or express any opinions about the matter

24  until it's submitted to you and you retire to the jury

25  room for your deliberation.

```
 1              Second thing is, during the course of the
 2    trial, all parties are ordered that they're not to have
 3    any contact with the members of the jury at all.  And
 4    vice versa also, you're not to have any contact with
 5    them.  If somebody comes up and says "Good morning" to
 6    you, you're going to have to ignore them.  I know it's
 7    impolite, but you're going to have to ignore them.
 8    Because if one side sees somebody else talking to a
 9    juror, they don't know what you're talking about.  It's
10    just not a good position to put people in.
11              During the course of the jury, you're not to
12    talk to anybody about this case or let anybody talk to
13    you about the case.
14              If somebody approaches you and wants to talk
15    to you about it, let the Court know right away.
16              Okay.  If no questions, we're going to
17    excuse you for about 15 minutes.  Then we'll come back
18    in go to the preinstructions.
19              (BREAK TAKEN.)
20              THE CLERK:  You may be seated.
21              THE COURT:  Okay.  I'm going to go through
22    the preinstructions.  It won't take very long at all.
23    Then we're excused for lunch.  And we'll come back and
24    go into opening statements.
25              Members of the Jury, you are now the jury in
```

```
 1    this case.  It is my duty to instruct you on the law

 2    that applies.  It is your duty to find, as we said

 3    before, the facts from all evidence in this case.

 4              To those facts you will apply the law as I

 5    give it to you.  You must follow the law as I give it to

 6    you, whether you agree with it or not.

 7              You must not be influenced by any personal

 8    likes or dislikes, opinions, prejudices or sympathy.

 9    This means that you must decide this case solely on the

10    evidence before you.  You will recall that you just took

11    an oath to do so.

12              At the end of the trial, I will give you

13    final instructions.  It is those final instructions that

14    with govern your deliberations.

15              Please do not read into these instructions

16    or anything that I may say or do that I have an opinion

17    regarding the evidence or what your verdict should be.

18              A party has a burden of proving any claim or

19    affirmative defense by a preponderance of the evidence.

20    It means that you must be persuaded by the evidence that

21    the claim or the affirmative defense is more probably

22    true than not true.  You should base your decision on

23    all the evidence regardless of which party presents it.

24              The evidence you are to consider in deciding

25    the facts consists of, as I said before, the sworn
```

 1    testimony of witnesses; exhibits that are admitted and

 2    received into evidence; and any fact to which both sides

 3    have agreed.

 4              In reaching your verdict you may consider

 5    only the testimony and exhibits received into evidence.

 6    Certain things are not evidence and may not be

 7    considered -- and you may not consider them in deciding

 8    what the facts are.  And I'll list some of them for you:

 9    Arguments or statements of the attorneys are not

10    evidence.  The lawyers are not witnesses.  What they may

11    say in their opening statements or closing arguments or

12    at other times is intended to help you interpret the

13    evidence, but it is not evidence.

14              If the facts as you remember them differ

15    from the way attorneys have stated them, it is your

16    memory that controls.

17              Questions or objections by the lawyers are

18    not evidence.  Attornies have a duty to their client to

19    object when they believe that a question is improper

20    under the rules of evidence.

21              You must not be influenced by the objection

22    or the Court's ruling on the objection.

23              Testimony that's excluded or stricken or

24    that you have been instructed to disregard is not

25    evidence and must not be considered by you.

1              In addition, sometimes evidence may be

2    received for a limited purpose.  When I instruct you to

3    consider certain evidence only for a limited purpose,

4    you must do so and may not consider that evidence for

5    any other purpose.

6              Anything you may see or hear when Court is

7    not in session is not evidence.

8              You are to decide this case solely on the

9    evidence received in this trial.

10             Evidence may be either direct or

11   circumstantial.  Direct evidence is direct proof of a

12   fact, such as the testimony by a witness about what that

13   witness personally saw or heard or did.

14             Circumstantial evidence is proof of one or

15   more facts from which you can find another fact.

16             You should consider both kinds of evidence.

17   The law makes to distinction between the weight to be

18   given to either direct or circumstantial evidence.  It

19   is for you to decide how much weight is to be given to

20   any evidence.

21             There are rules of evidence that control

22   what can be received into evidence.  When a lawyer asks

23   a question or offers an exhibit into evidence, and the

24   lawyer on the other side thinks it is not permitted by

25   the rules of evidence, that lawyer may object.  If I

 1    overrule the objection, the question may be answered or

 2    the exhibit received.  If I sustain the objection, the

 3    question cannot be answered, and the exhibit cannot be

 4    received.

 5              Whenever I sustain an objection to a

 6    question, you must ignore that question and must not

 7    guess as to what the answer might have been.

 8              Sometimes I may order that evidence be

 9    stricken from the record or that you disregard that

10    evidence.  That means in deciding this case, you must

11    not consider anything that I ordered you to strike or

12    disregard.

13              In deciding the facts of this case, you may

14    have to decide which testimony to believe and which

15    testimony not to believe.  You may believe everything

16    that a witness says or part of it or none of it.  In

17    considering the testimony of a witness, you may take

18    into account the opportunity and the ability of the

19    witness to see or hear or know the things testified to,

20    the witness' memory, the witness' manner while

21    testifying, the witness' interest in the outcome of the

22    case, if any.  The witness' bias or prejudice, if any.

23              Whether other evidence contradicts that

24    witness' testimony, the reasonableness of the witness'

25    testimony in light of all the other evidence or any

1   other fact that bears on believability.  The weight of

2   the evidence as to any fact does not necessarily depend

3   on the number of witnesses who have testified.

4             What is important is how believable the

5   witnesses were, and how much weight you think the

6   testimony deserves.

7             Let me say a few words about the conduct.  I

8   mentioned this a little bit earlier today.  First, you

9   must keep an open mind through the trial.  Do not decide

10  what the verdict should be until you and your fellow

11  jurors have completed your deliberations at the end of

12  the case.

13            Second, you must decide this case only on

14  the evidence received in this case and on the

15  instructions of the law that applies.  You must not be

16  exposed to any other information about the case or the

17  issues it involves during the course of your jury duty.

18            Thus, until the end of the case, I will

19  instruct you:  Do not communicate with anyone in any

20  manner or in any way.  Do not let anybody communicate

21  with you in any way about the merits of this case or

22  anything to do with it.

23            This includes discussing the case in person

24  and in writing, by phone, by electronic means, via

25  email, text messaging or Internet chatrooms or blogs,

 1    websites or other social media.

 2              It applies to communicating with your fellow

 3    jurors until I have given you the case for your

 4    deliberation.  And it implies to communicating with

 5    everyone else, including you family members or your

 6    employer and the people involved in this trial.

 7              Although you may notify your family and

 8    employer that you have been seated on a case and how

 9    long that will take, but it is -- if anybody asks you or

10    approaches you in any way about your jury service or

11    anything to do with this case, you must respond that you

12    have been ordered not to discuss this matter and report

13    it to the Court immediately.

14              Because you will receive all the evidence

15    and legal instructions, you properly may consider to

16    return a verdict.  Do not do any research, such as

17    consulting dictionaries, searching the Internet or using

18    other reference material.  And do not make any

19    investigations or in any other way try to learn about

20    the facts of the case, other than here in Court.

21              The law requires these restrictions to

22    ensure the parties have a fair trial based on the same

23    evidence.  And each party has the opportunity to

24    address.

25              A jury who violates these restrictions

1   jeopardizes the fairness of the proceedings and a

2   mistrial can result which would require the entire

3   process to start over again.

4           If any juror is exposed to any outside

5   information, please let the Court know immediately.

6           I urge you to pay close attention to the

7   testimony as it is given during your deliberations.  You

8   will not have a transcript of the testimony.  If you

9   wish to take notes, you may do that.  If you do take

10  notes, keep them to yourselves, and do not be overly

11  influenced by your notes.  Don't let them distract you

12  from hearing what's going on as far as evidence is

13  concerned.  Notes are only a way to help you remember

14  things.  It is your memory that controls, not notes.  So

15  your notes or the notes of others should not be given

16  undue -- should not be given a lot influence insofar as

17  it's your memory that controls.  But if you take notes,

18  you can leave them here in the courtroom, and nobody

19  will see those notes.  We will keep them confidential.

20          Now, the trial proceeds in the following way

21  as soon as we get back from lunch.  First, each side may

22  make an opening statement.  And I've talked to the

23  attorneys and it will be up to 20 minutes on opening

24  statements.

25          Any opening statement is not evidence.  It

1  is simply an outline to help you decide what the parties

2  expect the evidence will show.  A party is not required

3  to make an opening statement.

4         The plaintiff after opening statement will

5  then present evidence.  And counsel for the defendant

6  may cross-examine.  Then the defendant may present

7  evidence and counsel for the plaintiff may

8  cross-examine.

9         After the evidence has been presented, I

10  will instruct you on the law that applies to this case,

11  after the attorneys make their closing arguments.  After

12  that, you will go back to the jury room to deliberate

13  and to arrive at your verdict.

14         Any questions we have before I excuse you

15  for lunch?  If not, we'll see you back in at

16  1:00 o'clock.

17         And remember the admonishment not to discuss

18  the case among yourself or with anybody else or form or

19  express any opinions about the matter until it is

20  submitted to you and you retire to the jury.

21         If you leave quietly, I've got to talk to

22  the attorneys a little bit.

23              (OUTSIDE THE PRESENCE OF THE JURY.)

24              THE COURT:  Okay.  The record will reflect

25  that all the jurors have left the courtroom.  You may

     1    have seats.

     2              Counsel, somebody wanted to talk to the

     3    Court?

     4              MR. HENDY:  Yes, Your Honor.  Mitchell Hendy

     5    on behalf of Island.  There are two matters that we have

     6    not been able to reach agreement with opposing counsel.

     7    We would like to raise that before opening statements.

     8              First, at the final pretrial conference,

     9    there was some discussion about exclusion of witnesses.

    10    And there's been a disagreement between the parties as

    11    to whether Island's expert witness, Kelli Thompson,

    12    should be excluded from the trial.  And we would request

    13    that --

    14              THE COURT:  Counsel, the ruling of the Court

    15    on these matters is always the same.  If there's a

    16    motion to exclude witnesses, it will be granted.

    17              MR. CURRAN:  Your Honor, on behalf of the

    18    defense, we move under Federal Rule of Evidence.

    19              THE COURT:  That will be granted.  Your

    20    witnesses will remain outside.

    21              I know some courts will allow experts in to

    22    hear other testimony.  We don't do that here.

    23              MR. HENDY:  Briefly.  Under Rule 615, I

    24    believe an expert could be an essential witness.

    25              THE COURT:  Could be.

1                     Next question that you have.

2                     MR. HENDY:  The second issue is there's been

3       a dispute between the parties as to Island's summary

4       exhibit, which is a summary of all the form 7501s and

5       entry packets that Sigma enforce contain.

6                     We prepare a summary exhibit using Sigma's

7       own documents.  And Sigma has objected that the exhibit

8       is inaccurate without elaborating.  We tried multiple

9       times to meet and confer over that to no avail.  We have

10      gotten no elaboration.

11                     We have an associate who's prepared to take

12      the stand and testify as to how that exhibit was

13      created.  We just feel like that might not be the best

14      use of the Court's or jury's time.

15                     THE COURT:  Probably wouldn't be.  If you

16      guys can agree on something, that's fine.  If you can't

17      agree on it, then you'll have to prove it up.

18                     But I would -- again, I would suggest to you

19      the more you can agree on things like that, particularly

20      something like that, the better it is.

21                     MR. CURRAN:  We do not agree.  We would like

22      the witness' to lay the foundation.

23                     But I have said to Mr. Kramer he may use

24      that document in his opening with the good faith belief

25      that it will be admitted later in the case.

Case 2:22-cv-00050-TOR   ECF No. 9-6   filed 06/27/22   PageID.252   Page 254 of 587   Exhibit
Transcript of Day 1 of FCA Trial    Page 75 of 244

74

```
 1                    THE COURT:  Okay.  Okay.  Thank you very
 2      much, Counsel.
 3                    Have a pleasant lunch.  We'll see you back
 4      in at 1:00 o'clock.
 5                    (LUNCH BREAK.)
 6                    THE COURT:  Okay.  The record will reflect
 7      that all the jurors are in their respective seats in the
 8      jury box.
 9                    Ladies and gentlemen, we're now at the
10      opening statement.  As I told you before, opening
11      statement is not evidence.  It's just where they think
12      the evidence is going to take you.
13                    Both sides will have the opportunity to make
14      an opening statement to you.
15                    Counsel, you ready to go?
16                    MR. KRAMER:  Yes, Your Honor.
17                    THE COURT:  Okay.  Go ahead.
18                    MR. KRAMER:  We need to turn the computer
19      on.
20                    THE COURT:  Okay.
21                    MR. KRAMER:  Your Honor, may I remove my
22      mask?
23                    THE COURT:  As long as you are behind the
24      plexiglass.
25                    MR. KRAMER:  I will stay behind the
```

1    Plexiglass.

2              May I proceed?

3              THE COURT:  Yes.  Please.

4              MR. KRAMER:  This case is about antidumping

5    duties.  There's a special kind of tax or tariff that

6    the United States Government imposes when it finds that

7    foreign producers are selling goods in the United States

8    at less than fair value.  The purpose of an antidumping

9    duty is to combat unfair foreign trade practices.  The

10   idea is to level the competitive playing field.

11             But antidumping duties only work if

12   importers respect them and pay them when they're due.

13             The defendant in this case, the Sigma

14   Corporation, imported millions of dollars of steel pipe

15   fittings from China.

16             Each and every time that they imported these

17   products, they told Customs and Border Protection that

18   they were reporting steel couplings, and that no

19   antidumping duty applied.

20             The evidence will show that both of those

21   statements were false.

22             Sigma wasn't importing steel couplings.  It

23   was importing a different product called a welded

24   outlet.  And antidumping duties apply to each and every

25   one of those shipments.

 1              And in this trial, you will learn that

 2      between 2010 and 2018, Sigma's false statements cost the

 3      government, our government, more than $8 million in

 4      antidumping duties that were due but never paid.

 5              And you will learn that Sigma's false

 6      statement hurt domestic manufacturers who were forced to

 7      compete with unlawfully dumped Chinese steel products

 8      for nearly a decade.

 9              Ladies and gentlemen, my name is Kelly

10      Kramer.  And with my colleague, Mitchell Hendy, it is

11      our honor to represent one of those domestic

12      manufactures, a company called Island Industries.

13              Now, in this trial, you are going to learn

14      that a federal law called the False Claims Act

15      authorizes companies like Island to bring suit in

16      Federal Court against companies like Sigma upon

17      discovering that companies like Sigma haven't been

18      paying the antidumping duties.

19              A company who brings a case like that is

20      called a relater.  And that's what Island is here.

21              Congress encourages relaters to come forward

22      with cases like this because they help to protect the

23      Treasury.

24              And one of the ways that Congress does that

25      is by authorizing the relater to receive a portion of

Case 2:22-cv-00050-RJS-DBP Document 196-6 Filed 06/27/22 Entered 06/27/22 17:24:54 Desc Exhibit
Case 2:20-cv-00050-JCM-VCF Document 221 Filed 10/12/22 Page 255 of 585 PageID
Transcript of Day 1 of RCA Trial    Page 78 of 244                    77

 1   the Government's recovery in cases like the one that

 2   you'll be deciding in this trial.

 3              What that means is that Island has a stake

 4   in the outcome of this case.  And I wanted you to know

 5   that from the get-go.

 6              Now, the purpose -- the purpose of an

 7   opening statement like this is to give you a preview of

 8   the evidence.

 9              The judge used a jigsaw analogy already.

10   But it is kind of like showing you a picture of a

11   completed jigsaw puzzle before you are asked to put the

12   pieces together.  So let me tell you what I think the

13   evidence is going to show.

14              As I mentioned, my client is Island

15   Industries.  Island is a small business based in

16   Memphis, Tennessee.  It manufactures pipe fittings here

17   in the United States.  Its most important product you

18   will learn is called a welded outlet.  There's a picture

19   of it there on the screen.

20              You'll learn that a welded outlet is a --

21   sort of a special kind of pipe fitting.  It has this

22   curvy very edge which is beveled.  And it's designed to

23   be permanently welded to the side of a pipe.

24              You will find these welded outlets in fire

25   protection systems, sprinkler systems, all the round the

1   country.  There's probably welded outlets in this

2   courthouse.

3           The defendant in this case is the Sigma

4   Corporation.  Like Island, it distributes pipe fittings

5   and it sells welded outlets.  That's where the

6   similarities end.

7           In this trial you will learn that Sigma,

8   while it's not so much a domestic producer, it imports

9   most of its products.  And you will learn it does not

10  make welded outlets at all.

11          It purchases them from suppliers, third

12  parties.  Some of them are located in China.

13          And when Sigma purchases these products, it

14  brings them into the country as the importer of record.

15          That is an important term, and it's one you

16  might not be familiar with.  So let me provide some

17  context.

18          In this trial you will learn that an

19  importer of record is the person or entity that is

20  legally responsible for bringing products into the

21  United States and for paying the applicable duties or

22  antidumping duties.

23          You'll learn that our system, our Customs

24  laws, impose affirmative legal obligations on importers

25  of record.  You'll hear that it operates in many

 1    respects like an honor system.  Customs and Border

 2    Protection relies on importers of record to be candid

 3    and forthright.

 4              There are two obligations on importers of

 5    record that are especially important in this case.

 6    First, importers of record must accurately and

 7    completely describe the products that they're bringing

 8    into the country.  It's common sense.  You have to tell

 9    Customs what it is you're importing.

10              And second, importers of record are

11    obligated to determine and disclose if antidumping

12    duties apply to their products.

13              I told you at the beginning this case is

14    about antidumping duties.  And you may have never run

15    into them before.  So let me tell you a little bit more

16    about it.

17              As I mentioned, the antidumping duty is a

18    special kind of tariff that the United States Government

19    imposes, if after conducting a full investigation, the

20    United States Government concludes that foreign

21    producers are selling goods in the United States at less

22    than fair value.

23              Now, you might be wondering, why would a

24    foreign producer do that?  Why sell at less than fair

25    value.  In this trial you will learn that some countries

1    as a matter of trade policy, as a matter of national

2    economic security, they encourage producers -- they

3    encourage their producers to undercut American

4    manufacturers in the hopes of driving them out of the

5    marketplace.

6               You will hear that dumping is a particular

7    problem as it relates to countries like China that don't

8    have market-based economies.

9               And you will learn that there are more

10   antidumping duty orders placed against products from

11   China than there are against products from any other

12   country.  And it is not even close.

13              That brings me to the antidumping duty order

14   that's most relevant to this case:  Chinese welded

15   outlets, like the kind that Sigma imports, have been

16   subject to antidumping duties since 1992.

17              That's when the Department of Commerce

18   imposed the antidumping duty order on certain carbon

19   steel buttweld pipe fittings from the People's Republic

20   of China.  And that's a mouthful.

21              So in this case we will refer to that order

22   as the China order or just as the antidumping duty

23   order.

24              You will learn that the China order imposes

25   substantial antidumping duties.  The rate is

 1   182.9 percent.

 2            What that means is that for every dollar of

 3   product an importer of record brings into this country

 4   that is subject to the order, it must pay the government

 5   $1.82.9.

 6            Now, as I said, that is sizable.  You will

 7   hear that the Department of Commerce imposed that rate,

 8   and has reimposed that rate every five years through

 9   something called a Sunset Review.  Because it concluded

10   that anything less would be inadequate to protect the

11   American manufacturers given the nature and extent of

12   China's unfair trade practices as it relates to these

13   products.

14            And that gets me to the problem in this

15   case.  Even though Sigma has imported millions of

16   dollars of welded outlets that are subject to this

17   antidumping duty order, the China order, well, the

18   evidence is going to show that Sigma has never once paid

19   it.

20            The evidence will show that Sigma has not

21   paid a single cent.  And that's not all.  And here's

22   where it gets a little more interesting.  The evidence

23   is also going to show that each and every time Sigma

24   imported these products, it made false statements to

25   Customs and Border Protection.

```
 1                In fact, it made two kinds of false

 2     statements.  First, when Sigma imported these products,

 3     it told Customs and Border Protection that it was

 4     importing steel couplings.  The evidence is going to

 5     show that statement -- it was a lie.  Sigma was not

 6     importing steel couplings; it was importing a different

 7     product called a welded outlet.

 8                And you will hear in this trial these

 9     products are completely distinct.  They are like apples

10     and oranges.  But it's not just that Sigma misdescribed

11     its products, you'll hear that each and every time that

12     Sigma imported these products, it told Customs and

13     Border Protection that no antidumping duty applied.

14                The evidence in this case will show -- in

15     fact, Judge Klausner will instruct you that that

16     statement was false.  Antidumping duties applied to each

17     and every one of these products.

18                And so for purposes of this case, that's a

19     given.  That's where your deliberations start.

20                These false statements, they're distinct,

21     they're different, but they fit together, hand and

22     glove.  Why?  Because it's not just, it's not just that

23     Sigma said that there's no antidumping duty on our

24     products, it's that Sigma described a product, a steel

25     coupling, that if that description had been truthful, no
```

     1    antidumping duty would have applied.

     2              So from the perspective of Customs and

     3    Border Protection, receives a representation from an

     4    importer saying we're importing steel couplings.  No

     5    antidumping duties apply.  There would be no reason to

     6    believe that they did.  And you will hear that none were

     7    ever imposed.

     8              As I mentioned, over that period, 2010 to

     9    2018, those false statements caused the government to

    10    lose out on more than $8 million in antidumping duties.

    11              And that gets me to the real issue in this

    12    case which is this:  Did Sigma make either or both of

    13    those false statements knowingly, in reckless disregard

    14    of the truth, or in deliberate ignorance of the truth?

    15              And I know that those sound like lawyer

    16    words and they probably are.  But Judge Klausner will

    17    define them for you at the end of this case.

    18              But by way of preview, the evidence is going

    19    to show that Sigma actually knew that it was not

    20    importing steel couplings.

    21              You will learn that welded outlets, again,

    22    they have these curvy edges, they have these bevels,

    23    they're permanently welded into piping products, piping

    24    systems.  Steel couplings are flat; they're not beveled.

    25    They're never welded.  As I said, we're talking apples

1    and oranges.

2                You'll hear that no one in the industry

3    calls welded outlets steel couplings.

4                In fact, you'll learn that even Sigma --

5    well, when it comes to marketing these products,

6    advertising these products, selling them, listing them

7    in their product catalogs, Sigma doesn't call these

8    products steel couplings.  It calls them welded outlets.

9    The true description.

10               In fact, the evidence in this case is going

11   to show that the only time that Sigma called these

12   products steel couplings was in the import paperwork

13   they submitted to Customs and Border Protection.

14               The evidence is separately going to show

15   that Sigma made false statements in reckless disregard

16   of the truth.

17               And consider here Sigma's statement that no

18   antidumping duty applied to its products.  And remember,

19   that importers of record have an affirmative obligation

20   to determine if that is true.

21               The evidence in this case is going to show

22   that Customs has been very clear with importers about

23   what they need to do to determine if antidumping duties

24   apply to their products.

25               What Customs has said is, there are really

1    two ways.  First way, you can read the order.  You can

2    see if the text applies.

3              Well, you'll learn in this case that Sigma

4    never read the China order.  In fact, Sigma claims that

5    it didn't even know that order existed until December of

6    2017.

7              Now, the second way you can determine if an

8    antidumping duty order applies is to rely on a qualified

9    Customs expert.  But Customs has been really clear there

10   too.  You need to do three things.  You need to disclose

11   like a full, complete disclosure to the Customs expert

12   about the product.  You need to follow the expert's

13   advice.  You need to keep a written record of that

14   advice.

15             And you'll hear that Sigma -- Sigma may say

16   somebody would have called a broker, but you won't see a

17   single piece of paper.  Not one email.  Not one file.

18   No, not one piece of paper to suggest that that is true.

19             It will be up to you to decide if an

20   importer of record makes a statement, a false statement

21   in reckless disregard of the truth, but it never really

22   bothered to check if the antidumping duties applied to

23   its products.

24             Finally, the evidence will show that Sigma

25   made false statements to ignorance of the truth.  Why?

1    Well, the evidence will show that Sigma in essence has
2    put its head in the sand and it failed to make simple
3    inquiries that immediately would have alerted it to the
4    fact that these products were subject to antidumping
5    duties.
6            You will hear testimony from Mark Woehrel.
7    Mr. Woehrel is Island sales manager.  He'll tell you
8    that in 2016 when Island was at its wits end trying to
9    find ways to compete with these illegally dumped
10    products, he looked into whether maybe it could take of
11    an antidumping duty order.
12            He'll tell you he had no experience with
13    Customs laws.  He didn't know the first thing about an
14    antidumping duty order.  He didn't have any fancy
15    Customs databases.  But he had Google.  And he will tell
16    you that in about three simple searches he uncovered
17    documents that caused him to believe that Chinese welded
18    outlets were already subject to the China order.
19            There's more.  Within 24 hours of starting
20    that effort, he held in his hand a formal written ruling
21    issued by the Department of Commerce, back in 1992,
22    finding that another welded outlet, this one's called
23    the Sprink-let.  But it's identical to Sigma's products.
24    That that welded outlet was a carbon steel buttweld pipe
25    fitting under the terms of a companion order, called the

1    Taiwan order, that you'll hear that commerce has said is

2    essentially the same as the China order.

3              So any importer of record who did the simple

4    Google searches would have known from the beginning that

5    these products were subject to antidumping duties.

6              Now, Sigma may suggest that this is really

7    complicated concepts.  And no importer of record ever

8    could have known that this was subject to an antidumping

9    duty order.

10             So I would ask you to do this:  Keep your

11   eye on the ball.  Listen to the evidence as it comes in.

12   Notice the evidence that you would expect to see, like

13   the written advice from an importer of record, that you

14   never see.

15             I know that these concepts, these

16   international trade concepts, they may be new to some of

17   you.  And they might seem consuming at first blush.

18             But I submit to you that this is actually a

19   pretty straightforward case.  It is about an importer of

20   record that brought in millions of dollars of products

21   that were subject to the antidumping duty order, well,

22   without ever paying that order.  Without ever paying

23   that duty.

24             It is about an importer of record who

25   falsely told Customs and Border Protection that no

```
1   antidumping duty applied to its products despite having

2   never really checked.

3              And it's about an importer of record who out

4   outright lied to Customs and Border Protection when it

5   claimed to be importing steel couplings.

6              At the end of this case, in a day or two, we

7   will have another chance to talk, closing arguments.

8   And we will talk about the evidence.

9              And at the end, I will ask you to do three

10  things:  I will ask you to find that Sigma violated the

11  False Claims Act.  I'm going to ask you to find that

12  Sigma made materially false statements to Customs and

13  Border Protection on more than 200 occasions.  And I'm

14  going to ask you to find that Sigma's false statements

15  caused our government to lose out on more than

16  $8 million in antidumping duties that were due but were

17  never paid.

18             Ladies and gentlemen, this is an important

19  federal case.  And your work is essential to its

20  resolution.

21             So before I sit down, I just wanted to take

22  a moment to express my thanks and my client's thanks for

23  your time, your attention, and for your service.

24             Thank you very much.

25             THE COURT:  Thank you, Counsel.
```

```
 1                    Defense opening statement.

 2                    MR. CURRAN:  Judge Klausner, ladies and

 3       gentlemen of the jury, I'm Christopher Curran for Sigma.

 4                    In the course of this short trial, I will

 5       prove to you that Sigma did not make any knowing or

 6       reckless false statements to U.S. Customs.

 7                    I will prove to you that Sigma took its

 8       responsibilities very seriously with respect to import

 9       compliance.  And at all times it was transparent and

10       honest with U.S. Customs.

11                    I will prove to you that Sigma had a

12       dedicated team of employees committed to compliance with

13       the import laws, and they abided by those requirements.

14                    And I will also prove to you that US Customs

15       knew exactly what Sigma was doing at all times and

16       reviewed it, audited it, and approved of it.

17                    How am I going to prove these things to you?

18       Especially in light of the serious allegations you just

19       heard Mr. Kramer articulate.

20                    I will do it through the means that Judge

21       Klausner has already identified:  Witness testimony and

22       documents.

23                    The documents I am going to show you in the

24       course of this trial are contemporaneous documents from

25       the files of Sigma and from the files and the databases
```

  1    of the U.S. Government.

  2              I'm confident that when I show you the

  3    underlying documents and you hear witnesses explain

  4    them, that you will conclude that Sigma took its

  5    responsibilities seriously, acted reasonably at all

  6    times and abided by its obligation as an importer of

  7    record.

  8              Now, you will learn some things about Sigma

  9    at the outset; like Sigma is a U.S. company.  It sells

 10    products made in various places around the world,

 11    including the United States.  Sigma makes many products

 12    in the United States.

 13              It is in many respects like the relater,

 14    Island.  Island also sells U.S. made products and

 15    foreign made products.  It's all a matter of degree.

 16    Both companies do what their U.S. customers demand.  If

 17    the U.S. customers want foreign-made product, these

 18    distributors will provide that.  If the U.S. customers

 19    want U.S. made products, they'll provide that.  This

 20    isn't a battle about foreign versus U.S. or anything

 21    like that.

 22              Sigma makes a lot of piping products.

 23    You'll hear about that from various of our witnesses.

 24    They make manhole covers.  They make fire hydrants.

 25    They make underwater pipes that carry water through

```
 1   communities.

 2            One small line of business that they have

 3   are these welded outlets.  And you will hear about the

 4   welded outlets during the course of this trial.  And we

 5   have some witnesses who will show them to you and

 6   describe them to you; i.e., similar to what Mr. Kramer

 7   did.

 8            Sigma imported these welded outlets from

 9   China just during the period 2010 to early 2018.  It's

10   roughly an eight-year period.  At the same time it was

11   selling U.S. made welded outlets as well, including to

12   Island.  You'll hear about that.  You'll hear about the

13   interesting relationship between these companies.

14   They're competitors, but they also supply and purchase

15   from one another.

16            So this isn't a story about good or evil or

17   anything like that.  This is ultimately a story about a

18   competitor trying to make money from one of its

19   competitors.

20            So with respect to Sigma's conduct -- and my

21   main goal in this trial is to defend what Sigma did.

22   Let's start with what U.S. Customs said.  Not what a

23   competitor or relater says about Sigma's practices.

24            Fortunately in retrospect for Sigma, in 2013

25   U.S. Customs did a complete audit of Sigma's businesses
```

     1    and its import practices.

     2                And I would like to ask Mr. Ball to bring up

     3    the exhibit that reflects that.  That is Exhibit 1006.

     4                I think maybe the screen needs to be

     5    available.

     6                THE CLERK:  It's available.

     7                MR. CURRAN:  While Mr. Ball brings that

     8    document up.

     9                THE COURT:  Is the other computer plugged

    10    into it; is that the problem?

    11                MR. KRAMER:  No.  The other computer is

    12    here.

    13                THE COURT:  Okay.  Go ahead, Counsel.

    14                MR. CURRAN:  In 2013, officials from U.S.

    15    Customs Bureau came to the offices of Sigma and examined

    16    Sigma's import records for five months on the premises,

    17    and ultimately issued a report.  And that report

    18    approved of Sigma's practices.

    19                This -- pardon me.  My apologies, Your

    20    Honor.

    21                THE COURT:  No problem.  Okay.

    22                MR. CURRAN:  This is Exhibit 1006.  As you

    23    members of the jury can see, this is a document from the

    24    U.S. Customs and Border Protection agency.  It is from

    25    July 2013.  So it's right in the middle of this 2010 to

     1    2018 period I'll be discussing.

     2              This is a letter to an official at Sigma.

     3    You can see in the contents of the letter, in the second

     4    paragraph, the ultimate conclusion here, "We determine

     5    that Sigma's import activities represent an acceptable

     6    risk to CBP, Customs, in the review areas of transaction

     7    value, classification and generalized systems of

     8    preferences."

     9              Later it says, "We appreciate the assistance

    10    of you and your staff whose cooperation expedited the

    11    process."

    12              Now, this is a multipage document and it

    13    attaches a more detailed report.  That report -- and I

    14    will go to page 4 of this exhibit -- describes Sigma in

    15    the opening paragraphs and its business, including its

    16    fire protection business, and its piping products,

    17    including threaded fittings.  So it looked at these

    18    specific products among Sigma's broader portfolio

    19    products.  And you can see under "Objectives, scope and

    20    methodology" on this page, Customs wrote, "The objective

    21    of our audit was to determine whether the Sigma import

    22    activities represent an acceptable risk to CBP through

    23    an assessment of the auditees internal control over

    24    compliance with applicable CBP laws and regulations."

    25              On the following page, this report mentions

 1    that it "reviewed specifically" -- in the second bullet

 2    point -- "analyzed tariff numbers for merchandise

 3    potentially subject to antidumping duty."  ADD.

 4              And then two bullet points later, the report

 5    says that "The Customs officials analyzed the sample

 6    items above and assessed each item's compliance with

 7    applicable laws and regulations, including" -- and then

 8    the fourth empty bullet there refers to "antidumping and

 9    countervailing duties."

10              At the bottom of this page, Customs wrote in

11    this report, "We conducted this performance audit in

12    accordance with generally accepted government auditing

13    standards."

14              And then finally on the next page, "Summary

15    of Audit Results.  After a five-month on-site

16    inspection, through our assessment of Sigma's internal

17    control over compliance without applicable CBP laws and

18    regulations, we determined that Sigma's import

19    activities represent an acceptable risk to CBP in the

20    review areas of transaction value, classification and

21    generalized systems of preferences.  Our audit did not

22    disclose any significant risk in Sigma's internal

23    controls related to its import activities."

24              We will have witnesses explain this document

25    in more detail and the process that led to it.  But

     1  basically you will hear that Customs gave Sigma a clean

     2  bill of health.

     3            There were only two grades on an audit like

     4  this:  Pass or fail.  And Sigma passed.  Why did it

     5  pass?  It passed because Customs understood that the

     6  practices that Sigma was employing on the Customs

     7  compliance area, were sound and in line with the

     8  regulations.

     9            And let me talk about that and address some

    10  of Mr. Kramer's comments at the same time.

    11            I would like ask Mr. Ball to bring up

    12  Exhibit 1009.

    13            This is an example of the form that the

    14  plaintiff here, Island, says contains the false

    15  statements by Sigma on a regular you basis from 2010 to

    16  2018.

    17            This is a multipage exhibit.  It's called a

    18  duty pack you'll hear.  And this front page is a summary

    19  of a particular import.  So every shipment that Sigma or

    20  any other importer makes into the United States is

    21  accompanied by this page and its backed up

    22  documentation.

    23            And there are highly technical instructions

    24  on how to fill this out.  It's reminiscent you'll hear

    25  of filling out a 1040 at the end of the year for your

1    taxes.

2              And I will show you some of the detailed

3    instructions.  So for example, Box 9, where it says

4    "Mode of transport" you don't just write, Ocean going

5    vessel.  You have to use some code that Customs has

6    developed in their instructions.  Code 10 means vessel

7    import.

8              Country of origin, in Box 10.  You don't

9    type out the name of the country.  You use the Customs

10   code, CN.

11             Box 20, U.S. Port of Unloading.  You don't

12   write Houston, Texas.  You write 2704.  This is a

13   technical Customs document.  And Sigma, along with its

14   professional licensed broker, filled out this form.

15             Mr. Ball, if you can show at the bottom the

16   signature from CH Powell Company.  And you will hear

17   that CH Powell is one of the biggest, most reputable

18   importers in the country.  They work hand in hand with

19   Sigma filling out forms like this.

20             Let's focus on the specific items that the

21   plaintiff here says were false or fraudulent or were

22   lies.

23             So I want to focus your attention on what's

24   called column 28, Description of Merchandise.  There

25   Sigma and its licensed broker wrote "steel couplings."

1    You see that.  They also provide an invoice number.  You

2    see the number beginning AW -- AHWB with some subsequent

3    numbers.  There are some -- there's also a description

4    there, "pipe fit, other known nipples ST."  And below

5    that there's another code number, 7307995045.

6              So you heard Mr. Kramer describe the

7    allegations in this case that the steel coupling part

8    was a lie.  That's not a lie.  That -- those are the

9    words that are required by Customs.  And here is how

10   we'll prove that to you.  There are instructions that I

11   refer to that Customs provides.  And this is

12   Exhibit 1047.

13             So this is the empty form and a multi-page

14   instruction sheet, 22 pages in length.  And one of the

15   instructions relates to column 28.

16             So I would like to ask Mr. Ball to go to

17   page 13, and column 28 in the upper top there,

18   "Description of Merchandise.  A description of the

19   articles in sufficient detail to permit the

20   classification there of under the proper statistical

21   recording number in the Harmonized Tariff Schedule

22   should be reported at the top of column 28.

23             "The standard definitions from the Customs

24   HTS database are acceptable for this requirement."

25             Okay.  So what does the CBP, the Customs

1  Harmonized Tariff Schedule database say is the right

2  description for these products?  Well, for that, you can

3  look at the Harmonized Tariff Schedule which is

4  Exhibit 1068.

5           This is part of a lengthy government

6  database identifying how every product should be

7  classified when it comes to the United States for duty

8  purposes.

9           Mr. Ball, if you go to page 5 of this.

10          This page is the instruction sheet for

11  figuring out where welded outlets should fall.  You will

12  hear testimony that Sigma, in consultation with its

13  broker, concluded that the item fell under the category

14  and the subheading 7307, 995045.

15          So, Mr. Ball, if you can show all that,

16  maybe on one page, we can see that this description

17  begins with "tube or pipe fittings, for example,

18  couplings, elbow sleeves of iron or steel."  Aha.  So

19  the description includes the word couplings.

20          Then you will hear that the other

21  elements -- the subheadings that apply here are:  Other.

22  Other.  Other.  And of iron or non alloy steel.  Other.

23          And that is the description that Sigma and

24  its brokers concluded was the right one for these welded

25  outlet products.

 1              And you know what?  They were right.

 2   Because if you look at Exhibit 1007, Customs had already

 3   concluded in the year 2003, in a formal written ruling

 4   that welded outlets -- and this is in the third

 5   paragraph of this document.  That welded outlets fall

 6   under this description.

 7              And here's what Customs said in this ruling.

 8   "The applicable subheading for the forged steel

 9   threaded weld outlet fitting" -- that's the UniLet

10   product that Sigma sold at the time -- "will be

11   7307995045.  That's where I took you.  "Harmonized

12   Tariff Schedule of the United States.  Which provides

13   for tube or pipe fittings, for example, couplings,

14   elbows, sleeves of iron or steel.  Other.  Other.

15   Other.  Of iron or nonalloy steel.  Other.  The general

16   rate of duty will be 4.3 percent ad valorem."

17              So what we have here is we have a Customs

18   ruling in 2003 describing the correct description to be

19   put on the document for welded outlets.  And it says,

20   "Steel couplings."  So that's what Sigma did.  They

21   followed the instructions and they put "steel couplings"

22   on these entry forms.

23              So if we can go back, Mr. Ball, to the

24   sample 75 -- 1009.  That's why in column 28, Sigma put

25   steel coupling there.

     1              And you know what else?  The notion that

     2     that's a lie is -- you will hear is utterly

     3     unsustainable because, not only is that following

     4     instructions, but the invoice that's referred to in that

     5     same block -- see, again, those numbers, AHWB, well,

     6     that invoice is attached.

     7              So, Mr. Ball, if you can go to page 5 of

     8     this exhibit, this is the attached commercial invoice.

     9     And we can see that all the products with the letter A

    10     next to it are described there.  UniLet.  UniLet.

    11     Welded outlet fitting.

    12              So the notion that Sigma was trying to hide

    13     something or lie about what it was importing is

    14     unsustainable, because the records and the testimony

    15     will show that Sigma was following instructions and was

    16     completely transparent about what they were doing.

    17              The other alleged misstatement has to do

    18     with block two of this same document.  There the

    19     plaintiff Island says that instead of the specific code

    20     used here, that Sigma did in consultation with its

    21     broker, it -- it should have been a different code

    22     reflecting that antidumping duties are due.

    23              Well, you will hear testimony establishing

    24     exactly why Sigma believed that no antidumping duties

    25     were due on this product.  There was an antidumping duty

```
 1    order on buttweld pipe fittings, but not on welded
 2    outlets.
 3              And if you go back to the Harmonized Tariff
 4    Schedule -- so this is 1068 -- you will see -- and if
 5    you could show the whole page 5, Mr. Ball, you will see
 6    on that page that when Sigma and its broker and when
 7    U.S. Customs in the ruling I showed you, which is called
 8    a pipe -- the Star Pipe Ruling, by the way, those --
 9    when it's instructing that welded outlets fall under
10    subcategory 7307995045, look, it was skipping over the
11    buttweld fittings which is up top where it's 730793.
12              So in other words, when Customs was telling
13    the marketplace in 2003 that this -- these welded
14    outlets belong in the subpart down here at 45, it was
15    skipping over the buttweld fittings.  Even Customs
16    recognized that these products were welded outlets in
17    that category and not buttweld fittings.
18              And you will hear multiple witnesses in this
19    case explain exactly why Customs would reach that type
20    of decision.  Buttweld fittings are very different from
21    welded outlets.
22              Mr. Kramer did explain accurately what
23    welded outlets are.
24              THE COURT:  Counsel, you have about two more
25    minutes.
```

1              MR. CURRAN:  Thank you, Your Honor.

2              Welded outlets are a product like this that

3    as Mr. Kramer explained fit over a pipe.  They go on the

4    side of a pipe.  Outlet means the water, instead of

5    flowing continuously, has an outlet.  This can lead to a

6    sprinkler for fire -- for fire prevention and that kind

7    of thing.

8              Buttweld pipe fittings are completely

9    different.  Buttweld pipe fittings are a product that

10   continue the flow of water.

11             You are going to hear witnesses from Sigma

12   and an expert witness that we're bringing in who's

13   knowledgeable about all types of piping to explain that

14   a buttweld, which fits face to face, continues the flow

15   of the water is fundamentally different from an outlet.

16             That's why Sigma and its broker, in

17   accordance with the Star Pipe Ruling by Customs,

18   concluded that no antidumping duties were due there.

19             You will hear that more recently the

20   Department of Commerce has taken the position that

21   welded outlets are subject to antidumping duties.

22             That decision, which ultimately was reached

23   earlier this year, comes years after Sigma stopped

24   importing these welded outlets.

25             So the notion that Sigma could have had a

```
1   crystal ball to realize -- to conclude that it was going

2   to in the future be subject to antidumping duties is

3   unsustainable.

4               So ladies and gentlemen, I will conclude

5   where I began.  In the course of this trial, this short

6   trial, we will prove to you that Sigma did the right

7   thing at all times.  We will prove to you that the

8   allegations that it lied or acted recklessly or acted

9   with knowing disregard for its obligations are

10  unfounded.  Quite the contrary, you will be impressed

11  with the professionalism and dedication of Sigma's

12  import compliance folks, including Ms. Patricia

13  Velasquez who's at counsel table here, who you'll hear

14  from when we get the first opportunity to do so.

15              Thank you, Your Honor.

16              THE COURT:  Thank you, Counsel.

17              Okay.  Ladies and gentlemen, you've heard

18  the opening statement.  Again, it's not evidence.  It's

19  where they think the evidence is going to take them.

20              Now, we're going to get into the meat of the

21  case and that is the evidence itself.

22              Counsel, do you wish to call your first

23  witness?

24              THE CLERK:  Name of witness, please.

25              MR. KRAMER:  Your Honor, Island calls
```

Case 2:22-cv-00050-DCN Doc #19-6 Filed 06/27/22 Entered 06/27/22 17:24:24 of 587 Exhibit ID
Case 2:22-cv-00050-DCN Doc #19-6 Filed 06/27/22 Page 282 of 585 Exhibit ID
Transcript of Day 1 of FCA Trial    Page 105 of 244                104

```
 1   Mr. Mark Woehrel.

 2              THE CLERK:  Good afternoon.  Right here to

 3   be sworn, please.

 4              Do you solemnly swear that the testimony you

 5   are about to give in the cause now pending before this

 6   Court shall be the truth, the whole truth and nothing

 7   but the truth, so help you God?

 8              THE WITNESS:  So help me God, yes.

 9              THE CLERK:  Thank you.  You may be seated.

10              You will need to remove your face covering.

11              Thank you.

12              May I please ask that you state your full

13   name for the record and spell your last name.

14              THE WITNESS:  Sure.  Mark Woehrel.  Spelled

15   W-o-e-h-r-e-l.

16              THE COURT:  Thank you.

17              Counsel, you may inquire.

18              MR. KRAMER:  Thank you, Your Honor.

19              **DIRECT EXAMINATION**

20   BY MR. KRAMER:

21      Q.  Good afternoon, sir.

22      A.  Good afternoon.

23      Q.  Would you please tell the jury a little bit about

24   your education.

25      A.  Sure.  I have an undergraduate business degree
```

1   from Penn State University.  Graduated 1990.  And I have

2   an M.B.A. from Oakland University.  And I graduated in

3   1999.

4       Q.  What did you do -- what did you do for employment

5   after you graduated from Penn State?  1999.

6       A.  I went to work for two steel companies, first of

7   which was a flat well steel company product used to make

8   pipe weld.  I worked for them for ten years.  I went to

9   work at a steel pipe company 16 years after that.

10      Q.  After 26 years in the industry, did there come a

11  time when you ended up getting employed by Island

12  Industries?

13      A.  Yes.

14      Q.  When was that?

15      A.  After my employment ended with the pipe company,

16  in 2015, I was asked to move to -- my position was being

17  eliminated.  Asked to move.  For personal reasons I

18  chose to stay behind.

19              I had known Island Industries.  They were a

20  customer for a long time.  I contacted them to see if

21  they had any opportunities.

22      Q.  As you sit here today, how long have you been

23  involved in the steel industry?

24      A.  31 years.

25      Q.  Are you still with Island?

1    A.  Yes, I am.

2    Q.  What is your title?

3    A.  National sales manager.

4    Q.  Tell me Island's --

5    A.  Manufacturing weld outlets, pipe fittings.  Also

6    we buy and sell pipe.  And we do various fabrication

7    services mainly all involved in the piping industry.

8    Q.  Is it fair to say that Island is a small

9    business?

10   A.  Yes.

11   Q.  When you joined Island did you know it

12   manufactured pipe fittings?

13   A.  Yes.

14   Q.  Have you ever sold pipe fittings?

15   A.  No.

16   Q.  Did you know much about them?

17   A.  No.

18   Q.  Did you take responsibility for selling Island's

19   pipe fittings?

20   A.  Not at first.  I was hired mainly because of my

21   background with steel pipe.  I was going to buy and sell

22   that with the understanding for me to eventually get

23   involved with Island products and services.

24   Q.  What pipe fitting in particular is most important

25   to Island's business?

 1    A.  The welded outlet.

 2    Q.  So let me stop you there for a moment.

 3         Your Honor, may I approach the witness to

 4  hand some exhibits?

 5         THE COURT:  Yes.  Through the clerk, please.

 6  Does it have a number?

 7         MR. KRAMER:  For the record, I handed the

 8  witness through the clerk Island Exhibit 64A.

 9         THE COURT:  Okay.

10  BY MR. KRAMER:

11    Q.  Have you had a chance to look at that, sir?

12    A.  Yes.

13    Q.  What is it?

14    A.  This is a welded outlet.

15    Q.  Would you take a minute and explain what it is

16  and how it works, to the jury.

17    A.  Sure.  First and foremost this is considered a

18  weld fitting, which simply means it's going to be

19  permanently welded into a piping system.  And this

20  particular weld out is for firearm protection or

21  sprinkler piping systems.

22         And its design and purpose is to create a

23  branch connection in a piping system, say between -- if

24  you can imagine, like a limb on a tree and a branch, it

25  connects that branch and that connection.

1            And I would draw your attention to the

2    distinctive end here.  If I can turn it.  I don't know

3    if you can see it.  I guess I describe it as I wavy end.

4    It's contoured or shaped on that end.  You can see that.

5            And what that does, if you'll imagine -- say

6    my arm is a piece of pipe.  You can see that it's

7    designed that shaped end to fit on top and connect to

8    the top of the pipe.

9            So, again, like a branch on a tree, you

10   would cut a hole in the piece of pipe, the shape then

11   would fit properly over the top of that pipe.  And it

12   would be permanently welded to the base all around the

13   pipe and the fitting.  So it's permanently connected.

14   It's welded.

15           What's critical about this -- critical

16   feature about this, not only that wavy end, there's a

17   sloped edge -- all around this there's a sloped edge.  I

18   don't know if you can see that from there.

19           But that is called a bevel.  More

20   specifically it's called a weld bevel.

21           And what that allows is when the welder

22   places the fitting on the pipe, it creates a small gap

23   between the two pieces of metal.

24           And that gap or channel, if you will, is

25   filled with the welders weld material to permanently

1    attach it.  That's a distinctive feature.

2                 And that weld bevel is what makes this

3    product a buttweld fitting.  But more importantly

4    distinguishes it from other types of fittings.  If that

5    makes sense.

6    Q.  Well, you mentioned that these products are used

7    primarily in fire suppression systems, right?

8    A.  Yes.

9    Q.  Are they regulated or listed by Underwriters

10   Laboratories?

11   A.  Yes.

12   Q.  What is it that Underwriters Laboratory does as

13   it relates to welded outlets?

14   A.  They inspect the product on regular basis.  They

15   also inspect the manufacturing facilities and to assure

16   that the product is being made in a safe manner and that

17   it is -- it will protect human life and property.

18   Q.  Does Underwriters Laboratory have a standard of

19   identity for these products?

20   A.  Yes.  Yes.  They require --

21                 MR. CURRAN:  Objection.  Foundation, Your

22   Honor.

23                 THE COURT:  Sustained.

24   BY MR. KRAMER:

25   Q.  Are you familiar with Underwriters Laboratories

```
 1   standards of identities?

 2   A.  Yes.

 3   Q.  Is Underwriters Laboratories have a standard of

 4   identity with respect to these products?

 5   A.  Yes.

 6   Q.  What is that standard of identity?

 7   A.  Welded outlet, welding outlet or weld outlet

 8   fitting.

 9   Q.  Am I correct that you cannot use the Underwriters

10   Laboratories mark, the UL mark, to advertise these

11   products unless you call it one of those things?

12   A.  Yes.

13   Q.  Let's take a look at Island Exhibit 66 --

14        Which I believe there's no objection, but I

15   would like to be careful as to -- before I publish.

16        THE COURT:  Okay.  No objection, it may be

17   received and published.

18        (Exhibit 66 is received.)

19        MR. KRAMER:  Thank you, Your Honor.

20   BY MR. KRAMER:

21   Q.  Are you familiar with that exhibit, Mr. Woehrel?

22   A.  Yes.

23   Q.  What is it?

24   A.  It is a product brochure from Sigma.

25   Q.  Let's direct your attention to the fifth page of
```

 1    that exhibit.

 2             Do you see that okay?

 3    A.  I can see the title, yeah.  But everything else

 4    is little blurry.

 5    Q.  It is a little blurry.  Okay.

 6             Do you know how to turn the light on?

 7             Can you see that a little bit better, sir?

 8    A.  I can, yes.

 9    Q.  Now, if you look at this, does Sigma use the

10    Underwriters Laboratories mark to advertise this

11    product --

12    A.  Yes.  Yes, they do.

13    Q.  -- here?

14    A.  Yes.

15    Q.  What does Sigma call this product?

16    A.  Well, the title says "Welded outlet."  And the

17    description below it says "Welding outlets."

18    Q.  Is this a Chinese welded outlet?

19    A.  Yes.

20    Q.  Are you familiar with the product known as a

21    steel coupling?

22    A.  Yes.

23    Q.  How are you familiar with that product?

24    A.  Well, going back to the days when I sold pipe,

25    going back 21 years or so, a lot of pipe that I sell, to

```
 1   this day I sell, is called threaded and couple pipe.  So

 2   it will have a coupling screwed on the end of that pipe.

 3   So I'm familiar from that stance.

 4                MR. KRAMER:  Your Honor, may I approach the

 5   witness with another exhibit?

 6                THE COURT:  Yes.

 7                THE CLERK:  Are you done with the first one?

 8                MR. KRAMER:  You can keep it, actually.

 9                For the record, I've just handed up an

10   exhibit marked as 64J.

11                THE COURT:  Okay.

12   BY MR. KRAMER:

13      Q.  Have you had a chance to look at that?

14      A.  Yes.

15      Q.  What is that product?

16      A.  It is a merchant coupling.

17      Q.  Sometimes call a steel coupling?

18      A.  Yes.

19      Q.  Are welded outlets and steel couplings, are they

20   the same product?

21      A.  No.

22                MR. CURRAN:  Objection.  Lack of foundation.

23   This is not an expert witness.

24                THE COURT:  He is not testifying to

25   expertise right now.
```

    1                    Are you saying they appear to be different?

    2                    THE WITNESS:  Yes.

    3    BY MR. KRAMER:

    4      Q.  Could you describe for the jury how these

    5    products are different.

    6                    THE COURT:  How they appear to be different

    7    to you?

    8                    THE WITNESS:  Sure.  Sure.

    9                    As I said earlier, this is a weld fitting

   10    primarily.  This is not a weld fitting.  That's the

   11    first difference.

   12                    And the distinctive features, as I mentioned

   13    earlier, is this sloped edge or weld bevel.  Okay.

   14                    A coupling does not have a weld bevel.  And

   15    it's not a welded fitting.  So it's not going to be

   16    welded.  This is going to be permanently attached via

   17    the bevel.  This is going to be screwed on at both ends.

   18    Which means it can be unscrewed.  So it's not a

   19    permanent connection.  That's how they're different.

   20    BY MR. KRAMER:

   21      Q.  Has the United States Government identified any

   22    particular product features that distinguish buttweld

   23    pipe fittings from other kinds of fittings?

   24      A.  Yes.

   25                    MR. CURRAN:  Objection.  Lacks foundation.

```
 1                   THE COURT:  Sustained.

 2    BY MR. KRAMER:

 3        Q.  Are you familiar with any U.S. Government

 4    decisions defining what distinguishes a buttweld pipe

 5    fitting from other pipe fittings?

 6        A.  A weld bevel.

 7        Q.  So your understanding is that the defining

 8    product characteristic, the thing that distinguishes the

 9    buttweld pipe fitting from another kind of fitting is

10    the presence of a weld bevel?

11        A.  Yes.

12        Q.  Does a welded outlet have a weld bevel?

13        A.  Yes.

14        Q.  Does a steel coupling have a weld bevel?

15        A.  No.

16        Q.  In your 31 years in the steel industry have you

17    ever heard anyone refer to a welded outlet as a steel

18    coupling?

19        A.  No.

20        Q.  I would like to change topics.  I would like to

21    take you back to 2016.  Is that time period clear in

22    your head?

23        A.  Yes.

24        Q.  At that time, what, if anything, did you

25    understand about Island's ability to compete in the
```

1    market for welded outlets?

2        A.  The only thing I was aware of --

3            MR. CURRAN:  Objection.  Lacks foundation,

4    Your Honor.

5            THE COURT:  I don't know yet.

6            You can answer subject to a motion to

7    strike.

8            THE WITNESS:  I was aware that Island was

9    having difficulty competing with the imports of Chinese

10   weld fittings.

11           THE COURT:  Objection will be sustained.

12           Go ahead, Counsel.

13   BY MR. KRAMER:

14       Q.  In 2016 in your capacity as the sales manager at

15   Island, did you personally experience trying to sell

16   welded outlets in the marketplace?

17       A.  Yes.

18       Q.  What was your experience in terms of trying to

19   compete with Chinese welded outlets?

20       A.  That every time we tried to meet the market

21   price, we were consistently and subsequently undercut

22   and couldn't receive an order because of that.

23       Q.  And just to be clear, Island's products that it

24   was selling, these were domestically made welded

25   outlets; is that correct?

1     A.  Yes.

2     Q.  Did you have a plan to fix this market problem?

3     A.  No, I didn't have a plan at the time.  The only

4  thing I could -- I knew to suggest was based on my

5  previous experience at the other pipe companies, pipe

6  and steel companies that I worked for, the executives

7  would often be looking for relief with the Commerce

8  Department in Washington.  And they would be involved in

9  trade cases.  So I wouldn't be involved.  But they would

10  fill us in at sales meetings as to what they were doing

11  there and why and how that would affect our jobs as

12  sales people.

13     Q.  Given that historic experience, did you suggest

14  that Island do anything as it relates to the Commerce

15  Department?

16     A.  Yes.  The only thing I could suggest was a name

17  of an attorney in Washington that perhaps Mr. Sanders

18  could call.

19     Q.  Just to pause you.  Who's Mr. Sanders?

20     A.  He's the president of Island Industries.

21     Q.  Did Mr. Sanders call that lawyer?

22     A.  Yes, he did.

23     Q.  Did Mr. Sanders retain that lawyer?

24     A.  No, he did not.

25     Q.  Why not?

```
 1       A.   He said it was too expensive.

 2       Q.   Did there come a time when you considered whether

 3  Island might be able to take advantage of an existing

 4  trade case?

 5       A.   Eventually, yes.  It was several months later.

 6  Mr. Sanders asked me to look into that to see if there

 7  was anything I could find that possibly we would be able

 8  to -- to see if it was already covered or perhaps

 9  covered in a certain way with current cases that were

10  existing.

11       Q.   Did you have any specialized experience with

12  trade law or antidumping duty orders?

13       A.   No, none.

14       Q.   How did you go about researching whether there

15  was a potential order to take advantage of?

16       A.   I Googled it.

17       Q.   You Googled it?

18       A.   Yeah.  Google search engine.

19       Q.   Okay.  What did you find when you Googled?

20       A.   One of the first things I remember finding was a

21  list of ITC, the International Trade Commission's trade

22  cases of all products in all countries around the world.

23  And what was nice about that list is that it was

24  formatted in Excel spread sheet so that I could easily

25  sort and immediately sort out just the trade cases that
```

1    involved China.

2            But also I could sort out based on the

3    product description.  For instance, I chose fittings,

4    and I was able to filter that list down to only four

5    trade cases based on the China and the fittings filters.

6        Q.  Was it surprising to you that there were only

7    four pipe fitting cases?

8        A.  It was very surprising.  My experience was that

9    there was a lot of steel trade cases against China, and

10   certainly in the products -- pipe and steel products

11   that I had been exposed to before there was a lot more

12   than just a handful.

13       Q.  Of the four pipe fitting cases that you saw, how

14   many of them related to iron?

15       A.  Three of them related to iron.  And only one

16   related to carbon steel.

17       Q.  Welded outlets ever made of iron?

18       A.  No.

19       Q.  What did you do after you looked at this list of

20   four pipe fitting cases?

21       A.  Well, I was immediately able to draw my attention

22   to the one relevant case with carbon steel.  And I knew

23   these were made of carbon steel.  And it mentioned

24   carbon steel buttweld fittings.  And I was familiar with

25   the term buttweld from my previous experience.  And that

1    I felt that these were buttweld fittings.

2              But obviously I wanted to see how the

3    Commerce Department -- how they defined it within the

4    law.  So I examined.  I pursued an additional

5    investigation of searches for carbon steel buttweld pipe

6    fittings from China.

7    Q.  What did you find when you searched for carbon

8    steel buttweld pipe fittings?

9    A.  I found a document that was called A Sunset

10   Review.  And I was familiar with that term from my

11   experiences.  Is that every five years the Commerce

12   Department will review a trade law to see if it still

13   needs to be continued.  And this particular one was not

14   just for China, it was for Taiwan, Brazil, Thailand and

15   Japan, I believe.

16             So they were all together in one document,

17   all the countries, under a similar, I guess, language.

18   They were all being reviewed at the same time.  So I

19   wanted to determine in that context what exactly fit

20   within the scope of the law, if you will.

21   Q.  Let me pause you there for one moment.

22             Your Honor, we would like to publish and

23   admit Exhibit 1013.  I understand there is no objection.

24             THE COURT:  It will be received.

25             (Exhibit 1013 is received.)

```
 1              MR. KRAMER:  May we publish it to the jury?

 2              THE COURT:  Yes.

 3  BY MR. KRAMER:

 4      Q.  Do you recognize this Exhibit 1013?

 5      A.  Yes.  It is an e-mail to Mr. Sanders, yes.

 6      Q.  That's from May of 2016, correct?

 7      A.  Yes.

 8      Q.  And attached to that, is this the Sunset Review

 9  that you were referring to earlier?

10      A.  Yes.

11      Q.  Let me see if I can direct your attention to page

12  31 of that exhibit.

13              Can you see that, sir?

14      A.  Yes.

15      Q.  If I zoom in, is it legible to you?

16      A.  It is.

17      Q.  So starting with the section at the top, it talks

18  about Commerce's scope.  Do you see that?

19      A.  Yes.

20      Q.  Is there anything about this language that caught

21  your attention?

22      A.  Sure.  First, I mean, it's -- the title is the

23  subject product.  And the scope is that it is, you know,

24  essentially made of carbon steel under 14 inches in

25  diameter.  Has a bevel and it's permanently connected.
```

1    Require permanent welded connections.

2       Q.  In the paragraph below that, is there any

3    indication there about what product characteristics

4    distinguished buttweld pipe fittings from other kinds of

5    products?

6       A.  Yeah.  It said the beveled edges of buttweld pipe

7    fittings distinguished them from other types of pipe

8    fittings.

9       Q.  Let me take this down.

10              Your Honor, I would like to publish and

11   admit Exhibit 1012.

12              MR. CURRAN:  There is no objection.

13              THE COURT:  It may be received and

14   published.

15              (Exhibit 1012 is received.)

16              MR. KRAMER:  May I publish to the jury?

17              THE COURT:  Yes.

18              MR. KRAMER:  Thank you.

19   BY MR. KRAMER:

20       Q.  Mr. Woehrel, do you recognize this email?

21       A.  Yes.

22       Q.  What is it?

23       A.  It is another e-mail that I sent to Mr. Sanders.

24   After reviewing the previous document we just reviewed,

25   The Sunset Review, I was pointing out, as strongly as I

 1    possibly could, that I felt my premise was that these --

 2    that the welded outlet was a buttweld fitting according

 3    to the Commerce Department's ruling.

 4              And as you can see there in bold and

 5    underlined, I was making the point that the beveled

 6    edges of buttweld pipe fittings distinguished them from

 7    other types of pipe fittings.

 8    Q.  Let's go back to Exhibit 1013, which is part of

 9    The Sunset Review.  And let me ask you:  Was there

10    anything else -- was there anything else about this

11    exhibit that caught your eye?

12    A.  Yes.  So I was learning what a scope was.  And I

13    had saw something here called a scope ruling.  And

14    proceeded to read that.  In the first paragraph I read,

15    and it said that there was a scope ruling against a

16    product there called a Sprink-let, there in quotes.  And

17    that struck me.

18    Q.  Why did that strike you?

19    A.  Well, at the time Mr. Sanders was describing to

20    me how these products are often referred in the

21    marketplace often by brand names.

22              So for instance, these welded outlets might

23    be called a coup-let or a UniLet, as we just saw, or a

24    safe-let.

25              And the "let" standing for "outlet."  And

1    the first words, you know, having something in it.  When

2    I saw sprink, I knew that obviously these products were

3    for the fire protection or sprinkler market.  So I put

4    sprink and let together.  It made sense to me that this

5    a sprinkler outlet.

6        Q.  If you look back at the first page of this

7    exhibit, in this first paragraph, what was it that you

8    were trying to explain to Mr. Sanders?

9        A.  Well, some of the terminology I used here shows

10   that I didn't understand exactly how the process worked.

11   But what I was saying is that I used the word piggyback

12   on this case and I felt that this -- this decision had

13   already been made for this specific product under the

14   Taiwan order.  And that since all these products --

15   countries were reviewed together with similar scoping

16   language, that it's sort of a precedent, if you will, or

17   by transdent property that it applies to the China order

18   as well.  That was my premise.

19       Q.  Now at the time that you wrote this -- this

20   email, had you actually seen a copy of the Sprink-let

21   ruling?

22       A.  No, I had not.

23       Q.  Did you take any steps to get a copy of the

24   Sprink-let ruling?

25       A.  I continued searching on the internet.  And I

 1    found a document that had the name of a contact of an
 2    analyst from the Commerce Department relating to these
 3    cases.  And his name was Mathew Renke.  And I contacted
 4    him by phone and by email.
 5         Q.  Did he provide you a copy of the Sprink-let
 6    ruling?
 7         A.  Yes, he did.
 8         Q.  I will show you Island Exhibit 5.
 9              I understand there is no objection, Your
10    Honor.
11              THE COURT:  It will be received.
12              (Exhibit 5 is received.)
13              MR. KRAMER:  May I publish?
14              THE COURT:  Yes.
15    BY MR. KRAMER:
16         Q.  Do you recognize Island Exhibit 5, sir?
17         A.  Yes.
18         Q.  What is it?
19         A.  This is the Sprink-let ruling that Mr. Renke sent
20    to me.
21         Q.  What did you do when you received this ruling,
22    sir?
23         A.  Well, I read it.  And I sent a copy on to
24    Mr. Sanders.  But it seemed to confirm my premises that
25    these were in fact buttweld fittings due to the

1  description in the scoping language.

2     Q.  Let me ask you to take a look at page 3.  Can you

3  read that?

4     A.  Yes.

5     Q.  Focusing on the paragraph in the middle of that

6  page --

7     A.  Yeah.

8     Q.  -- it says it's part of Sprinks' request.

9           What about the information in Sprinks

10  request was relevant to you?  What did you notice about

11  this decision?

12     A.  Well, it says -- again, it repeats in the Sprinks

13  brochure, indicates that the buttweld fittings are

14  beveled.  And that they say in quotes, "The beveled

15  edges of buttweld pipe fittings distinguish them from

16  other type of fittings."

17     Q.  At the bottom of this paragraph, does it indicate

18  that the Sprink-let is permanently welded to a piping

19  system?

20     A.  Yes.  Like other products subject to this order,

21  it's permanently joined by welding.

22     Q.  Finally in the paragraph below that, does the

23  Commerce Department say anything about whether this

24  product is a steel coupling?

25     A.  Yeah.  In that last paragraph there, it says, "It

```
 1   does not indicate the product is a coupling."  Does not.
 2              And it goes on to say, "Rather, it is a
 3   buttweld pipe fitting."
 4      Q.  How much time went by between the moment that you
 5   started your search and your receipt of the Sprink-let
 6   scope ruling?
 7      A.  I would say about 24 hours.
 8      Q.  Do you think an importer of record would be able
 9   to find it faster?
10      A.  I would think so, yes.  I had no training.  I
11   didn't have any databases or places to look or manuals
12   of any sort.  I just had Google searches.
13              So I would think they would be able to do it
14   faster, more efficiently.
15      Q.  Did you subsequently have -- did you subsequently
16   make an effort to receive a copy of the Sprink-let
17   ruling request from the Department of Commerce?
18      A.  Yes.  Sometime later.
19      Q.  Did you receive that?
20      A.  Yes.
21              MR. KRAMER:  Your Honor, I would like to
22   publish and admit this.  I understand there may be an
23   objection.
24              THE COURT:  No objection?
25              MR. CURRAN:  I'm not sure what exhibit it
```

```
 1   is.

 2                  THE COURT:  Why don't you show it to him.

 3                  MR. KRAMER:  I'm sorry.  This is Island

 4   Exhibit 4.

 5                  MR. CURRAN:  We believe it's inadmissible

 6   hearsay, Your Honor.

 7                  MR. KRAMER:  Your Honor, I think it's 803,

 8   16, a document predating 1998 is exempt from the hearsay

 9   rule.

10                  THE COURT:  What date?

11                  MR. KRAMER:  1998.  It's the Ancient Records

12   Exemption.  This document's from 1991.

13                  THE COURT:  Counsel, you want to be heard?

14                  MR. CURRAN:  No.  I will withdraw the

15   objection.

16                  THE COURT:  Okay.  It will be received.

17                  (Exhibit 4 is received.)

18                  MR. KRAMER:  May I publish?

19                  THE COURT:  Yes.

20   BY MR. KRAMER:

21      Q.  Mr. Woehrel, is this the original request letter

22   that the Sprink, Inc. made in order to get this scope

23   ruling?

24      A.  Yes.

25      Q.  In the second paragraph, you see where it
```

```
 1   indicates that the product has a general appearance of a

 2   pipe coupling, correct?

 3       A.  Yes, I do.

 4       Q.  Now, a pipe coupling, is that the 64J product,

 5   the exhibit that you were -- the black steel coupling,

 6   is that what a pipe coupling is?

 7       A.  Yes.  That's a pipe coupling, right.

 8       Q.  Thank you.  And did you subsequently have cause

 9   to actually ever see a Sprink-let itself?

10       A.  Yes.

11           MR. KRAMER:  Your Honor, may I approach with

12   another exhibit?

13           THE COURT:  Yes.

14           MR. KRAMER:  For the record, this is

15   Exhibit 64H.

16           THE COURT:  Thank you.

17   BY MR. KRAMER:

18       Q.  Have you had a chance to look at that, sir?

19       A.  Yes, I have.

20       Q.  Do you know what that is?

21       A.  This is a Sprink-let.  It's stamped on the side.

22   Yes.

23       Q.  Is there any material difference of any kind

24   between be Sigma's Chinese welded outlets and the

25   Sprink-let?
```

     1      A.   There is no material --

     2              MR. CURRAN:  Objection, Your Honor.  Vague

     3   as to which Sigma outlet's being referred to.

     4              THE COURT:  Clarify, Counsel.

     5              MR. KRAMER:  I'm sorry, Your Honor.  I

     6   didn't hear that.

     7              THE COURT:  Do you want to clarify that?

     8              MR. KRAMER:  Sure.

     9   BY MR. KRAMER:

    10      Q.   Sure.  Is there any material difference between

    11   the Sprink-let and the UniLet?

    12      A.   To the extent that they have a bevel and are

    13   permanently welded, they're physically identical.

    14              You know, this product is a little smaller

    15   in diameter, but that's not relevant.

    16              These products are sold from half inch up

    17   through several inches in diameter.

    18              Is there any difference between the

    19   Sprink-let and the safe-let?

    20      A.   No.

    21      Q.   Going back to your efforts in 2016, once you

    22   concluded that Chinese welded outlets were subject to

    23   antidumping duties, did you make any effort to determine

    24   if importers like Sigma were paying that antidumping

    25   duty?

 1    A.  Yes.  What occurred to us right away was the size
 2   of the import duty, which was 182.9 percent, which is
 3   very substantial.  We didn't see any way right out of
 4   the box that anybody could pay 182.9 percent duty and
 5   sell it at the cost that we -- or prices in the market
 6   that we were aware of.  And Mr. Sanders had a good
 7   understanding of what these products were purchased
 8   from -- from China from.  There was just mathematically
 9   impossible to be able to pay that duty.
10            So that was the premise going into our
11   research.
12    Q.  Did you make an effort to gain access to import
13   data?
14    A.  Yes.  We subscribed to a service called Import
15   Genius.
16    Q.  What did you discover from reviewing the Import
17   Genius records?
18    A.  Well, reviewing multiple, multiple years of the
19   time frame going back more than a decade -- and we knew
20   these products were here by the millions over that time
21   period.  But in the import record, nobody was calling
22   them a welded outlet or anything similar.  Not once.
23            So that immediately gave us a red flag that
24   perhaps that's why the duties weren't being paid.  They
25   perhaps were not being called what they were supposed to

1    be called, and that's why the duty wasn't being charged.

2    That was the premise.

3        Q.  Did you do any research to determine what the

4    Chinese manufacturers called these products when they

5    sold them in the marketplace?

6        A.  Yes.  We did.  We did Internet searches.  And

7    looked up all the Chinese manufacturers.  They, too, on

8    there website called it a welded outlet.  So they called

9    it a welded outlet.  All the people we compete with in

10   the United States called it a welded outlet.  It's

11   called a welded outlet everywhere except the import

12   record, as far as we could see from that information.

13       Q.  Specifically as to Sigma, did the Import Genius

14   records show that Sigma was importing welded outlets?

15       A.  It did not show that they were importing welded

16   outlets, no.

17       Q.  Did the Import Genius records show that Sigma was

18   importing steel couplings?

19       A.  Yes, it did.

20       Q.  Was that suspicious to you?

21       A.  Yes.

22       Q.  Mr. Woehrel, let me ask you a couple more

23   questions.

24           Did Sigma's Chinese welded outlets --

25   competing with those Chinese welded outlets, did that

```
 1   give Sigma a price advantage in the market, vis-à-vis

 2   Island?

 3       A.   Absolutely.

 4       Q.   Did Island struggle to compete with Sigma's

 5   Chinese welded outlets?

 6       A.   Absolutely.

 7       Q.   Competing with these unlawfully dumped Chinese

 8   welded outlets, did that damage Island's business?

 9       A.   Absolutely.

10            MR. KRAMER:  Then I will pass the witness.

11            THE COURT:  Okay.

12            Counsel.
```

<strong>13                  CROSS-EXAMINATION</strong>

```
14   BY MR. CURRAN:

15       Q.   Good afternoon, Mr. Woehrel.  I'm Christopher

16   Curran representing Sigma.

17       A.   Good afternoon.

18       Q.   So let me first make sure I understand your

19   background correctly.

20            You graduated from Penn State.  And then you

21   got an M.B.A. at Oakland University; is that right?

22       A.   That is right.

23       Q.   You went to work in the steel industry for a

24   couple companies.  But those companies did not sell

25   welded outlets; is that right?
```

1    A.  That's correct.

2    Q.  So your first exposure to welded outlets was

3  after you joined Island, correct?

4    A.  Well, I had started selling Island pipe when I

5  joined the pipe company.  So there's a period, you know,

6  10 or 15 years that I was familiar with Island

7  Industries.  And I toured the plant.  So I was

8  familiar with -- I'd seen the product they made, but I'd

9  never sold it.

10    Q.  So you never sold it.  You didn't consider

11  yourself an expert in welded outlets at that time?

12    A.  No.

13    Q.  You are not a welder; you're not an expert in

14  welding, correct?

15    A.  Correct.

16    Q.  But you testified here today that Sigma in its

17  marketing materials characterized the UniLet product as

18  a welded outlet, right?

19    A.  Correct.

20    Q.  And that other sellers of welded outlets

21  characterize their products similarly, correct?

22    A.  Correct.

23    Q.  That was based on your personal observations and

24  the exhibit that Mr. Kramer showed you?

25    A.  Yes.

1      Q.  So those manufacturers characterize their product

2   as welded outlets, not as buttweld fittings, correct?

3      A.  Correct.  They call them what UL requires them to

4   call them, a welded outlet.

5      Q.  Right.  Okay.  And UL -- thank you -- which sets

6   the standards in this industry, they referred to it as

7   welded outlet, correct?

8      A.  Correct.

9      Q.  Not as a buttweld fitting?

10     A.  That's not one of the identity standards, right.

11     Q.  I have a series of questions about your

12  investigation.  So you joined Island in 2015, right?

13     A.  Yeah.  As I started with working with Glenn in

14  late 2015.

15     Q.  2015?

16     A.  Yes.

17     Q.  Shortly after joining, maybe in 2016, you began

18  an investigation as to whether Island could make a trade

19  remedy case against competitors, right?

20     A.  Yes.  I suppose.  Sure.  We discovered many

21  options.  But yes, that's what we were looking to do.

22     Q.  So at the point you were beginning your

23  investigation, you still were not an expert in welded

24  outlets or welding, correct?

25     A.  Correct.

1     Q.  And you -- in the course of your investigation,

2   you found this Sprink-let ruling that you described

3   today, correct?

4     A.  Yes.

5     Q.  That Sprink-let ruling was from 1992, right?

6     A.  Yes.

7     Q.  I think we heard reference to that being from an

8   ancient time, correct?

9     A.  Yes.

10    Q.  This was in 2016 where you were finding it,

11  right?

12    A.  Yes.

13    Q.  You were working with Mr. Sanders, your boss, in

14  conducting this investigation, right?

15    A.  Correct.

16    Q.  And Mr. Sanders had been at Island for almost his

17  whole life, right?  He inherited the company from his

18  father or something, right?

19    A.  I dont know if he inherited it.  But he started

20  it with his father.  I think they built it together.

21    Q.  Okay.  So he had been at the company for decades,

22  it's fair to say, by 2015?

23    A.  Yes.

24    Q.  He wasn't familiar with the Sprink-let ruling,

25  right?

```
 1       A.  No.  I think he said -- no, not the Sprink-let
 2   ruling specifically.  He had received a letter --
 3       Q.  That's not the question.
 4                Was he aware of the Sprink-let ruling when
 5   you discovered it in 2016?
 6       A.  I don't believe so.
 7       Q.  So for decades he was working at Island, the head
 8   of the company, and he wasn't aware that there was this
 9   Sprink-let ruling out there.  Fair?
10       A.  That's fair.  They'd never imported anything,
11   but, yeah.
12       Q.  Okay.  But he apparently was -- felt he was
13   suffering from competition from imports, right?
14       A.  But he had no reason -- since he was never
15   importing anything, he had no reason to look for that.
16   He would trust that, you know, the government would
17   enforce any trade laws.
18       Q.  Weight a second.  You and he were working for
19   such things in 2016, right?
20       A.  As we started -- as we had conversations, that's
21   when we started to look for that information, yes,
22   that's right.
23       Q.  So Mr. Sanders didn't look for -- certainly
24   didn't find the Sprink-let ruling any time earlier?
25       A.  Not to my knowledge, no.
```

Case 2:22-00050436-02M19-gc Document 86-1 Filed 06/27/22-1 Entered 06/27/22 Page 354 of 587 Exhibit D
Transcript of Day 1 of FCA Trial    Page 138 of 244
137

     1      Q.  The Sprink-let ruling you that you found, that
     2   you have described, that related to an antidumping duty
     3   investigation of buttweld fittings from Taiwan, correct?
     4      A.  Correct.
     5      Q.  And Taiwan is different from China, correct?
     6      A.  Sure.  Yes.
     7      Q.  You understand that antidumping duty orders are
     8   country specific, right?
     9      A.  Right.
    10      Q.  So the country -- the duty order that the
    11   Sprink-let ruling related to was different from the
    12   China buttweld fitting duty order, correct?
    13      A.  I understand it wasn't substantively different.
    14   But, yes, there was different wording.
    15      Q.  I'm sorry.  Different...
    16      A.  Different wording.
    17      Q.  The scope of the covered product is different,
    18   right?
    19      A.  Not substantively.
    20      Q.  Sir, was it different?
    21      A.  Okay.
    22      Q.  And, sir, you know, right, sitting here today,
    23   that that Sprink-let ruling has never been applied by
    24   any U.S. Government agency or any U.S. port as applying
    25   to the Chinese order, correct?

 1      A.  Right.

 2      Q.  So you -- you found a dumping -- a scope ruling

 3  in the Taiwan dumping case.  And it related to the

 4  Sprink-let product, correct?

 5      A.  Correct.

 6      Q.  I may have misheard you.  But did you say in your

 7  testimony on direct that the Sprink-let product is

 8  identical to the Sigma's UniLet?  Is that what you

 9  testified?

10      A.  I testified that it was physically identical --

11  essentially physically identical.

12      Q.  What do you mean essentially?

13      A.  That it has a weld bevel.  And it's used for the

14  same purpose in the same industry.

15      Q.  You know it's got an extra edge to it that fits

16  within the hole on the main pipe, right?

17      A.  And I don't consider that substantive.  It's used

18  for the same end use.  It is a bevel.  And it is

19  permanently welded.  And that's considered a weld bevel.

20      Q.  Well, it is not the identical product, correct?

21      A.  To me it is.

22      Q.  It has different characteristics, doesn't it?

23      A.  To me it hs the same characteristics.

24      Q.  If it fits within the hole on the lead pipe

25  instead of laying just on top of it, it requires a

```
 1   different weld, right?
 2       A.  I don't know that it -- I don't know that.  I'm
 3   not a welder.  I don't think it can -- requires a
 4   different weld at all.
 5       Q.  Have you consulted with any welders when you were
 6   conducting your investigation as whether Sigma's
 7   products fell within the Sprink-let ruling?
 8       A.  I didn't consult with a welder, no.
 9       Q.  Okay.  So in 2016 you and Mr. Sanders are doing
10   this investigation, you find the Sprink-let ruling.  Did
11   you find the Star Pipe ruling?
12       A.  The Star Pipe ruling?
13       Q.  Yes.
14       A.  No.
15       Q.  Do you even know what the Star Pipe ruling is?
16       A.  No.
17       Q.  Did you do a search on the cross-database?
18       A.  No.  I'm not familiar with the cross-database.
19       Q.  Have you ever heard of the Customs Ruling Online
20   Search System?
21       A.  No.
22       Q.  So you never did a search for welded outlets on
23   the cross database?
24       A.  I never have.
25       Q.  Sitting here today, you've still never even heard
```

 1    of the Star Pipe ruling; is that right?

 2        A.    That's correct.  Is it a scope ruling?

 3        Q.    Yes.  It's a classification ruling from Customs.

 4              And you've never heard of it?

 5        A.    I only know the two scope rulings that I read in

 6    The Sunset Review about five countries.

 7        Q.    Another part of your investigation that you

 8    talked about was -- under Mr. Kramer's questioning, you

 9    had to determine whether the foreign -- whether the

10    importers were paying the antidumping duty, right?

11        A.    Right.

12        Q.    And because that was important, because maybe

13    they were paying it, but maybe they weren't.  Right?

14        A.    Correct.

15        Q.    And among the ways that you investigated whether

16    the importers were paying dumping duties was you had

17    contacts with employees or former employees of the

18    importers, right?  Or you or Mr. Sanders?

19        A.    That was some of the information.  But it was

20    also, as I said in my testimony, general knowledge of

21    what these products were sold for in the marketplace,

22    which is readily available to anyone in the industry

23    that's selling and buying these products and what the

24    costs were.

25              And because of the size of the import duty

1    of 182.9 percent, it was our premise that it was not

2    being paid.

3         Q.   Okay.  But among the companies that you accused

4    of not paying antidumping duties was Anvil, correct?

5         A.   Correct.

6         Q.   And Anvil it turns out was a domestic

7    manufacturer of the product, correct?

8         A.   We felt that they were also importing a product

9    from China.

10        Q.   But you were wrong, correct?

11        A.   We did not pursue that case, correct.

12             We saw documents, and they published price

13   increase announcements where they said they brought it

14   in from China.

15             Now, that's the information we have.

16        Q.   Sitting here today, you know that Anvil was

17   competing effectively against Island while making the

18   product domestically, right?

19             MR. KRAMER:  I will object on relevance

20   grounds.

21             THE COURT:  Overruled.

22             THE WITNESS:  Sure.  We all compete in the

23   marketplace together.  And we have to do so

24   competitively to win business.

25   BY MR. CURRAN:

1      Q.  Anvil was competing effectively even though it

2   was a domestic manufacturer?

3      A.  Yeah.  They were a domestic manufacturer.  We

4   believe they also had a brand that was not a domestic

5   brand.

6      Q.  And today you know that you were wrong.  In fact

7   the Merit brand is made in the United States, correct?

8      A.  The Merit brand is made in the United States.

9   But their SPF brand is globally sourced as it says in

10   the brochure.

11          We weren't able to find exactly what that

12   global source was.  We went strictly on the pricing

13   information by the top management to the marketplace

14   that they -- when the Trump tariffs came out, that they

15   were going to raise prices to the Trump tariffs on this

16   specific SPF product because they were made in China.

17   That was our interpretation.

18      Q.  Sir, as part of your investigation, you wanted to

19   determine what manufacturers in China -- and suppliers

20   in China were providing the product to Sigma and the

21   other importers, right?

22      A.  I'm sorry.  Could you rephrase the question.

23      Q.  As part of your investigation with Mr. Sanders,

24   into whether you had trade remedies available to Island,

25   you undertook to determine whether Sigma and the other

1    importers -- who their SUPPLIERS were in China?

2       A.   Yeah.   We knew they were in China, because the

3    product is marked "Made in China."   But, yeah, we wanted

4    to find out who those suppliers were if we could.

5       Q.   Different duties apply to different suppliers,

6    right?

7       A.   They do.

8       Q.   And for you to know whether a particular duty was

9    being imposed, you needed to know who that foreign

10   supplier was?

11      A.   Yes.   If we could determine that.

12      Q.   One of the ways that you undertook to determine

13   that was by contacting former employees or current

14   employees of the importers, correct?

15      A.   Yes.

16      Q.   And one of the former employees whom you and

17   Mr. Sanders contacted was Tom Paquette, correct?

18      A.   I never contacted or talked to Mr. Piquet.   But

19   Mr. Sanders I believe did.

20      Q.   You know he did because he told you, correct?

21      A.   Correct.

22      Q.   So as part of this investigation, Mr. Sanders was

23   contacting a former employee of Sigma to get nonpublic

24   information, right?

25      A.   I'm not sure that it would necessarily be

  1    nonpublic across the industry.  Some people freely share

  2    who they buy their products from on the website.

  3             So that type of information and who your

  4    vendors are, that information is shared freely.  In

  5    fact, if you're a salesperson, that's one of the things

  6    you need to do is find out who your customers are buying

  7    from and what they are paying.  And they will tell you.

  8    Q.  Well, if you knew the information about Sigma,

  9    you wouldn't -- Mr. Sanders wouldn't have needed to

 10    contact Tom Piquet, right?

 11    A.  We knew -- Mr. Sanders was aware of the major

 12    Chinese manufacturers for a long time.  Beijing Bell was

 13    one of them.  That wasn't all of them.  There was -- Ji

 14    Ahn Nee (phonetic) was another.  I think when Mr. Piquet

 15    said that Beijing Bell was a source of supplier from

 16    Sigma, that didn't surprise him.  He already knew that.

 17    That was confirmation.  And it was helpful to our

 18    investigation to confirm that.

 19    Q.  So is it your testimony that you contacted a

 20    former employee of Sigma to get confirmation of

 21    information that you knew or suspected?

 22    A.  Mr. Sanders contacted a former employee or -- to

 23    get information that he willingly and freely gave to

 24    Mr. Sanders.

 25    Q.  The former employee of Sigma willingly gave it?

     1     A.   Yes.

     2     Q.   You're an M.B.A.  You know that's in breach of

     3   his obligation to his former employer, right?

     4     A.   I don't know that.  I don't know what his

     5   obligations are to his former employer.  I don't know if

     6   he has a contract or what that was.

     7               As I said, this information is freely

     8   exchanged in the industry in terms of pricing and

     9   supplier information.

    10               I do it very often in my job.  And ask

    11   customers who they are buying from and what they are

    12   paying.  They freely give me that information so that I

    13   can supply them with the most competitive price that

    14   helps them as a buyer.  That's why it's done.

    15     Q.   Do you disclose nonpublic information of your

    16   former employers?

    17     A.   If someone asked me a question about who we used

    18   to sell to, I wouldn't have a problem with that.  That's

    19   not -- the customers that we sold to in the past, you

    20   can do a simple Google search.  It's not like there's a

    21   customer on every street corner with steel products.

    22     Q.   We are talking about suppliers here, not

    23   customers, right?

    24     A.   Yeah.  If you are asking me if that would be a

    25   problem for me to say to customers or someone else that

```
1    my former employer used to buy from a certain person,

2    no, I won't have a problem with that.  It is not to me

3    private information.

4              THE COURT:  Ladies and gentlemen, I'm going

5    to interrupt at this time.  It is 2:30, which is time

6    for our break.  We'll have you come back in in 15

7    minutes.

8              Remember the admonishment not to discuss the

9    case among yourselves or with anybody else or form or

10   express any opinions about the matter until it's

11   submitted to you and you retire to the jury room.

12             See you back in 15 minutes.

13             (BREAK TAKEN.)

14             THE COURT:  Let the record reflect that all

15   jurors are in their respective seats in the jury box.

16             The witness is on the witness stand.

17             Counsel, you may continue your

18   cross-examination.

19             MR. CURRAN:  Thank you, Your Honor.

20             Your Honor, at this time I would like to lay

21   a foundation for the admission of a document with this

22   witness.

23             THE COURT:  Okay.

24             MR. CURRAN:  May I approach?

25             THE COURT:  Certainly.  The clerk.
```

```
 1              MR. KRAMER:  We object to this.  It was not
 2   disclosed to us.  It's not on the exhibit list.
 3              THE COURT:  I don't even know what it is
 4   yet, Counsel.
 5              THE CLERK:  Judge, did you want to see it
 6   first?
 7              THE COURT:  No.
 8              MR. CURRAN:  This is for impeachment.
 9              THE COURT:  Okay.
10   BY MR. CURRAN:
11      Q.  Mr. Woehrel, do you see the document that's in
12   front of you?
13      A.  Yes.
14      Q.  And, sir, that is an email sent to you by Glenn
15   Sanders on or about November 11th -- November 18, 2016,
16   correct?
17      A.  Correct.
18      Q.  You received this in the ordinary course of your
19   work at Island, correct?
20      A.  Correct.
21              MR. CURRAN:  Your Honor, I move for the
22   admission of this document into evidence.
23              THE COURT:  I don't know what the relevancy
24   is at this time, Counsel.
25              You can ask him questions about it.
```

Case 2:22-cv-00050-DCM-9c   Document 06/27/22-1   Entered 06/27/22 Page 834 of 565c Exhibit   148
Case 2:22-00050436-DCM-9c   Filed 06/27/22-1   Entered 06/27/22 Page 834 of 565c Exhibit
Transcript of Day 1 of FC42 Trial    Page 149 of 244

```
 1   BY MR. CURRAN:

 2      Q.  Mr. Woehrel, this is Mr. Sanders forwarding to

 3   you an email that he received from Thomas Paquette, a

 4   former employee of Sigma, correct?

 5      A.  Correct.

 6      Q.  And the email attaches certain information as to

 7   Sigma suppliers, correct?

 8      A.  Correct.

 9          MR. CURRAN:  Your Honor, I move for the

10   admission of this document.

11          THE COURT:  I just don't know what the

12   relevancy is, Counsel.

13          You haven't asked him what it says or

14   anything else.

15          At this time I have no idea what it is, so

16   the relevancy hasn't been established yet.

17   BY MR. CURRAN:

18      Q.  Mr. Woehrel, this email was forwarded to you by

19   Mr. Sanders in connection with the investigation the two

20   of you were doing into whether importers were failing to

21   pay antidumping duties, correct?

22      A.  This has nothing to do whether they were failing

23   to pay anything.  This is just an email confirming the

24   suppliers.  Beijing Bell, as I said.  Glenn Sanders

25   already knew that.
```

```
 1              Other suppliers were aware of the claim
 2    filed.  That was nothing new.  Aegis, nothing new.  We
 3    knew that.
 4              Orvis was a trading company from the
 5    Chinese.  We weren't aware who they were.  But, again,
 6    supplier information, I do not personally consider
 7    proprietary information.  These companies sell to many
 8    other companies.  And they freely advertise.  And some
 9    companies that buy from these companies freely advertise
10    on their websites that they buy from these companies.
11    So this -- I guess I don't understand either.  This is
12    benign.
13              THE COURT:  The question is:  Do you agree
14    with everything that's said on there?
15              THE WITNESS:  Yeah, I do.  The supplier
16    information, yes.
17    BY MR. CURRAN:
18       Q.  Mr. Woehrel, is it your testimony that the
19    information that you and Mr. Sanders received from
20    Mr. Paquette was not confidential, nonpublic
21    information?
22       A.  I don't believe it was not confidential
23    information.  It is, as I said -- in the industry -- I
24    can't speak for other industries, but I would imagine
25    it's the same thing, information on suppliers and
```

```
 1   pricing is freely shared amongst participants in

 2   industries, yes.  So I wouldn't think this is private

 3   information, no.

 4             MR. CURRAN:  Your Honor, at this time I

 5   would like to show a clip from Mr. Woehrel's deposition.

 6   This clip begins on page 197, line 3 and runs to 197,

 7   line 20 of that deposition.

 8             THE COURT:  Go ahead.  Want to take a look

 9   at it, Counsel?

10             MR. KRAMER:  I don't have a copy of it.

11             THE COURT:  Do you want to read it or do you

12   want to show it on the video.

13             MR. CURRAN:  I would like to show it on the

14   video.

15             THE COURT:  Counsel, would you like to take

16   a look at it?

17             MR. KRAMER:  Yes, please.

18             THE COURT:  See if there's an objection.

19             MR. KRAMER:  Your Honor, I object.  I don't

20   think it is impeaching anything.

21             THE COURT:  I don't know.  I have to read

22   it.  Pass it up.  I will take a look and see if it is

23   impeachment.

24             What are the lines again?

25             MR. CURRAN:  Pardon me?
```

```
 1                   THE COURT:  What are the lines again?
 2                   MR. CURRAN:  197, line 3 to 197, line 20.
 3                   If it helps, I would be happy to explain the
 4     impeachment.
 5                   THE COURT:  Counsel, I'm sorry.  I don't see
 6     any impeachment on there.
 7                   You can ask him questions about it.  But I
 8     see nothing that is contrary to the testimony he's
 9     already given.
10                   MR. CURRAN:  Your Honor, he has denied --
11                   THE COURT:  Counsel.
12                   MR. CURRAN:  Yeah.
13                   THE COURT:  Next question.
14     BY MR. CURRAN:
15         Q.  So, Mr. Woehrel, it is your testimony that you
16     and Mr. Sanders reached out to former employees and
17     current employees of the importers not to get
18     confidential information but just to confirm information
19     that was otherwise available?
20         A.  Yes.  To get information that was available.  A
21     lot of the information, the contacts we made, were in
22     the normal course of business.  Supplying products to
23     Sigma so we don't --
24                   THE COURT:  You've answered the question.
25                   It has to be by question and answer.  You
```

```
 1   answered the question.

 2                 THE WITNESS:  I'm sorry, Your Honor.

 3                 THE COURT:  That's okay.

 4   BY MR. CURRAN:

 5      Q.  Is it your testimony that the contacts that you

 6   and Mr. Sanders made to a former employee of Vandewater

 7   that that was perfectly fine as well?

 8                 MR. KRAMER:  Objection; relevance.

 9                 THE COURT:  Overruled.

10                 THE WITNESS:  Again, that wasn't my contact.

11   But, yes, I don't see any problem with that, with

12   Mr. Sanders getting information from a person in the

13   industry that he had a relationship with.

14   BY MR. CURRAN:

15      Q.  And, sir, is it your testimony that you saw no

16   issue with the contact that you and Mr. Sanders made to

17   a current employee of Anvil at the time?

18      A.  I don't see any problem with that, no.

19      Q.  Sir, a jury has recently concluded that it was

20   violation --

21                 MR. KRAMER:  Objection.

22                 THE COURT:  Sustained.

23                 What another jury did has nothing to do with

24   what this jury has to decide, Counsel.

25                 Next question.
```

1   BY MR. CURRAN:

2      Q.  Mr. Woehrel, have you ever seen a 7501 Customs

3   form filled out by Sigma with respect to the importation

4   of welded outlets?

5      A.  No, I never have.

6      Q.  So you wouldn't know whether the invoice attached

7   to such a duty pack would disclose that the couplings

8   being imported were welded outlets, correct?

9      A.  I haven't seen any of those packets.  So I

10  wouldn't be able to comment on that.

11     Q.  And, sir, during the course of your

12  investigation, back in 2016 with Mr. Sanders, you didn't

13  come across any evidence that Sigma was intentionally

14  trying to avoid the imposition of antidumping duties,

15  right?

16     A.  I don't know what intention they would have.  As

17  I said, I don't know what they were thinking.  I just

18  know that the circumstances that we unfolded were that

19  the duties -- we did understand that the duties weren't

20  being paid, and they weren't paid.  That is my

21  understanding.

22         THE COURT:  Again, that wasn't the question.

23  If your counsel wants you to expand on that he'll ask

24  you further question.

25         Why don't you ask the question again.

 1                THE WITNESS:  I apologize again.

 2   BY MR. CURRAN:

 3      Q.  The question is:  Did you, during the course of

 4   your investigation, come across any evidence that Sigma

 5   was intentionally trying to avoid the imposition of

 6   antidumping duties?

 7      A.  No.  Other than our observation of product

 8   descriptions.  But no.

 9                THE COURT:  Okay.

10                MR. CURRAN:  Nothing further, Your Honor.

11                THE COURT:  Redirect?

12                MR. KRAMER:  Very briefly.

13                THE COURT:  Sure.

14                **REDIRECT EXAMINATION**

15   BY MR. KRAMER:

16      Q.  Mr. Woehrel, you were asked a couple of questions

17   on cross-examination about the Sprink-let ruling.

18                Do you recall that?

19      A.  Yes.

20      Q.  And one of the questions you were asked had to do

21   with if Glen Sanders was aware of the Sprink-let ruling.

22                Do you remember that?

23      A.  Yes.

24      Q.  Is Island an importer of record?

25      A.  No.

1      Q.  Does it have any reason in its business to be

2   familiar with scope rulings?

3      A.  No.

4      Q.  Is it your understanding that importers of record

5   need to know about scope rulings?

6      A.  Yes.

7              MR. KRAMER:  Nothing further, Your Honor.

8              THE COURT:  Any recross in that area?

9              MR. CURRAN:  No, Your Honor.

10             THE COURT:  Okay.  You may step down.

11             Next witness.

12             MR. KRAMER:  Your Honor, Island calls

13   Mitchell Rona, who is a Sigma witness.

14             THE COURT:  Okay.

15             MR. CURRAN:  Your Honor, Mr. Lau will handle

16   this witnesses for Sigma.

17             THE COURT:  Thank you, Counsel.

18             THE CLERK:  Good afternoon.  Right here to

19   be sworn, please.

20             Do you solemnly swear that the testimony you

21   are about to give in the cause now pending before this

22   Court shall be the truth, the whole truth and nothing

23   but the truth, so help you God?

24             THE WITNESS:  I do.

25             THE CLERK:  Thank you.  You may be seated.

```
 1                    Please state your full name for the record
 2    and spell your last name.
 3                    THE WITNESS:  Mitchell Rona, R-o-n-a.
 4                    THE COURT:  You may inquire.
 5                    MR. KRAMER:  Thank you, Your Honor.
 6                         DIRECT EXAMINATION
 7    BY MR. KRAMER:
 8       Q.  Mr. Rona, my name is Kelly Kramer.  We've never
 9    met before, correct?
10       A.  Correct.
11       Q.  I understand this correctly, you've worked at
12    Sigma for more than 30 years, right?
13       A.  Yes.
14       Q.  And you're currently an executive vice president?
15       A.  Correct.
16       Q.  Do you have an ownership in the company?
17       A.  Very, very, very small.
18       Q.  Do you have any feel for what that might be
19    worth?
20       A.  Fractional.
21       Q.  Pennies?
22       A.  I don't know about pennies.  But very, very, very
23    small.
24       Q.  50 grand?
25       A.  A little bit more than that.
```

1    Q.  Okay.  Hundred?

2    A.  Invested?

3    Q.  I just want to know what your equity interest is

4  worth, sir?

5    A.  Very small.  150.

6    Q.  150.  Okay.  In this case you were designated as

7  Sigma's corporate representative for purposes of the

8  deposition, correct?

9    A.  Correct.

10   Q.  And you testified as Sigma's corporate

11 representative, correct?

12   A.  Correct.

13   Q.  That was back in March of 2020?

14   A.  Yes.

15   Q.  Deposition was transcribed?

16   A.  Yes.

17   Q.  You had an opportunity to review it to see if

18 there were mistakes?

19   A.  Yes.

20   Q.  You understood that you were speaking on behalf

21 of the company, correct?

22   A.  Correct.

23   Q.  Now, prior to that deposition, you received a

24 list of topics as to which you needed to be prepared,

25 right?

```
 1      A.  Correct.

 2      Q.  You understood that Sigma had a duty to educate

 3  you about those topics, correct?

 4      A.  Correct.

 5      Q.  And you spent two days to prepare?

 6      A.  Approximately.

 7      Q.  Okay.  And as part of those preparations, you

 8  reviewed documents, right?

 9      A.  Correct.

10      Q.  You spoke with a few Sigma employees, right?

11      A.  Correct.

12      Q.  Who did you speak with?

13      A.  Just to collect information about the sales

14  figures, I spoke with IT -- our IT department to collect

15  the information on the sales figures associated with,

16  you know, the particular products --

17      Q.  Okay.

18      A.  -- that were in question.

19      Q.  Did you speak with Ms. Velasquez?

20      A.  Probably spoke to her.

21      Q.  Do you remember one way or the other?

22      A.  I probably spoke to her also about the sales

23  figures, correct.

24      Q.  Did you speak to her about any other topic?

25      A.  No.
```

```
 1       Q.  Did you speak with Mr. Bhattacharji?

 2       A.  We talked about the same subjects because the

 3  figures were an area where I was able to be helpful.

 4       Q.  Did you speak with any former Sigma employees?

 5       A.  No.

 6       Q.  Did you speak with any of Sigma's customs

 7  brokers?

 8       A.  No.

 9       Q.  Did you speak with the lawyers from White & Case?

10       A.  During preparation?

11       Q.  Yes.

12       A.  Yes.

13       Q.  Okay.  And the purpose of these meetings was so

14  that you would be prepared to answer the questions on

15  all of the topics that were in that list, right?

16       A.  Correct.

17       Q.  So we are going to talk more about that.  But

18  let's talk a little bit now about your role at Sigma.

19  You're an executive vice president, right?

20       A.  Correct.

21       Q.  One of your responsibilities is to supervise the

22  company's global supply chain, correct?

23       A.  At the time back in 2011, I was vice president of

24  operations.  I became executive vice president in 2017.

25       Q.  But was there any meaningful distinction in your
```

1   job duties?

2       A.  Approximately the same, yes.

3       Q.  So your title was different.  The duties were

4   more or less the same?

5       A.  That's correct.

6       Q.  Back to my question.  One of your

7   responsibilities is to oversee the global supply chain,

8   correct?

9       A.  Correct.

10      Q.  You've been responsible for doing that since

11  June of 2011, right?

12      A.  Correct.

13      Q.  And as the executive vice president or as the

14  vice president, we will just amend it, responsible for

15  Sigma's global supply chain one of the groups that

16  reported up to you was the Import Operations Group,

17  correct?

18      A.  Correct.

19      Q.  As the executive who was responsible for the

20  global supply chain, you were responsible for ensuring

21  that import operations took the steps necessary to

22  comply with the law, right?

23      A.  Correct.

24      Q.  And as the executive responsible for overseeing

25  the import operation group, you were ultimately

 1    responsible for the importation of Sigma's Chinese

 2    welded outlets, correct?

 3        A.  Correct.

 4        Q.  Let's talk a little bit about Sigma's business.

 5    Most of Sigma's business involves imported products,

 6    correct?

 7        A.  The majority, yes.

 8        Q.  The majority.  Could you quantify that?  What

 9    percentage involves imported products?

10        A.  Approximately in revenue base today about

11    80 percent.

12        Q.  80 percent.  And historically, from 2010 to 2018,

13    was that more or less the same or was it a little bit

14    higher?

15        A.  It is hard to say.  But we've always consistently

16    maintained domestic manufacturing of certain products or

17    bought and sold certain percentage of domestic products.

18        Q.  Sure.  But my focus is on the foreign products.

19    And so I guess I'm just trying to make sure I

20    understand.  In that 2010, 2018 range, is 80 percent a

21    fair approximation?

22        A.  I don't have the exact figures.  But I would say

23    that 15 to 20 percent would be fair.

24        Q.  I'm sorry, you're saying --

25        A.  15 to 20 percent continually would be fair.

1    Q.  Of domestic products?

2    A.  No. No.  Of import.  Import was approximately 80

3    percent.  So approximately -- you asked me for the

4    entire period of 2010 through 2018.  It varied year to

5    year.  But it was -- approximately 20 percent was

6    domestic and 80 percent was imported.

7    Q.  Fair enough.  And of those imported products,

8    what percentage would you say come from China?

9    A.  That also varied.  In revenue terms, the exact

10   figures, I don't have them in front of me.  But I would

11   say that it was more than 50 percent but -- of the

12   80 percent.

13   Q.  Understood.  So let's talk about Sigma's Chinese

14   welded outlets.

15        Do you know what I'm referring to when I say

16   Sigma's Chinese welded outlets?

17   A.  Yes.

18   Q.  Talking about the UniLet, right?

19   A.  Correct.

20   Q.  Safe-let?

21   A.  Yes.

22   Q.  And a handful of grouped outlets for Shanghai

23   Vision, right?

24   A.  Correct.

25   Q.  Now, as to all of those products, Sigma served as

 1    the importer of record when they brought them into the

 2    country, correct?

 3        A.  Correct.

 4        Q.  And as the importer of record, Sigma had an

 5    obligation to take reasonable care when it imported

 6    those Chinese products, right?

 7        A.  Correct.

 8        Q.  And as the importer of record, one of the things

 9    that Sigma was responsible for was ensuring that the

10    products were accurately and completely described to

11    Customs and Border Protection, right?

12        A.  I would say that -- repeat the question, please.

13        Q.  One of the things that Sigma was responsible for

14    doing was to ensure that the products were accurately

15    and completely described to Customs and Border

16    Protection?

17        A.  Correct.

18        Q.  And as the importer of record, another obligation

19    was for Sigma to determine -- to exercise reasonable

20    care, to determine if the products were subject to

21    antidumping duties, right?

22        A.  Correct.

23        Q.  And Sigma was responsible for disclosing to

24    Customs and Border Protection whether those products

25    were subject to antidumping duties, right?

1    A.  Correct.

2    Q.  So speaking of antidumping duty orders for a

3  moment, I would like to take a look at Island

4  Exhibit 58.  I understand there's no objection, Your

5  Honor.

6              THE COURT:  It will be received.

7              (Exhibit 58 is received.)

8              MR. KRAMER:  May I publish?

9              THE COURT:  Yes.

10              MR. KRAMER:  Thank you.

11              Mr. Hendy, can you help me.

12              MR. HENDY:  Sure.

13              MR. KRAMER:  Thank you.  Excellent.

14  BY MR. KRAMER:

15    Q.  Now, Mr. Rona, these are some frequently asked

16  questions on the Customs and Border Protection website.

17              And my first question for you is, as the

18  executive responsible for overseeing import operations,

19  prior to this case, had you ever reviewed these

20  frequently asked questions?

21    A.  I had not.

22    Q.  Now, the -- as you sit here today -- if you look

23  at the bottom, you will see that there's a question and

24  answer.  Is that legible to you?  I'm trying to get to

25  the right spot.

```
 1      A.   It's fine.

 2      Q.   There's a question and answer there regarding --

 3  the question is:  "How can I determine whether

 4  merchandise that I'm planning to import is subject to

 5  antidumping duty or countervailing duties?"

 6           Do you see that?

 7      A.   Yes.

 8      Q.   The answer to that question is:  "You need to

 9  review the scope of the AD/CVD" -- that means

10  antidumping countervailing duty, right?

11      A.   Okay.

12      Q.   Okay.  "You need to review the scope of the

13  antidumping duty orders to determine whether the

14  merchandise falls within the scope of an order."

15           Do you see that?

16      A.   No, I don't see that.  I apologize.

17      Q.   No problem.  Let me see if I can highlight it.

18      A.   Oh, I'm sorry.

19      Q.   Can you read that clearly?

20      A.   Yes.

21      Q.   And as you sit here today, you know, as the

22  executive responsible for overseeing import operations,

23  that the only way to know the scope of an antidumping

24  duty order is to read the order, correct?

25      A.   I know that when we reviewed the initial
```

```
 1   classification for the UniLet --

 2       Q.  I hate to interrupt you.  That is not really my

 3   question.

 4            My question is:  As you sit here today, do

 5   you understand that the way to know if a product is

 6   within a scope of an antidumping duty order you have to

 7   read the order?

 8       A.  Okay.  Yes.

 9       Q.  You do know that?

10       A.  Yes.

11       Q.  Now, I would like to take a look a little bit

12   further down the page.

13            Can you read that?  Okay?

14       A.  Yes.

15       Q.  Okay.  Now, as you sit here today, you know what

16   an HTS code is, right?

17       A.  Yes.

18       Q.  It is a classification code, right?

19       A.  Correct.

20       Q.  It is the Harmonized Tariff Schedule, correct?

21       A.  Correct.

22            MR. LAU:  Objection, Your Honor.  There's

23   been no showing that the witness has any personal

24   knowledge of this document at all.

25            THE COURT:  Sustained.
```

```
 1                    Have you ever seen it before?

 2                    THE WITNESS:  No.

 3                    THE COURT:  Sustained.

 4                    MR. KRAMER:  Okay.

 5   BY MR. KRAMER:

 6      Q.  As you sit here today, you know that an HTS

 7   code --

 8      A.  Sorry.

 9      Q.  No problem.  You okay?

10      A.  I have to put my glasses down to see you.  And I

11   need my glasses to see.  It's okay.

12      Q.  Fair enough.  You understand that an HTS code

13   does not, in fact, determine the scope of an antidumping

14   duty order, correct?

15      A.  Yes, correct.

16      Q.  And you understand that the HTS codes that are

17   included in these antidumping duty orders are providing

18   for convenience only, right?

19      A.  Yes.

20      Q.  Let's take a look quickly at the China order.

21                    Your Honor, this is Exhibit 8.  I don't

22   believe it is in evidence yet.  But there is no

23   objection.

24                    THE COURT:  It will be received.

25                    (Exhibit 8 is received.)
```

```
 1   BY MR. KRAMER:

 2       Q.   I'm going to test your glasses again.

 3       A.   Not a problem.

 4       Q.   I hit the wrong word.  Okay.

 5            And this is what we've referred to in this

 6   case as the China order.

 7            Now, I just want to ask you a couple of

 8   questions about the China order.  Am I correct that

 9   Sigma first became aware of the China order in December

10   of 2017?

11       A.   Not that -- no.

12       Q.   No.  Okay.  When is it that you think Sigma first

13   became aware of the China order?

14       A.   I'm seeing it -- I apologize.  I'm seeing an

15   excerpt.  This is -- what is the actual total order?

16   What is the order?

17       Q.   So this is the order as it is published in the

18   Federal Registry.

19       A.   But meaning the whole order, the whole page.

20       Q.   Right.

21       A.   Can you go to the top, please.

22       Q.   Yes.

23       A.   Okay.  So this is -- okay.  I believe this is --

24            MR. LAU:  Objection.  Same objection, for

25   lack of showing personal knowledge.
```

```
 1                    THE COURT:  Have you ever seen this order
 2    before?
 3                    THE WITNESS:  I believe this is -- I don't
 4    recall seeing it.  But I believe this is the Sprink-let
 5    ruling from 1992.
 6                    MR. KRAMER:  No.
 7                    THE WITNESS:  Okay.  It is not.
 8    BY MR. KRAMER:
 9        Q.  This is the antidumping duty order on certain
10    carbon steel buttweld pipe fittings from the People's
11    Republic of China.
12        A.  I have not seen this before.
13        Q.  Did anyone at Sigma see this order prior to
14    December of 2017?
15        A.  No.
16        Q.  No.  I want to talk a little bit about your
17    day-to-day role in import compliance.
18                    Do you have a significant -- do you have a
19    meaningful day-to-day role in the import compliance
20    group's activities?
21        A.  From what time period?
22        Q.  So let's talk about the time period 2010 through
23    2018.
24        A.  In 2010, I did not.
25        Q.  Okay.  What about in 2011 through 2018, did you
```

 1    have a meaningful role in the day-to-day activities that

 2    occurred?

 3        A.  Not day-to-day.

 4        Q.  You're not a licensed Customs broker, right?

 5        A.  No.

 6        Q.  You didn't take any classes on import compliance?

 7        A.  No.

 8        Q.  Never received any formal training regarding

 9    import compliance at all, right?

10        A.  No.

11        Q.  Regarding antidumping duty orders, you didn't

12    take any classes on how to comply with antidumping duty

13    orders?

14        A.  I did not.

15        Q.  You didn't receive any formal training about

16    antidumping duty order compliance, right?

17        A.  Formal training, no.

18        Q.  And as part of your job, you basically didn't

19    review antidumping duties orders at all, right?

20        A.  Not unless someone asked me particularly to get

21    involved in a particular issue.

22        Q.  Right.  But on a day-to-day basis, as a personal

23    matter, you were not reviewing antidumping duty orders,

24    correct?

25        A.  Correct.

1     Q.  You've never in fact personally researched

2     whether a Sigma product was subject to an antidumping

3     duty order, have you?

4     A.  I don't recall doing that, no.

5     Q.  And you typically didn't talk to Customs brokers

6     about Sigma's products, correct?

7     A.  That's correct.

8     Q.  And focusing on 2010 specifically.  Sigma first

9     started to import the UniLet in 2010, correct?

10    A.  That's correct.

11    Q.  You know that?

12    A.  I do know that.

13    Q.  Now, at that time -- at that time.  And the

14    UniLet is a Chinese loaded outlet, correct?

15    A.  Correct.

16    Q.  Now in 2010, at that time you weren't yet

17    responsible for the supply chain, right?

18    A.  That is correct.

19    Q.  You weren't supervising the global supply chain

20    at all, right?

21    A.  That's correct.

22    Q.  And you personally didn't play any role in

23    researching whether the UniLet might be subject to an

24    antidumping duty order, right?

25    A.  That's correct.

1    Q.  You didn't speak with the Customs broker about

2    the UniLet, correct?

3    A.  That's correct.

4    Q.  In fact you don't actually have any firsthand

5    personal knowledge at all about what anyone at Sigma did

6    in 2010 regarding this product, do you?

7    A.  Not particularly for this product, no.

8    Q.  All you know is what people have told you, right?

9    A.  I know what people have told me, yes.  And I also

10   worked with the person who did the work.  So I had a lot

11   of background and experience working with her on --

12   Q.  Right.  But just to be clear, you don't have any

13   personal firsthand information about what happened in

14   2010 as it relates to the UniLet?

15   A.  Correct.

16   Q.  I'm sorry I spoke over you.

17   A.  That's okay.

18   Q.  Thank you.

19          But you testified as Sigma's corporate rep

20   regarding the UniLet, right?

21   A.  I did.  I testified as Sigma's corporate rep,

22   correct.

23   Q.  Right.  And one of the topics you testified about

24   was the UniLet product, right?

25   A.  Correct.

1     Q.  And you testified that before importing the

2   UniLet, no one from Sigma researched whether antidumping

3   duties applied to these welded outlets, correct?

4     A.  I believe in my testimony I -- in one place I may

5   have said that.  And then in another place I would have

6   said that I know that Mrs. Stacker, who was in charge of

7   imports, had done that work.  And that's what I had

8   heard, correct, from -- not firsthand.  From

9   Mrs. Stacker.

10            MR. KRAMER:  I move to the strike the

11   information you've heard not firsthand but from

12   Mrs. Stacker as hearsay.

13            THE COURT:  It will be stricken.

14   BY MR. KRAMER:

15     Q.  Now, as the corporate representative you

16   testified that in 2010 Sigma didn't get an opinion from

17   counsel as to whether the UniLet was subject to

18   antidumping duties, correct?

19     A.  I don't know recall that I testified.  If that's

20   what I said, that's what I said.

21     Q.  I would like to direct your attention to page 258

22   of your deposition, lines 1 through 13.

23            And this is the 30(b)(6) deposition

24   transcript, Your Honor.  May I show it to the witness?

25            THE COURT:  Sure.

```
 1              MR. KRAMER:  Your Honor, I would actually
 2    ask that this be displayed to the jury as well.  Since
 3    it is a 30(b)(6) deposition.  I believe it is useable
 4    for all purposes.
 5              THE COURT:  If there is no objection, sure.
 6    BY MR. KRAMER:
 7    Q.  As you can see here, sir, that you testified in
 8    response to the question:
 9              "So let's turn to 2010 when Sigma decided to
10    import the UniLet product.
11              "Did Sigma obtain any opinion of counsel in
12    2010 with respect to the proper classification of the
13    product?"
14              And your answer was:
15              "I have no knowledge of that as a
16    representative of Sigma.  I've clearly outlined probably
17    nine or times the process we used inheriting the
18    classification."
19              So as you sit here today, I'd like to ask
20    you this:  Do you have any knowledge of Sigma ever
21    obtaining an opinion of counsel with respect to the
22    UniLet in 2010?
23    A.  Personal knowledge, no.
24    Q.  Now, you testified as a corporate representative
25    that you were not aware of any documentation reflecting
```

1    communications between Sigma and the Customs broker as

2    it relates to the UniLet, correct?

3        A.  Correct.

4        Q.  And you as you sit here today, you don't have any

5    knowledge of any -- you don't firsthand have any

6    knowledge of any verbal communications between anyone at

7    Sigma and anyone at a Customs broker's house, correct?

8        A.  That's correct.

9        Q.  And you recall that Island served discovery

10   request on Sigma during the course of this case, right?

11       A.  Yes.

12       Q.  And one of those requests was for Sigma to answer

13   questions in writing, right?  They call it interrogatory

14   requests.

15       A.  Yes.

16       Q.  And to the best of your knowledge, Sigma answered

17   accurately, correct?

18       A.  Correct.

19               MR. KRAMER:  I would like to look at Island

20   Exhibit 52, which I understand there is no objection.

21               THE COURT:  It will be received.

22               (Exhibit 52 is received.)

23               MR. KRAMER:  May it be published, Your

24   Honor?

25               THE COURT:  Yes.

1   BY MR. KRAMER:

2      Q.  Now, Mr. Rona, were you involved at all in the

3   responses to these interrogatories?

4      A.  I would say partially involved.

5      Q.  I would like to direct your attention to the

6   interrogatory request, Question No. 3.  You will see

7   here that it says, "Identify any person who advised you

8   or consulted with you as to whether welded outlets were

9   subject to the antidumping duty order for buttweld pipe

10  fittings."

11          Did I read that right?

12     A.  I'm sorry.

13          THE COURT:  Number 3.

14          THE WITNESS:  I see it.  I was reading the

15  response.  Sorry.

16  BY MR. KRAMER:

17     Q.  Did I get that right?

18     A.  Okay.

19     Q.  Okay.  And Sigma's answer was "none."  Correct?

20     A.  Uh-huh.  Yes.

21     Q.  That's because Sigma didn't actually consult with

22  anyone about whether the UniLet or that any Chinese

23  welded outlets were subject to the antidumping duty

24  order for buttweld pipe fittings, correct?

25     A.  That's what -- that's what it says, yes.

```
 1      Q.  And any person would include a Customs broker,

 2   correct?

 3              MR. LAU:  Objection.  The document does

 4   speak for itself.

 5              THE COURT:  Sustained.

 6   BY MR. KRAMER:

 7      Q.  Let's talk about documentation.  As the executive

 8   responsible for overseeing import operations, you know

 9   that Customs -- Customs and Border Protection expect

10   importers of record to keep a written record of the

11   advice that they received from the Customs broker,

12   right?

13      A.  Yes.

14      Q.  Okay.  And you are familiar with Sigma's import

15   compliance manual, correct?

16      A.  Yes.

17      Q.  And you know that the manual requires the import

18   group to archive all communications and information

19   relating to classification decisions, right?

20      A.  That is what the manual says.  And that's

21   correct.

22      Q.  And one reason that a company like Sigma, they

23   would want to keep an archive of these things is because

24   you have to allow the company to demonstrate that it

25   engaged in reasonable care, right?
```

1     A.  I would say that the manual was produced in 2013.

2  And the previous conversation was about 2010.  I can't

3  comment on whether we have it -- had it, but -- correct.

4  I understand --

5     Q.  My question is a little bit different.  I want to

6  make sure we're on the same page here.

7          I'm saying that one of the reasons why a

8  company like Sigma would want to keep this documentation

9  is because it demonstrates that they engaged in

10  reasonable care, correct?

11     A.  Correct.

12     Q.  So it's in Sigma's interest to keep such

13  documents, correct?

14     A.  It's always in interest to keep documents,

15  correct.

16     Q.  But as you sit here today, you know that Sigma

17  does not have any documents reflecting communications

18  with any Customs broker about the UniLet, correct?

19     A.  In 2010, correct.

20     Q.  Right?

21     A.  Yes.

22     Q.  And it doesn't have a written opinion letter from

23  an attorney, for example, as to whether the UniLet was

24  subject to antidumping duties, correct?

25     A.  Correct.

```
 1      Q.  It doesn't have any emails with Customs brokers

 2   as to whether UniLet was subject to an antidumping duty,

 3   right?

 4      A.  Correct.

 5      Q.  Doesn't have any file notes from someone in

 6   import operations purporting to document a discussion

 7   with the Customs broker, does it?

 8      A.  Correct.

 9      Q.  Doesn't have any contracts with Customs brokers

10   showing that brokers would provide anti dumping

11   compliance, right?

12      A.  Not that I'm aware of.

13      Q.  It doesn't have any voices from a Customs broker

14   showing that the broker provided antidumping duty

15   related advice, right?

16      A.  On the UniLet.

17      Q.  On the UniLet?

18      A.  Right.  Correct.  Correct.

19      Q.  As you sit here today, you know that Sigma does

20   not have a single record, electronic, paper or

21   otherwise, showing that it communicated with anyone

22   about whether the UniLet was subject to antidumping

23   duties, correct?

24      A.  Correct.

25      Q.  Moving forward to 2016.  In 2016, that's when
```

    1    Sigma started to import the Safe-let, correct?

    2        A.   Correct.

    3        Q.   Safe-let is also a Chinese welded outlet,

    4    correct?

    5        A.   Correct.

    6        Q.   At that time, in 2016, you were the executive

    7    responsible for overseeing import operations, correct?

    8        A.   Right.

    9        Q.   But your personal involvement in terms of the

    10   safe-let, you were not personally involved in assessing

    11   whether the safe-let was subject or might be subject to

    12   an antidumping duty, right?

    13       A.   Correct.

    14       Q.   And as the corporate rep, though, you did testify

    15   about the safe-let, correct?

    16       A.   I'm sure I did.

    17       Q.   And as Sigma's corporate representative, you

    18   testified that Sigma viewed the safe-let to be the same

    19   product as the UniLet, correct?

    20       A.   Correct.

    21       Q.   And as Sigma's corporate representative, you

    22   testified that because Sigma viewed the safe-let to be

    23   the same as the UniLet, it did not do any research as to

    24   whether an antidumping duty would apply to that product,

    25   correct?

1      A.  Correct.

2      Q.  You testified as Sigma's corporate representative

3  that Sigma did not consult with counsel about whether

4  the safe-let was subject to an antidumping duty order,

5  correct?

6      A.  Correct.

7      Q.  You testified as Sigma's corporate representative

8  that Sigma did not consult with a Customs broker about

9  the classification of the safe-let, correct?

10     A.  Please repeat that.

11     Q.  You testified as Sigma's corporate representative

12 that Sigma did not consult with a Customs broker about

13 the classification of the safe-let, correct?

14     A.  Not to my knowledge, correct.

15     Q.  Well, you were testifying as the company's

16 representative, correct?

17     A.  That is correct.

18     Q.  That is the company's position, correct?

19     A.  Correct.

20     Q.  And you testified as the corporate representative

21 that Sigma did not consult with a Customs broker as to

22 whether the safe-let was subject to any antidumping duty

23 orders, correct?

24     A.  If that's what the testimony says.  I don't have

25 it in front of me.  But then it's correct.

 1     Q.  But you have no reason to believe as you sit here

 2   today that Sigma did anything in 2016 to determine if

 3   the sig-let -- excuse me, the safe-let was subject to

 4   antidumping duties, correct?

 5     A.  I knew that he had -- that we were receiving

 6   daily and repetitive updates from Customs on any HTS

 7   code that we imported and that if for any reason that

 8   HTS code was part of an antidumping order, we would come

 9   to know about it, which means we would find out if the

10   UniLet was now subject and that would make the safe-let

11   subject.

12          So We had no reason to believe there was any

13   change in the HTS code, correct.

14          MR. KRAMER:  I move to strike as

15   nonresponsive.

16          THE COURT:  Overruled.

17   BY MR. KRAMER:

18     Q.  I was asking you, sir, not about the HTS code.

19   I'm asking about whether you had any reason to

20   believe -- as you sit here today, do you have any reason

21   to believe that Sigma did anything to determine if the

22   safe-let was subject to an antidumping duty?

23     A.  I'm sure we did follow a process.  And when we

24   created the new item number for the safe-let and we went

25   through the same process we would always do, which was

1   followed all the time, which was to put together a new

2   item creation, to review it, to submit it, to collect

3   the drawings, to go to the same process, which is what I

4   believe I testified to.

5      Q.  I would like to show you page 188 of your

6   deposition testimony.

7              May I publish, Your Honor?

8              THE COURT:  Yes.  If there is no objection.

9   Yes.

10  BY MR. KRAMER:

11     Q.  I would like to direct your attention to line 13.

12  And the question says:

13     "QUESTION:  In 2016 when Sigma launched the

14  safe-let product, it did not do any research at that

15  time with respect to antidumping duty that would apply

16  to the safe-let product, correct?

17     "ANSWER:  We didn't do any additional new work on

18  that product because it was same product as far as we

19  were concerned."

20             Do you see that?

21     A.  Correct.  We didn't do any additional work.

22     Q.  In other words, in 2016 prior to importing the

23  safe-let, Sigma did not take any steps to determine if

24  it was subject to an antidumping duty, right?

25     A.  Not to my knowledge.

1    Q.  Whatever work it did, if it did any, it was done

2    all the way back in 2010, right?

3    A.  The work that was done on a day-to-day basis to

4    put in any new item would have been done.  But --

5    Q.  Mr. Rona, I'm asking specifically with respect to

6    what happened on this product.  As you sit here today,

7    you have no knowledge of any work at all being done in

8    2016 with respect to whether the safe-let was subject to

9    antidumping duties, correct?

10   A.  Correct.

11   Q.  I want to focus on the time frame 2010 through

12   2018.  Okay.  In that time frame, did you personally do

13   anything to determine if the Chinese welded outlet was

14   subject to an antidumping duty?

15   A.  No.

16   Q.  And you didn't do that because that wasn't your

17   job, right?

18   A.  My direct job, it was --

19   Q.  It's not a trick question.  It was not Mitch

20   Rona's job personally.  Correct?

21   A.  Correct.

22   Q.  There were import operations people that you

23   thought were responsible for those activities, right?

24   A.  Not thought.  I knew they were responsible for

25   their work.

1      Q.   Okay.  So you believe that they were responsible

2   for work.

3           But the point is that you didn't have any

4   firsthand knowledge about any of these activities,

5   correct?

6      A.   On the two particular products, right.

7      Q.   On these two particular products, which is all

8   this trial is about, right, sir?

9      A.   Correct.

10     Q.   Did you -- so we're talking about the people who

11  actually had some firsthand knowledge about this might

12  be somebody like Pat Packer, right?

13     A.   Right.

14     Q.   Because she worked in import operations, right?

15     A.   She was in charge of import operations.

16     Q.   And Andy Pogner, right?

17     A.   In charge of import operations.

18     Q.   And -- forgive me if I butcher this -- Ingay

19  Atkinson?

20     A.   Said correctly.

21     Q.   Oh.  Excellent.

22          So let net ask you a couple questions about

23  these folks.

24          Did Sigma disclose any of those people as

25  potential witnesses in this case?

1    A.  I'm not familiar with who was exposed as

2  witnesses.

3    Q.  Let me take you back to your testimony as

4  corporate representative.

5            You knew that you were speaking on behalf of

6  Sigma, right?

7    A.  Correct.

8    Q.  And you knew these folks had firsthand knowledge

9  about what might have happened, right?

10    A.  Correct.

11    Q.  They certainly had a better chance of knowing

12  something than you did, correct?

13    A.  Correct.

14    Q.  And you knew that Sigma had an obligation to

15  educate you about these topics, right?

16    A.  Obligation?  Okay.  I'll --

17            THE COURT:  If you know.

18            THE WITNESS:  I know that in my testimony

19  about those three people you just asked about, I was

20  asked if they were available, would they come forward

21  and testify, would they be interested in testifying.

22  BY MR. KRAMER:

23    Q.  Mr. Rona, that is not really responsive to any

24  question.

25    A.  Okay.

1      Q.  Let's just go back and back up on this, right.

2   You understood -- you understood that one of the topics

3   that is on the list, that you needed to be prepared for

4   was the nature, substance and extent of any effort Sigma

5   undertook, considered or caused others to undertake or

6   consider, if any, to determine whether welded outlets

7   were subject to any antidumping duty order.

8              Do you recall that?

9      A.  I don't recall that now, no.  But I remember that

10   the question.  I didn't particularly remember that.

11     Q.  And one of the things, though, you understood

12   that one of the topics of this deposition was:  What did

13   Sigma do, if anything, as it related to antidumping duty

14   compliance, right?

15     A.  Yes.

16     Q.  So when you prepared to testify as Sigma's

17   corporate representative, you knew that Ms. Acker might

18   know something, right?

19     A.  Correct.

20     Q.  You knew that Mr. Potter might know something,

21   right?

22     A.  Correct.

23     Q.  You knew that Ms. Atkinson might know something,

24   right?

25     A.  Correct.

 1       Q.  And you did not speak to any of them before your

 2  corporate representative testimony, did you?

 3       A.  Correct.

 4       Q.  In fact, you didn't -- other than Ms. Velasquez,

 5  you didn't speak with anyone who worked in import

 6  operations, right?

 7       A.  Correct.

 8       Q.  And you knew that Sigma's Customs brokers, well

 9  they might have information about what steps were taken

10  about whether there were antidumping duty applicable to

11  these product, right?

12       A.  Correct.

13       Q.  And you didn't speak to any of the Customs

14  brokers before you gave your corporate representative

15  testimony, did you?

16       A.  Correct.

17       Q.  And you didn't try to speak with any of these

18  former employees, right?

19       A.  No.

20       Q.  You didn't try to speak with any of these Customs

21  brokers, right?

22       A.  I did not.

23       Q.  Let's change topics.  Let's talk about how Sigma

24  markets Chinese welded outlets.

25                  Chinese -- Sigma's Chinese welded outlets,

1  they're listed and approved by Underwriters

2  Laboratories, right?

3     A.  I would have to see the literature to confirm

4  that.

5     Q.  You don't know?

6     A.  I would say they are.  I saw the literature --

7  I've seen the literature in the depositions.

8     Q.  And do you know then that Sigma markets these

9  products using the UL mark?

10     A.  If we have UL, then we would use the UL mark,

11  correct.

12     Q.  Do you know that as a condition to using those

13  marks UL requires that these products be called either a

14  welded outlet, a welding outlet or weld outlet fitting?

15          THE COURT:  If you know.

16          THE WITNESS:  I don't know that.

17  BY MR. KRAMER:

18     Q.  Do you have any knowledge as to whether the

19  description steel coupling is approved by Underwriters

20  Laboratory?

21     A.  I do not.

22          MR. KRAMER:  Let's take a look at Island

23  Exhibit 66, which is in evidence.

24          May I publish it, Your Honor?

25          THE COURT:  Yes.

1    BY MR. KRAMER:

2      Q.  So Mr. Rona, this is a Sigma catalog.  Do you

3    recognize that as such?

4      A.  Yes.

5      Q.  And if you look at the last page, I can show you

6    dates back to 2011.

7           Would you like to see that?

8      A.  Sure.  I can see it.

9      Q.  Excellent.  Now, this particular product, this

10   catalog section, right, these are the welded outlet

11   products, right?

12          MR. LAU:  Objection.  No showing of personal

13   knowledge on this document.

14          THE COURT:  I don't know.  Do you recognize

15   those items on that document?

16          THE WITNESS:  Is this the document that was

17   contained in the deposition --

18          THE COURT:  No.  That's not the question.

19   He showed you the picture.  Who knows what the picture

20   is.

21          THE WITNESS:  Yeah, I'm -- I'm --

22          THE COURT:  He wants to know if that picture

23   depicts --

24          THE WITNESS:  That's a picture of I believe

25   the cover of the welded outlet brochure.

```
 1                THE COURT:  Okay.

 2  BY MR. KRAMER:

 3     Q.  Sigma's welded outlet?

 4     A.  Correct.  Correct.

 5     Q.  In fact, this covers the -- it covers Sigma's

 6  welded piping products, right?

 7     A.  As I said --

 8             (Unreportable crosstalk.)

 9  BY MR. KRAMER:

10     Q.  I don't want it to be a trick --

11     A.  Look.  What I'm asking you is in the deposition

12  that was an exhibit.  The entire catalog, I believe, and

13  it's included.  If it's the same catalog, and this is

14  the same catalog, then I'm familiar with it.

15     Q.  Let me show you a couple pages of this.

16     A.  Sure.

17     Q.  (Showing witness.)

18     A.  That's the same catalog.

19             Correct.  It's the same catalog.

20     Q.  So I would like to show you on page 5 of this

21  exhibit -- which is the product literature for the

22  UniLet product, right?

23     A.  Yes.

24     Q.  And the UniLet again is one of these Chinese

25  welded outlets, correct?
```

```
 1      A.  Correct.

 2      Q.  When Sigma advertised this product it advertised

 3  it as a threaded welded outlet, right?

 4      A.  Yes.

 5          THE COURT:  Sorry, Counsel.  Are you

 6  referring to page 5 of what exhibit?

 7          MR. KRAMER:  Exhibit 66.

 8          THE COURT:  Page 5.

 9          Because only those pages that have been

10  referred to will come into evidence.

11          The whole document doesn't come in to

12  evidence.

13          Only pages that are referred to by a witness

14  will come into evidence.  I want to make sure that we

15  have it.  It's page 5 is what you are saying?

16          MR. KRAMER:  Yes.

17          THE COURT:  Go ahead.

18  BY MR. KRAMER:

19      Q.  Now, Mr. Rona, this page here, the first line

20  describes the product as the UniLet welding outlet,

21  correct?

22      A.  Correct.

23      Q.  Now, this product catalog, it never refers to the

24  UniLet as a steel coupling, does it?

25      A.  Correct.  From what you -- I didn't read the
```

1    entire document, but I'm assuming it doesn't.  Correct.

2      Q.  Well, I'll let your counsel point that out if it

3    does.

4            MR. KRAMER:  I would like to change topics

5    here.  Well, not change topics, but change documents.  I

6    would like to move to admit Sigma Exhibit 1088.  I

7    understand there is no objection.

8            THE COURT:  Okay.  It will be received.

9            (Exhibit 1088 is received.)

10   BY MR. KRAMER:

11     Q.  Now, Mr. Rona, do you recognize this as another

12   of Sigma's piping catalogs?

13     A.  I actually thought that was the same catalog you

14   just showed me.

15     Q.  Gotcha.  Let me show you the last page.

16     A.  I can see the date.

17     Q.  So you see that this is the later catalog, right,

18   this is from 2016?

19     A.  What I can say, Counsel, is I can see the

20   difference between the two that you showed me here

21   today, correct.

22            One says 2012 or, whatever, '11.  And one

23   says 2016.

24     Q.  Well, I would like to show you page 8 of

25   Exhibit 1088.

1    A.  Okay.

2    Q.  Which is a product literature for the safe-let

3    product, correct?

4    A.  Correct.

5    Q.  And the safe-let -- this is a product, the

6    Chinese welded outlet, correct?

7    A.  Correct.

8    Q.  And Sigma didn't start to import it until 2016,

9    right?

10    A.  Correct.

11    Q.  And here safe-let is described as welded outlet,

12    correct?

13    A.  Correct.

14    Q.  And it's referred to in that first paragraph as a

15    welding outlet, right?

16    A.  Correct.

17    Q.  You are not aware of any place in this catalog

18    where this product is described a steel coupling, are

19    you?

20    A.  Not to my knowledge.

21    Q.  Now, Sigma sells steel couplings, right?

22    A.  I believe we do.  But I'm not specifically clear

23    about the extent of our sale of steel couplings.  If we

24    do, it could be very small.  But I'm not personally

25    aware of it.

1    Q.  So I'm sorry --

2    A.  Oh, I don't have intimate knowledge of the sale

3    of steel couplings.  If we do sell them, I -- I -- I

4    just don't know each and every last product down --

5    Q.  You don't know every product that Sigma sells?

6    A.  Not every extension of a product.

7    Q.  Got it.

8    A.  But if we sell steel couplings and it's in our

9    catalog, then I don't disagree that we sell steel

10   couplings.

11   Q.  When Sigma sells steel couplings, it advertises

12   those steel couplings in the threaded product section of

13   its catalog, correct?

14   A.  I don't know that for a fact.  In the threaded

15   product -- in that brochure that you just showed me?

16   Q.  No.

17   A.  In another brochure?

18   Q.  I'm asking, as sit here today, do you understand

19   that Sigma in fact sells steel couplings, correct?

20   A.  I'm vaguely familiar with the fact that we sell

21   steel couplings, yes.

22   Q.  Do you have any familiarity at all of the fact

23   that Sigma sells its steel couplings, it lists them in

24   its product catalog as a threaded fitting -- threaded

25   product?

```
1      A.   I'm not aware of that.

2      Q.   You're not aware?

3      A.   No.

4      Q.   Do you have any understanding that the welded

5  outlets are sold in a completely different section as a

6  welded fitting?

7      A.   Without looking at -- of the catalog from 2016

8  that you just showed me, I have not -- are steel

9  couplings included in that catalog?

10     Q.   No.  I'm asking about what Sigma is selling

11 today.  I'm asking you -- we've gone over this now a

12 couple of times.  So do you have any familiarity with

13 Sigma's current advertising?  If the answer is no, we

14 can move on.

15     A.   I don't have any current advertising knowledge of

16 what items are contained in what particular catalogs.

17     Q.   As you sit here today, you know that there's an

18 antidumping duty order, applicable both to buttweld pipe

19 fittings, right, from Taiwan, you know that there's one,

20 right?

21     A.   Yes.

22     Q.   And you know that there's one from China,

23 correct?

24     A.   I -- okay.

25     Q.   And you understand as you sit here today that the
```

```
 1   Department of Commerce has said, that the scope of the
 2   China and Taiwan orders is essentially the same,
 3   correct?
 4       A.  I'm not particularly familiar with each of the
 5   orders.
 6              MR. KRAMER:  Well, let's take a look at
 7   Island Exhibit 28.  I understand there is no objection.
 8              THE COURT:  It will be received and may be
 9   published.
10              (Exhibit 28 is received.)
11   BY MR. KRAMER:
12       Q.  Now, Mr. Rona this is a what's called a Sunset
13   Review from August of 2016.
14       A.  Okay.
15       Q.  Are you familiar with Sunset Reviews?
16       A.  I believe that they are used when something which
17   was antidumping expires.  Is that the Sunset?
18       Q.  So you understood that a Sunset Review is a
19   review undertaken by the Department of Commerce
20   International Trade Commission every five years after an
21   antidumping duty order is imposed, correct?
22       A.  Okay.
23       Q.  The purpose is to determine whether or not to
24   continue with the antidumping duty order, right?
25       A.  Understood.
```

1    Q.  So you understood as it relates to these

2    particular products, the antidumping duty order buttweld

3    pipe fittings that the Sunset Reviews involved all five

4    countries to which these orders are subject, correct?

5    A.  Okay.

6    Q.  And as part of this, you understood that the

7    Department of Commerce provided information to the

8    importing community, including companies like Sigma if

9    they cared to look at it.  Do you know if Sigma ever

10   reviewed the Sunset Review?

11   A.  For these two -- for those, no.  I'm not aware of

12   us reviewing that.

13   Q.  I would like to direct your attention to page 6.

14        MR. LAU:  Objection, Your Honor.  There's no

15   showing of personal knowledge.

16        THE COURT:  I don't know what piece he is

17   putting in yet.

18        This is what document?

19        MR. KRAMER:  This is Exhibit 28.

20        THE COURT:  Have you seen Exhibit 28?  Do

21   you know what he's talking about?

22        THE WITNESS:  I do not, Your Honor.

23        THE COURT:  Okay.

24        MR. KRAMER:  So I apologize, Your Honor.

25   There are two different page numbers.

          1                  THE COURT:  Okay.

          2                  MR. KRAMER:  I would direct the witness'

          3    attention to Exhibit 28, page 11 and 12.  If I can make

          4    that work.

          5                  THE COURT:  Have you ever seen these two

          6    pages before?

          7                  THE WITNESS:  No.  No.  Sorry.

          8    BY MR. KRAMER:

          9     Q.  My question is this:  As the executive

         10    responsible for overseeing import operations at Sigma,

         11    were you aware --

         12                  THE COURT:  Counsel, why don't you take it

         13    down.  He said he's never seen it before.

         14                  MR. KRAMER:  Okay.

         15                  THE COURT:  Okay.  Thank you.  Go ahead with

         16    your question.

         17    BY MR. KRAMER:

         18     Q.  As you sit here today, sir, you understand that

         19    steel couplings are beyond the scope of the China order,

         20    correct?

         21     A.  Steel couplings are beyond the scope of the --

         22    I'm not sure of the total question.

         23     Q.  My question is this:  As you sit here today, you

         24    understand that steel couplings are not subject to

         25    antidumping duties under the antidumping duty order

1    applicable to carbon steel buttweld pipe fittings from

2    China, are you?

3        A.    I was not aware of that.  I did not have any

4    knowledge of steel couplings and them being part or not

5    part of an antidumping order.  I'm not aware of that.

6        Q.    Well, you understand the Department of Commerce

7    has said that the scope of these orders, the China or

8    Taiwan order, includes carbon steel buttweld pipe

9    fittings under 14 inches in diameter other than

10   couplings, correct?

11       A.    If that's what the order says.

12       Q.    Okay.  So you would agree with me that if the

13   order says "other than couplings," if that's what

14   Commerce has put out, other than couplings, you would

15   agree that steel couplings are not subject to

16   antidumping duties, right?

17       A.    I'm not clear on the relevance.

18       Q.    I'm just asking if you agree with my proposition.

19              THE COURT:  It's not irrelevant whether he

20   agrees to your proposition or not.

21              Next question.

22   BY MR. KRAMER:

23       Q.    Yes.  Let's take a look at the Sigma import

24   pages.

25              MR. KRAMER:  Your Honor I would like to

1  display and admit Exhibit 1010.

2              THE COURT:  No objection.  They will be

3  received and displayed.

4              (Exhibit 1010 is received.)

5  BY MR. KRAMER:

6      Q.  Now, Mr. Rona you are familiar with the entry

7  packets that were produced in this case, right?

8      A.  Yes.

9      Q.  So I would like to start with page 1 of this

10  packet, page 1 of Exhibit 1010, which is a form 7501,

11  correct?

12     A.  That's correct.

13     Q.  And you see here in the block in the middle of

14  page 3, third line --

15     A.  Yes.

16     Q.  -- paperwork indicates that Sigma is importing

17  steel couplings, correct?

18     A.  That's what the paperwork says.

19     Q.  And in fact it says, "steel couplings" twice,

20  correct?

21     A.  It does say steel couplings twice.

22     Q.  Now, the phrase "welded outlet" does that appear

23  anywhere on this page?

24     A.  It doesn't appear because it's not part of the

25  HTS code by which we are importing under.

1     Q.   Just to be clear, sir, I didn't ask you for the

2   reason.

3             I wanted to know, does welded outlet appear

4   on this page?

5     A.   It does not.

6     Q.   And welding outlet, does it appear on the page?

7     A.   It does not.

8     Q.   Does weld outlet fitting appear on this page?

9     A.   It does not.

10     Q.   And let's look at the second page of the packet,

11   which is the form 3461.

12             Do you see that?

13     A.   Yes.

14     Q.   And Box 20.  Box 20 contains a description of the

15   merchandise, correct?

16     A.   Correct.

17     Q.   And it reads -- what does it say?

18     A.   "Steel coupling."

19     Q.   And the phrase "welded outlet" doesn't appear on

20   this page, correct?

21     A.   That's correct.

22     Q.   The phrase welding outlet, that doesn't appear,

23   correct?

24     A.   Correct.

25     Q.   Look at the third page.  The third page is a

```
 1   commercial invoice, correct?

 2       A.   Correct.

 3       Q.   And it references an invoice number and all sorts

 4   of jazz like that, correct?

 5       A.   Correct.

 6       Q.   And it indicates that the product that's being

 7   imported is a steel coupling, correct?

 8       A.   That's correct.

 9       Q.   Let's look at next page.

10       A.   Yes.

11       Q.   So the next page is also a commercial invoice,

12   correct?

13       A.   Correct.

14       Q.   Okay.  So it's the second commercial invoice,

15   correct?

16       A.   Correct.

17       Q.   On this one it indicates that the product is a

18   UniLet welded.

19              Do you see that?

20       A.   Yes.

21       Q.   And a UniLet weld.

22              Do you see that?

23       A.   Yes.

24       Q.   And I think three or four from the bottom,

25   there's a reference to a UniLet welded out.
```

```
 1                   Do you see that?

 2      A.   Correct.

 3      Q.   Let's look at the fifth page.

 4      A.   Excuse me, Counsel.  It's clear to see from that

 5 page that it appears that the word "outlet," it just ran

 6 off the page.  And that welded outlet would have

 7 intended to be in that area.

 8      Q.   Let's take a look at the packing list.  What does

 9 that say?

10      A.   Steel coupling.

11      Q.   Let's take a look at the bill of lading.  What

12 does the bill of lading say?

13      A.   Steel coupling.

14      Q.   All right.  Let's look at this last page, which

15 is an arrival notice.

16                   Is this a document that you typically submit

17 to Customs and Border Protection as part of your entry

18 packets?

19      A.   I'm not familiar with this particular page.  If

20 it's an entry summary, I would believe that that

21 is correct.  I would believe that is correct.

22      Q.   Do you have any knowledge one way or the other as

23 to which of these documents are submitted to Customs and

24 Border Protection?

25      A.   I know that the whole package goes to Customs and
```

1  Border Protection.

2     Q.  So you believe that every one of these page goes

3  to Customs and Border Protection, correct?

4     A.  I believe that the whole 7501 package goes to

5  Customs.

6     Q.  I'm asking you whether you believe that every

7  single one of the pages we just looked at is submitted

8  to Customs?

9     A.  I was under the impression it was.

10    Q.  You don't actually know one way or the other, do

11 you?

12    A.  I'm going to go say that I was under the

13 impression it did.

14    Q.  Now, if you look at this one, what does it

15 indicate what product is being imported?

16    A.  It says "steel couplings."

17    Q.  So in this package, Sigma said seven different

18 times that it was importing steel couplings, correct?

19    A.  I didn't -- I'll -- I'll -- I'll agree if it's

20 seven.  I didn't count them, but meaning you said seven.

21    Q.  Okay.  You'll agree with me, I assume, that the

22 package repeatedly indicates that the product that's

23 being imported is a steel coupling, correct?

24    A.  Not what's being imported is a steel coupling.

25 But that following the HTS code, that coupling is a

```
 1   option in the HTS code and that welded outlet is not an

 2   option in the HTS code.

 3       Q.   Let me just be clear.  Where it says, Description

 4   of merchandise, for example, in the 3461, and it simply

 5   similarly says steel coupling.  You're telling me that

 6   that actually has something to do with HTS code?

 7       A.   On that --

 8       Q.   It's a description of the merchandise, correct?

 9       A.   That's correct.  That's what it says.

10                 (UNREPORTABLE CROSSTALK.)

11       Q.   Importing steel couplings, correct?

12       A.   That's what the document says.

13       Q.   Let's take a look at a different entry packet.

14   This one is Island Exhibit 29.

15                 THE CLERK:  Are you asking for that to be

16   moved into evidence?

17                 MR. KRAMER:  Yes, ma'am.  I would like to

18   move this into evidence.  I believe there is no

19   objection.

20                 THE COURT:  No objection.  It can be

21   received.

22                 (Exhibit 29 is received.)

23                 MR. KRAMER:  Thank you.

24   BY MR. KRAMER:

25       Q.   So Mr. Rona, this is another entry packet,
```

1   correct?

2       A.   Yes.

3       Q.   And here in the form 7501, we can go through this

4   quickly.  Again, in the form 7501, it indicates that the

5   product is a steel coupling, correct?

6       A.   Correct.

7       Q.   If we look here in the form 3461, we have another

8   indication here.  It says "steel coupling," correct?

9       A.   Correct.

10      Q.   We have another commercial invoice, right?

11      A.   Correct.

12      Q.   And it says "steel coupling," correct?

13      A.   Correct.

14      Q.   I'm sorry.  I missed your answer.

15      A.   Correct.  I said correct.

16      Q.   Thank you.

17           All right.  Now, we have another commercial

18   invoice, right, the second one, right?

19      A.   Correct.

20      Q.   And then this one indicates that two of these are

21   weld outlets fittings; one is a weld; and two are

22   welded, right?

23      A.   That's what it says, correct.

24      Q.   Packing list indicates it is a steel coupling,

25   correct?

        1      A.  Correct.

        2      Q.  The ocean bill of lading indicates it's steel

        3   couplings, correct?

        4      A.  Correct.

        5      Q.  And the Sigma invoice indicates that the product

        6   is a steel coupling, correct?

        7      A.  Correct.

        8      Q.  And we could go through a bunch of entry packets,

        9   right?  We can look through hundreds of them, correct?

       10   That's what's out there in this case, right?

       11      A.  I'm sure there are.

       12      Q.  But just to sort of cut this short, all of these

       13   entry packets Sigma represented that it was importing

       14   steel couplings, correct?

       15      A.  I wouldn't say representing.  But the documents

       16   speak for themselves.

       17           As I said before, the HTS code 7307995045

       18   provides a description.  And in the description,

       19   coupling is the closest thing that we found that met a

       20   welded outlet, and we were bringing in a welded outlet.

       21           But I understand what the documents say.

       22           MR. KRAMER:  So, Your Honor, I move to

       23   strike that as nonresponsive.

       24           THE COURT:  Denied.

       25           MR. KRAMER:  Okay.

1    BY MR. KRAMER:

2        Q.   Just to be clear, each and every one of these

3    documents is indicating that the products are steel

4    couplings, right?

5        A.   The word "steel coupling" is clearly written on

6    there.  I understand that.

7        Q.   Let's agree with that then.  That the words

8    "steel coupling" are the words that Sigma used to

9    describe its products on all of these different entry

10   forms, right?

11       A.   In addition to welded outlet being on the second

12   commercial invoice.

13            And I understand it's not in the spirit

14   of -- that's not what we are doing here.  But as I said,

15   Customs in the HTS importation allows for --

16            THE COURT:  Sorry.  Just listen to the

17   question.

18            THE WITNESS:  Yes.

19   BY MR. KRAMER:

20       Q.   I just want to make sure that we are all agreed,

21   that you and I have an agreement here; that these

22   documents, these entry packets -- we could go through

23   all them.  We could.  It's a waste time.  But those

24   words, "steel couplings" are going to appear essentially

25   in all of them, right?

```
 1      A.  They appeared on the two you showed me.  And I

 2  have no reason to believe that we were changing the

 3  paperwork each time.  Correct.

 4      Q.  And let me show you something else.  I want to

 5  show you your testimony as the corporate representative.

 6              And this is on page 174.

 7              THE COURT:  Of?

 8              MR. KRAMER:  The 30(b)(6) deposition, Your

 9  Honor.

10              THE COURT:  Okay.  What line on it?

11              MR. KRAMER:  Coming up.

12              We are going to be focusing on 18 through

13  21.

14              THE COURT:  Okay.

15  BY MR. KRAMER:

16      Q.  So Mr. Rona, when you testified as the corporate

17  representative and you were shown one of these entry

18  packets, and you were asked why the form 7501 says,

19  "steel coupling."

20              Your answer as the corporate representative

21  was, "I'm not sure.  I don't -- this -- I'm not sure."

22              Did I get that right?

23      A.  That's what it says.

24      Q.  And I would direct your attention to page 175,

25  lines 15 through 21.  You were shown a different form
```

1    7501 with the same description, "steel coupling."

2              The question you are asked is:  "Do you know

3    here why it's referred to as a steel coupling?"

4              And your answer was:  "No.  It's the same

5    answer to the same question.

6              "I understand where it says pipe fit.

7    Other.  Other.  I don't know why the steel coupling is

8    added I don't know what the reasoning for that is."

9              Do you see that?

10   A.  Yes.

11   Q.  Let me ask you this:  Since you testified as the

12   corporate representative in March 2020, and you didn't

13   know why it says "steel coupling," it seems to me you

14   are offering an explanation for why it says "steel

15   coupling" here today.

16              So let me ask you this:  Who told you what

17   that explanation was?

18   A.  I spoke to imports.

19   Q.  So after you testified as the corporate

20   representative, you spoke with someone else?

21   A.  To understand it.  Because I didn't understand

22   it.

23   Q.  So just to understand this.  The basis of your

24   knowledge for all of the testimony you've just given for

25   why this thing says "steel coupling," it's all hearsay,

```
 1   right?  You have no firsthand knowledge?

 2              THE COURT:  Why don't you reask the

 3   question.  That's argumentative.

 4              MR. KRAMER:  Yes, I'm sorry.

 5   BY MR. KRAMER:

 6      Q.  After you testified as corporate representative,

 7   you spoke with the imports department, and they told

 8   you -- they gave you a basis for why Sigma might have

 9   written these words down, correct?

10      A.  I don't think why is the right answer, Counsel --

11   or meaning.  I believe the -- when the actual product

12   name is not -- I sought clarity as to why something

13   was that I wasn't clear about.  I agree to that.

14      Q.  Okay.  So let's just -- I want to make sure we

15   are on the same page.

16              When you testified as the corporate

17   representative, when you testified on Sigma's behalf,

18   you did not know why these products were referred to as

19   steel couplings.  We can agree to that, correct?

20      A.  Correct.  I testified to that.

21      Q.  Right.  And then subsequently someone explained

22   to you why they think that it happened, right?

23      A.  Okay.

24      Q.  Okay.  So other than the information that someone

25   told to you, right, other than that information, you
```

1    actually don't have any firsthand knowledge as to why

2    this happened, correct?

3        A.   Firsthand meaning, I didn't go to the Internet

4    independently to find out how it's acceptable to fill

5    out a 7501, to put the right Harmonized Tariff Code in

6    and the right description based on --

7        Q.   Mr. Rona, I'm asking you -- I'm asking you.

8    Right?  I just want to know this.  This is an important

9    question.

10            If you're just repeating what someone else

11   is telling you, then it's not really valid testimony.

12   It's not very helpful to us.

13            Are you simply repeating what someone else

14   has told you?

15       A.   I collected information from imports.  I did not

16   research it independently.

17       Q.   Okay.

18            THE COURT:  Ladies and gentlemen, it's

19   4:00 o'clock.  I'm going to break at this time.

20            Remember the admonishment not to discuss the

21   case among yourselves or with anybody else or form or

22   express any opinions about the matter until you retire

23   to the jury room after your deliberation.

24            Now, let's talk about tomorrow.  We have to

25   start at 8:30.  I normally suggest to the jury that you

Case 2:22-cr-00054-DCN Document 196-6   Filed 06/27/22-1  Entered 06/27/22 17:24:54  of Desc Exhibit
Case 2:22-00054-DCN Doc 196-6   Filed 06/27/22-1  Entered 06/27/22 Page 392 of 587  Exhibit ID
Transcript of Day 1 of Trial   Page 215 of 244                              214

```
 1   try to get in by 8:15.  I'll will tell you why.  So many

 2   times people get tied up in traffic, et cetera.  And if

 3   somebody is late, it is like waiting for that person on

 4   the airplane to get on that gets on late.  It just

 5   frustrates everybody.  So I would suggest you be in at

 6   8:15.  Get some coffee or read a book, whatever.  So

 7   right at 8:30 we can start.  Okay?  See you back in

 8   tomorrow at 8:30.

 9                THE COURT:  8:15.  Get here at 8:30.  Court

10   will be in recess.

11                THE CLERK:  All rise.  Court is in recess.

12                (PROCEEDINGS CONCLUDED.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  CERTIFICATE OF REPORTER

 2

 3   COUNTY OF LOS ANGELES        )

 4                                ) SS.

 5   STATE OF CALIFORNIA          )

 6

 7   I, SHERI S. KLEEGER, OFFICIAL COURT REPORTER, IN AND FOR

 8   THE UNITED STATES DISTRICT COURT FOR THE CENTRAL

 9   DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

10   TO SECTION 753, TITLE 28, UNITED STATES CODE, THE

11   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

12   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

13   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE

14   FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE

15   JUDICIAL CONFERENCE OF THE UNITED STATES.

16   OCTOBER 5, 2021

17

18   /S/_____

19   SHERI S. KLEEGER, CSR

20   FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25
```

Case 2:22-00050-TOR Doc 19-6   Filed 06/27/22   Entered 06/27/22 Page 394 of 587 Exhibit ID

 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$1.82.9** [1] - 81:5

**'**

**'11** [1] - 193:23

**/**

**/S** [1] - 215:19

**1**

**1** [8] - 1:18, 7:25, 16:17, 16:19, 33:24, 173:23, 201:10, 201:11
**1-10** [1] - 1:13
**10** [9] - 42:12, 43:5, 43:7, 44:21, 50:3, 60:15, 96:6, 96:8, 133:6
**1006** [2] - 92:3, 92:22
**1007** [1] - 99:2
**1009** [2] - 95:12, 99:24
**1010** [3] - 201:2, 201:5, 201:11
**1012** [2] - 121:11, 121:15
**1013** [4] - 119:23, 119:25, 120:4, 122:8
**10340** [1] - 1:23
**1040** [1] - 95:25
**1047** [1] - 97:12
**1068** [2] - 98:4, 101:4
**1088** [3] - 193:7, 193:10, 194:1
**10:00** [3] - 4:22, 4:23, 7:3
**11** [4] - 43:1, 45:20, 61:10, 199:4
**11:30** [2] - 39:4, 39:5
**11th** [1] - 147:15
**12** [6] - 23:5, 23:13, 43:9, 45:17, 61:10, 199:4
**13** [7] - 43:14, 45:19, 59:11, 60:12, 97:17, 173:23, 183:12
**14** [15] - 7:17, 8:24, 9:1, 12:4, 14:22, 14:23, 16:18, 37:16, 42:1, 43:20, 43:23, 45:14, 59:9, 120:24, 200:10
**15** [7] - 63:17, 133:6, 146:6, 146:12, 161:23, 161:25, 211:1

**15-minute** [3] - 39:5, 39:8, 61:24
**150** [2] - 157:5, 157:6
**16** [3] - 72:23, 105:9, 127:8
**17** [1] - 7:5
**17-04393** [1] - 4:5
**17-04393-RGK-KS** [1] - 1:8
**174** [1] - 210:7
**175** [1] - 210:25
**18** [2] - 147:15, 210:13
**182.9** [4] - 81:1, 130:2, 130:4, 141:1
**188** [1] - 183:6
**197** [4] - 150:6, 151:2
**1990** [1] - 105:1
**1991** [1] - 127:12
**1992** [4] - 80:16, 86:21, 135:5, 169:5
**1996** [1] - 31:16
**1998** [2] - 127:8, 127:11
**1999** [2] - 105:3, 105:5
**1:00** [5] - 39:6, 62:2, 71:16, 74:4

**2**

**2** [3] - 8:2, 15:20, 44:18
**20** [13] - 6:1, 6:2, 6:5, 6:13, 70:23, 96:11, 150:7, 151:2, 161:23, 161:25, 162:5, 202:15
**200** [1] - 88:13
**20005-3801** [1] - 1:23
**2003** [3] - 99:3, 99:18, 101:13
**2010** [23] - 76:2, 83:8, 91:9, 92:25, 95:15, 161:12, 161:20, 162:4, 169:22, 169:24, 171:8, 171:9, 171:16, 172:6, 172:14, 173:17, 174:10, 174:13, 174:23, 178:3, 178:20, 184:3, 184:12
**2011** [4] - 159:23, 160:11, 169:25, 190:7
**2012** [1] - 193:23
**2013** [4] - 91:24, 92:14, 92:25, 178:2
**2015** [5] - 105:16, 134:12, 134:14, 134:15, 135:22

**2016** [24] - 86:8, 114:21, 115:14, 120:6, 129:21, 134:17, 135:10, 136:5, 136:19, 139:9, 147:15, 153:12, 180:1, 180:7, 182:3, 183:14, 183:23, 184:9, 193:19, 193:24, 194:9, 196:8, 197:14
**2017** [4] - 85:6, 159:24, 168:10, 169:14
**2018** [11] - 76:2, 83:9, 91:9, 93:1, 95:16, 161:12, 161:20, 162:4, 169:23, 169:25, 184:13
**2020** [2] - 157:13, 211:13
**2021** [3] - 1:19, 4:1, 215:17
**21** [3] - 111:25, 210:14, 211:1
**213)894-6604** [1] - 1:25
**22** [1] - 97:14
**24** [2] - 86:19, 126:7
**25** [1] - 40:20
**258** [1] - 173:22
**25TH** [1] - 2:8
**26** [1] - 105:10
**2704** [1] - 96:12
**28** [11] - 96:24, 97:15, 97:17, 97:22, 99:24, 197:8, 197:11, 198:20, 198:21, 199:4, 215:11
**29** [2] - 206:15, 206:23
**2:30** [1] - 146:5

**3**

**3** [12] - 15:22, 43:18, 43:19, 43:23, 44:17, 45:15, 125:2, 150:6, 151:2, 176:7, 176:14, 201:15
**3's** [1] - 43:20
**30** [3] - 6:4, 55:18, 156:12
**30(b)(6** [3] - 173:24, 174:4, 210:9
**31** [3] - 105:24, 114:16, 120:12
**312** [1] - 1:24
**3461** [2] - 202:12, 206:5, 207:8

**35** [1] - 6:5
**350** [1] - 2:8

**4**

**4** [15] - 8:7, 16:3, 20:3, 29:20, 36:15, 41:7, 41:9, 41:17, 42:5, 44:17, 45:16, 93:14, 127:4, 127:17
**4.3** [1] - 99:16
**402** [1] - 1:24
**4393** [1] - 7:5
**45** [2] - 60:4, 101:14
**4:00** [8] - 39:2, 39:7, 39:10, 39:14, 39:16, 39:25, 40:2, 213:20
**4:30** [2] - 39:24, 40:1

**5**

**5** [26] - 1:19, 4:1, 8:11, 20:2, 21:11, 44:8, 44:9, 44:17, 45:18, 45:24, 46:22, 58:25, 59:16, 60:12, 60:16, 98:9, 100:7, 101:5, 124:8, 124:12, 124:16, 191:21, 192:7, 192:9, 192:16, 215:17
**50** [2] - 156:24, 162:11
**51** [1] - 35:24
**52** [2] - 175:21, 175:23
**58** [2] - 164:4, 164:7

**6**

**6** [11] - 6:19, 40:16, 40:18, 40:25, 42:11, 42:12, 43:5, 43:10, 44:18, 45:17, 198:14
**64A** [1] - 107:8
**64H** [1] - 128:15
**64J** [2] - 112:10, 128:4
**66** [4] - 110:13, 110:18, 189:24, 192:8

**7**

**7** [4] - 42:23, 43:13, 44:20, 45:19
**701** [1] - 2:13
**7307** [1] - 98:14
**730793** [1] - 101:11
**7307995045** [4] - 97:5, 99:11, 101:10, 208:18
**75** [1] - 99:24

**7501** [8] - 153:2, 201:11, 205:5, 207:4, 207:5, 210:19, 211:2, 213:6
**7501s** [1] - 73:4
**753** [1] - 215:11

**8**

**8** [12] - 16:17, 42:19, 42:20, 42:25, 44:21, 45:21, 76:3, 83:10, 88:16, 167:21, 167:25, 193:25
**8's** [2] - 43:1, 45:21
**80** [6] - 161:11, 161:12, 161:20, 162:2, 162:6, 162:12
**803** [1] - 127:7
**8:15** [3] - 214:2, 214:7, 214:10
**8:29** [1] - 39:19
**8:30** [10] - 39:1, 39:3, 39:17, 39:18, 39:23, 40:2, 214:1, 214:8, 214:9, 214:10
**8:31** [1] - 39:19

**9**

**9** [17] - 8:16, 16:18, 25:12, 25:13, 35:12, 42:1, 42:6, 45:16, 45:25, 46:3, 49:8, 55:13, 55:14, 59:16, 59:22, 60:12, 96:3
**90012** [1] - 1:24
**90071-1503** [1] - 2:9
**995045** [1] - 98:14
**9:00** [2] - 39:24

**A**

**A.M** [1] - 4:2
**abided** [2] - 89:13, 90:6
**ability** [3] - 46:20, 67:18, 114:25
**able** [16] - 5:13, 27:11, 32:6, 36:8, 37:2, 72:6, 117:3, 117:7, 118:4, 118:21, 126:8, 126:13, 130:9, 142:11, 153:10, 159:3
**ABOVE** [1] - 215:14
**ABOVE-ENTITLED** [1] - 215:14
**absent** [1] - 22:25
**absolutely** [3] - 132:3,

132:6, 132:9
**acceptable** [5] - 93:5,
93:22, 94:19, 97:24,
213:5
**accepted** [1] - 94:12
**access** [1] - 130:12
**accompanied** [1] -
95:21
**accordance** [2] -
94:12, 102:17
**according** [2] - 61:2,
122:2
**account** [2] - 50:23,
67:18
**accountant** [2] -
50:20, 54:19
**accounting** [2] - 47:3,
54:20
**accurately** [5] - 79:6,
101:22, 163:10,
163:14, 175:18
**accusation** [1] - 40:21
**accused** [1] - 141:3
**Acker** [1] - 187:18
**acknowledged** [1] -
59:2
**Act** [2] - 76:14, 88:11
**acted** [3] - 90:5, 103:8
**action** [2] - 32:16,
35:7
**active** [1] - 55:8
**activities** [8] - 93:5,
93:22, 94:19, 94:23,
169:20, 170:1,
184:24, 185:5
**actual** [2] - 168:15,
212:12
**ad** [1] - 99:16
**AD/CVD** [1] - 165:9
**add** [1] - 13:25
**ADD** [1] - 94:3
**added** [1] - 211:9
**addition** [2] - 66:1,
209:12
**additional** [4] - 45:23,
119:4, 183:18,
183:22
**address** [3] - 15:21,
69:24, 95:9
**addressing** [2] - 5:17,
48:4
**adhering** [1] - 39:9
**Administration** [1] -
17:7
**admission** [3] -
146:21, 147:22,
148:10
**admit** [5] - 119:23,
121:11, 126:22,
193:7, 201:2

**admitted** [2] - 65:1,
73:25
**admonishment** [7] -
44:23, 44:24, 62:3,
62:4, 71:17, 146:8,
213:21
**advantage** [3] - 117:3,
117:15, 132:1
**advertise** [4] - 110:10,
111:10, 149:8, 149:9
**advertised** [2] - 192:3
**advertises** [1] -
195:12
**advertising** [3] - 84:6,
196:14, 196:16
**advice** [5] - 85:13,
85:14, 87:13,
177:12, 179:16
**advised** [1] - 176:8
**aegis** [1] - 149:2
**affect** [2] - 33:12,
116:11
**afternoon** [7] - 39:2,
104:2, 104:21,
104:22, 132:15,
132:17, 155:18
**agency** [2] - 92:24,
137:24
**ago** [1] - 58:10
**Agora** [1] - 26:25
**agree** [16] - 12:25,
14:5, 64:6, 73:16,
73:17, 73:19, 73:21,
149:13, 200:13,
200:16, 200:19,
205:20, 205:22,
209:8, 212:14,
212:20
**agreed** [3] - 14:7,
65:3, 209:21
**agreement** [2] - 72:6,
209:22
**agrees** [1] - 200:21
**aha** [1] - 98:18
**ahead** [7] - 7:24,
74:17, 92:13,
115:12, 150:8,
192:18, 199:16
**Ahn** [1] - 144:14
**AHWB** [2] - 97:2,
100:5
**airplane** [1] - 214:5
**al** [1] - 4:6
**alejandro** [2] - 8:4,
19:4
**alerted** [1] - 86:3
**allegation** [2] - 9:17,
9:24
**allegations** [3] -
89:18, 97:7, 103:8

**alleged** [1] - 100:17
**ALLIED** [1] - 1:12
**allow** [2] - 72:21,
177:25
**allowed** [2] - 6:16,
6:19
**allows** [2] - 108:21,
209:16
**alloy** [1] - 98:22
**almost** [5] - 6:7, 15:8,
20:3, 38:24, 135:16
**amend** [1] - 160:14
**AMERICA** [2] - 1:1,
1:6
**America** [3] - 4:5, 7:6,
9:16
**American** [2] - 80:3,
81:11
**amount** [1] - 41:14
**analogy** [2] - 13:19,
77:9
**analyst** [2] - 47:8,
124:2
**analyzed** [2] - 94:2,
94:5
**Ancient** [1] - 127:11
**ancient** [1] - 135:8
**AND** [3] - 215:8,
215:12, 215:14
**Andy** [1] - 185:17
**Angeles** [4] - 27:20,
28:18, 52:23, 52:24
**ANGELES** [5] - 1:19,
1:24, 2:9, 4:1, 215:4
**announcements** [1] -
141:13
**ANSWER** [1] - 183:18
**answer** [17] - 19:20,
67:7, 115:6, 151:25,
159:14, 164:24,
165:2, 165:8,
174:15, 175:13,
176:20, 196:14,
207:15, 210:21,
211:5, 211:6, 212:11
**answered** [5] - 67:1,
67:3, 151:24, 152:1,
175:17
**answers** [1] - 15:19
**anti** [1] - 179:11
**anticipating** [1] - 11:9
**antidumping** [108] -
9:20, 9:22, 31:20,
31:24, 41:2, 75:4,
75:8, 75:11, 75:19,
75:24, 76:4, 76:18,
78:22, 79:11, 79:14,
79:17, 80:10, 80:13,
80:16, 80:18, 80:22,
80:25, 81:17, 82:13,

82:16, 82:23, 83:1,
83:5, 83:10, 84:18,
84:23, 85:8, 85:22,
86:4, 86:11, 86:14,
87:5, 87:8, 87:21,
88:1, 88:16, 94:3,
94:8, 100:22,
100:24, 100:25,
102:18, 102:21,
103:2, 117:12,
129:23, 129:24,
137:2, 137:7,
140:10, 141:4,
148:21, 153:14,
154:6, 163:21,
163:25, 164:2,
165:5, 165:10,
165:13, 165:23,
166:6, 167:13,
167:17, 169:9,
170:11, 170:12,
170:16, 170:19,
170:23, 171:2,
171:24, 173:3,
173:19, 176:10,
176:24, 178:25,
179:3, 179:15,
179:23, 180:13,
180:25, 181:5,
181:23, 182:5,
182:9, 182:23,
183:16, 183:25,
184:10, 184:15,
187:8, 187:14,
188:11, 196:19,
197:18, 197:22,
197:25, 198:3,
200:1, 200:6, 200:17
**antiterrorism** [1] -
31:21
**Anvil** [5] - 141:4,
141:6, 141:16,
142:1, 152:17
**anyway** [1] - 38:12
**apologies** [1] - 92:19
**apologize** [5] - 16:13,
154:1, 165:16,
168:14, 198:25
**appear** [10] - 113:1,
113:6, 201:23,
201:25, 202:4,
202:7, 202:9,
202:20, 202:23,
209:25
**appearance** [1] -
128:1
**APPEARANCES** [1] -
2:4
**appearances** [2] - 4:7,
7:8

**appeared** [1] - 210:2
**apples** [2] - 82:9,
83:25
**applicable** [8] - 78:21,
93:24, 94:7, 94:17,
99:8, 188:11,
196:19, 200:2
**applied** [9] - 75:19,
82:13, 82:16, 83:1,
84:18, 85:22, 88:1,
137:23, 173:3
**applies** [7] - 64:2,
68:15, 69:2, 71:10,
85:2, 85:8, 123:17
**apply** [15] - 14:14,
15:1, 15:5, 28:2,
32:6, 37:13, 64:4,
75:24, 79:12, 83:5,
84:24, 98:21, 143:5,
180:25, 183:16
**applying** [1] - 137:24
**appreciate** [1] - 93:9
**approach** [4] - 107:3,
112:4, 128:11,
146:24
**approaches** [2] -
63:14, 69:10
**appropriate** [1] - 6:14
**approved** [4] - 89:16,
92:18, 189:2, 189:20
**approximation** [1] -
161:21
**archive** [2] - 177:19,
177:24
**area** [15] - 11:1, 22:24,
31:24, 32:20, 41:18,
48:3, 48:4, 49:12,
51:9, 54:16, 54:25,
95:7, 155:8, 159:3,
204:8
**areas** [3] - 53:19, 93:6,
94:20
**argument** [1] - 6:3
**argumentative** [1] -
212:4
**arguments** [4] - 65:9,
65:11, 71:11, 88:7
**arm** [1] - 108:6
**arrival** [1] - 204:16
**arrive** [1] - 71:13
**articles** [1] - 97:19
**articulate** [1] - 89:19
**aside** [1] - 41:10
**assessed** [1] - 94:6
**assessing** [1] - 180:11
**assessment** [2] -
93:23, 94:16
**assistance** [1] - 93:9
**associate** [1] - 73:11
**associated** [1] -

158:15
assume [1] - 205:22
assuming [3] - 18:15, 56:24, 193:2
assure [1] - 109:15
AT [1] - 2:12
Atkinson [2] - 185:20, 187:24
attach [1] - 109:1
attached [5] - 100:6, 100:8, 113:16, 120:8, 153:6
attaches [2] - 93:13, 148:6
attention [20] - 9:3, 9:8, 9:13, 21:9, 46:19, 49:23, 70:6, 88:23, 96:23, 108:1, 110:25, 118:21, 120:11, 120:21, 173:22, 176:6, 183:12, 198:14, 199:4, 210:25
attorney [2] - 116:17, 178:24
ATTORNEY [1] - 2:12
attorneys [11] - 10:4, 12:25, 37:9, 38:3, 38:4, 39:10, 65:9, 65:15, 70:23, 71:11, 71:22
attornies [1] - 65:18
audience [2] - 8:25, 9:3
audio [1] - 28:20
audit [7] - 51:4, 54:22, 91:25, 93:21, 94:11, 94:21, 95:3
Audit [1] - 94:15
audited [1] - 89:16
auditees [1] - 93:23
auditing [1] - 94:12
audits [1] - 51:4
August [1] - 197:14
authorizes [1] - 76:15
authorizing [1] - 76:25
avail [1] - 73:9
available [7] - 92:5, 92:6, 140:22, 142:24, 151:19, 151:20, 186:21
AVENUE [1] - 2:8
avoid [3] - 52:2, 153:14, 154:5
AW [1] - 97:2
aware [21] - 115:2, 115:8, 130:6, 136:4, 136:8, 144:11, 149:1, 149:5, 154:21, 168:9,

168:13, 175:1, 179:13, 194:18, 195:1, 196:2, 196:3, 198:12, 199:12, 200:4, 200:6

# B

B-e-a-c-h-y [1] - 8:11
baby [1] - 5:8
backed [1] - 95:21
background [3] - 106:21, 132:19, 172:11
bad [1] - 39:13
ball [11] - 87:11, 92:2, 92:7, 95:11, 96:15, 97:16, 98:9, 98:15, 99:23, 100:7, 103:1
Ball [1] - 101:5
Bar [1] - 47:1
base [3] - 64:22, 108:12, 161:10
based [9] - 30:22, 69:22, 77:15, 80:8, 116:4, 118:2, 118:5, 133:23, 213:7
basis [6] - 95:15, 109:14, 170:22, 184:4, 211:24, 212:9
battle [1] - 90:20
Beach [2] - 22:13, 52:9
Beachy [2] - 8:11, 21:13
bears [1] - 68:1
became [3] - 159:24, 168:9, 168:13
began [2] - 103:5, 134:17
beginning [4] - 79:13, 87:4, 97:2, 134:22
begins [2] - 98:17, 150:6
behalf [8] - 4:9, 34:18, 34:20, 72:5, 72:17, 157:20, 186:6, 212:18
BEHALF [2] - 2:5, 2:10
behind [7] - 5:18, 6:18, 6:20, 6:24, 74:23, 74:25, 105:18
Beijing [3] - 144:12, 144:15, 148:24
belief [1] - 73:24
believability [1] - 68:1
believable [1] - 68:4
Bell [3] - 144:12, 144:15, 148:24
belong [1] - 101:14

below [4] - 97:4, 111:17, 121:2, 125:22
bench [7] - 37:10, 38:5, 38:18, 38:19, 38:21, 40:7, 58:2
benign [1] - 149:12
best [4] - 51:16, 60:16, 73:13, 175:17
better [4] - 59:5, 73:20, 111:7, 186:12
between [19] - 5:3, 34:4, 35:7, 55:24, 57:1, 66:17, 72:10, 73:3, 76:2, 91:13, 107:23, 108:23, 126:4, 128:24, 129:10, 129:18, 175:2, 175:7, 193:21
bevel [15] - 108:19, 108:20, 109:2, 113:13, 113:14, 113:17, 114:6, 114:10, 114:12, 114:14, 120:25, 129:12, 138:13, 138:18, 138:19
beveled [6] - 77:22, 83:24, 121:6, 122:5, 125:14
bevels [1] - 83:22
beyond [3] - 35:19, 199:20, 199:22
Bhattacharji [1] - 10:18, 11:5, 159:1
bias [3] - 40:21, 59:6, 67:22
biggest [1] - 96:17
bill [4] - 95:2, 204:12, 204:13, 208:3
bit [17] - 7:24, 10:2, 12:12, 31:17, 59:4, 68:8, 71:22, 79:15, 104:23, 111:7, 156:25, 159:18, 161:4, 161:13, 166:11, 169:16, 178:6
black [1] - 128:5
block [4] - 39:4, 100:5, 100:18, 201:14
blogs [1] - 68:25
blood [1] - 22:21
blurry [2] - 111:4, 111:5
blush [1] - 87:17
boat [1] - 13:16
body [1] - 41:14
bold [1] - 122:4
book [1] - 214:7

bookkeeper [1] - 25:16
border [1] - 47:17
Border [23] - 22:14, 31:16, 40:19, 75:17, 79:1, 81:25, 82:3, 82:13, 83:3, 84:13, 87:25, 88:4, 88:13, 92:24, 163:11, 163:15, 163:24, 164:16, 177:10, 204:18, 204:25, 205:2, 205:4
bored [1] - 38:11
boring [1] - 50:11
boss [3] - 31:20, 32:3, 135:13
bother [1] - 34:22
bothered [1] - 85:22
bothers [1] - 28:10
bottom [5] - 94:10, 96:15, 125:17, 164:23, 203:25
bought [1] - 161:17
box [11] - 8:24, 9:1, 9:4, 13:9, 13:10, 13:13, 13:16, 16:16, 74:8, 130:4, 146:18
Box [5] - 96:3, 96:8, 96:11, 202:15
branch [4] - 107:23, 107:24, 107:25, 108:9
brand [6] - 122:21, 142:4, 142:5, 142:7, 142:8, 142:9
Brazil [1] - 119:14
breach [1] - 145:2
BREAK [3] - 63:19, 74:5, 146:13
break [9] - 39:6, 39:8, 60:4, 60:5, 61:24, 62:5, 146:6, 213:20
briefly [2] - 72:23, 154:12
bring [14] - 7:2, 9:7, 30:14, 33:5, 33:15, 36:12, 37:6, 43:24, 49:3, 53:15, 56:3, 76:15, 92:2, 95:11
bringing [6] - 26:15, 35:6, 78:20, 79:7, 102:12, 208:21
brings [5] - 76:19, 78:14, 80:13, 81:3, 92:7
broader [1] - 93:18
brochure [6] - 110:24, 125:13, 142:10, 191:1, 195:16,

195:18
broker [19] - 85:16, 96:14, 96:25, 98:13, 100:21, 101:6, 102:16, 170:4, 172:1, 175:2, 177:2, 177:12, 178:19, 179:8, 179:14, 179:15, 181:9, 181:13, 181:22
broker's [1] - 175:8
brokers [9] - 98:24, 159:7, 171:5, 179:2, 179:10, 179:11, 188:9, 188:15, 188:22
brought [3] - 87:20, 141:13, 163:1
BROWN [1] - 2:6
brush [1] - 27:19
built [1] - 135:20
bullet [3] - 94:1, 94:4, 94:8
bunch [1] - 208:9
burden [7] - 35:17, 35:23, 36:21, 55:24, 57:1, 57:13, 64:18
Bureau [1] - 93:15
business [14] - 32:13, 77:15, 91:2, 93:15, 93:16, 104:25, 106:9, 106:25, 132:8, 141:24, 151:22, 155:1, 161:4, 161:5
businesses [1] - 91:25
busy [1] - 17:3
butcher [2] - 10:19, 185:19
buttweld [38] - 80:19, 86:24, 101:1, 101:11, 101:15, 101:17, 101:20, 102:8, 102:9, 102:14, 109:3, 113:22, 114:4, 114:9, 118:24, 118:25, 119:1, 119:5, 119:8, 121:4, 121:6, 122:2, 122:6, 124:25, 125:13, 125:15, 126:3, 134:2, 134:9, 137:3, 137:12, 169:10, 176:10, 176:25, 196:19, 198:3, 200:2, 200:9
buy [6] - 106:6, 106:21, 144:2,

146:1, 149:9, 149:10
**buyer** [1] - 145:14
**buying** [3] - 140:23, 144:6, 145:11
**BY** [58] - 2:7, 2:11, 104:20, 107:10, 109:24, 110:20, 112:12, 113:3, 113:20, 114:2, 115:13, 120:3, 121:19, 124:15, 127:20, 128:17, 129:9, 132:14, 141:25, 147:10, 148:1, 148:17, 149:17, 151:14, 152:4, 152:14, 153:1, 154:2, 154:15, 156:7, 164:14, 167:5, 168:1, 169:8, 173:15, 174:7, 176:2, 176:17, 177:7, 182:18, 183:11, 186:23, 189:18, 190:2, 191:3, 191:10, 192:19, 193:11, 197:12, 199:9, 199:18, 200:23, 201:6, 206:25, 209:2, 209:20, 210:16, 212:6

## C

**CA** [1] - 2:9
**CALIFORNIA** [6] - 1:2, 1:19, 1:24, 4:1, 215:6, 215:10
**California** [6] - 19:6, 25:15, 26:7, 26:25, 28:6, 50:19
**candid** [1] - 79:2
**cannot** [8] - 19:14, 19:24, 23:1, 28:10, 30:13, 67:3, 110:9
**capacity** [1] - 115:14
**carbon** [12] - 80:18, 86:24, 118:16, 118:22, 118:23, 118:24, 119:5, 119:7, 120:24, 169:10, 200:2, 200:9
**cards** [1] - 15:6
**care** [7] - 14:9, 24:1, 51:12, 163:5, 163:20, 178:1, 178:11
**cared** [1] - 198:10

**careful** [1] - 110:15
**carefully** [2] - 10:10, 46:13
**caregiver** [1] - 52:9
**cares** [1] - 14:9
**carry** [1] - 90:25
**case** [144] - 6:6, 6:7, 7:5, 9:15, 10:5, 10:6, 10:9, 10:10, 11:11, 11:12, 11:13, 11:16, 11:17, 12:8, 12:9, 12:15, 12:16, 12:19, 13:2, 13:19, 14:15, 14:25, 15:2, 17:11, 17:15, 19:14, 20:18, 20:20, 20:21, 22:2, 23:6, 25:3, 26:2, 26:3, 26:14, 28:9, 30:22, 32:15, 33:6, 33:12, 33:15, 34:9, 34:10, 34:12, 34:13, 35:17, 35:22, 35:24, 36:4, 36:12, 36:25, 37:3, 37:6, 37:14, 37:15, 39:21, 40:21, 45:11, 46:20, 47:13, 48:6, 48:22, 51:12, 51:23, 55:8, 56:3, 56:12, 56:14, 56:15, 57:7, 57:11, 57:15, 57:16, 57:19, 58:7, 58:13, 58:17, 61:9, 61:15, 62:5, 62:11, 63:12, 63:13, 64:1, 64:3, 64:9, 66:8, 67:10, 67:13, 67:22, 68:12, 68:13, 68:14, 68:16, 68:18, 68:21, 68:23, 69:3, 69:8, 69:11, 69:20, 71:10, 71:18, 73:25, 75:4, 75:13, 76:19, 77:4, 78:3, 79:5, 79:13, 80:14, 80:21, 81:15, 82:14, 82:18, 83:12, 83:17, 84:10, 84:21, 85:3, 87:19, 88:6, 88:19, 97:7, 101:19, 103:21, 117:4, 118:22, 123:12, 134:19, 138:3, 141:11, 146:9, 157:6, 164:19, 168:6, 175:11, 186:1, 201:8, 208:11, 213:22
**CASE** [1] - 2:11
**Case** [4] - 4:4, 4:13, 7:12, 159:9
**cases** [24] - 14:6, 22:5,

30:6, 32:25, 35:13, 36:9, 36:12, 48:15, 56:2, 56:23, 57:1, 57:6, 76:22, 77:1, 116:9, 117:9, 117:22, 117:25, 118:5, 118:7, 118:9, 118:13, 118:20, 124:3
**catalog** [16] - 190:3, 190:11, 191:13, 191:14, 191:15, 191:19, 191:20, 192:24, 193:14, 193:18, 194:18, 195:10, 195:14, 195:25, 196:8, 196:10
**catalogs** [3] - 84:7, 193:13, 196:17
**category** [2] - 98:13, 101:17
**caught** [2] - 120:20, 122:11
**caused** [4] - 83:9, 86:17, 88:15, 187:6
**CBP** [6] - 93:6, 93:22, 93:24, 94:17, 94:19, 97:25
**Cedar** [1] - 50:5
**cent** [1] - 81:21
**CENTRAL** [2] - 1:2, 215:9
**certain** [14] - 13:20, 13:21, 13:22, 13:23, 65:6, 66:3, 80:18, 117:9, 146:1, 148:6, 161:16, 161:17, 169:9
**certainly** [4] - 118:10, 136:23, 146:25, 186:12
**CERTIFICATE** [1] - 215:2
**certified** [1] - 50:19
**CERTIFIED** [1] - 1:7
**CERTIFY** [1] - 215:10
**cetera** [4] - 16:9, 32:12, 61:21, 214:3
**CH** [2] - 96:16, 96:17
**chain** [6] - 159:22, 160:7, 160:15, 160:20, 171:17, 171:19
**challenge** [10] - 40:16, 41:25, 42:2, 42:8, 43:2, 43:15, 43:21, 58:25, 59:9, 59:17
**challenges** [6] - 40:13, 41:4, 41:21,

41:24, 42:14, 58:23
**chance** [7] - 7:1, 25:23, 88:7, 107:11, 112:13, 128:18, 186:12
**change** [9] - 14:19, 14:20, 62:21, 114:20, 182:14, 188:24, 193:5, 193:6
**changing** [1] - 210:3
**channel** [1] - 108:24
**characteristic** [1] - 114:8
**characteristics** [3] - 121:3, 138:22, 138:23
**characterize** [2] - 133:21, 134:1
**characterized** [1] - 133:17
**charge** [3] - 173:7, 185:16, 185:18
**charged** [2] - 32:16, 131:1
**chasing** [1] - 51:6
**chatrooms** [1] - 68:25
**check** [1] - 85:22
**checked** [1] - 88:2
**children** [2] - 39:15, 53:13
**China** [41] - 75:15, 78:12, 80:7, 80:11, 80:20, 80:22, 80:24, 81:17, 85:4, 86:18, 87:2, 91:9, 118:1, 118:5, 118:9, 119:6, 119:14, 123:17, 130:8, 137:5, 137:12, 141:9, 141:14, 142:16, 142:19, 142:20, 143:1, 143:2, 143:3, 162:8, 167:20, 168:6, 168:8, 168:9, 168:13, 169:11, 196:23, 197:3, 199:20, 200:3, 200:8
**China's** [1] - 81:12
**Chinese** [30] - 76:7, 80:14, 86:17, 111:18, 115:9, 115:19, 128:24, 129:22, 131:4, 131:7, 131:24, 131:25, 132:5, 132:7, 137:25, 144:12, 149:5, 161:1, 162:13, 162:16, 163:6, 171:14, 176:23,

180:4, 184:14, 188:25, 189:1, 191:25, 194:7
**chose** [2] - 105:18, 118:3
**Christine** [2] - 8:19, 26:23
**Christopher** [5] - 4:13, 7:12, 10:25, 89:3, 132:15
**CHRISTOPHER** [1] - 2:11
**circumstances** [1] - 153:18
**circumstantial** [3] - 66:11, 66:14, 66:18
**city** [6] - 15:21, 17:23, 19:5, 20:11, 46:25, 52:21
**civil** [14] - 4:5, 7:5, 35:15, 35:22, 36:18, 36:25, 55:8, 55:21, 55:22, 56:9, 56:10, 56:23, 57:1, 57:13
**claim** [3] - 64:18, 64:21, 149:1
**claimed** [1] - 88:5
**claims** [1] - 85:4
**Claims** [2] - 76:14, 88:11
**Clara** [2] - 56:18, 56:22
**clarify** [2] - 129:4, 129:7
**Clarita** [1] - 21:16
**clarity** [1] - 212:13
**classes** [2] - 170:6, 170:12
**classification** [11] - 93:7, 94:20, 97:20, 140:3, 166:1, 166:18, 174:13, 174:19, 177:20, 181:10, 181:14
**classified** [1] - 98:7
**clean** [1] - 95:1
**clear** [16] - 24:7, 24:10, 40:25, 51:4, 84:22, 85:9, 114:21, 115:23, 172:12, 194:23, 200:18, 202:2, 204:5, 206:4, 209:3, 212:14
**clearly** [3] - 165:19, 174:17, 209:6
**clerk** [3] - 107:5, 107:8, 146:25
**CLERK** [20] - 4:4, 7:5, 7:25, 44:12, 44:19, 45:7, 45:9, 46:1,

60:22, 63:20, 92:6, 103:24, 104:2, 104:9, 112:7, 147:5, 155:18, 155:25, 206:16, 214:12

**client** [2] - 65:18, 77:14

**client's** [1] - 88:22

**clinical** [1] - 28:21

**clip** [2] - 150:5, 150:6

**clock** [1] - 38:24

**close** [4] - 9:3, 54:24, 70:6, 80:12

**closest** [1] - 208:20

**closing** [3] - 65:11, 71:11, 88:7

**closings** [1] - 5:25

**CN** [1] - 96:10

**Coast** [1] - 27:3

**Code** [1] - 213:6

**code** [20] - 96:5, 96:6, 96:10, 97:5, 100:19, 100:21, 166:16, 166:18, 167:7, 167:12, 182:8, 182:9, 182:14, 182:19, 202:1, 206:1, 206:2, 206:3, 206:7, 208:18

**CODE** [1] - 215:11

**coder** [1] - 50:6

**codes** [1] - 167:16

**coffee** [1] - 214:7

**colleague** [1] - 76:10

**collect** [3] - 158:13, 158:14, 183:3

**collected** [1] - 213:16

**college** [1] - 18:12

**column** [5] - 96:24, 97:15, 97:17, 97:22, 99:24

**combat** [1] - 75:9

**comfortable** [3] - 60:3, 61:6, 61:8

**coming** [5] - 24:8, 29:6, 38:4, 47:25, 210:12

**comment** [3] - 59:12, 153:10, 178:4

**comments** [1] - 95:10

**Commerce** [17] - 80:17, 81:7, 86:21, 102:20, 116:7, 116:14, 119:3, 119:11, 122:3, 124:2, 125:23, 126:17, 197:2, 197:20, 198:8, 200:7, 200:15

**commerce** [1] - 87:1

**Commerce's** [1] - 120:18

**commercial** [7] - 100:8, 203:2, 203:12, 203:15, 207:11, 207:18, 209:13

**Commission** [1] - 197:21

**Commission's** [1] - 117:21

**commitment** [1] - 39:22

**committed** [1] - 89:12

**common** [1] - 79:8

**communicate** [2] - 68:19, 68:20

**communicated** [1] - 179:22

**communicating** [2] - 69:2, 69:4

**communications** [4] - 175:2, 175:7, 177:19, 178:18

**communities** [1] - 91:1

**community** [1] - 198:9

**companies** [17] - 76:15, 76:16, 76:17, 90:16, 91:13, 105:6, 116:5, 116:6, 132:24, 141:3, 149:7, 149:8, 149:9, 149:10, 198:9

**companion** [1] - 86:25

**company** [19] - 29:25, 47:15, 76:12, 76:19, 90:9, 105:7, 105:9, 105:15, 133:5, 135:17, 135:21, 136:8, 149:4, 156:16, 157:21, 177:23, 177:25, 178:9

**Company** [1] - 96:16

**COMPANY** [1] - 1:13

**company's** [3] - 159:22, 181:16, 181:19

**compete** [7] - 76:7, 86:9, 114:25, 115:19, 131:9, 132:4, 141:22

**competing** [5] - 115:9, 131:25, 132:7, 141:17, 142:1

**competition** [2] - 56:21, 136:13

**competitive** [2] - 75:10, 145:13

**competitively** [1] - 141:24

**competitor** [2] - 91:18, 91:23

**competitors** [3] - 91:14, 91:19, 134:19

**complete** [2] - 85:11, 91:25

**completed** [2] - 68:11, 77:11

**completely** [7] - 79:7, 82:9, 100:16, 102:8, 163:10, 163:15, 196:6

**compliance** [16] - 41:11, 89:9, 89:12, 93:24, 94:6, 94:17, 95:7, 103:12, 169:17, 169:19, 170:6, 170:9, 170:16, 177:16, 179:12, 187:15

**complicated** [2] - 6:8, 87:7

**complied** [1] - 9:23

**comply** [2] - 160:22, 170:12

**computer** [4] - 15:8, 74:18, 92:9, 92:11

**concepts** [3] - 87:7, 87:15, 87:16

**concerned** [3] - 40:20, 70:13, 183:20

**conclude** [3] - 90:4, 103:1, 103:4

**concluded** [7] - 81:9, 98:13, 98:24, 99:3, 102:18, 129:22, 152:19

**CONCLUDED** [3] - 44:14, 60:9, 214:13

**concludes** [1] - 79:20

**conclusion** [1] - 93:4

**condition** [1] - 189:13

**conduct** [3] - 61:19, 68:7, 91:20

**conducted** [1] - 94:11

**conducting** [3] - 79:19, 135:14, 139:6

**confer** [1] - 73:9

**CONFERENCE** [1] - 215:16

**conference** [3] - 38:5, 38:19, 72:8

**conferences** [2] - 38:18, 38:21

**confident** [2] - 59:7, 90:2

**confidential** [4] - 70:19, 149:20,

149:22, 151:18

**confirm** [4] - 124:24, 144:18, 151:18, 189:4

**confirmation** [2] - 144:17, 144:20

**confirming** [1] - 148:23

**CONFORMANCE** [1] - 215:15

**confuse** [2] - 34:9, 36:21

**Congress** [2] - 76:21, 76:24

**connect** [1] - 108:7

**connected** [3] - 22:24, 108:13, 120:25

**connection** [4] - 107:23, 107:25, 113:19, 148:19

**connections** [1] - 121:1

**connects** [1] - 107:25

**consider** [13] - 64:24, 65:4, 65:7, 66:3, 66:4, 66:16, 67:11, 69:15, 84:17, 133:10, 138:17, 149:6, 187:7

**considered** [6] - 65:7, 65:25, 107:17, 117:2, 138:19, 187:6

**considering** [1] - 67:17

**consistency** [1] - 15:1

**consistently** [2] - 115:21, 161:15

**consists** [1] - 64:25

**construction** [1] - 28:8

**consult** [6] - 139:8, 176:22, 181:4, 181:9, 181:13, 181:22

**consultation** [2] - 98:12, 100:20

**consulted** [2] - 139:5, 176:9

**consulting** [1] - 69:17

**consuming** [1] - 87:17

**contact** [7] - 45:10, 63:3, 63:4, 124:1, 144:10, 152:10, 152:16

**contacted** [6] - 105:20, 124:3, 143:17, 143:18, 144:19, 144:22

**contacting** [2] - 143:13, 143:23

**contacts** [3] - 140:17, 151:21, 152:5

**contain** [1] - 73:5

**contained** [2] - 190:18, 196:17

**contains** [2] - 95:14, 202:15

**contemporaneous** [1] - 89:24

**contents** [1] - 93:3

**context** [2] - 78:17, 119:19

**continually** [1] - 161:25

**continue** [3] - 102:10, 146:17, 197:25

**continued** [2] - 119:13, 123:25

**continues** [1] - 102:14

**continuously** [1] - 102:5

**contoured** [1] - 108:4

**contract** [3] - 34:5, 34:7, 145:6

**contracts** [1] - 179:10

**contradicts** [1] - 67:23

**contrary** [3] - 9:24, 103:10, 151:8

**control** [3] - 66:21, 93:23, 94:17

**controls** [4] - 65:16, 70:14, 70:17, 94:23

**convenience** [1] - 167:18

**conversation** [1] - 178:3

**conversations** [1] - 136:20

**convince** [1] - 62:22

**convinced** [1] - 59:14

**COOPER** [1] - 1:12

**cooperation** [1] - 93:10

**copy** [6] - 123:20, 123:23, 124:5, 124:23, 126:16, 150:10

**COPY** [1] - 1:7

**corner** [1] - 145:21

**corporate** [24] - 157:7, 157:10, 172:19, 172:21, 173:16, 174:25, 180:15, 180:18, 180:22, 181:3, 181:8, 181:12, 181:21, 186:5, 187:18, 188:3, 188:15, 210:6, 210:17, 210:21, 211:13,

Case 2:22-cv-00050-RWS-RSP Document 119-6 Filed 06/27/23 Page 460 of 535 PageID #: Case 2:22-cv-00050-DCJ-JPM Document 119-6 Filed 06/27/22 Page 460 of 535 PageID

Transcript of Day 1 of FCR Trial    Page 223 of 244

6

211:20, 212:7, 212:17
**Corporation** [2] - 75:14, 78:4
**CORPORATION** [1] - 1:12
**corporation** [1] - 34:17
**corporations** [1] - 6:10
**CORRECT** [1] - 215:12
**correct** [274] - 4:19, 17:18, 19:25, 32:8, 34:16, 35:2, 35:3, 54:21, 57:14, 57:20, 61:9, 99:18, 110:9, 115:25, 120:6, 128:2, 133:1, 133:3, 133:14, 133:15, 133:19, 133:21, 133:22, 134:2, 134:3, 134:7, 134:8, 134:24, 134:25, 135:3, 135:8, 135:15, 137:3, 137:4, 137:5, 137:12, 137:25, 138:4, 138:5, 138:20, 140:2, 140:14, 141:4, 141:5, 141:7, 141:10, 141:11, 142:7, 143:14, 143:17, 143:20, 143:21, 147:16, 147:17, 147:19, 147:20, 148:4, 148:5, 148:7, 148:8, 148:21, 153:8, 156:9, 156:10, 156:15, 157:8, 157:9, 157:11, 157:12, 157:21, 157:22, 158:1, 158:3, 158:4, 158:9, 158:11, 158:23, 159:16, 159:20, 159:22, 160:5, 160:8, 160:9, 160:12, 160:17, 160:18, 160:23, 161:2, 161:3, 161:6, 162:19, 162:24, 163:2, 163:3, 163:7, 163:17, 163:22, 164:1, 165:24, 166:19, 166:20, 166:21, 167:14, 167:15, 168:8,

170:24, 170:25, 171:6, 171:7, 171:9, 171:10, 171:14, 171:15, 171:18, 171:21, 171:25, 172:2, 172:3, 172:15, 172:22, 172:25, 173:4, 173:9, 173:19, 175:3, 175:4, 175:8, 175:9, 175:18, 175:19, 176:20, 176:25, 177:3, 177:16, 177:22, 178:4, 178:11, 178:12, 178:14, 178:16, 178:19, 178:20, 178:25, 179:1, 179:5, 179:9, 179:19, 179:24, 179:25, 180:2, 180:3, 180:5, 180:6, 180:8, 180:14, 180:16, 180:20, 180:21, 181:1, 181:2, 181:6, 181:7, 181:10, 181:14, 181:15, 181:17, 181:18, 181:19, 181:20, 181:24, 182:1, 182:5, 182:14, 183:17, 183:22, 184:10, 184:11, 184:21, 184:22, 185:6, 185:10, 186:8, 186:11, 186:13, 186:14, 187:20, 187:23, 188:1, 188:4, 188:8, 188:13, 188:17, 189:12, 191:5, 191:20, 192:1, 192:2, 192:22, 192:23, 193:1, 193:2, 193:22, 194:4, 194:5, 194:7, 194:8, 194:11, 194:13, 194:14, 194:17, 195:14, 195:20, 196:24, 197:4, 197:22, 198:5, 199:21, 200:11, 201:12, 201:13, 201:18, 201:21, 202:16, 202:17, 202:21, 202:22, 202:24, 202:25, 203:2, 203:3, 203:5, 203:6, 203:8, 203:9,

203:13, 203:14, 203:16, 203:17, 204:3, 204:22, 205:4, 205:19, 205:24, 206:9, 206:10, 206:12, 207:2, 207:6, 207:7, 207:9, 207:10, 207:12, 207:13, 207:14, 207:16, 207:20, 207:24, 208:1, 208:2, 208:4, 208:5, 208:7, 208:8, 208:10, 208:15, 210:4, 212:10, 212:20, 212:21, 213:3
**correctly** [3] - 132:19, 156:11, 185:21
**cost** [2] - 76:2, 130:5
**costs** [1] - 140:24
**COUNSEL** [1] - 2:4
**Counsel** [26] - 4:7, 4:11, 4:18, 7:8, 7:16, 10:22, 11:8, 34:16, 40:6, 58:1, 74:2, 88:25, 92:13, 103:16, 115:12, 129:4, 147:4, 147:24, 148:12, 150:9, 152:24, 155:17, 192:6, 193:20, 204:5, 212:11
**counsel** [29] - 4:14, 7:13, 10:11, 10:14, 10:23, 10:25, 71:5, 71:7, 72:2, 72:6, 72:14, 74:15, 101:24, 103:13, 103:22, 104:17, 127:13, 132:12, 146:17, 150:15, 151:5, 151:11, 153:23, 173:18, 174:12, 174:22, 181:4, 193:3, 199:13
**count** [2] - 55:17, 205:21
**countervailing** [3] - 94:9, 165:5, 165:10
**countries** [7] - 79:25, 80:7, 117:22, 119:17, 123:15, 140:6, 198:5
**country** [11] - 78:1, 78:14, 79:8, 80:12, 81:3, 96:8, 96:9, 96:18, 137:8, 137:10, 163:2

**counts** [3] - 6:9, 6:10
**COUNTY** [1] - 215:4
**coup** [1] - 122:23
**coup-let** [1] - 122:23
**couple** [10] - 29:18, 56:19, 112:1, 131:22, 132:24, 154:16, 168:7, 185:23, 191:16, 196:13
**coupling** [43] - 82:25, 97:7, 99:25, 111:21, 112:2, 112:16, 112:17, 113:14, 114:14, 114:18, 125:24, 126:1, 128:2, 128:4, 128:5, 128:6, 128:7, 189:20, 192:25, 194:19, 202:19, 203:8, 204:11, 204:14, 205:24, 205:25, 206:1, 206:6, 207:6, 207:9, 207:13, 207:25, 208:7, 208:20, 209:6, 209:9, 210:20, 211:2, 211:4, 211:8, 211:14, 211:16, 212:1
**couplings** [50] - 75:18, 75:22, 82:4, 82:6, 83:4, 83:20, 83:24, 84:3, 84:8, 84:12, 88:5, 96:25, 98:18, 98:19, 99:13, 99:20, 99:21, 112:19, 131:18, 153:7, 194:22, 194:24, 195:4, 195:9, 195:11, 195:12, 195:13, 195:20, 195:22, 195:24, 196:10, 199:20, 199:22, 199:25, 200:5, 200:11, 200:14, 200:15, 200:16, 201:18, 201:20, 201:22, 205:17, 205:19, 206:12, 208:4, 208:15, 209:5, 209:25, 212:20
**course** [14] - 12:24, 63:1, 63:11, 68:17, 89:4, 89:24, 91:4, 103:5, 135:1, 147:18, 151:22,

153:11, 154:3, 175:11
**Court** [21] - 9:16, 12:20, 30:23, 33:16, 35:1, 38:23, 48:13, 61:1, 61:3, 63:15, 66:6, 69:13, 69:20, 70:5, 72:3, 72:14, 76:16, 104:6, 155:22, 214:10, 214:12
**COURT** [374] - 1:1, 1:23, 4:11, 4:17, 4:21, 5:5, 5:8, 6:1, 6:18, 6:23, 7:1, 7:16, 8:23, 10:22, 11:8, 12:11, 15:11, 15:15, 16:23, 17:2, 17:8, 17:11, 17:17, 17:19, 17:21, 17:23, 17:25, 18:3, 18:5, 18:8, 18:11, 18:14, 18:18, 18:21, 19:1, 19:3, 19:5, 19:7, 19:9, 19:12, 19:16, 19:20, 20:2, 20:6, 20:8, 20:10, 20:13, 20:16, 20:21, 20:25, 21:2, 21:8, 21:11, 21:14, 21:17, 21:21, 21:24, 22:4, 22:10, 22:15, 22:19, 22:22, 23:3, 23:11, 23:16, 23:19, 23:23, 24:2, 24:7, 24:14, 24:17, 24:21, 24:24, 25:3, 25:7, 25:10, 25:19, 25:22, 26:5, 26:9, 26:12, 26:17, 26:20, 27:1, 27:4, 27:9, 27:14, 27:17, 27:21, 27:24, 28:4, 28:9, 28:13, 28:16, 28:19, 28:23, 29:1, 29:8, 29:10, 29:23, 30:4, 30:20, 31:4, 31:7, 31:10, 31:12, 31:18, 31:23, 32:2, 32:5, 32:10, 32:20, 32:23, 33:3, 33:14, 33:24, 34:3, 34:8, 34:15, 34:24, 35:4, 35:15, 35:17, 35:22, 36:2, 36:8, 36:11, 36:14, 36:18, 36:20, 36:24, 37:2, 37:5, 37:8, 37:21, 37:25, 38:16, 40:18, 41:4, 41:8, 41:16, 41:21, 42:6, 42:12, 42:20, 42:22, 42:25, 43:6, 43:9, 43:14,

43:19, 43:24, 44:1,
44:5, 44:9, 44:13,
44:15, 44:20, 45:8,
45:12, 46:10, 46:16,
46:22, 46:25, 47:2,
47:5, 47:9, 47:19,
47:24, 48:3, 48:9,
49:1, 49:8, 49:12,
49:14, 49:18, 49:22,
50:1, 50:3, 50:7,
50:10, 50:14, 50:17,
50:21, 50:23, 51:1,
51:10, 51:15, 51:17,
51:20, 52:4, 52:6,
52:10, 52:15, 52:18,
52:21, 52:24, 53:1,
53:4, 53:7, 53:9,
53:12, 53:14, 53:18,
53:22, 53:25, 54:3,
54:6, 54:11, 54:13,
54:19, 54:23, 55:4,
55:8, 55:11, 55:19,
55:23, 56:2, 56:5,
56:8, 56:11, 56:14,
56:17, 56:21, 57:4,
57:9, 57:12, 57:15,
57:18, 57:21, 58:1,
58:5, 58:8, 58:11,
58:16, 58:19, 58:21,
58:23, 59:4, 59:8,
59:11, 59:14, 59:23,
60:1, 60:10, 61:5,
63:21, 71:24, 72:14,
72:19, 72:25, 73:15,
74:1, 74:6, 74:17,
74:20, 74:23, 75:3,
88:25, 92:9, 92:13,
92:21, 101:24,
103:16, 104:16,
107:5, 107:9,
109:23, 110:16,
112:6, 112:11,
112:24, 113:6,
114:1, 115:5,
115:11, 119:24,
120:2, 121:13,
121:17, 124:11,
124:14, 126:24,
127:2, 127:10,
127:13, 127:16,
127:19, 128:13,
128:16, 129:4,
129:7, 132:11,
141:21, 146:4,
146:14, 146:23,
146:25, 147:3,
147:7, 147:9,
147:23, 148:11,
149:13, 150:8,
150:11, 150:15,
150:18, 150:21,

151:1, 151:5,
151:11, 151:13,
151:24, 152:3,
152:9, 152:22,
153:22, 154:9,
154:11, 154:13,
155:8, 155:10,
155:14, 155:17,
156:4, 164:6, 164:9,
166:25, 167:3,
167:24, 169:1,
173:14, 174:1,
174:6, 175:22,
176:1, 176:14,
177:6, 182:17,
183:9, 186:18,
189:16, 190:1,
190:15, 190:19,
190:23, 191:2,
192:6, 192:9,
192:18, 193:9,
197:9, 198:17,
198:21, 198:24,
199:2, 199:6,
199:13, 199:16,
200:20, 201:3,
206:21, 208:25,
209:17, 210:8,
210:11, 210:15,
212:3, 213:19,
214:10, 215:8,
215:9, 215:21
**Court's** [1] - 36:3,
65:22, 73:14
**courthouse** [1] - 78:2
**courtroom** [5] - 4:15,
7:4, 7:14, 70:18,
71:25
**courts** [2] - 39:23,
72:21
**cover** [1] - 191:1
**covered** [3] - 117:8,
117:9, 137:17
**covering** [1] - 104:10
**covers** [3] - 90:24,
191:6
**Covina** [1] - 24:19
**create** [1] - 107:22
**created** [2] - 73:13,
182:25
**creates** [1] - 108:22
**creation** [1] - 183:3
**creek** [1] - 11:10
**criminal** [12] - 6:7,
35:15, 35:16, 35:17,
36:18, 36:19, 55:21,
55:22, 56:8, 56:23,
57:1, 57:11
**critical** [2] - 108:15
**CROSS** [2] - 3:2,

132:13
**cross** [10] - 5:14, 22:7,
30:15, 71:6, 71:8,
139:17, 139:18,
139:23, 146:18,
154:17
**cross-database** [2] -
139:17, 139:18
**cross-examination** [2]
- 146:18, 154:17
**CROSS-**
**EXAMINATION** [1] -
132:13
**cross-examine** [4] -
5:14, 30:15, 71:6,
71:8
**cross-examined** [1] -
22:7
**crosstalk** [1] - 191:9
**CROSSTALK** [1] -
206:11
**crystal** [1] - 103:1
**CSR** [2] - 1:23, 215:20
**Curran** [5] - 4:13,
7:12, 10:25, 89:3,
132:16
**cURRAN** [1] - 146:24
**CURRAN** [47] - 2:11,
4:12, 4:20, 5:24,
7:11, 10:24, 35:3,
72:17, 73:21, 89:2,
92:7, 92:14, 92:22,
102:1, 109:21,
112:22, 113:25,
115:3, 121:12,
126:25, 127:5,
127:14, 129:2,
132:14, 141:25,
146:19, 147:8,
147:10, 147:21,
148:1, 148:9,
148:17, 149:17,
150:4, 150:13,
150:25, 151:2,
151:10, 151:12,
151:14, 152:4,
152:14, 153:1,
154:2, 154:10,
155:9, 155:15
**currency** [1] - 51:6
**current** [6] - 117:9,
143:13, 151:17,
152:17, 196:14,
196:16
**curvy** [2] - 77:22,
83:22
**custom** [2] - 47:17,
48:8
**customer** [1] - 105:20,
145:21

**customers** [8] - 90:16,
90:17, 90:18, 144:6,
145:11, 145:19,
145:23, 145:25
**Customs** [86] - 22:14,
31:15, 40:19, 75:17,
78:23, 79:1, 79:9,
81:25, 82:3, 82:12,
83:2, 84:13, 84:22,
84:25, 85:9, 85:11,
86:13, 86:15, 87:25,
88:4, 88:12, 89:6,
89:10, 89:14, 91:22,
91:25, 92:15, 92:24,
93:6, 93:20, 94:5,
94:10, 95:1, 95:5,
95:6, 96:5, 96:9,
96:13, 97:9, 97:11,
97:23, 97:25, 99:2,
99:7, 99:17, 101:7,
101:12, 101:15,
101:19, 102:17,
139:19, 140:3,
153:2, 163:11,
163:15, 163:24,
164:16, 170:4,
171:5, 172:1, 175:2,
175:8, 177:2,
177:10, 177:12,
178:19, 179:2,
179:8, 179:10,
179:14, 181:9,
181:13, 181:22,
182:7, 188:9,
188:14, 188:21,
204:18, 204:24,
205:1, 205:4, 205:6,
205:9, 209:16
**customs** [3] - 29:16,
48:10, 159:6
**cut** [3] - 62:1, 108:10,
208:13
**CV** [1] - 1:8

# D

**D-i-a-z** [1] - 8:18
**D-y-e-r** [1] - 8:19
**D.C** [1] - 14:20
**dad** [1] - 28:7
**daily** [1] - 182:7
**damage** [1] - 132:8
**data** [1] - 130:13
**database** [6] - 97:24,
98:1, 98:6, 139:17,
139:18, 139:23
**databases** [3] - 86:15,
89:25, 126:11
**date** [4] - 13:21, 13:23,
127:10, 193:17

**dates** [1] - 190:7
**David** [2] - 8:12, 22:13
**DAY** [1] - 1:18
**day-to-day** [6] -
169:17, 169:19,
170:1, 170:3,
170:22, 184:4
**days** [3] - 51:4,
111:24, 158:5
**DC** [1] - 2:13
**De** [1] - 28:5
**de** [1] - 8:21
**DE** [1] - 8:21
**dealing** [3] - 6:7,
31:17, 32:25
**death** [1] - 38:11
**decade** [2] - 76:8,
130:19
**decades** [2] - 135:21,
136:7
**December** [3] - 85:5,
168:9, 169:14
**decide** [3] - 35:7,
56:12, 64:9, 66:8,
66:19, 67:14, 68:9,
68:13, 71:1, 85:19,
152:24
**decided** [1] - 174:10
**deciding** [5] - 64:24,
65:7, 67:10, 67:13,
77:2
**decision** [5] - 64:22,
101:20, 102:22,
123:12, 125:11
**decisions** [2] - 114:4,
177:20
**dedicated** [1] - 89:12
**dedication** [1] -
103:11
**defend** [1] - 91:21
**DEFENDANT** [1] -
2:10
**defendant** [10] - 6:10,
23:11, 35:19, 40:16,
43:4, 57:23, 71:5,
71:6, 75:13, 78:3
**defendant's** [1] -
37:17
**DEFENDANTS** [1] -
1:15
**defendants** [2] -
34:25, 43:3
**defense** [7] - 42:9,
43:16, 44:7, 64:19,
64:21, 72:18, 89:1
**define** [1] - 83:17
**defined** [1] - 119:3
**defining** [2] - 114:4,
114:7
**definitions** [1] - 97:23

degree [2] - 90:15, 104:25
deliberate [2] - 71:12, 83:14
deliberation [4] - 11:20, 62:25, 69:4, 213:24
deliberations [4] - 64:14, 68:11, 70:7, 82:19
demand [1] - 90:16
demonstrate [1] - 177:25
demonstrates [1] - 178:10
Dena [2] - 8:17, 25:15
denied [4] - 41:22, 41:24, 151:10, 208:25
denies [1] - 9:24
Department [15] - 80:17, 81:7, 86:21, 102:20, 116:8, 116:15, 119:3, 119:12, 124:2, 125:23, 126:17, 197:2, 197:20, 198:8, 200:7
department [3] - 47:4, 158:14, 212:8
Department's [1] - 122:3
depicted [1] - 13:14
depicts [1] - 190:24
deposition [13] - 150:5, 150:7, 157:8, 157:15, 157:23, 173:23, 173:24, 174:4, 183:7, 187:13, 190:18, 191:12, 210:9
depositions [1] - 189:8
describe [7] - 31:13, 79:7, 91:6, 97:6, 108:3, 113:4, 209:10
described [9] - 9:20, 82:24, 100:10, 135:2, 137:2, 163:10, 163:15, 194:12, 194:19
describes [2] - 93:14, 192:21
describing [2] - 99:18, 122:19
description [20] - 82:25, 84:9, 97:3, 97:18, 98:2, 98:16, 98:19, 98:23, 99:6, 99:18, 111:17,

118:3, 125:1, 189:20, 202:15, 206:9, 208:19, 211:2, 213:7
Description [3] - 96:24, 97:18, 206:4
descriptions [1] - 154:8
deserves [1] - 68:6
design [1] - 107:22
designated [1] - 157:6
designed [2] - 77:22, 108:7
despite [1] - 88:1
detail [3] - 10:1, 94:25, 97:19
detailed [2] - 93:13, 96:2
determine [29] - 12:15, 12:17, 12:18, 13:2, 79:11, 84:20, 84:23, 85:7, 93:4, 93:21, 119:19, 129:23, 131:3, 140:9, 142:19, 142:25, 143:11, 143:12, 163:19, 163:20, 165:3, 165:13, 167:13, 182:3, 182:22, 183:24, 184:14, 187:7, 197:24
determined [1] - 94:18
developed [1] - 96:6
diameter [4] - 120:25, 129:15, 129:17, 200:10
diamond [1] - 47:1
Diaz [2] - 8:18, 26:7
dictionaries [1] - 69:17
differ [1] - 65:14
difference [6] - 55:23, 113:11, 128:23, 129:10, 129:18, 193:21
different [36] - 6:3, 14:23, 36:2, 36:21, 57:13, 75:23, 82:6, 82:21, 100:21, 101:20, 102:9, 102:15, 113:1, 113:5, 113:6, 113:19, 137:5, 137:11, 137:13, 137:14, 137:16, 137:17, 137:20, 138:22, 139:1, 139:4, 143:5, 160:3, 178:6, 196:6, 199:1,

205:18, 206:14, 209:10, 211:1
different.. [1] - 137:15
differently [1] - 14:24
difficult [1] - 31:4
difficulty [1] - 115:9
dire [1] - 4:23
DIRECT [3] - 3:2, 104:19, 156:6
direct [14] - 66:10, 66:11, 66:18, 110:25, 120:11, 138:7, 173:22, 176:6, 183:12, 184:19, 198:14, 199:3, 210:25
directing [1] - 46:10
disagree [3] - 14:18, 15:3, 195:10
disagreement [1] - 72:10
disclose [6] - 79:11, 85:10, 94:22, 145:15, 153:7, 185:25
disclosed [1] - 147:2
disclosing [1] - 163:23
disclosure [1] - 85:11
discover [1] - 130:16
discovered [2] - 134:20, 136:5
discovering [1] - 76:17
discovery [1] - 175:10
discuss [3] - 62:5, 69:12, 71:17, 146:8, 213:21
discussing [2] - 68:23, 93:1
discussion [2] - 72:9, 179:7
dislikes [1] - 64:8
display [1] - 201:2
displayed [2] - 174:3, 201:4
dispute [3] - 48:8, 48:11, 73:3
disregard [7] - 65:24, 67:9, 67:12, 83:13, 84:15, 85:21, 103:9
distance [1] - 6:20
distinct [2] - 82:9, 82:20
distinction [3] - 56:25, 66:17, 159:25
distinctive [3] - 108:2, 109:1, 113:12
distinguish [2] - 113:22, 125:15

distinguished [3] - 121:4, 121:7, 122:6
distinguishes [3] - 109:4, 114:4, 114:8
distract [1] - 70:11
distributes [1] - 78:4
distributors [1] - 90:18
DISTRICT [5] - 1:1, 1:2, 1:4, 215:9, 215:10
DIVISION [1] - 1:2
DO [1] - 215:10
document [29] - 73:24, 92:8, 92:23, 93:12, 94:24, 96:13, 99:5, 99:19, 100:18, 119:9, 119:16, 121:24, 124:1, 127:8, 146:21, 147:11, 147:22, 148:10, 166:24, 177:4, 179:7, 190:14, 190:16, 190:17, 192:12, 193:2, 198:19, 204:17, 206:13
document's [1] - 127:12
documentation [4] - 95:22, 175:1, 177:8, 178:9
documents [17] - 73:7, 86:17, 89:22, 89:23, 89:24, 90:3, 141:12, 158:8, 178:14, 178:15, 178:18, 193:6, 204:24, 208:16, 208:22, 209:4, 209:23
DOES [1] - 1:13
dog [1] - 13:16
dollar [1] - 81:2
dollars [3] - 75:14, 81:16, 87:20
domestic [11] - 76:6, 76:11, 78:8, 141:6, 142:2, 142:3, 142:4, 161:16, 161:17, 162:1, 162:6
domestically [2] - 115:24, 141:18
done [9] - 13:5, 51:4, 112:7, 145:14, 173:8, 184:2, 184:4, 184:5, 184:8
doors [1] - 8:10
doubt [2] - 35:20, 36:5
down [23] - 7:2, 7:19,

7:21, 16:17, 17:4, 25:11, 25:12, 29:13, 33:25, 39:17, 41:8, 46:12, 55:14, 88:21, 101:14, 118:4, 121:9, 155:10, 166:12, 167:10, 195:5, 199:14, 212:10
draw [2] - 108:1, 118:21
drawings [1] - 183:4
drew [1] - 22:20
drive [1] - 21:21
drivers [2] - 48:17, 48:18
driving [4] - 30:6, 30:7, 48:15, 80:4
drunk [3] - 48:15, 48:16, 48:18
due [8] - 24:23, 75:12, 76:4, 88:16, 100:22, 100:25, 102:18, 124:25
duh [1] - 48:17
dumped [3] - 76:7, 86:9, 132:7
dumping [5] - 80:6, 138:2, 138:3, 140:16, 179:11
during [10] - 10:6, 12:24, 16:15, 19:23, 38:17, 38:20, 63:1, 63:11, 68:17, 70:7, 91:4, 91:9, 153:11, 154:3, 159:10, 175:11
duties [61] - 9:22, 12:13, 27:11, 29:16, 31:21, 31:24, 32:12, 41:2, 47:20, 48:1, 54:16, 55:5, 75:11, 75:24, 76:4, 76:18, 78:21, 78:22, 79:12, 79:14, 80:16, 80:25, 82:16, 83:5, 83:10, 84:23, 85:22, 86:5, 87:5, 88:16, 94:9, 100:22, 100:24, 102:18, 102:21, 103:2, 129:23, 130:24, 140:16, 141:4, 143:5, 148:21, 153:14, 153:19, 154:6, 160:1, 160:3, 163:21, 163:25, 165:5, 170:19, 173:3, 173:19, 178:25, 179:24,

182:5, 184:10,
200:1, 200:17
**duty** [91] - 9:20, 12:14,
14:12, 14:13, 15:9,
27:25, 29:2, 29:3,
33:1, 35:10, 37:11,
56:5, 57:9, 64:1,
64:2, 65:18, 68:17,
75:9, 75:19, 79:17,
80:10, 80:13, 80:18,
80:22, 81:17, 82:13,
82:23, 83:1, 84:18,
85:8, 86:11, 86:14,
87:9, 87:21, 87:23,
88:1, 94:3, 95:18,
98:7, 99:16, 100:25,
117:12, 129:25,
130:2, 130:4, 130:9,
131:1, 137:2, 137:7,
137:10, 137:12,
140:10, 140:25,
143:8, 153:7, 158:2,
164:2, 165:5,
165:10, 165:13,
165:24, 166:6,
167:14, 167:17,
169:9, 170:11,
170:12, 170:16,
170:23, 171:3,
171:24, 176:10,
176:24, 179:4,
179:15, 180:13,
180:25, 181:5,
181:23, 182:23,
183:16, 183:25,
184:15, 187:8,
187:14, 188:11,
196:19, 197:22,
197:25, 198:3, 200:1
**Dyer** [2] - 8:19, 26:23

# E

**e-mail** [2] - 120:5,
121:23
**E-s-p-i-r-i-t-u** [1] -
46:8
**early** [4] - 5:12, 45:3,
91:9
**easily** [1] - 117:24
**east** [1] - 27:20
**eavesdrop** [1] - 38:14
**economic** [1] - 80:2
**economies** [1] - 80:8
**edge** [5] - 77:22,
108:17, 113:13,
138:15
**edges** [4] - 83:22,
121:6, 122:6, 125:15
**educate** [2] - 158:2,

186:16
**education** [1] - 104:24
**effectively** [2] -
141:17, 142:1
**efficiently** [1] - 126:14
**effort** [5] - 86:20,
126:16, 129:23,
130:12, 187:5
**efforts** [1] - 129:21
**eight** [12] - 23:6, 23:7,
37:18, 37:22, 42:1,
42:15, 60:19, 61:6,
61:8, 62:13, 91:10
**eight-person** [1] -
23:7
**eight-year** [1] - 91:10
**either** [6] - 12:4,
66:10, 66:18, 83:12,
149:11, 189:14
**EI** [2] - 28:6, 56:20
**elaborating** [1] - 73:8
**elaboration** [1] - 73:10
**elbow** [1] - 98:18
**elbows** [1] - 99:14
**electronic** [2] - 68:24,
179:21
**elements** [1] - 98:21
**eliminated** [1] -
105:17
**email** [10] - 68:25,
85:17, 121:20,
123:20, 124:4,
147:14, 148:3,
148:6, 148:18,
148:23
**emails** [1] - 179:2
**employed** [6] - 15:22,
18:1, 21:19, 22:19,
53:7, 105:11
**employed..** [1] - 18:3
**employee** [7] - 143:23,
144:20, 144:22,
144:25, 148:4,
152:6, 152:17
**employees** [11] -
89:12, 140:17,
143:13, 143:14,
143:16, 151:16,
151:17, 158:10,
159:4, 188:19
**employer** [7] - 40:22,
45:11, 69:6, 69:8,
145:3, 145:5, 146:1
**employers** [1] -
145:16
**employing** [1] - 95:6
**employment** [6] -
15:23, 16:1, 18:8,
53:1, 105:4, 105:15
**empty** [3] - 45:18,

94:8, 97:13
**encourage** [2] - 80:2,
80:3
**encourages** [1] -
76:21
**end** [25] - 6:3, 7:19,
7:21, 11:11, 14:15,
15:2, 36:4, 37:14,
41:19, 64:12, 68:11,
68:18, 78:6, 83:17,
86:8, 88:6, 88:9,
95:25, 108:2, 108:3,
108:4, 108:7,
108:16, 112:2,
138:18
**ended** [2] - 105:11,
105:15
**ends** [1] - 113:17
**enforce** [2] - 73:5,
136:17
**engaged** [2] - 178:1,
178:10
**engine** [1] - 117:18
**engineer** [1] - 21:20
**English** [1] - 24:5
**ensure** [2] - 69:22,
163:14
**ensuring** [2] - 160:20,
163:9
**enter** [1] - 8:10
**entire** [4] - 70:2,
162:4, 191:13, 193:2
**ENTITLED** [1] - 215:14
**entity** [1] - 78:19
**entry** [12] - 73:5,
99:22, 201:7,
204:18, 204:21,
206:14, 207:1,
208:9, 208:14,
209:10, 209:23,
210:18
**environmental** [1] -
28:7
**equity** [1] - 157:3
**Esmeralda** [2] - 8:21,
28:5
**especially** [2] - 79:5,
89:18
**Espiritu** [2] - 46:7,
52:8
**ESQUIRE** [4] - 2:7,
2:7, 2:11, 2:12
**essence** [1] - 86:1
**essential** [2] - 72:24,
88:19
**essentially** [6] - 87:2,
120:24, 138:11,
138:12, 197:3,
209:25
**established** [1] -

148:16
**establishing** [1] -
100:23
**et** [5] - 4:6, 16:9,
32:12, 61:21, 214:3
**ETR** [1] - 49:16
**eventually** [2] -
106:22, 117:5
**everywhere** [1] -
131:11
**evidence** [114] - 12:19,
12:22, 13:22, 14:1,
14:3, 14:11, 14:14,
15:4, 18:23, 19:17,
19:18, 22:1, 22:4,
26:14, 28:1, 30:11,
30:14, 30:25, 31:1,
32:6, 33:6, 33:15,
35:23, 36:5, 36:25,
37:13, 48:12, 48:20,
48:24, 49:4, 49:5,
50:12, 51:24, 61:2,
61:19, 62:14, 64:3,
64:10, 64:17, 64:19,
64:20, 64:23, 64:24,
65:2, 65:5, 65:6,
65:10, 65:13, 65:18,
65:20, 65:25, 66:1,
66:3, 66:4, 66:7,
66:9, 66:10, 66:11,
66:14, 66:16, 66:18,
66:20, 66:21, 66:22,
66:23, 66:25, 67:8,
67:10, 67:23, 67:25,
68:2, 68:14, 69:14,
69:23, 70:12, 70:25,
71:2, 71:5, 71:7,
71:9, 74:11, 74:12,
75:20, 77:8, 77:13,
81:18, 81:20, 81:22,
82:4, 82:14, 83:18,
84:10, 84:14, 84:21,
85:24, 86:1, 87:11,
87:12, 88:8, 103:18,
103:19, 103:21,
147:22, 153:13,
154:4, 167:22,
189:24, 192:11,
192:13, 192:15,
206:17, 206:19
**Evidence** [1] - 72:18
**evil** [1] - 91:16
**ex** [1] - 1:6
**exact** [2] - 161:22,
162:9
**exactly** [8] - 39:22,
40:3, 89:15, 100:24,
101:19, 119:19,
123:10, 142:11
**examination** [2] -

146:18, 154:17
**EXAMINATION** [4] -
104:19, 132:13,
154:14, 156:6
**examine** [4] - 5:14,
30:15, 71:6, 71:8
**examined** [3] - 22:7,
92:15, 119:4
**example** [7] - 13:4,
95:13, 96:3, 98:17,
99:13, 178:24, 206:5
**Excel** [1] - 117:24
**excellent** [2] - 164:13,
185:22, 190:10
**except** [2] - 6:8,
131:11
**excerpt** [1] - 168:15
**exchanged** [1] - 145:8
**exclude** [1] - 72:16
**excluded** [2] - 65:23,
72:12
**exclusion** [1] - 72:9
**excuse** [17] - 6:2, 6:3,
20:10, 23:6, 42:4,
42:11, 42:19, 43:5,
43:17, 44:8, 44:22,
61:11, 61:12, 63:17,
71:14, 182:4, 204:5
**excused** [7] - 42:25,
45:5, 45:10, 59:15,
60:13, 61:13, 63:23
**executive** [11] -
156:14, 159:19,
159:24, 160:13,
160:19, 160:24,
164:18, 165:22,
177:8, 180:7, 199:10
**executives** [1] - 116:6
**exempt** [1] - 127:8
**Exemption** [1] -
127:12
**exercise** [2] - 42:1,
163:19
**Exhibit** [42] - 92:3,
92:22, 95:12, 97:12,
98:4, 99:2, 107:8,
110:13, 110:18,
119:23, 119:25,
120:4, 121:11,
121:15, 122:8,
124:8, 124:12,
124:16, 127:4,
127:17, 128:15,
164:4, 164:7,
167:21, 167:25,
175:21, 175:23,
189:24, 192:8,
193:7, 193:10,
194:1, 197:8,
197:11, 198:20,

198:21, 199:4,
201:2, 201:5,
201:11, 206:15,
206:23
**exhibit** [26] - 66:23,
67:2, 67:3, 73:4,
73:6, 73:7, 73:12,
92:3, 93:14, 95:17,
100:8, 110:21,
111:1, 112:5,
112:10, 120:12,
122:11, 123:7,
126:25, 128:5,
128:12, 133:24,
147:2, 191:13,
191:22, 192:7
**exhibits** [4] - 12:23,
65:1, 65:5, 107:4
**existed** [1] - 85:5
**existing** [2] - 117:3,
117:10
**expand** [1] - 153:23
**expect** [2] - 71:2,
87:12, 177:10
**expects** [1] - 10:16
**expedited** [1] - 93:10
**expensive** [1] - 117:1
**experience** [30] - 14:8,
20:19, 22:7, 22:24,
29:16, 29:17, 29:21,
30:5, 30:12, 30:19,
31:14, 31:17, 31:23,
32:23, 41:1, 41:11,
41:18, 51:9, 53:19,
54:16, 54:20, 86:12,
115:15, 115:18,
116:5, 116:13,
117:11, 118:8,
118:25, 172:11
**experienced** [1] - 59:1
**experiences** [4] -
29:5, 30:22, 58:16,
119:11
**expert** [9] - 72:11,
72:24, 85:9, 85:11,
102:12, 112:23,
133:11, 133:13,
134:23
**expert's** [1] - 85:12
**expertise** [1] - 112:25
**experts** [1] - 72:21
**expires** [1] - 197:18
**explain** [9] - 12:12,
90:3, 94:24, 101:19,
101:22, 102:13,
107:15, 123:8, 151:3
**explained** [2] - 102:3,
212:22
**explanation** [3] -
15:12, 211:15,

211:18
**exports** [2] - 31:17,
51:5
**exposed** [4] - 68:16,
70:4, 118:11, 186:2
**exposure** [1] - 133:2
**express** [7] - 62:6,
62:10, 62:23, 71:19,
88:22, 146:10,
213:23
**extension** [1] - 195:7
**extent** [5] - 10:20,
81:11, 129:12,
187:5, 194:24
**extra** [2] - 26:15,
138:15
**eye** [2] - 87:11, 122:11

## F

**fabrication** [1] - 106:6
**face** [3] - 102:14,
104:10
**facilities** [1] - 109:15
**fact** [26] - 30:17, 33:4,
65:2, 66:12, 66:15,
68:1, 68:2, 82:1,
82:15, 84:4, 84:10,
85:4, 86:4, 124:25,
142:6, 144:5,
167:13, 171:1,
172:4, 188:5, 191:6,
195:15, 195:20,
195:21, 195:23,
201:20
**facts** [23] - 12:15,
12:17, 12:19, 13:2,
14:4, 14:5, 14:15,
15:5, 22:2, 30:10,
31:1, 34:9, 37:12,
37:13, 51:11, 64:3,
64:4, 64:25, 65:8,
65:14, 66:15, 67:13,
69:20
**fail** [1] - 95:4
**failed** [1] - 86:2
**failing** [2] - 148:20,
148:22
**fair** [47] - 14:10, 17:17,
23:1, 23:8, 23:9,
23:14, 23:16, 25:7,
26:17, 27:25, 28:10,
28:13, 28:25, 30:9,
33:16, 37:19, 37:23,
41:1, 41:13, 41:20,
48:6, 48:16, 48:19,
48:23, 50:1, 50:11,
50:14, 51:2, 51:11,
57:18, 57:22, 57:23,
57:24, 59:2, 69:22,

75:8, 79:22, 79:24,
106:8, 135:22,
136:9, 136:10,
161:21, 161:23,
161:25, 162:7,
167:12
**fairly** [1] - 6:12
**fairness** [1] - 70:1
**faith** [1] - 73:24
**fall** [5] - 15:7, 60:18,
98:11, 99:5, 101:9
**falls** [1] - 165:14
**false** [17] - 75:21,
76:2, 76:5, 81:24,
82:1, 82:16, 82:20,
83:9, 83:13, 84:15,
85:20, 85:25, 88:12,
88:14, 89:6, 95:14,
96:21
**False** [2] - 76:14,
88:11
**falsely** [3] - 9:20, 9:21,
87:25
**familiar** [23] - 6:12,
78:16, 109:25,
110:21, 111:20,
111:23, 112:3,
114:3, 118:24,
119:10, 133:6,
133:8, 135:24,
139:18, 155:2,
177:15, 186:2,
191:15, 195:21,
197:5, 197:16,
201:7, 204:20
**familiarity** [2] -
195:23, 196:13
**family** [2] - 69:5, 69:7
**fancy** [1] - 86:14
**far** [8] - 24:7, 39:21,
39:22, 46:19, 55:1,
70:12, 131:12,
183:19
**Farm** [1] - 27:7
**faster** [3] - 12:2,
126:9, 126:14
**father** [3] - 24:1,
135:18, 135:20
**feature** [2] - 108:16,
109:1
**features** [2] - 113:12,
113:22
**FEDERAL** [2] - 1:23,
215:21
**federal** [3] - 32:17,
76:14, 88:19
**Federal** [3] - 72:18,
76:16, 168:18
**fell** [2] - 98:13, 139:7
**fellow** [2] - 68:10, 69:2

**felt** [5] - 119:1, 122:1,
123:12, 136:12,
141:8
**Fermin** [2] - 8:18, 26:7
**few** [3] - 5:16, 68:7,
158:10
**field** [1] - 75:10
**fifth** [2] - 110:25,
204:4
**figure** [1] - 25:11
**figures** [6] - 158:14,
158:15, 158:23,
159:3, 161:22,
162:10
**figuring** [1] - 98:11
**file** [2] - 85:17, 179:6
**filed** [1] - 149:2
**files** [2] - 89:25
**fill** [4] - 45:24, 95:24,
116:10, 213:5
**filled** [3] - 96:14,
108:25, 153:3
**filling** [3] - 7:21,
95:25, 96:19
**filter** [1] - 118:4
**filters** [1] - 118:5
**final** [3] - 64:13, 72:8
**finally** [3] - 85:24,
94:14, 125:22
**financial** [1] - 47:8
**fine** [4] - 45:2, 73:16,
152:7, 165:1
**finish** [3] - 11:10,
11:25, 39:13
**finishes** [1] - 5:12
**fire** [7] - 77:24, 90:24,
93:16, 102:6, 109:7,
123:3
**firearm** [1] - 107:20
**first** [45] - 7:18, 8:2,
8:7, 8:16, 12:14,
14:12, 29:20, 35:12,
40:9, 41:15, 42:1,
42:2, 45:24, 55:14,
68:8, 70:21, 72:8,
79:6, 82:2, 85:1,
86:13, 87:17,
103:14, 103:22,
105:6, 106:20,
107:17, 112:7,
113:11, 117:20,
120:22, 122:14,
123:1, 123:6, 123:7,
132:18, 133:2,
147:6, 164:17,
168:9, 168:12,
171:8, 192:20,
194:15
**firsthand** [11] - 172:4,
172:13, 173:9,

173:12, 175:6,
185:5, 185:12,
186:9, 212:2, 213:2,
213:4
**fit** [7] - 82:21, 97:4,
102:3, 108:7,
108:11, 119:19,
211:7
**fits** [3] - 102:14,
138:15, 138:24
**fitting** [27] - 77:21,
86:25, 99:9, 100:11,
106:24, 107:18,
108:13, 108:22,
109:3, 110:8, 113:9,
113:10, 113:15,
114:5, 114:9, 118:7,
118:13, 118:20,
122:2, 126:3, 134:9,
137:12, 189:15,
195:25, 196:7, 202:9
**fittings** [48] - 75:15,
77:16, 78:4, 80:19,
93:17, 98:17, 99:13,
101:1, 101:11,
101:15, 101:17,
101:20, 102:8,
102:9, 106:5,
106:12, 106:14,
106:19, 109:4,
113:23, 114:5,
115:10, 118:3,
118:5, 118:24,
119:1, 119:6, 119:8,
121:4, 121:7, 121:8,
122:6, 122:7,
124:25, 125:13,
125:15, 125:16,
134:2, 137:3,
169:10, 176:11,
176:25, 196:20,
198:4, 200:2,
200:10, 207:22
**five** [12] - 5:4, 55:18,
55:22, 58:9, 81:8,
92:16, 94:15,
119:11, 140:6,
197:21, 198:4
**five-month** [1] - 94:15
**fix** [1] - 116:2
**flag** [1] - 130:23
**flat** [2] - 83:24, 105:7
**FLOOR** [1] - 2:8
**Florida** [1] - 10:20
**flow** [2] - 102:10,
102:14
**flowing** [1] - 102:5
**focus** [4] - 96:20,
96:23, 161:10,
184:12

**focusing** [3] - 125:5, 171:8, 210:13
**fold** [1] - 27:25
**folks** [3] - 103:12, 185:24, 186:9
**follow** [8] - 16:6, 16:8, 47:16, 48:7, 48:9, 64:5, 85:12, 182:24
**follow-up** [2] - 16:6, 16:8
**followed** [3] - 30:10, 99:21, 183:2
**following** [8] - 36:3, 44:15, 60:10, 70:20, 93:25, 100:3, 100:15, 206:1
**FOR** [2] - 215:8, 215:9
**forced** [1] - 76:6
**FOREGOING** [1] - 215:12
**foreign** [10] - 75:7, 75:9, 79:20, 79:24, 90:15, 90:17, 90:20, 140:9, 143:9, 161:18
**foreign-made** [1] - 90:17
**foremost** [1] - 107:17
**forged** [1] - 99:8
**forget** [2] - 11:25, 44:24
**forgive** [1] - 185:19
**form** [22] - 62:6, 62:9, 62:14, 62:16, 62:19, 62:23, 71:18, 73:4, 95:13, 96:14, 97:13, 146:9, 153:3, 201:11, 202:12, 207:4, 207:5, 207:8, 210:19, 211:1, 213:22
**formal** [5] - 86:20, 99:3, 170:8, 170:15, 170:17
**FORMAT** [1] - 215:15
**formatted** [1] - 117:24
**formed** [1] - 62:20
**former** [17] - 43:5, 140:17, 143:13, 143:16, 143:23, 144:20, 144:22, 144:25, 145:3, 145:5, 145:16, 146:1, 148:4, 151:16, 152:6, 159:4, 188:19
**forms** [3] - 96:19, 99:22, 209:11
**forthright** [1] - 79:3
**fortunately** [1] - 91:24
**forward** [3] - 76:21,

**focusing** (col 2):
**180:1, 186:21**
**forwarded** [1] - 148:18
**forwarding** [1] - 148:2
**foundation** [6] - 73:22, 109:21, 112:22, 113:25, 115:3, 146:21
**four** [14] - 5:1, 5:4, 5:6, 5:9, 6:10, 15:18, 25:22, 42:14, 55:18, 118:4, 118:7, 118:13, 118:20, 203:25
**fourth** [1] - 94:8
**fractional** [1] - 156:20
**frame** [3] - 130:19, 184:12, 184:13
**fraud** [2] - 6:9, 40:21, 41:18
**fraudulent** [1] - 96:21
**free** [2] - 39:14, 44:24
**freely** [8] - 144:1, 144:4, 144:23, 145:7, 145:12, 149:8, 149:9, 150:1
**frequently** [2] - 164:15, 164:20
**friend** [1] - 54:25
**friends** [2] - 33:8, 33:20
**front** [10] - 8:16, 30:23, 35:1, 45:25, 46:3, 95:18, 147:12, 162:10, 182:1
**frustrates** [1] - 214:6
**fulfill** [3] - 19:24, 27:11, 27:24
**full** [5] - 10:20, 79:19, 85:11, 104:12, 156:1
**function's** [1] - 12:13
**fundamentally** [1] - 102:15
**future** [1] - 103:2

## G

**G-o-l-a-n** [1] - 8:14
**G-o-m-e-z** [1] - 8:4
**gain** [1] - 130:12
**game** [2] - 32:7, 41:3
**gap** [2] - 108:22, 108:24
**Gardena** [1] - 49:13
**GARY** [1] - 1:4
**GASKET** [1] - 1:13
**general** [12] - 12:1, 12:3, 16:11, 20:22, 20:25, 21:4, 22:23, 54:14, 54:24, 99:15, 128:1, 140:20

**generalized** [2] - 93:7, 94:21
**generally** [1] - 94:12
**Genius** [4] - 130:15, 130:17, 131:13, 131:17
**gentlemen** [16] - 7:17, 8:23, 9:15, 10:13, 11:9, 37:8, 60:24, 61:14, 74:9, 76:9, 88:18, 89:3, 103:4, 103:17, 146:4, 213:19
**get-go** [1] - 77:5
**given** [11] - 66:18, 66:19, 69:3, 70:7, 70:15, 70:16, 81:11, 82:19, 116:13, 151:9, 211:25
**glass** [1] - 5:19
**glasses** [3] - 167:10, 167:11, 168:2
**Glen** [1] - 154:21
**Glendale** [1] - 56:20
**Glenn** [3] - 134:13, 147:14, 148:24
**global** [6] - 142:12, 159:22, 160:7, 160:15, 160:20, 171:19
**globally** [1] - 142:9
**Gloria** [2] - 46:9, 52:20
**glove** [1] - 82:22
**goal** [1] - 91:21
**God** [5] - 11:9, 61:3, 104:7, 104:8, 155:23
**Golan** [2] - 8:13, 23:20
**Gomez** [2] - 8:4, 19:4
**goods** [2] - 75:7, 79:21
**Google** [5] - 86:15, 87:4, 117:18, 126:12, 145:20
**Googled** [3] - 117:16, 117:17, 117:19
**gotcha** [1] - 193:16
**govern** [1] - 64:14
**Government** [7] - 75:6, 79:18, 79:20, 90:1, 113:21, 114:3, 137:24
**government** [16] - 32:17, 34:18, 34:21, 35:18, 55:5, 59:18, 59:20, 76:3, 81:4, 83:9, 88:15, 94:12, 98:5, 136:16
**Government's** [1] - 77:1
**grades** [1] - 95:3

**graduated** [4] - 105:1, 105:2, 105:5, 132:20
**GRAND** [1] - 2:8
**grand** [1] - 156:24
**granted** [2] - 72:16, 72:19
**ground** [1] - 4:21
**grounds** [1] - 141:20
**Group** [1] - 160:16
**group** [2] - 160:25, 177:19
**group's** [1] - 169:20
**grouped** [1] - 162:22
**groups** [1] - 160:15
**guaranteed** [1] - 39:16
**guard** [1] - 23:21
**guess** [7] - 34:11, 48:22, 67:7, 108:3, 119:17, 149:11, 161:19
**guilty** [1] - 35:19
**guys** [2] - 42:22, 73:16

## H

**H-e-r-r** [1] - 46:6
**H-e-r-r-e-r-a** [1] - 46:9
**half** [4] - 5:6, 5:8, 5:9, 129:16
**halfway** [1] - 39:10
**hand** [12] - 9:12, 12:5, 24:10, 29:19, 31:8, 51:18, 60:23, 82:21, 86:20, 96:18, 107:4
**handed** [2] - 107:7, 112:9
**handful** [2] - 118:12, 162:22
**handle** [1] - 155:15
**hands** [2] - 35:11, 60:18
**happy** [2] - 38:17, 151:3
**hard** [1] - 161:15
**Harmonized** [7] - 97:21, 98:1, 98:3, 99:11, 101:3, 166:20, 213:6
**hate** [3] - 48:14, 50:10, 166:2
**head** [4] - 54:7, 86:2, 114:22, 136:7
**health** [1] - 93:2
**hear** [43] - 5:20, 9:12, 23:4, 24:9, 26:13, 34:19, 38:11, 40:9, 40:12, 46:20, 53:25, 54:7, 66:6, 67:19, 72:22, 78:25, 80:6, 81:7, 82:8, 82:11,

**graduated** (col 5):
83:6, 84:2, 85:15, 86:6, 87:1, 90:3, 90:23, 91:3, 91:12, 95:1, 95:18, 95:24, 96:16, 98:12, 98:20, 100:2, 100:23, 101:18, 102:11, 102:19, 103:13, 129:6
**heard** [19] - 19:12, 21:24, 38:12, 40:23, 47:9, 47:11, 62:17, 66:13, 89:19, 97:6, 103:17, 114:17, 127:13, 135:7, 139:19, 139:25, 140:4, 173:9, 173:12
**hearing** [1] - 70:12
**hearsay** [4] - 127:6, 127:8, 173:13, 212:1
**held** [1] - 86:20
**HELD** [1] - 215:13
**hello** [6] - 17:20, 19:2, 22:12, 26:6, 31:11, 57:10
**Hello** [1] - 17:21
**help** [9] - 61:3, 65:12, 70:13, 71:1, 76:22, 104:7, 104:8, 155:23, 164:11
**helpful** [3] - 144:17, 159:3, 213:13
**helps** [2] - 145:14, 151:3
**HENDY** [5] - 2:7, 72:4, 72:23, 73:2, 164:12
**Hendy** [6] - 4:9, 7:10, 10:14, 72:4, 76:10, 164:11
**HEREBY** [1] - 215:10
**Herr** [2] - 46:6, 50:19
**Herrera** [2] - 46:9, 52:20
**hesitation** [1] - 59:3
**Hi** [1] - 24:18
**hide** [1] - 100:12
**high** [2] - 18:12, 35:20
**higher** [1] - 161:14
**highlight** [1] - 165:17
**highly** [1] - 95:23
**Hills** [3] - 17:24, 26:25, 50:5
**hindered** [1] - 59:4
**hired** [1] - 106:20
**historic** [1] - 116:13
**historically** [1] - 161:12
**history** [1] - 29:17
**hit** [1] - 168:4
**hold** [1] - 45:8

**hole** [3] - 108:10, 138:16, 138:24
**home** [33] - 16:4, 17:9, 18:6, 19:9, 19:10, 20:14, 21:22, 22:15, 22:16, 23:24, 24:25, 25:16, 26:9, 26:10, 27:5, 27:8, 27:21, 27:22, 35:25, 45:9, 45:13, 47:5, 47:6, 49:18, 49:19, 50:7, 50:8, 53:9, 53:10
**honest** [1] - 89:10
**honestly** [1] - 47:14
**honor** [2] - 76:11, 79:1
**Honor** [67] - 4:8, 4:12, 4:20, 7:12, 10:12, 10:24, 11:7, 35:3, 40:24, 42:4, 42:18, 43:12, 43:25, 44:3, 57:10, 59:21, 72:4, 72:17, 74:16, 74:21, 92:20, 102:1, 103:15, 103:25, 104:18, 107:3, 109:22, 110:19, 112:4, 115:4, 119:22, 121:10, 124:10, 126:21, 127:6, 127:7, 128:11, 129:2, 129:5, 146:19, 146:20, 147:21, 148:9, 150:4, 150:19, 151:10, 152:2, 154:10, 155:7, 155:9, 155:12, 155:15, 156:5, 164:5, 166:22, 167:21, 173:25, 174:2, 175:25, 183:8, 189:25, 198:15, 198:23, 198:25, 201:1, 208:23, 210:10
**HONORABLE** [1] - 1:4
**hope** [1] - 10:19
**hopefully** [2] - 7:3, 24:5
**hopes** [1] - 80:4
**hour** [2] - 39:4, 60:6
**hours** [6] - 5:1, 5:4, 5:9, 39:8, 86:19, 126:7
**house** [2] - 28:22, 175:8
**Houston** [1] - 96:12
**hs** [1] - 138:23
**HTS** [16] - 97:24,

166:16, 167:6, 167:12, 167:16, 182:7, 182:9, 182:14, 182:19, 202:1, 206:1, 206:2, 206:3, 206:7, 208:18, 209:16
**human** [1] - 109:17
**humbling** [1] - 14:8
**hundred** [1] - 157:1
**hundreds** [2] - 14:6, 208:10
**hurt** [1] - 76:6
**husband** [3] - 21:19, 27:6, 47:7
**husband's** [1] - 25:17
**hydrants** [1] - 90:24

## I

**i.e** [1] - 91:6
**ICU** [1] - 25:2
**idea** [2] - 75:10, 148:15
**identical** [6] - 86:23, 129:13, 138:8, 138:10, 138:11, 138:20
**identified** [2] - 89:21, 113:21
**Identify** [1] - 176:8
**identifying** [1] - 98:6
**identities** [1] - 110:1
**identity** [4] - 109:19, 110:4, 110:6, 134:10
**ignorance** [2] - 83:14, 85:25
**ignorant** [1] - 32:1
**ignore** [3] - 63:6, 63:7, 67:6
**illegally** [1] - 86:9
**imagine** [3] - 107:24, 108:5, 149:24
**immediately** [6] - 69:13, 70:5, 86:3, 117:25, 118:21, 130:23
**impartial** [4] - 14:10, 27:25, 57:19, 57:22
**impeaching** [1] - 150:20
**impeachment** [4] - 147:8, 150:23, 151:4, 151:6
**implies** [1] - 69:4
**impolite** [1] - 63:7
**import** [47] - 29:25, 41:11, 51:5, 84:12, 89:8, 89:13, 92:1, 92:16, 93:5, 93:21,

94:18, 94:23, 95:19, 96:7, 103:12, 130:2, 130:12, 130:21, 131:11, 140:25, 160:21, 160:25, 162:2, 164:18, 165:4, 165:22, 169:17, 169:19, 170:6, 170:9, 171:9, 174:11, 177:9, 177:15, 177:18, 179:7, 180:2, 180:8, 184:23, 185:15, 185:16, 185:18, 188:6, 194:9, 199:11, 200:24
**Import** [5] - 130:14, 130:16, 131:13, 131:17, 160:16
**important** [18] - 14:17, 29:4, 30:21, 30:24, 31:2, 33:3, 33:5, 33:14, 49:2, 51:23, 68:4, 77:17, 78:15, 79:5, 88:18, 106:24, 140:12, 213:9
**importantly** [1] - 109:3
**importation** [11] - 20:20, 20:22, 20:23, 30:2, 32:11, 53:19, 55:1, 59:1, 153:3, 161:1, 209:16
**importations** [3] - 31:14, 31:17, 54:16
**imported** [20] - 9:19, 75:14, 75:16, 81:15, 81:24, 82:2, 82:12, 91:8, 136:10, 153:8, 161:5, 161:9, 162:6, 162:7, 163:5, 182:8, 203:8, 205:16, 205:24, 205:25
**importer** [19] - 78:14, 78:19, 81:3, 83:4, 85:20, 87:3, 87:7, 87:13, 87:19, 87:24, 88:3, 90:6, 95:20, 126:8, 154:24, 163:1, 163:4, 163:8, 163:18
**importers** [20] - 75:12, 78:24, 79:2, 79:4, 79:6, 79:10, 84:19, 84:22, 96:18, 129:24, 140:10, 140:16, 140:18, 142:21, 143:1, 143:14, 148:20, 151:17, 155:4, 177:11

**importing** [26] - 32:14, 41:12, 75:22, 75:23, 79:9, 82:4, 82:6, 83:4, 83:20, 88:5, 100:13, 102:24, 131:14, 131:15, 131:18, 136:15, 141:8, 173:1, 183:23, 198:9, 201:17, 202:1, 205:19, 206:12, 208:14
**imports** [11] - 32:25, 41:18, 47:16, 78:8, 80:15, 115:9, 136:13, 173:8, 211:19, 212:8, 213:16
**impose** [1] - 78:24
**imposed** [5] - 80:18, 81:7, 83:7, 143:9, 197:22
**imposes** [2] - 75:6, 79:19, 80:24
**imposition** [2] - 153:14, 154:5
**impossible** [1] - 130:9
**impressed** [1] - 103:10
**impression** [2] - 205:10, 205:14
**improper** [1] - 65:19
**IN** [3] - 215:8, 215:13, 215:15
**inaccurate** [1] - 73:8
**inadequate** [1] - 81:10
**inadmissible** [1] - 127:5
**Inaudible** [1] - 17:10
**Inc** [2] - 4:6, 127:22
**INC** [2] - 1:7, 1:11
**inch** [1] - 129:16
**inches** [3] - 120:24, 129:17, 200:10
**include** [1] - 177:2
**included** [3] - 167:17, 191:14, 196:10
**includes** [3] - 68:23, 98:19, 200:9
**including** [8] - 69:5, 90:11, 91:11, 93:15, 93:17, 94:7, 103:12, 198:9
**increase** [1] - 141:13
**independent** [1] - 28:20
**independently** [2] - 213:5, 213:17
**indicate** [5] - 13:5, 34:15, 125:17,

126:1, 205:16
**indicated** [5] - 5:24, 41:7, 41:9, 41:17, 58:25
**indicates** [11] - 125:13, 128:1, 201:17, 203:7, 203:18, 205:23, 207:5, 207:21, 207:25, 208:3, 208:6
**indicating** [1] - 209:4
**indication** [2] - 121:3, 207:9
**individual** [3] - 16:10, 29:11, 34:17
**individually** [2] - 12:7, 46:17
**Industries** [8] - 4:10, 7:10, 76:12, 77:15, 105:12, 105:19, 116:20, 133:7
**INDUSTRIES** [1] - 1:7
**industries** [2] - 149:24, 150:2
**industry** [13] - 84:2, 105:10, 105:23, 106:7, 114:16, 132:23, 134:6, 138:14, 140:22, 144:1, 145:8, 149:23, 152:13
**influence** [2] - 30:6, 70:16
**influenced** [3] - 64:7, 65:21, 70:11
**informal** [1] - 16:24
**information** [44] - 33:5, 68:16, 70:5, 125:9, 131:12, 136:21, 140:19, 141:15, 142:13, 143:24, 144:3, 144:4, 144:8, 144:21, 144:23, 145:7, 145:9, 145:12, 145:15, 146:3, 148:6, 149:6, 149:7, 149:16, 149:19, 149:21, 149:23, 149:25, 150:3, 151:18, 151:20, 151:21, 152:12, 158:13, 158:15, 172:13, 173:12, 177:19, 188:10, 198:8, 212:25, 213:1, 213:16
**Ingay** [1] - 185:19
**inherited** [2] - 135:17,

135:19
inheriting [1] - 174:18
initial [1] - 165:25
input [2] - 41:16, 62:15
inquire [2] - 104:17, 156:4
inquiries [1] - 86:3
insofar [1] - 70:16
inspect [2] - 109:14, 109:15
inspection [1] - 94:16
instance [2] - 118:3, 122:22
instead [3] - 100:19, 102:4, 138:25
instruct [6] - 16:9, 64:1, 66:2, 68:19, 71:10, 82:15
instructed [1] - 65:24
instructing [1] - 61:16, 62:4, 101:9
instruction [3] - 36:4, 97:14, 98:10
instructions [15] - 61:2, 61:17, 64:13, 64:15, 68:15, 69:15, 95:23, 96:3, 96:6, 97:10, 97:15, 99:21, 100:4, 100:15
instructor [2] - 26:24, 27:3
Insurance [1] - 27:7
intend [1] - 11:3
intended [2] - 65:12, 204:8
intention [1] - 153:16
intentionally [2] - 153:13, 154:5
interest [4] - 67:21, 157:3, 178:13, 178:15
interested [1] - 186:22
interesting [2] - 81:22, 91:13
intermission [1] - 39:5
internal [3] - 93:23, 94:16, 94:22
International [4] - 4:6, 7:7, 117:21, 197:21
international [1] - 87:16
INTERNATIONAL [2] - 1:11, 1:12
internet [1] - 123:25
Internet [4] - 68:25, 69:17, 131:6, 213:4
interpret [1] - 65:12
interpretation [1] - 142:17

interpretations [1] - 14:23
interrogatories [1] - 176:4
interrogatory [2] - 175:14, 176:7
interrupt [3] - 38:20, 146:5, 166:2
intimate [1] - 195:3
introduce [1] - 10:4
introduced [2] - 11:14, 12:23
invested [1] - 157:2
investigated [1] - 140:15
investigation [18] - 79:19, 119:5, 134:12, 134:18, 134:23, 135:1, 135:14, 137:3, 139:6, 139:10, 140:7, 142:18, 142:23, 143:22, 144:18, 148:19, 153:12, 154:4
investigations [1] - 69:19
invoice [13] - 97:1, 100:4, 100:6, 100:8, 153:6, 203:2, 203:4, 203:12, 203:15, 207:11, 207:19, 208:6, 209:13
involved [21] - 6:11, 10:9, 11:16, 12:9, 32:15, 32:25, 33:21, 55:5, 58:7, 69:6, 105:23, 106:7, 106:23, 116:8, 116:9, 118:1, 170:21, 176:3, 176:5, 180:11, 198:4
involvement [1] - 180:10
involves [3] - 68:17, 161:5, 161:9
Irene [2] - 46:1, 46:24
iron [7] - 98:18, 98:22, 99:14, 99:15, 118:14, 118:15, 118:17
irrelevant [1] - 200:20
IS [2] - 215:12, 215:15
Isaiah [2] - 46:7, 52:7
Island [56] - 4:9, 7:10, 10:15, 10:21, 72:5, 76:12, 76:15, 76:20, 77:3, 77:14, 77:15, 78:4, 86:7, 86:8, 90:14, 91:12, 95:14,

100:19, 103:25, 105:11, 105:19, 105:25, 106:8, 106:11, 106:23, 107:8, 110:13, 115:8, 115:15, 116:14, 116:20, 117:3, 124:8, 124:16, 127:3, 132:2, 132:4, 133:3, 133:4, 133:6, 134:12, 134:18, 135:16, 136:7, 141:17, 142:24, 147:19, 154:24, 155:12, 164:3, 175:10, 175:20, 189:23, 197:8, 206:15
ISLAND [1] - 1:7
Island's [8] - 72:11, 73:3, 106:4, 106:18, 106:25, 114:25, 115:23, 132:8
issue [5] - 6:8, 73:2, 83:11, 152:16, 170:21
issued [2] - 86:21, 92:17
issues [3] - 32:1, 42:24, 68:17
IT [2] - 158:14
ITC [1] - 117:21
item [5] - 4:4, 98:13, 182:25, 183:3, 184:5
item's [1] - 94:6
items [4] - 94:6, 96:20, 190:16, 196:17
itself [3] - 103:21, 128:9, 177:5

**J**

J-o-h-n-s-o-n [1] - 46:5
janitorial [1] - 25:17
Japan [1] - 119:15
jazz [1] - 203:5
jealous [1] - 16:1
jeopardizes [1] - 70:1
Jersey [4] - 10:17, 10:18, 11:5, 11:6
Jewish [1] - 23:21
Ji [1] - 144:13
jigsaw [5] - 13:5, 13:8, 14:1, 77:9, 77:11
job [7] - 32:1, 145:10, 160:1, 170:18, 184:18, 184:19, 184:21

jobs [1] - 116:11
JOHN [1] - 1:13
Johnson [2] - 46:5, 50:4
Joined [1] - 4:14
joined [8] - 7:13, 10:14, 10:25, 106:11, 125:21, 133:3, 133:5, 134:12
joining [1] - 134:17
Joshua [2] - 8:20, 27:19
Judge [11] - 22:12, 23:2, 23:15, 23:18, 25:14, 31:11, 32:9, 82:15, 83:16, 89:2, 89:20
judge [4] - 23:10, 33:13, 77:9, 147:5
JUDGE [1] - 1:4
JUDICIAL [1] - 215:16
July [1] - 92:25
June [1] - 160:11
Junior [1] - 8:18
juries [2] - 36:16, 55:12
Juror [47] - 16:17, 16:19, 25:11, 29:20, 36:15, 40:16, 40:25, 41:6, 41:9, 42:5, 42:11, 42:19, 43:5, 43:7, 43:9, 43:13, 43:17, 43:19, 44:8, 44:9, 44:17, 44:18, 44:20, 44:21, 45:14, 45:16, 45:17, 45:19, 45:20, 46:22, 49:8, 55:13, 58:25, 59:9, 59:16, 59:21, 60:12, 60:15, 61:10
JUROR [186] - 12:10, 16:21, 17:1, 17:6, 17:10, 17:16, 17:18, 17:20, 17:22, 17:24, 18:1, 18:4, 18:7, 18:9, 18:13, 18:17, 18:20, 18:25, 19:2, 19:4, 19:6, 19:8, 19:11, 19:15, 19:19, 20:1, 20:5, 20:7, 20:9, 20:12, 20:15, 20:18, 20:23, 21:1, 21:7, 21:10, 21:12, 21:15, 21:18, 21:22, 22:3, 22:9, 22:12, 22:17, 22:20, 23:2, 23:10, 23:15, 23:18, 23:20, 23:25, 24:5, 24:11, 24:16, 24:18, 24:22, 25:1, 25:5,

25:9, 25:14, 25:21, 26:4, 26:6, 26:11, 26:16, 26:19, 26:22, 27:2, 27:6, 27:13, 27:16, 27:18, 27:23, 28:3, 28:5, 28:11, 28:15, 28:17, 28:20, 29:24, 29:7, 29:9, 29:22, 29:24, 30:16, 31:3, 31:6, 31:9, 31:11, 31:15, 31:19, 31:25, 32:4, 32:8, 33:2, 33:13, 33:23, 34:1, 34:6, 34:14, 35:14, 35:16, 35:21, 36:1, 36:7, 36:10, 36:13, 36:17, 36:19, 36:23, 37:1, 37:4, 37:7, 46:24, 47:1, 47:3, 47:7, 47:14, 47:22, 48:2, 48:7, 48:25, 49:7, 49:10, 49:13, 49:15, 49:20, 49:25, 50:2, 50:4, 50:9, 50:13, 50:16, 50:18, 50:22, 50:25, 51:3, 51:13, 51:16, 51:19, 52:3, 52:5, 52:7, 52:12, 52:17, 52:20, 52:23, 52:25, 53:2, 53:5, 53:8, 53:11, 53:13, 53:17, 53:21, 53:24, 54:2, 54:5, 54:10, 54:12, 54:18, 54:22, 55:7, 55:10, 55:17, 55:22, 56:1, 56:4, 56:6, 56:10, 56:13, 56:16, 56:18, 57:3, 57:8, 57:10, 57:14, 57:17, 57:20, 58:4, 58:6, 58:9, 58:14, 58:18, 58:20, 61:4
juror [46] - 7:18, 8:7, 9:10, 11:24, 15:17, 16:18, 17:14, 17:19, 18:19, 19:1, 19:14, 20:2, 20:17, 21:11, 22:11, 23:17, 24:4, 24:17, 25:4, 25:13, 26:2, 26:5, 27:14, 27:17, 28:16, 31:10, 35:12, 41:7, 41:17, 43:9, 47:12, 49:24, 50:17, 52:6, 52:11, 52:14, 52:16, 52:19, 53:23, 54:4, 55:19, 56:5, 56:17, 62:10, 63:9, 70:4
JURORS [12] - 15:10, 15:14, 32:19, 32:22,

34:23, 37:20, 37:24,
38:15, 46:15, 46:21,
55:3, 57:25
**Jurors** [1] - 7:4
**jurors** [28] - 7:18,
7:20, 8:9, 8:24, 9:6,
9:14, 12:12, 15:8,
16:14, 26:12, 29:11,
30:21, 38:1, 39:25,
44:16, 45:9, 45:12,
45:23, 46:11, 57:22,
60:10, 60:19, 62:16,
68:11, 69:3, 71:25,
74:7, 146:15
**JURY** [1] - 71:23
**Jury** [1] - 63:25
**jury** [55] - 5:17, 6:4,
7:2, 9:11, 11:20,
12:13, 16:9, 16:16,
23:7, 25:19, 35:10,
38:21, 39:13, 44:23,
44:25, 45:7, 45:13,
51:24, 56:5, 57:9,
60:1, 60:21, 60:24,
61:11, 61:15, 62:8,
62:12, 62:13, 62:15,
62:18, 62:24, 63:3,
63:11, 63:25, 68:17,
69:10, 69:25, 71:12,
71:20, 74:8, 89:3,
92:23, 104:23,
107:16, 113:4,
120:1, 121:16,
146:11, 146:15,
152:19, 152:23,
152:24, 174:3,
213:24, 214:1
**jury's** [1] - 73:14

## K

**Kathleen** [2] - 8:15,
24:19
**keep** [14] - 15:24,
41:8, 58:5, 68:9,
70:10, 70:19, 85:13,
87:10, 112:8,
177:11, 177:24,
178:9, 178:13,
178:15
**Kelli** [1] - 72:11
**KELLY** [1] - 2:7
**Kelly** [8] - 4:9, 7:9,
10:13, 10:19, 40:24,
58:24, 76:9, 156:8
**kind** [15] - 6:10, 11:22,
16:8, 20:19, 30:5,
34:6, 62:11, 75:5,
77:10, 77:21, 79:18,
80:15, 102:6, 114:9,

128:23
**kinds** [4] - 66:16, 82:1,
113:23, 121:4
**Klausner** [4] - 82:15,
83:16, 89:2, 89:21
**KLAUSNER** [1] - 1:4
**KLEEGER** [3] - 1:23,
215:8, 215:20
**knowing** [4] - 26:1,
89:5, 103:9, 186:12
**knowingly** [1] - 83:13
**knowledge** [31] -
20:19, 29:17, 30:18,
136:25, 140:20,
166:24, 168:25,
172:5, 174:16,
174:21, 174:24,
175:6, 175:7,
175:17, 181:15,
184:1, 184:8, 185:5,
185:12, 186:9,
189:19, 190:14,
194:21, 195:3,
196:16, 198:16,
200:5, 204:23,
211:25, 212:2, 213:2
**knowledgeable** [1] -
102:13
**known** [5] - 87:4, 87:8,
97:4, 105:19, 111:20
**knows** [1] - 190:20
**KRAMER** [136] - 2:7,
4:8, 4:19, 5:3, 5:7,
6:15, 6:22, 6:25, 7:9,
10:12, 40:24, 41:6,
41:9, 42:4, 42:18,
42:21, 42:24, 43:7,
43:12, 43:23, 43:25,
44:3, 58:24, 59:13,
59:20, 59:24, 60:8,
74:16, 74:18, 74:21,
74:25, 75:4, 92:11,
103:25, 104:18,
104:20, 107:7,
107:10, 109:24,
110:19, 110:20,
112:4, 112:8,
112:12, 113:3,
113:20, 114:2,
115:13, 120:1,
120:3, 121:16,
121:18, 121:19,
124:13, 124:15,
126:21, 127:3,
127:7, 127:11,
127:18, 127:20,
128:11, 128:14,
128:17, 129:5,
129:8, 129:9,
132:10, 141:19,

147:1, 150:10,
150:17, 150:19,
152:8, 152:21,
154:12, 154:15,
155:7, 155:12,
156:5, 156:7, 164:8,
164:10, 164:13,
164:14, 167:4,
167:5, 168:1, 169:6,
169:8, 173:11,
173:15, 174:2,
174:7, 175:20,
175:24, 176:2,
176:17, 177:7,
182:15, 182:18,
183:11, 186:23,
189:18, 189:23,
190:2, 191:3,
191:10, 192:8,
192:17, 192:19,
193:5, 193:11,
197:7, 197:12,
198:20, 198:25,
199:3, 199:9,
199:15, 199:18,
200:23, 201:1,
201:6, 206:18,
206:24, 206:25,
208:23, 209:1,
209:2, 209:20,
210:9, 210:12,
210:16, 212:5, 212:6
**Kramer** [14] - 4:9,
7:10, 10:14, 11:4,
40:25, 58:24, 73:23,
76:10, 89:19, 91:6,
97:6, 101:22, 102:3,
133:24, 156:8
**Kramer's** [2] - 95:10,
140:8

## L

**Laboratories** [6] -
109:10, 109:25,
110:3, 110:10,
111:10, 189:3
**Laboratory** [3] -
109:12, 109:18,
189:21
**lack** [2] - 112:22,
168:25
**lacks** [2] - 113:25,
115:3
**ladies** [14] - 7:16,
8:23, 9:15, 10:13,
11:9, 37:8, 60:24,
61:14, 74:9, 76:9,
88:18, 89:2, 103:4,
146:4
**Ladies** [1] - 103:17,

213:19
**lading** [3] - 204:12,
204:13, 208:3
**Lane** [5] - 4:15, 7:14,
11:2, 40:15, 42:10
**LANE** [11] - 2:12,
40:15, 40:19, 41:17,
42:10, 43:4, 43:8,
43:17, 44:7, 59:5,
59:9
**language** [7] - 24:8,
41:15, 42:24,
119:17, 120:20,
123:16, 125:1
**last** [18] - 8:3, 8:8,
8:15, 28:23, 33:19,
33:22, 45:21, 46:7,
55:9, 55:18, 59:10,
104:13, 125:25,
156:2, 190:6,
193:16, 195:5,
204:15
**Last** [1] - 8:13
**late** [3] - 134:14,
214:4, 214:5
**lau** [1] - 155:15
**LAU** [6] - 2:12, 166:22,
168:24, 177:4,
190:13, 198:15
**Lau** [3] - 4:14, 7:13,
11:1
**launched** [1] - 183:14
**law** [32] - 12:18, 14:14,
14:18, 14:19, 14:21,
14:23, 15:2, 15:3,
15:5, 18:16, 28:2,
30:3, 30:10, 32:7,
37:13, 41:11, 58:7,
64:1, 64:4, 64:5,
66:17, 68:15, 69:21,
71:10, 76:14,
117:12, 119:4,
119:12, 119:20,
160:22
**LAW** [1] - 2:12
**laws** [8] - 15:1, 78:24,
86:13, 89:13, 93:24,
94:7, 94:17, 136:17
**lawsuit** [4] - 33:21,
55:4, 55:5, 60:18
**lawyer** [6] - 66:22,
66:24, 66:25, 83:15,
116:21, 116:23
**lawyers** [3] - 65:10,
65:17, 159:9
**LAX** [1] - 24:23
**lay** [2] - 73:22, 146:20
**laying** [1] - 138:25
**lead** [2] - 102:5,
138:24

**learn** [17] - 69:19,
76:1, 76:5, 76:13,
77:18, 77:20, 78:7,
78:9, 78:18, 78:23,
79:25, 80:9, 80:24,
83:21, 84:4, 85:3,
90:8
**learning** [1] - 122:12
**least** [1] - 28:23
**leave** [4] - 45:18,
58:17, 70:18, 71:21
**led** [1] - 94:25
**left** [8] - 38:10, 43:21,
44:11, 44:13, 59:17,
71:25
**legal** [2] - 69:15, 78:24
**legally** [1] - 78:20
**legible** [2] - 120:15,
164:24
**Lemon** [1] - 58:7
**length** [1] - 97:14
**lengthy** [1] - 98:5
**less** [6] - 75:8, 79:21,
79:24, 81:10, 160:4,
161:13
**letter** [6] - 93:2, 93:3,
100:9, 127:21,
136:2, 178:23
**level** [2] - 18:11, 75:10
**Lexie** [2] - 46:5, 50:4
**licensed** [3] - 96:14,
96:25, 170:4
**lie** [5] - 82:5, 97:8,
100:2, 100:13
**lied** [2] - 88:4, 103:8
**lies** [1] - 96:22
**life** [3] - 13:6, 109:17,
135:17
**light** [4] - 37:16,
67:25, 89:18, 111:6
**limb** [1] - 107:24
**limine** [1] - 4:25
**limit** [2] - 18:22, 26:13
**limited** [3] - 22:4,
66:2, 66:3
**line** [10] - 91:2, 95:7,
150:6, 150:7, 151:2,
183:12, 192:20,
201:15, 210:11
**lines** [5] - 54:17,
150:24, 151:1,
173:23, 211:1
**lips** [1] - 38:14
**Lisa** [2] - 8:11, 21:12
**list** [11] - 65:8, 117:21,
117:23, 118:4,
118:19, 147:2,
157:24, 159:15,
187:4, 204:9, 207:25
**listed** [2] - 109:9,

189:2

**listen** [5] - 10:10, 62:13, 62:15, 87:11, 209:17

**listening** [2] - 9:8, 46:13

**listing** [1] - 84:6

**lists** [1] - 195:24

**literature** [5] - 189:4, 189:7, 189:8, 191:22, 194:3

**live** [21] - 15:20, 15:21, 16:25, 17:1, 17:23, 19:5, 20:11, 21:15, 22:13, 24:19, 25:15, 26:7, 26:24, 27:20, 28:6, 46:25, 49:12, 49:13, 50:5, 52:8, 52:21

**lives** [3] - 16:3, 18:6, 20:14

**living** [1] - 23:21

**LLP** [1] - 2:6

**loaded** [1] - 171:14

**located** [1] - 78:12

**location** [1] - 16:25

**logistical** [1] - 6:15

**logistics** [1] - 30:2

**look** [41] - 14:3, 98:3, 99:2, 101:10, 107:11, 110:13, 111:9, 112:13, 117:6, 123:6, 125:2, 126:11, 128:18, 136:15, 136:21, 136:23, 150:8, 150:16, 150:22, 164:3, 164:22, 166:11, 167:20, 175:20, 189:23, 190:6, 191:12, 197:7, 198:10, 200:24, 202:11, 203:1, 203:10, 204:4, 204:9, 204:12, 204:15, 205:15, 206:14, 207:8, 208:10

**looked** [5] - 86:10, 93:17, 118:19, 131:7, 205:8

**looking** [5] - 15:13, 51:5, 116:7, 134:21, 196:8

**loose** [1] - 62:1

**Los** [4] - 27:20, 28:18, 52:23, 52:24

**LOS** [5] - 1:19, 1:24, 2:9, 4:1, 215:4

**lose** [4] - 42:16, 44:5,

83:10, 88:15

**lost** [1] - 55:17

**love** [1] - 23:3

**LUCIUS** [1] - 2:12

**Lucius** [3] - 4:14, 7:13, 11:1

**lunch** [10] - 39:6, 60:4, 60:6, 61:12, 62:1, 63:23, 70:21, 71:15, 74:3, 74:5

## M

**M-o-n-c-h-i-l** [1] - 8:3

**M-o-n-t-e-s** [1] - 46:4

**M-u-l-d-o-o-n** [1] - 8:12

**M.B.A** [3] - 105:2, 132:21, 145:2

**ma'am** [1] - 206:18

**machine** [1] - 19:8

**machinery** [1] - 34:7

**machinist** [1] - 26:8

**mail** [2] - 120:5, 121:23

**main** [2] - 91:21, 138:16

**maintained** [1] - 161:16

**maintains** [1] - 9:23

**major** [1] - 144:11

**majority** [2] - 161:7, 161:8

**management** [1] - 142:13

**manager** [6] - 20:7, 20:8, 41:12, 86:7, 106:3, 115:14

**manhole** [1] - 90:24

**manner** [3] - 67:20, 68:20, 109:16

**manual** [4] - 177:16, 177:18, 177:21, 178:2

**manuals** [1] - 126:11

**manufactured** [1] - 106:12

**manufacturer** [3] - 141:7, 142:2, 142:3

**manufacturers** [8] - 76:6, 80:4, 81:11, 131:4, 131:7, 134:1, 142:19, 144:12

**manufactures** [2] - 76:12, 77:16

**manufacturing** [4] - 27:20, 106:5, 109:15, 161:16

**marbles** [1] - 35:25

**March** [2] - 157:13,

211:13

**mark** [7] - 104:1, 104:14, 110:10, 111:10, 189:10, 189:11

**Mark** [2] - 10:16, 86:6

**marked** [2] - 112:10, 143:3

**market** [7] - 80:8, 115:1, 115:20, 116:2, 123:3, 130:5, 132:1

**market-based** [1] - 80:8

**marketing** [2] - 84:5, 133:17

**marketplace** [8] - 80:5, 101:13, 115:16, 122:21, 131:5, 140:21, 141:23, 142:13

**markets** [2] - 188:25, 189:9

**marks** [1] - 189:14

**mask** [5] - 6:17, 6:19, 6:24, 6:25, 74:22

**material** [5] - 69:18, 108:25, 128:23, 129:1, 129:10

**materially** [1] - 88:12

**materials** [1] - 133:17

**mathematically** [1] - 130:8

**Mathew** [1] - 124:3

**MATTER** [1] - 215:14

**matter** [15] - 4:17, 5:15, 34:19, 62:7, 62:10, 62:21, 62:23, 69:12, 71:19, 80:1, 90:15, 146:10, 170:23, 213:23

**matters** [2] - 72:5, 72:15

**Maximiliano** [2] - 46:3, 49:10

**MAYER** [1] - 2:6

**mean** [5] - 48:17, 49:2, 62:9, 120:22, 138:12

**meaning** [4] - 168:19, 205:21, 212:12, 213:4

**meaningful** [3] - 159:25, 169:19, 170:1

**means** [16] - 38:5, 39:7, 50:14, 64:9, 64:20, 67:10, 68:24, 77:3, 81:2, 89:20, 96:6, 102:4, 107:18, 113:18, 165:9,

182:10

**meant** [1] - 27:9

**meat** [1] - 103:20

**media** [1] - 69:1

**medium** [1] - 21:19

**meet** [2] - 73:9, 115:20

**meetings** [2] - 116:10, 159:13

**members** [3] - 63:3, 69:5, 92:23

**Members** [1] - 63:25

**memory** [4] - 65:16, 67:20, 70:14, 70:17

**Memphis** [1] - 77:16

**mention** [1] - 5:16

**mentioned** [13] - 5:1, 5:18, 27:12, 29:15, 33:9, 51:25, 68:8, 77:14, 79:17, 83:8, 109:6, 113:12, 118:23

**mentions** [1] - 93:25

**Merchandise** [2] - 96:24, 97:18

**merchandise** [6] - 94:2, 165:4, 165:14, 202:16, 206:5, 206:9

**merchant** [1] - 112:16

**Merit** [2] - 142:7, 142:8

**merits** [1] - 68:21

**messaging** [1] - 68:25

**met** [2] - 156:9, 208:20

**metal** [1] - 108:23

**methodology** [1] - 93:20

**mic** [2] - 29:12, 33:24

**microphone** [3] - 5:19, 25:11, 55:13

**middle** [7] - 18:13, 18:14, 18:15, 46:1, 92:25, 125:5, 201:14

**might** [23] - 22:5, 22:6, 31:4, 41:10, 52:11, 53:15, 67:7, 73:13, 78:16, 79:23, 87:17, 117:3, 122:22, 156:18, 171:23, 180:12, 185:12, 186:10, 187:18, 187:21, 187:24, 188:10, 212:9

**million** [3] - 76:3, 83:10, 88:16

**millions** [4] - 75:14, 81:15, 87:20, 130:20

**mind** [2] - 15:24, 68:9

**minute** [3] - 39:12, 61:23, 107:15

**minutes** [11] - 6:1, 6:2, 6:5, 6:14, 60:4,

63:17, 70:23, 101:25, 146:7, 146:12

**misdescribed** [1] - 82:10

**misheard** [1] - 138:6

**mislabeled** [1] - 13:15

**missed** [1] - 207:15

**misstate** [1] - 34:16

**misstatement** [1] - 100:17

**mistakes** [1] - 157:18

**mistrial** [1] - 70:2

**Mitch** [4] - 7:10, 10:14, 10:17, 184:20

**Mitchell** [5] - 4:9, 11:5, 72:4, 76:10, 155:13

**mitchell** [1] - 156:3

**MITCHELL** [1] - 2:7

**mix** [1] - 30:18

**Mode** [1] - 96:4

**Momchil** [1] - 17:22

**moment** [6] - 25:5, 88:22, 107:2, 119:21, 126:4, 164:3

**Monchil** [1] - 8:3

**money** [3] - 32:17, 55:6, 91:18

**Monte** [2] - 28:6, 56:20

**Monterey** [1] - 20:12

**Montes** [2] - 46:4, 49:11

**month** [1] - 94:15

**months** [2] - 92:16, 117:5

**morning** [13] - 4:8, 4:12, 7:9, 7:11, 23:18, 23:19, 25:14, 27:18, 38:24, 39:1, 39:3, 39:18, 63:5

**Moss** [1] - 56:19

**most** [11] - 15:19, 24:11, 32:1, 47:16, 77:17, 78:9, 80:14, 96:17, 106:24, 145:13, 161:5

**motion** [2] - 72:16, 115:6

**motions** [1] - 4:24

**mouthful** [1] - 80:20

**move** [12] - 50:25, 72:18, 105:16, 105:17, 147:21, 148:9, 173:11, 182:15, 193:7, 196:15, 206:19, 208:23

**moved** [1] - 206:17

**moving** [2] - 16:15,

180:1
**MR** [191] - 4:8, 4:12, 4:19, 4:20, 5:3, 5:7, 5:24, 6:15, 6:22, 6:25, 7:9, 7:11, 10:12, 10:24, 35:3, 40:24, 41:6, 41:9, 42:4, 42:18, 42:21, 42:24, 43:7, 43:12, 43:23, 43:25, 44:3, 58:24, 59:13, 59:20, 59:24, 60:8, 72:4, 72:17, 72:23, 73:2, 73:21, 74:16, 74:18, 74:21, 74:25, 75:4, 89:2, 92:7, 92:11, 92:14, 92:22, 102:1, 103:25, 104:18, 104:20, 107:7, 107:10, 109:21, 109:24, 110:19, 110:20, 112:4, 112:8, 112:12, 112:22, 113:3, 113:20, 113:25, 114:2, 115:3, 115:13, 120:1, 120:3, 121:12, 121:16, 121:18, 121:19, 124:13, 124:15, 126:21, 126:25, 127:3, 127:5, 127:7, 127:11, 127:14, 127:18, 127:20, 128:11, 128:14, 128:17, 129:2, 129:5, 129:8, 129:9, 132:10, 132:14, 141:19, 141:25, 146:19, 146:24, 147:1, 147:8, 147:10, 147:21, 148:1, 148:9, 148:17, 149:17, 150:4, 150:10, 150:13, 150:17, 150:19, 150:25, 151:2, 151:10, 151:12, 151:14, 152:4, 152:8, 152:14, 152:21, 153:1, 154:2, 154:10, 154:12, 154:15, 155:7, 155:9, 155:12, 155:15, 156:5, 156:7, 164:8, 164:10, 164:12, 164:13, 164:14, 166:22, 167:4,

167:5, 168:1, 168:24, 169:6, 169:8, 173:11, 173:15, 174:2, 174:7, 175:20, 175:24, 176:2, 176:17, 177:4, 177:7, 182:15, 182:18, 183:11, 186:23, 189:18, 189:23, 190:2, 190:13, 191:3, 191:10, 192:8, 192:17, 192:19, 193:5, 193:11, 197:7, 197:12, 198:15, 198:20, 198:25, 199:3, 199:9, 199:15, 199:18, 200:23, 201:1, 201:6, 206:18, 206:24, 206:25, 208:23, 209:1, 209:2, 209:20, 210:9, 210:12, 210:16, 212:5, 212:6
**MS** [10] - 40:15, 40:19, 41:17, 42:10, 43:4, 43:8, 43:17, 44:7, 59:5, 59:9
**Muldoon** [2] - 8:12, 22:13
**multi** [1] - 97:13
**multi-page** [1] - 97:13
**multipage** [2] - 93:12, 95:17
**multiple** [4] - 73:8, 101:18, 130:18
**must** [18] - 12:14, 12:18, 64:5, 64:7, 64:9, 64:20, 65:21, 65:25, 66:4, 67:6, 67:10, 68:9, 68:13, 68:15, 69:11, 79:6, 81:4

# N

**N-i-n-g-s-i-h** [1] - 8:8
**nailed** [1] - 25:23
**name** [42] - 7:17, 8:2, 8:3, 8:7, 8:8, 10:13, 10:19, 15:20, 16:14, 16:21, 17:21, 19:3, 20:4, 21:12, 22:13, 23:20, 24:18, 25:13, 25:15, 26:6, 26:22, 27:19, 34:19, 40:12, 45:22, 46:7, 46:23,

49:6, 50:18, 52:7, 76:9, 96:9, 103:24, 104:13, 116:16, 124:1, 124:3, 156:1, 156:2, 156:8, 212:13
**name's** [2] - 8:13, 8:15
**named** [1] - 11:4
**names** [2] - 34:25, 122:21
**narcotics** [1] - 31:22
**national** [2] - 80:1, 106:3
**native** [1] - 11:1
**nature** [2] - 81:11, 187:5
**nearly** [1] - 76:8
**necessarily** [3] - 23:8, 68:2, 143:25
**necessary** [1] - 160:21
**Nee** [1] - 144:14
**need** [13] - 12:3, 74:18, 84:23, 85:10, 85:12, 85:13, 104:10, 144:6, 155:5, 165:8, 165:12, 167:11
**needed** [4] - 143:9, 144:9, 157:24, 187:4
**needs** [2] - 92:4, 119:13
**NEIL** [1] - 1:11
**net** [1] - 185:23
**never** [26] - 51:25, 76:4, 79:14, 81:18, 83:25, 85:4, 85:21, 87:14, 88:2, 88:17, 133:9, 133:10, 136:10, 136:14, 137:23, 139:22, 139:24, 139:25, 140:4, 143:18, 153:5, 156:8, 170:8, 171:1, 192:24, 199:14
**New** [5] - 10:17, 10:18, 11:5, 11:6, 39:12
**new** [11] - 12:11, 43:5, 46:11, 57:21, 87:16, 149:2, 182:25, 183:2, 183:18, 184:5
**next** [25] - 5:19, 17:19, 19:1, 22:11, 23:17, 24:17, 26:5, 26:21, 27:17, 28:16, 31:10, 50:17, 52:6, 52:19, 56:5, 56:17, 73:1, 94:14, 100:10, 151:13, 152:25, 155:11, 200:22, 203:10, 203:12

nice [1] - 117:23
**nine** [1] - 174:18
**Ningsih** [1] - 20:5
**nipples** [1] - 97:4
**nobody** [3] - 14:9, 70:18, 130:21
**nobody's** [2] - 13:12, 13:19
**non** [1] - 98:22
**nonalloy** [1] - 99:15
**none** [4] - 67:16, 83:6, 117:13, 176:20
**nonpublic** [4] - 143:23, 144:1, 145:15, 149:20
**nonresponsive** [2] - 182:16, 208:24
**noon** [1] - 45:10
**normal** [1] - 151:22
**normally** [3] - 6:4, 16:8, 214:1
**NORTH** [1] - 1:24
**Norwalk** [2] - 19:6, 26:7
**Nos** [1] - 1:13
**notes** [10] - 70:9, 70:10, 70:11, 70:13, 70:14, 70:15, 70:17, 70:19, 179:6
**nothing** [14] - 17:11, 36:11, 56:2, 56:14, 57:6, 104:6, 148:22, 149:2, 151:8, 152:23, 154:10, 155:7, 155:22
**notice** [3] - 87:12, 125:10, 204:16
**notify** [1] - 69:7
**notion** [3] - 100:1, 100:12, 102:25
**November** [2] - 147:15
**number** [15] - 4:4, 7:5, 16:14, 33:24, 44:16, 51:8, 51:10, 68:3, 97:1, 97:2, 97:5, 97:21, 107:6, 182:25, 203:4
**Number** [10] - 8:2, 8:11, 15:20, 15:22, 20:3, 40:18, 50:3, 55:13, 55:14, 176:14
**numbers** [5] - 16:17, 94:2, 97:3, 100:5, 199:1
**nurse** [5] - 25:2, 26:23, 26:24, 27:3, 52:8
**NW** [1] - 2:13

# O

**o'clock** [14] - 4:22, 4:23, 7:3, 39:2, 39:6, 39:7, 39:10, 39:14, 39:16, 40:2, 62:2, 71:16, 74:4, 213:20
**O-r-e-l** [1] - 8:13
**Oakland** [2] - 105:2, 132:21
**oath** [2] - 12:23, 64:11
**object** [5] - 65:19, 66:25, 141:19, 147:1, 150:19
**objected** [1] - 73:7
**Objection** [1] - 166:22
**objection** [37] - 65:21, 65:22, 67:1, 67:2, 67:5, 109:21, 110:14, 110:16, 112:22, 113:25, 115:3, 115:11, 119:23, 121:12, 124:9, 126:23, 126:24, 127:15, 129:2, 150:18, 152:8, 152:21, 164:4, 167:23, 168:24, 174:6, 175:21, 177:4, 183:9, 190:13, 193:8, 197:8, 198:15, 201:3, 206:20, 206:21
**objections** [1] - 65:17
**objective** [4] - 19:18, 28:2, 37:14, 93:20
**Objectives** [1] - 93:19
**obligated** [1] - 79:11
**obligation** [8] - 19:24, 84:19, 90:6, 145:3, 163:5, 163:18, 186:15, 186:17
**obligations** [4] - 78:24, 79:4, 103:9, 145:5
**observation** [1] - 154:7
**observations** [1] - 133:23
**obtain** [1] - 174:12
**obtaining** [1] - 174:22
**obvious** [1] - 51:22
**obviously** [4] - 51:7, 56:22, 119:2, 123:2
**occasions** [1] - 88:13
**occupation** [9] - 16:5, 16:20, 17:3, 17:5, 17:25, 19:7, 20:6, 47:2, 49:14

occupations [1] - 33:8
occurred [2] - 130:1, 170:2
ocean [1] - 208:3
Ocean [1] - 96:4
OCTOBER [3] - 1:19, 4:1, 215:17
OF [15] - 1:1, 1:2, 1:6, 1:18, 2:4, 2:5, 2:10, 71:23, 215:2, 215:4, 215:6, 215:10, 215:12, 215:15, 215:16
offended [1] - 38:9
offering [1] - 211:15
offers [1] - 66:23
officer [2] - 22:14, 31:16
offices [1] - 92:15
OFFICIAL [3] - 1:23, 215:8, 215:21
official [1] - 93:2
officials [2] - 92:14, 94:5
often [4] - 116:7, 122:20, 122:21, 145:10
ON [2] - 2:5, 2:10
on-site [1] - 94:15
once [12] - 5:11, 5:14, 8:9, 13:6, 13:17, 14:13, 56:20, 81:18, 129:21, 130:22
one [102] - 5:12, 5:16, 6:15, 9:5, 9:6, 9:14, 11:21, 15:1, 15:19, 16:6, 21:4, 24:1, 25:16, 33:12, 34:12, 35:24, 36:17, 36:24, 37:11, 38:8, 38:21, 39:12, 41:6, 42:14, 43:21, 44:10, 46:18, 49:2, 49:3, 51:10, 51:22, 55:22, 56:6, 57:11, 57:12, 59:10, 59:17, 63:8, 66:14, 75:25, 76:11, 76:24, 77:1, 78:15, 82:17, 84:2, 85:17, 85:18, 91:2, 91:15, 91:18, 96:17, 97:14, 98:16, 98:24, 110:11, 112:7, 117:20, 118:15, 118:22, 119:13, 119:16, 119:21, 134:10, 143:12, 143:16, 144:5, 144:13, 154:20, 158:21, 159:21, 160:6,

160:15, 163:8, 163:13, 172:23, 173:2, 173:5, 175:13, 177:23, 178:8, 187:3, 187:12, 187:13, 191:25, 193:23, 196:20, 196:23, 203:18, 204:23, 205:3, 205:8, 205:11, 205:15, 206:15, 207:19, 207:21, 207:22, 209:3, 210:18
one's [3] - 48:9, 48:10, 86:22
ones [2] - 56:22, 56:23
Online [1] - 139:19
open [1] - 68:9
opening [21] - 6:2, 60:3, 60:7, 61:20, 63:24, 65:11, 70:22, 70:23, 70:25, 71:3, 71:4, 72:7, 73:24, 74:10, 74:14, 77:7, 89:1, 93:15, 103:18
openings [1] - 5:25
operates [1] - 78:25
operation [1] - 160:25
operations [13] - 159:24, 160:21, 164:18, 165:22, 177:9, 179:7, 180:8, 184:23, 185:15, 185:16, 185:18, 188:7, 199:11
Operations [1] - 160:16
operator [1] - 19:8
opinion [10] - 62:14, 62:16, 62:17, 62:19, 62:21, 64:16, 173:17, 174:12, 174:22, 178:23
opinions [1] - 62:7, 62:10, 62:23, 64:8, 71:19, 146:10, 213:23
opportunities [1] - 105:21
opportunity [5] - 67:18, 69:23, 74:13, 103:14, 157:17
opposing [1] - 72:6
option [2] - 206:2, 206:3
options [1] - 134:21
oranges [2] - 82:10, 84:1
order [72] - 4:22, 5:22,

55:15, 67:8, 80:13, 80:18, 80:21, 80:22, 80:23, 80:24, 81:4, 81:17, 85:1, 85:4, 85:5, 85:8, 86:11, 86:14, 86:18, 86:25, 87:1, 87:2, 87:9, 87:21, 87:22, 101:1, 115:22, 117:15, 123:14, 123:17, 125:20, 127:22, 137:10, 137:12, 137:25, 165:14, 165:24, 166:6, 166:7, 167:14, 167:20, 168:6, 168:8, 168:9, 168:13, 168:15, 168:16, 168:17, 168:19, 169:1, 169:9, 169:13, 170:16, 171:3, 171:24, 176:10, 176:25, 181:5, 182:9, 187:8, 196:19, 197:22, 197:25, 198:3, 199:20, 200:1, 200:6, 200:9, 200:12, 200:14
ordered [3] - 63:2, 67:11, 69:12
ordering [1] - 30:1
orders [15] - 80:10, 117:12, 137:7, 164:2, 165:13, 167:17, 170:11, 170:13, 170:19, 170:23, 181:24, 197:3, 197:6, 198:5, 200:8
ordinary [1] - 147:18
Orel [2] - 8:13, 23:20
origin [1] - 96:8
original [1] - 127:21
Orvis [1] - 149:4
otherwise [4] - 60:17, 62:19, 151:19, 179:22
outcome [2] - 67:21, 77:4
outlet [58] - 75:24, 77:18, 77:20, 82:7, 86:22, 86:24, 98:25, 99:9, 100:11, 102:4, 102:5, 102:15, 107:1, 107:14, 110:7, 111:16, 111:18, 114:12, 114:17, 122:2,

122:25, 123:5, 130:22, 131:8, 131:9, 131:10, 131:11, 133:18, 134:4, 134:7, 171:14, 180:4, 184:14, 189:15, 190:11, 191:1, 191:4, 192:4, 192:21, 194:7, 194:12, 194:16, 201:23, 202:4, 202:7, 202:9, 202:20, 202:23, 204:6, 204:7, 206:2, 208:21, 209:12
outlet's [1] - 129:3
outlets [67] - 77:24, 78:1, 78:5, 78:10, 80:15, 81:16, 83:21, 84:3, 84:8, 86:18, 91:3, 91:4, 91:8, 91:11, 98:11, 99:4, 99:5, 99:19, 101:2, 101:9, 101:14, 101:16, 101:21, 101:23, 102:2, 102:21, 102:24, 106:5, 109:13, 111:17, 112:19, 115:1, 115:16, 115:19, 115:25, 118:17, 122:22, 128:24, 129:22, 131:14, 131:16, 131:24, 131:25, 132:5, 132:8, 132:25, 133:2, 133:11, 133:20, 134:2, 134:24, 139:22, 153:4, 153:8, 161:2, 162:14, 162:16, 162:22, 173:3, 176:9, 176:24, 187:7, 188:25, 189:1, 192:1, 196:6, 207:22
outline [2] - 10:8, 71:1
outlined [1] - 174:17
outright [1] - 88:4
outset [1] - 90:9
OUTSIDE [1] - 71:23
outside [24] - 13:25, 16:4, 17:9, 18:6, 19:10, 20:13, 22:6, 22:16, 23:23, 24:25, 25:16, 26:10, 27:5, 27:22, 30:14, 30:22, 32:14, 33:5, 47:6,

49:19, 50:7, 53:10, 70:4, 72:20
overly [1] - 70:10
overrule [1] - 67:1
overruled [3] - 141:21, 152:9, 182:17
oversee [1] - 160:7
overseeing [6] - 160:24, 164:18, 165:22, 177:9, 180:8, 199:11
owe [2] - 32:17, 55:6
own [2] - 41:10, 73:7
ownership [1] - 156:16
owns [1] - 51:6

P

pack [2] - 95:18, 153:7
package [4] - 205:1, 205:5, 205:18, 205:23
Packer [1] - 185:13
packet [4] - 201:11, 202:11, 206:14, 207:1
packets [8] - 73:5, 153:9, 201:8, 204:19, 208:9, 208:14, 209:23, 210:19
packing [2] - 204:9, 207:25
page [59] - 93:14, 93:20, 93:25, 94:10, 94:14, 95:18, 95:21, 97:13, 97:17, 98:9, 98:10, 98:16, 100:7, 101:5, 101:6, 110:25, 120:11, 123:6, 125:2, 125:6, 150:6, 166:12, 168:19, 173:22, 178:7, 183:6, 190:6, 191:21, 192:7, 192:9, 192:16, 192:20, 193:16, 193:25, 198:14, 199:1, 199:4, 201:10, 201:11, 201:15, 201:24, 202:5, 202:7, 202:9, 202:11, 202:21, 203:1, 203:10, 203:12, 204:4, 204:6, 204:7, 204:15, 204:20, 205:3, 210:7, 210:25, 212:16

**PAGE** [1] - 215:14
**pages** [7] - 97:14, 191:16, 192:10, 192:14, 199:7, 200:25, 205:8
**paid** [11] - 29:16, 54:17, 55:6, 76:4, 81:18, 81:21, 88:17, 130:24, 141:2, 153:20
**pandemic** [1] - 24:23
**panel** [1] - 5:23
**paper** [3] - 85:17, 85:18, 179:21
**paperwork** [5] - 30:2, 84:12, 201:17, 201:19, 210:4
**Paquette** [3] - 143:17, 148:3, 149:20
**paragraph** [11] - 93:4, 99:5, 121:2, 122:14, 123:7, 125:5, 125:17, 125:22, 125:25, 127:25, 194:15
**paragraphs** [1] - 93:15
**pardon** [2] - 92:19, 150:25
**Park** [1] - 20:12
**part** [20] - 9:11, 13:25, 47:20, 67:16, 97:7, 98:5, 122:8, 125:8, 140:7, 142:18, 142:23, 143:22, 158:7, 170:18, 182:9, 198:7, 200:5, 200:6, 201:25, 204:18
**partially** [1] - 176:5
**participants** [1] - 150:1
**participating** [1] - 10:4
**particular** [18] - 4:17, 5:15, 51:9, 80:6, 95:19, 106:24, 107:20, 113:22, 119:13, 143:8, 158:16, 170:21, 185:7, 185:8, 190:10, 196:17, 198:3, 204:20
**particularly** [6] - 38:10, 73:19, 170:20, 172:7, 187:11, 197:5
**parties** [10] - 11:14, 33:16, 35:6, 35:7, 63:2, 69:22, 71:1, 72:10, 73:3, 78:12

**partner** [1] - 18:10
**party** [4] - 64:18, 64:23, 69:23, 71:2
**Pasadena** [2] - 50:19, 56:20
**pass** [9] - 25:12, 26:5, 42:16, 44:4, 44:6, 95:4, 95:5, 132:10, 150:22
**passed** [2] - 95:4, 95:5
**passes** [1] - 42:17
**passing** [1] - 29:12
**past** [3] - 20:19, 30:18, 145:19
**Pat** [1] - 185:13
**Patricia** [4] - 4:16, 7:15, 11:6, 103:12
**pause** [2] - 116:19, 119:21
**pay** [11] - 9:3, 9:13, 47:23, 70:6, 75:12, 81:4, 130:4, 130:9, 148:21, 148:23
**paying** [12] - 31:24, 76:18, 78:21, 87:22, 129:24, 140:10, 140:13, 140:16, 141:4, 144:7, 145:12
**pending** [2] - 104:5, 155:21
**Penn** [3] - 105:1, 105:5, 132:20
**pennies** [2] - 156:21, 156:22
**people** [26] - 8:24, 11:21, 14:22, 23:5, 23:6, 23:7, 23:13, 29:18, 30:7, 35:6, 37:19, 37:22, 48:15, 62:13, 63:10, 69:6, 116:12, 131:9, 144:1, 172:8, 172:9, 184:23, 185:11, 185:25, 186:20, 214:3
**People's** [2] - 80:19, 169:10
**people's** [1] - 29:5
**per** [2] - 5:1, 5:9
**percent** [16] - 35:24, 81:1, 99:16, 130:2, 130:4, 141:1, 161:11, 161:12, 161:20, 161:23, 161:25, 162:3, 162:5, 162:6, 162:11, 162:12
**percentage** [3] - 161:9, 161:17, 162:8
**peremptory** [8] -

41:23, 41:25, 42:2, 42:8, 43:2, 43:15, 43:21, 59:17
**perfect** [3] - 5:7, 12:11, 38:1
**perfectly** [1] - 152:7
**performance** [1] - 94:11
**perhaps** [4] - 116:17, 117:8, 130:24, 130:25
**period** [10] - 83:8, 91:9, 91:10, 93:1, 114:21, 130:21, 133:5, 162:4, 169:21, 169:22
**permanent** [2] - 113:19, 121:1
**permanently** [12] - 77:23, 83:23, 107:19, 108:12, 108:13, 108:25, 113:16, 120:25, 125:18, 125:21, 129:13, 138:19
**permit** [1] - 97:19
**permitted** [1] - 66:24
**person** [15] - 11:21, 12:5, 12:6, 23:7, 25:18, 34:4, 45:24, 68:23, 78:19, 146:1, 152:12, 172:10, 176:8, 177:2, 214:4
**personal** [12] - 64:7, 105:17, 133:23, 166:23, 168:25, 170:22, 172:5, 172:13, 174:24, 180:10, 190:13, 198:16
**personally** [10] - 16:7, 66:13, 115:15, 149:6, 171:1, 171:22, 180:11, 184:13, 184:21, 194:25
**perspective** [1] - 83:2
**persuaded** [1] - 64:20
**PH** [1] - 1:25
**phlebotomist** [1] - 22:20
**phone** [2] - 68:24, 124:4
**phonetic** [1] - 144:14
**phrase** [3] - 201:23, 202:20, 202:23
**physical** [1] - 12:23
**physically** [3] - 129:13, 138:10, 138:11

**pick** [2] - 39:15, 42:15
**picture** [6] - 77:10, 77:18, 190:20, 190:23, 190:25
**piece** [5] - 85:17, 85:18, 108:6, 108:10, 198:17
**pieces** [10] - 13:9, 13:11, 13:14, 13:18, 13:24, 13:25, 14:2, 14:3, 77:12, 108:23
**piggyback** [1] - 123:11
**Pipe** [6] - 101:8, 102:17, 139:11, 139:12, 139:15, 140:1
**pipe** [71] - 75:14, 77:16, 77:21, 77:23, 78:4, 80:19, 86:24, 97:4, 98:17, 99:13, 101:1, 101:8, 102:3, 102:4, 102:8, 102:9, 105:8, 105:9, 105:15, 106:5, 106:6, 106:12, 106:14, 106:19, 106:21, 106:24, 108:6, 108:8, 108:10, 108:11, 108:13, 108:22, 111:24, 111:25, 112:1, 112:2, 113:23, 114:4, 114:5, 114:9, 116:5, 118:7, 118:10, 118:13, 118:20, 119:5, 119:8, 121:4, 121:6, 121:7, 122:6, 122:7, 125:15, 126:3, 128:2, 128:4, 128:6, 128:7, 133:4, 133:5, 138:16, 138:24, 169:10, 176:10, 176:25, 196:19, 198:4, 200:2, 200:9, 211:7
**pipes** [1] - 90:25
**piping** [12] - 83:23, 90:22, 93:16, 102:13, 106:7, 107:19, 107:21, 107:23, 125:18, 191:7, 193:13
**Piquet** [3] - 143:18, 144:10, 144:14
**place** [6] - 9:6, 13:21, 13:23, 173:5, 173:6, 194:18
**placed** [1] - 80:10

**places** [3] - 90:10, 108:22, 126:11
**PLAINTIFF** [1] - 2:5
**plaintiff** [13] - 23:4, 34:17, 37:21, 42:3, 42:13, 43:11, 43:22, 57:24, 71:4, 71:7, 95:14, 96:21, 100:19
**PLAINTIFFS** [1] - 1:9
**plan** [2] - 116:2, 116:3
**planning** [1] - 165:4
**plant** [1] - 133:7
**play** [1] - 171:22
**playing** [1] - 75:10
**pleasant** [1] - 74:3
**pleasure** [1] - 45:4
**plexiglass** [4] - 6:18, 6:21, 6:24, 74:24
**Plexiglass** [1] - 75:1
**plugged** [1] - 92:9
**podium** [2] - 5:18, 6:16
**Pogner** [1] - 185:17
**point** [6] - 50:24, 94:2, 122:5, 134:22, 185:4, 193:3
**pointing** [1] - 121:25
**points** [1] - 94:4
**policy** [1] - 80:1
**Pomona** [1] - 25:15
**Port** [1] - 96:11
**port** [1] - 137:24
**portfolio** [1] - 93:18
**portion** [1] - 76:25
**position** [11] - 40:11, 42:7, 42:13, 43:1, 43:10, 43:14, 43:20, 63:10, 102:20, 105:16, 181:19
**possible** [3] - 10:5, 10:15, 59:3
**possibly** [2] - 117:7, 122:1
**potential** [2] - 117:15, 186:1
**potentially** [1] - 94:3
**potter** [1] - 187:21
**Powell** [2] - 96:16, 96:17
**practices** [6] - 75:9, 81:12, 91:23, 92:1, 92:18, 95:6
**precedent** [1] - 123:16
**predating** [1] - 127:8
**predominantly** [1] - 31:21
**prefer** [1] - 39:25
**preferences** [2] - 93:8, 94:21
**preinstruct** [1] - 61:25

**preinstructions** [4] - 60:6, 61:17, 63:18, 63:22
**prejudice** [1] - 67:22
**prejudices** [1] - 64:8
**premise** [5] - 122:1, 123:18, 130:10, 131:2, 141:1
**premises** [2] - 92:16, 124:24
**preparation** [1] - 159:10
**preparations** [1] - 158:7
**prepare** [2] - 73:6, 158:5
**prepared** [5] - 73:11, 157:24, 159:14, 187:4, 187:17
**preponderance** [4] - 35:23, 36:4, 36:25, 64:19
**presence** [1] - 114:10
**PRESENCE** [1] - 71:23
**present** [3] - 49:4, 71:5, 71:6
**presented** [3] - 13:17, 22:5, 71:9
**presents** [1] - 64:23
**president** [7] - 116:20, 156:14, 159:19, 159:23, 159:24, 160:13, 160:14
**PRESIDING** [1] - 1:4
**pretrial** [5] - 4:24, 5:10, 5:18, 5:21, 72:8
**pretty** [4] - 35:20, 37:10, 40:25, 87:19
**prevention** [1] - 102:6
**preview** [2] - 77:7, 83:18
**previous** [4] - 116:5, 118:25, 121:24, 178:3
**price** [4] - 115:21, 132:1, 141:12, 145:13
**prices** [2] - 130:5, 142:15
**pricing** [3] - 142:12, 145:8, 150:1
**primarily** [2] - 109:7, 113:10
**private** [2] - 146:3, 150:2
**problem** [20] - 12:2, 17:14, 17:16, 36:3, 55:24, 56:25, 59:15,

80:7, 81:14, 92:10, 92:21, 116:2, 145:18, 145:25, 146:2, 152:11, 152:18, 165:17, 167:9, 168:3
**problems** [2] - 32:21, 41:10
**procedures** [2] - 20:24, 48:10
**proceed** [1] - 75:2
**proceeded** [1] - 122:14
**proceeding** [1] - 40:3
**PROCEEDINGS** [3] - 1:18, 214:13, 215:13
**proceedings** [1] - 70:1
**proceeds** [1] - 70:20
**process** [10] - 16:15, 34:1, 70:3, 93:11, 94:25, 123:10, 174:18, 182:24, 183:1, 183:4
**produce** [1] - 54:22
**produced** [2] - 178:2, 201:8
**producer** [3] - 28:21, 78:8, 79:24
**producers** [4] - 75:7, 79:21, 80:2, 80:3
**product** [89] - 75:23, 77:17, 81:3, 82:7, 82:24, 84:7, 85:12, 90:17, 98:6, 99:10, 100:25, 102:2, 102:9, 105:7, 109:3, 109:14, 109:16, 110:24, 111:11, 111:15, 111:20, 111:23, 112:15, 112:20, 113:22, 114:8, 118:3, 120:23, 121:3, 122:16, 123:13, 125:24, 126:1, 128:1, 128:4, 129:14, 133:8, 133:17, 134:1, 137:17, 138:4, 138:7, 138:20, 141:7, 141:8, 141:18, 142:16, 142:20, 143:3, 154:7, 166:5, 171:2, 172:6, 172:7, 172:24, 174:11, 174:14, 180:20, 180:25, 183:15, 183:17, 183:19, 184:7, 188:12,

190:10, 191:22, 191:23, 192:3, 192:21, 192:24, 194:3, 194:4, 194:6, 194:19, 195:5, 195:6, 195:7, 195:13, 195:16, 195:25, 196:1, 203:7, 203:18, 205:16, 205:23, 207:6, 208:6, 212:12
**products** [98] - 9:19, 9:21, 41:12, 75:17, 76:7, 78:9, 78:13, 78:20, 79:7, 79:12, 80:10, 80:11, 81:13, 81:24, 82:2, 82:9, 82:11, 82:12, 82:17, 82:24, 83:23, 84:5, 84:6, 84:8, 84:12, 84:18, 84:24, 85:23, 86:4, 86:10, 86:23, 87:5, 87:20, 88:1, 90:10, 90:11, 90:14, 90:15, 90:19, 90:22, 93:16, 93:18, 93:19, 98:2, 98:25, 100:9, 101:16, 106:23, 109:6, 109:19, 110:4, 110:11, 113:5, 115:23, 117:22, 118:10, 121:5, 122:20, 123:2, 123:14, 125:20, 129:16, 130:7, 130:20, 131:4, 133:21, 139:7, 140:21, 140:23, 144:2, 145:21, 151:22, 158:16, 161:5, 161:9, 161:16, 161:17, 161:18, 162:1, 162:7, 162:25, 163:6, 163:10, 163:14, 163:20, 163:24, 171:6, 185:7, 185:8, 189:10, 189:14, 190:12, 191:7, 198:3, 209:4, 209:10, 212:19
**professional** [2] - 55:19, 96:14
**professionalism** [1] - 103:11
**program** [1] - 39:21
**project** [1] - 20:8
**promise** [2] - 32:2, 38:13

**promised** [1] - 39:13
**proof** [8] - 35:18, 35:23, 36:21, 55:24, 57:1, 57:13, 66:11, 66:14
**proper** [2] - 97:20, 174:13
**properly** [2] - 69:15, 108:11
**property** [2] - 109:17, 123:17
**proposition** [2] - 200:19, 200:21
**proprietary** [1] - 149:7
**PROSPECTIVE** [195] - 12:10, 15:10, 15:14, 16:21, 17:1, 17:6, 17:10, 17:16, 17:18, 17:20, 17:24, 18:1, 18:4, 18:7, 18:9, 18:13, 18:17, 18:20, 18:25, 19:2, 19:4, 19:6, 19:8, 19:11, 19:15, 19:19, 20:1, 20:5, 20:7, 20:9, 20:12, 20:15, 20:18, 20:23, 21:1, 21:7, 21:10, 21:12, 21:15, 21:18, 21:22, 22:3, 22:9, 22:12, 22:17, 22:20, 23:2, 23:10, 23:15, 23:18, 23:20, 23:25, 24:5, 24:11, 24:16, 24:18, 24:22, 25:1, 25:5, 25:9, 25:14, 25:21, 26:4, 26:6, 26:11, 26:16, 26:19, 26:22, 27:2, 27:6, 27:13, 27:16, 27:18, 27:23, 28:3, 28:5, 28:11, 28:15, 28:17, 28:20, 28:24, 29:7, 29:9, 29:22, 29:24, 30:16, 31:3, 31:6, 31:9, 31:11, 31:15, 31:19, 31:25, 32:4, 32:8, 32:19, 32:22, 33:2, 33:13, 33:23, 34:1, 34:6, 34:14, 34:23, 35:14, 35:16, 35:21, 36:1, 36:7, 36:10, 36:13, 36:17, 36:19, 36:23, 37:1, 37:4, 37:7, 37:20, 37:24, 38:15, 46:15, 46:21, 46:24, 47:1, 47:3, 47:7, 47:14, 47:22, 48:2, 48:7, 48:25, 49:7, 49:10, 49:13, 49:15,

49:20, 49:25, 50:2, 50:4, 50:9, 50:13, 50:16, 50:18, 50:22, 50:25, 51:3, 51:13, 51:16, 51:19, 52:3, 52:5, 52:7, 52:12, 52:17, 52:20, 52:23, 52:25, 53:2, 53:5, 53:8, 53:11, 53:13, 53:17, 53:21, 53:24, 54:2, 54:5, 54:10, 54:12, 54:18, 54:22, 55:3, 55:7, 55:10, 55:17, 56:1, 56:4, 56:6, 56:10, 56:13, 56:16, 56:18, 57:3, 57:8, 57:10, 57:14, 57:17, 57:20, 57:25, 58:4, 58:6, 58:9, 58:14, 58:18, 58:20
**Prospective** [1] - 7:4
**protect** [3] - 76:22, 81:10, 109:17
**Protection** [23] - 22:14, 31:16, 40:20, 75:17, 79:2, 81:25, 82:3, 82:13, 83:3, 84:13, 87:25, 88:4, 88:13, 92:24, 163:11, 163:16, 163:24, 164:16, 177:10, 204:18, 204:25, 205:2, 205:4
**protection** [4] - 77:25, 93:16, 107:20, 123:3
**prove** [11] - 35:18, 35:19, 73:17, 89:5, 89:7, 89:11, 89:14, 89:17, 97:10, 103:6, 103:7
**proven** [1] - 37:15
**proves** [1] - 35:24
**provide** [6] - 78:16, 90:18, 90:19, 97:1, 124:5, 179:11
**provided** [2] - 179:15, 198:8
**provides** [3] - 97:11, 99:12, 208:19
**providing** [2] - 142:20, 167:17
**proving** [1] - 64:18
**pseudo** [1] - 59:20
**psychic** [1] - 21:19
**psychologist** [1] - 28:21
**public** [1] - 50:19
**publish** [11] - 110:15, 119:22, 120:1, 121:10, 121:16,

124:13, 126:22,
127:18, 164:8,
183:8, 189:25
**published** [6] -
110:17, 121:14,
141:12, 168:17,
175:24, 197:10
**purchase** [1] - 91:14
**purchased** [1] - 130:7
**purchases** [2] - 78:11,
78:13
**purchasing** [5] - 20:7,
20:9, 29:25, 41:12,
41:19
**purporting** [1] - 179:7
**purpose** [10] - 66:2,
66:3, 66:5, 75:8,
77:6, 107:22,
138:14, 159:13,
197:24
**purposes** [4] - 82:18,
98:8, 157:7, 174:5
**PURSUANT** [1] -
215:10
**pursue** [1] - 141:11
**pursued** [1] - 119:4
**put** [20] - 13:9, 13:10,
13:14, 13:16, 13:17,
13:24, 41:3, 43:1,
63:10, 77:11, 86:2,
99:19, 99:21, 99:24,
123:3, 167:10,
183:2, 184:5,
200:15, 213:6
**putting** [2] - 13:11,
198:18
**puzzle** [3] - 13:6, 13:9,
14:1, 77:11

## Q

**qualified** [1] - 85:8
**quantify** [1] - 161:8
**QUESTION** [1] -
183:14
**questioning** [1] -
140:8
**questions** [43] - 5:11,
5:13, 9:1, 9:4, 9:9,
11:23, 12:1, 12:3,
15:16, 15:17, 15:18,
16:7, 16:8, 16:11,
16:12, 19:12, 21:3,
21:4, 22:23, 25:23,
29:10, 31:13, 36:20,
40:5, 46:14, 47:9,
54:14, 54:24, 63:16,
65:17, 71:14,
131:23, 134:11,
147:25, 151:7,

154:16, 154:20,
159:14, 164:16,
164:20, 168:8,
175:14, 185:23
**qui** [1] - 34:18
**quick** [1] - 6:15
**quickly** [2] - 167:20,
207:5
**quietly** [1] - 71:21
**quit** [1] - 39:16
**quite** [5] - 12:18,
16:14, 31:16, 59:4,
103:10
**quotes** [2] - 122:16,
125:14

## R

**R-e-s-e-n-d-e-z** [1] -
8:20
**R-o-m-e-r-o** [1] - 8:1
**R-o-n-a** [1] - 156:3
**raise** [10] - 9:12, 12:4,
24:10, 29:18, 31:7,
35:10, 51:17, 60:22,
32:7, 142:15
**ran** [1] - 204:6
**range** [1] - 161:20
**rate** [4] - 80:25, 81:7,
81:8, 99:16
**rather** [3] - 16:14,
36:5, 39:25
**Rather** [1] - 126:2
**reach** [5] - 14:16,
36:8, 37:2, 72:6,
101:19
**reached** [2] - 102:22,
151:16
**reaching** [1] - 65:4
**read** [18] - 38:14,
64:15, 85:1, 85:4,
122:14, 124:23,
125:3, 140:5,
150:11, 150:21,
165:19, 165:24,
166:7, 166:13,
176:12, 193:1, 214:7
**readily** [1] - 140:22
**reading** [1] - 176:15
**reads** [1] - 202:18
**ready** [3] - 4:18, 5:22,
74:15
**real** [2] - 52:2, 83:11
**realize** [3] - 14:17,
57:12, 103:1
**really** [15] - 14:9,
15:18, 24:12, 31:23,
33:7, 48:3, 52:1,
84:25, 85:9, 85:21,
87:6, 88:2, 166:2,

186:24, 213:12
**reask** [1] - 212:3
**reason** [22] - 10:7,
18:18, 19:13, 22:25,
26:2, 30:13, 48:5,
53:23, 54:3, 83:5,
136:14, 136:15,
155:1, 177:23,
182:2, 182:8,
182:13, 182:20,
182:21, 202:3, 210:3
**reasonable** [6] -
35:20, 36:5, 163:5,
163:19, 178:1,
178:11
**reasonableness** [1] -
67:24
**reasonably** [1] - 90:5
**reasoning** [1] - 211:9
**reasons** [3] - 9:5,
105:17, 178:8
**receipt** [1] - 126:5
**receive** [6] - 69:14,
76:25, 115:22,
126:16, 126:19,
170:15
**received** [41] - 12:20,
65:2, 65:5, 66:2,
66:9, 66:22, 67:2,
67:4, 68:14, 110:17,
110:18, 119:24,
119:25, 121:13,
121:15, 124:11,
124:12, 124:21,
127:16, 127:17,
136:2, 147:18,
148:3, 149:19,
157:23, 164:6,
164:7, 167:24,
167:25, 170:8,
175:22, 175:23,
177:12, 193:9,
193:10, 197:9,
197:11, 201:4,
201:5, 206:22,
206:23
**receives** [1] - 83:3
**receiving** [1] - 182:6
**recently** [3] - 49:15,
102:19, 152:19
**recess** [2] - 214:11,
214:12
**reckless** [4] - 83:13,
84:15, 85:21, 89:6
**recklessly** [1] - 103:8
**recognize** [7] - 35:1,
120:4, 121:20,
124:16, 190:4,
190:15, 193:12
**recognized** [1] -

101:16
**record** [39] - 67:9,
71:24, 74:6, 78:14,
78:19, 78:25, 79:2,
79:5, 79:6, 79:10,
81:3, 84:19, 85:13,
85:20, 87:3, 87:7,
87:13, 87:20, 87:24,
88:3, 90:7, 104:13,
107:7, 112:9, 126:8,
128:14, 130:21,
131:12, 146:14,
154:24, 155:4,
156:1, 163:1, 163:4,
163:8, 163:18,
177:11, 179:21
**recording** [1] - 97:21
**records** [5] - 92:16,
100:14, 130:17,
131:14, 131:17
**Records** [1] - 127:11
**recovery** [1] - 77:1
**RECROSS** [1] - 3:2
**recross** [1] - 155:8
**red** [1] - 130:23
**REDIRECT** [2] - 3:2,
154:14
**redirect** [1] - 154:11
**redundant** [1] - 47:10
**refer** [4] - 16:13,
80:21, 97:11, 114:17
**reference** [3] - 69:18,
135:7, 204:1
**references** [1] - 203:4
**referred** [10] - 100:4,
122:20, 129:3,
134:6, 168:5,
192:11, 192:14,
194:15, 211:4,
212:19
**referring** [3] - 120:9,
162:15, 192:7
**refers** [2] - 94:8,
192:24
**reflect** [3] - 71:24,
74:6, 146:14
**reflecting** [3] - 100:22,
175:1, 178:18
**reflects** [1] - 92:3
**regarding** [6] - 64:17,
165:2, 170:8,
170:11, 172:6,
172:20
**regardless** [1] - 64:23
**registered** [3] - 25:2,
26:23, 52:8
**Registry** [1] - 168:18
**regular** [2] - 95:15,
109:14
**regulated** [1] - 109:9

**REGULATIONS** [1] -
215:15
**regulations** [4] -
93:24, 94:7, 94:18,
95:8
**reimposed** [1] - 81:8
**rel** [1] - 1:7
**related** [9] - 94:23,
118:14, 118:15,
118:16, 137:2,
137:11, 138:3,
179:16, 187:14
**relater** [4] - 76:20,
76:25, 90:13, 91:23
**relaters** [1] - 76:21
**relates** [10] - 56:15,
57:16, 80:7, 81:12,
97:15, 109:13,
116:14, 172:14,
175:3, 198:2
**relating** [2] - 124:2,
177:20
**relationship** [3] - 34:4,
91:13, 152:13
**relatives** [3] - 33:8,
33:20, 54:25
**relevance** [3] - 141:19,
152:8, 200:18
**relevancy** [3] - 147:23,
148:12, 148:16
**relevant** [4] - 80:14,
118:22, 125:10,
129:15
**relief** [1] - 116:7
**relies** [1] - 79:2
**religiously** [1] - 39:9
**reluctance** [1] - 41:14
**rely** [2] - 11:3, 85:8
**remain** [1] - 72:20
**remedies** [1] - 142:24
**remedy** [1] - 134:19
**remember** [19] - 5:10,
9:11, 38:7, 42:16,
44:23, 48:13, 48:14,
62:3, 65:14, 70:13,
71:17, 84:18,
117:20, 146:8,
154:22, 158:21,
187:10, 187:11,
213:21
**reminiscent** [1] -
95:24
**remove** [4] - 6:16,
6:19, 74:21, 104:10
**render** [1] - 61:2
**Renke** [2] - 124:3,
124:19
**rep** [3] - 172:19,
172:21, 180:15
**repeat** [2] - 163:12,

181:11
**repeatedly** [1] - 205:23
**repeating** [2] - 213:11, 213:14
**repeats** [1] - 125:12
**repetitive** [1] - 182:7
**rephrase** [1] - 142:22
**report** [8] - 69:12, 92:17, 93:13, 93:25, 94:4, 94:11
**REPORTED** [1] - 215:13
**reported** [2] - 97:22, 160:16
**REPORTER** [5] - 1:23, 40:10, 215:2, 215:8, 215:21
**reporter** [1] - 29:13
**REPORTER'S** [1] - 1:18
**reporting** [1] - 75:18
**represent** [4] - 76:11, 93:5, 93:22, 94:19
**representation** [1] - 83:3
**representative** [25] - 4:16, 7:14, 157:7, 157:11, 173:16, 174:17, 174:25, 180:18, 180:22, 181:3, 181:8, 181:12, 181:17, 181:21, 186:5, 187:18, 188:3, 188:15, 210:6, 210:18, 210:21, 211:13, 211:21, 212:7, 212:18
**represented** [1] - 208:14
**representing** [2] - 132:16, 208:16
**Republic** [2] - 80:19, 169:11
**reputable** [1] - 96:17
**request** [7] - 72:12, 125:8, 125:10, 126:17, 127:21, 175:11, 176:7
**requests** [2] - 175:13, 175:15
**require** [3] - 70:2, 109:20, 121:1
**required** [2] - 71:2, 97:9
**requirement** [1] - 97:24
**requirements** [1] - 89:13

**requires** [6] - 69:21, 134:3, 138:25, 139:3, 177:18, 189:14
**research** [6] - 69:16, 130:11, 131:3, 180:24, 183:15, 213:17
**researched** [2] - 171:1, 173:2
**researching** [2] - 117:14, 171:23
**Resendez** [2] - 8:20, 27:19
**resolution** [1] - 88:20
**respect** [10] - 75:12, 89:8, 91:20, 110:4, 153:3, 174:13, 174:22, 183:16, 184:6, 184:9
**respective** [2] - 74:7, 146:15
**respects** [2] - 79:1, 90:13
**respond** [1] - 69:11
**responds** [1] - 12:5
**response** [6] - 12:3, 46:14, 53:17, 54:12, 174:9, 176:16
**responses** [1] - 176:4
**responsibilities** [4] - 89:8, 90:5, 159:21, 160:7
**responsibility** [1] - 106:18
**responsible** [20] - 30:1, 78:20, 160:10, 160:14, 160:19, 160:20, 160:24, 161:1, 163:9, 163:13, 163:23, 164:18, 165:22, 171:17, 177:9, 180:8, 184:24, 184:25, 185:2, 199:11
**responsive** [1] - 186:24
**rest** [2] - 7:20, 45:25
**restrictions** [2] - 69:21, 69:25
**result** [1] - 70:2
**Results** [1] - 94:15
**retain** [1] - 116:23
**retire** [5] - 62:8, 62:24, 71:20, 146:11, 213:23
**retired** [8] - 15:24, 15:25, 16:2, 25:17, 49:16, 49:21, 50:20,

51:8
**retrospect** [1] - 91:24
**return** [1] - 69:16
**revenue** [2] - 161:10, 162:9
**Review** [9] - 81:9, 119:10, 120:8, 121:25, 122:9, 140:6, 197:14, 197:19, 198:11
**review** [9] - 93:6, 94:20, 119:12, 157:17, 165:9, 165:12, 170:19, 183:3, 197:20
**reviewed** [9] - 89:16, 94:1, 119:18, 121:24, 123:15, 158:8, 164:19, 165:25, 198:11
**reviewing** [5] - 121:24, 130:16, 130:18, 170:23, 198:13
**Reviews** [2] - 197:16, 198:4
**RGK** [2] - 4:5, 7:6
**Richard** [1] - 50:18
**richard** [1] - 46:6
**rise** [2] - 11:10, 214:12
**risk** [4] - 93:6, 93:22, 94:19, 94:22
**role** [5] - 159:18, 169:17, 169:19, 170:1, 171:22
**Romero** [2] - 8:1, 16:22
**Rona** [17] - 10:17, 11:5, 155:13, 156:3, 156:8, 164:15, 176:3, 184:6, 186:24, 190:3, 192:20, 193:12, 197:13, 201:7, 207:1, 210:17, 213:8
**Rona's** [1] - 184:21
**room** [11] - 44:23, 44:25, 45:7, 45:13, 61:12, 62:8, 62:15, 62:25, 71:12, 146:11, 213:24
**ROOM** [1] - 1:24
**roughly** [1] - 91:10
**round** [1] - 77:25
**row** [7] - 7:20, 7:21, 8:17, 45:25, 46:2, 46:3
**rows** [1] - 60:20
**RUBBER** [1] - 1:13
**RUEBENS** [1] - 1:11

**rule** [1] - 127:9
**Rule** [2] - 72:18, 72:23
**rules** [5] - 9:24, 59:6, 65:20, 66:21, 66:25
**Ruling** [3] - 101:8, 102:17, 139:19
**ruling** [41] - 47:17, 65:22, 72:14, 86:20, 99:3, 99:7, 99:18, 101:7, 122:3, 122:13, 122:15, 123:21, 123:24, 124:6, 124:19, 124:21, 126:6, 126:17, 127:23, 135:2, 135:5, 135:24, 136:2, 136:4, 136:9, 136:24, 137:1, 137:11, 137:23, 138:2, 139:7, 139:10, 139:11, 139:12, 139:15, 140:1, 140:2, 140:3, 154:17, 154:21, 169:5
**rulings** [3] - 140:5, 155:2, 155:5
**run** [2] - 38:23, 79:14
**runs** [1] - 150:6

---

# S

**S-a-n-t-i-a-g-o** [1] - 8:21
**S-c-o-t-t** [1] - 8:22
**Sacramento** [1] - 14:19
**safe** [25] - 109:16, 122:24, 129:19, 162:20, 180:4, 180:11, 180:12, 180:16, 180:19, 180:23, 181:5, 181:10, 181:14, 181:23, 182:4, 182:11, 182:23, 182:25, 183:17, 183:24, 184:9, 194:3, 194:6, 194:12
**Safe** [1] - 180:2
**safe-let** [24] - 122:24, 129:19, 162:20, 180:4, 180:11, 180:12, 180:16, 180:19, 180:23, 181:5, 181:10, 181:14, 181:23, 182:4, 182:11,

182:23, 182:25, 183:15, 183:17, 183:24, 184:9, 194:3, 194:6, 194:12
**Safe-let** [1] - 180:2
**sale** [2] - 194:24, 195:3
**sales** [8] - 86:7, 106:3, 115:14, 116:10, 116:12, 158:13, 158:15, 158:22
**salesperson** [1] - 144:5
**sample** [2] - 94:5, 99:24
**sand** [1] - 86:2
**Sanders** [7] - 139:9, 143:17, 144:9, 144:22, 147:15, 148:24, 154:21
**sanders** [28] - 116:17, 116:19, 116:21, 116:23, 117:6, 120:5, 121:23, 122:19, 123:8, 124:24, 130:6, 135:13, 135:16, 136:23, 140:18, 142:23, 143:19, 143:22, 144:11, 144:24, 148:2, 148:19, 149:19, 151:16, 152:6, 152:12, 152:16, 153:12
**Santa** [1] - 21:15
**Santiago** [2] - 8:21, 28:6
**sat** [3] - 11:20, 46:11, 55:12
**satisfied** [4] - 23:5, 23:13, 37:18, 37:22
**saw** [8] - 66:13, 118:13, 122:13, 122:23, 123:2, 141:12, 152:15, 189:7
**Schedule** [6] - 97:21, 98:1, 98:3, 99:12, 101:4, 166:20
**school** [5] - 18:12, 18:13, 18:14, 18:15, 23:22
**scope** [25] - 93:19, 119:20, 120:18, 120:23, 122:12, 122:13, 122:15, 126:6, 127:22, 137:17, 138:2, 140:2, 140:5, 155:2,

155:5, 165:9,
165:12, 165:14,
165:23, 166:6,
167:13, 197:2,
199:20, 199:22,
200:8
**scoping** [2] - 123:15,
125:1
**Scott** [2] - 8:22, 28:17
**screen** [2] - 77:19,
92:4
**screwed** [2] - 112:2,
113:17
**Search** [1] - 139:20
**search** [5] - 117:18,
126:5, 139:17,
139:22, 145:20
**searched** [1] - 119:7
**searches** [5] - 86:16,
87:4, 119:5, 126:12,
131:6
**searching** [2] - 69:17,
123:25
**seat** [11] - 7:25, 8:16,
45:14, 45:16, 45:17,
45:19, 45:20, 45:21,
45:24, 46:3, 60:16
**seated** [4] - 63:20,
69:8, 104:9, 155:25
**seats** [4] - 61:7, 72:1,
74:7, 146:15
**second** [15] - 14:13,
38:16, 63:1, 68:13,
73:2, 79:10, 85:7,
93:3, 94:1, 127:25,
136:18, 202:11,
203:15, 207:19,
209:12
**section** [4] - 120:17,
190:11, 195:13,
196:6
**SECTION** [1] - 215:11
**security** [2] - 23:21,
80:2
**Security** [2] - 16:22,
17:7
**see** [87] - 9:12, 9:17,
10:8, 29:1, 30:13,
30:17, 36:14, 40:6,
45:2, 48:5, 58:1,
60:13, 60:15, 66:6,
67:19, 70:19, 71:15,
74:3, 85:2, 85:16,
87:12, 87:14, 92:23,
93:3, 93:19, 97:1,
97:2, 98:16, 100:5,
100:9, 101:4, 101:5,
105:20, 108:3,
108:4, 108:6,
108:18, 111:2,

111:3, 111:7, 117:6,
117:8, 119:2,
119:12, 120:11,
120:13, 120:18,
122:4, 127:25,
128:9, 130:3,
131:12, 146:12,
147:5, 147:11,
150:22, 151:5,
151:8, 152:11,
152:18, 157:17,
164:23, 165:6,
165:15, 165:16,
165:17, 167:10,
167:11, 169:13,
174:8, 176:7,
176:15, 183:21,
189:4, 190:8, 190:9,
193:17, 193:18,
193:20, 201:14,
202:13, 203:20,
203:23, 204:2,
204:5, 211:10, 214:8
**See** [1] - 150:18
**seeing** [3] - 168:14,
169:4
**seem** [2] - 58:12,
87:17
**sees** [1] - 63:8
**self** [3] - 18:1, 21:19,
51:22
**Self** [1] - 18:3
**self-employed** [2] -
18:1, 21:19
**Self-employed..** [1] -
18:3
**self-obvious** [1] -
51:22
**sell** [14] - 79:24, 106:6,
106:21, 111:25,
112:1, 115:15,
130:5, 132:24,
145:18, 149:7,
195:4, 195:9,
195:10, 195:21
**sellers** [1] - 133:20
**selling** [9] - 75:7,
79:21, 84:6, 91:11,
106:18, 115:24,
133:4, 140:23,
196:11
**sells** [8] - 78:5, 90:9,
90:14, 194:22,
195:6, 195:12,
195:20, 195:24
**sense** [3] - 79:8,
109:5, 123:4
**sent** [4] - 121:23,
124:19, 124:23,
147:14

**separately** [1] - 84:14
**series** [1] - 134:11
**serious** [1] - 89:18
**seriously** [2] - 89:8,
90:5
**served** [2] - 162:25,
175:10
**service** [4] - 25:17,
69:10, 88:23, 130:14
**services** [3] - 28:7,
106:7, 106:23
**SESSION** [1] - 4:2
**session** [2] - 39:7,
66:7
**set** [2] - 15:1, 40:2
**sets** [1] - 134:5
**setting** [1] - 41:10
**settled** [1] - 56:7
**seven** [4] - 43:24,
205:18, 205:21
**several** [2] - 117:5,
129:17
**shaking** [1] - 54:6
**shall** [2] - 104:6,
155:22
**shamefully** [1] - 31:25
**Shanghai** [1] - 162:22
**Shannon** [5] - 4:15,
7:14, 11:2, 40:15,
42:10
**SHANNON** [1] - 2:12
**shape** [1] - 108:10
**shaped** [2] - 108:4,
108:7
**share** [1] - 144:1
**shared** [2] - 144:4,
150:1
**sheet** [3] - 97:14,
98:10, 117:24
**SHERI** [3] - 1:23,
215:8, 215:20
**shipment** [1] - 95:19
**shipments** [1] - 75:25
**short** [5] - 11:12, 60:5,
89:4, 103:5, 208:13
**shortly** [1] - 134:17
**Shortridge** [2] - 56:19,
56:22
**show** [41] - 13:22,
30:25, 71:2, 75:20,
77:13, 81:18, 81:20,
81:23, 82:5, 82:14,
83:19, 84:11, 84:14,
84:21, 85:24, 86:1,
89:23, 90:2, 91:5,
96:2, 96:15, 98:15,
100:15, 101:5,
124:8, 127:2,
131:14, 131:15,
131:17, 150:5,

150:12, 150:13,
173:25, 183:6,
190:6, 191:16,
191:21, 193:16,
193:25, 210:5, 210:6
**showed** [8] - 101:7,
133:24, 190:20,
193:15, 193:21,
195:16, 196:9, 210:2
**showing** [9] - 77:10,
166:23, 168:25,
179:11, 179:15,
179:22, 190:13,
191:18, 198:16
**shown** [2] - 210:18,
211:1
**shows** [3] - 30:4, 31:1,
123:9
**sic** [1] - 72:23
**Siddharth** [2] - 10:18,
11:4
**side** [22] - 5:1, 5:9,
5:12, 5:13, 8:5, 8:10,
34:12, 35:24, 37:9,
37:17, 38:6, 39:17,
40:6, 42:17, 43:21,
58:2, 63:8, 66:24,
70:21, 77:23, 102:4,
128:21
**side's** [2] - 49:2, 49:3
**SIDEBAR** [4] - 40:8,
44:14, 58:22, 60:9
**sides** [18] - 4:18,
12:25, 17:17, 23:1,
23:16, 25:8, 26:17,
27:15, 28:14, 41:1,
48:6, 50:1, 50:15,
51:2, 52:16, 57:23,
65:2, 74:13
**sig** [1] - 182:4
**sig-let** [1] - 182:4
**SIGMA** [1] - 1:11
**Sigma** [180] - 4:13,
7:12, 9:17, 9:19,
9:23, 35:2, 40:16,
73:5, 73:7, 75:13,
75:22, 76:16, 76:17,
78:3, 78:7, 78:13,
80:15, 81:15, 81:18,
81:20, 81:23, 82:2,
82:5, 82:10, 82:12,
82:23, 82:24, 83:12,
83:19, 84:4, 84:7,
84:11, 84:15, 85:3,
85:4, 85:15, 85:24,
86:1, 87:6, 88:10,
88:12, 89:3, 89:5,
89:7, 89:11, 89:15,
89:25, 90:4, 90:8,
90:9, 90:11, 90:22,

91:8, 91:21, 91:24,
92:15, 93:2, 93:14,
93:21, 95:1, 95:4,
95:6, 95:15, 95:19,
96:13, 96:19, 96:25,
98:12, 98:23, 99:10,
99:20, 99:24,
100:12, 100:15,
100:20, 100:24,
101:6, 102:11,
102:16, 102:23,
102:25, 103:6,
110:24, 111:9,
111:15, 129:3,
129:24, 131:13,
131:14, 131:17,
132:1, 132:16,
133:16, 142:20,
142:25, 143:23,
144:8, 144:16,
144:20, 144:25,
148:4, 148:7,
151:23, 153:3,
153:13, 154:4,
155:13, 155:16,
156:12, 158:2,
158:10, 159:4,
159:18, 162:25,
163:4, 163:9,
163:12, 163:19,
163:23, 168:9,
168:12, 169:13,
171:2, 171:8, 172:5,
173:2, 173:17,
174:10, 174:12,
174:17, 174:21,
175:2, 175:8,
175:11, 175:13,
175:17, 176:22,
177:23, 178:9,
178:17, 179:20,
180:2, 180:19,
180:23, 181:4,
181:9, 181:13,
181:22, 182:3,
182:22, 183:14,
183:24, 185:25,
186:7, 186:15,
187:5, 187:14,
188:24, 189:9,
190:3, 192:3, 193:7,
194:9, 194:22,
195:6, 195:12,
195:20, 195:24,
196:11, 198:9,
198:10, 199:11,
200:24, 201:17,
205:18, 208:6,
208:14, 209:9, 212:9
**Sigma's** [50] - 73:6,
76:2, 76:5, 84:17,

86:23, 88:14, 91:20, 91:23, 91:25, 92:16, 92:18, 93:5, 93:18, 94:16, 94:18, 94:22, 103:11, 128:24, 131:24, 132:4, 138:8, 139:6, 157:7, 157:10, 159:6, 160:15, 161:1, 161:4, 161:5, 162:13, 162:16, 171:6, 172:19, 172:21, 176:20, 177:15, 178:13, 180:18, 180:22, 181:3, 181:8, 181:12, 187:17, 188:9, 189:1, 191:4, 191:6, 193:13, 196:14, 212:18

signature [1] - 96:16

significant [3] - 41:14, 94:22, 169:18

similar [7] - 6:6, 57:7, 58:19, 91:6, 119:17, 123:15, 130:22

similarities [1] - 78:6

similarly [2] - 133:21, 206:6

simple [5] - 12:18, 86:2, 86:16, 87:3, 145:20

simply [5] - 16:14, 71:1, 107:18, 206:5, 213:14

Sinai [1] - 50:5

single [6] - 11:24, 81:21, 85:17, 179:21, 205:8

sister [2] - 25:1, 53:11

sit [21] - 17:4, 45:1, 88:21, 105:22, 164:22, 165:21, 166:4, 166:15, 167:6, 174:20, 175:5, 178:17, 179:20, 182:2, 182:21, 184:7, 195:19, 196:18, 197:1, 199:19, 199:24

site [1] - 94:15

sitting [4] - 37:17, 137:22, 139:25, 141:16

six [6] - 44:13, 46:1, 46:13, 55:2, 55:11, 57:21

sizable [1] - 81:6

size [2] - 130:1,

140:25

skipped [1] - 20:3

skipping [2] - 101:10, 101:15

sleeves [2] - 98:18, 99:14

sloped [3] - 108:17, 113:13

small [8] - 77:15, 91:2, 106:8, 108:22, 156:17, 156:23, 157:5, 194:25

smaller [1] - 129:14

SMITH [1] - 1:12

smuggling [1] - 31:22

SoCalGas [1] - 49:17

social [1] - 69:1

Social [2] - 16:22, 17:6

sold [11] - 99:10, 106:14, 111:24, 129:16, 131:5, 133:9, 133:10, 140:21, 145:19, 161:17, 196:6

solely [2] - 64:9, 66:8

solemnly [3] - 60:25, 104:4, 155:20

someone [10] - 34:2, 145:17, 145:25, 170:20, 179:6, 211:21, 212:22, 212:25, 213:11, 213:14

sometime [1] - 126:18

sometimes [3] - 66:1, 67:8, 112:17

somewhat [1] - 22:23

son [1] - 24:1

soon [3] - 7:23, 37:10, 70:21

Soraya [2] - 7:25, 16:21

SORAYA [1] - 8:1

sorry [24] - 6:1, 18:3, 43:7, 53:4, 53:25, 59:19, 127:3, 129:5, 137:15, 142:22, 151:5, 152:2, 161:24, 165:18, 167:8, 172:16, 176:13, 176:16, 192:6, 195:2, 199:8, 207:15, 209:17, 212:5

sort [7] - 77:21, 117:25, 118:2, 123:16, 126:12, 208:13

sorts [1] - 203:4

sought [1] - 212:13

sound [2] - 83:15, 95:7

sounded [1] - 59:7

sounds [3] - 13:12, 58:19, 60:8

source [2] - 142:12, 144:15

sourced [1] - 142:9

south [1] - 52:23

SOUTH [1] - 2:8

speaking [3] - 157:20, 164:2, 186:6

special [3] - 75:5, 77:21, 79:18

specialist [1] - 50:6

specialized [1] - 117:11

specific [10] - 9:18, 15:17, 20:21, 39:3, 93:18, 96:20, 100:19, 123:13, 137:8, 142:16

specifically [7] - 94:1, 108:20, 131:13, 136:2, 171:8, 184:6, 194:23

spell [3] - 8:2, 104:13, 156:2

spelled [4] - 8:7, 8:15, 46:7, 104:14

spent [1] - 158:5

SPF [2] - 142:9, 142:16

spirit [1] - 209:14

split [1] - 55:8

spot [1] - 164:25

spread [1] - 117:24

SPRING [1] - 1:24

sprink [2] - 123:2, 123:4

Sprink [32] - 86:23, 122:16, 123:20, 123:24, 124:5, 124:19, 125:18, 126:5, 126:16, 127:22, 128:9, 128:21, 128:25, 129:11, 129:19, 135:2, 135:5, 135:24, 136:1, 136:4, 136:9, 136:24, 137:1, 137:11, 137:23, 138:4, 138:7, 139:7, 139:10, 154:17, 154:21, 169:4

Sprink-let [31] - 86:23, 122:16, 123:20, 123:24, 124:5,

124:19, 125:18, 126:5, 126:16, 128:9, 128:21, 128:25, 129:11, 129:19, 135:2, 135:5, 135:24, 136:1, 136:4, 136:9, 136:24, 137:1, 137:11, 137:23, 138:4, 138:7, 139:7, 139:10, 154:17, 154:21, 169:4

sprinkler [5] - 77:25, 102:6, 107:21, 123:3, 123:5

Sprinks [2] - 125:9, 125:12

Sprinks' [1] - 125:8

SS [1] - 215:5

ST [1] - 97:4

stacker [3] - 173:7, 173:10, 173:13

staff [1] - 93:10

stake [1] - 77:3

stamped [1] - 128:21

stance [1] - 112:3

stand [8] - 4:25, 12:4, 16:24, 44:16, 60:11, 60:20, 73:12, 146:16

standard [7] - 35:20, 36:2, 36:6, 97:23, 109:18, 110:3, 110:6

standards [4] - 94:13, 110:1, 134:6, 134:10

standing [1] - 122:25

Stanley [1] - 56:19

Star [6] - 101:8, 102:17, 139:11, 139:12, 139:15, 140:1

start [18] - 7:3, 13:11, 16:19, 38:24, 39:1, 39:3, 39:18, 39:19, 39:23, 46:22, 70:3, 82:19, 91:22, 194:9, 201:10, 214:1, 214:8

started [12] - 4:23, 7:2, 40:14, 56:7, 126:5, 133:4, 134:13, 135:19, 136:20, 136:21, 171:9, 180:2

starting [4] - 38:24, 38:25, 86:19, 120:17

state [5] - 4:7, 7:8, 40:11, 104:12, 156:1

State [4] - 27:7, 105:1, 105:5, 132:20

STATE [1] - 215:6

statement [19] - 41:15, 60:3, 60:7, 70:22,

70:25, 71:3, 71:4, 74:10, 74:11, 74:14, 76:6, 77:7, 82:5, 82:16, 84:17, 85:20, 89:1, 103:18

statements [20] - 6:2, 61:21, 63:24, 65:9, 65:11, 70:24, 72:7, 75:21, 76:2, 81:24, 82:2, 82:20, 83:9, 83:13, 84:15, 85:25, 88:12, 88:14, 89:6, 95:15

STATES [7] - 1:1, 1:1, 1:4, 1:6, 215:9, 215:11, 215:16

States [22] - 4:5, 7:6, 9:16, 9:19, 32:14, 34:20, 75:6, 75:7, 77:17, 78:21, 79:18, 79:20, 79:21, 90:11, 90:12, 95:20, 98:7, 99:12, 113:21, 131:10, 142:7, 142:8

statistical [1] - 97:20

stay [2] - 74:25, 105:18

steak [2] - 32:7, 41:2

Steel [1] - 99:20

steel [105] - 75:14, 75:18, 75:22, 76:7, 80:19, 82:4, 82:6, 82:24, 83:4, 83:20, 83:24, 84:3, 84:8, 84:12, 86:24, 88:5, 96:25, 97:7, 98:18, 98:22, 99:8, 99:14, 99:15, 99:21, 99:25, 105:6, 105:7, 105:9, 105:23, 106:21, 111:21, 112:17, 112:19, 114:14, 114:16, 114:17, 116:6, 118:9, 118:10, 118:16, 118:22, 118:23, 118:24, 119:5, 119:8, 120:24, 125:24, 128:5, 131:18, 132:23, 145:21, 169:10, 189:20, 192:25, 194:19, 194:22, 194:24, 195:4, 195:9, 195:10, 195:12, 195:13, 195:20, 195:22, 195:24, 196:9, 199:20, 199:22, 199:25, 200:2,

200:5, 200:9,
200:16, 201:18,
201:20, 201:22,
202:19, 203:8,
204:11, 204:14,
205:17, 205:19,
205:24, 205:25,
206:6, 206:12,
207:6, 207:9,
207:13, 207:25,
208:3, 208:7,
208:15, 209:4,
209:6, 209:9,
209:25, 210:20,
211:2, 211:4, 211:8,
211:14, 211:15,
212:1, 212:20
**STENOGRAPHICAL LY** [1] - 215:13
**step** [2] - 28:7, 155:10
**step-dad** [1] - 28:7
**steps** [4] - 123:23,
160:21, 183:24,
188:10
**Steven** [2] - 8:22,
28:17
**still** [8] - 8:25, 30:9,
41:23, 51:11,
105:25, 119:12,
134:23, 139:25
**stipulate** [1] - 12:25
**stop** [1] - 107:2
**stopped** [1] - 102:23
**stories** [1] - 48:14
**story** [2] - 91:16,
91:17
**straightforward** [1] -
87:19
**STREET** [2] - 1:24,
2:13
**street** [2] - 15:21,
145:21
**stricken** [3] - 65:23,
67:9, 173:14
**strictly** [1] - 142:12
**strike** [7] - 59:21,
67:11, 115:7,
122:18, 173:11,
182:15, 208:24
**strongly** [1] - 121:25
**struck** [1] - 122:17
**struggle** [1] - 132:4
**stuff** [2] - 26:15, 47:16
**subcategory** [1] -
101:10
**subconscious** [1] -
41:10
**subconsciously** [1] -
30:18
**subheading** [2] -

98:14, 99:8
**subheadings** [1] -
98:21
**subject** [45] - 9:20,
9:21, 18:16, 47:25,
80:16, 81:4, 81:16,
86:4, 86:18, 87:5,
87:8, 87:21, 94:3,
102:21, 103:2,
115:6, 120:23,
125:20, 129:22,
163:20, 163:25,
165:4, 171:2,
171:23, 173:18,
176:10, 176:24,
178:25, 179:3,
179:23, 180:12,
181:5, 181:23,
182:4, 182:11,
182:12, 182:23,
183:25, 184:9,
184:15, 187:8,
198:5, 199:25,
200:16
**subjects** [1] - 159:2
**submit** [3] - 87:18,
183:3, 204:17
**submitted** [7] - 62:7,
62:24, 71:20, 84:13,
146:11, 204:24,
205:8
**subpart** [1] - 101:14
**subscribed** [1] -
130:14
**subsequent** [1] - 97:2
**subsequently** [5] -
115:21, 126:15,
128:8, 212:22
**substance** [1] - 187:5
**substantial** [3] - 59:3,
80:25, 130:3
**substantive** [1] -
138:17
**substantively** [2] -
137:13, 137:19
**subtle** [2] - 13:12,
15:11
**sued** [5] - 33:18,
33:21, 55:9
**suffering** [1] - 136:13
**sufficient** [1] - 97:19
**suggest** [8] - 73:18,
85:18, 87:6, 116:4,
116:13, 116:16,
214:1, 214:6
**suing** [3] - 34:2,
34:18, 34:20
**suit** [1] - 76:15
**Summary** [1] - 94:14
**summary** [5] - 73:3,

73:4, 73:6, 95:18,
204:21
**Sunset** [12] - 81:9,
119:9, 120:8,
121:25, 122:9,
140:6, 197:13,
197:16, 197:18,
197:19, 198:4,
198:11
**supervise** [1] - 159:21
**supervising** [1] -
171:19
**supervisor** [1] - 24:23
**supervisory** [1] -
22:14
**supplier** [5] - 143:10,
144:15, 145:9,
149:6, 149:15
**suppliers** [9] - 78:11,
142:19, 143:4,
143:5, 145:22,
148:7, 148:24,
149:1, 149:25
**SUPPLIERS** [1] -
143:1
**supply** [8] - 91:14,
145:13, 159:22,
160:7, 160:15,
160:20, 171:17,
171:19
**supplying** [1] - 151:22
**suppose** [1] - 134:20
**supposed** [1] - 130:25
**suppression** [1] -
109:7
**surprise** [1] - 144:16
**surprising** [2] - 118:6,
118:8
**suspected** [1] -
144:21
**suspicious** [1] -
131:20
**sustain** [2] - 67:2,
67:5
**sustained** [7] -
109:23, 114:1,
115:11, 152:22,
166:25, 167:3, 177:6
**swear** [3] - 60:25,
104:4, 155:20
**sworn** [4] - 60:21,
64:25, 104:3, 155:19
**Sylmar** [1] - 17:1
**sympathy** [1] - 64:8
**system** [5] - 78:23,
79:1, 107:19,
107:23, 125:19
**System** [1] - 139:20
**systems** [7] - 77:25,
83:24, 93:7, 94:21,

107:21, 109:7

---

## T

**T-i-n-a-p-a-y** [1] - 8:15
**table** [6] - 4:14, 7:13,
10:14, 11:1, 13:10,
103:13
**Taiwan** [9] - 87:1,
119:14, 123:14,
137:3, 137:5, 138:3,
196:20, 197:3, 200:9
**TAKEN** [2] - 63:19,
146:13
**talks** [1] - 120:17
**tam** [1] - 34:19
**tariff** [3] - 75:5, 79:18,
94:2
**Tariff** [7] - 97:21, 98:1,
98:3, 99:12, 101:3,
166:20, 213:6
**tariffs** [2] - 142:14,
142:15
**Tarzana** [1] - 23:21
**tax** [1] - 75:5
**taxes** [2] - 32:20, 96:1
**teacher** [5] - 18:2,
18:4, 18:9, 18:10,
18:11
**team** [1] - 89:12
**technical** [3] - 62:11,
95:23, 96:13
**ten** [5] - 33:19, 33:22,
55:9, 61:23, 105:8
**ten-minute** [1] - 61:23
**Tennessee** [2] - 10:17,
77:16
**tentatives** [1] - 4:25
**term** [3] - 78:15,
118:25, 119:10
**terminology** [1] -
123:9
**terms** [6] - 10:15,
86:25, 115:18,
145:8, 162:9, 180:10
**test** [1] - 168:2
**testified** [28] - 67:19,
68:3, 133:16, 138:9,
138:10, 157:10,
172:19, 172:21,
172:23, 173:1,
173:17, 173:20,
174:8, 174:25,
180:19, 180:23,
181:3, 181:8,
181:12, 181:21,
183:5, 210:17,
211:12, 211:20,
212:7, 212:17,
212:18, 212:21

**testify** [4] - 73:12,
180:15, 186:22,
187:17
**testifying** [5] - 6:23,
67:21, 112:24,
181:16, 186:22
**testimony** [39] - 12:22,
65:1, 65:5, 65:23,
66:12, 67:14, 67:15,
67:17, 67:24, 67:25,
68:6, 70:7, 70:8,
72:22, 86:6, 89:21,
98:12, 100:14,
100:23, 104:4,
138:7, 140:20,
144:19, 149:18,
151:8, 151:15,
152:5, 152:15,
155:20, 173:5,
181:25, 183:7,
186:4, 186:19,
188:3, 188:16,
210:6, 211:25,
213:12
**Texas** [1] - 96:12
**text** [2] - 68:25, 85:2
**Thailand** [1] - 119:14
**Thanksgiving** [1] -
12:1
**THAT** [2] - 215:10,
215:14
**THE** [624] - 4:4, 4:11,
4:17, 4:21, 5:5, 5:8,
6:1, 6:18, 6:23, 7:1,
7:5, 7:16, 7:25, 8:23,
10:22, 11:8, 12:10,
12:11, 15:10, 15:11,
15:14, 15:15, 16:21,
16:23, 17:1, 17:2,
17:6, 17:8, 17:10,
17:11, 17:16, 17:17,
17:18, 17:19, 17:20,
17:21, 17:22, 17:23,
17:24, 17:25, 18:1,
18:3, 18:4, 18:5,
18:7, 18:8, 18:9,
18:11, 18:13, 18:14,
18:17, 18:18, 18:20,
18:21, 18:25, 19:1,
19:2, 19:3, 19:4,
19:5, 19:6, 19:7,
19:8, 19:9, 19:11,
19:12, 19:15, 19:16,
19:19, 19:20, 20:1,
20:2, 20:5, 20:6,
20:7, 20:8, 20:9,
20:10, 20:12, 20:13,
20:15, 20:16, 20:18,
20:21, 20:23, 20:25,
21:1, 21:2, 21:7,

21:8, 21:10, 21:11, 21:12, 21:14, 21:15, 21:17, 21:18, 21:21, 21:22, 21:24, 22:3, 22:4, 22:9, 22:10, 22:12, 22:15, 22:17, 22:19, 22:20, 22:22, 23:2, 23:3, 23:10, 23:11, 23:15, 23:16, 23:18, 23:19, 23:20, 23:23, 23:25, 24:2, 24:5, 24:7, 24:11, 24:14, 24:16, 24:17, 24:18, 24:21, 24:22, 24:24, 25:1, 25:3, 25:5, 25:7, 25:9, 25:10, 25:14, 25:19, 25:21, 25:22, 26:4, 26:5, 26:6, 26:9, 26:11, 26:12, 26:16, 26:17, 26:19, 26:20, 26:22, 27:1, 27:2, 27:4, 27:6, 27:9, 27:13, 27:14, 27:16, 27:17, 27:18, 27:21, 27:23, 27:24, 28:3, 28:4, 28:5, 28:9, 28:11, 28:13, 28:15, 28:16, 28:17, 28:19, 28:20, 28:23, 28:24, 29:1, 29:7, 29:8, 29:9, 29:10, 29:22, 29:23, 29:24, 30:4, 30:16, 30:20, 31:3, 31:4, 31:6, 31:7, 31:9, 31:10, 31:11, 31:12, 31:15, 31:18, 31:19, 31:23, 31:25, 32:2, 32:4, 32:5, 32:8, 32:10, 32:19, 32:20, 32:22, 32:23, 33:2, 33:3, 33:13, 33:14, 33:23, 33:24, 34:1, 34:3, 34:6, 34:8, 34:14, 34:15, 34:23, 34:24, 35:4, 35:14, 35:15, 35:16, 35:17, 35:21, 35:22, 36:1, 36:2, 36:7, 36:8, 36:10, 36:11, 36:13, 36:14, 36:17, 36:18, 36:19, 36:20, 36:23, 36:24, 37:1, 37:2, 37:4, 37:5, 37:7, 37:8, 37:20, 37:21, 37:24, 37:25, 38:15, 38:16, 40:10, 40:18, 41:4, 41:8, 41:16, 41:21, 42:6, 42:12, 42:20, 42:22, 42:25, 43:6, 43:9,

43:14, 43:19, 43:24, 44:1, 44:5, 44:9, 44:12, 44:13, 44:15, 44:19, 44:20, 45:7, 45:8, 45:9, 45:12, 46:1, 46:10, 46:15, 46:16, 46:21, 46:22, 46:24, 46:25, 47:1, 47:2, 47:3, 47:5, 47:7, 47:9, 47:14, 47:19, 47:22, 47:24, 48:2, 48:3, 48:7, 48:9, 48:25, 49:1, 49:7, 49:8, 49:10, 49:12, 49:13, 49:14, 49:15, 49:18, 49:20, 49:22, 49:25, 50:1, 50:2, 50:3, 50:4, 50:7, 50:9, 50:10, 50:13, 50:14, 50:16, 50:17, 50:18, 50:21, 50:22, 50:23, 50:25, 51:1, 51:3, 51:10, 51:13, 51:15, 51:16, 51:17, 51:19, 51:20, 52:3, 52:4, 52:5, 52:6, 52:7, 52:10, 52:12, 52:15, 52:17, 52:18, 52:20, 52:21, 52:22, 52:23, 52:24, 52:25, 53:1, 53:2, 53:4, 53:5, 53:7, 53:8, 53:9, 53:11, 53:12, 53:13, 53:14, 53:17, 53:18, 53:21, 53:22, 53:24, 53:25, 54:2, 54:3, 54:5, 54:6, 54:10, 54:11, 54:12, 54:13, 54:18, 54:19, 54:22, 54:23, 55:3, 55:4, 55:7, 55:8, 55:10, 55:11, 55:17, 55:19, 55:22, 55:23, 56:1, 56:2, 56:4, 56:5, 56:6, 56:8, 56:10, 56:11, 56:13, 56:14, 56:16, 56:17, 56:18, 56:21, 57:3, 57:4, 57:8, 57:9, 57:10, 57:12, 57:14, 57:15, 57:17, 57:18, 57:20, 57:21, 57:25, 58:1, 58:4, 58:5, 58:6, 58:8, 58:9, 58:11, 58:14, 58:16, 58:18, 58:19, 58:20, 58:21, 58:23, 59:4, 59:8, 59:11, 59:14, 59:23, 60:1, 60:10, 60:22, 61:4, 61:5, 63:20, 63:21,

71:23, 71:24, 72:14, 72:19, 72:25, 73:15, 74:1, 74:6, 74:17, 74:20, 74:23, 75:3, 88:25, 92:6, 92:9, 92:13, 92:21, 101:24, 103:16, 103:24, 104:2, 104:8, 104:9, 104:14, 104:16, 107:5, 107:9, 109:23, 110:16, 112:6, 112:7, 112:11, 112:24, 113:2, 113:6, 113:8, 114:1, 115:5, 115:8, 115:11, 119:24, 120:2, 121:13, 121:17, 124:11, 124:14, 126:24, 127:2, 127:10, 127:13, 127:16, 127:19, 128:13, 128:16, 129:4, 129:7, 132:11, 141:21, 141:22, 146:4, 146:14, 146:23, 146:25, 147:3, 147:5, 147:7, 147:9, 147:23, 148:11, 149:13, 149:15, 150:8, 150:11, 150:15, 150:18, 150:21, 151:1, 151:5, 151:11, 151:13, 151:24, 152:2, 152:3, 152:9, 152:10, 152:22, 153:22, 154:1, 154:9, 154:11, 154:13, 155:8, 155:10, 155:14, 155:17, 155:18, 155:24, 155:25, 156:3, 156:4, 164:6, 164:9, 166:25, 167:2, 167:3, 167:24, 169:1, 169:3, 169:7, 173:14, 174:1, 174:6, 175:22, 176:1, 176:14, 176:15, 177:6, 182:17, 183:9, 186:18, 186:19, 189:16, 189:17, 190:1, 190:15, 190:17, 190:19, 190:22, 190:23, 190:25, 191:2,

192:6, 192:9, 192:18, 193:9, 197:9, 198:17, 198:21, 198:23, 198:24, 199:2, 199:6, 199:8, 199:13, 199:16, 200:20, 201:3, 206:16, 206:21, 208:25, 209:17, 209:19, 210:8, 210:11, 210:15, 212:3, 213:19, 214:10, 214:12, 215:9, 215:11, 215:12, 215:13, 215:14, 215:15, 215:16

**together** [15] - 13:11, 13:14, 13:16, 13:18, 13:24, 14:3, 14:14, 77:12, 82:21, 119:16, 123:4, 123:15, 135:20, 141:23, 183:2
**Tom** [2] - 143:17, 144:10
**tomorrow** [4] - 38:25, 213:25, 214:9
**took** [5] - 64:10, 89:7, 90:4, 99:11, 160:21
**top** [13] - 13:10, 13:13, 13:16, 97:17, 97:22, 101:11, 108:7, 108:8, 108:11, 138:25, 142:13, 168:21
**topic** [1] - 158:24
**topics** [11] - 114:20, 157:24, 158:3, 159:15, 172:23, 186:16, 187:3, 187:13, 188:24, 193:5, 193:6
**total** [2] - 168:15, 199:23
**tough** [1] - 15:18
**toured** [1] - 133:7
**toward** [1] - 41:25
**towards** [1] - 33:7
**Trade** [2] - 117:21, 197:21
**trade** [17] - 32:1, 32:25, 75:9, 80:1, 81:12, 87:16, 116:9, 117:4, 117:12, 117:21, 117:25, 118:5, 118:9, 119:12, 134:18, 136:17, 142:24
**trading** [1] - 149:4
**traffic** [2] - 40:1, 214:3
**training** [4] - 126:10, 170:8, 170:15, 170:17
**transaction** [2] - 93:6, 94:20
**transcribed** [1] - 157:15
**transcript** [2] - 70:8, 173:25

178:17, 179:20, 182:3, 182:21, 184:7, 193:22, 195:19, 196:12, 196:18, 197:1, 199:19, 199:24, 211:16

**themselves** [1] - 208:17
**therein** [1] - 61:1
**they've** [1] - 33:21
**thinking** [1] - 153:17
**thinks** [3] - 14:24, 46:18, 66:24
**third** [5] - 78:11, 99:4, 201:15, 203:1
**THIRTEENTH** [1] - 2:13
**Thomas** [1] - 148:3
**Thompson** [2] - 10:19, 72:11
**threaded** [8] - 93:17, 99:9, 112:1, 192:4, 195:13, 195:15, 195:25
**three** [13] - 13:1, 13:2, 35:14, 36:9, 39:4, 39:7, 56:19, 85:10, 86:16, 88:9, 118:15, 186:20, 203:25
**three-hour** [1] - 39:4
**throw** [1] - 14:2
**tied** [1] - 214:3
**Tinapay** [1] - 24:19
**title** [6] - 51:5, 106:2, 111:3, 111:16, 120:22, 160:3
**TITLE** [1] - 215:11
**TO** [1] - 215:11
**today** [34] - 4:22, 4:23, 9:16, 35:1, 38:25, 68:8, 105:22, 133:16, 135:3, 137:22, 139:25, 141:16, 142:6, 161:10, 164:22, 165:21, 166:4, 166:15, 167:6, 174:20, 175:5,

TRANSCRIPT [3] - 1:18, 215:12, 215:14
transdent [1] - 123:17
transfers [1] - 51:5
transparent [2] - 89:9, 100:16
transport [1] - 96:4
Treasury [1] - 76:23
tree [2] - 107:24, 108:9
trial [41] - 4:18, 10:1, 10:8, 12:24, 19:23, 23:8, 23:9, 23:14, 26:18, 37:19, 37:23, 38:17, 38:20, 40:3, 45:2, 52:1, 53:16, 57:23, 57:24, 63:2, 64:12, 66:9, 68:9, 69:6, 69:22, 70:20, 72:12, 76:1, 76:13, 77:2, 78:7, 78:18, 79:25, 82:8, 89:4, 89:24, 91:4, 91:21, 103:5, 103:6, 185:9
TRIAL [1] - 1:18
trials [1] - 11:20
trick [2] - 184:20, 191:11
tried [3] - 14:6, 73:8, 115:20
trip [1] - 8:9
TRUE [1] - 215:12
true [7] - 39:20, 61:1, 64:22, 84:9, 84:20, 85:18
truly [1] - 60:25
Trump [2] - 142:14, 142:15
trust [1] - 136:16
truth [11] - 83:14, 84:16, 85:21, 85:25, 104:6, 104:7, 155:22, 155:23
truthful [1] - 82:25
try [15] - 12:7, 14:25, 22:5, 29:4, 33:6, 33:15, 38:13, 51:16, 51:23, 52:5, 60:25, 69:19, 188:18, 188:21, 214:2
trying [14] - 30:6, 30:22, 48:15, 61:8, 86:8, 91:18, 100:12, 115:15, 115:18, 123:8, 153:14, 154:5, 161:19, 164:24
tube [2] - 98:17, 99:13
TUESDAY [1] - 1:19
turn [4] - 74:18, 108:2, 111:6, 174:10

turns [1] - 141:6
twice [2] - 201:20, 201:22
two [37] - 4:4, 11:21, 11:23, 12:24, 16:6, 27:25, 29:19, 35:6, 35:7, 35:9, 38:3, 38:7, 51:10, 72:5, 79:4, 82:1, 85:1, 88:6, 94:4, 95:3, 100:18, 101:24, 105:6, 108:23, 140:5, 148:19, 158:5, 185:7, 185:8, 193:21, 198:12, 199:1, 199:6, 207:21, 207:22, 210:2
two-fold [1] - 27:25
twofold [3] - 12:14, 29:2, 29:3
type [5] - 53:12, 96:9, 101:19, 125:16, 144:3
types [4] - 102:13, 109:4, 121:7, 122:7
typically [2] - 171:5, 204:17

U

U.S [20] - 89:6, 89:10, 90:1, 90:9, 90:14, 90:16, 90:17, 90:18, 90:19, 90:20, 91:11, 91:22, 91:25, 92:14, 92:24, 96:11, 101:7, 114:3, 137:24
UL [7] - 110:10, 134:3, 134:5, 189:10, 189:11, 189:14
ultimate [1] - 93:4
ultimately [6] - 41:13, 59:2, 91:17, 92:17, 102:22, 160:25
uncovered [1] - 86:16
under [20] - 12:23, 30:6, 65:20, 72:18, 72:23, 86:25, 93:19, 97:20, 98:13, 99:6, 101:9, 119:17, 120:24, 123:13, 140:8, 200:1, 200:10, 202:1, 205:10, 205:13
undercut [2] - 80:3, 115:21
undergraduate [1] - 104:25
underlined [1] - 122:5

underlying [1] - 90:3
understood [12] - 6:22, 95:5, 157:20, 158:2, 162:13, 187:3, 187:12, 197:19, 198:1, 198:2, 198:7
undertake [1] - 187:6
undertaken [1] - 197:20
undertook [3] - 142:25, 143:12, 187:6
underwater [1] - 90:25
Underwriters [9] - 109:9, 109:12, 109:18, 109:25, 110:3, 110:9, 111:10, 189:2, 189:20
undue [1] - 70:16
unemployed [4] - 22:18, 24:20, 53:2, 53:5
unfair [2] - 75:9, 81:12
unfolded [1] - 153:18
unfounded [1] - 103:10
uni [26] - 100:10, 122:23, 129:11, 133:17, 138:8, 162:18, 166:1, 171:9, 171:14, 171:23, 172:2, 172:14, 172:20, 172:24, 173:2, 173:18, 174:11, 174:23, 175:3, 176:23, 178:19, 178:24, 179:3, 179:17, 179:18
UniLet [26] - 100:10, 122:23, 129:11, 133:17, 138:8, 162:18, 166:1, 171:9, 171:14, 171:23, 172:2, 172:14, 172:20, 172:24, 173:2, 173:18, 174:11, 174:23, 175:3, 176:23, 178:19, 178:24, 179:3, 179:17, 179:18
UniLet [20] - 99:9, 179:23, 180:20, 180:24, 182:11, 191:23, 191:25, 192:21, 192:25, 203:19, 203:22,

204:1
United [22] - 4:5, 7:6, 9:16, 9:19, 32:14, 34:19, 75:6, 75:7, 77:17, 78:21, 79:18, 79:20, 79:21, 90:11, 90:12, 95:20, 98:7, 99:12, 113:21, 131:10, 142:7, 142:8
UNITED [7] - 1:1, 1:1, 1:4, 1:6, 215:9, 215:11, 215:16
university [2] - 26:24, 27:1
University [4] - 27:3, 105:1, 105:2, 132:21
unlawfully [2] - 76:7, 132:7
unless [4] - 42:17, 44:5, 110:11, 170:20
Unloading [1] - 96:11
Unreportable [1] - 191:9
UNREPORTABLE [1] - 206:11
unscrewed [1] - 113:18
unsustainable [3] - 100:3, 100:14, 103:3
up [42] - 5:11, 5:14, 7:19, 7:20, 7:22, 9:1, 9:4, 9:10, 9:14, 12:4, 13:10, 14:19, 16:6, 16:8, 19:23, 24:10, 30:23, 39:15, 44:16, 45:23, 58:5, 60:11, 60:20, 63:5, 70:23, 73:17, 85:19, 92:2, 92:8, 95:11, 95:21, 101:11, 105:11, 112:9, 129:16, 131:7, 150:22, 160:16, 187:2, 210:12, 214:3
updates [1] - 182:7
upper [1] - 97:17
urge [1] - 70:6
US [1] - 89:14
USC [1] - 21:19
useable [1] - 174:4
utility [1] - 49:16
utterly [1] - 100:2

V

V-a-n-e-h [1] - 8:3
vague [1] - 129:2
vaguely [1] - 195:21
valid [1] - 213:12
valorem [1] - 99:16

value [5] - 75:8, 79:22, 79:25, 93:7, 94:20
VANDEWATER [1] - 1:11
Vandewater [3] - 4:6, 7:6, 152:6
Vaneh [1] - 8:3
varied [2] - 162:4, 162:9
various [3] - 90:10, 90:23, 106:6
Velasquez [6] - 4:16, 7:15, 11:6, 103:13, 158:19, 188:5
vendors [1] - 144:4
verbal [1] - 175:7
verdict [13] - 14:7, 14:16, 15:6, 28:2, 36:9, 37:3, 37:14, 61:1, 64:17, 65:4, 68:10, 69:16, 71:13
versa [1] - 63:4
versus [5] - 4:5, 7:6, 9:16, 34:20, 90:20
vessel [2] - 96:5, 96:6
via [2] - 68:24, 113:16
vice [7] - 63:4, 156:14, 159:19, 159:23, 159:24, 160:13, 160:14
video [2] - 150:12, 150:14
viewed [2] - 180:19, 180:23
viewpoint [1] - 54:21
views [1] - 29:5
violated [1] - 88:10
violates [1] - 69:25
violation [3] - 48:20, 48:24, 152:20
violin [2] - 18:2, 18:4
vis-à-vis [1] - 132:1
Vision [1] - 162:23
voice [2] - 41:8, 58:5
voices [1] - 179:14
voir [1] - 4:23
VS [1] - 1:10

W

W-i-j-a-y-a [1] - 8:8
W-o-e-h-r-e-l [1] - 104:15
W-o-n-g [1] - 46:1
wait [2] - 29:23, 42:1
waiting [1] - 214:4
wants [3] - 63:14, 153:23, 190:23
war [1] - 48:14
WASHINGTON [1] -

2:13

**Washington** [3] - 14:20, 116:8, 116:17

**waste** [2] - 46:16, 209:24

**watch** [1] - 40:2

**water** [4] - 90:25, 102:4, 102:10, 102:15

**wavy** [2] - 108:3, 108:16

**ways** [6] - 11:23, 76:24, 85:1, 86:9, 140:15, 143:12

**website** [3] - 131:8, 144:2, 164:16

**websites** [2] - 69:1, 149:10

**week** [2] - 11:11, 11:25

**weight** [5] - 66:17, 66:19, 68:1, 68:5, 136:18

**weld** [27] - 99:9, 105:8, 106:5, 107:18, 107:20, 108:20, 108:25, 109:2, 110:7, 113:9, 113:10, 113:13, 113:14, 114:6, 114:10, 114:12, 114:14, 115:10, 138:13, 138:19, 139:1, 139:4, 189:15, 202:9, 203:22, 207:22

**Welded** [1] - 111:16

**welded** [120] - 75:23, 77:18, 77:20, 77:23, 77:24, 78:1, 78:5, 78:10, 80:14, 81:16, 82:7, 83:21, 83:23, 83:25, 84:3, 84:8, 86:17, 86:22, 86:24, 91:3, 91:4, 91:8, 91:11, 98:11, 98:24, 99:4, 99:5, 99:19, 100:11, 101:1, 101:9, 101:13, 101:16, 101:21, 101:23, 102:2, 102:21, 102:24, 107:1, 107:14, 107:19, 108:12, 108:14, 109:13, 110:7, 111:18, 112:19, 113:15, 113:16, 114:12, 114:17, 115:1, 115:16, 115:19,

115:24, 118:17, 121:1, 122:2, 122:22, 125:18, 128:24, 129:13, 129:22, 130:22, 131:8, 131:9, 131:10, 131:11, 131:14, 131:15, 131:24, 131:25, 132:5, 132:8, 132:25, 133:2, 133:11, 133:18, 133:20, 134:2, 134:4, 134:7, 134:23, 138:19, 139:22, 153:4, 153:8, 161:2, 162:14, 162:16, 173:3, 176:9, 176:24, 180:4, 184:14, 187:7, 188:25, 189:1, 189:15, 190:11, 191:1, 191:4, 191:7, 192:1, 192:4, 194:7, 194:12, 196:5, 196:7, 201:23, 202:4, 202:20, 203:19, 204:1, 204:7, 206:2, 207:23, 208:21, 209:12

**welder** [4] - 108:21, 133:13, 139:3, 139:8

**welders** [2] - 108:25, 139:5

**Welding** [1] - 111:17

**welding** [9] - 110:7, 125:21, 133:14, 134:24, 189:15, 192:21, 194:16, 202:7, 202:23

**West** [2] - 24:19, 27:2

**WESTERN** [1] - 1:2

**whatsoever** [1] - 41:1

**whispering** [1] - 38:9

**WHITE** [1] - 2:11

**White** [3] - 4:13, 7:12, 159:9

**whole** [11] - 15:16, 29:11, 101:5, 104:6, 135:17, 155:22, 168:19, 192:12, 205:1, 205:5

**wife** [4] - 22:17, 28:21, 49:20, 52:9

**Wijaya** [2] - 8:8, 20:5

**willing** [1] - 11:10

**willingly** [2] - 144:23, 144:25

**win** [3] - 23:8, 37:18, 141:24

**wireless** [1] - 21:20

**wish** [2] - 70:9, 103:22

**WITH** [1] - 215:15

**withdraw** [1] - 127:14

**witness** [26] - 39:11, 66:12, 66:13, 67:16, 67:17, 67:19, 72:11, 72:24, 89:21, 102:12, 103:23, 103:24, 107:3, 107:8, 112:5, 112:23, 132:10, 146:16, 146:22, 155:11, 155:13, 166:23, 173:25, 191:18, 192:14

**WITNESS** [25] - 3:2, 104:8, 104:14, 113:2, 113:8, 115:8, 141:22, 149:15, 152:2, 152:10, 154:1, 155:24, 156:3, 167:2, 169:3, 169:7, 176:15, 186:19, 189:17, 190:17, 190:22, 190:25, 198:23, 199:8, 209:19

**witness'** [8] - 67:20, 67:21, 67:22, 67:24, 73:22, 199:3

**witnesses** [23] - 6:23, 10:5, 10:15, 10:21, 11:3, 11:14, 12:22, 65:1, 65:10, 68:3, 68:5, 72:9, 72:16, 72:20, 90:3, 90:23, 91:5, 94:24, 101:18, 102:11, 155:16, 186:1, 186:3

**wits** [1] - 86:8

**Woehrel** [17] - 10:16, 86:6, 86:7, 104:1, 104:14, 110:21, 121:20, 127:21, 131:22, 132:15, 147:11, 148:2, 148:18, 149:18, 151:15, 153:2, 154:16

**Woehrel's** [1] - 150:5

**wondering** [1] - 79:23

**Wong** [2] - 46:1, 46:24

**Woodland** [2] - 17:24, 50:5

**word** [5] - 98:19, 123:11, 168:4, 204:6, 209:6

**wording** [2] - 137:14, 137:16

**words** [11] - 53:18, 68:7, 83:16, 97:9, 101:12, 123:1, 183:23, 209:8, 209:9, 209:25, 212:10

**worker** [1] - 49:16

**works** [21] - 16:4, 17:9, 18:5, 19:10, 20:13, 21:19, 22:16, 23:23, 24:25, 25:16, 26:9, 27:5, 27:7, 27:21, 28:7, 28:22, 47:6, 49:19, 53:10, 53:13, 107:16

**world** [3] - 52:2, 90:10, 117:22

**worth** [2] - 156:19, 157:4

**write** [3] - 96:4, 96:12

**writing** [2] - 68:24, 175:14

**written** [8] - 85:13, 86:20, 87:13, 99:3, 177:11, 178:23, 209:6, 212:10

**wrote** [4] - 93:20, 94:10, 96:25, 123:19

**Y**

**year** [6] - 91:10, 95:25, 99:3, 102:23, 162:4, 162:5

**years** [20] - 33:19, 33:22, 40:20, 51:8, 55:9, 55:18, 58:9, 81:8, 102:23, 105:8, 105:9, 105:10, 105:24, 111:25, 114:16, 119:11, 130:18, 133:6, 156:12, 197:21

**York** [1] - 39:12

**yourself** [5] - 18:22, 26:13, 47:19, 71:18, 133:11

**yourselves** [4] - 62:6, 70:10, 146:9, 213:22

**Z**

**Z-i-l-l-m-e-r** [1] - 8:17

**Zanev** [1] - 17:22

**Zillmer** [2] - 8:17, 25:15

**zoom** [1] - 120:15

# EXHIBIT 7

```
1                  UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3          HONORABLE R. GARY KLAUSNER, JUDGE PRESIDING

4     UNITED STATES OF AMERICA, ET AL.,  )
                                         )
5                                        )
                                         )
6                         Plaintiffs,    )
                                         )
7                                        )
                                         )
8              Vs.                       )  No. CV17-04393-RGK
                                         )
9                                        )
                                         )
10    VANDEWATER INTERNATIONAL, INC.,    )
      ET AL.,                            )
11                                       )
                                         )
12                        Defendants.    )
13    _____   )

14

15

16              REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                    JURY TRIAL, DAY 3

18                  LOS ANGELES, CALIFORNIA

19                 THURSDAY, OCTOBER 7, 2021

20

21

22

23            MIRIAM V. BAIRD, CSR 11893, CCRA
           OFFICIAL U.S. DISTRICT COURT REPORTER
24          350 WEST FIRST STREET, FOURTH FLOOR
             LOS ANGELES, CALIFORNIA 90012
25                  MVB11893@aol.com
```

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE THE PLAINTIFF,        CHRISTOPHER MITCHELL HENDY
      ISLAND INDUSTRIES:            KELLY KRAMER
 4                                  MAYER BROWN LLP
                                    350 SOUTH GRAND AVENUE
 5                                  SUITE 2500
                                    LOS ANGELES, CA 90071
 6

 7

 8

 9

10    IN BEHALF OF THE DEFENDANT,   CHRISTOPHER M. CURRAN
      VANDEWATER INTERNATIONAL,     CRISTINA BRAYTON-LEWIS
11    INC., ET AL.,:                LUCIUS B. LAU
                                    SHANNON LANE
12                                  WHITE AND CASE LLP
                                    601 THIRTEENTH STREET NW
13                                  WASHINGTON, DC 20005-3807

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:22-cv-00050-JPM-jc Document 19-7c Filed 06/27/22 Entered 06/27/22 17:24:34 of 587 Desc Exhibit
Transcript of Day 3 of FCA Trial    Page 4 of 166

3

```
 1                              INDEX

 2   WITNESS:                                          PAGE:

 3
```

```
 3      Walter Sperko, Defendant's witness, previously     4
 4      sworn
        DIRECT EXAMINATION RESUMED                         4
 5      CROSS-EXAMINATION                                  17
        Patricia Velazquez, Defendant's witness, sworn     23
 6      DIRECT EXAMINATION                                 23
        CROSS-EXAMINATION                                  68
 7      REDIRECT EXAMINATION                               86
        RECROSS-EXAMINATION                                91
```

```
 8                              * * * * *

 9

10   EXHIBITS:

11      Exhibit 1079  received)                            12
        Exhibit 1080  received)                            13
12      Exhibit 1077  received)                            14
        Exhibit 1083  received)                            14
13      Exhibit 1084  received)                            15
        Exhibit 1047  received)                            50
14                              * * * * *

15

16

17

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

Case 2:22-cv-00053-RWS-RSP Document 19-7c Filed 06/27/22 Page 4 of 5 PageID
Case 2:22-cv-00053 Document 9-7c Filed 06/27/22 Page 4 of 565 Exhibit
Transcript of Day 3 of SCA Trial    Page 5 of 166

4

```
 1    LOS ANGELES, CALIFORNIA; THURSDAY, OCTOBER 7, 2012; 8:21 A.M.

 2                            ---

 3             THE CLERK:  All rise.

 4             (Open court - jury present)

 5             THE COURT:  Okay.  Let the record reflect that all

 6    members of the jury are in their respective seats in the jury

 7    box.  The witness is on the witness stand.

 8             Counsel, we're in direct examination.

 9             THE CLERK:  Mr. Sperko, I'll remind you you're

10    still under oath at this time.

11             THE WITNESS:  Yes, ma'am.

12         Walter Sperko, Defendant's witness, previously sworn

13                  DIRECT EXAMINATION RESUMED

14    BY MR. LAU:

15    Q.   Good morning, Mr. Sperko.

16    A.   Good morning, Mr. Lau.

17    Q.   Is SIGMA compensating you for your time today?

18    A.   Yes.

19    Q.   What is your hourly rate?

20    A.   My hourly rate for this is $375 an hour.

21    Q.   Mr. Sperko, what opinions have you reached in this case

22    with respect to SIGMA?

23    A.   The essence of my opinion is that an outlet fitting is

24    not a butt-weld fitting, nor is a butt-weld fitting an outlet

25    fitting.
```

 1   Q.   Feel free to take off your mask because you're behind
 2   the plexiglass.
 3   A.   (Witness complies.)  All right.
 4   Q.   Thank you, sir.
 5   A.   Sorry.
 6   Q.   First, let's discuss the concept of industry standards.
 7   What is an industry standard?
 8   A.   An industry standard is a written document that
 9   describes a product, a process, or a service.  A simple
10   example of an industry standard is a bolt.  A bolt has a head
11   on it.  It has a shaft.  It has threads on it.
12        In order for that bolt to work correctly, the nut
13   that matches up to that bolt -- the nut that matches up to
14   that bolt has to have the threads that match the threads on
15   the outside of that bolt so that when you take two pieces of
16   material and you want to join together, you slide the bolt
17   through, you spin the nut on, you tighten it up, and the
18   threaded fastener works.
19        A bolt is not the same thing as a wood screw.  A
20   wood screw, threaded fastener just like a bolt, but the
21   threads on a wood screw are very coarse threads and they're
22   designed to hold into wood.  One would never mistake a wood
23   screw for a bolt.
24   Q.   Are there industry standards that would distinguish
25   between a bolt on the one hand and a wood screw on the other?

6

```
1    A.    Yes.
2    Q.    Are industry standards important?
3    A.    Yes.
4    Q.    Why are they important?
5    A.    As more or less implied by my example, if you didn't
6    have industry standards that covered the configuration and
7    geometry for bolts and nuts, they would not be compatible and
8    they would not work.
9    Q.    Who relies on industry standards?
10   A.    Everyone.
11   Q.    Do people sometimes rely on industry standards to
12   determine what a product is?
13   A.    Yes.
14   Q.    Let's talk about welds.  What is a weld?
15   A.    A weld is a method of joining materials together using
16   heat and/or pressure to create coalescence, that is, a
17   joining between two materials to make them one.
18   Q.    And can you give me some examples of welds?
19   A.    Well, welds are used in things like office furniture
20   where they -- the furniture is made out of metal.  Welds are
21   used in the piping systems that provide hot water and chilled
22   water to keep this room cool, or not, as the case might be.
23          Welds are used in piping systems that provide the
24   fire protection system that protects this building.
25   Q.    Do welds sometimes have different names?
```

1    A.    Yes.  There are different kinds of welds that are

2    identified by the type of joint that is being made.  In

3    discussions here you'll hear about a butt-weld fitting.

4    Well, a butt weld is a joint where two materials are butted

5    together and they happen to be welded.  It's a butt joint

6    because the two materials that are being joined together are

7    in approximately the same plane.

8          You can have joints that are T joints where one

9    member tees into another member.  You can have joints that

10   are lap joints where one member laps over the other joint.

11   You can also have joints where one member is perpendicular to

12   the other joint at the corner.  That's referred to as a

13   corner joint.

14         These type of joints can be made by welding.  They

15   can be made by brazing.  They can be made by soldering.  They

16   can be made by using adhesive bonding.

17   Q.    Mr. Sperko, are there industry standards applicable to

18   welds?

19   A.    Yes.  There are many standards applicable to welding.

20   Q.    You mentioned butt welds.  Are there industry standards

21   applicable to butt welds?

22   A.    When it comes to piping systems, there are a number of

23   standards that have been written by ASME, American Society of

24   Mechanical Engineers.  Those are the B31 standards that cover

25   piping systems in power plants, refineries, chemical plants,

```
 1   pharmaceutical plants.

 2           The majority of the welding that is done under

 3   those standards requires butt welding of piping systems

 4   together or other joints such as outlet connections.

 5   Q.   Now, let's talk about butt-weld pipe fittings.  What is

 6   a butt-weld pipe fitting?

 7   A.   A butt-weld pipe fitting is a fitting that is designed

 8   to join together a straight piece of pipe on the end of the

 9   pipe and, depending on the configuration of the fitting,

10   either it's an elbow or it's a T or some other configuration

11   where the pipe and the fittings are joined together and the

12   ends of the pipe and the ends of the fitting are in the same

13   plane.

14           The fitting itself matches up with the plane of the

15   pipe; that is, if I look at the definition of a butt joint

16   where two materials are joined together in the same plane, as

17   I go around the pipe, that plane is constant as I go around

18   the pipe.  So all the way around the pipe the materials that

19   are being joined are in the same plane.

20           So those are butt joints, and because they're

21   welded, they're referred to as butt-welding fittings.

22   Q.   Are there industry standards applicable to butt-weld

23   pipe fittings?

24   A.   Yes.

25   Q.   What are those industry standards?
```

Case 2:22-cv-00050-DCN-9-C  Document 99-7  Filed 06/27/22  Entered 06/27/22 14:54  of Desc Exhibit ID
Transcript of Day 3 of F54A Trial    Page 10 of 166

9

```
 1    A.    There are a number of them.  The most commonly used

 2    standard that describes the geometry of a butt-weld fitting

 3    is ASME B16.9.

 4    Q.    What welds are used with butt-weld pipe fittings?

 5    A.    Yes.  Butt-weld pipe fittings are specifically designed

 6    to be butt welded to pieces of pipe or to other butt-weld

 7    fittings.

 8    Q.    If you had to identify the one defining characteristic

 9    of a butt-weld pipe fitting, what would that defining

10    characteristic be?

11    A.    The joints between the members are butt joints; that is,

12    the joints are in the same plane in both members.

13    Q.    Now let's talk about welded outlets.  What is a welded

14    outlet?

15    A.    A welded outlet is a -- it's basically a small tube that

16    is designed to fit on the outside surface.  If you have a

17    piece of pipe, it's designed to fit on the outside surface of

18    the pipe.  The way it's installed is you cut a hole in the

19    pipe, you put this fitting over the outside of the south-side

20    surface of the pipe, and you weld that fitting to the pipe.

21          The other end of the fitting will have some kind of

22    connection.  In most fire protection piping systems, outlet

23    fittings are threaded on the outlet end so that the sprinkler

24    heads can be screwed into the outlet fitting which is

25    connected to the pipe that provides the water that makes the
```

```
 1    sprinkler system work.
 2    Q.    Are there industry standards applicable to welded
 3    outlets?
 4    A.    Yes.
 5    Q.    What are those standards?
 6    A.    The standard for welded outlets is a Manufacturers
 7    Standardization Society standard SP97.
 8    Q.    And what welds are used with welded outlets?
 9    A.    The weld that joins a welded outlet to the main pipe,
10    the run pipe.  What we refer to as the run pipe or the header
11    pipe is a corner joint; that is, the outlet sits on the
12    outside of the pipe.  If you look at the wall of the outlet
13    and you look at the wall of the pipe, it's a corner joint.
14    Q.    Based on the industry standards that we've been
15    discussing, would industry participants treat welded outlets
16    as butt-weld pipe fittings?
17    A.    No one that is in the industry dealing with piping would
18    ever confuse an outlet fitting with a butt-weld fitting.
19    Q.    Why is that so?
20    A.    Number one, because they're manufactured to different
21    standards.  Number two, they serve different purposes.
22    Q.    At this point I'd like you to take a look at
23    Exhibit 1089, which is the Uni-Let outlet, which should be up
24    there on the shelf someplace.
25              What is this exhibit, Mr. Sperko?
```

Case 2:22-cv-00051-JRG-RSP Document 195-7 Filed 06/27/22 Page 454 of 587 PageID
Transcript of Day 3 of Jury Trial    Page 12 of 166

11

1    A.    This is an outlet fitting.

2    Q.    Is there a marking or a brand name on that outlet

3    fitting?

4    A.    This outlet fitting is a Uni-Let.  I can tell that it's

5    an outlet fitting because it has the characteristic shape on

6    one end of the fitting that matches up to the outside

7    diameter of the pipe that it is intended to be joined to.

8    Q.    Let's take a look at another outlet, the Safe-Let

9    outlet.  Take a look at Exhibit 1090.  What is this,

10   Mr. Sperko?

11   A.    This is also an outlet fitting.  Again, I can tell it's

12   an outlet fitting because it's contoured to match the outside

13   surface of the pipe to which it will be attached, and it is

14   identified as a Safe-Let fitting.

15        MR. LAU:  At this point I would like to hand

16   physical Exhibit 1079 to the witness.  It's on the exhibit

17   list.

18        THE COURT:  Counsel, that exhibit has never been

19   received into evidence yet.

20        MR. LAU:  No, it has not, Your Honor.

21        THE COURT:  Why don't you show it to the plaintiff

22   first, and then we can pass it up.

23        MR. LAU:  Yes, Your Honor.

24        THE COURT:  Okay.  And this is marked as what?

25        MR. LAU:  Exhibit 1079.

```
 1              THE COURT:  Are you introducing it at this time?
 2              MR. LAU:  After the witness identifies it, yes,
 3    Your Honor.
 4    BY MR. LAU:
 5    Q.   Mr. Sperko, what is Exhibit 1079?
 6    A.   Exhibit 1079 is an example of a header pipe that would
 7    be attached -- that an outlet fitting has been attached to.
 8    You can say that the outlet fitting has been welded around.
 9              If I take the outlet fittings here, either the
10    Safe-Let or the Uni-Let, we can see that the outlet fitting
11    sits on the outside end of the pipe and can be welded to the
12    outside surface of the pipe.
13              MR. LAU:  At this point, Your Honor, I would like
14    to move Exhibit 1079 into evidence.
15              THE COURT:  It will be received.
16              (Exhibit 1079 received)
17    BY MR. LAU:
18    Q.   Mr. Sperko, for this exhibit what weld is used to attach
19    the outlet to the header pipe?
20    A.   The weld that joins the outlet to the header pipe is a
21    corner joint.  That is, if you look at the face of the
22    fitting and the face of the pipe, that joint is a corner
23    joint.  It's not a butt joint.
24    Q.   Would you ever use a butt weld to attach the outlet to
25    the header pipe?
```

```
1    A.    No.
2              MR. LAU:  At this point I would like to hand
3    physical Exhibit 1080 to the witness.
4              THE COURT:  Okay.
5    BY MR. LAU:
6    Q.    Mr. Sperko, what is Exhibit 1080?
7    A.    Exhibit 1080 used to be the same as Exhibit 1079 except
8    that it has been cut in half down the long axis so that the
9    connection between the outlet fitting and the header pipe --
10   that corner weld on that side, corner weld on that side,
11   corner weld all the way around -- is clearly evident.
12             MR. LAU:  Your Honor, I would like to move
13   Exhibit 1080 into evidence.
14             THE COURT:  It will be received.
15             (Exhibit 1080 received)
16             MR. LAU:  At this point I'd like to hand physical
17   Exhibit 1077 to the witness.
18   BY MR. LAU:
19   Q.    Mr. Sperko, what is Exhibit 1077?
20   A.    This is a piece of pipe.
21   Q.    Any particular type of piece of pipe?
22   A.    Well, it's got some identification markings on it.  This
23   particular piece of pipe has been prepared on its ends for
24   butt welding to either another piece of pipe or a pipe
25   fitting.  It's also been prepared to attach an outlet fitting
```

Case 2:22-cv-00050-RWS Document 197-7 Filed 06/27/22 Entered 06/27/22 Page 454 of 585 Exhibit ID
Transcript of Day 3 of FSA Trial    Page 15 of 166

14

 1   in that there is a hole in the pipe where an outlet fitting

 2   could be set over the hole and welded in place.

 3        MR. LAU:  Your Honor, at this point I'd like to

 4   move Exhibit 1077 into evidence.

 5        THE COURT:  It will be received.

 6        **(Exhibit 1077 received)**

 7   BY MR. LAU:

 8   Q.   Mr. Sperko, you said that the pipe that you're looking

 9   at had been prepared to receive a butt weld?

10   A.   Correct.

11   Q.   How do you know that?

12   A.   Because the ends of the pipe -- when you cut the pipe,

13   if you cut it with a saw, the ends are square.  To prepare it

14   for welding, what the welder will do is take a grinder or do

15   machining to put a bevel on that, on the face, the end face

16   on the end of the pipe.

17        MR. LAU:  At this point I'd like to hand

18   Exhibit 1083 to the witness.

19   BY MR. LAU:

20   Q.   Mr. Sperko, what is Exhibit 1083?

21   A.   Exhibit 1083 is a butt-welding T.

22        MR. LAU:  Your Honor, I'd like to move Exhibit 1083

23   into evidence.

24        THE COURT:  It will be received.

25        **(Exhibit 1083 received)**

1

2    BY MR. LAU:

3    Q.    When you say this is a butt-welding T, how do you know

4    it is a butt-welding T?

5    A.    Because the open ends of this T are square to the axis

6    of the T.  The ends have been beveled in preparation for

7    welding to join to a piece of pipe or some other pipe

8    fitting.

9    Q.    And how would those two -- how would the elbow and the

10   pipe be joined together?  What weld would be used?

11   A.    This would be -- this would be a butt weld.  You take

12   the pipe and the fittings and you would simply butt them

13   together, the pipe and the fittings both being in the same

14   plane.  Being in the same plane identifies a butt weld.

15           MR. LAU:  At this point I'd like to hand physical

16   Exhibit 1084 to the witness.

17   BY MR. LAU:

18   Q.    Mr. Sperko, what is physical Exhibit 1084?

19   A.    Exhibit 1084 is what is known as a pipe cap.

20   Q.    Any particular type of pipe cap?

21   A.    It is a butt-welding pipe cap.

22           MR. LAU:  Your Honor, I would like to move

23   Exhibit 1084 into evidence.

24           THE COURT:  It will be received.

25           **(Exhibit 1084 received)**

BY MR. LAU:

Q.   Mr. Sperko, you now have in front of you some welded

outlets, and you have in front of you some butt-weld fittings

and pipes and the Ts and the caps.  Is there any doubt in

your mind as to the difference between the pipe, the elbow,

and the cap on the one hand, and the Uni-Let and Safe-Let

welded outlets on the other?

A.   They -- the pipe fittings are butt-weld fittings; that

is, the cap and the T are butt-weld fittings.  The outlet

fittings are outlet fittings.  They're not the same thing.

Q.   Can you show me again how the cap might be attached to

the pipe.

A.   Sure.  I can take the cap and I would attach it to the

end of the pipe, or I could take the cap and I could attach

it to the end of the fitting as a -- by making a butt weld,

or to the outlet on the fitting, or to the other end of the

fitting.

Q.   Mr. Sperko, have you read the Commerce decision that

concluded that welded outlets are covered by the antidumping

duty order on butt-weld pipe fittings from China?

A.   Yes.

Q.   Based on the industry standards that we've been

discussing, do you think that a member of the industry could

have foreseen that Commerce would treat welded outlets as a

butt-weld pipe fitting?

```
 1   A.    No.

 2   Q.    Why do you say that?

 3   A.    Because a butt-weld fitting is designed to match up to

 4   the end of the piece of pipe.  It is a completely different

 5   fitting and has a completely different application from an

 6   outlet fitting which is designed to attach to the outside

 7   surface of the pipe and provide an additional path for

 8   whatever fluid is in the pipe to go out that outlet fitting.

 9              MR. LAU:  Thank you.  No further questions.

10              THE COURT:  Cross-examination.

11                      CROSS-EXAMINATION

12   BY MR. KRAMER:

13   Q.    Mr. Sperko, how many times in your career have you

14   testified as a paid expert witness?

15   A.    Probably five or six over the 40 years that I've been in

16   this.

17   Q.    And how many times have you been retained as a paid

18   expert witness?

19   A.    Probably 25, 30 times.

20   Q.    Now, in your career you've never had any role in

21   importing products, correct?

22   A.    I'm sorry?  Could you repeat.

23   Q.    Yes.  During your career you've never had any role in

24   importing products?

25   A.    No, I have not.
```

1    Q.    In fact, it would be fair to say that you have no

2    expertise as it relates to the U.S. import laws, correct?

3    A.    That is correct.

4    Q.    And specifically with respect to antidumping duty

5    orders, you have no expertise with respect to antidumping

6    duty orders, right?

7    A.    That is correct.

8    Q.    No one has ever consulted with you about how to comply

9    with an antidumping duty order?

10   A.    That is correct.

11   Q.    You've never received any training regarding antidumping

12   duty orders, right?

13   A.    I have not.

14   Q.    Now, you've testified about certain industry standards

15   today, and you've said that the reason we have industry

16   standards is so that products can be interchangeable, right?

17   A.    We have industry standards so that products can be

18   properly identified.

19   Q.    But industry standards are not designed to help protect

20   American industry from unfair foreign trade practices; are

21   they?

22   A.    Industry standards are designed to help industry to keep

23   costs down.

24   Q.    Mr. Sperko, that wasn't my question.  They are not

25   designed to protect American industry from unfair foreign

Case 2:22-000504-3-DCM19-7c Document-37/22-1 Entered 10 6/27/22 21 Page 2 484 of 565 c Exibit ID
Transcript of Day 3 of FCA Trial    Page 20 of 166

19

```
 1   trade competition; are they?
 2   A.   No, they are not.
 3   Q.   Now, you understand that the Department of Commerce is
 4   charged with establishing antidumping duty orders, correct?
 5   A.   That's what I understand, yes, sir.
 6   Q.   And you understand that the Department of Commerce is
 7   charged in the first instance with defining the scope of
 8   those orders?
 9            THE COURT:  Is that within the expertise?  Is that
10   within your expertise?
11            THE WITNESS:  No, sir, it is not.
12            THE COURT:  That's what I thought.  Okay.
13   BY MR. KRAMER:
14   Q.   When you formed your opinion in this case, at that time
15   you had no idea what the definition was that the Commerce
16   Department used for butt-weld fittings, correct?
17   A.   That is correct.
18   Q.   And as you sit here today, you know that the Department
19   of Commerce has ruled that SIGMA's welded outlets are
20   butt-weld pipe fittings within the meaning of the order,
21   correct?
22            THE COURT:  Counsel, I'm not too sure that's within
23   his expertise.  Go ahead.  He's not testifying to expertise
24   as far as customs, as far as the duties go.  Just as to
25   mechanics of pipes.
```

```
 1              MR. KRAMER:  Okay.
 2   BY MR. KRAMER:
 3   Q.    Mr. Sperko, you submitted an expert report to the
 4   Department of Commerce that was similar to what you just
 5   testified to here today, correct?
 6   A.    That is correct.
 7   Q.    And the Department of Commerce ruled, notwithstanding
 8   your report, that welded outlets in fact are butt-weld pipe
 9   fittings, given the definition in the antidumping duty order,
10   right?
11   A.    That's what I understand.
12   Q.    So I have just one last area to cover with you -- well,
13   two.  I'm sorry.
14              In forming your opinion, you consulted with SIGMA's
15   counsel, correct?
16   A.    I'm sorry.  I consulted with --
17   Q.    SIGMA's counsel.
18   A.    -- SIGMA's counsel before forming my opinion?
19   Q.    Yes.
20   A.    No.
21   Q.    You consulted with another importer's counsel before
22   forming your opinion?
23   A.    My initial contacts or my initial activities on this
24   were for a company called Vandewater.
25   Q.    Now, prior to forming your opinion, you did not consult
```

1    with any domestic manufacturers of welded outlets, correct?

2    A.    I'm sorry.  I'm having trouble understanding.

3    Q.    I said prior to forming your opinion, you did not

4    consult with any domestic manufacturers of welded outlets,

5    correct?

6    A.    No, I did not.

7    Q.    Mr. Sperko, in 2010 when SIGMA started to import the

8    Uni-Let, did they consult with you as to whether it was a

9    butt-weld pipe fitting?

10    A.    No.

11    Q.    And in 2016 when SIGMA started importing the Safe-Let,

12    did it consult with you as to whether it was a butt-weld pipe

13    fitting?

14    A.    No.

15    Q.    In fact, prior to this litigation SIGMA has never

16    consulted with you about anything; has it?

17    A.    Correct.

18    Q.    So the first time you ever had any contact with SIGMA

19    was after it learned that it was already under investigation,

20    correct?

21             THE COURT:  If you know.

22             THE WITNESS:  I have no idea.

23    BY MR. KRAMER:

24    Q.    And you do know, though, that SIGMA offered to pay you

25    to provide your opinion, correct?

Case 2:22-cv-00050-JPM Document 197 Filed 06/27/22 Entered 06/27/22 Page 444 of 587 Exhibit
Transcript of Day 3 of FCA Trial    Page 23 of 166

22

```
1    A.    That is correct.

2    Q.    And you know that one of the reasons that SIGMA retained

3    you is because it is hoping to avoid paying the 182.9 percent

4    antidumping duty on Chinese butt-weld pipe fittings, correct?

5    A.    I think they retained me for my expert opinion.

6    Q.    Mr. Sperko, do you recall testifying in this case in a

7    deposition?

8          THE COURT:  Counsel, I think the question that he

9    just answered is an improper question to begin with.

10         MR. KRAMER:  Then I --

11         THE COURT:  His expertise are only going towards

12   the pipes and pipe welding, et cetera, and not going towards

13   this particular action.

14         MR. KRAMER:  Fair enough, Your Honor.

15         THE COURT:  Hypotheticals.  He has to testify to

16   hypotheticals.

17         MR. KRAMER:  Okay.  Fair enough, Your Honor.

18         Thank you very much, Mr. Sperko.  I have no further

19   questions.

20         THE COURT:  Anything further?  Any recross?

21         MR. LAU:  No recross, Your Honor.

22         THE COURT:  Sir, you're free to go.  Thank you very

23   much for coming in.  I appreciate it.

24         MR. CURRAN:  Your Honor, at this time SIGMA would

25   like to call as its next witness Patricia Velazquez.
```

```
1              THE COURT:  Okay.

2         Patricia Velazquez, Defendant's witness, sworn

3              THE CLERK:  Would you please state your full name

4    for the record and spell your last name.

5              THE WITNESS:  Patricia Velazquez,

6    V-e-l-a-z-q-u-e-z.

7              THE COURT:  Okay.  You may inquire, counsel.

8              MR. CURRAN:  Thank you, Your Honor.

9                        DIRECT EXAMINATION

10   BY MR. CURRAN:

11   Q.   So, Ms. Velazquez, you had a shorter walk up to the

12   witness stand than most of our witnesses in this case.

13   A.   I did.

14   Q.   You've been sitting in and observing the trial so far as

15   SIGMA's corporate representative, correct?

16   A.   That's correct.

17   Q.   And you understand that each party in the case is

18   entitled to have one person sit in throughout the trial?

19   A.   Yes.

20   Q.   Ms. Velazquez, are you currently employed?

21   A.   Yes, I am.

22   Q.   And who are you employed by?

23   A.   SIGMA Corporation.

24   Q.   And how long have you been employed by SIGMA?

25   A.   Since 1999.
```

```
 1   Q.   Have you always been in the same geographic location at
 2   SIGMA?
 3   A.   Yes, I have.
 4   Q.   And where was that -- where is that?
 5   A.   Cream Ridge, New Jersey, headquarters at Cream Ridge.
 6   Q.   Where in New Jersey is Cream Ridge?
 7   A.   It's considered South Jersey.
 8   Q.   Closer to Philadelphia than New York?
 9   A.   Yes.
10   Q.   And what is your current position at SIGMA?
11   A.   Imports compliance and logistics manager.
12   Q.   What are your responsibilities?
13   A.   There's many, many responsibilities.  I oversee all the
14   accounting that's done for the imports division for SIGMA.  I
15   oversee the logistics to ensure that our shipments get from
16   point A to point B.
17        And importantly, the compliance, imports
18   compliance, and that's to ensure that we're following all
19   practices and procedures outlined by Customs.
20   Q.   Are you the senior-most person at SIGMA devoted to
21   import compliance?
22   A.   Yes, I am.
23   Q.   And how long have you been employed at SIGMA?
24   A.   I am going on 23 years -- 23 years.
25   Q.   And for how long of that 23-year employment period have
```

```
1    you had responsibilities relating to imports?

2    A.   Since 2001, so about 20 years, 21 years.

3    Q.   Do you currently have other folks at SIGMA who report to

4    you?

5    A.   I do.

6    Q.   How many, and what do they do?

7    A.   I currently have four.  Everyone is involved in the

8    compliance portion.  I have one person with the accounts

9    payable who pays all the bills for anything related to

10   imports.

11        I have two in logistics and compliance.  I have

12   another one who handles our filings, scanning, and things of

13   that nature.  I actually have another one that started today

14   and I'm unfortunately not there.  So another one is coming on

15   board.

16   Q.   And to whom do you report?

17   A.   I report to Jeff Marcus, the CFO of SIGMA Corporation.

18   Q.   Right.  Now, when did you assume your current position?

19   A.   In June of 2019.

20   Q.   And who held the position before you?

21   A.   Inge Atkinson.

22   Q.   And who held the position before her?

23   A.   Andy Podner.

24   Q.   And who held the position before him?

25   A.   Pat Thacker.
```

Case 2:22-cv-00050-DCN-1 Document 19-7 Filed 06/27/22 Entered 06/27/22 Page 448 of 587 Exhibit Page ID
Transcript of Day 3 of BGA Trial    Page 27 of 166

26

```
 1    Q.   Did you work closely with those three?

 2    A.   I did.  Prior to my role as import manager, I was also

 3    the manager for accounts payable import division.  So I was

 4    responsible to audit and pay any bills related to imports, so

 5    I worked with them on a day-to-day, all-day basis since 2001.

 6    Q.   Can you explain what that means when you say you audit

 7    the import function?

 8    A.   Certainly.  In a payable function you must audit any

 9    document that comes in to ensure that you're paying the

10    correct amount.  If there's any variances or any

11    discrepancies, you want to take that up before you send a

12    payment to anybody.  So that was my primary role for many

13    years since 2001, the accounts payable imports division.

14         I need to audit to check that the documentation was

15    there.  That would include the supplier commercial invoice,

16    the packing list, the bill of lading, any certificates, the

17    mill cert, country of origin; the 7501, which is the entry

18    summary which is required for every shipment that comes into

19    the U.S.; and any other documents, landed costs, ocean

20    freight bills, inland freight bills; any charges that were at

21    the ports, the U.S. ports -- really anything related to

22    imports that cost, that had a cost to it.

23    Q.   So in that prior position did you become familiar with

24    the day-to-day practices and policies followed by

25    Ms. Thacker, Mr. Podner, and Ms. Atkinson?
```

```
 1    A.   Yes, of course.  I needed to know those in order to do
 2    my job.
 3    Q.   Can you elaborate on that?  Why did you need to know
 4    that stuff?
 5    A.   I needed to understand if there were any discrepancies,
 6    how to find them.  What was the compliance requirements and
 7    were we meeting them.  I wasn't responsible for some of them,
 8    but I was responsible to be accountable to audit them.
 9    Q.   At some point did you become sufficiently familiar with
10    the responsibilities of those three predecessors that you
11    filled in for them from time to time?
12    A.   Yes.  I've really been responsible for my portion on the
13    accounts payable side since 2001, so that audit function
14    remained all through.  In 2019 when I became the import
15    manager, I then had to take also -- in addition to my
16    responsibilities, I had to take also the personal
17    responsibility for the compliance portion of all of theirs.
18    Q.   I'm asking you, before you even took over as the manager
19    in charge of import compliance, did you from time to time
20    have to fill in for --
21    A.   I'm sorry.
22    Q.   -- one or more of your three predecessors and take over
23    their responsibilities?
24    A.   Yes.  I'm sorry.  I did have to cover for Inge twice.
25    Two times she went on maternity leave.  One was in 2015 for
```

Case 2:22-cv-00050-DCN-19-7c    Document 06/27/21    Entered 106/27/22 Page 450 of 567 Exhibit
Transcript of Day 3 of FCA Trial    Page 29 of 166

28

```
1    her maternity leave.  The second one was in 2018 for her
2    second maternity leave.
3    Q.   And do you know why you were the person filling in for
4    Ms. Atkinson during her maternity leaves?
5    A.   Yes.  I was the one that knew all the compliances and
6    practices they already maintained.  I worked very closely
7    with her team on a day-to-day basis.  They were familiar with
8    me.  I was familiar with them.  I understood their
9    responsibilities.  I understood everything that was needed to
10   be done.
11        So when she was on maternity leave, it made me
12   responsible to handle all of those.  I relied on the broker.
13   I hadn't done her job for all of those years, but I did her
14   job, her complete job, while she was on maternity leave for a
15   few months each time -- in conjunction with the broker who
16   assisted me in any questions that I may have had.
17   Q.   Okay.  Ms. Velazquez, in the year 2013 did Customs do a
18   focused assessment at SIGMA?
19   A.   Yes, they did.
20   Q.   And you've heard some testimony about that in this
21   trial?
22   A.   I have.
23   Q.   What was your personal involvement in that focused
24   assessment?
25   A.   I was the point person for all audits done at SIGMA, and
```

```
 1    that would include the focused assessment as well as any

 2    financial audits that were done.  The focused assessment was

 3    based on U.S. Customs.

 4          I've also been involved in CBSA, which is the

 5    Canadian version of Customs, audit.  I've been involved in

 6    outside audits, internal audits.  SIGMA also had their own

 7    internal audits on practices, so I had been involved in those

 8    as well.  So I would be the primary point person for all

 9    audits.

10    Q.   Focusing, so to speak, on this 2013 focused assessment

11    in particular, what did you do in connection with the Customs

12    audit or assessment?

13    A.   I provided all the documentation that was needed.  I

14    reviewed the -- we had to supply -- the accounting department

15    was responsible to supply all the purchase orders that had

16    been done in a year's span, right.

17          So we provided all that detail, and this would

18    allow the auditors to pick any one, any selection that they

19    needed to review.  Any questions that they had about the

20    documentation or if they needed to see any additional

21    information, I would have assisted in answering those

22    questions.

23    Q.   Okay.  Please tell the jury what the Customs

24    investigators did.  Were they physically at SIGMA

25    headquarters?
```

```
 1    A.    This was the longest audit I have ever attended by far.

 2    They were physically at the Cream Ridge office.  The audit, I

 3    believe, took approximately five months.  A standard audit

 4    for SIGMA would be about two weeks, so they were there

 5    extensively.

 6           They were looking to ensure that we were following

 7    all policies and practices outlined by Customs.

 8    Q.    And what did they do on a day-to-day basis while they

 9    were on your premises?

10    A.    They asked a lot of questions.  They reviewed all the

11    documents that we had provided -- let me just back up a

12    little bit and take a sip.  They reviewed all of our

13    purchases, and they selected ones that they felt needed to be

14    sampled.

15           I walked them through all of our documents, what

16    each document meant, what a commercial invoice was, what a

17    packing list was, what our bill of ladings looked like, what

18    our purchase orders looked like, our shipping records, our

19    receiving records, our freight invoices, all of our landed

20    costs; the duty packs, which were the 7501s.  I assume

21    everyone has seen many of those here.

22           So anything related, anything needed they were

23    looking into, and they would ask questions about those

24    documents.  So I would answer them.

25    Q.    Okay.  Were you their principal contact on a day-to-day
```

```
 1   basis?
 2   A.    I was one of the principal contacts.  Andy Podner was
 3   the other.
 4   Q.    Okay.
 5           MR. CURRAN:  I'd like, Mr. Ball, if you will, to
 6   please put up the focused assessment.  This is Exhibit 1006
 7   which has already been admitted into evidence.
 8   BY MR. CURRAN:
 9   Q.    Ms. Velazquez, are you familiar with this multi-page
10   document from U.S. Customs?
11   A.    Yes, I am.
12   Q.    I'd like to ask some specific questions about it.  What
13   is this document?
14   A.    This is the final report surrounding their audit, the
15   focused assessment answer.  It -- it will let us know whether
16   we passed or failed the audit.
17   Q.    And what's your understanding?  Did SIGMA pass or fail?
18   A.    Oh, yes, we passed.
19   Q.    All right.
20           MR. CURRAN:  Mr. Ball, can you show the whole first
21   page.
22   BY MR. CURRAN:
23   Q.    Ms. Velazquez, I do want to refer your attention to some
24   of the other pages in here.  So the second page, this is
25   after the cover letter.  So this is the first page of the
```

```
 1    actual report, correct?

 2    A.    Yes.

 3    Q.    And the next page is the table of contents?

 4    A.    Correct.

 5    Q.    And then the next page is the beginning of the body of

 6    the report, correct?

 7    A.    Yes.  That's correct.

 8    Q.    And this page under objective, scope, and methodology,

 9    it refers to this focused inquiry as an audit, correct?

10    A.    That's correct.

11    Q.    And then you know that there has been some discussion in

12    this trial about whether antidumping duties were part of the

13    Customs assessment or audit.

14    A.    Yes.

15    Q.    Were they?

16    A.    Yes, of course.

17    Q.    Can you explain and elaborate upon that?

18    A.    In their samples, they actually did pull samples that

19    did have antidumping on them, and they found that we were

20    compliant.  We were paying the duties for those items.  We

21    had announced them.  They were included in our Customs bond.

22          Every year we have -- you have a Customs bond that

23    you have to apply for which essentially is insurance right on

24    your product that's shipping from overseas or anywhere from

25    the time that it leaves to the time that it becomes yours.
```

1    At that point you need to notify your bond or your

2    surety company whether or not you have any antidumping, how

3    much you pay, and what's applicable.  I was responsible to do

4    that every year.

5    Q.   Now, Ms. Velazquez, focusing on this report, do you see

6    at the bottom of this page right before that first bullet

7    point, it says:  For each identified review area, in order to

8    determine if risk is acceptable, we assessed the applicable

9    internal control over compliance by applying the following

10   procedures.  Do you see that?

11   A.   Yes.

12   Q.   Then I want to refer your attention to the third bullet

13   point under that, and that requires us to go to the next

14   page.  So it's the second bullet point on this page.

15       MR. CURRAN:  Mr. Ball, can you show that it's the

16   second bullet point.

17   BY MR. CURRAN:

18   Q.   Do you see that reference there, Ms. Velazquez, to

19   antidumping duty?

20   A.   Yes, I do.

21   Q.   What is the significance, if any, of the reference there

22   to antidumping duty?

23   A.   It's showing that they included that in their selection.

24   Q.   And do you see two bullet points below that there's a

25   reference to analyze the sample items above and assess each

Case 2:22-cv-00050-RM-JCW Document 9-7 Filed 06/27/22 Entered 06/27/22 Page 456 of 587 Exhibit ID
Transcript of Day 3 of FCA Trial    Page 35 of 166

34

```
 1    item's compliance with applicable laws and regulations,

 2    including?

 3    A.    Yes.

 4    Q.    And do you see the fourth circle below that?

 5    A.    Yes, I do.

 6    Q.    Again you see a reference there to antidumping duties?

 7    A.    Yes.

 8    Q.    What's the significance of that reference?

 9    A.    Again, that they reviewed antidumping orders.

10    Q.    At the bottom of this page --

11    A.    I just want to back up real quick.  Not only did they

12    review antidumping orders and any items that currently had

13    antidumping on them in the selection, they were also

14    reviewing our policies and practices.  I just want to make

15    sure that that's out there.

16    Q.    So in the course of this audit, did Customs identify any

17    circumstances where SIGMA was not paying antidumping duties

18    and they should have been?

19    A.    No, they did not.

20    Q.    And then at the bottom of this page, the last full

21    sentence, do you see:  We conducted this performance audit in

22    accordance with generally accepted government auditing

23    standards?

24    A.    Yes, I do.

25    Q.    Do you have an understanding as to what that sentence
```

```
 1   communicates?

 2   A.    Pretty much what it says.  You would expect Customs to

 3   understand what the accepted government auditing standards

 4   were and that they were followed.

 5   Q.    And then the final page, which is Exhibit 6, that

 6   reports the summary of the audit results, right?

 7   A.    Yes, that's correct.

 8   Q.    And, as you say, SIGMA passed the audit, correct?

 9   A.    Yes.  It's a pass or fail.  There is no grade.  It's a

10   pass or fail, and we passed.

11   Q.    And do you see the sentence under summary of audit

12   results, the second sentence there:  Our audit did not

13   disclose any significant risk in SIGMA's internal controls

14   related to its import activities?

15   A.    Yes.

16   Q.    What is your understanding of internal controls?  What

17   does that mean to you?

18   A.    That we followed all compliance and regulations that

19   were laid out by every importer and that we passed.

20   Q.    Okay.  And this report is signed by two officials from

21   Customs, correct?

22   A.    Yes, that's correct.

23   Q.    One from the Philadelphia field office and the other

24   from the port in Houston?

25   A.    Yes, that's correct.
```

```
 1    Q.   Now, Ms. Velazquez, you're aware that there's an

 2    appendix to the Customs report, correct?

 3    A.   Yes, I am.

 4         MR. CURRAN:  Mr. Ball, can you show page 7 of this

 5    exhibit.

 6    BY MR. CURRAN:

 7    Q.   Ms. Velazquez, what is this appendix?

 8    A.   This was a letter drafted from Andy Podner who was the

 9    imports manager at the time to Mr. Jim Williams.  He was one

10    of the auditors.  He was the lead auditor that was in-house

11    at SIGMA's headquarters.

12    Q.   Do you have an understanding as to the purpose of this

13    letter?

14    A.   The purpose of this letter is a standard thing that

15    SIGMA would do.  Anytime you're audited, you pay close

16    attention to the questions that are asked of you.  If you

17    felt like the documents didn't speak for themselves or they

18    had additional questions on certain documents, then you would

19    do a follow-up.

20         Well, you do a follow-up anyway thanking them for

21    their time and service and all of that, but you would also

22    mention things that you would do going forward that could

23    benefit and make it maybe clearer to any auditors, certainly

24    to lessen time for auditors to be there because it is costly.

25    Q.   Now, Ms. Velazquez, in this letter Mr. Podner identified
```

1    certain follow-up items that SIGMA may undertake, correct?

2    A.    Yes.  Yes, that's true.  I just want to note on the

3    bottom, at the very bottom, the last paragraph, if we can

4    note that.  This is not anything that Customs asked us to do.

5    This was something that we suggested could help for clarity

6    on any future audits.

7    Q.    Okay.

8            MR. CURRAN:  Let me ask Mr. Ball to show the bottom

9    of page 7 where it -- where there's a sentence that begins on

10   that page:  Though we have not been specifically asked to do

11   these things, we feel -- then to the next page -- we feel

12   that going through the focused assessment has provided us the

13   opportunity to improve our organization, and it is our goal

14   to improve in any way we can.

15   BY MR. CURRAN:

16   Q.    Do you see that language, Ms. Velazquez?

17   A.    Yes, and that would be a standard.  We would -- a

18   standard reply to any audit if -- again, if there was

19   additional questions or that you felt that didn't come out

20   clear.

21           When I say didn't come out clear, that you had to

22   explain things either once or twice -- more than once, I

23   should say -- you certainly would list them here.

24   Q.    Ms. Velazquez, did SIGMA in fact undertake to follow up

25   on the items listed in this letter?

```
1    A.    We did.

2    Q.    And I want to direct your attention to the last sentence

3    in this letter.  Do you see where it says:  From both myself

4    and Patty, thank you again for everything.  We look forward

5    to seeing you at the INTA conference?

6    A.    Yes.

7    Q.    Do you have an understanding as to who the reference to

8    Patty is?

9    A.    That would be me, Patricia, Patty.  I go by Patty.

10   Q.    Ms. Velazquez, was this 2013 Customs audit the only

11   audit of SIGMA conducted by Customs in the period from, say,

12   2010 to present?

13   A.    No.  Actually we're audited all the time.  This was the

14   only Customs audit, a formal Customs audit, I would say.

15   Customs does submit questions just like they would for any

16   importer.

17         If they need to look at our goods at port -- which

18   is a common practice at every port, and SIGMA does import to

19   all the major ports in the U.S. -- I mean, focused intensive

20   exams are done.  That would also be considered an audit.

21   They're auditing your material at the port.

22         In the ten-year span I believe 400 to 500 exams

23   were done at port.  They also included the welded outlets

24   both in L.A. and Houston.  Other audits, financial audits,

25   were done.  Our documents were reviewed many times by our
```

```
 1    bank.  Of course, they ensure that we are compliant.  It's
 2    not their sole responsibility to see if we're complying to
 3    the U.S. Customs or Canadian Customs; however, it is
 4    important to them that we are, so they do review our
 5    practices.
 6    Q.   With respect to Customs intensive audits that you
 7    referred to at the ports, can you just elaborate upon what
 8    Customs does as part of that process?
 9    A.   First and foremost they review your paperwork.  You have
10    to provide an entry summary -- a duty pack which has the
11    supplier's commercial invoice, the bill of lading, the
12    packing list, the 7501 and any other add-ons to that, any
13    certificates, country of origins, things of that nature.
14         They also are checking to make sure that there's no
15    change on the seal on the container.  They'll request you to
16    allow them to open your container to take the items out,
17    review them.
18         They will also X-ray them, check to make sure that
19    the characteristics match up to the paperwork, that the
20    material matches up to the paperwork, meaning if it's iron or
21    steel, that that matches to the HTS code.  Could be anything.
22         They could open the container to see if there's any
23    agriculture issues within the container.  That would be if
24    any seeds had made their way over or anything like that.
25    It's a multitude of things they would be looking for, but
```

```
 1    those are the ones that happen the most often.

 2    Q.   Did Customs perform intensive audits specifically on

 3    welded outlets from China such as the Uni-Let or Safe-Let

 4    products?

 5    A.   Yes, they did.

 6    Q.   How do you know that?

 7    A.   I'm responsible to audit and pay those bills.  Each time

 8    an exam happens, you yourself would also pull the bills just

 9    to see if potentially there is any liability in there.  This

10    is your third, fourth, fifth check at this point.  So you

11    look at the documents, and Uni-Lets were included in both

12    L.A. and Houston in their exams.

13    Q.   Ms. Velazquez, at any time during either the focused

14    assessment in 2013 or these intensive audits, intensive exams

15    at the ports or otherwise, did Customs ever raise any issue

16    with SIGMA as to the paperwork or whether antidumping duties

17    were due on the Uni-Let or Safe-Let products?

18    A.   No, they did not.

19    Q.   Ms. Velazquez, are you generally familiar with or aware

20    of the policies and practices that SIGMA followed with

21    respect to classification and antidumping duties for the

22    period 2010 to present?

23    A.   Yes, I am.

24    Q.   What are those policies and practices?  What does SIGMA

25    do with respect to classification and antidumping duties?
```

```
 1    A.    The screen wasn't here.  It's standard.  These actually

 2    have been standard policies and practices since I walked in

 3    the door in 1999.  So, of course, they were also done in 2010

 4    through today.

 5          We start with something called an NIR, which is a

 6    new item request.  In 2010 this would have been done on a

 7    paper form.  In 2014 we just changed that over to an

 8    electronic form.  New item request is when a sales rep or a

 9    customer service representative has an opportunity for new

10    business or a customer has called and asked SIGMA, will you

11    make this product; can you make this product for us; we're

12    looking for a product either from India, China, domestic

13    within the U.S., the purchasing department, engineering would

14    fill out the first part of the NIR.

15          This NIR would provide the material.  We do a lot

16    work in iron and steel, so what type of.  It would provide

17    the specifications.  It would also advise on the standards,

18    the item standards, the industry item standards, the size of

19    the item, the description of the item.

20          That would include SIGMA's description as well as

21    what it is you -- how it's used in the industry, whether or

22    not it's a fully-assembled item or just a component to a

23    fully-assembled item.  It would provide a suggested item

24    number, the country of origin, where we intend to purchase

25    the item from, drawings, any brochures that the customer may
```

Case 2:22-00050-DCN-9-7c Document 19-1 Filed 06/27/22 Entered 06/27/22 Page 464 of 587 Exhibit
Transcript of Day 3 of FSA Trial    Page 43 of 166

42

```
 1   have.  That could be a reference to a website that they have

 2   or a paper form of a brochure.

 3          So all of this in the electronic version jumps from

 4   department to department to department electronically.  Once

 5   one person or one department has filled out one section, it

 6   then jumps to the next.  So all the material that I just

 7   mentioned, once that's completed, it then jumps to the import

 8   department.

 9          We would be responsible to classify that item and

10   note if there's any antidumping on that item or any other

11   added tariffs such as the section 301 China tariff, GSP if

12   GSP was applicable, section 232.  There's many add-ons to not

13   just antidumping duty.  You would be checking all of them.

14          You also would note on that if you approved the

15   item, if you consulted with your broker, if you consulted

16   with counsel or a compliance consultant or other.  You must

17   fill out these boxes in order to move on.

18          You would also provide the standard duty rate, the

19   rate of antidumping.  And there's a box for notes for any

20   other added costs, any other added tariff or HTS that had a

21   value to it.  The intention to do this is so sales would know

22   how much it would cost.  And this would be a determining

23   factor on if we would proceed with producing this material.

24   Q.   Were there circumstances in which SIGMA declined to

25   proceed with a potential product?
```

43

```
1    A.    Absolutely.

2    Q.    Due to concerns about duties?

3    A.    Concerns about duties.  It could be something as simple

4    as maybe the salesperson thought that the duty was going to

5    be zero but it was five percent, and maybe we wouldn't find a

6    good margin on that.  So we might not go through with that.

7              Certainly antidumping.  Again, we were paying

8    antidumping.  Antidumping rate could be a different rate.

9    It's not always 182 percent.  It could just be a two percent

10   add-on or what have you if there's a special rate added.  So

11   you would note that, and that would again allow you to

12   determine whether or not you'll make a profit on this.

13             Same thing with the 301 tariff, which is

14   25 percent, which we pay on most of our product coming in.

15   We would note that, again to see if there's a profit.  If

16   there's not a profit in continuing, if I find that there's a

17   range, it's not me who will determine whether or not SIGMA

18   will continue.  This is executive management that would

19   decide that.

20             It's my job to tell them how much, right.  We just

21   wouldn't -- if we're not going to make a profit, there's no

22   sense in continuing to do that.

23   Q.    Ms. Velazquez, specifically with respect to antidumping

24   duties, how does SIGMA determine whether or not antidumping

25   duties are applicable?
```

    1    A.    There's multiple ways to check on that.  I believe Kelli

    2    Thompson actually referenced quite a few.  One of them was --

    3    she mentioned the ITA Excel sheet.  This is just a simple way

    4    to go and narrow down a scope.  It provides for every ruling,

    5    and it's updated often.

    6            My responsibility is to keep those records, you

    7    know, updated at all times.  You can pull it by the country

    8    of origin, as she mentioned.  You can pull by the type of

    9    material you're using, its use.  It really doesn't give you

   10    much information there, but it's a way you can look at it.

   11            CROSS, which is found in CBP.gov, that would be a

   12    site I would use every single time.  CROSS not only assists

   13    you with the classification of an item.  If there's any

   14    investigation, preliminary investigation, ongoing

   15    investigation, final decisions on any orders, if a supplier

   16    has requested for a ruling to be done -- an importer, I'm

   17    sorry, had requested for a ruling to be done by Customs, to

   18    let them know what the classification is, and that would be

   19    listed there.

   20            In this -- in CROSS, which I find is the most

   21    valuable one, you're going to pull by many, many things,

   22    right.  You have this section where, just like anytime you're

   23    Googling anything, it's the same type of thing in a search

   24    box.  You're going to pull by different variations of a

   25    description.

1            In the case of a welded outlet, you would type in

2       welded outlet or weld outlet or outlet.  You're going to

3       certainly look for those that apply to the country of origin

4       that you're intending to import it from.

5            You would look for the HTS code as well.  Now, you

6       need to do that in conjunction with any description, but when

7       you do the HTS code lookup, you're not looking at it by the

8       ten digit.  You would start at a six-digit level, which is a

9       broader scale, and then work your way down.

10      Q.   So you would cast a broader net first?

11      A.   You cast a broader net in both the description as well

12      as the HTS code.

13      Q.   What is the role, if any, of your outside Customs

14      brokers in either classification or antidumping duty

15      determination?

16      A.   In SIGMA's standard operation procedure, SOP as we call

17      it, this is written guidelines that we have with our broker

18      that states what they would be responsible for in every area

19      of work that they would do on our behalf.

20           One of the daily work would also include an

21      antidumping review.  There's quite -- it's a little lengthy.

22      Do you want me to go through every one?  I certainly can.

23           When we're doing -- I just want to go back to the

24      NIR.  When we're doing the NIR and we're doing the

25      classification review for antidumping, if it's an add-on, you

 1    can check with the broker.  If it's a new item, a new product
 2    line, you always would check with the broker.
 3              We do something called a blind check.  This is
 4    where all the material that's provided to the import
 5    department to classify an item would be provided to the
 6    broker.  You would not provide your HTS code.  You would not
 7    provide what your determination was.
 8              What you want them to do is to come to their own
 9    conclusion and see if it matches up to yours to ensure that
10    if they meet, you're good.  If they don't meet, why did they
11    not meet.  And you're able to talk through any
12    indiscrepancies [sic].
13              We also require for CH Powell, who is our broker --
14    they have been our exclusive broker since 2012.  We require
15    for them to notify us anytime our entries are flagged for
16    antidumping, and that happens numerous times a day.  That
17    allows us again to review the scope.
18    Q.   Let's jump to a document familiar I think probably to
19    everybody in this room, one example of the 7501 for the
20    products at issue in this case.
21              MR. CURRAN:  So I'd like to ask Mr. Ball to bring
22    up trial Exhibit 1009.
23    BY MR. CURRAN:
24    Q.   So, Ms. Velazquez, are you familiar with this document?
25    A.   Yes, I am.

Case 2:22-cr-00050-JPM-19-jc   Document 9-7   Filed 06/27/22   Entered 06/27/22 17:24:54   of 587   Exhibit PageID
Transcript of Day 3 of FCA Trial    Page 48 of 166

47

```
 1    Q.   All right.  What is it?

 2    A.   This -- it's a form 7501, also known as an entry

 3    summary.

 4    Q.   Do you know how SIGMA came up with the -- let's start

 5    with the classification HTS code for the pipe fitting

 6    referred to in this 7501.

 7    A.   There's two.  There's two, actually, pipe fitting

 8    references.

 9    Q.   Let's start with the one at line 001.

10    A.   001.

11    Q.   In box 28.

12    A.   All right.  Ask your question again.  I'm sorry.

13    Q.   How did SIGMA or its broker come up with the HTS code to

14    be used for that imported product?

15    A.   This HTS code, this is for the Uni-Let products or the

16    weld outlets.  This particular HTS code we inherited from

17    Unique when we purchased that portion of their

18    fire-protection unit back in 2010.  They provided that.

19         We also checked, you know, did our normal routine

20    checking with our broker, checking to ensure the

21    classification did meet their description.  We had the

22    drawing -- we would have the same material that we had for

23    anything else.  And that's how the HTS was determined.

24    Q.   There are words or abbreviations above the numbers.  You

25    see the number 7307.99.5045?
```

Case 2:22-cv-00050-DCN-9-jc    Document 19-7    Filed 06/27/22    Entered 06/27/22 17:24:54   Desc Exhibit
Case 2:22-cv-00050-DCN-9-jc    Document 19-7    Filed 06/27/22    Page 470 of 587   Page ID
Transcript of Day 3 of FDA Trial    Page 49 of 166

48

```
 1    A.    Yes.

 2    Q.    Then there's some words above that.  Where do those come

 3    from?

 4    A.    Those actually come from -- our broker has an approved

 5    Customs -- what is the word -- software.  The software meets

 6    up with ACE.  ACE is Customs' actual software that links in

 7    where the 7501 is entered into Customs' system.

 8          When the broker types in 7307.99.5045 in auto

 9    description, it auto-generates a description, and this would

10    be that description.

11    Q.    So that description is kind of auto-populated by the

12    software?

13    A.    That's correct.

14    Q.    All right.  What -- you know there's been reference to

15    the term steel coupling that you see there I guess twice in

16    box 28?

17    A.    Yes.

18    Q.    Where does that come from?

19    A.    This comes from -- I just want to go back up a little

20    bit.  Stay where you're at, but if you could highlight 28,

21    the description of merchandise.  This is a header.  This is

22    considered a header screen or a header portion of the column.

23          This is referenced on the bill of lading or the

24    documentation.  The word steel coupling is referenced on the

25    documentation.  So if you look right above steel coupling,
```

```
1    this would be also the bill of lading number.  The invoice

2    number is also listed below where it says steel couplings.

3    39803 would be SIGMA's shipment number.  These are also

4    referenced on documents.

5           So the broker would fill in anything that's

6    referenced on any of the documents that are listed.

7    Q.   So the term steel coupling originates from documents

8    provided by the supplier?

9    A.   Correct, in the duty pack.

10   Q.   But this 7501 form is filed on behalf of SIGMA, right?

11   A.   That's correct.

12   Q.   And particularly by its licensed Customs broker?

13   A.   That's correct.

14   Q.   But you have to be comfortable with -- you have to be

15   comfortable with the contents of the whole document, right?

16   A.   Yes, absolutely.

17   Q.   Is SIGMA comfortable with the term steel coupling being

18   in box 28?

19   A.   Yes, we are.

20   Q.   Why?

21   A.   It says -- so for a 7501, for some of you, I've always

22   looked at it as very similar to a 1040 tax form.  There are

23   instructions for all boxes.  All locations, everything that's

24   listed here by Customs, there are instructions for that.  For

25   box 28, it does state to use -- similar to the tariff
```

1    description, you want to use something that is not cut off

2    such as pipe fit, other, no NIP, ST.  You want to be able to

3    use something that's actually a full word.  I don't know how

4    else to explain that.  Easily recognizable I guess would be

5    the best way to explain that.

6            And again, you would want that to match up to the

7    tariff schedule.

8            MR. CURRAN:  Okay.  So I'm going to ask Mr. Ball to

9    jump to trial Exhibit 1047 at page 1.  This may not be

10   admitted yet, but I believe there's no objection to it, 1047,

11   which is the instructions for filling out the 7501.

12   Your Honor, I move for the admission of Exhibit 1047.

13           THE COURT:  It will be received.

14           **(Exhibit 1047 received)**

15           MR. CURRAN:  Mr. Ball, you can put that up.  Thank

16   you.

17   BY MR. CURRAN:

18   Q.   Beginning with page 1, looking at page 1, Ms. Velazquez,

19   do you know what this document is?

20   A.   Yes.  This would be a blank entry summary or form 7501.

21           MR. CURRAN:  Mr. Ball, can you go to the second

22   page.

23   BY MR. CURRAN:

24   Q.   Ms. Velazquez, that's a continuation of the form,

25   correct?

```
 1   A.   Yes, it is.  This is used when there's multiple HTS
 2   codes used.  It goes on to the next page.
 3   Q.   And then the third page is also part of the sample 7501,
 4   correct?
 5   A.   That is correct.
 6   Q.   Then page 4 begins the instructions for filling out the
 7   form, correct?
 8   A.   That's correct.
 9   Q.   And you can see in the bottom right of the page in the
10   very small print, this is instruction page 1 of 22, right?
11   A.   That's correct.
12   Q.   And that indicates that the instructions for filling out
13   the 7501 is a 22-page document, right?
14   A.   It's pretty elaborate, yes.
15            MR. CURRAN:  I'd like to jump specifically to the
16   page of the exhibit, so Exhibit 1047 at page 13.  You can see
17   in the bottom right this is page 10 of 22.
18   BY MR. CURRAN:
19   Q.   In the upper part of this page, do you see,
20   Ms. Velazquez, it refers to column 28, description of
21   merchandise?
22   A.   Yes.
23   Q.   And that's where the instructions are for filling out
24   column or block 28, correct?
25   A.   That's correct.
```

```
 1    Q.   I'd like to draw your attention to the first paragraph

 2    under those instructions.  I don't need to read it.  I would

 3    like you to explain your understanding of what it requires.

 4    A.   Well, first and foremost it says a description of the

 5    articles in sufficient detail to permit the classification

 6    therefor under the proper statistical reporting number in

 7    the HTS.

 8           This should be reported at the top of column 28.

 9    The standard definitions from CBP HTS database are acceptable

10    for this requirement.

11    Q.   Okay.  So that first sentence refers to at the top of

12    column 28.  That's the end of that sentence, right?

13    A.   Yes.

14    Q.   Is that the part of the form when we were looking at

15    Exhibit 1009 and you referred to it -- did you refer to it as

16    the header?

17    A.   Yes.

18    Q.   And the header and top refers to the same thing?

19    A.   Yes.

20    Q.   So that first sentence -- well, maybe both of those

21    sentences relate to the description of the product where

22    SIGMA uses steel coupling?

23    A.   Yes.

24    Q.   And the two sentences in the instruction here both refer

25    to the HTS or harmonized tariff schedule?
```

```
 1    A.    Yes.

 2    Q.    And did you say your understanding is that the

 3    appropriate description under these instructions should come

 4    from the harmonized tariff schedule?

 5    A.    Yes.  That's correct.

 6    Q.    Why didn't SIGMA or its broker just put in weld outlets

 7    or welded outlets or Uni-Let?

 8           MR. KRAMER:  Objection.  Lack of personal

 9    knowledge.

10           THE COURT:  If you know.

11           THE WITNESS:  Wait.  I do have personal knowledge.

12           THE COURT:  Okay.  If you know, you can answer the

13    question.

14           THE WITNESS:  Okay.  Welded outlets is not listed

15    in the harmonized tariff schedule.  You need to use something

16    that is listed in the harmonized tariff schedule.  Again, in

17    the first sentence you need to use sufficient detail to

18    describe that item.

19           The harmonized tariff schedule for welded outlets

20    is pipe fittings.  It does provide for the examples, and then

21    it goes to other, other, other, other category.  Sufficient

22    detail is not other, other, other, other.

23           MR. CURRAN:  I'd now like Mr. Ball to bring up

24    trial Exhibit 1068, starting with page 1.

25    BY MR. CURRAN:
```

Case 2:22-0005043-DCN19-7c Elec.u06/27/221 Entered 10612722 Page 454 of 565c Exh.gelD
Transcript of Day 3 of BCA Trial    Page 55 of 166

54

```
 1   Q.   Ms. Velazquez, what is this?

 2   A.   This is the harmonized tariff schedule.

 3   Q.   And in particular, what part of it?

 4   A.   This is chapter 73, which is for articles of iron or

 5   steel.

 6   Q.   Do you spend a lot time in this chapter of the HTS?

 7   A.   Yes, I have.

 8   Q.   I'd like to direct your attention to page 5 of this

 9   exhibit.  What is this page, Ms. Velazquez?

10   A.   This would be a continuation of -- we just cut that

11   off -- of 7307, which is the heading for tube and pipe

12   fittings.

13   Q.   Is this a page that you and your colleagues at SIGMA and

14   your license Customs broker refer to in determining how to

15   classify the welded outlets?

16   A.   No, this would not.  You would start, I believe, on

17   page 1.  If you would just --

18   Q.   Okay.

19            MR. CURRAN:  Let's go to page 2 of the exhibit.

20            THE WITNESS:  This is the beginning.  This would be

21   the beginning.  You always want to start at your header,

22   which is 7307 in this case.  Then it will have the

23   subheadings underneath.  So you would want to start with your

24   header, your first four digits, and then you work your way

25   down.
```

 1    Q.    Okay.  Please walk us through your analysis of applying

 2    this chapter to the welded outlets.

 3    A.    We do know that chapter 73 applies because that's for

 4    iron or steel.  So we start there with 73.  We do know it's

 5    also considered a tube or pipe fitting, so you would go to

 6    7307, which is the very top here.  For example, couplings or

 7    sleeves of iron or steel.

 8          When you go down just below that section, it shows

 9    cast fittings.  Our item is not a casted fitting.  There's a

10    lot of indents here, so you really want to focus on that, on

11    the cast fitting.  And if there's -- I don't know if James

12    can do a line all the way down to show cast all the way down.

13          Okay.  Thank you.  You see that there's

14    indentations for each, right.  All of these would be for cast

15    fittings on this page, so this would not be applicable to our

16    item.

17    Q.    So you would go to the next page?

18    A.    You would go to the next page.

19    Q.    Okay.  So this is page 3 of Exhibit 1068?

20    A.    Right, using the exact same concept.

21          THE WITNESS:  If you can highlight right under tube

22    and pipe fittings, for example, couplings, elbows, sleeves,

23    the word other of stainless steel.  And if you just do a line

24    down, draw down there.

25          Our item is not made of stainless steel, so you

Case 2:22-cv-00050-DCMJ-jc   Document 9-7   Filed 06/27/22   Entered 06/27/22 14:54 of 565   Page ID
Transcript of Day 3 of FCA Trial    Page 57 of 166

56

```
 1    would move to the next page.
 2             MR. CURRAN:  Okay.  So now we go to trial
 3    Exhibit 1068, page 4.
 4             THE WITNESS:  Right, 7307.  Again where the term
 5    other is, if you could just highlight other.  So other is
 6    going to refer to the material, right, that it's not casted
 7    material.
 8             It's not stainless steel material, so the next
 9    option would be the word other.  Okay.  So this is going --
10    this is where we're really going to start digging in to find
11    our classification.
12             The very first one is 7307.91.  This is for
13    flanges.  Our item is not a flange, so you would move down to
14    the threaded elbow.  I don't know, James, if you can also do
15    a line from flanges to threaded.  You can see the indents.
16    BY MR. CURRAN:
17    Q.   How do you do that in real life?
18    A.   With a ruler.
19    Q.   Please continue.
20    A.   So now we've moved from 7307.91, which refers to
21    flanges, to 7307.92, which refers to threaded elbows, bends,
22    or sleeves, or items not considered an elbow, bend, or
23    sleeve.  So you would move to the next page.
24    Q.   We're now at 1068, page 5.
25    A.   Correct.  Again you would start at the other.  So now
```

Case 2:22-cv-00050-JRS-MG   Document 19-7   Filed 06/27/22   Entered 06/27/22 21:24:54   Desc Exhibit
Transcript of Day 3 of FCA Trial    Page 58 of 166

57

1    we're at a third -- I'm sorry.  We're at a second other,

2    7307.93, butt-weld fittings.  We do not feel our item is a

3    butt-welded fitting.  Never did.  So you move on to the

4    other.

5            In this section 7307.99, not machined, not tooled,

6    and not otherwise processed after forging.  You would move to

7    the next one under 99.10.00 of iron or non-alloy steel.  Our

8    item did not fit in that category, and that was in reference

9    to the not machined, not tooled, or not otherwise processed

10   after forging.

11           So you would move down to 7307.99.50.  Puts you in

12   an other category.  So now we are on our fourth or fifth

13   other.

14   Q.    It seems that way.  It might not be that high, but

15   anyway, please continue.

16   A.    7307.99.50.  Then we're getting to the bottom of the

17   page.  I don't know if you can scroll up just a hair -- of

18   iron or non-alloy steel, that does describe the material of

19   our item.  5015 refers to nipples, which is the extension

20   that is on a sprinkler head.  That's not our item.  45 is

21   other, and that would be our item.

22           Our items did not match any others.  The only one

23   that did not have an other category in this case was a

24   butt-weld fitting.  It has always been SIGMA's understanding

25   that you must have the same plane ends to match up, and that

 1    would be a butt-weld fitting.  That would also have that

 2    slope in here.

 3            Our engineers advise us that our item was not a

 4    butt-weld fitting.  That's the only one on this page that

 5    actually has something specific.  If you go back down to

 6    where we classified our item in 45, the very last option was

 7    60, which is called alloyed steel.  Our item is a non-alloy

 8    steel, so that would not be an option.

 9    Q.   Okay.  So, Ms. Velazquez, you have explained now how

10    SIGMA settled on 7307.99.5045, correct?

11    A.   That's correct.

12    Q.   You mentioned earlier in your testimony CROSS rulings or

13    CROSS database, correct?

14    A.   I did, yes.

15    Q.   Have you ever found anything on the CROSS database at

16    Customs that either confirms or rejects the classification

17    number that you've come up with at SIGMA?

18    A.   When you type in CROSS, weld outlets, there is one

19    ruling that comes up.  It's the Star Pipe ruling, and the

20    Star Pipe ruling agrees with our classification.

21            MR. CURRAN:  Mr. Ball, can you bring up trial

22    Exhibit 1007.

23    BY MR. CURRAN:

24    Q.   Ms. Velazquez, is this the CROSS ruling you're referring

25    to?

```
 1    A.    Yes, I am.

 2    Q.    And are you familiar with the company Star Pipe?

 3    A.    I am.  Star Pipe, we do business with Star Pipe.  They

 4    would be what you would consider our number one competitor.

 5    They sell like items of SIGMA's, some of the same items that

 6    SIGMA --

 7    Q.    And do you follow --

 8          THE COURT:  Ladies and gentlemen, it's

 9    10:00 o'clock, so we're going to take our recess.  We'll see

10    you back in 15 minutes.  Remember the admonishment not to

11    discuss the case among yourselves or with anybody else, nor

12    form or express any opinions about the matter until it is

13    submitted to you and you retire to the jury room.

14          If you will leave quietly, I've got to talk to the

15    attorneys for a second.

16          THE CLERK:  All rise.

17          (Open court - jury not present)

18          THE COURT:  The record will reflect that all the

19    jurors have left the courtroom.

20          The only thing I wanted to mention is just an

21    update on time.  The plaintiff has 31 minutes left.  The

22    defendant has 20 minutes left.  See you back in 15 minutes.

23          THE CLERK:  All rise.

24        (Recess taken from 10:01 a.m. until 10:20 a.m.)

25          THE CLERK:  All rise.
```

Case 2:22-cv-00050-DCN-19-7c   Document 19-7c   Filed 06/27/22-1 Entered 06/27/22 17:24:52   of 587 c Exh.gid ID
Transcript of Day 3 of FCA Trial    Page 61 of 166

60

```
 1              (Open court - jury present)

 2              THE COURT:  Let the record reflect that all the

 3      members of the jury are in their respective seats in the jury

 4      box.  The witness is on the witness stand.

 5              Counsel, you may continue your direct examination.

 6      BY MR. CURRAN:

 7      Q.   Ms. Velazquez, when we left off, we were discussing the

 8      Star Pipe ruling?

 9      A.   Yes.

10      Q.   And that's on the screen in front of you?

11      A.   Yes.

12      Q.   That's trial Exhibit 1007, page 1?

13      A.   Yes.

14      Q.   And you're aware that this CROSS ruling is still

15      available today on the Customs website?

16      A.   That's correct.

17      Q.   And do you -- I want to draw your attention to the third

18      paragraph in this ruling.  Do you see the third paragraph?

19      A.   Yes.

20      Q.   What does that mean to you?

21      A.   This applicable subheading for the forged steel threaded

22      weld outlet fittings will be, and it provides the

23      classification 7307.99.5045, the harmonized tariff schedule

24      of the United States which provides for tube or pipe

25      fittings, for example, couplings, elbows, sleeves of iron or
```

```
 1    steel, other, other, other of iron or non-alloy steel, other.
 2    And then it also will provide for the duty rate of the
 3    4.3 percent.
 4         My understanding is this is a ruling from Customs.
 5    It states at the top that a representative sample of the
 6    product to be imported was submitted with the -- I'm sorry.
 7    It's at the very second sentence at the top -- in the letter
 8    dated July 8th, 2003.
 9         MR. CURRAN:  First paragraph, Mr. Ball.
10         THE WITNESS:  Yeah.  So it tells me that Customs
11    reviewed a sample of their welded outlet fitting, and they
12    determined that the classification was 7307.99.5045.
13    BY MR. CURRAN:
14    Q.   So that confirms what SIGMA has been using consistently
15    in its 7501, correct?
16    A.   Right.  It also mentions -- there's quite a few things.
17    It seems short to anyone who's not used to looking at them,
18    but there's quite a few things that are very important in
19    this.
20         Also, in the second paragraph after it mentions the
21    specs, it says:  The standard specification for carbon steel
22    forging for piping applications.  The fitting is contoured on
23    one end to provide a precise fit at the opening in the run
24    pipe and threaded on the other end to provide a threaded
25    outlet branch connection, which meets the description of our
```

```
 1   item.
 2   Q.   Does this Star Pipe ruling have any relevance with
 3   respect to whether or not the welded outlets are butt-weld
 4   fittings?
 5   A.   It does not.  Butt-weld fitting has another HTS code
 6   that was not referenced here.  It was not mentioned here in
 7   any form.  The term butt weld was not mentioned in this
 8   ruling.
 9   Q.   Now, Ms. Velazquez, when you were going through your
10   analysis of the harmonized tariff schedule, you skipped over
11   a category for butt weld in order to get to the 7307.99.5045
12   code, correct?
13   A.   Yes.
14   Q.   So in the Star Pipe ruling, Customs did the same thing?
15   A.   Yes, they did.
16   Q.   Ms. Velazquez, are you aware -- let me ask it this way.
17   When did SIGMA stop importing the Uni-Lets and the Safe-Lets
18   from China?
19   A.   In 2018.
20   Q.   Are you aware that after SIGMA stopped its imports of
21   those products, the Department of Commerce has concluded that
22   those products fall within the butt-weld antidumping duty
23   orders?
24   A.   They did, and that was in -- the final came out in 2021.
25   Q.   So that indicates that SIGMA -- well, you have at least
```

```
1    one government agency saying SIGMA was wrong with respect to
2    its position on antidumping duties on these products, right?
3    A.   We have one, but the DOJ found during their
4    investigation that --
5              MR. KRAMER:  Objection, Your Honor.
6              THE COURT:  Sustained.
7    BY MR. CURRAN:
8    Q.   Ms. Velazquez, let's not get into DOJ.  Let's just talk
9    about Commerce and Customs.
10   A.   Okay.  You have two.  You have Customs has ruled.
11   There's a ruling here that shows that we were classified
12   properly based on the description.  You have Commerce who --
13   there was a couple rulings with Commerce.  There was a back
14   and forth.  They did --
15             MR. KRAMER:  Objection, Your Honor.
16             THE COURT:  Sustained.
17             THE WITNESS:  I'm sorry.  Can you ask the question
18   again?  I feel like I'm answering it.
19             THE COURT:  I sustained the objection, which means
20   go to the next question.
21   BY MR. CURRAN:
22   Q.   Ms. Velazquez, at the time that SIGMA was filling out
23   the 7501 forms, did you and your colleagues believe you were
24   filling them out accurately and in accordance with the law?
25   A.   Yes, I was.
```

```
1              MR. KRAMER:  Objection.  Calls for speculation.

2              THE COURT:  Overruled.

3              THE WITNESS:  Yes, of course.

4    BY MR. CURRAN:

5    Q.   Did you and your colleagues and your licensed customs

6    broker use the term steel coupling in the 7501 form in order

7    to mislead to avoid antidumping duties?

8    A.   Of course not.  We followed the directions --

9              THE COURT:  She answered the question, counsel.

10   BY MR. CURRAN:

11   Q.   Can you elaborate?  Please explain why you feel that you

12   were not circumventing antidumping duties.

13   A.   First and foremost there is antidumping on forged steel

14   fittings that do include couplings.  The antidumping order on

15   the butt-weld fittings for China does not refer to couplings

16   at all.  I want to make that clear.

17             But there is a separate antidumping order on carbon

18   steel forged fittings which would be applicable to review for

19   the term steel coupling.  You would review that order.

20   Q.   So you're saying using steel coupling would have been a

21   very poor way to avoid antidumping duties?

22   A.   It would be a very poor way.

23             MR. CURRAN:  I'd like to ask Mr. Ball to bring up

24   the 7501 form again.  This is trial Exhibit 1009.

25   BY MR. CURRAN:
```

Case 2:22-cv-00050-DPM-9c   Document 9-7   Filed 06/27/22   Entered 06/27/22 17:24:57   Desc Exhibit
Transcript of Day 3 of RICO Trial     Page 66 of 166

65

```
 1    Q.   In addition, Ms. Velazquez to the first page, there's
 2    been testimony about the commercial invoice pages in this
 3    document, right?
 4    A.   Yes, there has.
 5    Q.   I'd like to you ask you briefly, why are there two pages
 6    in this duty pack, page 4 and page 5, that are both called
 7    commercial invoice?
 8    A.   We refer to the one on the left --
 9             MR. KRAMER:  Objection.  Lack of foundation.
10             THE WITNESS:  I'm sorry.
11             THE COURT:  You want to lay the foundation,
12    counsel?
13    BY MR. CURRAN:
14    Q.   Ms. Velazquez, do you have personal knowledge as to why
15    there are two pages that say commercial invoice in these duty
16    packs?
17    A.   Yes, I do.  There's many of our duty packs for multiple
18    suppliers that are similar to this.  Of course, in my
19    accounts payable position --
20             THE COURT:  Counsel, I'm sorry.  Jury trials are
21    conducted by question and answer.  Your witness seems to be
22    going into narratives to try to explain or argue something.
23    It's got to be done by question and answer.
24             THE WITNESS:  I'm sorry.
25    BY MR. CURRAN:
```

1    Q.   So, Ms. Velazquez, why are there two pages in a duty

2    pack that are called commercial invoice?

3            MR. KRAMER:  Your Honor, I'm going to object again.

4    This witness was not in this role in 2013.  She has no

5    personal knowledge as to any of these historic documents.

6            MR. CURRAN:  Well, Your Honor, we've laid a

7    foundation about her knowledge throughout this period in her

8    20-year employment.

9            THE COURT:  Overruled.

10            THE WITNESS:  I can answer?

11            THE COURT:  Yes.

12   BY MR. CURRAN:

13   Q.   Please.

14   A.   The first would be considered a summary page specific to

15   the HTS, that there's different HTS used in this invoice.

16   The second, the one on the right, would be a detailed line

17   item for --

18            THE COURT:  Counsel, let me make sure I answered

19   his question because he's objected to.  She's not testifying

20   as to what the pages say.  She's testifying to what her

21   understanding of the pages are?

22            MR. CURRAN:  Of course.

23            THE COURT:  Okay.

24            Go ahead.

25   BY MR. CURRAN:

Case 2:22-cr-00050-JCM-EJY Document 97-1 Filed 06/27/22 Page 489 of 587 Exhibit ID
Case 2:20-cr-00050-JCM-EJY Document 197 Filed 06/27/22 Page 484 of 565 PageID
Transcript of Day 3 of FCA Trial    Page 68 of 166

67

1    Q.   So, Ms. Velazquez, please explain your understanding as

2    to why there are two pages that are say commercial invoice.

3    A.   The one on the left would be a summary page.  This would

4    be a summary based on the classification.  There are three

5    different classifications here which it summarized there.

6         The second or the one on the right would be a

7    detailed line item.  This would match up to SIGMA's purchase

8    order.

9    Q.   Do these two documents referring to commercial invoice,

10   do they relate to the same shipment and the same order and

11   invoice?

12   A.   Yes, they do.  It has the same invoice number.  It has

13   the same supplier, the port, the total quantity, the total

14   amount or dollar value, the weight.

15        It also has the breakdown of the three tariffs.

16   You'll see it handwritten A, B, C.  That's also written on

17   the bottom.  This is written by our broker.  And if you refer

18   to the second -- the detailed invoice, that would be the same

19   written there.  Everything matches.

20   Q.   Ms. Velazquez, looking at the commercial invoice page on

21   the right, do you see the multiple references to Uni-Let or

22   Uni-Let welded or Uni-Let welded outlet fitting?

23   A.   Yes.

24   Q.   And that page was part of the duty pack, correct?

25   A.   It is part of the duty pack.  This is what we would call

Case 2:22-cv-00050-JCC   Document 197   Filed 06/27/22   Page 490 of 587   PageID
Transcript of Day 3 of FCA Trial    Page 69 of 166

68

```
 1   a detailed line-item commercial invoice which provides for
 2   each line.  It wouldn't be in a summary form.  It would be
 3   for each line, the quantity for each item, the description
 4   for each item, our purchase order for each item, the item
 5   number for each item.
 6           This would refer to all of SIGMA's item numbers
 7   that reflect our purchase order.
 8   Q.   And that commercial invoice with the descriptions of
 9   welded outlets Uni-Let, et cetera, that was part of the duty
10   pack that went to Customs with every importation of Uni-Lets
11   or Safe-Lets?
12   A.   Yes, that's correct.
13           MR. CURRAN:  Nothing further, Your Honor.
14           THE COURT:  Thank you, counsel.
15           Counsel.
16                      CROSS-EXAMINATION
17   BY MR. KRAMER:
18   Q.   Good morning, Ms. Velazquez.
19   A.   Good morning.
20   Q.   Now, I think you've indicated that you've worked at
21   SIGMA for more than 20 years, correct?
22   A.   That is correct.
23   Q.   In fact, members of your family have worked at SIGMA,
24   too, correct?
25   A.   Yes.
```

Case 2:22-cv-00050-RWS Document 19-7c Filed 06/27/22 Entered 06/27/22 Page 491 of 587 Exhibit ID
Case 2:22-cv-00050-RWS Document 19-7c Filed 06/27/22 Page 491 of 587
Transcript of Day 3 of RICO Trial    Page 70 of 166
69

```
 1    Q.   Five of them, in fact, right?

 2    A.   Yes, that's correct.

 3    Q.   I want to focus on the recent role that you're playing.

 4    You moved into the imports group in 2019.  That's June of

 5    2019, correct?

 6    A.   The import manager role.

 7    Q.   Okay.  But prior to June 2019, you were not in the

 8    import group, correct?

 9    A.   I was in the import group.  I was in the accounts

10    payable import division.

11    Q.   But, in fact, you were not part of the actual import

12    group; is that correct?

13    A.   I would be an extension of that group.

14    Q.   I'd like to show you what is part of Exhibit 19 already

15    in evidence.  This is page 58.

16         Ms. Velazquez, while we wait for that to come up,

17    you know that this was part of the import compliance manual,

18    correct?

19    A.   It is.

20    Q.   What we have here, this is an org chart showing the

21    operations flow in the import group, correct?

22    A.   If you can scroll out just a little bit more so I can

23    see the whole thing?

24    Q.   Sure.

25    A.   Yes.
```

Case 2:22-00050436-DCM-9-jc   Document 06/27/22-1   Entered 06/27/22 11:24:54 of 585c Exhibit ID
Transcript of Day 3 of RCA Trial    Page 71 of 166

70

```
 1   Q.    Imports operation structure, you can see that right

 2   here, right?

 3   A.    Yes.  That's correct.

 4   Q.    Okay.  And if we see this core group that we talked

 5   about here reporting up to Andy Podner, you see it says the

 6   imports group, correct?

 7   A.    Yes.

 8   Q.    And you see these dotted lines here making this sort of

 9   circle around it, right?

10   A.    To reflect the extensions of that group, yeah.

11   Q.    Right.  So you have Inge -- is that Inge Atkinson?  Is

12   that her prior name?

13   A.    That was her maiden name.

14   Q.    And you can see that you are over here, correct, Patty

15   Velazquez?

16   A.    That's correct.

17   Q.    Reporting up to the CFO, correct?

18   A.    That's correct.

19   Q.    Not reporting up to Mr. Podner, and you're outside the

20   dotted line imports group, correct?

21   A.    That's correct.  It's an -- I'm an extension group.

22   Q.    Now, then you moved into the imports group, right,

23   because you're now inside that box, correct?

24   A.    Yes.

25   Q.    When you moved into that group, you already knew about
```

```
 1    this lawsuit, correct?

 2    A.    Actually, no, I did not.

 3    Q.    Okay.  SIGMA already knew about this lawsuit when you

 4    were moved in June of 2019, correct?

 5    A.    I -- I don't know that.

 6    Q.    You don't know.  Okay.  Now, I want to go back to the

 7    accounts payable position that you held between 2001 and

 8    2019.  Are those dates, correct?

 9    A.    For the import division, yes, that's correct.

10    Q.    For the accounts payable position within the import

11    division, right?

12    A.    That's correct.

13    Q.    Okay.  And in that time you were responsible to pay any

14    bills related to import expenses, correct?

15    A.    That is correct.

16    Q.    And in that accounts payable position, you didn't have

17    any responsibility for ensuring that antidumping duties were

18    properly identified, correct?

19    A.    No.  I would be notified if there were antidumping as it

20    relates to potential liability.

21    Q.    But again, you didn't have any responsibility for

22    ensuring that antidumping duties were properly identified,

23    correct?

24    A.    That is correct.

25    Q.    And you didn't have any responsibility for reviewing
```

```
1    antidumping duty orders, correct?

2    A.    That's correct.

3    Q.    And it's fair to say that you weren't actually

4    responsible for antidumping duty compliance during that

5    18-year period, correct?

6    A.    Correct.

7    Q.    When you were in the accounts payable division, you were

8    not responsible for assigning HTS codes to SIGMA's products,

9    correct?

10   A.    Only when I covered Inge for her two maternity leaves.

11   Q.    Okay.  So there's two little breaks, but for, let's see,

12   17 and a half of those 18 years that was not your

13   responsibility?

14   A.    It was not my responsibility.  That's correct.

15   Q.    And you generally were not aware of how SIGMA's products

16   were classified, correct?

17   A.    No.  I was aware.  I was generally aware.  I just had

18   never done it myself.

19   Q.    Well, you recall being deposed in this case, correct?

20   A.    Yes, I do.

21   Q.    All right.  If we look at page 11, line 16 --

22            MR. KRAMER:  This is for impeachment, Your Honor.

23   I don't know if you want me to show it to the witness only.

24            THE COURT:  No.  You don't have to for impeachment.

25            MR. KRAMER:  Thank you.
```

```
 1    BY MR. KRAMER:

 2    Q.   You were asked:

 3              "Question:  In your role while you were in the

 4    accounts payable department, did you ever see something or

 5    say something about items that were not properly classified

 6    under the HTS code?"

 7              Your response was:

 8              "Answer:  It wouldn't be my role."

 9              Correct?

10    A.   If you can scroll up a little bit.

11              MR. CURRAN:  Counsel, can you say the page and line

12    again.

13              MR. KRAMER:  Yes.  Page 11, lines 16 to 25.

14    A.   Let me just read the question.

15              MR. CURRAN:  Your Honor, for rule of completeness,

16    I ask that the excerpt begin at line 8.

17              THE COURT:  Counsel, normally on depositions we

18    don't even have to show it.  You can read in the testimony.

19              MR. KRAMER:  Perfect.  Okay.  Thank you, Your

20    Honor.  Moving on.

21              THE COURT:  If you want to read in the testimony,

22    you can do that now.

23              MR. KRAMER:  I'll just move on, Your Honor.

24              THE COURT:  Okay.

25    BY MR. KRAMER:
```

```
1    Q.   When you were in the AP division, the accounts payable
2    division, you weren't speaking with customs brokers about HTS
3    codes, correct?
4    A.   Yes.  I mean, I would speak to them about anything
5    that's found on a 7501.
6    Q.   I'm sorry.  When you were in the AP role, what I'm
7    saying is you were not communicating with the customs brokers
8    about product classifications, right?  That wasn't part of
9    your role?
10   A.   It wasn't part of my role, but I would speak to them
11   about it, yes.
12   Q.   Focusing again on this time period, this 2001 through
13   2019, your only responsibility regarding the 7501 was to make
14   sure that the valuation information was correct, right?
15   A.   That was my Customs compliance portion, was to ensure
16   that the valuation and the documentation was maintained and
17   correct.
18   Q.   And you were not responsible for filling out Customs and
19   Border Protection form 7501, correct?
20   A.   That is correct.
21   Q.   And you did not review the form 7501 for accuracy,
22   correct?
23   A.   I did.  Yes, I did.
24   Q.   In your deposition at page 9, line 19, you were asked:
25             "Question:  Other than reviewing them for the
```

```
 1    accuracy of the valuation, were you responsible for ensuring
 2    that any classifications entered on the 7501s were correct
 3    during this period of time?"
 4            And your response was:
 5            "Answer:  No, not during this period, no."
 6    A.   In reference to --
 7            THE COURT:  Excuse me.  There's no question.
 8            Ladies and gentlemen, when deposition testimony is
 9    read in to the jury, that's testimony that is taken under
10    oath before a trial.  And when it's allowed to be read in to
11    the jury, it's just like that testimony had been given to
12    you.  It's not a question and answer.  It's like that is
13    testimony that the jury is to accept.
14            Go ahead, counsel.
15    BY MR. KRAMER:
16    Q.   Okay.  Now, speaking -- you mentioned the Uni-Let
17    product in your testimony, I believe, correct?
18    A.   Yes.
19    Q.   Okay.  And you actually did not know whether the Uni-Let
20    was a steel coupling, correct?
21    A.   Yes.  That's true.
22    Q.   And you didn't know whether Safe-Let was a steel
23    coupling, correct?
24    A.   Yes.  That's true.
25    Q.   Focusing again on 2010 when you were in this AP role,
```

1     you weren't responsible for classifying the Uni-Let product,

2     correct?

3     A.    That is correct.

4     Q.    And you weren't responsible for any import compliance

5     issues as it related to the Uni-Let, correct?

6     A.    Beyond retaining the documentation and valuation, no, I

7     was not personally responsible.

8     Q.    And you were not involved in conversations with any

9     customs broker about the classification of the Uni-Let,

10    correct?

11    A.    That's correct.

12    Q.    And you were not involved in any conversations with a

13    customs broker about whether it might be subject to

14    antidumping duties?

15    A.    I'm sorry.  Say that one more time.

16    Q.    Yeah.  You were not involved in any conversations with a

17    customs broker about whether it might be subject to the

18    antidumping duties?

19    A.    Yes.  That's correct.

20    Q.    And that's true for the Safe-Let, too, in 2016, right?

21    A.    Yes.  That's correct.

22    Q.    In your direct examination you were asked a couple of

23    questions about the Exhibit 1006, which is the focused

24    assessment.  Do you recall that?

25    A.    Yes.

```
 1    Q.    Now, we've heard a little bit about this document, so I
 2    won't belabor it, but you understand that there are three
 3    review areas identified in this document, correct?
 4    A.    I believe there's multiple review areas.
 5    Q.    Well, let's look at what the actual document says.  It
 6    says:  We determined that SIGMA's import activities represent
 7    an acceptable risk in the review areas of transaction value
 8    classification and generalized system of preferences.
 9              Now, is there any place in this document where it
10    identifies antidumping duties as a review area?
11    A.    I believe that's found on page -- we brought that up.  I
12    don't know the exact page.
13    Q.    If we look at page 5 of this document, we see a
14    reference to antidumping duties, correct?
15              MR. CURRAN:  Your Honor, can we see the whole page?
16              THE WITNESS:  I'm sorry.  I can't see the whole --
17    BY MR. KRAMER:
18    Q.    See right here, the second bullet, analyze the tariff
19    numbers for antidumping duties, right?
20    A.    Yes.
21    Q.    Does that indicate that antidumping duties is a review
22    area of this audit?
23    A.    No.  It mentions it in two bullets down, analyze samples
24    of items above and assess each item's compliance with
25    applicable laws and regulations, including -- and it mentions
```

```
 1    antidumping.
 2    Q.   Right.  And does that indicate that antidumping duties
 3    are a review area?  Are those words there on this document
 4    anywhere?
 5    A.   It says they were assessed, that SIGMA was following
 6    compliance.
 7    Q.   If we look at the --
 8    A.   And I know for a fact that they were because --
 9    Q.   Excuse me.  If we look at the page before it, it
10    indicates that each of these bullets, the sub bullets that we
11    look at below it, are for each of the review areas, correct?
12    A.   I'm sorry?
13    Q.   Right here it says for each identified review area,
14    correct?  Do you see that?  And antidumping duties is not a
15    review area, correct?
16    A.   Right.  In this -- in this specific sentence, yes.
17    Q.   You mentioned that some of these items, these sample
18    items we looked at, I just wanted to show you one.  This is
19    page 5.  You see that the sample items were reviewed for
20    transaction value, correct?
21    A.   I'm -- right, the highlighted in the very top portion.
22    Q.   Exactly.  Correct?
23    A.   Yes.
24    Q.   And 26 items for classification, correct?
25    A.   Yes.  They asked for additional samples, and we
```

```
1    provided.
2    Q.   Right.  Now, you mentioned, too, this letter that
3    Mr. Podner sent, correct?
4    A.   Yes.
5    Q.   In that letter -- we looked at it a few times in this
6    case -- he indicated that SIGMA would take steps to improve
7    aspects of its operations, correct?
8    A.   Yes.  We suggested --
9    Q.   Right.  So one of the things it suggested it might do is
10   to hire a licensed customs broker, correct?
11   A.   That's correct.
12   Q.   And it never did that, right?
13   A.   No.  We have CH Powell, which is one of the largest.
14   Q.   Yes, but he didn't say we would retain a customs broker.
15   Mr. Podner said that you would hire a full-time customs
16   broker, correct?
17   A.   I'd have to look at the exact language.  I believe he
18   said we would look into it.
19   Q.   Look into the feasibility of having at least one person
20   in the organization become a licensed customs broker,
21   correct?
22   A.   That we would look into it, and we did.
23   Q.   You looked into it but it never happened, correct?
24   A.   Inge Atkinson went for her license.
25   Q.   And she failed the exam, correct?
```

```
 1    A.    She failed and she started a family, so she didn't

 2    continue.

 3    Q.    Uh-huh.  You also indicated that you would consider

 4    joining the CTPAT, I think that is?

 5    A.    That's correct, CTPAT.

 6    Q.    Gotcha.  Now, I wanted to ask you a couple of other

 7    questions.  You mentioned CROSS rulings -- excuse me, you

 8    mentioned the CROSS database, right?

 9    A.    Yes.

10    Q.    You said that it was the most helpful database for you

11    and you used it frequently, correct?

12    A.    Along with others, yes.

13    Q.    Right, but the CROSS ruling I think in your testimony

14    you said -- not the ruling.  Strike that -- that the CROSS

15    database was the one you thought was most helpful, correct?

16    A.    One of, yes.

17    Q.    In fact, in this letter that Mr. Podner sent --

18    A.    Customsinfo was another one.  Federal Registers are

19    another one.

20              THE COURT:  I'm sorry.

21    BY MR. KRAMER:

22    Q.    I have a question here, ma'am.

23    A.    I'm sorry.

24    Q.    So when --

25              THE COURT:  I know it's tough being a witness, but
```

```
 1    it has to be done by question and answer.
 2              Go ahead.  If your attorney wants you to expand,
 3    he'll ask you further questions.
 4              THE WITNESS:  Okay.
 5    BY MR. KRAMER:
 6    Q.   So, in fact, in this section 2 here, Mr. Podner
 7    indicates that SIGMA had recently gained access to a series
 8    of different Customs databases, correct?
 9    A.   They've gained access to some, including ACE.
10    Q.   Right.  And it refers to a portal called
11    customsinfo.com, correct?
12    A.   Yes.
13    Q.   Recently gained access to ACE, correct?
14    A.   Yes.
15    Q.   And he felt that it was helping.  It was better.  It was
16    better than they were able to do previously, correct?
17    A.   Sure, yes.
18    Q.   So back in 2010 those databases weren't available to
19    SIGMA, correct?
20    A.   I don't know that to be the fact, but, yeah.
21    Q.   You mentioned towards the end of your testimony, you
22    made reference to an antidumping duty on forged steel
23    fittings.  Do you recall that?
24    A.   Yes, I do.
25    Q.   And you know that that antidumping duty didn't go into
```

```
 1  effect until the very end of 2017, correct?

 2  A.    The preliminary -- I'm not quite sure when the

 3  preliminary investigation started on that.

 4  Q.    Okay, but it wasn't in place back in 2010, correct?

 5  A.    No, I don't believe so.

 6  Q.    It was much, much later, correct?

 7  A.    Correct.

 8  Q.    And we've talked a little bit in this case about the

 9  compliance manual, the SIGMA compliance manual?

10  A.    Yes.

11  Q.    And that compliance manual was put in place in 2013,

12  correct?

13  A.    It was formally memorialized in a manual form,

14  compliance manual book, I guess is the best way to put it.

15  Q.    Okay.  So you're trying -- let me make sure I understand

16  what you're saying.  You're saying that prior to the

17  compliance manual, there were already some procedures in

18  place, right?

19  A.    Yes.

20  Q.    So the manual was reflecting what was actually happening

21  at SIGMA already.  That's what you're saying, correct?

22  A.    Yes.

23  Q.    Now, as the import manager, have you updated this

24  compliance manual?

25  A.    No, I have not.
```

Case 2:22-cv-00050-DCN-9-7c   Document 99-7   Filed 06/27/22   Entered 06/27/22 17:24:54   Desc Exhibit
Transcript of Day 3 of FCA Trial    Page 84 of 166

83

```
 1    Q.    Okay.  And you do understand, though, that the

 2    compliance manual says it will be reviewed and updated

 3    annually, correct?

 4    A.    Right.  There has been no changes.

 5    Q.    Now, you also remember that there is some training

 6    provisions in this material, correct?

 7    A.    That's correct.

 8    Q.    All right.  In fact, if we take a look at this, on page

 9    50 of the exhibit it indicates that there are some

10    expectations for formal course work, correct?

11    A.    For new employees, yes.

12    Q.    And employees who wish to transfer into imports must

13    complete the course work before accepting the transfer,

14    correct?

15    A.    Let me read.  I'm sorry.  Yes.

16    Q.    And in the manual it outlines -- let's see down here at

17    bottom -- nine areas of required course work, correct?

18    A.    Yes.

19    Q.    There are five core training courses there, right?

20    A.    Yes.

21    Q.    Four areas of advanced course work, correct?

22    A.    Yes.

23    Q.    And none of those formal course work -- none of that

24    relates to antidumping duties, correct?

25    A.    There's more in the manual.
```

Case 2:22-cv-00050-RWS Document 97-3 Filed 06/27/22 Entered 06/27/22 Page 464 of 545 Exhibit
Case 2:22-cv-00050-RWS Document 19-7c Filed 06/27/21 Entered 10/12/22 Page 464 of 565 PageID

Transcript of Day 3 of FCA Trial    Page 85 of 166

84

```
 1    Q.   There's more in the manual.  In section 1.3?  No.  Well?

 2    A.   For training, no, it's not mentioned for training in

 3    here.

 4    Q.   It's not mentioned for training.

 5          So before you moved into the imports group, you

 6    didn't receive any of this formal training, correct?

 7    A.   I've been with SIGMA close to the imports division.

 8    Q.   That's not actually my question.  My question is:  Prior

 9    to moving into the imports group, you did not receive any of

10    this formal training, correct?

11    A.   Let's see what is outlined as formal training here.  I

12    did go to our broker's seminar.  It was a two-day seminar

13    where they had a compliance consultant there.

14    Q.   You received -- let's be -- you got some on-the-ground

15    training, if you will, right?  Inge Atkinson gave you some

16    training with respect to -- some on-the-job training with

17    respect to classification, right?

18    A.   Classification with Inge Atkinson, yes.

19    Q.   Okay.  But you did not actually have any specific

20    training before you moved into import compliance, correct?

21    A.   I already knew this, so I didn't need to take -- if

22    you're referring to formal outside courses --

23    Q.   I'm referring to any of the required course on this

24    paper.  You did not do any of that required course work,

25    correct?
```

```
 1    A.    In a formal outside stance, no, I did not.  In-house,
 2    yes, I did.
 3    Q.    Okay.  You spent some time talking about a CROSS ruling
 4    in this case.  Do you recall that?
 5    A.    Yes.
 6    Q.    And you understand as you sit here today that the CROSS
 7    ruling is a Customs ruling, correct?
 8    A.    That is correct.
 9    Q.    It deals with classification, correct?
10    A.    It deals with not just classification.  Classification
11    is one area.
12    Q.    Well, the ruling is telling you what the proper
13    classification for a product is, correct?
14    A.    In this particular ruling it is, yes.
15    Q.    Okay.  So the one that we're talking about, that's the
16    point of the ruling, right?
17    A.    In this particular one, yes.
18    Q.    Okay.  And you understand that the Department of
19    Commerce is responsible for antidumping duties, right?
20    A.    That's correct.
21    Q.    Okay.  And you understand that the ruling we were
22    talking about, this CROSS ruling, that was not issued by the
23    Department of Commerce, correct?
24    A.    That's correct.
25    Q.    Now, Ms. Velazquez, when you -- you have stated that
```

```
 1    your number-one objective is to keep SIGMA's best interest in
 2    the forefront; is that correct?
 3    A.    I mean, that's one of, sure.
 4    Q.    It's just a yes-or-no question.  Have you stated that or
 5    have you not?
 6    A.    In testimony I don't believe so.
 7    Q.    Well, I didn't say in testimony.  Have you stated that
 8    in any public website or press release?
 9    A.    I believe I stated many things.  You're referring to
10    when I was promoted.
11    Q.    It's just a yes-or-no question.
12    A.    Yes.
13    Q.    Thank you.
14              MR. KRAMER:  Nothing further, Your Honor.
15              THE COURT:  Counsel?  You have eight minutes left
16    on it, counsel.
17                        REDIRECT EXAMINATION
18    BY MR. CURRAN:
19    Q.    Ms. Velazquez, Mr. Kramer asked you some questions about
20    your titles over the years, correct?
21    A.    Yes.
22    Q.    Can you please explain how closely you were working with
23    the import managers while you were in the accounts payable
24    for imports section.
25    A.    It would be all day every day.  All right.  My role
```

 1    again was to pay any import-related bills.  Any questions

 2    that I had would be made to the imports manager.  I was to

 3    audit and ensure that they were -- that they met and agreed

 4    with our database, SIGMA's database -- any questions that I

 5    had.  So I would be with them all day.

 6    Q.    Looking over their shoulder while they were doing their

 7    job?

 8    A.    They would say so, I guess, yes.

 9    Q.    That experience and knowledge of the customs compliance

10    function was sufficient that you were the point person for

11    the Customs focused assessment in 2013, right?

12    A.    Yes.

13    Q.    That focused assessment and the letter that Mr. Podner

14    sent to Customs afterwards, did SIGMA undertake in good faith

15    to explore all of those possible enhancements that SIGMA

16    volunteered to look into?

17    A.    Yes, of course.

18    Q.    Let's focus on one that Mr. Kramer focused on.  He asked

19    about SIGMA retaining as an employee a licensed customs

20    broker?

21    A.    Yes.

22    Q.    And I think you said that Ms. Inge Atkinson pursued that

23    but then did not go the whole distance?

24    A.    Yeah.  It's a hard test.  I believe Kelly Kramer -- I'm

25    sorry -- Kelli Thompson --

```
 1              THE COURT:  Next question.  It's been answered.
 2              THE WITNESS:  Yes.
 3              THE COURT:  Counsel, I'm trying to help you on
 4    time.
 5              MR. CURRAN:  I'm okay on time.  Thank you,
 6    Your Honor.
 7    BY MR. CURRAN:
 8    Q.   How much does SIGMA rely on outside licensed brokers?
 9    A.   Rely on them all day every day.  Speed dial on every one
10    of our phones in the imports department.
11    Q.   I'd like even more detail.
12              MR. KRAMER:  Your Honor, I object on scope grounds.
13    Beyond the scope of the cross.
14              THE COURT:  Overruled.
15              MR. CURRAN:  Thank you, Your Honor.
16              THE WITNESS:  I'm sorry.  Can you ask it again.
17    BY MR. CURRAN:
18    Q.   I'd like a deep understanding of how much SIGMA relies
19    on its licensed customs broker at CH Powell, which has been
20    exclusive, you said, since 2013 and before that.
21    A.   They've been with SIGMA all along, just they were -- we
22    signed up with them exclusively in 2012.  We didn't use any
23    other customs broker.
24              There's an -- we have a standard operating
25    procedure with them.  They are to obviously file our 7501s,
```

```
 1   review our documentation, retain our documentation for five
 2   years, ensure that our product gets delivered, that once it
 3   reaches a U.S. port, it gets delivered to its final, that
 4   they file the Customs documents that are required even prior
 5   to the 7501, which is the ISF and the documents that are
 6   related to that.
 7            Antidumping is a major thing.  We've -- SIGMA has
 8   always felt that that was very important.  On a daily,
 9   anytime our item -- anytime an entry --
10            THE COURT:  There's no question pending right now.
11   Counsel, next question.
12   BY MR. CURRAN:
13   Q.   But again, the frequency with which you're in contact
14   with the customs broker?
15   A.   All day every day.
16   Q.   Mr. Kramer also asked you questions about the Uni-Let
17   and Safe-Let and steps taken when those products were
18   introduced.  He specifically asked whether there were
19   conversations with a broker with respect to Uni-Let.
20            Do you know, did SIGMA consult, not necessarily
21   conversations but did it consult with a broker with respect
22   to antidumping duties on Uni-Let?
23            MR. KRAMER:  Your Honor, can we get foundation.
24            THE WITNESS:  Yes, they did.
25            THE COURT:  Overruled.  Next question.
```

```
1    BY MR. CURRAN:

2    Q.   Ms. Velazquez, what did SIGMA do with respect to

3    Safe-Let when it was introducing that product with respect to

4    antidumping duties?

5    A.   Same process we would always do -- NIR.

6              THE COURT:  You have personal knowledge of that?

7              THE WITNESS:  Yes, I do.

8              THE COURT:  Go ahead.

9              THE WITNESS:  I probably --

10             THE COURT:  Go ahead, counsel.

11   BY MR. CURRAN:

12   Q.   Finally, Ms. Velazquez, on the manual, you mentioned

13   that SIGMA hasn't updated the manual, the general manual.

14   Are there other related manuals that outline procedures with

15   respect to import compliance that SIGMA has updated over the

16   years?

17   A.   Yes.  There's many, many manuals.  The compliance manual

18   that's being referred to is a broader spectrum.  These are

19   just the basics, basic requirements that we must follow,

20   right.

21             In addition, there's more detail in other

22   compliance manuals such as the vendor import compliance

23   manual.  That is updated quite often.

24             MR. CURRAN:  Thank you.

25             Thank you, Your Honor.
```

```
1              THE COURT:  Counsel?

2              MR. KRAMER:  Very briefly.

3                      RECROSS-EXAMINATION

4    BY MR. KRAMER:

5    Q.   Ms. Velazquez, under questioning just now you were

6    referring to how much SIGMA relies on its brokers, correct?

7    A.   Yes.

8    Q.   But you understand that the importer of record is

9    ultimately responsible for complying with the import laws,

10   correct?

11   A.   Yes, that's correct.

12   Q.   And you are not trying to suggest to this jury that

13   SIGMA is shifting that burden to its broker, correct?

14   A.   That's correct.

15             MR. KRAMER:  Nothing further, Your Honor.

16             THE COURT:  Okay.  You may step down.

17             Both sides rest?

18             MR. CURRAN:  Yes.  SIGMA rests, Your Honor.

19             THE COURT:  Counsel?

20             MR. KRAMER:  Nothing for the rebuttal case.

21             THE COURT:  Okay.

22             Ladies and gentlemen, I'm going to be excusing you

23   a little bit early for lunch here.  You're going to have two

24   hours.  I've got to go over jury instructions and talk with

25   counsel before they get in their argument.
```

```
 1              When we come back in at 1:00, both sides will have

 2      an opportunity to argue their case to you and then I'll

 3      instruct you on the law that applies to it and we're going to

 4      send you back to the jury room to do your deliberations at

 5      that time.

 6              So at this time I'm going to excuse you.  Remember

 7      the admonishment not to discuss the case among yourselves or

 8      with anybody else, nor form or express any opinions about the

 9      matter until it is submitted to you and you retire to the

10      jury room.

11              Have a pleasant lunch.  We'll see you back in at

12      1:00 and we'll start right then.

13              Thank you.

14              THE CLERK:  All rise.

15              (Open court - jury not present)

16              THE COURT:  The record will reflect that the jurors

17      have left the courtroom.  You may have a seat.

18              Counsel, a couple of things.  On the motion that

19      you made earlier, that's reserved.  You can make that.  I'm

20      going to give you a chance to do it in writing if you wish as

21      long as you get it in by next Tuesday, and the reply by two

22      days later.  Or you can make it orally today if you wish.

23              MR. CURRAN:  Actually we filed on ECF yesterday.

24              THE COURT:  Okay.  That's fine.

25              MR. CURRAN:  We may have a further motion after --
```

```
 1              THE COURT:  Okay.  I'm just saying any motion
 2    should be done by Tuesday, and any responses should be done
 3    by two days later on Thursday.
 4              MR. CURRAN:  Thank you, Your Honor.
 5              THE COURT:  I just want to make sure that both
 6    sides know that I'm not cutting you off as far as motions
 7    being made today.  It's reserved.
 8              MR. CURRAN:  Thank you.
 9              THE COURT:  Secondly, counsel, what -- I spent all
10    day yesterday and last night and this morning going over all
11    the instructions that have been submitted, the disputed
12    instructions that were given, the arguments on both sides as
13    to whether the instructions would be given or not, what
14    instructions would be given.
15              What I've done for you, which should be helpful, is
16    I've prepared clean instructions that I will be giving --
17    that I probably will be giving most likely, tentative that
18    I'm going to be giving.  If you wait for about ten minutes, I
19    can provide those to you so you can use them in your
20    argument.
21              In your argument please, when you refer to the
22    judge will instruct you, always say "I anticipate the judge
23    will instruct you," because sometimes I modify those
24    instructions a little bit, you know, cross out a word here or
25    there.  So it's just better to say, "I anticipate the Court
```

```
 1    will be giving you this following instruction."

 2              Both arguments I think 30 minutes is sufficient on

 3    it.  And, of course, the plaintiff has opening and also has

 4    closing on it.  I always leave it to the attorneys if they

 5    wish for me to give you a five-minute warning when you get

 6    close to the end if you want it.  If you don't want it,

 7    that's fine, too.  I don't want to interrupt you when you're

 8    in your argument unless you want me to give that.

 9              So think about that and before 1:00 let me know if

10    you want me to give you a five-minute warning.

11              Plaintiff, you have the 30 minutes, but you may

12    want to break it up.

13              MR. KRAMER:  Yes.

14              THE COURT:  And I don't know if you're going to

15    want a warning.  Sometimes they'll say, well, Judge, will you

16    give me a warning five minutes before the 20 minutes and five

17    minutes before the end?  I'll do it any way you want.  If I

18    don't hear from you, I won't give any warning at all.

19              MR. CURRAN:  I'll take the five-minute warning.

20              THE COURT:  Okay.

21              See you all back after -- well, if you just wait

22    for a while, I'm going to have my law clerk bring out the

23    instructions for you so you can use them.  It will be within

24    ten minutes or so.

25              Thank you, counsel.
```

95

```
 1              (Recess taken from 11:04 a.m. until 1:07 p.m.)

 2                 (Open court - jury present)

 3              THE COURT:  The record will reflect that all the

 4       jurors are in their respective seats in the jury box.

 5              Ladies and gentlemen, we've gotten to that point of

 6       the trial now where you've heard all the evidence you're to

 7       use to determine what the facts of the case are.

 8              At this time we're going to have the parties have

 9       an opportunity to argue the case to you.  The plaintiff goes

10       first, then the defendant goes, and then the plaintiff.

11       Because he has the burden of proof, he has the rebuttal at

12       the end.  So they get two and one.

13              It's going to be about, I don't know.  They're

14       going to go about a half hour each side.  Then I'll instruct

15       you on the law that applies to the case.  Then we'll send you

16       back to deliberate.

17              Now, remember during the argument, what the

18       attorneys say is not evidence.  I've told you that before.

19       It's to help you interpret the evidence.  If they say

20       something different than the way you remember it, it's not

21       because they're trying to mislead you.  It's just that some

22       people see and hear things differently.  But it's your memory

23       that controls, not what they may say.  Okay?

24              Counsel.

25              MR. KRAMER:  Thank you, Your Honor.  May we split
```

```
 1   20, 10, and have five-minute warnings?

 2             THE COURT:  Yes.  On both sides?

 3             MR. KRAMER:  Both sides.

 4             THE COURT:  You got it.

 5             Counsel?

 6             MR. KRAMER:  Thank you.

 7             A couple days ago -- feels like maybe a couple

 8   weeks ago for me -- I told you that this case was about an

 9   importer of record that imported millions of dollars of

10   Chinese products without paying an antidumping duty.  You've

11   heard the evidence.  You're the judges of the facts.  Your

12   memory controls.  But you know that that's true.  In fact,

13   it's really just undisputed.

14             I told you that this case was about an importer of

15   record that falsely told Customs and Border Protection that

16   no antidumping duties applied to its products even though it

17   never really checked.

18             You've heard the evidence.  You are the judges.

19   That's your call now.  I told you that it was about an

20   importer of record that outright lied when it said that it

21   was importing steel couplings.

22             SIGMA's false statements.  Count them up.  Count

23   them up.  There's 5,000 pieces of paper now in this record

24   showing all of these different misrepresentations.  SIGMA's

25   false statements caused the United States to lose out on more
```

1    than $8 million in antidumping duties.  That's where this

2    case is going.  That's where Island's proof is going to show

3    and has shown.

4            Next slide.

5            Before we walk through the evidence, I want to talk

6    to you about the burden for a moment.  Island has the burden

7    of proof in this case.  It means that we have to carry a

8    burden.  We accept that.  We acknowledge it.  We embrace it.

9    We believe we've done that.

10           But I also want to be clear about this, and Judge

11   Klausner mentioned this in jury selection.  The burden of

12   proof in this case is not beyond a reasonable doubt.  This is

13   not Law and Order.  This is not a TV show about a criminal

14   case.

15           Your verdict, no matter what it is, no one's

16   liberty is going to be taken away.  No one is going to jail.

17   This is a civil case, and under the law the judge I

18   anticipate will instruct you that civil cases have a

19   different burden of proof.  It's called the preponderance

20   standard.

21           What the preponderance standard means, classic

22   analogy, is that you will have to weigh the evidence almost

23   like on a scale.  And if you think at the end of this case

24   that it's perfectly equally balanced and Island is able to

25   add just a feather to its side of the ledger and it tilts

```
 1   just ever so slightly, that means Island is entitled to a
 2   verdict.  That's what the burden of proof is in this case.
 3         So understanding that burden, let's move on and
 4   walk through the evidence.  So what is it that you -- that
 5   you know?  Well, you know at this point that SIGMA was the
 6   importer of record for each and every shipment of Chinese
 7   welded outlets that we've been speaking about for the past
 8   three days.
 9         You know basically, acknowledged freely by SIGMA,
10   that the importer of record has affirmative legal
11   obligations.  You've heard -- Ms. Kelli Thompson testified at
12   length about this.  She explained that our system is
13   primarily an honor system.  That's just the reality of where
14   we are.
15         You know that importers of record have two
16   affirmative legal obligations that matter here.  Importers of
17   record have to completely and accurately describe the
18   products they're bringing into the country, and they have to
19   research and determine if the products are subject to
20   antidumping duties.
21         What else do you know?  You know that antidumping
22   duties apply to each and every one of these shipments.  Judge
23   Klausner has made that clear.  I anticipate he will do that
24   again in the final instructions.  We start from the
25   proposition that antidumping duties applied to each and every
```

 1   one of these shipments.

 2          Now, I told you that the evidence would show that

 3   SIGMA made two distinct misstatements.  I told you that it

 4   would show that SIGMA falsely claimed to be importing steel

 5   couplings and that it falsely claimed that these products

 6   were not subject to antidumping duties.  So let me walk

 7   through the evidence with respect to each of these false

 8   claims.

 9          False claim number one.  There can be no real

10   dispute at this point.  SIGMA told Customs and Border

11   Protection that it was importing steel couplings.  You've

12   seen it over and over again.  It wasn't isolated.  This isn't

13   Island cherry-picking a mistake.  You'll see the steel

14   coupling representation over and over and over again in

15   document after document, and it went on for nearly a decade.

16          You see it in the form 7501, the form 3461, the

17   packing list, the bill of lading.  SIGMA spent a lot of time

18   trying to explain to you that under entry type 28 in this

19   particular instruction on the 7501, that there was some

20   rationale for what they did.  But that's -- the problem here

21   is that it's just not true.

22          You know that steel couplings -- steel couplings

23   and welded outlets are different products.  You know that.

24   You know that steel couplings aren't beveled.  You know that

25   steel couplings are not designed to be welded.  Welded

 1    outlets are.

 2              So one of the first elements you'll have to decide,

 3    and I anticipate the judge will instruct you, the question

 4    is:  Were these statements false?  What does that mean?  They

 5    were untrue when said.  Well, if I'm importing an apple and I

 6    tell Customs it's an orange, that's a false statement.

 7              That's exactly what happened here.  How do you know

 8    that for sure?  Well, nobody really disputes it.  Mark

 9    Woehrel, he explained to you in the beginning.  He showed you

10    these products.  You'll have them in the jury room and you

11    can see the curve.  You can see the bevels.  And you'll see

12    that the steel couplings have no product feature like that.

13              Mitchell Rona, you remember him?  He testified for

14    SIGMA as the corporate representative, and you saw his

15    corporate representative testimony.  He was asked:  Why does

16    it say steel coupling?  His response was:  I don't know.  You

17    know why he said, I don't know?  Because he knew it wasn't a

18    steel coupling.

19              Mr. Bhattacharji testified in this case.  He was

20    asked directly whether he understood that steel couplings and

21    welded outlets were different products.  His answer was yes.

22    So that statement, that evidence, it shows that that

23    statement was not true.  It was false.

24              One of the next elements that the judge will

25    instruct you on is materiality.  Does the statement matter?

1    That's really what we're getting at here.  I anticipate he'll

2    say that a statement is material if it has a natural tendency

3    to influence or to be capable of influencing the payment or

4    receipt of money.

5              So the question becomes for Customs and Border

6    Protection:  Would I?  Might I?  Am I capable of it?  Does it

7    influence my decision whether or not to impose an antidumping

8    duty?  Of course it did.  How do you know?  Ms. Thompson, she

9    testified.  She explained that in our customs system, Customs

10   and Border Protection takes these product descriptions.  They

11   make a difference.  If you say steel coupling, Customs takes

12   it to mean steel coupling.

13             Then it makes appropriate decisions after that.

14   Are steel couplings subject to an antidumping duty?  No.  You

15   know that, too.  You've seen the evidence.  You've heard it

16   all now.  You know that welded outlets are subject to

17   antidumping duties, but steel couplings are not.

18             Commerce has said that explicitly.  You've seen it

19   in black and white.  You'll see it in the evidence.  You've

20   heard everyone explain it.  Again, the difference between a

21   steel coupling and welded outlet, one is beveled.  It's

22   permanently welded.  That makes it subject to the antidumping

23   duty.

24             So what SIGMA did was to describe a product that

25   simply wasn't subject to an antidumping duty, and not

```
 1    surprisingly Customs didn't impose an antidumping duty.
 2              Now, the judge is also going to tell you that it's
 3    not enough to show that it was just a false statement and
 4    that it was material.  We have to show that SIGMA had the
 5    required knowledge.
 6              I told you in the opening that that's a bit of an
 7    unusual term.  What that means is that SIGMA had actual
 8    knowledge that the statement was false, that it acted in
 9    reckless disregard, or that it acted in deliberate ignorance
10    of the truth.
11              Now, with respect to this statement, the steel
12    coupling statement, of course SIGMA knew that this was a
13    false statement.  You heard the SIGMA people explain, testify
14    here, yeah, steel couplings and welded outlets are different
15    products.  We know that.  And it's not just that they said it
16    here in court.
17              You heard testimony and saw this document, the
18    spreadsheet.  In realtime SIGMA was keeping track of these
19    products and it used two different columns.  One said HTS
20    description.  We will tell Customs it's a steel coupling.
21    The other said SIGMA description.  The SIGMA description
22    refers to these products as welded outlets, what they really
23    are.  So there's no question that SIGMA actually knew.
24              It's also in the advertising.  When you look at
25    SIGMA's product catalog, right, does it say steel coupling?
```

```
 1    Absolutely not.  It says welded outlet.  So think about that.

 2    When it came time to monetize these products, when it came

 3    time to actually, actually do what a business does, which is

 4    to try to make money, SIGMA called them what they really

 5    were -- welded outlets.

 6          The only time you see this steel coupling

 7    description in all the evidence that has come into this case

 8    is in the import paperwork that was submitted Customs and

 9    Border Protection.  Think about that spreadsheet.  Think

10    about what it means to keep two sets of books, because that's

11    what this looks like.  You've got two different descriptions,

12    and you use them selectively.

13          Finally we get to damages.  The judge is going to

14    instruct you that the final element, the fourth element when

15    it comes to this case, the False Claims Act claim, is that

16    you have to figure out if there's damages.  The damages are

17    going to be the difference between what the government

18    received and what it would have received if the defendant had

19    been truthful.

20          You know what the government got paid here?

21    Nothing, not one penny.  So if SIGMA had told the truth and

22    told Customs and Border Protection and said:  We're importing

23    these welded outlets, right.  There's an antidumping duty.

24    How much should the government have been paid?

25          You know from Exhibit 65 which is in evidence, it
```

Case 2:22-00050-DOC-19-jc Elec06/27/22-1 Entered 06/27/22 Page 434 of 585 Ex ID
Transcript of Day 3 of 6 Trial    Page 105 of 166
104

1    does all the math for you.  It lays out on a year-by-year

2    basis the value of the products that were imported.  It shows

3    you what the applicable antidumping duty would be, the 1.829,

4    which is the 182.9 percent antidumping duty.  So the damages

5    calculation here is straightforward, and you know that the

6    government should have been paid more than $8 million in

7    antidumping duties.

8            So you take those four elements, you put it

9    together, and the steel couplings representation by

10   themselves is adequate to establish Island's burden and to

11   show a violation of the False Claims Act.

12           There's one point I'd like to mention.  SIGMA has

13   suggested that somehow it didn't intend to mislead anybody.

14   You will see, and the judge I anticipate will instruct you,

15   that intent is not an element here.  It's not about whether

16   SIGMA intended to deceive the government.  It's about whether

17   it did.  A false statement that's material, caused damages,

18   and that they actually knew was false establishes liability.

19           Let me move to my second false statement.

20           False statement number two, you all know it.  It's

21   that Customs and Border Protection, SIGMA told them no

22   antidumping duty applies to this product.  That's what they

23   represented.  That was false.  There's nothing to debate.

24   There's nothing to deliberate on.  That is a given.  Judge

25   Klausner has already told you that, and I anticipate he'll

```
 1    tell that you again.  The representation that no antidumping

 2    duty applied was false.

 3         Was that material?  Well, think about it.  Imagine

 4    if SIGMA had told the truth.  Imagine if SIGMA had filled in

 5    that box to say antidumping duties apply; I just want you to

 6    know.  Is there any question in your mind that Customs and

 7    Border Protection would have imposed and collected the

 8    antidumping duty?  Of course it would have.  Of course it

 9    would have.  This is a no-brainer.

10         So then we get to requisite -- required knowledge.

11    Required knowledge.  Again, this one is a little bit of an

12    unusual term here.  It's actual knowledge, it's reckless

13    disregard, and it's deliberate ignorance.  Actual knowledge,

14    reckless disregard, deliberate ignorance.

15         So when it comes to the second misstatement, what

16    the evidence is going to show at a minimum is that SIGMA

17    acted recklessly and that it made these statements in

18    deliberate ignorance of the truth.

19         Let me talk recklessness first.

20         THE COURT:  You've got five.

21         MR. KRAMER:  Thank you.

22         What you know is that SIGMA failed to make the kind

23    of inquiry that you know that an importer of record is

24    required to make.  You know that an importer of record is

25    obligated to read the antidumping duty orders.  You know that
```

Case 2:22-cv-00043-JDC-TPL Document 19-7 Filed 06/27/22 Entered 06/27/22 Page 534 of 587 PageID
Transcript of Day 3 of Trial    Page 107 of 166
106

 1    SIGMA never did.  In fact, SIGMA told you that they didn't

 2    even know about it until December of 2017.  And you heard

 3    Ms. Thompson explain, that's unacceptable.

 4            You cannot be an importer of record and be ignorant

 5    of a duty like this on a Chinese steel product for nearly a

 6    decade.  You heard that they didn't read the scope rulings.

 7    You heard that they didn't review the sunset reviews.  You

 8    heard that they didn't do any of these things.

 9            Alternatively you can rely on an expert.  You can.

10    But there's two problems.  First, you've seen the evidence.

11    Even SIGMA's compliance manual, it talks about archiving your

12    communications with an expert.  Well, there's not a single

13    piece of paper, not one, not an e-mail, not a document,

14    nothing, nothing, nothing to suggest that SIGMA ever spoke to

15    any kind of Customs expert, not an attorney, not to Commerce,

16    not to Customs.

17            I know it claims that it talked to a broker.  It

18    had this process that it always followed.  But remember in

19    the interrogatory responses, Island Exhibit 52 asked the

20    question:  Who did you consult with about whether welded

21    outlets were subject to antidumping duties?  Answer:  No one.

22            Remember the Department of Justice interrogatory,

23    the one that Mr. Rona sat on the stand and looked at and

24    looked at and looked at and didn't know what to say.  That

25    interrogatory response said:  We didn't have any

Case 2:22-cv-00050-TFM-C Document 19-7 Filed 06/27/22 Entered 06/27/22 Page 534 of 587 Exhibit
Transcript of Day 3 of Trial    Page 108 of 166
107

 1    communications about these outlets that aren't documented.

 2    You've heard about SIGMA's whole process.  You know from

 3    SIGMA's process, it leaves tracks.  If SIGMA did in this case

 4    what it said it did, you would see the e-mails.

 5              You heard Ms. Velazquez testify today.  The

 6    engineers were sending e-mails.  Everyone is collecting all

 7    of this information.  There's communications with the

 8    brokers -- all of that, and yet you haven't seen a single

 9    thing.

10              In fact, you heard her talk about the new item

11    review process, the NIR.  There's a form that you check a

12    box.  I spoke to a consultant.  I spoke to a broker.  I spoke

13    to an attorney.  Where is that document?  SIGMA's process is

14    not on trial.  It's what SIGMA did on these products, and on

15    these products it failed woefully.

16              Finally, as to deliberate ignorance, you use your

17    common sense here.  SIGMA failed to do simple things that

18    immediately would have alerted it to the fact that these

19    products were subject to antidumping duties.  How do you

20    know?  Mr. Woehrel, he explained:  I have no training and

21    experience, and in one day, one day, I did a couple Google

22    searches.  I read the sunset review.  I looked at the scope

23    review.  Commerce sent it to me.  I sat there with my mouth

24    agape.  These products are always subject to antidumping

25    duties.

Case 2:22-cv-00050-DMG-JC Document 9-7 Filed 06/27/22 Entered 06/27/22 Page 450 of 587 Exhibit ID
Transcript of Day 3 of Trial    Page 109 of 166
108

1          When you see the Sprink-Let ruling, when you see

2     it, you heard some questions to Mr. Bhattacharji:  Is this

3     ruling binding?  Did the department walk away from it?  Okay.

4     Think about what actually happened when Mr. Bhattacharji saw

5     the Sprink-Let ruling.  What he said was:  When I saw it, I

6     knew it.  We needed -- we couldn't bring these products in

7     because we would have to pay antidumping duties.

8          So think about how simple it would have been for

9     SIGMA with its 300 employees and its compliance manuals, its

10    access to databases, all of these different things, how hard

11    would it have been for SIGMA to do the simple basic

12    inquiries.

13         I'm going to have one last chance to speak with you

14    after SIGMA's counsel concludes, but I want to just come back

15    to the basics here, which is this:  You know that SIGMA was

16    supposed to pay more than $8 million in antidumping duties.

17    You know that SIGMA submitted materially false statements to

18    Customs and Border Protection on more than 200 occasions.

19         When I come back, I'm going to ask you to return a

20    verdict in Island's favor and to make those findings.

21         Thank you.

22         THE COURT:  Thank you very much, counsel.

23         MR. CURRAN:  Judge Klausner, ladies and gentlemen

24    of the jury, I'd like to begin by thanking you for being

25    here, thanking you for participating in this trial.  There

```
 1    are not that many occasions in our lives where we are called

 2    upon to fulfill our duties as citizens of this country.  Jury

 3    duty is one of them.  Voting is another.  There aren't that

 4    many things in our day-to-day lives when we do that.  I know

 5    it's a burden.  It's also an honor.

 6          It seems a little corny sometimes, but Judge

 7    Klausner has this custom where on the start of every day of

 8    the jury trial, we all salute the flag and reflect on the

 9    role of our judicial system in our country.  And I think it's

10    very appropriate to do that.

11          We all have to be here.  We're the litigants.

12    We're the parties.  But our system places its trust in

13    impartial citizens to determine the outcome.  And regardless

14    of the outcome of this particular trial, we thank you for

15    your service.

16          Now, when I first addressed you on Tuesday, my

17    first words were that in the course of this trial, I would

18    prove to you that SIGMA did not knowingly or intentionally or

19    recklessly make false statements to U.S. Customs.  I think

20    I've done that.  I think we've proven that.

21          I think the witnesses and the documents that you've

22    been shown prove that at all times SIGMA acted responsibly,

23    in good faith, and transparently.  Now, I know how when

24    people act in good faith and transparently, they sometimes

25    can still be accused of acting otherwise.  And sometimes it's
```

Case 2:22-cv-00050-DCN-MEG Document 97-7 Filed 06/27/22 Entered 06/27/22 Page 454 of 507 PageID
Transcript of Day 3 of Trial    Page 111 of 166
110

```
 1   challenging to refute such allegations, but we've undertaken

 2   that.  We've put our faith in you citizens to see the truth

 3   here.

 4            And in my short presentation now, I'll try to

 5   resummarize why it is we are comfortable putting our faith in

 6   you to resolve this dispute.  I'll start where Mr. Kramer

 7   focused his attention for the most part, and that's on the

 8   form 7501.  So I'd like to ask Mr. Ball to bring up trial

 9   Exhibit 1009.

10            This is the centerpiece of the case in some

11   respects because this form -- this is an example of one of

12   the forms.  We know that many of these forms were filed over

13   the period from 2010 until early 2018 by SIGMA and its

14   broker.

15            The reason why this form is so important is this is

16   the alleged false statement, right, or the alleged false

17   statements are on this form.  I'll start with the steel

18   coupling language because that's kind of a centerpiece of

19   Island's claim here.

20            So is the inclusion of the word steel coupling on

21   this form a knowing or intentional false statement by SIGMA

22   to U.S. Customs.  No way.  I think you've heard the

23   testimony, right?  It was clear that the use of the word

24   steel coupling on this form is the result of a good-faith

25   effort to comply with Customs' rules, not to defy them.
```

Case 2:22-cv-00050-TPM-JTC Document 19-7 Filed 06/27/22 Entered 06/27/22 Page 454 of 587 Exhibit ID
Transcript of Day 3 of FCA Trial    Page 112 of 166
111

 1          Ms. Velazquez and other witnesses testified that on

 2    this form in that block 28 which Mr. Ball has shown here,

 3    SIGMA complied with the requirement to include the HTS code,

 4    the harmonized tariff schedule code, the 7307.99.5045.

 5          As we've heard, under Customs software, that auto

 6    populates the language pipe fit, OF, no nipples, ST.  The

 7    additional -- so first of all, that disclosure, I don't think

 8    anybody disputes that that's disclosure in accordance with

 9    Customs requirements.

10          So as to the information above that, you -- again

11    you heard Ms. Velazquez talking, that has got the invoice

12    number.  It's got the bill of lading number.  It's got other

13    important information.  And the steel coupling term comes

14    from the supplier's documentation including the bill of

15    lading, and that carries through on to here.

16          The reason why it was perfectly appropriate for

17    SIGMA and their broker to include steel coupling on this form

18    is because that description is in accordance with the

19    harmonized tariff schedule code descriptions.

20          Now, at the risk of pounding a nail into the

21    floorboard, I'd like to ask Mr. Ball to bring up trial

22    Exhibit 1068, page 5.  This is the most important page in

23    trial Exhibit 1068.  This is from the harmonized tariff code.

24    You heard and saw Ms. Velazquez explain the thinking process

25    going through this form that resulted in her and her

Case 2:22-cv-00050-RJC Document 19-7c Filed 06/27/22 Entered 06/27/22 Page 454 of 585 Exhibit
Transcript of Day 3 of Trial   Page 113 of 166
112

1    colleagues ultimately picking 7307.99.5045.

2            And that process is not only defensible as she

3    presented it, but it also -- you note that in the top line,

4    couplings is there.  You know that.  And that is a

5    description from the HTS tariff code carried through from the

6    documents and put on the form 7501.

7            Now, a couple of points on this page.  One I'll

8    kind of circle back to, but note that this classification has

9    been expressly adopted by Customs in that Star Pipe ruling.

10   I'll show you that in a moment.

11           I'd also like to note that the butt-weld fittings

12   is on line 7307.93, and that indication means that if this --

13   if this is the proper classification at 7307.99.5045, and

14   that's confirmed by the Star Pipe ruling, that means that

15   these welded outlets are not butt-weld fittings.  That helps

16   explain why SIGMA did not believe they were subject to the

17   butt-weld fitting duty order.

18           So let's first put up the Star Pipe ruling,

19   Mr. Ball.  This is trial Exhibit 1007.  I think this has been

20   talked about enough that I don't have to get into great

21   detail here.

22           This is a Customs ruling from 2003, so you see it's

23   ten years after the ancient Sprink-Let ruling.  This

24   expressly states in the third paragraph that the applicable

25   subheading for these outlet fitting products is 7307.99.5045.

Case 2:22-cv-00050-JRM9-7c Document-91 Filed 06/27/22 Entered 06/27/22 Page 454 of 587 Exhibit ID
Transcript of Day 3 of Trial    Page 114 of 166

113

 1     So there's no question about that.

 2              And to kind of close the loop on this, Mr. Ball, if

 3     you can go to trial Exhibit 1047, and particularly page 13

 4     there.  This is -- ladies and gentlemen, I hope you'll

 5     remember the instruction booklet for how to fill out the form

 6     7501.

 7              That says up at the top:  The description of the

 8     articles in sufficient detail to permit the classification

 9     thereof under the proper statistical reporting number in the

10     HTS should be reported at the top of column 28.  The standard

11     definitions from the Customs HTS database are acceptable for

12     this requirement.

13              So again, it's reasonable -- it was reasonable for

14     SIGMA to conclude that using steel coupling in box 28 was

15     what Customs wanted.  This is following instructions.  And if

16     there was anything wrong with that interpretation, then how

17     come Customs never brought this up during its focused

18     assessment audit in 2018?

19              How come Customs didn't bring this up on the close

20     examinations of imports of the welded outlets at the ports or

21     in other occasions?  How come DOJ when it examined the

22     circumstances here didn't pursue an action against SIGMA?

23     Why is it that Island has to come forward to step in the

24     shoes of the United States government here?

25              I ask you to ask yourselves those questions if

Case 2:22-00050-JDM19-7c Filed 06/07/22-1 Entered 06/27/22 Page 454 of 587 c Exhibit D
Transcript of Day 3 of 672 Trial    Page 115 of 166
114

```
 1    there was something really wrong with the use of steel

 2    couplings in this box.  Another point is I think it's been

 3    clear that Exhibit 1009, this 7501 form, is a multi-page

 4    document, right?  We've been focused frequently on the first

 5    page.

 6            We've shown repeatedly that there are other

 7    underlying documents here, including -- and this is page 5 of

 8    this exhibit -- the commercial invoice that contains the

 9    description of the products.  So ask yourselves this question

10    when you're deliberating:  If SIGMA was really trying to

11    deceive Customs or anybody else, what were they thinking?

12    How could they include a document that spells out these

13    products in this detail?

14            This is the description of the products I think

15    that Island is suggesting SIGMA should be using, and it's in

16    the duty packet.  Please, I ask you to use your common sense.

17    Consider this duty packet as a whole.  Do you think SIGMA is

18    trying to evade duties on welded outlets by disclosing the

19    Uni-Let welded outlets in the commercial invoice?

20            It doesn't add up.  It doesn't make sense.  It's an

21    overly cynical, technical argument that doesn't hold up.  The

22    inclusion of the word steel coupling is reasonable, made

23    sense, and by no means does it support a notion of a knowing

24    or reckless false statement to the government.

25            The other alleged false statement on this form has
```

Case 2:22-cv-00050-DCN Document 9-7c Filed 06/27/22 Entered 06/27/22 Page 454 of 585 Exhibit
Case 2:22-00050-DCN Document 9-7c Filed 06/27/22 Page 537 of 587 PageID
Transcript of Day 3 of Trial   Page 116 of 166
678
115

```
 1    to do with the antidumping duties.  There it is true that we

 2    know today that Commerce has decided welded outlets are

 3    included in the butt-weld pipe fitting order and are subject

 4    to import duties.  So, yes, it turns out that that was a

 5    false statement when SIGMA did not disclose antidumping

 6    duties on that form.

 7              But Commerce didn't make that determination until

 8    after SIGMA had stopped importing the product.  You all know

 9    SIGMA imported this product from 2010 when it acquired the

10    line from the Unique company until early 2018.

11    Mr. Bhattacharji testified about the termination of the

12    imports at that point in time.  The Commerce rulings happened

13    after that.

14              There's no crystal ball that alerts businesspeople

15    or everyday people as to what the U.S. -- what one U.S.

16    government agency might do in the future.  Does a Commerce

17    decision in 2021 cause a statement made in the year 2010 to

18    be knowingly and recklessly false?  No way.  It doesn't add

19    up.

20              Now, the Sprink-Let ruling was issued -- you've

21    heard a lot about that throughout the course of this case,

22    and Mr. Kramer mentioned it a moment ago.  The Sprink-Let

23    ruling came out in 1992, I believe it was.  That was long

24    before SIGMA got into this line of business, right?  You

25    heard SIGMA acquired this product line in the year 2010.  By
```

```
 1   2010 we already had the Star Pipe ruling.

 2            So I will ask Mr. Ball to bring up the Star Pipe

 3   ruling again.  So that's Exhibit 1007.

 4            So in 2010 through early 2018 when SIGMA was

 5   importing this product, we had the SIGMA [sic] ruling

 6   available on that CROSS database, right?  That's the website

 7   for Customs that has been referred to repeatedly throughout

 8   this case, the Customs Ruling Online Search System.

 9            Ms. Velazquez testified today that this is the only

10   ruling that comes up for welded outlets.  The Sprink-Let

11   ruling doesn't come up.  We don't know exactly why, but it

12   doesn't come up.  But the fact that the Star Pipe ruling

13   exists and it confirms the classification of welded outlets

14   and it confirms that the welded outlets are not butt-weld

15   pipe fittings makes it clear that SIGMA was acting reasonably

16   when it was stating that it didn't believe it owed

17   antidumping duties when it was importing the product.

18            The gentleman who was testifying earlier today,

19   Walter Sperko, an eminent expert in piping, he testified to

20   you unequivocally that in his view no one in the business

21   world in piping would consider a welded outlet to be a

22   butt-weld fitting.  That confirms SIGMA's real-world belief

23   that its products were not covered by the butt-weld fitting

24   order.

25            Another thing.  Mr. Kramer said this a moment ago
```

1    and I think he's said it a couple of times during the case to

2    witnesses, that the word steel coupling is expressly excluded

3    from the China order.

4           So, Mr. Ball, I'd like you to put up if you can the

5    China order scope side by side with the Taiwan butt-weld

6    scope.

7           So here, ladies and gentlemen, you'll see on the

8    screen on the left side is the scope of the China order.  You

9    can see that came out in 1992.  On the right side is the

10   scope of the Taiwan order.  Only the Taiwan order says other

11   than couplings.

12          I'm afraid that Mr. Kramer has created the

13   impression that couplings are expressly excluded from the

14   China order.  And I think he was suggesting that that would

15   explain perhaps why SIGMA was using the word coupling in the

16   7501.  It's like an effort to fall into some exclusion, but

17   the fact of the matter is the China order doesn't exclude

18   couplings.

19          And Ms. Velazquez testified today that there are

20   other dumping orders that cover couplings.  So not only was

21   the inclusion of couplings fair, reasonable, in good faith,

22   but it also would have been a particularly inappropriate

23   effort at circumventing antidumping duties because it would

24   be walking into perhaps other dumping duties.

25          Ladies and gentlemen, this case focuses on the

```
 1   conduct and state of mind of SIGMA, but I do ask you to
 2   consider the other side of the room as well, Island's role
 3   here.  I ask you to consider what Island's motivation is in
 4   bringing this case.
 5            Now, fortunately we had some -- a candid statement
 6   or two about acknowledgment of financial interest in the
 7   case.  I think Mr. Kramer made a comment to that effect in
 8   his opening, and I think Mr. Sanders made an admission along
 9   those lines in his videotape presentation that we put on
10   because he didn't come to the trial.
11            That might be part of it, but you also heard that
12   Island actually purchases from SIGMA, and you heard that
13   Island actually purchases welded outlets from China from
14   SIGMA.  And just on the chance that perhaps that wasn't clear
15   or has been forgotten, I would like to ask Mr. Ball to play
16   the short clip, pages 69, line 20, to 70, line 11.
17            (Portion of videotape deposition played)
18            MR. CURRAN:  So let's reflect upon that for a
19   minute.  So Island is generally a competitor of SIGMA and may
20   be motivated by competitive instincts to sue SIGMA in a case
21   like this.  But it's particularly problematic, I submit, for
22   Island to be a purchaser of welded outlets from China that
23   Island believes evaded antidumping duties.
24            So Island is buying the product at a cheaper price
25   and then is suing its own supplier for not paying the duties
```

1    on it?  It doesn't make sense.  I ask you just to consider

2    that the allegations here may not be coming from some

3    patriotic duty to have the United States Treasury gain a few

4    million dollars but instead might be an effort to impose some

5    punishment on a competitor that's also a supplier.

6            And it -- it suggests dirty tricks, is what I'm

7    suggesting.  And Mr. Woehrel acknowledged that as part of

8    their pretrial investigation in this case, Island was

9    contacting employees and former employees of competitors to

10   get information to support this lawsuit.  I ask you to

11   consider whether that is ethical behavior on the part of

12   Island.

13           In any event, separate and apart from Island's

14   motivations perhaps, we are comfortable with you passing

15   judgment on what SIGMA did, reaching your own conclusions as

16   to whether SIGMA was acting in good faith or not.

17           If you believe that SIGMA intentionally or

18   recklessly was evading antidumping duties, then you know what

19   to do.  You follow Judge Klausner's instructions.  But we

20   submit to you -- I submit to you that the evidence

21   establishes overwhelmingly a good-faith effort here to comply

22   with the law, not to evade it.

23           This is a difficult technical area.  SIGMA did its

24   best.  It has come forward here.  It's had three executives

25   appear in court in person to explain their position.  They're

Case 2:22-00050-DMG-7c   Document 19-7   Filed 06/27/22   Entered 06/27/22 12:45:54   Desc Exhibit
Transcript of Day 3 of FCA Trial    Page 121 of 166

120

1   willing to put the decision in your lap.  We have great faith

2   you'll execute those duties seriously.

3        Also, please consider that in SIGMA's effort to

4   comply with the law, not only did they reach their own

5   independent judgments as to what was the right thing to do,

6   not only did Ms. Velazquez and her colleagues do the analysis

7   called for by the harmonized tariff schedule, not only did

8   they also follow the Star Pipe ruling and other guidance they

9   had from the government, but they relied heavily upon outside

10  experts.

11       You heard about their reliance on licensed customs

12  brokers including CH Powell, which Ms. Thompson acknowledged

13  is a reputable national consulting firm or compliance broker,

14  and SIGMA has been relying on them and other brokers before

15  that.  That smacks of an effort to comply with the law, not

16  evade it.

17       All things in this case point in the same

18  direction.  SIGMA had good faith, not an effort to

19  circumvent.  We have faith in your abilities to see the truth

20  here.  Thank you for your time today and throughout this

21  week.  Thank you.

22       Thank you, Judge Klausner.

23       THE COURT:  Rebuttal?

24       MR. KRAMER:  Ladies and gentlemen, SIGMA's counsel

25  didn't really dispute that SIGMA owes $8 million in

```
 1    antidumping duties.  That's not even -- that's not even being
 2    discussed.  SIGMA's counsel instead offered a series of
 3    excuses, explained why it is that SIGMA was trying but it got
 4    it wrong.
 5            SIGMA's counsel doesn't -- didn't come up here and
 6    tell you that steel coupling was a true statement -- because
 7    it was not.  Think about what has been suggested here.
 8    SIGMA's counsel has suggested that using the phrase steel
 9    coupling was required.
10            Well, you've heard the evidence, and you know that
11    Ms. Thompson addressed this point directly.  The phrase steel
12    coupling on these forms is not mandated.  It was a choice
13    that SIGMA made.  That's what happened here.  If SIGMA had
14    wanted to be honest and transparent, it could have called the
15    product a welded outlet, because that's what it is.  SIGMA
16    could have said it's a welding outlet, because they use that
17    phrase in their advertising, too.
18            What it can't do, what it can't do is choose to use
19    a phrase that just isn't true.  Now, it's okay.  Maybe
20    there's a reason how they got to that.  But again, read Judge
21    Klausner's instructions closely.  Follow them.  You'll see
22    this is not about intent.  It's not about good faith.
23            The question here is really straightforward.  Are
24    these false statements?  Yes.  Did SIGMA know that they were
25    false statements?  Of course they knew it wasn't a steel
```

Case 2:22-cr-00050-DCN-19-7c Electron06/27/221 Entered06/27722-Page454 of 585c ExhibID
Transcript of Day 3 of Fox Trial    Page 123 of 166
122

```
 1    coupling.  Was it material?  Yes.  Was the United States
 2    deprived of $8 million in antidumping duties?  Yes.  That's
 3    the case.  That's the four elements.
 4              Now, SIGMA's counsel raised a point.  He said that
 5    we had suggested that couplings were excluded from the China
 6    order -- expressly excluded, I think, may have been the
 7    phrase.
 8              What we've done in this case -- you've heard this
 9    testimony -- Mr. Woehrel explained this as the first witness.
10    He explained that the difference between the butt-weld pipe
11    fitting using the Commerce Department product descriptions in
12    history here is a beveled edge that is permanently welded.
13    That's what he explained, is that couplings are not beveled
14    and are not permanently welded.
15              If you take a look at Exhibit 1033, which is the
16    SIGMA scope ruling request.  You may remember during the
17    course of the trial, we talked about the Commerce Department
18    publications, the sunset reviews where they talk about the
19    scope of the antidumping duty applicable to all five of these
20    countries and what they have said.
21              This isn't me.  This is the Commerce Department.
22    The Commerce Department has said the merchandise here is
23    carbon steel butt-weld pipe fittings under 14 inches other
24    than couplings.  Other than couplings.
25              Now, you heard SIGMA's counsel suggest today -- you
```

Case 2:22-cv-00050-DCN-19-jc Document 19-7 Filed 06/27/22 Entered 06/27/22 Page 454 of 587c Exhibit ID
Transcript of Day 3 of Trial    Page 124 of 166

123

 1    heard Ms. Velazquez testify to this -- that there was an

 2    antidumping duty order on steel couplings.  But you heard her

 3    also when I asked her a few questions about it, the

 4    antidumping duty order on steel couplings didn't come about

 5    until the very end of 2017.

 6         It has nothing to do with why SIGMA made these

 7    decisions in 2010 and 2011 and 2012.  Talk about a crystal

 8    ball.  That would be a crystal ball.  Speaking of crystal

 9    balls, we've now heard in the opening statement and in the

10    closing statement that SIGMA couldn't possibly have known

11    that these products were subject to antidumping duties.  It

12    would take a crystal ball.

13         It would not.  It would take a simple review of the

14    sunset review, because we know what happened here is that

15    Commerce ruled not just in 2021 that welded outlets were

16    butt-weld pipe fittings.  We know that Commerce ruled in

17    1992, 1992, that welded outlets were butt-weld pipe fittings.

18         So Island -- we're not asking for SIGMA to predict

19    the future.  We're asking for SIGMA to do its job.  Importers

20    of record -- you've heard about this Customs system now.

21    It's sort of strange.  I'm going to admit it.  In some ways

22    it's like a fox guarding the henhouse.  But importers of

23    record are the people who are charged with a legal obligation

24    to determine if antidumping duties apply to these products.

25         You know what happens if they don't try that hard,

Case 2:22-cv-00050-DCN-CJC Document 19-7c Filed 06/27/22 Entered 10/12/22 22:14:54 of 587c Exhibit
Transcript of Day 3 of Jury Trial    Page 125 of 166

124

```
 1   if it's easier to look away?  It's like, I don't know that I
 2   need to try that hard.  I don't -- we've done enough.  You
 3   know who suffers?  Domestic manufacturers.  That's who
 4   suffer.
 5               THE COURT:  You've got five.
 6               MR. KRAMER:  Thank you.
 7               Because antidumping duties -- you've heard this --
 8   the point of an antidumping duty is to level the competitive
 9   playing field.  They're not imposed as a whim.  This isn't
10   protectionism.  This is when the U.S. government undertakes a
11   formal investigation and it determines that another country
12   is engaging in unfair trade practices.
13               You heard Ms. Velazquez say not all antidumping
14   duties are 182.9 percent.  Some of them are only, like, two
15   percent.  What does that tell you?  It tells you in this
16   industry China cheats.  The U.S. government found that and
17   imposed this antidumping duty.
18               A domestic manufacturer like Island who has never
19   imported a product ever -- that clip, sure, they bought a
20   product at some point.  Doesn't even say what time it was.
21   2010?  2011?  Was it before they even knew about this
22   investigation?
23               You can't just take these things out of context and
24   suggest that there's something improper happening at Island.
25   When you take a look at those instructions, you will not see
```

```
 1   a single instruction that suggests anything about Island's

 2   conduct is relevant to this case.  This case is about SIGMA.

 3           Here's what happens when it's easier to look away

 4   and not bother to do the research.  Companies like Island go

 5   out of business.  That's what happens.  The people that they

 6   employ, they get laid off.  That's what happens.

 7           So when you go back and you deliberate and you

 8   think about this case and you wonder what is it that I want

 9   an importer of record to do -- what does it mean to be

10   reckless?  What does it mean to act in deliberate ignorance?

11           Think about that, too, because when you balance

12   this all out, when you think about what the point of these

13   antidumping duties are, when you think about the honor system

14   that we have, think about that.  It means that importers of

15   record need to do their jobs.

16           Now, in this case what the record reflects and what

17   the evidence shows is that SIGMA didn't come close.  Go back

18   through the evidence.  I told you this in the opening.  I

19   said, keep your eye on the ball.  Keep your eye on the ball.

20   Look at the evidence that comes in.  Notice the evidence you

21   would expect to see from an importer of record that you never

22   see.

23           I promised you that, and guess what you never saw?

24   You didn't see an e-mail with a customs broker.  You didn't

25   see an opinion from a customs broker.  You didn't see an
```

 1    e-mail with an attorney.  Think about the witnesses that they

 2    presented.  They told us that the people who know the most

 3    about this case are the people in the import group -- Pat

 4    Thacker, Andy Podner, Inge Atkinson.

 5         Mitchell Rona testified as the corporate

 6    representative.  He had a duty to know what the company had

 7    done.  Did he talk to any of those people before he came and

 8    gave that deposition?  He did not.  Why?  He didn't want to

 9    know.  He didn't want to know.

10         Where are the documents?  Island doesn't have the

11    documents.  SIGMA has the documents.  Where is the evidence

12    that they undertook any meaningful effort to be a good

13    importer of record?  Where is it?  You're not going to find

14    it.  It's not in this case.

15         So let me finish where I told you I would finish.

16    Island Industries requests that you return a verdict that

17    finds that SIGMA violated the False Claims Act.

18         We request that you return a verdict that indicates

19    that SIGMA made more than material false statements on more

20    than 200 occasions and that you return a verdict that finds

21    that the United States government, our government, that flag,

22    was deprived of more than $8 million in antidumping duties.

23    You've got the exact math right there on Exhibit 65.

24         And then my final statement.  This is an important

25    case.  It's important for Island.  It's important for

```
 1   importers of record.  It's important for the government.  And
 2   you all know your service is essential to its resolution.
 3           So as I sit down, I want to just take this last
 4   minute to thank you for your time, your attention, and your
 5   service.
 6           THE COURT:  Thank you, counsel.
 7           Counsel, is the defense pursuing the affirmative
 8   defense?  I didn't hear anything in the argument about
 9   affirmative defense.  So as far as your instructions, are you
10   pursuing the affirmative defense?
11           MR. CURRAN:  Yes.
12           THE COURT:  Okay.
13           Ladies and gentlemen, I'm going to instruct you now
14   on the law that applies to the case.  Now that you've heard
15   all the evidence and the argument of the attorneys, it is my
16   duty to instruct you on the law that applies to this case.  A
17   copy of these instructions will be sent to the jury room for
18   you to consult during your deliberations.
19           It is your duty to find the facts from all the
20   evidence in this case.  To those facts you will apply the law
21   that I give to you.  You must follow the law as I give it to
22   you whether you agree with it or not.
23           You must not be influenced by any personal likes or
24   dislikes, opinions, prejudice, or sympathy.  That means that
25   you must decide this case solely on the evidence before you.
```

Case 2:22-cr-00050-JPM Document 19-7c Filed 06/27/22 Entered 06/27/22 14:54:40 of 587 Desc Exhibit
Transcript of Day 3 of Trial    Page 129 of 166
128

1    You will recall that you took an oath to do so.

2            Please do not read into these instructions or

3    anything that I may have said or done that I have an opinion

4    regarding the evidence or what the verdict should be.  That

5    is a matter that is entirely up to you.

6            The evidence you are to consider in deciding this

7    case consists of the sworn testimony of witnesses, the

8    exhibits that have been admitted into evidence, and any fact

9    to which the lawyers have agreed or any fact that I have

10   instructed you to accept as proved.

11           In reaching your verdict, you may consider only the

12   testimony and exhibits received into evidence.  As I've said

13   before, certain things are not evidence and you may not

14   consider them in deciding what the facts are.

15           I'll list them for you:

16           Argument and statements of attorneys are not

17   evidence.  The lawyers are not witnesses.  What they have

18   said in their opening statements or closing arguments or at

19   other times is intended to help you interpret the evidence,

20   but it is not evidence.  If the facts as you remember them

21   differ from the way the attorneys have stated them, your

22   memory of them controls.

23           Questions and objections by the attorneys are not

24   evidence.  Attorneys have a duty to their client to object

25   when they believe that a question is improper under the rules

Case 2:22-cv-00050-DCN Doc 19-7c Filed 06/27/22 Entered 06/27/22 Page 4 of 58 Exhibit
Transcript of Day 3 of Trial    Page 130 of 166
129

1    of evidence.  You should not be influenced by the objection

2    or by the Court's ruling on it.

3            Testimony that is excluded or stricken or that I

4    have told you to disregard is not evidence and must not be

5    considered.  In addition, if some evidence was received only

6    for a limited purpose or when I've so instructed you to

7    consider it only for a limited purpose, you must do so and

8    not consider it for any other purpose.

9            Anything that you have seen or heard when court is

10   not in session is not evidence.  You are to decide this case

11   solely on the evidence received in this trial.

12           Evidence may be either direct or circumstantial.

13   Direct evidence is direct proof of a fact such as testimony

14   by a witness about what that witness personally saw or heard

15   or did.

16           Circumstantial evidence is proof of one or more

17   facts from which you could find another fact.  You should

18   consider both kinds of evidence.  The law makes no

19   distinction between the weight to be given to either direct

20   or circumstantial evidence.  It is for you to decide how much

21   weight is to be given to any evidence.

22           There are rules of evidence that control what can

23   be received into evidence.  When a lawyer asks a question or

24   offers an exhibit into evidence and the lawyer on the other

25   side thinks that it is not permitted by the rules of

Case 2:22-cv-00050-DCN-9-7c Document 19-7  Filed 06/27/22  Entered 06/27/22  Page 552 of 587  Desc Exhibit
Transcript of Day 3 of Foia Trial    Page 131 of 166
130

```
 1    evidence, the lawyer may object.

 2          If I overrule the objection, the question may be

 3    answered and the exhibit received.  If I sustain the

 4    objection, the question cannot be answered or the exhibit

 5    cannot be received.  Whenever I sustain an objection to a

 6    question, you must ignore the question and must not guess as

 7    to what the answer might have been.

 8          In deciding the facts of this case, you may have to

 9    decide which testimony to believe and which testimony not to

10    believe.  You may believe everything a witness says or part

11    of it or none of it.

12          In considering the testimony of a witness, you may

13    take into account:  number one, the opportunity and the

14    ability of the witness to see or hear or know the things

15    testified to; number two, the witness's memory; number three,

16    the witness's manner while testifying; number four, the

17    witness's interest in the outcome of the case, if any; number

18    five, the witness's bias or prejudice, if any; number six,

19    whether other evidence contradicts the witness's testimony;

20    seven, the reasonableness of the witness's testimony in light

21    of all the other evidence; eight, any other factor that bears

22    on believability.

23          The weight of the evidence as to any fact does not

24    necessarily depend on the number of witnesses who have

25    testified.  What is important is how believable the witnesses
```

Case 2:22-00450-DCN-19-7c Document 19-7 Filed 06/27/22 Entered 06/27/22 Page 554 of 587c Exhibit
Transcript of Day 3 of Jury Trial    Page 132 of 166

131

 1    were and how much weight you think their testimony deserves.

 2            You have heard testimony from experts who testified

 3    to opinions and the reasons given for those opinions.  This

 4    opinion testimony is allowed because of the education and

 5    experience of these witnesses.

 6            Such opinion testimony should be judged like any

 7    other testimony.  You may accept it or reject it and give it

 8    as much weight as you think it deserves considering the

 9    witness's education and experience, the reasons given for the

10    opinion, and all the other evidence in the case.

11            Under the law a corporation is considered to be a

12    person.  It can act only through its employees, agents,

13    directors, or officers.  Therefore, a corporation is

14    responsible for the acts of its employees, agents, directors,

15    or officers performed within the scope of their authority.

16            To help you evaluate the evidence, I'll give you a

17    brief summary of the position of the parties.  Plaintiff

18    Island asserts that the defendant SIGMA Corporation, number

19    one, imported Chinese welding outlets into the United States

20    that were subject to antidumping order on butt-welding pipe

21    fittings from the People's Republic of China.

22            Number two, that they knew, deliberately ignored,

23    or recklessly disregarded that these Chinese welded outlets

24    were subject to the antidumping duty order.  Three, that they

25    falsely described the product and falsely stated that they

Case 2:22-cv-00050-RWS Document 19-7c Filed 06/27/22 Entered 06/27/22 Page 554 of 587 Exhibit ID
Transcript of Day 3 of FCA Trial    Page 133 of 166
132

         1    were not subject to any antidumping duty order.  The

         2    plaintiff has a burden of proving this claim by a

         3    preponderance of the evidence.

         4          The defendant denies that it knowingly made any

         5    false statements or that it knowingly failed to pay the

         6    duties that were owed.

         7          When a party has the burden of proving a claim by a

         8    preponderance of the evidence, it means you must be persuaded

         9    by the evidence that that claim is more probably true than

        10    not true.  You should base your decision on all the evidence

        11    regardless of which party presents it.

        12          The False Claim Act prohibits a defendant from

        13    knowingly making false statements to avoid an obligation to

        14    pay money to the government.  For you to find the defendant

        15    liable under the False Claims Act, plaintiff must show by a

        16    preponderance of the evidence the following:

        17          First, that the defendant made a false statement.

        18          Second, that the statement was material.

        19          Third, that the defendant acted with required

        20    knowledge; that is, that the defendant made the statement

        21    while having actual knowledge of the information or acting in

        22    deliberate ignorance or reckless disregard for the truth or

        23    falsity.

        24          And fourth, the false statement caused the

        25    government to forfeit money that it was due.

Case 2:22-cv-00050-RMP ECF No. 19-7 filed 06/27/22 PageID 4554 of 587 Exhibit
Transcript of Day 3 of FCA Trial    Page 134 of 166
133

```
 1            A statement is false if it is an assertion that is

 2    untrue when it is made.  In this case the Department of

 3    Commerce has ruled that the Chinese weld outlets are subject

 4    to antidumping duties and are within the scope of the 1992

 5    antidumping duty order or the China order.

 6            Accordingly, I instruct you that the defendant's

 7    statements that its welded outlets are not subject to the

 8    antidumping duty are false.

 9            The second element is materiality.  A statement is

10    material if it has a natural tendency to influence or be

11    capable of influencing the payment or receipt of money.

12            The third element.  For purposes of the False

13    Claims Act, the defendant must have acted with the required

14    knowledge.  Defendant acted with the required knowledge if

15    the plaintiff proves one of the following:  number one, that

16    the defendant had actual knowledge of the information; number

17    two, that the defendant acted in deliberate ignorance of the

18    truth or falsity of the information; number three, that the

19    defendant acted in reckless disregard of the truth or falsity

20    of the information.

21            It is not necessary for the plaintiff to prove the

22    defendant acted with actual intent.  If you find the

23    plaintiff has proved each of the elements that it must

24    establish to prove a False Claim Act violation by the

25    defendant, you must then consider the defendant's affirmative
```

1    defense which the defendant has the burden to prove by a

2    preponderance of the evidence.

3          That defense is that the defendant contends that

4    the plaintiff's claim for violations that occurred before

5    June 13th of 2011 are barred by law that requires a plaintiff

6    to bring a lawsuit within a specified time.

7          To prevail on this defense, the defendant must

8    prove by a preponderance of the evidence that the government

9    reasonably should have known about the defendant's

10   pre-June 13th, 2011, conduct before June 13th, 2014.

11         It is the duty of the Court to instruct you about

12   the measure of damages.  By instructing you on damages, the

13   Court does not mean to suggest for which party your verdict

14   should be rendered.

15         If you find for the plaintiff, you must determine

16   the amount of damages.  The plaintiff has the burden of

17   proving damages by a preponderance of the evidence.  The

18   measure of damages is the difference between what the

19   government receives and what the government would have

20   received if the defendant's statements were truthful.

21         It is for you to determine damages if any have been

22   proved.  Your award must be based upon evidence and not upon

23   speculation, guesswork, or conjecture.

24         Before you begin your deliberations, you'll elect

25   one of your members of the jury as a presiding juror.  The

Case 2:22-cr-00054-DCN Document 9-7 Filed 06/27/22 Entered 06/27/22 Page 454 of 565 Exhibit ID
Transcript of Day 3 of FCA Trial    Page 136 of 166
135

1   presiding juror will preside over your deliberations and

2   serve as a spokesperson for the jury in this court.

3           You shall diligently strive to reach an agreement

4   with all of your other fellow jurors if you can do so.  Your

5   verdict must be unanimous.  Each of you must decide this case

6   for yourselves, but you should do so only after you have

7   considered all the evidence, discussed it fully with all the

8   other jurors, and listened to their views.

9           It is the important that you attempt to reach a

10  unanimous verdict but, of course, only if each of you can do

11  so after having made your own conscientious decisions.  Do

12  not be unwilling to change your opinion if the discussion

13  persuades you that you should, but do not come to a decision

14  simply because the other jurors think that it is right, nor

15  change an honest belief about the weight or the effect of the

16  evidence simply to reach a verdict.

17          As I've talked to you before about your conduct,

18  because you must base your verdict only on the evidence

19  received in this case and on these instructions, I'll remind

20  you that you must not be exposed to any other information

21  about this case or the issues it involves.

22          Except for discussing the case with your fellow

23  jurors during your deliberations, you should not communicate

24  with anyone in any way and do not let anyone communicate with

25  you in any way about the merits of this case or anything to

Case 2:22-cr-00054-DPM- c Document 9-7 Filed 06/27/22 Entered 06/27/22 12:45:54 of 585 c Exhibit Page 4 of 566 PageID
Transcript of Day 3 of FCA Trial    Page 137 of 166
136

 1    do with it.  This applies to communicating with your family

 2    members, your employer, the media, and people involved in

 3    this trial.

 4          If you are asked or approached in any way about

 5    your jury service or anything to do with this case, you must

 6    respond that you've been ordered not to discuss this matter

 7    and to report that contact to the Court.

 8          Do not do any research such as consulting

 9    dictionaries, searching the internet, or using any other

10    reference material, and do not make any investigation or in

11    any other way try to learn about this case on your own.

12          Do not visit or view any place discussed in this

13    case, and do not use internet programs or any other devices

14    to search or to view any place discussed in this trial.

15          Also, do not do any research about this case, the

16    law, or the people involved such as the parties, the

17    witnesses, or the lawyers until you've been excused as

18    jurors.

19          If you happen to hear anything touching on this

20    case, please turn away from that information and report to

21    the Court such contact.  A juror who violates these

22    restrictions jeopardizes the fairness of these proceedings

23    and a mistrial could result which would require the entire

24    trial process to start over.  If any juror has been exposed

25    to any outside information, please notify the Court

Case 2:22-cr-00050-DCN-19-jc   Document 9-7   Filed 06/27/22   Entered 06/27/22 Page 559 of 587 Exhibit ID
Transcript of Day 3 of FCR Trial    Page 138 of 166

137

1    immediately.

2            If it becomes necessary during your deliberations

3    to communicate with me, you may send a note out through the

4    bailiff, signed by any one or more of you.  No member of the

5    jury should ever attempt to communicate with me except in a

6    signed writing, and I will not communicate with any member of

7    the jury on anything concerning this case except in writing

8    or here in open court.

9            If you send out a question, I will consult the

10   attorneys before answering it, which may take some time.  Let

11   me talk to you a little bit about that.  Sometimes we have

12   other cases going on.  Sometimes if you're back there in

13   deliberation and you have a question you sent out to us,

14   don't get discouraged because sometimes we have to get the

15   attorneys in or we have to finish the other case.  So

16   sometimes it make take an hour or an hour and a half to get

17   back to you on any question you might send out.  So during

18   that period of time, you may continue your deliberations

19   while waiting for an answer to any question.

20           Also, I can tell you that if you want to revisit

21   any videos or if you want to see the material that has been

22   introduced as physical evidence, we're going to have to bring

23   you back here in court to show you those physical objects or

24   to play the video for you.

25           Remember that you are not to tell anyone, including

```
 1   this Court, how the jury stands whether in terms of the vote

 2   count or otherwise until after you've reached a unanimous

 3   verdict or have been discharged by this Court.

 4          A verdict form will be prepared for you after

 5   you've reached a unanimous verdict or an agreement on a

 6   verdict.  Your foreperson should complete the verdict form

 7   according to your deliberations, sign it, date it, and advise

 8   the bailiff that you're ready to return to this courtroom.

 9          Do you have any questions before we release you

10   back to the jury room?  If not, will you swear the bailiff,

11   please.

12          THE CLERK:  Approach the podium, please.

13          (Bailiff sworn)

14          THE CLERK:  Please state your name.

15          THE BAILIFF:  David Crivelli, C-r-i-v-e-l-l-i.

16          THE CLERK:  All rise.

17          (Jury out for deliberation)

18          THE COURT:  The jury has left the courtroom.

19          Counsel, I'm going to ask both sides if you could

20   stay around the courthouse until at least until 4:00.  At

21   4:00 we're going to excuse everybody.

22          Tomorrow, if they're deliberating tomorrow and you

23   want to be within 15 or 20 minutes, that's fine.  But tonight

24   if you can stay around here -- you can go down to the

25   cafeteria or whatever, as long as we can get a hold of you
```

Case 2:22-00050436... Document 19-7c Filed 06/27/22 Filed 06/27/22 Page 564 of 567 Exhibit
Transcript of Day 3 of FCA Trial    Page 140 of 166

139

```
 1    and get you back in 10 or 15 minutes.  Okay?

 2              Also I want to compliment both sides on your

 3    professionalism in the way you both presented the case.  Your

 4    clients, your corporations, should be very proud of you.

 5              We'll be in recess.

 6            (Recess taken from 2:18 p.m. until 3:48 p.m.)

 7              THE CLERK:  All rise.

 8            (Open court - jury present)

 9              THE COURT:  The foreperson is juror number three?

10              THE JURY FOREPERSON:  Yes, sir.

11              THE COURT:  I understand that you have a note here

12    that you've reached a unanimous verdict; is that correct?

13              THE JURY FOREPERSON:  Yes, Your Honor.

14              THE COURT:  Have you signed that verdict and

15    dated it?

16              THE JURY FOREPERSON:  Yes.

17              THE COURT:  Okay.  If you could pass that up to the

18    bailiff, please.

19              (Document handed to the bailiff)

20              THE COURT:  Okay.  If you could read the verdict,

21    please.

22              THE CLERK:  United States District Court, Central

23    District of California.

24              United States of America, ex rel., Island

25    Industries, Inc., plaintiff, versus Vandewater International,
```

```
 1    Inc., et al., defendants.

 2                Case Number CV 17-04393-RGK.

 3                Jury verdict form.

 4                We the jury in the above-titled case answer the

 5    questions posed to us as follows:

 6                Question Number 1:  Do you find by a preponderance

 7    of the evidence that defendant violated the False Claims Act

 8    by knowingly making false statements to avoid an obligation

 9    to pay money to the government?

10                Answer, yes.

11                If your answer to question one is yes, proceed to

12    the next question.  If your answer to question 1 is no, stop

13    here.  Answer no further questions and have the presiding

14    juror sign and date this form.

15                Question Number 2:  Do you find that the government

16    reasonably should have known by June 13, 2014, of any

17    violation that plaintiff alleges defendant committed before

18    July 13, 2011?

19                Answer, no.

20                If your answer to question 2 is yes, proceed to the

21    next question.  If your answer to question 2 is no, skip

22    question 3 and proceed to question 4.

23                Question Number 4:  What is the amount of damages

24    that plaintiff has proven that defendant owes?

25                Answer, $8,085,546.03.
```

Case 2:22-cv-00050-DCN-1-9-7c Filed 06/27/22-1 Entered 06/27/22 12:46:54 of 585c Exhibit
Transcript of Day 3 of FCA Trial    Page 142 of 166
141

```
1                    Signed by the presiding juror October 7th, 2021.

2                    THE COURT:  Okay.

3                    Ladies and gentlemen of the jury, is that your

4        verdict, say you one say you all?

5                    THE JURY FOREPERSON:  Yes.

6                    THE COURT:  Anytime we take a jury verdict, whether

7        it's criminal or civil, we always do what we call polling the

8        jury.  That means we go through each juror individually to

9        find out if the verdict as just read by the clerk represents

10       your own individual verdict.  That's the way we can tell if

11       it's unanimous or not.

12                   So, Juror No. 1, does the verdict as read reflect

13       your own individual verdict?

14                   JUROR NO. 1:  Correct.

15                   THE COURT:  Juror No. 2?

16                   JUROR NO. 2:  Yes, Your Honor.

17                   THE COURT:  Juror No. 3?

18                   JUROR NO. 3:  Yes.

19                   THE COURT:  Juror No. 4?

20                   JUROR NO. 4:  Yes, Your Honor.

21                   THE COURT:  Juror No. 5?

22                   JUROR NO. 5:  Yes, Your Honor.

23                   THE COURT:  Juror No. 6?

24                   JUROR NO. 6:  Yes.

25                   THE COURT:  Juror No. 7?
```

Case 2:22-cv-00050-DCN-9-jc Document 19-7 Filed 06/27/22 Entered 06/27/22 Page 564 of 585 Exhibit ID
Transcript of Day 3 of FCA Trial    Page 143 of 166
142

```
1              JUROR NO. 7:  Yes.

2              THE COURT:  Juror No. 8?

3              JUROR NO. 8:  Yes.

4              THE COURT:  Okay.  The Court will then order that

5    at this time the verdict will be recorded.

6              Ladies and gentlemen, I'm now relieving you of your

7    obligation not to discuss the case, et cetera.  You have no

8    more obligations.  We want to thank you very much for your

9    participation.  Hopefully it's been an educational or an

10   interesting experience for you here.

11             I'm going to be excusing you at this time.  I do

12   want to give you one caveat, though.  After the verdict

13   sometimes the attorneys like to talk with the jurors and the

14   jurors like to talk with the attorneys.

15             If you do talk with the attorneys, one of the

16   things you do not divulge to the attorneys or anybody else is

17   what the other jurors said in the jury room.  That should be

18   sacred between the jurors.  People should feel free to say

19   whatever they want without thinking that somebody else is

20   going to go out and publish it all over the place.

21             So you can say what you think about the case, what

22   you thought was strong or weak about the case, but don't

23   divulge what the other jurors said in the jury room.  Okay?

24             Also, many times, in fact the majority of times,

25   jurors just want to go home.  They don't particularly want to
```

Case 2:22-00050436-0rM19-jc Filed 06/27/22-1 Entered 06/27/22 17 24 54 of 585 c Exhid ID
Transcript of Day 3 of FCA Trial    Page 144 of 166
143

```
1    talk with the attorneys afterwards.  They just want to go
2    home.  If you do, the bailiff will make sure that you can get
3    out of the building without talking to anybody at all.
4            If you want to talk to the attorneys, that's fine.
5    They can lead you into that area to talk with the attorneys
6    if you wish.  That's up to you.
7            Anything else I can do for you?  If not, thank you
8    very much for your participation.  We appreciate it and we're
9    going to excuse you at this time.
10           THE CLERK:  All rise.
11           (Jury excused)
12           THE COURT:  You can have a seat.
13           First of all, counsel, I want to thank you both.  I
14   already have.  Thank you both for all of the attorneys'
15   participation.  Anyone that wishes to submit their motions to
16   the Court?  You said you've already submitted yours.  Any
17   motion that you wish to submit to the Court has to be done by
18   Tuesday at 10:00 o'clock.  And any response has to be in by
19   Thursday at 4:00.  Okay.
20           Anything else I can do for you?  If not, thank you
21   very much for your participation.
22               (Proceedings concluded at 3:53 p.m.)
23                          -oOo-
24
25
```

Case 2:22-cv-00050-DCN-9-c   Document 06/27/22-1   Entered 06/27/22 Page 456 of 585   Exhibit
Transcript of Day 3 of Jury Trial    Page 145 of 166
144

```
 1                        CERTIFICATE

 2    I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

 3    TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN

 4    THE ABOVE MATTER.

 5    FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

 6    REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

 7    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

 8

 9    /s/ Miriam V. Baird          10/07/2021

10    MIRIAM V. BAIRD                        DATE
      OFFICIAL REPORTER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:22-cv-00050-RGK-JC   Document 21   Filed 06/27/22   Page 567 of 587   Page ID
Transcript of Day 3 of Court Trial   Page 146 of 166
145

**$**

**$375** [1] - 4:20
**$8,085,546.03** [1] - 140:25

**/**

**/s** [1] - 144:9

**0**

**001** [2] - 47:9, 47:10

**1**

**1** [11] - 50:9, 50:18, 51:10, 53:24, 54:17, 60:12, 140:6, 140:12, 141:12, 141:14
**1.3** [1] - 84:1
**1.829** [1] - 104:3
**10** [3] - 51:17, 96:1, 139:1
**10/07/2021** [1] - 144:9
**1006** [2] - 31:6, 76:23
**1007** [4] - 58:22, 60:12, 112:19, 116:3
**1009** [5] - 46:22, 52:15, 64:24, 110:9, 114:3
**1033** [1] - 122:15
**1040** [1] - 49:22
**1047** [7] - 3:13, 50:9, 50:10, 50:12, 50:14, 51:16, 113:3
**1068** [6] - 53:24, 55:19, 56:3, 56:24, 111:22, 111:23
**1077** [5] - 3:12, 13:17, 13:19, 14:4, 14:6
**1079** [8] - 3:11, 11:16, 11:25, 12:5, 12:6, 12:14, 12:16, 13:7
**1080** [6] - 3:11, 13:3, 13:6, 13:7, 13:13, 13:15
**1083** [6] - 3:12, 14:18, 14:20, 14:21, 14:22, 14:25
**1084** [6] - 3:13, 15:16, 15:18, 15:19, 15:23, 15:25
**1089** [1] - 10:23
**1090** [1] - 11:9
**10:00** [2] - 59:9, 143:18
**10:01** [1] - 59:24
**10:20** [1] - 59:24
**11** [3] - 72:21, 73:13, 118:16
**11893** [1] - 1:23
**11:04** [1] - 95:1
**12** [1] - 3:11
**13** [5] - 3:11, 51:16, 113:3, 140:16, 140:18
**13th** [3] - 134:5, 134:10
**14** [3] - 3:12, 3:12, 122:23
**15** [5] - 3:13, 59:10, 59:22, 138:23, 139:1
**16** [2] - 72:21, 73:13

**17** [2] - 3:5, 72:12
**17-04393-RGK** [1] - 140:2
**18** [1] - 72:12
**18-year** [1] - 72:5
**182** [1] - 43:9
**182.9** [3] - 22:3, 104:4, 124:14
**19** [2] - 69:14, 74:24
**1992** [5] - 115:23, 117:9, 123:17, 133:4
**1999** [2] - 23:25, 41:3
**1:00** [1] - 92:1, 92:12, 94:9
**1:07** [1] - 95:1

**2**

**2** [7] - 54:19, 81:6, 140:15, 140:20, 140:21, 141:15, 141:16
**20** [7] - 25:2, 59:22, 68:21, 94:16, 96:1, 118:16, 138:23
**20-year** [1] - 66:8
**200** [2] - 108:18, 126:20
**20005-3807** [1] - 2:13
**2001** [6] - 25:2, 26:5, 26:13, 27:13, 71:7, 74:12
**2003** [2] - 61:8, 112:22
**2010** [17] - 21:7, 38:12, 40:22, 41:3, 41:6, 47:18, 75:25, 81:18, 82:4, 110:13, 115:9, 115:17, 115:25, 116:1, 116:4, 123:7, 124:21
**2011** [2] - 123:7, 124:21, 134:5, 134:10, 140:18
**2012** [4] - 4:1, 46:14, 88:22, 123:7
**2013** [8] - 28:17, 29:10, 38:10, 40:14, 66:4, 82:11, 87:11, 88:20
**2014** [3] - 41:7, 134:10, 140:16
**2015** [1] - 27:25
**2016** [2] - 21:11, 76:20
**2017** [3] - 82:1, 106:2, 123:5
**2018** [6] - 28:1, 62:19, 110:13, 113:18, 115:10, 116:4
**2019** [8] - 25:19, 27:14, 69:4, 69:5, 69:7, 71:4, 71:8, 74:13
**2021** [5] - 1:19, 62:24, 115:17, 123:15, 141:1
**21** [1] - 25:2
**22** [1] - 51:10, 51:17
**22-page** [1] - 51:13
**23** [4] - 3:5, 3:6, 24:24
**23-year** [1] - 24:25
**232** [1] - 42:12

**25** [3] - 17:19, 43:14, 73:13
**2500** [1] - 2:5
**26** [1] - 78:24
**28** [31] - 47:11, 48:16, 48:20, 49:18, 49:25, 51:20, 51:24, 52:8, 52:12, 99:18, 111:2, 113:10, 113:14
**2:18** [1] - 139:6

**3**

**3** [5] - 1:17, 55:19, 140:22, 141:17, 141:18
**30** [3] - 17:19, 94:2, 94:11
**300** [1] - 108:9
**301** [2] - 42:11, 43:13
**31** [1] - 59:21
**3461** [1] - 99:16
**350** [2] - 1:24, 2:4
**39803** [1] - 49:3
**3:48** [1] - 139:6
**3:53** [1] - 143:22

**4**

**4** [9] - 3:3, 3:4, 51:6, 56:3, 65:6, 140:22, 140:23, 141:19, 141:20
**4.3** [1] - 61:3
**40** [1] - 17:15
**400** [1] - 38:22
**45** [2] - 57:20, 58:6
**4:00** [3] - 138:20, 138:21, 143:19

**5**

**5** [9] - 54:8, 56:24, 65:6, 77:13, 78:19, 111:22, 114:7, 141:21, 141:22
**5,000** [1] - 96:23
**50** [2] - 3:13, 83:9
**500** [1] - 38:22
**5015** [1] - 57:19
**52** [1] - 106:19
**58** [1] - 69:15

**6**

**6** [3] - 35:5, 141:23, 141:24
**60** [1] - 58:7
**601** [1] - 2:12
**65** [2] - 103:25, 126:23
**68** [1] - 3:6
**69** [1] - 118:16

**7**

**7** [6] - 1:19, 4:1, 36:4, 37:9, 141:25, 142:1

**70** [1] - 118:16
**73** [3] - 54:4, 55:3, 55:4
**7307** [4] - 54:11, 54:22, 55:6, 56:4
**7307.91** [2] - 56:12, 56:20
**7307.92** [1] - 56:21
**7307.93** [2] - 57:2, 112:12
**7307.99** [1] - 57:5
**7307.99.50** [2] - 57:11, 57:16
**7307.99.5045** [10] - 47:25, 48:8, 58:10, 60:23, 61:12, 62:11, 111:4, 112:1, 112:13, 112:25
**7501** [28] - 26:17, 39:12, 46:19, 47:2, 47:6, 48:7, 49:10, 49:21, 50:11, 50:20, 51:3, 51:13, 61:15, 63:23, 64:6, 64:24, 74:5, 74:13, 74:19, 74:21, 89:5, 99:16, 99:19, 110:8, 112:6, 113:6, 114:3, 117:16
**7501s** [3] - 30:20, 75:2, 88:25
**7th** [1] - 141:1

**8**

**8** [9] - 73:16, 97:1, 104:6, 108:16, 120:25, 122:2, 126:22, 142:2, 142:3
**86** [1] - 3:7
**8:21** [1] - 4:1
**8th** [1] - 61:8

**9**

**9** [1] - 74:24
**90012** [1] - 1:24
**90071** [1] - 2:5
**91** [1] - 3:7
**99.10.00** [1] - 57:7

**A**

**A.M** [1] - 4:1
**a.m** [3] - 59:24, 95:1
**abbreviations** [1] - 47:24
**abilities** [1] - 120:19
**ability** [1] - 130:14
**able** [4] - 46:11, 50:2, 81:16, 97:24
**ABOVE** [1] - 144:4
**above-titled** [1] - 140:4
**absolutely** [3] - 43:1, 49:16, 103:1
**accept** [4] - 75:13, 97:8, 128:10, 131:7
**acceptable** [4] - 33:8, 52:9, 77:7, 113:11
**accepted** [2] - 34:22, 35:3
**accepting** [1] - 83:13

Case 2:22-cv-00043-DCM-9-7c Elec 06/27/22 1 Filed 06/27/22 Page 454 of 585 PageID
Transcript of Day 3 of 674 Trial    Page 147 of 166
146

**access** [4] - 81:7, 81:9, 81:13, 108:10
**accordance** [4] - 34:22, 63:24, 111:8, 111:18
**according** [1] - 138:7
**accordingly** [1] - 133:6
**account** [1] - 130:13
**accountable** [1] - 27:8
**accounting** [2] - 24:14, 29:14
**accounts** [13] - 25:8, 26:3, 26:13, 27:13, 65:19, 69:9, 71:7, 71:10, 71:16, 72:7, 73:4, 74:1, 86:23
**accuracy** [2] - 74:21, 75:1
**accurately** [2] - 63:24, 98:17
**accused** [1] - 109:25
**ACE** [4] - 48:6, 81:9, 81:13
**acknowledge** [1] - 97:8
**acknowledged** [3] - 98:9, 119:7, 120:12
**acknowledgment** [1] - 118:6
**acquired** [2] - 115:9, 115:25
**act** [3] - 109:24, 125:10, 131:12
**Act** [8] - 103:15, 104:11, 126:17, 132:12, 132:15, 133:13, 133:24, 140:7
**acted** [10] - 102:8, 102:9, 105:17, 109:22, 132:19, 133:13, 133:14, 133:17, 133:19, 133:22
**acting** [4] - 109:25, 116:15, 119:16, 132:21
**action** [2] - 22:13, 113:22
**activities** [3] - 20:23, 35:14, 77:6
**acts** [1] - 131:14
**actual** [10] - 32:1, 48:6, 69:11, 77:5, 102:7, 105:12, 105:13, 132:21, 133:16, 133:22
**add** [7] - 39:12, 42:12, 43:10, 45:25, 97:25, 114:20, 115:18
**add-on** [2] - 43:10, 45:25
**add-ons** [2] - 39:12, 42:12
**added** [4] - 42:11, 42:20, 43:10
**addition** [4] - 27:15, 65:1, 90:21, 129:5
**additional** [6] - 17:7, 29:20, 36:18, 37:19, 78:25, 111:7
**addressed** [2] - 109:16, 121:11
**adequate** [1] - 104:10
**adhesive** [1] - 7:16
**admission** [2] - 50:12, 118:8
**admit** [1] - 123:21
**admitted** [3] - 31:7, 50:10,

128:8
**admonishment** [2] - 59:10, 92:7
**adopted** [1] - 112:9
**advanced** [1] - 83:21
**advertising** [2] - 102:24, 121:17
**advise** [3] - 41:17, 58:3, 138:7
**afraid** [1] - 117:12
**afterwards** [2] - 87:14, 143:1
**agape** [1] - 107:24
**agency** [2] - 63:1, 115:16
**agents** [2] - 131:12, 131:14
**ago** [4] - 96:7, 96:8, 115:22, 116:25
**agree** [1] - 127:22
**agreed** [2] - 87:3, 128:9
**agreement** [2] - 135:3, 138:5
**agrees** [1] - 58:20
**agriculture** [1] - 39:23
**ahead** [6] - 19:23, 66:24, 75:14, 81:2, 90:8, 90:10
**al** [1] - 140:1
**AL** [3] - 1:4, 1:10, 2:11
**alerted** [1] - 107:18
**alerts** [1] - 115:14
**all-day** [1] - 26:5
**allegations** [2] - 110:1, 119:2
**alleged** [3] - 110:16, 114:25
**alleges** [1] - 140:17
**allow** [2] - 29:18, 39:16, 43:11
**allowed** [2] - 75:10, 131:4
**allows** [1] - 46:17
**alloy** [4] - 57:7, 57:18, 58:7, 61:1
**alloyed** [1] - 58:7
**almost** [1] - 97:22
**alternatively** [1] - 106:9
**AMERICA** [1] - 1:4
**America** [1] - 139:24
**American** [3] - 7:23, 18:20, 18:25
**amount** [4] - 26:10, 67:14, 134:16, 140:23
**analogy** [1] - 97:22
**analysis** [3] - 55:1, 62:10, 120:6
**analyze** [3] - 33:25, 77:18, 77:23
**ancient** [1] - 112:23
**AND** [2] - 2:12, 144:2
**AND/OR** [1] - 144:6
**Andy** [5] - 25:23, 31:2, 36:8, 70:5, 126:4
**ANGELES** [4] - 1:18, 1:24, 2:5, 4:1
**announced** [1] - 32:21

**annually** [1] - 83:3
**answer** [21] - 30:24, 31:15, 53:12, 65:21, 65:23, 66:10, 75:12, 81:1, 100:21, 106:21, 130:7, 137:19, 140:4, 140:10, 140:11, 140:12, 140:13, 140:19, 140:20, 140:21, 140:25
**Answer** [2] - 73:8, 75:5
**answered** [6] - 22:9, 64:9, 66:18, 88:1, 130:3, 130:4
**answering** [3] - 29:21, 63:18, 137:10
**anticipate** [8] - 93:22, 93:25, 97:18, 98:23, 100:3, 101:1, 104:14, 104:25
**antidumping** [114] - 16:19, 18:4, 18:5, 18:9, 18:11, 19:4, 20:9, 22:4, 32:12, 32:19, 33:2, 33:19, 33:22, 34:6, 34:9, 34:12, 34:13, 34:17, 40:16, 40:21, 40:25, 42:10, 42:13, 42:19, 43:7, 43:8, 43:23, 43:24, 45:14, 45:21, 45:25, 46:16, 62:22, 63:2, 64:7, 64:12, 64:13, 64:14, 64:17, 64:21, 71:17, 71:19, 71:22, 72:1, 72:4, 76:14, 76:18, 77:10, 77:14, 77:19, 77:21, 78:1, 78:2, 78:14, 81:22, 81:25, 83:24, 85:19, 89:7, 89:22, 90:4, 96:10, 96:16, 97:1, 98:20, 98:21, 98:25, 99:6, 101:7, 101:14, 101:17, 101:22, 101:25, 102:1, 103:23, 104:3, 104:4, 104:7, 104:22, 105:1, 105:5, 105:8, 105:25, 106:21, 107:19, 107:24, 108:7, 108:16, 115:1, 115:5, 116:17, 117:23, 118:23, 119:18, 121:1, 122:2, 122:19, 123:2, 123:4, 123:11, 123:24, 124:7, 124:8, 124:13, 124:17, 125:13, 126:22, 131:20, 131:24, 132:1, 133:4, 133:5, 133:8
**ANY** [1] - 144:5
**anytime** [6] - 36:15, 44:22, 46:15, 89:9, 141:6
**anyway** [2] - 36:20, 57:15
**AP** [3] - 74:1, 74:6, 75:25
**apart** [1] - 119:13
**appear** [1] - 119:25
**appendix** [2] - 36:2, 36:7
**apple** [1] - 100:5
**applicable** [17] - 7:17, 7:19, 7:21, 8:22, 10:2, 33:3,

33:8, 34:1, 42:12, 43:25, 55:15, 60:21, 64:18, 77:25, 104:3, 112:24, 122:19
**application** [1] - 17:5
**applications** [1] - 61:22
**applied** [2] - 96:16, 98:25, 105:2
**applies** [7] - 55:3, 92:3, 95:15, 104:22, 127:14, 127:16, 136:1
**apply** [6] - 32:23, 45:3, 98:22, 105:5, 123:24, 127:20
**applying** [2] - 33:9, 55:1
**appreciate** [2] - 22:23, 143:8
**approach** [1] - 138:12
**approached** [1] - 136:4
**appropriate** [4] - 53:3, 101:13, 109:10, 111:16
**approved** [2] - 42:14, 48:4
**archiving** [1] - 106:11
**ARE** [1] - 144:6
**area** [11] - 20:12, 33:7, 45:18, 77:10, 77:22, 78:3, 78:13, 78:15, 85:11, 119:23, 143:5
**areas** [6] - 77:3, 77:4, 77:7, 78:11, 83:17, 83:21
**argue** [3] - 65:22, 92:2, 95:9
**argument** [9] - 91:25, 93:20, 93:21, 94:8, 95:17, 114:21, 127:8, 127:15, 128:16
**arguments** [3] - 93:12, 94:2, 128:18
**articles** [3] - 52:5, 54:4, 113:8
**ASME** [2] - 7:23, 9:3
**aspects** [1] - 79:7
**assembled** [2] - 41:22, 41:23
**assertion** [1] - 133:1
**asserts** [1] - 131:18
**assess** [2] - 33:25, 77:24
**assessed** [2] - 33:8, 78:5
**assessment** [15] - 28:18, 28:24, 29:1, 29:2, 29:10, 29:12, 31:6, 31:15, 32:13, 37:12, 40:14, 76:24, 87:11, 87:13, 113:18
**assigning** [1] - 72:8
**assisted** [2] - 28:16, 29:21
**assists** [1] - 44:12
**assume** [2] - 25:18, 30:20
**Atkinson** [9] - 25:21, 26:25, 28:4, 70:11, 79:24, 84:15, 84:18, 87:22, 126:4
**attach** [6] - 12:18, 12:24, 13:25, 16:13, 16:14, 17:6
**attached** [4] - 11:13, 12:7, 16:11
**attempt** [2] - 135:9, 137:5

Case 2:22-cv-00054-TOR ECF No. 106-7 filed 06/27/22 PageID.569 Page 149 of 166
Transcript of Day 3 of FCA Trial    Page 148 of 166
147

attended [1] - 30:1
attention [9] - 31:23, 33:12, 36:16, 38:2, 52:1, 54:8, 60:17, 110:7, 127:4
attorney [4] - 81:2, 106:15, 107:13, 126:1
attorneys [17] - 59:15, 94:4, 95:18, 127:15, 128:16, 128:21, 128:23, 128:24, 137:10, 137:15, 142:13, 142:14, 142:15, 142:16, 143:1, 143:4, 143:5
attorneys' [1] - 143:14
audit [31] - 26:4, 26:6, 26:8, 26:14, 27:8, 27:13, 29:5, 29:12, 30:1, 30:2, 30:3, 31:14, 31:16, 32:9, 32:13, 34:16, 34:21, 35:6, 35:8, 35:11, 35:12, 37:18, 38:10, 38:11, 38:14, 38:20, 40:7, 77:22, 87:3, 113:18
audited [2] - 36:15, 38:13
auditing [3] - 34:22, 35:3, 38:21
auditor [1] - 36:10
auditors [4] - 29:18, 36:10, 36:23, 36:24
audits [12] - 28:25, 29:2, 29:6, 29:7, 29:9, 37:6, 38:24, 39:6, 40:2, 40:14
authority [1] - 131:15
auto [4] - 48:8, 48:9, 48:11, 111:5
auto-generates [1] - 48:9
auto-populated [1] - 48:11
available [3] - 60:15, 81:18, 116:6
AVENUE [1] - 2:4
avoid [5] - 22:3, 64:7, 64:21, 132:13, 140:8
award [1] - 134:22
aware [8] - 36:1, 40:19, 60:14, 62:16, 62:20, 72:15, 72:17
axis [2] - 13:8, 15:5

## B

B16.9 [1] - 9:3
B31 [1] - 7:24
BAILIFF [1] - 138:15
bailiff [7] - 137:4, 138:8, 138:10, 138:13, 139:18, 139:19, 143:2
Baird [1] - 144:9
BAIRD [2] - 1:23, 144:10
balance [1] - 125:11
balanced [1] - 97:24
Ball [1] - 50:15
ball [26] - 31:5, 31:20, 33:15,

36:4, 37:8, 46:21, 50:8, 50:21, 53:23, 58:21, 61:9, 64:23, 110:8, 111:2, 111:21, 112:19, 113:2, 115:14, 116:2, 117:4, 118:15, 123:8, 123:12, 125:19
balls [1] - 123:9
bank [1] - 39:1
barred [1] - 134:5
base [2] - 132:10, 135:18
based [6] - 10:14, 16:22, 29:3, 63:12, 67:4, 134:22
basic [2] - 90:19, 108:11
basics [2] - 90:19, 108:15
basis [5] - 26:5, 28:7, 30:8, 31:1, 104:2
bears [1] - 130:21
became [1] - 27:14
become [3] - 26:23, 27:9, 79:20
becomes [3] - 32:25, 101:5, 137:2
begin [4] - 22:9, 73:16, 108:24, 134:24
beginning [5] - 32:5, 50:18, 54:20, 54:21, 100:9
begins [2] - 37:9, 51:6
BEHALF [1] - 2:10
behalf [2] - 45:19, 49:10
behavior [1] - 119:11
behind [1] - 5:1
belabor [1] - 77:2
belief [2] - 116:22, 135:15
believability [1] - 130:22
believable [1] - 130:25
believes [1] - 118:23
below [5] - 33:24, 34:4, 49:2, 55:8, 78:11
bend [1] - 56:22
bends [1] - 56:21
benefit [1] - 36:23
best [4] - 50:5, 82:14, 86:1, 119:24
better [3] - 81:15, 81:16, 93:25
between [12] - 5:25, 6:17, 9:11, 13:9, 16:5, 71:7, 101:20, 103:17, 122:10, 129:19, 134:18, 142:18
bevel [1] - 14:15
beveled [5] - 15:6, 99:24, 101:21, 122:12, 122:13
bevels [1] - 100:11
beyond [3] - 76:6, 88:13, 97:12
Bhattacharji [4] - 100:19, 108:2, 108:4, 115:11
bias [1] - 130:18
bill [8] - 26:16, 30:17, 39:11,

48:23, 49:1, 99:17, 111:12, 111:14
bills [8] - 25:9, 26:4, 26:20, 40:7, 40:8, 71:14, 87:1
binding [1] - 108:3
bit [11] - 30:12, 48:20, 69:22, 73:10, 77:1, 82:8, 91:23, 93:24, 102:6, 105:11, 137:11
black [1] - 101:19
blank [1] - 50:20
blind [1] - 46:3
block [2] - 51:24, 111:2
board [1] - 25:15
body [1] - 32:5
bolt [11] - 5:10, 5:12, 5:13, 5:14, 5:15, 5:16, 5:19, 5:20, 5:23, 5:25
bolts [1] - 6:7
bond [3] - 32:21, 32:22, 33:1
bonding [1] - 7:16
book [1] - 82:14
booklet [1] - 113:5
books [1] - 103:10
Border [10] - 74:19, 96:15, 99:10, 101:5, 101:10, 103:9, 103:22, 104:21, 105:7, 108:18
bother [1] - 125:4
bottom [11] - 33:6, 34:10, 34:20, 37:3, 37:8, 51:9, 51:17, 57:16, 67:17, 83:17
bought [1] - 124:19
box [14] - 4:7, 42:19, 44:24, 47:11, 48:16, 49:18, 49:25, 60:4, 70:23, 95:4, 105:5, 107:12, 113:14, 114:2
boxes [2] - 42:17, 49:23
brainer [1] - 105:9
branch [1] - 61:25
brand [1] - 11:2
BRAYTON [1] - 2:10
BRAYTON-LEWIS [1] - 2:10
brazing [1] - 7:15
break [1] - 94:12
breakdown [1] - 67:15
breaks [1] - 72:11
brief [1] - 131:17
briefly [2] - 65:5, 91:2
bring [12] - 46:21, 53:23, 58:21, 64:23, 94:22, 108:6, 110:8, 111:21, 113:19, 116:2, 134:6, 137:22
bringing [2] - 98:18, 118:4
broader [4] - 45:9, 45:10, 45:11, 90:18
brochure [1] - 42:2
brochures [1] - 41:25
broker [40] - 28:12, 28:15, 42:15, 45:17, 46:1, 46:2,

46:6, 46:13, 46:14, 47:13, 47:20, 48:4, 48:8, 49:5, 49:12, 53:6, 54:14, 64:6, 67:17, 76:9, 76:13, 76:17, 79:10, 79:14, 79:16, 79:20, 87:20, 88:19, 88:23, 89:14, 89:19, 89:21, 91:13, 106:17, 107:12, 110:14, 111:17, 120:13, 125:24, 125:25
broker's [1] - 84:12
brokers [8] - 45:14, 74:2, 74:7, 88:8, 91:6, 107:8, 120:12, 120:14
brought [2] - 77:11, 113:17
BROWN [1] - 2:4
building [2] - 6:24, 143:3
bullet [6] - 33:6, 33:12, 33:14, 33:16, 33:24, 77:18
bullets [3] - 77:23, 78:10
burden [15] - 91:13, 95:11, 97:6, 97:8, 97:11, 97:19, 98:2, 98:3, 104:10, 109:5, 132:2, 132:7, 134:1, 134:16
business [6] - 41:10, 59:3, 103:3, 115:24, 116:20, 125:5
businesspeople [1] - 115:14
butt [72] - 4:24, 7:3, 7:4, 7:5, 7:20, 7:21, 8:3, 8:5, 8:6, 8:7, 8:15, 8:20, 8:21, 8:22, 9:2, 9:4, 9:5, 9:6, 9:9, 9:11, 10:16, 10:18, 12:23, 12:24, 13:24, 14:9, 14:21, 15:3, 15:4, 15:11, 15:12, 15:14, 15:21, 16:3, 16:8, 16:9, 16:15, 16:20, 16:25, 17:3, 19:16, 19:20, 20:8, 21:9, 21:12, 22:4, 57:2, 57:3, 57:24, 58:1, 58:4, 62:3, 62:5, 62:7, 62:11, 62:22, 64:15, 112:11, 112:15, 112:17, 115:3, 116:14, 116:22, 116:23, 117:5, 122:10, 122:23, 123:16, 123:17, 131:20
butt-weld [46] - 4:24, 7:3, 8:5, 8:6, 8:7, 8:22, 9:2, 9:4, 9:5, 9:6, 9:9, 10:16, 10:18, 16:3, 16:8, 16:9, 16:20, 16:25, 17:3, 19:16, 19:20, 20:8, 21:9, 21:12, 22:4, 57:2, 57:24, 58:1, 58:4, 62:3, 62:5, 62:5, 62:22, 64:15, 112:11, 112:15, 112:17, 115:3, 116:14, 116:23, 117:5, 122:10, 122:23, 123:16, 123:17
butt-welded [1] - 57:3

**butt-welding** [6] - 8:21, 14:21, 15:3, 15:4, 15:21, 131:20
**butted** [1] - 7:4
**buying** [1] - 118:24
**BY** [52] - 4:14, 12:4, 12:17, 13:5, 13:18, 14:7, 14:19, 15:2, 15:17, 16:1, 17:12, 19:13, 20:2, 21:23, 23:10, 31:8, 31:22, 33:17, 36:6, 37:15, 46:23, 50:17, 50:23, 51:18, 53:25, 56:16, 58:23, 60:6, 61:13, 63:7, 63:21, 64:4, 64:10, 64:25, 65:13, 65:25, 66:12, 66:25, 68:17, 73:1, 73:25, 75:15, 77:17, 80:21, 81:5, 86:18, 88:7, 88:17, 89:12, 90:1, 90:11, 91:4

## C

**C-r-i-v-e-l-l-i** [1] - 138:15
**CA** [1] - 2:5
**cafeteria** [1] - 138:25
**calculation** [1] - 104:5
**California** [1] - 139:23
**CALIFORNIA** [4] - 1:2, 1:18, 1:24, 4:1
**Canadian** [2] - 29:5, 39:3
**candid** [1] - 118:5
**cannot** [3] - 106:4, 130:4, 130:5
**cap** [8] - 15:19, 15:20, 15:21, 16:6, 16:9, 16:11, 16:13, 16:14
**capable** [3] - 101:3, 101:6, 133:11
**caps** [1] - 16:4
**carbon** [3] - 61:21, 64:17, 122:23
**career** [3] - 17:13, 17:20, 17:23
**carried** [1] - 112:5
**carries** [1] - 111:15
**carry** [1] - 97:7
**CASE** [1] - 2:12
**Case** [1] - 140:2
**case** [80] - 4:21, 6:22, 19:14, 22:6, 23:12, 23:17, 45:1, 46:20, 54:22, 57:23, 59:11, 72:19, 79:6, 82:8, 85:4, 91:20, 92:2, 92:7, 95:7, 95:9, 95:15, 96:8, 96:14, 97:2, 97:7, 97:12, 97:14, 97:17, 97:23, 98:2, 100:19, 103:7, 103:15, 107:3, 110:10, 115:21, 116:8, 117:1, 117:25, 118:4, 118:7, 118:20, 119:8,

120:17, 122:3, 122:8, 125:2, 125:8, 125:16, 126:3, 126:14, 126:25, 127:14, 127:16, 127:20, 127:25, 128:7, 129:10, 130:8, 130:17, 131:10, 133:2, 135:5, 135:19, 135:21, 135:22, 135:25, 136:5, 136:11, 136:13, 136:15, 136:20, 137:7, 137:15, 139:3, 140:4, 142:7, 142:21, 142:22
**cases** [2] - 97:18, 137:12
**cast** [6] - 45:10, 45:11, 55:9, 55:11, 55:12, 55:14
**casted** [2] - 55:9, 56:6
**catalog** [1] - 102:25
**category** [5] - 53:21, 57:8, 57:12, 57:23, 62:11
**caused** [3] - 96:25, 104:17, 132:24
**caveat** [1] - 142:12
**CBP** [1] - 52:9
**CBP.gov** [1] - 44:11
**CBSA** [1] - 29:4
**CCRA** [1] - 1:23
**centerpiece** [2] - 110:10, 110:18
**Central** [1] - 139:22
**CENTRAL** [1] - 1:2
**cert** [1] - 26:17
**certain** [4] - 18:14, 36:18, 37:1, 128:13
**certainly** [4] - 26:8, 36:23, 37:23, 43:7, 45:3, 45:22
**CERTIFICATE** [1] - 144:1
**certificates** [2] - 26:16, 39:13
**CERTIFY** [1] - 144:2
**cetera** [3] - 22:12, 68:9, 142:7
**CFO** [2] - 25:17, 70:17
**CH** [4] - 46:13, 79:13, 88:19, 120:12
**challenging** [1] - 110:1
**chance** [3] - 92:20, 108:13, 118:14
**change** [3] - 39:15, 135:12, 135:15
**changed** [1] - 41:7
**changes** [1] - 83:4
**chapter** [4] - 54:4, 54:6, 55:2, 55:3
**characteristic** [3] - 9:8, 9:10, 11:5
**characteristics** [1] - 39:19
**charge** [1] - 27:19
**charged** [3] - 19:4, 19:7, 123:23
**CHARGED** [1] - 144:5
**charges** [1] - 26:20

**chart** [1] - 69:20
**cheaper** [1] - 118:24
**cheats** [1] - 124:16
**check** [8] - 26:14, 39:18, 40:10, 44:1, 46:1, 46:2, 46:3, 107:11
**checked** [2] - 47:19, 96:17
**checking** [4] - 39:14, 42:13, 47:20
**chemical** [1] - 7:25
**cherry** [1] - 99:13
**cherry-picking** [1] - 99:13
**chilled** [1] - 6:21
**China** [17] - 16:20, 40:3, 41:12, 42:11, 62:18, 64:15, 117:3, 117:5, 117:8, 117:14, 117:17, 118:13, 118:22, 122:5, 124:16, 131:21, 133:5
**Chinese** [7] - 22:4, 96:10, 98:6, 106:5, 131:19, 131:23, 133:3
**choice** [1] - 121:12
**choose** [1] - 121:18
**CHRISTOPHER** [2] - 2:3, 2:10
**circle** [3] - 34:4, 70:9, 112:8
**CIRCUIT** [1] - 144:5
**circumstances** [3] - 34:17, 42:24, 113:22
**circumstantial** [3] - 129:12, 129:16, 129:20
**circumvent** [1] - 120:19
**circumventing** [2] - 64:12, 117:23
**citizens** [3] - 109:2, 109:13, 110:2
**civil** [3] - 97:17, 97:18, 141:7
**Claim** [2] - 132:12, 133:24
**claim** [7] - 99:9, 103:15, 110:19, 132:2, 132:7, 132:9, 134:4
**claimed** [2] - 99:4, 99:5
**Claims** [6] - 103:15, 104:11, 126:17, 132:15, 133:13, 140:7
**claims** [2] - 99:8, 106:17
**clarity** [1] - 37:5
**classic** [1] - 97:21
**classification** [28] - 40:21, 40:25, 44:13, 44:18, 45:14, 45:25, 47:5, 47:21, 52:5, 56:11, 58:16, 58:20, 60:23, 61:12, 67:4, 76:9, 77:8, 78:24, 84:17, 84:18, 85:9, 85:10, 85:13, 112:8, 112:13, 113:8, 116:13
**classifications** [3] - 67:5, 74:8, 75:2
**classified** [4] - 58:6, 63:11,

72:16, 73:5
**classify** [3] - 42:9, 46:5, 54:15
**classifying** [1] - 76:1
**clean** [1] - 93:16
**clear** [9] - 37:20, 37:21, 64:16, 97:10, 98:23, 110:23, 114:3, 116:15, 118:14
**clearer** [1] - 36:23
**clearly** [1] - 13:11
**CLERK** [13] - 4:3, 4:9, 23:3, 59:16, 59:23, 59:25, 92:14, 138:12, 138:14, 138:16, 139:7, 139:22, 143:10
**clerk** [2] - 94:22, 141:9
**client** [1] - 128:24
**clients** [1] - 139:4
**clip** [2] - 118:16, 124:19
**close** [6] - 36:15, 84:7, 94:6, 113:2, 113:19, 125:17
**closely** [4] - 26:1, 28:6, 86:22, 121:21
**closer** [1] - 24:8
**closing** [3] - 94:4, 123:10, 128:18
**coalescence** [1] - 6:16
**coarse** [1] - 5:21
**code** [17] - 39:21, 45:5, 45:7, 45:12, 46:6, 47:5, 47:13, 47:15, 47:16, 62:5, 62:12, 73:6, 111:3, 111:4, 111:19, 111:23, 112:5
**codes** [3] - 51:2, 72:8, 74:3
**colleagues** [5] - 54:13, 63:23, 64:5, 112:1, 120:6
**collected** [1] - 105:7
**collecting** [1] - 107:6
**column** [6] - 48:22, 51:20, 51:24, 52:8, 52:12, 113:10
**columns** [1] - 102:19
**comfortable** [5] - 49:14, 49:15, 49:17, 110:5, 119:14
**coming** [4] - 22:23, 25:14, 43:14, 119:2
**comment** [1] - 118:7
**Commerce** [26] - 16:18, 16:24, 19:3, 19:6, 19:15, 19:19, 20:4, 20:7, 62:21, 63:9, 63:12, 63:13, 85:19, 85:23, 106:15, 115:2, 115:7, 115:12, 115:16, 122:11, 122:17, 122:21, 122:22, 123:15, 123:16, 133:3
**commerce** [2] - 101:18, 107:23
**commercial** [14] - 26:15, 30:16, 39:11, 65:2, 65:7,

Case 2:22-cv-00050-RWS Document 19-7c Filed 06/27/22 Page 454 of 565 PageID
Case 2:22-cv-00050-DC-RSP Document 106-7 Filed 06/27/22 Page 151 of 565 PageID
Transcript of Day 3 of Trial    Page 150 of 166
149

65:15, 66:2, 67:2, 67:9, 67:20, 68:1, 68:8, 114:8, 114:19
**committed** [1] - 140:17
**common** [3] - 38:18, 107:17, 114:16
**commonly** [1] - 9:1
**communicate** [5] - 135:23, 135:24, 137:3, 137:5, 137:6
**communicates** [1] - 35:1
**communicating** [2] - 74:7, 136:1
**communications** [3] - 106:12, 107:1, 107:7
**companies** [1] - 125:4
**company** [5] - 20:24, 33:2, 59:2, 115:10, 126:6
**compatible** [1] - 6:7
**compensating** [1] - 4:17
**competition** [1] - 19:1
**competitive** [2] - 118:20, 124:8
**competitor** [1] - 59:4, 118:19, 119:5
**competitors** [1] - 119:9
**complete** [3] - 28:14, 83:13, 138:6
**completed** [1] - 42:7
**completely** [3] - 17:4, 17:5, 98:17
**completeness** [1] - 73:15
**compliance** [36] - 24:11, 24:17, 24:18, 24:21, 25:8, 25:11, 27:6, 27:17, 27:19, 33:9, 34:1, 35:18, 42:16, 69:17, 72:4, 74:15, 76:4, 77:24, 78:6, 82:9, 82:11, 82:14, 82:17, 82:24, 83:2, 84:13, 84:20, 87:9, 90:15, 90:17, 90:22, 106:11, 108:9, 120:13
**compliances** [1] - 28:5
**compliant** [2] - 32:20, 39:1
**complied** [1] - 111:3
**complies** [1] - 5:3
**compliment** [1] - 139:2
**comply** [5] - 18:8, 110:25, 119:21, 120:4, 120:15
**complying** [2] - 39:2, 91:9
**component** [1] - 41:22
**concept** [2] - 5:6, 55:20
**concerning** [1] - 137:7
**concerns** [2] - 43:2, 43:3
**conclude** [1] - 113:14
**concluded** [3] - 16:19, 62:21, 143:22
**concludes** [1] - 108:14
**conclusion** [1] - 46:9
**conclusions** [1] - 119:15

**conduct** [4] - 118:1, 125:2, 134:10, 135:17
**conducted** [3] - 34:21, 38:11, 65:21
**CONFERENCE** [1] - 144:7
**conference** [1] - 38:5
**configuration** [3] - 6:6, 8:9, 8:10
**confirmed** [1] - 112:14
**confirms** [5] - 58:16, 61:14, 116:13, 116:14, 116:22
**CONFORMANCE** [1] - 144:6
**confuse** [1] - 10:18
**conjecture** [1] - 134:23
**conjunction** [2] - 28:15, 45:6
**connected** [1] - 9:25
**connection** [4] - 9:22, 13:9, 29:11, 61:25
**connections** [1] - 8:4
**conscientious** [1] - 135:11
**consider** [16] - 59:4, 80:3, 114:17, 116:21, 118:2, 118:3, 119:1, 119:11, 120:3, 128:6, 128:11, 128:14, 129:7, 129:8, 129:18, 133:25
**considered** [4] - 24:7, 38:20, 48:22, 55:5, 56:22, 66:14, 129:5, 131:11, 135:7
**considering** [2] - 130:12, 131:8
**consistently** [1] - 61:14
**consists** [1] - 128:7
**constant** [1] - 8:17
**consult** [9] - 20:25, 21:4, 21:8, 21:12, 89:20, 89:21, 106:20, 127:18, 137:9
**consultant** [3] - 42:16, 84:13, 107:12
**consulted** [7] - 18:8, 20:14, 20:16, 20:21, 21:16, 42:15
**consulting** [2] - 120:13, 136:8
**contact** [5] - 21:18, 30:25, 89:13, 136:7, 136:21
**contacting** [1] - 119:9
**contacts** [2] - 20:23, 31:2
**container** [4] - 39:15, 39:16, 39:22, 39:23
**contains** [1] - 114:8
**contends** [1] - 134:3
**contents** [2] - 32:3, 49:15
**context** [1] - 124:23
**continuation** [2] - 50:24, 54:10
**continue** [6] - 43:18, 56:19, 57:15, 60:5, 80:2, 137:18
**continuing** [2] - 43:16, 43:22
**contoured** [2] - 11:12, 61:22
**contradicts** [1] - 130:19

**control** [2] - 33:9, 129:22
**controls** [5] - 35:13, 35:16, 95:23, 96:12, 128:22
**conversations** [5] - 76:8, 76:12, 76:16, 89:19, 89:21
**cool** [1] - 6:22
**copy** [1] - 127:17
**core** [2] - 70:4, 83:19
**corner** [9] - 7:12, 7:13, 10:11, 10:13, 12:21, 12:22, 13:10, 13:11
**corny** [1] - 109:6
**corporate** [4] - 23:15, 100:14, 100:15, 126:5
**Corporation** [3] - 23:23, 25:17, 131:18
**corporation** [2] - 131:11, 131:13
**corporations** [1] - 139:4
**CORRECT** [1] - 144:2
**correct** [170] - 14:10, 17:21, 18:2, 18:3, 18:7, 18:10, 19:4, 19:16, 19:17, 19:21, 20:5, 20:6, 20:15, 21:1, 21:5, 21:17, 21:20, 21:25, 22:1, 22:4, 23:15, 23:16, 26:10, 32:1, 32:4, 32:6, 32:7, 32:9, 32:10, 35:7, 35:8, 35:21, 35:22, 35:25, 36:2, 37:1, 48:13, 49:9, 49:11, 49:13, 50:25, 51:4, 51:5, 51:7, 51:8, 51:11, 51:24, 51:25, 53:5, 56:25, 58:10, 58:11, 58:13, 60:16, 61:15, 62:12, 67:24, 68:12, 68:21, 68:22, 68:24, 69:2, 69:5, 69:8, 69:12, 69:18, 69:21, 70:3, 70:6, 70:14, 70:16, 70:17, 70:18, 70:20, 70:21, 70:23, 71:1, 71:4, 71:8, 71:9, 71:12, 71:14, 71:15, 71:18, 71:23, 71:24, 72:1, 72:2, 72:5, 72:6, 72:9, 72:14, 72:16, 72:19, 73:9, 74:3, 74:14, 74:17, 74:19, 74:20, 74:22, 75:2, 75:17, 75:20, 75:23, 76:2, 76:3, 76:5, 76:10, 76:11, 76:19, 76:21, 77:3, 77:14, 78:11, 78:14, 78:15, 78:20, 78:22, 78:24, 79:3, 79:7, 79:10, 79:11, 79:16, 79:21, 79:23, 79:25, 80:5, 80:11, 80:15, 81:8, 81:11, 81:13, 81:16, 81:19, 82:1, 82:4, 82:6, 82:7, 82:12, 82:21, 83:3, 83:6, 83:7, 83:10, 83:14, 83:17, 83:21, 83:24, 84:6, 84:10, 84:20, 84:25, 85:7, 85:8, 85:9, 85:13,

85:20, 85:23, 85:24, 86:2, 86:20, 91:6, 91:10, 91:11, 91:13, 91:14, 139:12, 141:14
**correctly** [1] - 5:12
**cost** [3] - 26:22, 42:22
**costly** [1] - 36:24
**costs** [4] - 18:23, 26:19, 30:20, 42:20
**counsel** [45] - 4:8, 11:18, 19:22, 20:15, 20:17, 20:18, 20:21, 22:8, 23:7, 42:16, 60:5, 64:9, 65:12, 65:20, 66:18, 68:14, 68:15, 73:11, 73:17, 75:14, 86:15, 86:16, 88:3, 89:11, 90:10, 91:1, 91:19, 91:25, 92:18, 93:9, 94:25, 95:24, 96:5, 108:14, 108:22, 120:24, 121:2, 121:5, 121:8, 122:4, 122:25, 127:6, 127:7, 138:19, 143:13
**count** [3] - 96:22, 138:2
**countries** [1] - 122:20
**country** [9] - 26:17, 39:13, 41:24, 44:7, 45:3, 98:18, 109:2, 109:9, 124:11
**couple** [9] - 63:13, 76:22, 80:6, 92:18, 96:7, 107:21, 112:7, 117:1
**coupling** [34] - 48:15, 48:24, 48:25, 49:7, 49:17, 52:22, 64:6, 64:19, 64:20, 75:20, 75:23, 99:14, 100:16, 100:18, 101:11, 101:12, 101:21, 102:12, 102:20, 102:25, 103:6, 110:18, 110:20, 110:24, 111:13, 111:17, 113:14, 114:22, 117:2, 117:15, 121:6, 121:9, 121:12, 122:1
**couplings** [32] - 49:2, 55:6, 55:22, 60:25, 64:14, 64:15, 96:21, 99:5, 99:11, 99:22, 99:24, 99:25, 100:12, 100:20, 101:14, 101:17, 102:14, 104:9, 112:4, 114:2, 117:11, 117:13, 117:18, 117:20, 117:21, 122:5, 122:13, 122:24, 123:2, 123:4
**course** [27] - 27:1, 32:16, 34:16, 39:1, 41:3, 64:3, 64:8, 65:18, 66:22, 83:10, 83:13, 83:17, 83:21, 83:23, 84:23, 84:24, 87:17, 94:3, 101:8, 102:12, 105:8, 109:17, 115:21, 121:25, 122:17, 135:10
**courses** [2] - 83:19, 84:22

Case 2:22-cv-00050-RGK-JEM Document 1-7 Filed 06/27/22 Entered 06/27/22 Page 454 of 587 Page ID
Transcript of Day 3 of Trial    Page 151 of 166

150

**Court** [12] - 93:25, 134:11, 134:13, 136:7, 136:21, 136:25, 138:1, 138:3, 139:22, 142:4, 143:16, 143:17

**COURT** [96] - 1:1, 1:23, 4:5, 11:18, 11:21, 11:24, 12:1, 12:15, 13:4, 13:14, 14:5, 14:24, 15:24, 17:10, 19:9, 19:12, 19:22, 21:21, 22:8, 22:11, 22:15, 22:20, 22:22, 23:1, 23:7, 50:13, 53:10, 53:12, 59:8, 59:18, 60:2, 63:6, 63:16, 63:19, 64:2, 64:9, 65:11, 65:20, 66:9, 66:11, 66:18, 66:23, 68:14, 72:24, 73:17, 73:21, 73:24, 75:7, 80:20, 80:25, 86:15, 88:1, 88:3, 88:14, 89:10, 89:25, 90:6, 90:8, 90:10, 91:1, 91:16, 91:19, 91:21, 92:16, 92:24, 93:1, 93:5, 93:9, 94:14, 94:20, 95:3, 96:2, 96:4, 105:20, 108:22, 120:23, 124:5, 127:6, 127:12, 138:18, 139:9, 139:11, 139:14, 139:17, 139:20, 141:2, 141:6, 141:15, 141:17, 141:19, 141:21, 141:23, 141:25, 142:2, 142:4, 143:12

**court** [12] - 4:4, 59:17, 60:1, 92:15, 95:2, 102:16, 119:25, 129:9, 135:2, 137:8, 137:23, 139:8

**Court's** [1] - 129:2

**courthouse** [1] - 138:20

**courtroom** [4] - 59:19, 92:17, 138:8, 138:18

**cover** [5] - 7:24, 20:12, 27:24, 31:25, 117:20

**covered** [4] - 6:6, 16:19, 72:10, 116:23

**cream** [1] - 24:5

**Cream** [3] - 24:5, 24:6, 30:2

**create** [1] - 6:16

**created** [1] - 117:12

**criminal** [2] - 97:13, 141:7

**CRISTINA** [1] - 2:10

**Crivelli** [1] - 138:15

**CROSS** [21] - 3:5, 3:6, 17:11, 44:11, 44:12, 44:20, 58:12, 58:13, 58:15, 58:18, 58:24, 60:14, 68:16, 80:7, 80:8, 80:13, 80:14, 85:3, 85:6, 85:22, 116:6

**cross** [3] - 17:10, 88:13, 93:24

**CROSS-EXAMINATION** [4] - 3:5, 3:6, 17:11, 68:16

**cross-examination** [1] - 17:10

**crystal** [5] - 115:14, 123:7, 123:8, 123:12

**CSR** [1] - 1:23

**CTPAT** [2] - 80:4, 80:5

**CURRAN** [67] - 2:10, 22:24, 23:8, 23:10, 31:5, 31:8, 31:20, 31:22, 33:15, 33:17, 36:4, 36:6, 37:8, 37:15, 46:21, 46:23, 50:8, 50:15, 50:17, 50:21, 50:23, 51:15, 51:18, 53:23, 53:25, 54:19, 56:2, 56:16, 58:21, 58:23, 60:6, 61:9, 61:13, 63:7, 63:21, 64:4, 64:10, 64:23, 64:25, 65:13, 65:25, 66:6, 66:12, 66:22, 66:25, 68:13, 73:11, 73:15, 77:15, 86:18, 88:5, 88:7, 88:15, 88:17, 89:12, 90:1, 90:11, 90:24, 91:18, 92:23, 92:25, 93:4, 93:8, 94:19, 108:23, 118:18, 127:11

**current** [2] - 24:10, 25:18

**curve** [1] - 100:11

**custom** [1] - 109:7

**customer** [3] - 41:9, 41:10, 41:25

**Customs** [77] - 24:19, 28:17, 29:3, 29:5, 29:11, 29:23, 30:7, 31:10, 32:13, 32:21, 32:22, 34:16, 35:2, 35:21, 36:2, 37:4, 38:10, 38:11, 38:14, 38:15, 39:3, 39:6, 39:8, 40:2, 40:15, 44:17, 45:13, 48:5, 49:12, 49:24, 54:14, 58:16, 60:15, 61:4, 61:10, 62:14, 63:9, 63:10, 68:10, 74:15, 74:18, 81:8, 85:7, 87:11, 87:14, 89:4, 96:15, 99:10, 100:6, 101:5, 101:9, 101:11, 102:1, 102:20, 103:8, 103:22, 104:21, 105:6, 106:15, 106:16, 108:18, 109:19, 110:22, 111:5, 111:9, 112:9, 112:22, 113:11, 113:15, 113:17, 113:19, 114:11, 116:7, 116:8, 123:20

**customs** [20] - 19:24, 64:5, 74:2, 74:7, 76:9, 76:13, 76:17, 79:10, 79:14, 79:15, 79:20, 87:9, 87:19, 88:19, 88:23, 89:14, 101:9, 120:11, 125:24, 125:25

**Customs'** [3] - 48:6, 48:7, 110:25

**Customsinfo** [1] - 80:18

**customsinfo.com** [1] - 81:11

**cut** [6] - 9:18, 13:8, 14:12, 14:13, 50:1, 54:10

**cutting** [1] - 93:6

**CV** [1] - 140:2

**CV17-04393-RGK** [1] - 1:8

**cynical** [1] - 114:21

## D

**daily** [2] - 45:20, 89:8

**damages** [12] - 103:13, 103:16, 104:4, 104:17, 134:12, 134:16, 134:17, 134:18, 134:21, 140:23

**database** [10] - 52:9, 58:13, 58:15, 80:8, 80:10, 80:15, 87:4, 113:11, 116:6

**databases** [3] - 81:8, 81:18, 108:10

**date** [2] - 138:7, 140:14

**DATE** [1] - 144:10

**dated** [2] - 61:8, 139:15

**dates** [1] - 71:8

**David** [1] - 138:15

**DAY** [1] - 1:17

**day-to-day** [6] - 26:5, 26:24, 28:7, 30:8, 30:25, 109:4

**days** [4] - 92:22, 93:3, 96:7, 98:8

**DC** [2] - 2:13

**dealing** [1] - 10:17

**deals** [2] - 85:9, 85:10

**debate** [1] - 104:23

**decade** [2] - 99:15, 106:6

**deceive** [2] - 104:16, 114:11

**December** [1] - 106:2

**decide** [7] - 43:19, 100:2, 127:25, 129:10, 129:20, 130:9, 135:5

**decided** [1] - 115:2

**deciding** [3] - 128:6, 128:14, 130:8

**decision** [6] - 16:18, 101:7, 115:17, 120:1, 132:10, 135:13

**decisions** [4] - 44:15, 101:13, 123:7, 135:11

**declined** [1] - 42:24

**deep** [1] - 88:18

**defendant** [23] - 59:22, 95:10, 103:18, 131:18, 132:4, 132:12, 132:14, 132:17, 132:19, 132:20, 133:13, 133:14, 133:16, 133:17, 133:19, 133:22, 133:25, 134:1, 134:3, 134:7, 140:7, 140:17, 140:24

**DEFENDANT** [1] - 2:10

**defendant's** [4] - 133:6, 133:25, 134:9, 134:20

**Defendant's** [4] - 3:3, 3:5, 4:12, 23:2

**Defendants** [1] - 1:12

**defendants** [1] - 140:1

**defense** [7] - 127:7, 127:8, 127:9, 127:10, 134:1, 134:3, 134:7

**defensible** [1] - 112:2

**defining** [3] - 9:8, 9:9, 19:7

**definition** [3] - 8:15, 19:15, 20:9

**definitions** [2] - 52:9, 113:11

**defy** [1] - 110:25

**deliberate** [11] - 95:16, 102:9, 104:24, 105:13, 105:14, 105:18, 107:16, 125:7, 125:10, 132:22, 133:17

**deliberately** [1] - 131:22

**deliberating** [2] - 114:10, 138:22

**deliberation** [2] - 137:13, 138:17

**deliberations** [8] - 92:4, 127:18, 134:24, 135:1, 135:23, 137:2, 137:18, 138:7

**delivered** [2] - 89:2, 89:3

**denies** [1] - 132:4

**Department** [15] - 19:3, 19:6, 19:16, 19:18, 20:4, 20:7, 62:21, 85:18, 85:23, 106:22, 122:11, 122:17, 122:21, 122:22, 133:2

**department** [11] - 29:14, 41:13, 42:4, 42:5, 42:8, 46:5, 73:4, 88:10, 108:3

**deposed** [1] - 72:19

**DEPOSIT** [1] - 144:6

**deposition** [5] - 22:7, 74:24, 75:8, 118:17, 126:8

**depositions** [1] - 73:17

**deprived** [2] - 122:2, 126:22

**describe** [4] - 53:18, 57:18, 98:17, 101:24

**described** [1] - 131:25

**describes** [2] - 5:9, 9:2

**description** [28] - 41:19, 41:20, 44:25, 45:6, 45:11, 47:21, 48:9, 48:10, 48:11, 48:21, 50:1, 51:20, 52:4, 52:21, 53:3, 61:25, 63:12, 68:3, 102:20, 102:21, 103:7, 111:18, 112:5, 113:7, 114:9, 114:14

**descriptions** [5] - 68:8, 101:10, 103:11, 111:19, 122:11

Case 2:22-cv-00050-DCN-9:22-cv-00050-DCN-9:22-cv-00050-DCN-9 Document 19-7 Filed 06/27/22 Page 454 of 567 Page 45 of 567 Page ID #45
Transcript of Day 3 of 6 679 Trial    Page 152 of 166
151

**deserves** [2] - 131:1, 131:8
**designed** [11] - 5:22, 8:7, 9:5, 9:16, 9:17, 17:3, 17:6, 18:19, 18:22, 18:25, 99:25
**detail** [9] - 29:17, 52:5, 53:17, 53:22, 88:11, 90:21, 112:21, 113:8, 114:13
**detailed** [4] - 66:16, 67:7, 67:18, 68:1
**determination** [3] - 45:15, 46:7, 115:7
**determine** [11] - 6:12, 33:8, 43:12, 43:17, 43:24, 95:7, 98:19, 109:13, 123:24, 134:15, 134:21
**determined** [3] - 47:23, 61:12, 77:6
**determines** [1] - 124:11
**determining** [2] - 42:22, 54:14
**devices** [1] - 136:13
**devoted** [1] - 24:20
**dial** [1] - 88:9
**diameter** [1] - 11:7
**dictionaries** [1] - 136:9
**differ** [1] - 128:21
**difference** [6] - 16:5, 101:11, 101:20, 103:17, 122:10, 134:18
**different** [20] - 6:25, 7:1, 10:20, 10:21, 17:4, 17:5, 43:8, 44:24, 66:15, 67:5, 81:8, 95:20, 96:24, 97:19, 99:23, 100:21, 102:14, 102:19, 103:11, 108:10
**differently** [1] - 95:22
**difficult** [1] - 119:23
**digging** [1] - 56:10
**digit** [2] - 45:8
**digits** [1] - 54:24
**diligently** [1] - 135:3
**DIRECT** [4] - 3:4, 3:6, 4:13, 23:9
**direct** [9] - 4:8, 38:2, 54:8, 60:5, 76:22, 129:12, 129:13, 129:19
**direction** [1] - 120:18
**directions** [1] - 64:8
**directly** [2] - 100:20, 121:11
**directors** [2] - 131:13, 131:14
**dirty** [1] - 119:6
**discharged** [1] - 138:3
**disclose** [2] - 35:13, 115:5
**disclosing** [1] - 114:18
**disclosure** [2] - 111:7, 111:8
**discouraged** [1] - 137:14
**discrepancies** [2] - 26:11, 27:5
**discuss** [5] - 5:6, 59:11,

92:7, 136:6, 142:7
**discussed** [4] - 121:2, 135:7, 136:12, 136:14
**discussing** [4] - 10:15, 16:23, 60:7, 135:22
**discussion** [2] - 32:11, 135:12
**discussions** [1] - 7:3
**dislikes** [1] - 127:24
**dispute** [3] - 99:10, 110:6, 120:25
**disputed** [1] - 93:11
**disputes** [2] - 100:8, 111:8
**disregard** [2] - 102:9, 105:13, 105:14, 129:4, 132:22, 133:19
**disregarded** [1] - 131:23
**distance** [1] - 87:23
**distinct** [1] - 99:3
**distinction** [1] - 129:19
**distinguish** [1] - 5:24
**District** [2] - 139:22, 139:23
**DISTRICT** [3] - 1:1, 1:2, 1:23
**division** [10] - 24:14, 26:3, 26:13, 69:10, 71:9, 71:11, 72:7, 74:1, 74:2, 84:7
**divulge** [2] - 142:16, 142:23
**document** [24] - 5:8, 26:9, 30:16, 31:10, 31:13, 46:18, 46:24, 49:15, 50:19, 51:13, 65:3, 77:1, 77:3, 77:5, 77:9, 77:13, 78:3, 99:15, 102:17, 106:13, 107:13, 114:4, 114:12
**Document** [1] - 139:19
**documentation** [10] - 26:14, 29:13, 29:20, 48:24, 48:25, 74:16, 76:6, 89:1, 111:14
**documented** [1] - 107:1
**documents** [21] - 26:19, 30:11, 30:15, 30:24, 36:17, 36:18, 38:25, 40:11, 49:4, 49:6, 49:7, 66:5, 67:9, 89:4, 89:5, 109:21, 112:6, 114:7, 126:10, 126:11
**DOJ** [3] - 63:3, 63:8, 113:21
**dollar** [1] - 67:14
**dollars** [2] - 96:9, 119:4
**domestic** [5] - 21:1, 21:4, 41:12, 124:3, 124:18
**done** [27] - 8:2, 24:14, 28:10, 28:13, 28:25, 29:2, 29:16, 38:20, 38:23, 38:25, 41:3, 41:6, 44:16, 44:17, 65:23, 72:18, 81:1, 93:2, 93:15, 97:9, 109:20, 122:8, 124:2, 126:7, 128:3, 143:17
**door** [1] - 41:3
**dotted** [2] - 70:8, 70:20
**doubt** [2] - 16:4, 97:12

**down** [18] - 13:8, 18:23, 44:4, 45:9, 54:25, 55:8, 55:12, 55:24, 56:13, 57:11, 58:5, 77:23, 83:16, 91:16, 127:3, 138:24
**drafted** [1] - 36:8
**draw** [3] - 52:1, 55:24, 60:17
**drawing** [1] - 47:22
**drawings** [1] - 41:25
**due** [3] - 40:17, 43:2, 132:25
**dumping** [2] - 117:20, 117:24
**during** [19] - 17:23, 28:4, 40:13, 63:3, 72:4, 75:3, 75:5, 95:17, 113:17, 117:1, 122:16, 127:18, 135:23, 137:2, 137:17
**duties** [66] - 19:24, 32:12, 32:20, 34:6, 34:17, 40:16, 40:21, 40:25, 43:2, 43:3, 43:24, 43:25, 63:2, 64:7, 64:12, 64:21, 71:17, 71:22, 76:14, 76:18, 77:10, 77:14, 77:19, 77:21, 78:2, 78:14, 83:24, 85:19, 89:22, 90:4, 96:16, 97:1, 98:20, 98:22, 98:25, 99:6, 101:17, 104:7, 105:5, 106:21, 107:19, 107:25, 108:7, 108:16, 109:2, 114:18, 115:1, 115:4, 115:6, 116:17, 117:23, 117:24, 118:23, 118:25, 119:18, 120:2, 121:1, 122:2, 123:11, 123:24, 124:7, 124:14, 125:13, 126:22, 132:6, 133:4
**duty** [63] - 16:20, 18:4, 18:6, 18:9, 18:12, 19:4, 20:9, 22:4, 30:20, 33:19, 33:22, 39:10, 42:13, 42:18, 43:4, 45:14, 49:9, 61:2, 62:22, 65:6, 65:15, 65:17, 66:1, 67:24, 67:25, 68:9, 72:1, 72:4, 81:22, 81:25, 96:10, 101:8, 101:14, 101:23, 101:25, 102:1, 103:23, 104:3, 104:4, 104:22, 105:2, 105:8, 105:25, 106:5, 109:3, 112:17, 114:16, 114:17, 119:3, 122:19, 123:2, 123:4, 124:8, 124:17, 126:6, 127:16, 127:19, 128:24, 131:24, 132:1, 133:5, 133:8, 134:11

---

# E

**e-mail** [3] - 106:13, 125:24,

126:1
**e-mails** [2] - 107:4, 107:6
**early** [4] - 91:23, 110:13, 115:10, 116:4
**easier** [2] - 124:1, 125:3
**easily** [1] - 50:4
**ECF** [1] - 92:23
**edge** [1] - 122:12
**education** [2] - 131:4, 131:9
**educational** [1] - 142:9
**effect** [3] - 82:1, 118:7, 135:15
**effort** [9] - 110:25, 117:16, 117:23, 119:4, 119:21, 120:3, 120:15, 120:18, 126:12
**eight** [2] - 86:15, 130:21
**either** [10] - 8:10, 12:9, 13:24, 37:22, 40:13, 41:12, 45:14, 58:16, 129:12, 129:19
**elaborate** [5] - 27:3, 32:17, 39:7, 51:14, 64:11
**elbow** [5] - 8:10, 15:9, 16:5, 56:14, 56:22
**elbows** [3] - 55:22, 56:21, 60:25
**elect** [1] - 134:24
**electronic** [2] - 41:8, 42:3
**electronically** [1] - 42:4
**element** [5] - 103:14, 104:15, 133:9, 133:12
**elements** [5] - 100:2, 100:24, 104:8, 122:3, 133:23
**embrace** [1] - 97:8
**eminent** [1] - 116:19
**employ** [1] - 125:6
**employed** [4] - 23:20, 23:22, 23:24, 24:23
**employee** [1] - 87:19
**employees** [7] - 83:11, 83:12, 108:9, 119:9, 131:12, 131:14
**employer** [1] - 136:2
**employment** [2] - 24:25, 66:8
**end** [21] - 8:8, 9:21, 9:23, 11:6, 12:11, 14:15, 14:16, 16:14, 16:15, 16:16, 17:4, 52:12, 61:23, 61:24, 82:1, 82:1, 94:6, 94:17, 95:12, 97:23, 123:5
**ends** [8] - 8:12, 13:23, 14:12, 14:13, 15:5, 15:6, 57:25
**engaging** [1] - 124:12
**engineering** [1] - 41:13
**engineers** [2] - 58:3, 107:6
**Engineers** [1] - 7:24
**enhancements** [1] - 87:15
**ensure** [10] - 24:15, 24:18, 26:9, 30:6, 39:1, 46:9,

Case 2:22-cv-00050-DC-M-c Document 19-7 Filed 06/27/22 Filed 06/27/22 Page 454 of 567 PageID
Transcript of Day 3 of FCA Trial   Page 153 of 166
152

47:20, 74:15, 87:3, 89:2
**ensuring** [3] - 71:17, 71:22, 75:1
**entered** [2] - 48:7, 75:2
**entire** [1] - 136:23
**entirely** [1] - 128:5
**entitled** [2] - 23:18, 98:1
**entries** [1] - 46:15
**entry** [6] - 26:17, 39:10, 47:2, 50:20, 89:9, 99:18
**equally** [1] - 97:24
**essence** [1] - 4:23
**essential** [1] - 127:2
**essentially** [1] - 32:23
**establish** [2] - 104:10, 133:24
**establishes** - 104:18, 119:21
**establishing** [1] - 19:4
**et** [4] - 22:12, 68:9, 140:1, 142:7
**ET** [3] - 1:4, 1:10, 2:11
**ethical** [1] - 119:11
**evade** [3] - 114:18, 119:22, 120:16
**evaded** [1] - 118:23
**evading** [1] - 119:18
**evaluate** [1] - 131:16
**event** [1] - 119:13
**everyday** [1] - 115:15
**evidence** [78] - 11:19, 12:14, 13:13, 14:4, 14:23, 15:23, 31:7, 69:15, 95:6, 95:18, 95:19, 96:11, 96:18, 97:5, 97:22, 98:4, 99:2, 99:7, 100:22, 101:15, 101:19, 103:7, 103:25, 105:16, 106:10, 119:20, 121:10, 125:17, 125:18, 125:20, 126:11, 127:15, 127:20, 127:25, 128:4, 128:6, 128:8, 128:12, 128:13, 128:17, 128:19, 128:20, 128:24, 129:1, 129:4, 129:5, 129:10, 129:11, 129:12, 129:13, 129:16, 129:18, 129:20, 129:21, 129:22, 129:23, 129:24, 130:1, 130:19, 130:21, 130:23, 131:10, 131:16, 132:3, 132:8, 132:9, 132:10, 132:16, 134:2, 134:8, 134:17, 134:22, 135:7, 135:16, 135:18, 137:22, 140:7
**evident** [1] - 13:11
**ex** [1] - 139:24
**exact** [4] - 55:20, 77:12, 79:17, 126:23
**exactly** [3] - 78:22, 100:7,

116:11
**exam** [2] - 40:8, 79:25
**EXAMINATION** [12] - 3:4, 3:5, 3:6, 3:6, 3:7, 3:7, 4:13, 17:11, 23:9, 68:16, 86:17, 91:3
**examination** [4] - 4:8, 17:10, 60:5, 76:22
**examinations** [1] - 113:20
**examined** [1] - 113:21
**example** [8] - 5:10, 6:5, 12:6, 46:19, 55:6, 55:22, 60:25, 110:11
**examples** - 6:18, 53:20
**exams** [4] - 38:20, 38:22, 40:12, 40:14
**Excel** [1] - 44:3
**except** [4] - 13:7, 135:22, 137:5, 137:7
**excerpt** [1] - 73:16
**exclude** [1] - 117:17
**excluded** [5] - 117:2, 117:13, 122:5, 122:6, 129:3
**exclusion** [1] - 117:16
**exclusive** [2] - 46:14, 88:20
**exclusively** [1] - 88:22
**excuse** [6] - 75:7, 78:9, 80:7, 92:6, 138:21, 143:9
**excused** [2] - 136:17, 143:11
**excuses** [1] - 121:3
**excusing** [2] - 91:22, 142:11
**execute** [1] - 120:2
**executive** [1] - 43:18
**executives** [1] - 119:24
**Exhibit** [61] - 3:11, 3:11, 3:12, 3:12, 3:13, 3:13, 10:23, 11:9, 11:16, 11:25, 12:5, 12:6, 12:14, 12:16, 13:3, 13:6, 13:7, 13:13, 13:15, 13:17, 13:19, 14:4, 14:6, 14:18, 14:20, 14:21, 14:22, 14:25, 15:16, 15:18, 15:19, 15:23, 15:25, 31:6, 35:5, 46:22, 50:9, 50:12, 50:14, 51:16, 52:15, 53:24, 55:19, 56:3, 58:22, 60:12, 64:24, 69:14, 76:23, 103:25, 106:19, 110:9, 111:22, 111:23, 112:19, 113:3, 114:3, 116:3, 122:15, 126:23
**exhibit** [13] - 10:25, 11:16, 11:18, 12:18, 36:5, 51:16, 54:9, 54:19, 83:9, 114:8, 129:24, 130:3, 130:4
**exhibits** [3] - 3:10, 128:8, 128:12
**exists** [1] - 116:13
**expand** [1] - 81:2
**expect** [2] - 35:2, 125:21

**expectations** [1] - 83:10
**expenses** [1] - 71:14
**experience** [5] - 87:9, 107:21, 131:5, 131:9, 142:10
**expert** [8] - 17:14, 17:18, 20:3, 22:5, 106:9, 106:12, 106:15, 116:19
**expertise** [7] - 18:2, 18:5, 19:9, 19:10, 19:23, 22:11
**experts** [2] - 120:10, 131:2
**explain** [18] - 26:6, 32:17, 37:22, 50:4, 50:5, 52:3, 64:11, 65:22, 67:1, 86:22, 99:18, 101:20, 102:13, 106:3, 111:24, 112:16, 117:15, 119:25
**explained** [9] - 58:9, 98:12, 100:9, 101:9, 107:20, 121:3, 122:9, 122:10, 122:13
**explicitly** [1] - 101:18
**explore** [1] - 87:15
**exposed** [2] - 135:20, 136:24
**express** [2] - 59:12, 92:8
**expressly** [5] - 112:9, 112:24, 117:2, 117:13, 122:6
**extension** [3] - 57:19, 69:13, 70:21
**extensions** [1] - 70:10
**extensively** [1] - 30:5
**eye** [2] - 125:19

# F

**face** [4] - 12:21, 12:22, 14:15
**fact** [24] - 18:1, 20:8, 21:15, 37:24, 68:23, 69:1, 69:11, 78:8, 80:17, 81:6, 81:20, 83:8, 96:12, 106:1, 107:10, 107:18, 116:12, 117:17, 128:8, 128:9, 129:13, 129:17, 130:23, 142:24
**factor** [2] - 42:23, 130:21
**facts** [8] - 95:7, 96:11, 127:19, 127:20, 128:14, 128:20, 129:17, 130:8
**fail** [3] - 31:17, 35:9, 35:10
**failed** [7] - 31:16, 79:25, 80:1, 105:22, 107:15, 107:17, 132:5
**fair** [5] - 18:1, 22:14, 22:17, 72:3, 117:21
**fairness** [1] - 136:22
**faith** [13] - 87:14, 109:23, 109:24, 110:2, 110:5, 110:24, 117:21, 119:16, 119:21, 120:1, 120:18, 120:19, 121:22

**fall** [2] - 62:22, 117:16
**False** [8] - 103:15, 104:11, 126:17, 132:12, 132:15, 133:12, 133:24, 140:7
**false** [35] - 96:22, 96:25, 99:7, 99:9, 100:4, 100:6, 100:23, 102:3, 102:8, 102:13, 104:17, 104:18, 104:19, 104:20, 104:23, 105:2, 108:17, 109:19, 110:16, 110:21, 114:24, 114:25, 115:5, 115:18, 121:24, 121:25, 126:19, 132:5, 132:13, 132:17, 132:24, 133:1, 133:8, 140:8
**falsely** [5] - 96:15, 99:4, 99:5, 131:25
**falsity** [3] - 132:23, 133:18, 133:19
**familiar** [9] - 26:23, 27:9, 28:7, 28:8, 31:9, 40:19, 46:18, 46:24, 59:2
**family** [3] - 68:23, 80:1, 136:1
**far** [6] - 19:24, 23:14, 30:1, 93:6, 127:9
**fastener** [2] - 5:18, 5:20
**favor** [1] - 108:20
**feasibility** [1] - 79:19
**feather** [1] - 97:25
**feature** [1] - 100:12
**federal** [1] - 80:18
**FEE** [1] - 144:5
**FEES** [1] - 144:5
**fellow** [2] - 135:4, 135:22
**felt** [5] - 30:13, 36:17, 37:19, 81:15, 89:8
**few** [7] - 28:15, 44:2, 61:16, 61:18, 79:5, 119:3, 123:3
**field** [2] - 35:23, 124:9
**fifth** [2] - 40:10, 57:12
**figure** [1] - 103:16
**file** [2] - 88:25, 89:4
**filed** [3] - 49:10, 92:23, 110:12
**filings** [1] - 25:12
**fill** [5] - 27:20, 41:14, 42:17, 49:5, 113:5
**filled** [3] - 27:11, 42:5, 105:4
**filling** [8] - 28:3, 50:11, 51:6, 51:12, 51:23, 63:22, 63:24, 74:18
**final** [8] - 31:14, 35:5, 44:15, 62:24, 89:3, 98:24, 103:14, 126:24
**finally** [3] - 90:12, 103:13, 107:16
**financial** [2] - 29:2, 38:24, 118:6

Case 2:22-cv-00050-RMJ-ec Document 19-7 Filed 06/27/22 Page 154 of 166 PageID #: 671
Transcript of Day 3 of Jury Trial    Page 154 of 166
153

**findings** [1] - 108:20
**fine** [4] - 92:24, 94:7, 138:23, 143:4
**finish** [3] - 126:15, 137:15
**fire** [3] - 6:24, 9:22, 47:18
**fire-protection** [1] - 47:18
**firm** [1] - 120:13
**first** [33] - 5:6, 11:22, 19:7, 21:18, 31:20, 31:25, 33:6, 39:9, 41:14, 45:10, 52:1, 52:4, 52:11, 52:20, 53:17, 54:24, 56:12, 61:9, 64:13, 65:1, 66:14, 95:10, 100:2, 105:19, 106:10, 109:16, 109:17, 111:7, 112:18, 114:4, 122:9, 132:17, 143:13
**FIRST** [1] - 1:24
**fit** [6] - 9:16, 9:17, 50:2, 57:8, 61:23, 111:6
**fitting** [65] - 4:23, 4:24, 4:25, 7:3, 8:6, 8:7, 8:9, 8:12, 8:14, 9:2, 9:9, 9:19, 9:20, 9:21, 9:24, 10:18, 11:1, 11:3, 11:4, 11:5, 11:6, 11:11, 11:12, 11:14, 12:7, 12:8, 12:10, 12:22, 13:9, 13:25, 14:1, 15:8, 16:15, 16:16, 16:17, 16:25, 17:3, 17:5, 17:6, 17:8, 21:9, 21:13, 47:5, 47:7, 55:5, 55:9, 55:11, 57:3, 57:24, 58:1, 58:4, 61:11, 61:22, 62:5, 67:22, 112:17, 112:25, 115:3, 116:22, 116:23, 122:11
**fittings** [43] - 8:5, 8:11, 8:21, 8:23, 9:4, 9:5, 9:7, 9:23, 10:16, 12:9, 15:12, 15:13, 16:3, 16:8, 16:9, 16:10, 16:20, 19:16, 19:20, 20:9, 22:4, 53:20, 54:12, 55:9, 55:15, 55:22, 57:2, 60:22, 60:25, 62:4, 64:14, 64:15, 64:18, 81:23, 112:11, 112:15, 116:15, 122:23, 123:16, 123:17, 131:21
**five** [16] - 17:15, 30:3, 43:5, 69:1, 83:19, 89:1, 94:5, 94:10, 94:16, 94:19, 96:1, 105:20, 122:19, 124:5, 130:18
**five-minute** [4] - 94:5, 94:10, 94:19, 96:1
**flag** [2] - 109:8, 126:21
**flagged** [1] - 46:15
**flange** [1] - 56:13
**flanges** [3] - 56:13, 56:15, 56:21
**FLOOR** [1] - 1:24

**floorboard** [1] - 111:21
**flow** [1] - 69:21
**fluid** [1] - 17:8
**focus** [3] - 55:10, 69:3, 87:18
**focused** [18] - 28:18, 28:23, 29:1, 29:2, 29:10, 31:6, 31:15, 32:9, 37:12, 38:19, 40:13, 76:23, 87:11, 87:13, 87:18, 110:7, 113:17, 114:4
**focuses** [1] - 117:25
**focusing** [4] - 29:10, 33:5, 74:12, 75:25
**folks** [1] - 25:3
**follow** [10] - 36:19, 36:20, 37:1, 37:24, 59:7, 90:19, 119:19, 120:8, 121:21, 127:21
**follow-up** [3] - 36:19, 36:20, 37:1
**followed** [6] - 26:24, 35:4, 35:18, 40:20, 64:8, 106:18
**following** [8] - 24:18, 30:6, 33:9, 78:5, 94:1, 113:15, 132:16, 133:15
**follows** [1] - 140:5
**FOR** [2] - 2:3, 144:5
**forefront** [1] - 86:2
**FOREGOING** [1] - 144:2
**foreign** [2] - 18:20, 18:25
**foremost** [2] - 39:9, 52:4, 64:13
**foreperson** [2] - 138:6, 139:9
**FOREPERSON** [4] - 139:10, 139:13, 139:16, 141:5
**foreseen** [1] - 16:24
**forfeit** [1] - 132:25
**forged** [4] - 60:21, 64:13, 64:18, 81:22
**forging** [3] - 57:6, 57:10, 61:22
**forgotten** [1] - 118:15
**form** [40] - 41:7, 41:8, 42:2, 47:2, 49:10, 49:22, 50:20, 50:24, 51:7, 52:14, 59:12, 62:7, 64:6, 64:24, 68:2, 74:19, 74:21, 82:13, 92:8, 99:16, 107:11, 110:8, 110:11, 110:15, 110:17, 110:21, 110:24, 111:2, 111:17, 111:25, 112:6, 113:5, 114:3, 114:25, 115:6, 138:4, 138:6, 140:3, 140:14
**formal** [9] - 38:14, 83:10, 83:23, 84:6, 84:10, 84:11, 84:22, 85:1, 124:11
**formally** [1] - 82:13
**formed** [1] - 19:14
**former** [1] - 119:9

**forming** [5] - 20:14, 20:18, 20:22, 20:25, 21:3
**forms** [4] - 63:23, 110:12, 121:12
**forth** [1] - 63:14
**fortunately** [1] - 118:5
**forward** [4] - 36:22, 38:4, 113:23, 119:24
**foundation** [4] - 65:9, 65:11, 66:7, 89:23
**four** [6] - 25:7, 54:24, 83:21, 104:8, 122:3, 130:16
**fourth** [5] - 34:4, 40:10, 57:12, 103:14, 132:24
**FOURTH** [1] - 1:24
**fox** [1] - 123:22
**free** [3] - 5:1, 22:22, 142:18
**freely** [1] - 98:9
**freight** [3] - 26:20, 30:19
**frequency** [1] - 89:13
**frequently** [2] - 80:11, 114:4
**front** [3] - 16:2, 16:3, 60:10
**fulfill** [1] - 109:2
**full** [4] - 23:3, 34:20, 50:3, 79:15
**full-time** [1] - 79:15
**fully** [3] - 41:22, 41:23, 135:7
**fully-assembled** [2] - 41:22, 41:23
**function** [4] - 26:7, 26:8, 27:13, 87:10
**furniture** [2] - 6:19, 6:20
**future** [3] - 37:6, 115:16, 123:19

**G**

**gain** [1] - 119:3
**gained** [3] - 81:7, 81:9, 81:13
**GARY** [1] - 1:3
**general** [1] - 90:13
**generalized** [1] - 77:8
**generally** [5] - 34:22, 40:19, 72:15, 72:17, 118:19
**generates** [1] - 48:9
**gentleman** [1] - 116:18
**gentlemen** [12] - 59:8, 75:8, 91:22, 95:5, 108:23, 113:4, 117:7, 117:25, 120:24, 127:13, 141:3, 142:6
**geographic** [1] - 24:1
**geometry** [2] - 6:7, 9:2
**given** [10] - 20:9, 75:11, 93:12, 93:13, 93:14, 104:24, 129:19, 129:21, 131:3, 131:9
**goal** [1] - 37:13
**good-faith** [2] - 110:24, 119:21
**goods** [1] - 38:17

**Google** [1] - 107:21
**Googling** [1] - 44:23
**gotcha** [1] - 80:6
**government** [24] - 34:22, 35:3, 63:1, 103:17, 103:20, 103:24, 104:6, 104:16, 113:24, 114:24, 115:16, 120:9, 124:10, 124:16, 126:21, 127:1, 132:14, 132:25, 134:8, 134:19, 140:9, 140:15
**grade** [1] - 35:9
**GRAND** [1] - 2:4
**great** [2] - 112:20, 120:1
**grinder** [1] - 14:14
**ground** [1] - 84:14
**grounds** [1] - 88:12
**group** [16] - 69:4, 69:8, 69:9, 69:12, 69:13, 69:21, 70:4, 70:6, 70:10, 70:20, 70:21, 70:22, 70:25, 84:5, 84:9, 126:3
**GSP** [2] - 42:11, 42:12
**guarding** [1] - 123:22
**guess** [6] - 48:15, 50:4, 82:14, 87:8, 125:23, 130:9
**guesswork** [1] - 134:23
**guidance** [1] - 120:8
**guidelines** [1] - 45:17

**H**

**hair** [1] - 57:17
**half** [4] - 13:8, 72:12, 95:14, 137:16
**hand** [7] - 5:25, 11:15, 13:2, 13:16, 14:17, 15:15, 16:6
**handed** [1] - 139:19
**handle** [1] - 28:12
**handles** [1] - 25:12
**handwritten** [1] - 67:16
**hard** [4] - 87:24, 108:10, 123:25, 124:2
**harmonized** [12] - 52:25, 53:4, 53:15, 53:16, 53:19, 54:2, 60:23, 62:10, 111:4, 111:19, 111:23, 120:7
**head** [2] - 5:10, 57:20
**header** [13] - 10:10, 12:6, 12:19, 12:20, 12:25, 13:9, 48:21, 48:22, 52:16, 52:18, 54:21, 54:24
**heading** [1] - 54:11
**headquarters** [2] - 24:5, 29:25, 36:11
**heads** [1] - 9:24
**hear** [6] - 7:3, 94:18, 95:22, 127:8, 130:14, 130:19, 136:19
**heard** [40] - 28:20, 77:1, 95:6, 96:11, 96:18, 98:11,

Case 2:22-cv-00050 Document 19-7c Filed 06/27/22 Entered 06/27/22 Page 154 of 165 Exhibit
Transcript of Day 3 of FCA Trial    Page 155 of 166
154

101:15, 101:20, 102:13,
102:17, 106:2, 106:6,
106:7, 106:8, 107:2, 107:5,
107:10, 108:2, 110:22,
111:5, 111:11, 111:24,
115:21, 115:25, 118:11,
118:12, 120:11, 121:10,
122:8, 122:25, 123:1,
123:2, 123:9, 123:20,
124:7, 124:13, 127:14,
129:9, 129:14, 131:2
**heat** [1] - 6:16
**heavily** [1] - 120:9
**held** [4] - 25:20, 25:22,
25:24, 71:7
**help** [7] - 18:19, 18:22, 37:5,
88:3, 95:19, 128:19,
131:16
**helpful** [3] - 80:10, 80:15,
93:15
**helping** [1] - 81:15
**helps** [1] - 112:15
**HENDY** [1] - 2:3
**henhouse** [1] - 123:22
**HEREBY** [1] - 144:2
**high** [1] - 57:14
**highlight** [3] - 48:20, 55:21,
56:5
**highlighted** [1] - 78:21
**hire** [2] - 79:10, 79:15
**historic** [1] - 66:5
**history** [1] - 122:12
**hold** [3] - 5:22, 114:21,
138:25
**hole** [3] - 9:18, 14:1, 14:2
**home** [2] - 142:25, 143:2
**honest** [2] - 121:14, 135:15
**Honor** [38] - 11:20, 11:23,
12:3, 12:13, 13:12, 14:3,
14:22, 15:22, 22:14, 22:17,
22:21, 22:24, 23:8, 50:12,
63:5, 63:15, 66:3, 66:6,
68:13, 72:22, 73:15, 73:20,
73:23, 77:15, 86:14, 88:6,
88:12, 88:15, 89:23, 90:25,
91:15, 91:18, 93:4, 95:25,
139:13, 141:16, 141:20,
141:22
**honor** [3] - 98:13, 109:5,
125:13
**HONORABLE** [1] - 1:3
**hope** [1] - 113:4
**hopefully** [1] - 142:9
**hoping** [1] - 22:3
**hot** [1] - 6:21
**hour** [4] - 4:20, 95:14, 137:16
**hourly** [2] - 4:19, 4:20
**hours** [1] - 91:24
**house** [2] - 36:10, 85:1
**Houston** [3] - 35:24, 38:24,

40:12
**HTS** [27] - 39:21, 42:20, 45:5,
45:7, 45:12, 46:6, 47:5,
47:13, 47:15, 47:16, 47:23,
51:1, 52:7, 52:9, 52:25,
54:6, 62:5, 66:15, 72:8,
73:6, 74:2, 102:19, 111:3,
112:5, 113:10, 113:11
**hypotheticals** [2] - 22:15,
22:16

**I**

**idea** [2] - 19:15, 21:22
**identification** [1] - 13:22
**identified** [7] - 2:1, 11:14,
18:18, 33:7, 36:25, 71:18,
71:22, 77:3, 78:13
**identifies** [3] - 12:2, 15:14,
77:10
**identify** [2] - 9:8, 34:16
**ignorance** [8] - 102:9,
105:13, 105:14, 105:18,
107:16, 125:10, 132:22,
133:17
**ignorant** [1] - 106:4
**ignore** [1] - 130:6
**ignored** [1] - 131:22
**imagine** [2] - 105:3, 105:4
**immediately** [2] - 107:18,
137:1
**impartial** [1] - 109:13
**impeachment** [2] - 72:22,
72:24
**implied** [1] - 6:5
**import** [35] - 18:2, 21:7,
24:21, 26:2, 26:3, 26:7,
27:14, 27:19, 35:14, 38:18,
42:7, 45:4, 46:4, 69:6,
69:8, 69:9, 69:10, 69:11,
69:17, 69:21, 71:9, 71:10,
71:14, 76:4, 77:6, 82:23,
84:20, 86:23, 87:1, 90:15,
90:22, 91:9, 103:8, 115:4,
126:3
**import-related** [1] - 87:1
**important** [14] - 6:2, 6:4,
39:4, 61:18, 89:8, 110:15,
111:13, 111:22, 126:24,
126:25, 127:1, 130:25,
135:9
**importantly** [1] - 24:17
**importation** [1] - 68:10
**imported** [7] - 47:14, 61:6,
96:9, 104:2, 115:9, 124:19,
131:19
**importer** [15] - 35:19, 38:16,
44:16, 91:8, 96:9, 96:14,
96:20, 98:6, 98:10, 105:23,
105:24, 106:4, 125:9,

125:21, 126:13
**importer's** [1] - 20:21
**importers** [6] - 98:15, 98:16,
123:19, 123:22, 125:14,
127:1
**importing** [12] - 17:21,
17:24, 21:11, 62:17, 96:21,
99:4, 99:11, 100:5, 103:22,
115:8, 116:5, 116:17
**imports** [24] - 24:11, 24:14,
24:17, 25:1, 25:10, 26:4,
26:13, 26:22, 36:9, 62:20,
69:4, 70:1, 70:6, 70:20,
70:22, 83:12, 84:5, 84:7,
84:9, 86:24, 87:2, 88:10,
113:20, 115:12
**impose** [3] - 101:7, 102:1,
119:4
**imposed** [1] - 105:7, 124:9,
124:17
**impression** [1] - 117:13
**improper** [3] - 22:9, 124:24,
128:25
**improve** [2] - 37:13, 37:14,
79:6
**IN** [3] - 2:10, 144:3, 144:6
**in-house** [2] - 36:10, 85:1
**inappropriate** [1] - 117:22
**INC** [2] - 1:10, 2:11
**Inc** [2] - 139:25, 140:1
**inches** [1] - 122:23
**include** [8] - 26:15, 29:1,
41:20, 45:20, 64:14, 111:3,
111:17, 114:12
**included** [5] - 32:21, 33:23,
38:23, 40:11, 115:3
**including** [4] - 34:2, 77:25,
81:9, 111:14, 114:7,
120:12, 137:25
**inclusion** [3] - 110:20,
114:22, 117:21
**indentations** [1] - 55:14
**indents** [2] - 55:10, 56:15
**independent** [1] - 120:5
**INDEX** [1] - 3:1
**India** [1] - 41:12
**indicate** [2] - 77:21, 78:2
**indicated** [3] - 68:20, 79:6,
80:3
**indicates** [6] - 51:12, 62:25,
78:10, 81:7, 83:9, 126:18
**indication** [1] - 112:12
**indiscrepancies** [1] - 46:12
**individual** [2] - 141:10,
141:13
**individually** [1] - 141:8
**Industries** [2] - 126:16,
139:25
**INDUSTRIES** [1] - 2:3
**industry** [30] - 5:6, 5:7, 5:8,

5:10, 5:24, 6:2, 6:6, 6:9,
6:11, 7:17, 7:20, 8:22,
8:25, 10:2, 10:14, 10:15,
10:17, 16:22, 16:23, 18:14,
18:15, 18:17, 18:19, 18:20,
18:22, 18:25, 41:18, 41:21,
124:16
**influence** [3] - 101:3, 101:7,
133:10
**influenced** [2] - 127:23,
129:1
**influencing** [2] - 101:3,
133:11
**information** [14] - 29:21,
44:10, 74:14, 107:7,
111:10, 111:13, 119:10,
132:21, 133:16, 133:18,
133:20, 135:20, 136:20,
136:25
**Inge** [10] - 25:21, 27:24,
70:11, 72:10, 79:24, 84:15,
84:18, 87:22, 126:4
**inherited** [1] - 47:16
**initial** [1] - 20:23
**inland** [1] - 26:20
**inquire** [1] - 23:7
**inquiries** [1] - 108:12
**inquiry** [2] - 32:9, 105:23
**inside** [1] - 70:23
**installed** [1] - 9:18
**instance** [1] - 19:7
**instead** [2] - 119:4, 121:2
**instincts** [1] - 118:20
**instruct** [13] - 92:3, 93:22,
93:23, 95:14, 97:18, 100:3,
100:25, 103:14, 104:14,
127:13, 127:16, 133:6,
134:11
**instructed** [2] - 128:10,
129:6
**instructing** [1] - 134:12
**instruction** [6] - 51:10,
52:24, 94:1, 99:19, 113:5,
125:1
**instructions** [25] - 49:23,
49:24, 50:11, 51:6, 51:12,
51:23, 52:2, 53:3, 91:24,
93:11, 93:12, 93:13, 93:14,
93:16, 93:24, 94:23, 98:24,
113:15, 119:19, 121:21,
124:25, 127:9, 127:17,
128:2, 135:19
**insurance** [1] - 32:23
**INTA** [1] - 38:5
**intend** [2] - 41:24, 104:13
**intended** [3] - 11:7, 104:16,
128:19
**intending** [1] - 45:4
**intensive** [5] - 38:19, 39:6,
40:2, 40:14

**intent** [3] - 104:15, 121:22, 133:22
**intention** [1] - 42:21
**intentional** [1] - 110:21
**intentionally** [2] - 109:18, 119:17
**interchangeable** [1] - 18:16
**interest** [3] - 86:1, 118:6, 130:17
**interesting** [1] - 142:10
**internal** [5] - 29:6, 29:7, 33:9, 35:13, 35:16
**International** [1] - 139:25
**INTERNATIONAL** [2] - 1:10, 2:10
**internet** [2] - 136:9, 136:13
**interpret** [2] - 95:19, 128:19
**interpretation** [1] - 113:16
**interrogatory** [3] - 106:19, 106:22, 106:25
**interrupt** [1] - 94:7
**introduced** [2] - 89:18, 137:22
**introducing** [2] - 12:1, 90:3
**investigation** [10] - 21:19, 44:14, 44:15, 63:4, 82:3, 119:8, 124:11, 124:22, 136:10
**investigators** [1] - 29:24
**invoice** [20] - 26:15, 30:16, 39:11, 49:1, 65:2, 65:7, 65:15, 66:2, 66:15, 67:2, 67:9, 67:11, 67:12, 67:18, 67:20, 68:1, 68:8, 111:11, 114:8, 114:19
**invoices** [1] - 30:19
**involved** [9] - 25:7, 29:4, 29:5, 29:7, 76:8, 76:12, 76:16, 136:2, 136:16
**involvement** [1] - 28:23
**involves** [1] - 135:21
**iron** [9] - 39:20, 41:16, 54:4, 55:4, 55:7, 57:7, 57:18, 60:25, 61:1
**IS** [1] - 144:2
**ISF** [1] - 89:5
**ISLAND** [1] - 2:3
**Island** [24] - 97:6, 97:24, 98:1, 99:13, 106:19, 113:23, 114:15, 118:12, 118:13, 118:19, 118:22, 118:23, 118:24, 119:8, 119:12, 123:18, 124:18, 124:24, 125:4, 126:10, 126:16, 126:25, 131:18, 139:24
**Island's** [8] - 97:2, 104:10, 108:20, 110:19, 118:2, 118:3, 119:13, 125:1
**isolated** [1] - 99:12

**issue** [2] - 40:15, 46:20
**issued** [2] - 85:22, 115:20
**issues** [3] - 39:23, 76:5, 135:21
**ITA** [1] - 44:3
**item** [41] - 41:6, 41:8, 41:18, 41:19, 41:22, 41:23, 41:25, 42:9, 42:10, 42:15, 44:13, 46:1, 46:5, 53:18, 55:9, 55:16, 55:25, 56:13, 57:2, 57:8, 57:19, 57:20, 57:21, 58:3, 58:6, 58:7, 62:1, 66:17, 67:7, 68:1, 68:3, 68:4, 68:5, 68:6, 89:9, 107:10
**item's** [2] - 34:1, 77:24
**items** [16] - 32:20, 33:25, 34:12, 37:1, 37:25, 39:16, 56:22, 57:22, 59:5, 73:5, 77:24, 78:17, 78:18, 78:19, 78:24
**itself** [1] - 8:14

**J**

**jail** [1] - 97:16
**James** [2] - 55:11, 56:14
**Jeff** [1] - 25:17
**jeopardizes** [1] - 136:22
**Jersey** [3] - 24:5, 24:6, 24:7
**Jim** [1] - 36:9
**job** [8] - 27:2, 28:13, 28:14, 43:20, 84:16, 87:7, 123:19
**jobs** [1] - 125:15
**join** [3] - 5:16, 8:8, 15:7
**joined** [6] - 7:6, 8:11, 8:16, 8:19, 11:7, 15:10
**joining** [3] - 6:15, 6:17, 80:4
**joins** [2] - 10:9, 12:20
**joint** [13] - 7:2, 7:4, 7:5, 7:10, 7:12, 7:13, 8:15, 10:11, 10:13, 12:21, 12:22, 12:23
**joints** [1] - 7:8, 7:9, 7:10, 7:11, 7:14, 8:4, 8:20, 9:11, 9:12
**judge** [8] - 93:22, 97:17, 100:3, 100:24, 102:2, 103:13, 104:14
**JUDGE** [1] - 1:3
**Judge** [9] - 94:15, 97:10, 98:22, 104:24, 108:23, 109:6, 119:19, 120:22, 121:20
**judged** [1] - 131:6
**judges** [2] - 96:11, 96:18
**judgment** [1] - 119:15
**judgments** [1] - 120:5
**JUDICIAL** [1] - 144:7
**judicial** [1] - 109:9
**July** [1] - 61:8, 140:18

**jump** [3] - 46:18, 50:9, 51:15
**jumps** [3] - 42:3, 42:6, 42:7
**June** [8] - 25:19, 69:4, 69:7, 71:4, 134:5, 134:10, 140:16
**Juror** [8] - 141:12, 141:15, 141:17, 141:19, 141:21, 141:23, 141:25, 142:2
**juror** [8] - 134:25, 135:1, 136:21, 136:24, 139:9, 140:14, 141:1, 141:8
**JUROR** [8] - 141:14, 141:16, 141:18, 141:20, 141:22, 141:24, 142:1, 142:3
**jurors** [14] - 59:19, 92:16, 95:4, 135:4, 135:8, 135:14, 135:23, 136:18, 142:13, 142:14, 142:17, 142:18, 142:23, 142:25
**JURY** [5] - 1:17, 139:10, 139:13, 139:16, 141:5
**Jury** [1] - 143:11
**jury** [43] - 4:4, 4:6, 29:23, 59:13, 59:17, 60:1, 60:3, 65:20, 75:9, 75:11, 75:13, 91:12, 91:24, 92:4, 92:10, 92:15, 95:2, 95:4, 97:11, 100:10, 108:24, 109:2, 109:8, 127:17, 134:25, 135:2, 136:5, 137:5, 137:7, 138:1, 138:10, 138:17, 138:18, 139:8, 140:3, 140:4, 141:3, 141:6, 141:8, 142:17, 142:23
**Justice** [1] - 106:22

**K**

**keep** [7] - 6:22, 18:22, 44:6, 86:1, 103:10, 125:19
**keeping** [1] - 102:18
**Kelli** [3] - 44:1, 87:25, 98:11
**Kelly** [1] - 87:24
**KELLY** [1] - 2:3
**kind** [7] - 9:21, 48:11, 105:22, 106:15, 110:18, 112:8, 113:2
**kinds** [2] - 7:1, 129:18
**Klausner** [6] - 97:11, 98:23, 104:25, 108:23, 109:7, 120:22
**KLAUSNER** [1] - 1:3
**Klausner's** [2] - 119:19, 121:21
**knowing** [2] - 110:21, 114:23
**knowingly** [6] - 109:18, 115:18, 132:4, 132:5, 132:13, 140:8
**knowledge** [18] - 53:9, 53:11, 65:14, 66:5, 66:7,

87:9, 90:6, 102:5, 102:8, 105:10, 105:11, 105:12, 105:13, 132:20, 132:21, 133:14, 133:16
**known** [5] - 15:19, 47:2, 124:10, 134:9, 140:16
**KRAMER** [41] - 2:3, 17:12, 19:13, 20:1, 20:2, 21:23, 22:10, 22:14, 22:17, 53:8, 63:5, 63:15, 64:1, 65:9, 66:3, 68:17, 72:22, 72:25, 73:1, 73:13, 73:19, 73:23, 73:25, 75:15, 77:17, 80:21, 81:5, 86:14, 88:12, 89:23, 91:2, 91:4, 91:15, 91:20, 94:13, 95:25, 96:3, 96:6, 105:21, 120:24, 124:6
**Kramer** [9] - 86:19, 87:18, 87:24, 89:16, 110:6, 115:22, 116:25, 117:12, 118:7

**L**

**L.A** [2] - 38:24, 40:12
**lack** [2] - 53:8, 65:9
**ladies** [12] - 59:8, 75:8, 91:22, 95:5, 108:23, 113:4, 117:7, 117:25, 120:24, 127:13, 141:3, 142:6
**lading** [7] - 26:16, 39:11, 48:23, 49:1, 99:17, 111:12, 111:15
**ladings** [1] - 30:17
**laid** [3] - 35:19, 66:6, 125:6
**landed** [2] - 26:19, 30:19
**LANE** [1] - 2:11
**language** [4] - 37:16, 79:17, 110:18, 111:6
**lap** [2] - 7:10, 120:1
**laps** [1] - 7:10
**largest** [1] - 79:13
**last** [9] - 20:12, 23:4, 34:20, 37:3, 38:2, 58:6, 93:10, 108:13, 127:3
**Lau** [1] - 4:16
**LAU** [27] - 2:11, 4:14, 11:15, 11:20, 11:23, 11:25, 12:2, 12:4, 12:13, 12:17, 13:2, 13:5, 13:12, 13:16, 13:18, 14:3, 14:7, 14:17, 14:19, 14:22, 15:2, 15:15, 15:17, 15:22, 16:1, 17:9, 22:21
**Law** [1] - 97:13
**law** [16] - 63:24, 92:3, 94:22, 95:15, 97:17, 119:22, 120:4, 120:15, 127:14, 127:16, 127:20, 127:21, 129:18, 131:11, 134:5, 136:16

Case 2:22-cv-00050-DFM19-c Filed 06/27/22 1 Filed 06/27/22 Page 455 of 587 PageID Transcript of Day 3 of 694 Trial    Page 157 of 166

156

**laws** [4] - 18:2, 34:1, 77:25, 91:9
**lawsuit** [4] - 71:1, 71:3, 119:10, 134:6
**lawyer** [3] - 129:23, 129:24, 130:1
**lawyers** [3] - 128:9, 128:17, 136:17
**lay** [1] - 65:11
**lays** [1] - 104:1
**lead** [2] - 36:10, 143:5
**learn** [1] - 136:11
**learned** [1] - 21:19
**least** [3] - 62:25, 79:19, 138:20
**leave** [7] - 27:25, 28:1, 28:2, 28:11, 28:14, 59:14, 94:4
**leaves** [4] - 28:4, 32:25, 72:10, 107:3
**ledger** [1] - 97:25
**left** [10] - 59:19, 59:21, 59:22, 60:7, 65:8, 67:3, 86:15, 92:17, 117:8, 138:18
**legal** [3] - 98:10, 98:16, 123:23
**length** [1] - 98:12
**lengthy** [1] - 45:21
**less** [1] - 6:5
**LESS** [1] - 144:5
**lessen** [1] - 36:24
**letter** [12] - 31:25, 36:8, 36:13, 36:14, 36:25, 37:25, 38:3, 61:7, 79:2, 79:5, 80:17, 87:13
**level** [2] - 45:8, 124:8
**LEWIS** [1] - 2:10
**liability** [3] - 40:9, 71:20, 104:18
**liable** [1] - 132:15
**liberty** [1] - 97:16
**license** [2] - 54:14, 79:24
**licensed** [8] - 49:12, 64:5, 79:10, 79:20, 87:19, 88:8, 88:19, 120:11
**lied** [1] - 96:20
**life** [1] - 56:17
**light** [1] - 130:20
**likely** [1] - 93:17
**limited** [2] - 129:6, 129:7
**line** [22] - 46:2, 47:9, 55:12, 55:23, 56:15, 66:16, 67:7, 68:1, 68:2, 68:3, 70:20, 72:21, 73:11, 73:16, 74:24, 112:3, 112:12, 115:10, 115:24, 115:25, 118:16
**line-item** [1] - 68:1
**lines** [3] - 70:8, 73:13, 118:9
**links** [1] - 48:6
**list** [7] - 11:17, 26:16, 30:17, 37:23, 39:12, 99:17,

128:15
**listed** [7] - 37:25, 44:19, 49:2, 49:6, 49:24, 53:14, 53:16
**listened** [1] - 135:8
**litigants** [1] - 109:11
**litigation** [1] - 21:15
**lives** [2] - 109:1, 109:4
**LLP** [2] - 2:4, 2:12
**location** [1] - 24:1
**locations** [1] - 49:23
**logistics** [3] - 24:11, 24:15, 25:11
**longest** [1] - 30:1
**look** [32] - 8:15, 10:12, 10:13, 10:22, 11:8, 11:9, 12:21, 38:4, 38:17, 40:11, 44:10, 45:3, 45:5, 48:25, 72:21, 77:5, 77:13, 78:7, 78:9, 78:11, 79:17, 79:18, 79:19, 79:22, 83:8, 87:16, 102:24, 122:15, 124:1, 124:25, 125:3, 125:20
**looked** [10] - 30:17, 30:18, 49:22, 78:18, 79:5, 79:23, 106:23, 106:24, 107:22
**looking** [11] - 14:8, 30:6, 30:23, 39:25, 41:12, 45:7, 50:18, 52:14, 61:17, 67:20, 87:6
**looks** [1] - 103:11
**lookup** [1] - 45:7
**loop** [1] - 113:2
**LOS** [4] - 1:18, 1:24, 2:5, 4:1
**lose** [1] - 96:25
**LUCIUS** [1] - 2:11
**lunch** [2] - 91:23, 92:11

## M

**ma'am** [2] - 4:11, 80:22
**machined** [2] - 57:5, 57:9
**machining** [1] - 14:15
**maiden** [1] - 70:13
**mail** [3] - 106:13, 125:24, 126:1
**mails** [2] - 107:4, 107:6
**main** [1] - 10:9
**maintained** [2] - 28:6, 74:16
**major** [2] - 38:19, 89:7
**majority** [2] - 8:2, 142:24
**management** [1] - 43:18
**manager** [9] - 24:11, 26:2, 26:3, 27:15, 27:18, 36:9, 69:6, 82:23, 87:2
**managers** [1] - 86:23
**mandated** [1] - 121:12
**manner** [1] - 130:16
**manual** [19] - 69:17, 82:9, 82:11, 82:13, 82:14, 82:17,

82:20, 82:24, 83:2, 83:16, 83:25, 84:1, 90:12, 90:13, 90:17, 90:23, 106:11
**manuals** [4] - 90:14, 90:17, 90:22, 108:9
**manufactured** [1] - 10:20
**manufacturer** [1] - 124:18
**manufacturers** [3] - 21:1, 21:4, 124:3
**Manufacturers** [1] - 10:6
**Marcus** [1] - 25:17
**margin** [1] - 43:6
**mark** [1] - 100:8
**marked** [1] - 11:24
**marking** [1] - 11:2
**markings** [1] - 13:22
**mask** [1] - 5:1
**match** [8] - 5:14, 11:12, 17:3, 39:19, 50:6, 57:22, 57:25, 67:7
**matches** [8] - 5:13, 8:14, 11:6, 39:20, 39:21, 46:9, 67:19
**material** [24] - 5:16, 38:21, 39:20, 41:15, 42:6, 42:23, 44:9, 46:4, 47:22, 56:6, 56:7, 56:8, 57:18, 83:6, 101:2, 102:4, 104:17, 105:3, 122:1, 126:19, 132:18, 133:10, 136:10, 137:21
**materiality** [2] - 100:25, 133:9
**materially** [1] - 108:17
**materials** [6] - 6:15, 6:17, 7:4, 7:6, 8:16, 8:18
**maternity** [7] - 27:25, 28:1, 28:2, 28:4, 28:11, 28:14, 72:10
**math** [2] - 104:1, 126:23
**MATTER** [1] - 144:4
**matter** [8] - 59:12, 92:9, 97:15, 98:16, 100:25, 117:17, 128:5, 136:6
**MAYER** [1] - 2:4
**mean** [10] - 35:17, 38:19, 60:20, 74:4, 86:3, 100:4, 101:12, 125:9, 125:10, 134:13
**meaning** [2] - 19:20, 39:20
**meaningful** [1] - 112:14
**means** [14] - 26:6, 63:19, 97:7, 97:21, 98:1, 102:7, 103:10, 112:12, 112:14, 114:23, 125:14, 127:24, 132:8, 141:8
**meant** [1] - 30:16
**measure** [2] - 134:12, 134:18
**Mechanical** [1] - 7:24
**mechanics** [1] - 19:25

**media** [1] - 136:2
**meet** [4] - 46:10, 46:11, 47:21
**meeting** [1] - 27:7
**meets** [2] - 48:5, 61:25
**member** [7] - 7:9, 7:10, 7:11, 16:23, 137:4, 137:6
**members** [7] - 4:6, 9:11, 9:12, 60:3, 68:23, 134:25, 136:2
**memorialized** [1] - 82:13
**memory** [4] - 95:22, 96:12, 128:22, 130:15
**mention** [3] - 36:22, 59:20, 104:12
**mentioned** [18] - 7:20, 42:7, 44:3, 44:8, 58:12, 62:6, 62:7, 75:16, 78:17, 79:2, 80:7, 80:8, 81:21, 84:2, 84:4, 90:12, 97:11, 115:22
**mentions** [4] - 61:16, 61:20, 77:23, 77:25
**merchandise** [3] - 48:21, 51:21, 122:22
**merits** [1] - 135:25
**met** [1] - 87:3
**metal** [1] - 6:20
**method** [1] - 6:15
**methodology** [1] - 32:8
**might** [13] - 6:22, 16:11, 43:6, 57:14, 76:13, 76:17, 79:9, 101:6, 115:16, 118:11, 119:4, 130:7, 137:17
**mill** [1] - 26:17
**million** [7] - 97:1, 104:6, 108:16, 119:4, 120:25, 122:2, 126:22
**millions** [1] - 96:9
**mind** [3] - 16:5, 105:6, 118:1
**minimum** [1] - 105:16
**minute** [6] - 94:5, 94:10, 94:19, 96:1, 118:19, 127:4
**minutes** [14] - 59:10, 59:21, 59:22, 86:15, 93:18, 94:2, 94:11, 94:16, 94:17, 94:24, 138:23, 139:1
**Miriam** [1] - 144:9
**MIRIAM** [2] - 1:23, 144:10
**mislead** [3] - 64:7, 95:21, 104:13
**misrepresentations** [1] - 96:24
**misstatement** [1] - 105:15
**misstatements** [1] - 99:3
**mistake** [2] - 5:22, 99:13
**mistrial** [1] - 136:23
**Mitchell** [2] - 100:13, 126:5
**MITCHELL** [1] - 2:3
**modify** [1] - 93:23

Case 2:22-cr-00054-DJC Document 19-7c Filed 06/27/22 Entered 06/27/22 Page 579 of 587 Page ID
Transcript of Day 3 of FCA Trial    Page 158 of 166
157

**moment** [4] - 97:6, 112:10, 115:22, 116:25
**monetize** [1] - 103:2
**money** [6] - 101:4, 103:4, 132:14, 132:25, 133:11, 140:9
**months** [2] - 28:15, 30:3
**morning** [5] - 4:15, 4:16, 68:18, 68:19, 93:10
**most** [13] - 9:1, 9:22, 23:12, 24:20, 40:1, 43:14, 44:20, 80:10, 80:15, 93:17, 110:7, 111:22, 126:2
**motion** [4] - 92:18, 92:25, 93:1, 143:17
**motions** [2] - 93:6, 143:15
**motivated** [1] - 118:20
**motivation** [1] - 118:3
**motivations** [1] - 119:14
**mouth** [1] - 107:23
**move** [16] - 12:14, 13:12, 14:4, 14:22, 15:22, 42:17, 50:12, 56:1, 56:13, 56:23, 57:3, 57:6, 57:11, 73:23, 98:3, 104:19
**moved** [7] - 56:20, 69:4, 70:22, 70:25, 71:4, 84:5, 84:20
**moving** [2] - 73:20, 84:9
**MR** [132] - 4:14, 11:15, 11:20, 11:23, 11:25, 12:2, 12:4, 12:13, 12:17, 13:2, 13:5, 13:12, 13:16, 13:18, 14:3, 14:7, 14:17, 14:19, 14:22, 15:2, 15:15, 15:17, 15:22, 16:1, 17:9, 17:12, 19:13, 20:1, 20:2, 21:23, 22:10, 22:14, 22:17, 22:21, 22:24, 23:8, 23:10, 31:5, 31:8, 31:20, 31:22, 33:15, 33:17, 36:4, 36:6, 37:8, 37:15, 46:21, 46:23, 50:8, 50:15, 50:17, 50:21, 50:23, 51:15, 51:18, 53:8, 53:23, 53:25, 54:19, 56:2, 56:16, 58:21, 58:23, 60:6, 61:9, 61:13, 63:5, 63:7, 63:15, 63:21, 64:1, 64:4, 64:10, 64:23, 64:25, 65:9, 65:13, 65:25, 66:3, 66:6, 66:12, 66:22, 66:25, 68:13, 68:17, 72:22, 72:25, 73:1, 73:11, 73:13, 73:15, 73:19, 73:23, 73:25, 75:15, 77:15, 77:17, 80:21, 81:5, 86:14, 86:18, 88:5, 88:7, 88:12, 88:15, 88:17, 89:12, 89:23, 90:1, 90:11, 90:24, 91:2, 91:4, 91:15, 91:18, 91:20, 92:23, 92:25, 93:4, 93:8, 94:13, 94:19,

95:25, 96:3, 96:6, 105:21, 108:23, 118:18, 120:24, 124:6, 127:11
**multi** [2] - 31:9, 114:3
**multi-page** [2] - 31:9, 114:3
**multiple** [5] - 44:1, 51:1, 65:17, 67:21, 77:4
**multitude** [1] - 39:25
**must** [25] - 26:8, 42:16, 57:25, 83:12, 90:19, 127:21, 127:23, 127:25, 129:4, 129:7, 130:6, 132:8, 132:15, 133:13, 133:23, 133:25, 134:7, 134:15, 134:22, 135:5, 135:18, 135:20, 136:5
**MVB11893@aol.com** [1] - 1:25

### N

**nail** [1] - 111:20
**name** [6] - 11:2, 23:3, 23:4, 70:12, 70:13, 138:14
**names** [1] - 6:25
**narratives** [1] - 65:22
**narrow** [1] - 44:4
**national** [1] - 120:13
**nature** [2] - 25:13, 39:13
**nearly** [2] - 99:15, 106:5
**necessarily** [2] - 89:20, 130:24
**necessary** [2] - 133:21, 137:2
**need** [11] - 26:14, 27:3, 33:1, 38:17, 45:6, 52:2, 53:15, 53:17, 84:21, 124:2, 125:15
**needed** [9] - 27:1, 27:5, 28:9, 29:13, 29:19, 29:20, 30:13, 30:22, 108:6
**net** [2] - 45:10, 45:11
**never** [16] - 5:22, 11:18, 17:20, 17:23, 18:11, 21:15, 57:3, 72:18, 79:12, 79:23, 96:17, 106:1, 113:17, 124:18, 125:21, 125:23
**new** [7] - 41:6, 41:8, 41:9, 46:1, 83:11, 107:10
**New** [3] - 24:5, 24:6, 24:8
**next** [22] - 22:25, 32:3, 32:5, 33:13, 37:11, 42:6, 51:2, 55:17, 55:18, 56:1, 56:8, 56:23, 57:7, 63:20, 88:1, 89:11, 89:25, 92:21, 97:4, 100:24, 140:12, 140:21
**night** [1] - 93:10
**nine** [1] - 83:17
**NIP** [1] - 50:2

**nipples** [2] - 57:19, 111:6
**NIR** [7] - 41:5, 41:14, 41:15, 45:24, 90:5, 107:11
**NO** [8] - 141:14, 141:16, 141:18, 141:20, 141:22, 141:24, 142:1, 142:3
**no-brainer** [1] - 105:9
**nobody** [1] - 100:8
**non** [4] - 57:7, 57:18, 58:7, 61:1
**non-alloy** [2] - 57:7, 57:18, 58:7, 61:1
**none** [3] - 83:23, 130:11
**normal** [1] - 47:19
**normally** [1] - 73:17
**note** [11] - 37:2, 37:4, 42:10, 42:14, 43:11, 43:15, 112:3, 112:8, 112:11, 137:3, 139:11
**notes** [1] - 42:19
**nothing** [8] - 68:13, 86:14, 91:15, 91:20, 103:21, 104:23, 104:24, 106:14, 123:6
**notice** [1] - 125:20
**notified** [1] - 71:19
**notify** [3] - 33:1, 46:15, 136:25
**notion** [1] - 114:23
**notwithstanding** [1] - 20:7
**Number** [7] - 10:20, 10:21, 131:22, 140:2, 140:6, 140:15, 140:23
**number** [30] - 7:22, 9:1, 41:24, 47:25, 49:1, 49:2, 49:3, 52:6, 58:17, 59:4, 67:12, 68:5, 86:1, 99:9, 104:20, 111:12, 113:9, 130:13, 130:15, 130:16, 130:17, 130:18, 130:24, 131:18, 133:15, 133:16, 133:18, 139:9
**number-one** [1] - 86:1
**numbers** [4] - 47:24, 68:6, 77:19
**numerous** [1] - 46:16
**nut** [3] - 5:12, 5:13, 5:17
**nuts** [1] - 6:7
**NW** [1] - 2:12

### O

**o'clock** [2] - 59:9, 143:18
**oath** [3] - 4:10, 75:10, 128:1
**object** [4] - 66:3, 88:12, 128:24, 130:1
**objected** [1] - 66:19
**objection** [1] - 50:10, 53:8, 63:5, 63:15, 63:19, 64:1, 65:9, 129:1, 130:2, 130:4,

130:5
**objections** [1] - 128:23
**objective** [2] - 32:8, 86:1
**objects** [1] - 137:23
**obligated** [1] - 105:25
**obligation** [4] - 123:23, 132:13, 140:8, 142:7
**obligations** [3] - 98:11, 98:16, 142:8
**observing** [1] - 23:14
**obviously** [1] - 88:25
**occasions** [4] - 108:18, 109:1, 113:21, 126:20
**occurred** [1] - 134:4
**ocean** [1] - 26:19
**OCTOBER** [2] - 1:19, 4:1
**October** [1] - 141:1
**OF** [8] - 1:2, 1:4, 1:16, 2:10, 111:6, 144:3, 144:7
**offered** [2] - 21:24, 121:2
**offers** [1] - 129:24
**office** [3] - 6:19, 30:2, 35:23
**officers** [2] - 131:13, 131:15
**OFFICIAL** [2] - 1:23, 144:10
**officials** [1] - 35:20
**often** [3] - 40:1, 44:5, 90:23
**on-the-ground** [1] - 84:14
**on-the-job** [1] - 84:16
**once** [5] - 37:22, 42:4, 42:7, 89:2
**one** [99] - 5:22, 5:25, 6:17, 7:8, 7:10, 7:11, 9:8, 10:17, 10:20, 11:6, 16:6, 18:8, 20:12, 22:2, 23:18, 25:8, 25:12, 25:13, 25:14, 27:22, 27:25, 28:1, 28:5, 29:18, 31:2, 35:23, 36:9, 42:5, 44:2, 44:21, 45:20, 45:22, 46:19, 47:9, 56:12, 57:7, 57:22, 58:4, 58:18, 59:4, 61:23, 63:1, 63:3, 65:8, 66:16, 67:3, 67:6, 76:15, 78:18, 79:9, 79:13, 79:19, 80:15, 80:16, 80:18, 80:19, 85:11, 85:15, 85:17, 86:1, 86:3, 87:18, 88:9, 95:12, 97:16, 98:22, 99:1, 99:9, 100:2, 100:24, 101:21, 102:19, 103:21, 104:12, 105:11, 106:13, 106:21, 106:23, 107:21, 108:13, 109:3, 110:11, 112:7, 115:15, 116:20, 129:16, 130:13, 131:19, 133:15, 134:25, 137:4, 140:11, 141:4, 142:12, 142:15
**one's** [1] - 97:15
**ones** [2] - 30:13, 40:1
**ongoing** [1] - 44:14
**Online** [1] - 116:8

Case 2:22-cv-00050-DCN-9c Document 19-7c Filed 06/27/22 Entered 06/27/22 Page 580 of 587 Exhibit Page ID
Transcript of Day 3 of FCC Trial    Page 159 of 166
158

**ons** [2] - 39:12, 42:12
**oOo** [1] - 143:23
**Open** [6] - 4:4, 59:17, 60:1, 92:15, 95:2, 139:8
**open** [4] - 15:5, 39:16, 39:22, 137:8
**opening** [7] - 61:23, 94:3, 102:6, 118:8, 123:9, 125:18, 128:18
**operating** [1] - 88:24
**operation** [2] - 45:16, 70:1
**operations** [2] - 69:21, 79:7
**opinion** [15] - 4:23, 19:14, 20:14, 20:18, 20:22, 20:25, 21:3, 21:25, 22:5, 125:25, 128:3, 131:4, 131:6, 131:10, 135:12
**opinions** [6] - 4:21, 59:12, 92:8, 127:24, 131:3
**opportunity** [5] - 37:13, 41:9, 92:2, 95:9, 130:13
**option** [3] - 56:9, 58:6, 58:8
**orally** [1] - 92:22
**orange** [1] - 100:6
**order** [36] - 5:12, 16:20, 18:9, 19:20, 20:9, 27:1, 33:7, 42:17, 62:11, 64:6, 64:14, 64:17, 64:19, 67:8, 67:10, 68:4, 68:7, 112:17, 115:3, 116:24, 117:3, 117:5, 117:8, 117:10, 117:14, 117:17, 122:6, 123:2, 123:4, 131:20, 131:24, 132:1, 133:5, 142:4
**Order** [1] - 97:13
**ordered** [1] - 136:6
**orders** [14] - 18:5, 18:6, 18:12, 19:4, 19:8, 29:15, 30:18, 34:9, 34:12, 44:15, 62:23, 72:1, 105:25, 117:20
**org** [1] - 69:20
**organization** [2] - 37:13, 79:20
**origin** [4] - 26:17, 41:24, 44:8, 45:3
**originates** [1] - 49:7
**origins** [1] - 39:13
**otherwise** [5] - 40:15, 57:6, 57:9, 109:25, 138:2
**outcome** [3] - 109:13, 109:14, 130:17
**outlet** [50] - 4:23, 4:24, 8:4, 9:14, 9:15, 9:22, 9:23, 9:24, 10:9, 10:11, 10:12, 10:18, 10:23, 11:1, 11:2, 11:4, 11:5, 11:8, 11:9, 11:11, 11:12, 12:7, 12:8, 12:9, 12:10, 12:19, 12:20, 12:24, 13:9, 13:25, 14:1,

16:9, 16:10, 16:16, 17:6, 17:8, 45:1, 45:2, 60:22, 61:11, 61:25, 67:22, 101:21, 103:1, 112:25, 116:21, 121:15, 121:16
**outlets** [52] - 9:13, 10:3, 10:6, 10:8, 10:15, 16:3, 16:7, 16:19, 16:24, 19:19, 20:8, 21:1, 21:4, 38:23, 40:3, 47:16, 53:6, 53:7, 53:14, 53:19, 54:15, 55:2, 58:18, 62:3, 68:9, 98:7, 99:23, 100:1, 100:21, 101:16, 102:14, 102:22, 103:5, 103:23, 106:21, 107:1, 112:15, 113:20, 114:18, 114:19, 115:2, 116:10, 116:13, 116:14, 118:13, 118:22, 123:15, 123:17, 131:19, 131:23, 133:3, 133:7
**outline** [1] - 90:14
**outlined** [3] - 24:19, 30:7, 84:11
**outlines** [1] - 83:16
**outright** [1] - 96:20
**outside** [18] - 5:15, 9:16, 9:17, 9:19, 10:12, 11:6, 11:12, 12:11, 12:12, 17:6, 29:6, 45:13, 70:19, 84:22, 85:1, 88:8, 120:9, 136:25
**overly** [1] - 114:21
**overrule** [1] - 130:2
**overruled** [4] - 64:2, 66:9, 88:14, 89:25
**overseas** [1] - 32:24
**oversee** [2] - 24:13, 24:15
**overwhelmingly** [1] - 119:21
**owed** [2] - 116:16, 132:6
**owes** [2] - 120:25, 140:24
**own** [9] - 29:6, 46:8, 118:25, 119:15, 120:4, 135:11, 136:11, 141:10, 141:13

**P**

**p.m** [3] - 95:1, 139:6, 143:22
**pack** [7] - 39:10, 49:9, 65:6, 66:2, 67:24, 67:25, 68:10
**packet** [2] - 114:16, 114:17
**packing** [4] - 26:16, 30:17, 39:12, 99:17
**packs** [3] - 30:20, 65:16, 65:17
**PAGE** [1] - 3:2
**page** [73] - 31:9, 31:21, 31:24, 31:25, 32:3, 32:5, 32:8, 33:6, 33:14, 34:10, 34:20, 35:5, 36:4, 37:9, 37:10, 37:11, 50:9, 50:18,

50:22, 51:2, 51:3, 51:6, 51:9, 51:10, 51:16, 51:17, 51:19, 53:24, 54:8, 54:9, 54:13, 54:17, 54:19, 55:15, 55:17, 55:18, 55:19, 56:1, 56:3, 56:23, 56:24, 57:17, 58:4, 60:12, 65:1, 65:6, 66:14, 67:3, 67:20, 67:24, 69:15, 72:21, 73:11, 73:13, 74:24, 77:11, 77:12, 77:13, 77:15, 78:9, 78:19, 83:8, 111:22, 112:7, 113:3, 114:3, 114:5, 114:7
**pages** [9] - 31:24, 65:2, 65:5, 65:15, 66:1, 66:20, 66:21, 67:2, 118:16
**paid** [5] - 17:14, 17:17, 103:20, 103:24, 104:6
**paper** [5] - 41:7, 42:2, 84:24, 96:23, 106:13
**paperwork** [5] - 39:9, 39:19, 39:20, 40:16, 103:8
**paragraph** [7] - 37:3, 52:1, 60:18, 61:9, 61:20, 112:24
**part** [20] - 32:12, 39:8, 41:14, 51:3, 51:19, 52:14, 54:3, 67:24, 67:25, 68:9, 69:11, 69:14, 69:17, 74:8, 74:10, 110:7, 118:11, 119:7, 119:11, 130:10
**participants** [1] - 10:15
**participating** [1] - 108:25
**participation** [4] - 142:9, 143:8, 143:15, 143:21
**particular** [11] - 13:21, 13:23, 15:20, 22:13, 29:11, 47:16, 54:3, 85:14, 85:17, 99:19, 109:14
**particularly** [5] - 49:12, 113:3, 117:22, 118:21, 142:25
**parties** [4] - 95:8, 109:12, 131:17, 136:16
**party** [4] - 23:17, 132:7, 132:11, 134:13
**pass** [5] - 11:22, 31:17, 35:9, 35:10, 139:17
**passed** [5] - 31:16, 31:18, 35:8, 35:10, 35:19
**passing** [1] - 119:14
**past** [1] - 98:7
**Pat** [2] - 25:25, 126:3
**path** [1] - 17:7
**Patricia** [5] - 3:5, 22:25, 23:2, 23:5, 38:9
**patriotic** [1] - 119:3
**Patty** [5] - 38:4, 38:8, 38:9, 70:14
**pay** [13] - 21:24, 26:4, 33:3, 36:15, 40:7, 43:14, 71:13,

87:1, 108:7, 108:16, 132:5, 132:14, 140:9
**payable** [14] - 25:9, 26:3, 26:8, 26:13, 27:13, 65:19, 69:10, 71:7, 71:10, 71:16, 72:7, 73:4, 74:1, 86:23
**paying** [7] - 22:3, 26:9, 32:20, 34:17, 43:7, 96:10, 118:25
**payment** [3] - 26:12, 101:3, 133:11
**pays** [1] - 25:9
**pending** [1] - 89:10
**penny** [1] - 103:21
**people** [13] - 6:11, 95:22, 102:13, 109:24, 115:15, 123:23, 125:5, 126:2, 126:3, 126:7, 136:2, 136:16, 142:18
**People's** [1] - 131:21
**percent** [9] - 22:3, 43:5, 43:9, 43:14, 61:3, 104:4, 124:14, 124:15
**perfect** [1] - 73:19
**perfectly** [2] - 97:24, 111:16
**perform** [1] - 40:2
**performance** [1] - 34:21
**performed** [1] - 131:15
**perhaps** [4] - 117:15, 117:24, 118:14, 119:14
**period** [10] - 24:25, 38:11, 40:22, 66:7, 72:5, 74:12, 75:3, 75:5, 110:13, 137:18
**permanently** [2] - 101:22, 122:12, 122:14
**permit** [2] - 52:5, 113:8
**permitted** [1] - 129:25
**perpendicular** [1] - 7:11
**person** [11] - 23:18, 24:20, 25:8, 28:3, 28:25, 29:8, 42:5, 79:19, 87:10, 119:25, 131:12
**personal** [8] - 27:16, 28:23, 53:8, 53:11, 65:14, 66:5, 90:6, 127:23
**personally** [2] - 76:7, 129:14
**persuaded** [1] - 132:8
**persuades** [1] - 135:13
**pharmaceutical** [1] - 8:1
**Philadelphia** [2] - 24:8, 35:23
**phones** [1] - 88:10
**phrase** [5] - 121:8, 121:11, 121:17, 121:19, 122:7
**physical** [7] - 11:16, 13:3, 13:16, 15:15, 15:18, 137:22, 137:23
**physically** [2] - 29:24, 30:2
**pick** [1] - 29:18
**picking** [2] - 99:13, 112:1

**piece** [9] - 8:8, 9:17, 13:20, 13:21, 13:23, 13:24, 15:7, 17:4, 106:13
**pieces** [3] - 5:15, 9:6, 96:23
**Pipe** [15] - 58:19, 58:20, 59:2, 59:3, 60:8, 62:2, 62:14, 112:9, 112:14, 112:18, 116:1, 116:2, 116:12, 120:8
**pipe** [89] - 8:5, 8:6, 8:7, 8:8, 8:9, 8:11, 8:12, 8:15, 8:17, 8:18, 8:23, 9:4, 9:5, 9:6, 9:9, 9:17, 9:18, 9:19, 9:20, 9:25, 10:9, 10:10, 10:11, 10:12, 10:13, 10:16, 11:7, 11:13, 12:6, 12:11, 12:12, 12:19, 12:20, 12:22, 12:25, 13:9, 13:20, 13:21, 13:23, 13:24, 14:1, 14:8, 14:12, 14:16, 15:7, 15:10, 15:12, 15:13, 15:19, 15:20, 15:21, 16:5, 16:8, 16:12, 16:14, 16:20, 16:25, 17:4, 17:7, 17:8, 19:20, 20:8, 21:9, 21:12, 22:4, 22:12, 47:5, 47:7, 50:2, 53:20, 54:11, 55:5, 55:22, 60:24, 61:24, 111:6, 115:3, 116:15, 122:10, 122:23, 123:16, 123:17, 131:20
**pipes** [3] - 16:4, 19:25, 22:12
**piping** [10] - 6:21, 6:23, 7:22, 7:25, 8:3, 9:22, 10:17, 61:22, 116:19, 116:21
**place** [8] - 14:2, 77:9, 82:4, 82:11, 82:18, 136:12, 136:14, 142:20
**places** [1] - 109:12
**PLAINTIFF** [1] - 2:3
**plaintiff** [18] - 11:21, 59:21, 94:3, 94:11, 95:9, 95:10, 131:17, 132:2, 132:15, 133:15, 133:21, 133:23, 134:5, 134:15, 134:16, 139:25, 140:17, 140:24
**plaintiff's** [1] - 134:4
**Plaintiffs** [1] - 1:6
**plane** [10] - 7:7, 8:13, 8:14, 8:16, 8:17, 8:19, 9:12, 15:14, 57:25
**plants** [3] - 7:25, 8:1
**play** [2] - 118:15, 137:24
**played** [1] - 118:17
**playing** [2] - 69:3, 124:9
**pleasant** [1] - 92:11
**plexiglass** [1] - 5:2
**podium** [1] - 138:12
**Podner** [13] - 25:23, 26:25, 31:2, 36:8, 36:25, 70:5, 70:19, 79:3, 79:15, 80:17,

81:6, 87:13, 126:4
**point** [33] - 10:22, 11:15, 12:13, 13:2, 13:16, 14:3, 14:17, 15:15, 24:16, 27:9, 28:25, 29:8, 33:1, 33:7, 33:13, 33:14, 33:16, 40:10, 85:16, 87:10, 95:5, 98:5, 99:10, 104:12, 114:2, 115:12, 120:17, 121:11, 122:4, 124:8, 124:20, 125:12
**points** [2] - 33:24, 112:7
**policies** [6] - 26:24, 30:7, 34:14, 40:20, 40:24, 41:2
**polling** [1] - 141:7
**poor** [2] - 64:21, 64:22
**populated** [1] - 48:11
**populates** [1] - 111:6
**port** [7] - 35:24, 38:17, 38:18, 38:21, 38:23, 67:13, 89:3
**portal** [1] - 81:10
**portion** [7] - 25:8, 27:12, 27:17, 47:17, 48:22, 74:15, 78:21
**Portion** [1] - 118:17
**ports** [6] - 26:21, 38:19, 39:7, 40:15, 113:20
**posed** [1] - 140:5
**position** [13] - 24:10, 25:18, 25:20, 25:22, 25:24, 26:23, 63:2, 65:19, 71:7, 71:10, 71:16, 119:25, 131:17
**possible** [1] - 87:15
**possibly** [1] - 123:10
**potential** [2] - 42:25, 71:20
**potentially** [1] - 40:9
**pounding** [1] - 111:20
**Powell** [4] - 46:13, 79:13, 88:19, 120:12
**power** [1] - 7:25
**practice** [1] - 38:18
**practices** [12] - 18:20, 24:19, 26:24, 28:6, 29:7, 30:7, 34:14, 39:5, 40:20, 40:24, 41:2, 124:12
**pre** [1] - 134:10
**pre-June** [1] - 134:10
**precise** [1] - 61:23
**predecessors** [2] - 27:10, 27:22
**predict** [1] - 123:18
**preferences** [1] - 77:8
**prejudice** [2] - 127:24, 130:18
**preliminary** [3] - 44:14, 82:2, 82:3
**premises** [1] - 30:9
**preparation** [1] - 15:6
**prepare** [1] - 14:13
**prepared** [5] - 13:23, 13:25,

14:9, 93:16, 138:4
**preponderance** [9] - 97:19, 97:21, 132:3, 132:8, 132:16, 134:2, 134:8, 134:17, 140:6
**present** [8] - 4:4, 38:12, 40:22, 59:17, 60:1, 92:15, 95:2, 139:8
**presentation** [2] - 110:4, 118:9
**presented** [3] - 112:3, 126:2, 139:3
**presents** [1] - 132:11
**preside** [1] - 135:1
**PRESIDING** [1] - 1:3
**presiding** [4] - 134:25, 135:1, 140:13, 141:1
**press** [1] - 86:8
**pressure** [1] - 6:16
**pretrial** [1] - 119:8
**pretty** [2] - 35:2, 51:14
**prevail** [1] - 134:7
**previously** [3] - 3:3, 4:12, 81:16
**price** [1] - 118:24
**primarily** [1] - 98:13
**primary** [2] - 26:12, 29:8
**principal** [2] - 30:25, 31:2
**print** [1] - 51:10
**problem** [1] - 99:20
**problematic** [1] - 118:21
**problems** [1] - 106:10
**procedure** [2] - 45:16, 88:25
**procedures** [4] - 24:19, 33:10, 82:17, 90:14
**proceed** [5] - 42:23, 42:25, 140:11, 140:20, 140:22
**proceedings** [1] - 136:22
**Proceedings** [1] - 143:22
**PROCEEDINGS** [2] - 1:16, 144:3
**process** [11] - 5:9, 39:8, 90:5, 106:18, 107:2, 107:3, 107:11, 107:13, 111:24, 112:2, 136:24
**processed** [2] - 57:6, 57:9
**producing** [1] - 42:23
**product** [35] - 5:9, 6:12, 32:24, 41:11, 41:12, 42:25, 43:14, 46:1, 47:14, 52:21, 61:6, 74:8, 75:17, 76:1, 85:13, 89:2, 90:3, 100:12, 101:10, 101:24, 102:25, 104:22, 106:5, 115:8, 115:9, 115:25, 116:5, 116:17, 118:24, 121:15, 122:11, 124:19, 124:20, 131:25
**products** [39] - 17:21, 17:24, 18:16, 18:17, 40:4, 40:17,

46:20, 47:15, 62:21, 62:22, 63:2, 72:8, 72:15, 89:17, 96:10, 96:16, 98:18, 98:19, 99:5, 99:23, 100:10, 100:21, 102:15, 102:19, 102:22, 103:2, 104:2, 107:14, 107:15, 107:19, 107:24, 108:6, 112:25, 114:9, 114:13, 114:14, 116:23, 123:11, 123:24
**professionalism** [1] - 139:3
**profit** [4] - 43:12, 43:15, 43:16, 43:21
**programs** [1] - 136:13
**prohibits** [1] - 132:12
**promised** [1] - 125:23
**promoted** [1] - 86:10
**proof** [8] - 95:11, 97:2, 97:7, 97:12, 97:19, 98:2, 129:13, 129:16
**proper** [4] - 52:6, 85:12, 112:13, 113:9
**properly** [5] - 18:18, 63:12, 71:18, 71:22, 73:5
**proposition** [1] - 98:25
**protect** [2] - 18:19, 18:25
**Protection** [10] - 74:19, 96:15, 99:11, 101:6, 101:10, 103:9, 103:22, 104:21, 105:7, 108:18
**protection** [3] - 6:24, 9:22, 47:18
**protectionism** [1] - 124:10
**protects** [1] - 6:24
**proud** [1] - 139:4
**prove** [6] - 109:18, 109:22, 133:21, 133:24, 134:1, 134:8
**proved** [3] - 128:10, 133:23, 134:22
**proven** [2] - 109:20, 140:24
**proves** [1] - 133:15
**provide** [16] - 6:21, 6:23, 17:7, 21:25, 39:10, 41:15, 41:16, 41:23, 42:18, 46:6, 46:7, 53:20, 61:2, 61:23, 61:24, 93:19
**provided** [9] - 29:13, 29:17, 30:11, 37:12, 46:4, 46:5, 47:18, 49:8, 79:1
**provides** [5] - 9:25, 44:4, 60:22, 60:24, 68:1
**proving** [3] - 132:2, 132:7, 134:17
**provisions** [1] - 83:6
**public** [1] - 86:8
**publications** [1] - 122:18
**publish** [1] - 142:20
**pull** [6] - 32:18, 40:8, 44:7, 44:8, 44:21, 44:24

Case 2:22-cv-00050-TOR-19-c Filed 06/27/21 Entered 06/27/22 Page 584 of 587 Exhibit
Transcript of Day 3 of FCA Trial    Page 161 of 166
160

punishment [1] - 119:5
purchase [6] - 29:15, 30:18, 41:24, 67:7, 68:4, 68:7
purchased [1] - 47:17
purchaser [1] - 118:22
purchases [3] - 30:13, 118:12, 118:13
purchasing [1] - 41:13
purpose [5] - 36:12, 36:14, 129:6, 129:7, 129:8
purposes [2] - 10:21, 133:12
pursue [1] - 113:22
pursued [1] - 87:22
pursuing [2] - 127:7, 127:10
put [14] - 9:19, 14:15, 31:6, 50:15, 53:6, 82:11, 82:14, 104:8, 110:2, 112:6, 112:18, 117:4, 118:9, 120:1
puts [1] - 57:11
putting [1] - 110:5

## Q

quantity [2] - 67:13, 68:3
questioning [1] - 91:5
questions [26] - 17:9, 22:19, 28:16, 29:19, 29:22, 30:10, 30:23, 31:12, 36:16, 36:18, 37:19, 38:15, 76:23, 80:7, 81:3, 86:19, 87:1, 87:4, 89:16, 108:2, 113:25, 123:3, 128:23, 138:9, 140:5, 140:13
quick [1] - 34:11
quietly [1] - 59:14
quite [6] - 44:2, 45:21, 61:16, 61:18, 82:2, 90:23

## R

raise [1] - 40:15
raised [1] - 122:4
range [1] - 43:17
rate [8] - 4:19, 4:20, 42:18, 42:19, 43:8, 43:10, 61:2
rationale [1] - 99:20
ray [1] - 39:18
reach [4] - 120:4, 135:3, 135:9, 135:16
reached [4] - 4:21, 138:2, 138:5, 139:12
reaches [1] - 89:3
reaching [2] - 119:15, 128:11
read [16] - 16:18, 52:2, 73:14, 73:18, 73:21, 75:9, 75:10, 83:15, 105:25, 106:6, 107:22, 121:20, 128:22, 139:20, 141:9, 141:12
ready [1] - 138:8

real [4] - 34:11, 56:17, 99:9, 116:22
real-world [1] - 116:22
reality [1] - 98:13
really [15] - 26:21, 27:12, 44:9, 55:10, 56:10, 96:13, 96:17, 100:8, 101:1, 102:22, 103:4, 114:1, 114:10, 120:25, 121:23
realtime [1] - 102:18
reason [4] - 18:15, 110:15, 111:16, 121:20
reasonable [5] - 97:12, 113:13, 114:22, 117:21
reasonableness [1] - 130:20
reasonably [3] - 116:15, 134:9, 140:16
reasons [4] - 22:2, 131:3, 131:9
rebuttal [3] - 91:20, 95:11, 120:23
receipt [2] - 101:4, 133:11
receive [3] - 14:9, 84:6, 84:9
received [31] - 3:11, 3:11, 3:12, 3:12, 3:13, 3:13, 11:19, 12:15, 12:16, 13:14, 13:15, 14:5, 14:6, 14:24, 14:25, 15:24, 15:25, 18:11, 50:13, 50:14, 84:14, 103:18, 128:12, 129:5, 129:11, 129:23, 130:3, 130:5, 134:20, 135:19
receives [1] - 134:19
receiving [1] - 30:19
recent [1] - 69:3
recently [2] - 81:7, 81:13
recess [2] - 59:9, 139:5
Recess [3] - 59:24, 95:1, 139:6
reckless [7] - 102:9, 105:12, 105:14, 114:24, 125:10, 132:22, 133:19
recklessly [5] - 105:17, 109:19, 115:18, 119:18, 131:23
recklessness [1] - 105:19
recognizable [1] - 50:4
record [26] - 4:5, 23:4, 59:18, 60:2, 91:8, 92:16, 95:3, 96:9, 96:15, 96:20, 96:23, 98:6, 98:10, 98:15, 98:17, 105:23, 105:24, 106:4, 123:20, 123:23, 125:9, 125:15, 125:16, 125:21, 126:13, 127:1
recorded [1] - 142:5
RECORDED [1] - 144:3
records [3] - 30:18, 30:19, 44:6
RECROSS [2] - 3:7, 91:3

recross [2] - 22:20, 22:21
RECROSS-EXAMINATION [2] - 3:7, 91:3
REDIRECT [2] - 3:7, 86:17
REDUCTION [1] - 144:6
refer [12] - 10:10, 31:23, 33:12, 52:15, 52:24, 54:14, 56:6, 64:15, 65:8, 67:17, 68:6, 93:21
reference [13] - 33:18, 33:21, 33:25, 34:6, 34:8, 38:7, 42:1, 48:14, 57:8, 75:6, 77:14, 81:22, 136:10
referenced [6] - 44:2, 48:23, 48:24, 49:4, 49:6, 62:6
references [2] - 47:8, 67:21
referred [7] - 7:12, 8:21, 39:7, 47:6, 52:15, 90:18, 116:7
referring [6] - 58:24, 67:9, 84:22, 84:23, 86:9, 91:6
refers [9] - 32:9, 51:20, 52:11, 52:18, 56:20, 56:21, 57:19, 81:10, 102:22
refineries [1] - 7:25
reflect [10] - 4:5, 59:18, 60:2, 68:7, 70:10, 92:16, 95:3, 109:8, 118:18, 141:12
reflecting [1] - 82:20
reflects [1] - 125:16
refute [1] - 110:1
regarding [3] - 18:11, 74:13, 128:4
regardless [2] - 109:13, 132:11
Registers [1] - 80:18
REGULATIONS [1] - 144:7
regulations [3] - 34:1, 35:18, 77:25
reject [1] - 131:7
rejects [1] - 58:16
rel [1] - 139:24
relate [2] - 52:21, 67:10
related [10] - 25:9, 26:4, 26:21, 30:22, 35:14, 71:14, 76:5, 87:1, 89:6, 90:14
relates [3] - 18:2, 71:20, 83:24
relating [1] - 25:1
release [2] - 86:8, 138:9
relevance [1] - 62:2
relevant [1] - 125:2
reliance [1] - 120:11
relied [2] - 28:12, 120:9
relies [3] - 6:9, 88:18, 91:6
relieving [1] - 142:6
rely [4] - 6:11, 88:8, 88:9, 106:9
relying [1] - 120:14
remained [1] - 27:14

remember [12] - 59:10, 83:5, 92:6, 95:17, 95:20, 100:13, 106:18, 106:22, 113:5, 122:16, 128:20, 137:25
remind [2] - 4:9, 135:19
rendered [1] - 134:14
rep [1] - 41:8
repeat [1] - 17:22
repeatedly [2] - 114:6, 116:7
reply [2] - 37:18, 92:21
report [13] - 20:3, 20:8, 25:3, 25:16, 25:17, 31:14, 32:1, 32:6, 33:5, 35:20, 36:2, 136:7, 136:20
reported [2] - 52:8, 113:10
REPORTER [2] - 1:23, 144:10
REPORTER'S [1] - 1:16
reporting [5] - 52:6, 70:5, 70:17, 70:19, 113:9
reports [1] - 35:6
represent [1] - 77:6
representation [3] - 99:14, 104:9, 105:1
representative [6] - 23:15, 41:9, 61:5, 100:14, 100:15, 126:6
represented [1] - 104:23
represents [1] - 141:9
Republic [1] - 131:21
reputable [1] - 120:13
request [5] - 39:15, 41:6, 41:8, 122:16, 126:18
requested [2] - 44:16, 44:17
requests [1] - 126:16
require [3] - 46:13, 46:14, 136:23
required [13] - 26:18, 83:17, 84:23, 84:24, 89:4, 102:5, 105:10, 105:11, 105:24, 121:9, 132:19, 133:13, 133:14
requirement [3] - 52:10, 111:3, 113:12
requirements [3] - 27:6, 90:19, 111:9
requires [4] - 8:3, 33:13, 52:3, 134:5
requisite [1] - 105:10
research [4] - 98:19, 125:4, 136:8, 136:15
reserved [2] - 92:19, 93:7
resolution [1] - 127:2
resolve [1] - 110:6
respect [18] - 4:22, 18:4, 18:5, 39:6, 40:21, 40:25, 43:23, 62:3, 63:1, 84:16, 84:17, 89:19, 89:21, 90:2, 90:3, 90:15, 99:7, 102:11
respective [2] - 4:6, 60:3,

Case 2:22-cv-00047-DCLC-CRW Document 76 Filed 06/27/22 Page 583 of 587 PageID
Transcript of Day 3 of Trial    Page 162 of 166
161

**95:4**
**respects** [1] - 110:11
**respond** [1] - 136:6
**response** [5] - 73:7, 75:4, 100:16, 106:25, 143:18
**responses** [2] - 93:2, 106:19
**responsibilities** [7] - 24:12, 24:13, 25:1, 27:10, 27:16, 27:23, 28:9
**responsibility** [9] - 27:17, 39:2, 44:6, 71:17, 71:21, 71:25, 72:13, 72:14, 74:13
**responsible** [21] - 26:4, 27:7, 27:8, 27:12, 28:12, 29:15, 33:3, 40:7, 42:9, 45:18, 71:13, 72:4, 72:8, 74:18, 75:1, 76:1, 76:4, 76:7, 85:19, 91:9, 131:14
**responsibly** [1] - 109:22
**rest** [1] - 91:17
**restrictions** [1] - 136:22
**rests** [1] - 91:18
**result** [2] - 110:24, 136:23
**resulted** [1] - 111:25
**results** [2] - 35:6, 35:12
**RESUMED** [2] - 3:4, 4:13
**resummarize** [1] - 110:5
**retain** [2] - 79:14, 89:1
**retained** [3] - 17:17, 22:2, 22:5
**retaining** [2] - 76:6, 87:19
**retire** [2] - 59:13, 92:9
**return** [5] - 108:19, 126:16, 126:18, 126:20, 138:8
**review** [28] - 29:19, 33:7, 34:12, 39:4, 39:9, 39:17, 45:21, 45:25, 46:17, 64:18, 64:19, 74:21, 77:3, 77:4, 77:7, 77:10, 77:21, 78:3, 78:11, 78:13, 78:15, 89:1, 106:7, 107:11, 107:22, 107:23, 123:13, 123:14
**reviewed** [8] - 29:14, 30:10, 30:12, 34:9, 38:25, 61:11, 78:19, 83:2
**reviewing** [3] - 34:14, 71:25, 74:25
**reviews** [2] - 106:7, 122:18
**revisit** [1] - 137:20
**Ridge** [4] - 24:5, 24:6, 30:2
**rise** [8] - 4:3, 59:16, 59:23, 59:25, 92:14, 138:16, 139:7, 143:10
**risk** [4] - 33:8, 35:13, 77:7, 111:20
**role** [17] - 17:20, 17:23, 26:2, 26:12, 45:13, 66:4, 69:3, 69:6, 73:3, 73:8, 74:6, 74:9, 74:10, 75:25, 86:25, 109:9, 118:2

**Rona** [3] - 100:13, 106:23, 126:5
**room** [11] - 6:22, 46:19, 59:13, 92:4, 92:10, 100:10, 118:2, 127:17, 138:10, 142:17, 142:23
**routine** [1] - 47:19
**rule** [1] - 73:15
**ruled** [6] - 19:19, 20:7, 63:10, 123:15, 123:16, 133:3
**ruler** [1] - 56:18
**rules** [4] - 110:25, 128:25, 129:22, 129:25
**ruling** [44] - 44:4, 44:16, 44:17, 58:19, 58:20, 58:24, 60:8, 60:14, 60:18, 61:4, 62:2, 62:8, 62:14, 63:11, 80:13, 80:14, 85:3, 85:7, 85:12, 85:14, 85:16, 85:21, 85:22, 108:1, 108:3, 108:5, 112:9, 112:14, 112:18, 112:22, 112:23, 115:20, 115:23, 116:1, 116:3, 116:5, 116:10, 116:11, 116:12, 120:8, 122:16, 129:2
**Ruling** [1] - 116:8
**rulings** [5] - 58:12, 63:13, 80:7, 106:6, 115:12
**run** [3] - 10:10, 61:23

## S

**sacred** [1] - 142:18
**Safe** [13] - 11:8, 11:14, 12:10, 16:6, 21:11, 40:3, 40:17, 62:17, 68:11, 75:22, 76:20, 89:17, 90:3
**Safe-Let** [11] - 11:8, 11:14, 12:10, 16:6, 21:11, 40:3, 40:17, 75:22, 76:20, 89:17, 90:3
**Safe-Lets** [2] - 62:17, 68:11
**sales** [2] - 41:8, 42:21
**salesperson** [1] - 43:4
**salute** [1] - 109:8
**sample** [6] - 33:25, 51:3, 61:5, 61:11, 78:17, 78:19
**sampled** [1] - 30:14
**samples** [4] - 32:18, 77:23, 78:25
**Sanders** [1] - 118:8
**sat** [2] - 106:23, 107:23
**saw** [8] - 14:13, 100:14, 102:17, 108:4, 108:5, 111:24, 125:23, 129:14
**scale** [2] - 45:9, 97:23
**scanning** [1] - 25:12
**schedule** [12] - 50:7, 52:25, 53:4, 53:15, 53:16, 53:19,

54:2, 60:23, 62:10, 111:4, 111:19, 120:7
**scope** [16] - 19:7, 32:8, 44:4, 46:17, 88:12, 88:13, 106:6, 107:22, 117:5, 117:6, 117:8, 117:10, 122:16, 122:19, 131:15, 133:4
**screen** [4] - 41:1, 48:22, 60:10, 117:8
**screw** [5] - 5:19, 5:20, 5:21, 5:23, 5:25
**screwed** [1] - 9:24
**scroll** [3] - 57:17, 69:22, 73:10
**seal** [1] - 39:15
**search** [2] - 44:23, 136:14
**Search** [1] - 116:8
**searches** [1] - 107:22
**searching** [1] - 136:9
**seat** [2] - 92:17, 143:12
**seats** [3] - 4:6, 60:3, 95:4
**second** [19] - 28:1, 28:2, 31:24, 33:14, 33:16, 35:12, 50:21, 57:1, 59:15, 61:7, 61:20, 66:16, 67:6, 67:18, 77:18, 104:19, 105:15, 132:18, 133:9
**secondly** [1] - 93:9
**section** [9] - 42:5, 42:11, 42:12, 44:22, 55:8, 57:5, 81:6, 84:1, 86:24
**see** [73] - 12:10, 29:20, 33:5, 33:10, 33:18, 33:24, 34:4, 34:6, 34:21, 35:11, 37:16, 38:3, 39:2, 39:22, 40:9, 43:15, 46:9, 47:25, 48:15, 51:9, 51:16, 51:19, 55:13, 56:15, 59:9, 59:22, 60:18, 67:16, 67:21, 69:23, 70:1, 70:4, 70:5, 70:8, 70:14, 72:11, 73:4, 77:13, 77:15, 77:16, 77:18, 78:14, 78:19, 83:16, 84:11, 92:11, 94:21, 95:22, 99:13, 99:16, 100:11, 101:19, 103:6, 104:14, 107:4, 108:1, 110:2, 112:22, 117:7, 117:9, 120:19, 121:21, 124:25, 125:21, 125:22, 125:24, 125:25, 130:14, 137:21
**seeds** [1] - 39:24
**seeing** [1] - 38:5
**selected** [1] - 30:13
**selection** [4] - 29:18, 33:23, 34:13, 97:11
**selectively** [1] - 103:12
**sell** [1] - 59:5
**seminar** [2] - 84:12
**send** [6] - 26:11, 92:4, 95:15,

137:3, 137:9, 137:17
**sending** [1] - 107:6
**senior** [1] - 24:20
**senior-most** [1] - 24:20
**sense** [6] - 43:22, 107:17, 114:16, 114:20, 114:23, 119:1
**sent** [6] - 79:3, 80:17, 87:14, 107:23, 127:17, 137:13
**sentence** [12] - 34:21, 34:25, 35:11, 35:12, 37:9, 38:2, 52:11, 52:12, 52:20, 53:17, 61:7, 78:16
**sentences** [2] - 52:21, 52:24
**separate** [2] - 64:17, 119:13
**series** [2] - 81:7, 121:2
**seriously** [1] - 120:2
**serve** [2] - 10:21, 135:2
**service** [7] - 5:9, 36:21, 41:9, 109:15, 127:2, 127:5, 136:5
**session** [1] - 129:10
**set** [1] - 14:2
**sets** [1] - 103:10
**settled** [1] - 58:10
**seven** [1] - 130:20
**shaft** [1] - 5:11
**shall** [1] - 135:3
**SHANNON** [1] - 2:11
**shape** [1] - 11:5
**sheet** [1] - 44:3
**shelf** [1] - 10:24
**shifting** [1] - 91:13
**shipment** [4] - 26:18, 49:3, 67:10, 98:6
**shipments** [3] - 24:15, 98:22, 99:1
**shipping** [2] - 30:18, 32:24
**shoes** [1] - 113:24
**short** [3] - 61:17, 110:4, 118:16
**shorter** [1] - 23:11
**shoulder** [1] - 87:6
**show** [22] - 11:21, 16:11, 31:20, 33:15, 36:4, 37:8, 55:12, 69:14, 72:23, 73:18, 78:18, 97:2, 97:13, 99:2, 99:4, 102:3, 102:4, 104:11, 105:16, 112:10, 132:15, 137:23
**showed** [1] - 100:9
**showing** [3] - 33:23, 69:20, 96:24
**shown** [4] - 97:3, 109:22, 111:2, 114:6
**shows** [5] - 55:8, 63:11, 100:22, 104:2, 125:17
**sic** [1] - 116:5
**sic]** [1] - 46:12
**side** [12] - 9:19, 13:10, 27:13,

Case 2:22-cv-00050-RC Document 197-7 Filed 06/27/22 Page 584 of 587 PageID
Transcript of Day 3 of FCA Trial    Page 163 of 166
162

95:14, 97:25, 117:5, 117:8, 117:9, 118:2, 129:25
**sides** [8] - 91:17, 92:1, 93:6, 93:12, 96:2, 96:3, 138:19, 139:2
**SIGMA** [162] - 4:17, 4:22, 21:7, 21:11, 21:15, 21:18, 21:24, 22:2, 22:24, 23:23, 23:24, 24:2, 24:10, 24:14, 24:20, 24:23, 25:3, 25:17, 28:18, 28:25, 29:6, 29:24, 30:4, 31:17, 34:17, 35:8, 36:15, 37:1, 37:24, 38:11, 38:18, 40:16, 40:20, 40:24, 41:10, 42:24, 43:17, 43:24, 47:4, 47:13, 49:10, 49:17, 52:22, 53:6, 54:13, 58:10, 58:17, 59:6, 61:14, 62:17, 62:20, 62:25, 63:1, 63:22, 68:21, 68:23, 71:3, 78:5, 79:6, 81:7, 81:19, 82:9, 82:21, 84:7, 87:14, 87:15, 87:19, 88:8, 88:18, 88:21, 89:7, 89:20, 90:2, 90:13, 90:15, 91:6, 91:13, 91:18, 98:5, 98:9, 99:3, 99:4, 99:10, 99:17, 100:14, 101:24, 102:4, 102:7, 102:12, 102:13, 102:18, 102:21, 102:23, 103:4, 103:21, 104:12, 104:16, 104:21, 105:4, 105:16, 105:22, 106:1, 106:14, 107:3, 107:14, 107:17, 108:9, 108:11, 108:15, 108:17, 109:18, 109:22, 110:13, 110:21, 111:3, 111:17, 112:16, 113:14, 113:22, 114:10, 114:15, 114:17, 115:5, 115:8, 115:9, 115:24, 115:25, 116:4, 116:5, 116:15, 117:15, 118:1, 118:12, 118:14, 118:19, 118:20, 119:15, 119:16, 119:17, 119:23, 120:14, 120:18, 120:25, 121:3, 121:13, 121:15, 121:24, 122:16, 123:6, 123:10, 123:18, 123:19, 125:2, 125:17, 126:11, 126:17, 126:19, 131:18
**SIGMA's** [35] - 19:19, 20:14, 20:17, 20:18, 23:15, 35:13, 36:11, 41:20, 45:16, 49:3, 57:24, 59:5, 67:7, 68:6, 72:8, 72:15, 77:6, 86:1, 87:4, 96:22, 96:24, 102:25, 106:11, 107:2, 107:3, 107:13, 108:14, 116:22, 120:3, 120:24, 121:2,

121:5, 121:8, 122:4, 122:25
**sign** [2] - 138:7, 140:14
**signed** [6] - 35:20, 88:22, 137:4, 137:6, 139:14, 141:1
**significance** [2] - 33:21, 34:8
**significant** [1] - 35:13
**similar** [4] - 20:4, 49:22, 49:25, 65:18
**simple** [7] - 5:9, 43:3, 44:3, 107:17, 108:8, 108:11, 123:13
**simply** [4] - 15:12, 101:25, 135:14, 135:16
**single** [4] - 44:12, 106:12, 107:8, 125:1
**sip** [1] - 30:12
**sit** [4] - 19:18, 23:18, 85:6, 127:3
**site** [1] - 44:12
**sits** [2] - 10:11, 12:11
**sitting** [1] - 23:14
**six** [3] - 17:15, 45:8, 130:18
**six-digit** [1] - 45:8
**size** [1] - 41:18
**skip** [1] - 140:21
**skipped** [1] - 62:10
**sleeve** [1] - 56:23
**sleeves** [4] - 55:7, 55:22, 56:22, 60:25
**slide** [2] - 5:16, 97:4
**slightly** [1] - 98:1
**slope** [1] - 58:2
**smacks** [1] - 120:15
**small** [2] - 9:15, 51:10
**Society** [2] - 7:23, 10:7
**software** [5] - 48:5, 48:6, 48:12, 111:5
**soldering** [1] - 7:15
**sole** [1] - 39:2
**solely** [2] - 127:25, 129:11
**someplace** [1] - 10:24
**sometimes** [2] - 6:11, 6:25, 93:23, 94:15, 109:6, 109:24, 109:25, 137:11, 137:12, 137:14, 137:16, 142:13
**SOP** [1] - 45:16
**sorry** [24] - 5:5, 17:22, 20:13, 20:16, 21:2, 27:21, 27:24, 44:17, 47:12, 57:1, 61:6, 63:17, 65:10, 65:20, 65:24, 74:6, 76:15, 77:16, 78:12, 80:20, 80:23, 83:15, 87:25, 88:16
**sort** [2] - 70:8, 123:21
**SOUTH** [1] - 2:4
**South** [1] - 24:7
**south** [1] - 9:19

**south-side** [1] - 9:19
**SP97** [1] - 10:7
**span** [2] - 29:16, 38:22
**speaking** [4] - 74:2, 75:16, 98:7, 123:8
**special** [1] - 43:10
**specific** [5] - 31:12, 58:5, 66:14, 78:16, 84:19
**specifically** [7] - 9:5, 18:4, 37:10, 40:2, 43:23, 51:15, 89:18
**specification** [1] - 61:21
**specifications** [1] - 41:17
**specified** [1] - 134:6
**specs** [1] - 61:21
**spectrum** [1] - 90:18
**speculation** [2] - 64:1, 134:23
**speed** [1] - 88:9
**spell** [1] - 23:4
**spells** [1] - 114:12
**spend** [1] - 54:6
**spent** [3] - 85:3, 93:9, 99:17
**Sperko** [24] - 3:3, 4:9, 4:12, 4:15, 4:21, 7:17, 10:25, 11:10, 12:5, 12:18, 13:6, 13:19, 14:8, 14:20, 15:18, 16:2, 16:18, 17:13, 18:24, 20:3, 21:7, 22:6, 22:18, 116:19
**spin** [1] - 5:17
**split** [1] - 95:25
**spokesperson** [1] - 135:2
**spreadsheet** [2] - 102:18, 103:9
**Sprink** [6] - 108:1, 108:5, 112:23, 115:20, 115:22, 116:10
**Sprink-Let** [6] - 108:1, 108:5, 112:23, 115:20, 115:22, 116:10
**sprinkler** [3] - 9:23, 10:1, 57:20
**square** [2] - 14:13, 15:5
**ST** [2] - 50:2, 111:6
**stainless** [3] - 55:23, 55:25, 56:8
**stance** [1] - 85:1
**stand** [4] - 4:7, 23:12, 60:4, 106:23
**standard** [20] - 5:7, 5:8, 5:10, 9:2, 10:6, 10:7, 30:3, 36:14, 37:17, 37:18, 41:1, 41:2, 42:18, 45:16, 52:9, 61:21, 88:24, 97:20, 97:21, 113:10
**Standardization** [1] - 10:7
**standards** [29] - 5:6, 5:24, 6:2, 6:6, 6:9, 6:11, 7:17, 7:19, 7:20, 7:23, 7:24, 8:3,

8:22, 8:25, 10:2, 10:5, 10:14, 10:21, 16:22, 18:14, 18:16, 18:17, 18:19, 18:22, 34:23, 35:3, 41:17, 41:18
**stands** [1] - 138:1
**Star** [14] - 58:19, 58:20, 59:2, 59:3, 60:8, 62:2, 62:14, 112:9, 112:14, 112:18, 116:1, 116:2, 116:12, 120:8
**star** [1] - 59:3
**start** [16] - 41:5, 45:8, 47:4, 47:9, 54:16, 54:21, 54:23, 55:4, 56:10, 56:25, 92:12, 98:24, 109:7, 110:6, 110:17, 136:24
**started** [5] - 21:7, 21:11, 25:13, 80:1, 82:3
**starting** [1] - 53:24
**state** [4] - 23:3, 49:25, 118:1, 138:14
**statement** [30] - 100:6, 100:22, 100:23, 100:25, 101:2, 102:3, 102:8, 102:11, 102:12, 102:13, 104:17, 104:19, 104:20, 110:16, 110:21, 114:24, 114:25, 115:5, 115:17, 118:5, 121:6, 123:9, 123:10, 126:24, 132:17, 132:18, 132:20, 132:24, 133:1, 133:9
**statements** [17] - 96:22, 96:25, 100:4, 105:17, 108:17, 109:19, 110:17, 121:24, 121:25, 126:19, 128:16, 128:18, 132:5, 132:13, 133:7, 134:20, 140:8
**States** [9] - 60:24, 96:25, 113:24, 119:3, 122:1, 126:21, 131:19, 139:22, 139:24
**states** [3] - 45:18, 61:5, 112:24
**STATES** [3] - 1:1, 1:4, 144:7
**stating** [1] - 116:16
**statistical** [2] - 52:6, 113:9
**stay** [3] - 48:20, 138:20, 138:24
**steel** [71] - 39:21, 41:16, 48:15, 48:24, 48:25, 49:2, 49:7, 49:17, 52:22, 54:5, 55:4, 55:7, 55:23, 55:25, 56:8, 57:7, 57:18, 58:7, 58:8, 60:21, 61:1, 61:21, 64:6, 64:13, 64:18, 64:19, 64:20, 75:20, 75:22, 81:22, 96:21, 99:4, 99:11, 99:13, 99:22, 99:24, 99:25,

Case 2:22-cv-00050-RWS Document 97-7 Filed 06/27/22 Page 584 of 585 PageID #: ...
Transcript of Day 3 of FCA Trial    Page 164 of 166

163

100:12, 100:16, 100:18, 100:20, 101:11, 101:12, 101:14, 101:17, 101:21, 102:11, 102:14, 102:20, 102:25, 103:6, 104:9, 106:5, 110:17, 110:20, 110:24, 111:13, 111:17, 113:14, 114:1, 114:22, 117:2, 121:6, 121:8, 121:11, 121:25, 122:23, 123:2, 123:4

**STENOGRAPHICALLY** [1] - 144:3

**step** [2] - 91:16, 113:23
**steps** [2] - 79:6, 89:17
**still** [3] - 4:10, 60:14, 109:25
**stop** [2] - 62:17, 140:12
**stopped** [2] - 62:20, 115:8
**straight** [1] - 8:8
**straightforward** [2] - 104:5, 121:23
**strange** [1] - 123:21
**STREET** [2] - 1:24, 2:12
**stricken** [1] - 129:3
**strike** [1] - 80:14
**strive** [1] - 135:3
**strong** [1] - 142:22
**structure** [1] - 70:1
**stuff** [1] - 27:4
**sub** [1] - 78:10
**subheading** [2] - 60:21, 112:25
**subheadings** [1] - 54:23
**subject** [19] - 76:13, 76:17, 98:19, 99:6, 101:14, 101:16, 101:22, 101:25, 106:21, 107:19, 107:24, 112:16, 115:3, 123:11, 131:20, 131:24, 132:1, 133:3, 133:7
**submit** [6] - 38:15, 118:21, 119:20, 143:15, 143:17
**submitted** [8] - 20:3, 59:13, 61:6, 92:9, 93:11, 103:8, 108:17, 143:16
**sue** [1] - 118:20
**suffer** [1] - 124:4
**suffers** [1] - 124:3
**sufficient** [6] - 52:5, 53:17, 53:21, 87:10, 94:2, 113:8
**sufficiently** [1] - 27:9
**suggest** [5] - 91:12, 106:14, 122:25, 124:24, 134:13
**suggested** [8] - 37:5, 41:23, 79:8, 79:9, 104:13, 121:7, 121:8, 122:5
**suggesting** [3] - 114:15, 117:14, 119:7
**suggests** [2] - 119:6, 125:1
**suing** [1] - 118:25

**SUITE** [1] - 2:5
**summarized** [1] - 67:5
**summary** [11] - 26:18, 35:6, 35:11, 39:10, 47:3, 50:20, 66:14, 67:3, 67:4, 68:2, 131:17
**sunset** [4] - 106:7, 107:22, 122:18, 123:14
**supplier** [6] - 26:15, 44:15, 49:8, 67:13, 118:25, 119:5
**supplier's** [2] - 39:11, 111:14
**suppliers** [1] - 65:18
**supply** [2] - 29:14, 29:15
**support** [2] - 114:23, 119:10
**supposed** [1] - 108:16
**surety** [1] - 33:2
**surface** [6] - 9:16, 9:17, 9:20, 11:13, 12:12, 17:7
**surprisingly** [1] - 102:1
**surrounding** [1] - 31:14
**sustain** [2] - 130:3, 130:5
**sustained** [3] - 63:6, 63:16, 63:19
**swear** [1] - 138:10
**sworn** [6] - 3:4, 3:5, 4:12, 23:2, 128:7, 138:13
**sympathy** [1] - 127:24
**System** [1] - 116:8
**system** [11] - 6:24, 10:1, 48:7, 77:8, 98:12, 98:13, 101:9, 109:9, 109:12, 123:20, 125:13
**systems** [6] - 6:21, 6:23, 7:22, 7:25, 8:3, 9:22

## T

**table** [1] - 32:3
**Taiwan** [3] - 117:5, 117:10
**talks** [1] - 106:11
**tariff** [19] - 42:11, 42:20, 43:13, 49:25, 50:7, 52:25, 53:4, 53:15, 53:16, 53:19, 54:2, 60:23, 62:10, 77:18, 111:4, 111:19, 111:23, 112:5, 120:7
**tariffs** [2] - 42:11, 67:15
**tax** [1] - 49:22
**team** [1] - 28:7
**technical** [2] - 114:21, 119:23
**tees** [1] - 7:9
**ten** [5] - 38:22, 45:8, 93:18, 94:24, 112:23
**ten-year** [1] - 38:22
**tendency** [2] - 101:2, 133:10
**tentative** [1] - 93:17
**term** [10] - 48:15, 49:7, 49:17, 56:4, 62:7, 64:6, 64:19, 102:7, 105:12,

111:13
**termination** [1] - 115:11
**terms** [1] - 138:1
**test** [1] - 87:24
**testified** [16] - 17:14, 18:14, 20:5, 98:11, 100:13, 100:19, 101:9, 111:1, 115:11, 116:9, 116:19, 117:19, 126:5, 130:15, 130:25, 131:2
**testify** [4] - 22:15, 102:13, 107:5, 123:1
**testifying** [6] - 19:23, 22:6, 66:19, 66:20, 116:18, 130:16
**testimony** [32] - 28:20, 58:12, 65:2, 73:18, 73:21, 75:8, 75:9, 75:11, 75:13, 75:17, 80:13, 81:21, 86:6, 86:7, 100:15, 102:17, 110:23, 122:9, 128:7, 128:12, 129:3, 129:13, 130:9, 130:12, 130:19, 130:20, 131:1, 131:2, 131:4, 131:6, 131:7
**Thacker** [3] - 25:25, 26:25, 126:4
**thanking** [3] - 36:20, 108:24, 108:25
**THAT** [1] - 144:2
**THE** [143] - 2:3, 2:10, 4:3, 4:5, 4:9, 4:11, 11:18, 11:21, 11:24, 12:1, 12:15, 13:4, 13:14, 14:5, 14:24, 15:24, 17:10, 19:9, 19:11, 19:12, 19:22, 21:21, 21:22, 22:8, 22:11, 22:15, 22:20, 22:22, 23:1, 23:3, 23:5, 23:7, 50:13, 53:10, 53:11, 53:12, 53:14, 54:20, 55:21, 56:4, 59:8, 59:16, 59:18, 59:23, 59:25, 60:2, 61:10, 63:6, 63:16, 63:17, 63:19, 64:2, 64:3, 64:9, 65:10, 65:11, 65:20, 65:24, 66:9, 66:10, 66:11, 66:18, 66:23, 68:14, 72:24, 73:17, 73:21, 73:24, 75:7, 77:16, 80:20, 80:25, 81:4, 86:15, 88:1, 88:2, 88:3, 88:14, 88:16, 89:10, 89:24, 89:25, 90:6, 90:7, 90:8, 90:9, 90:10, 91:1, 91:16, 91:19, 91:21, 92:14, 92:16, 92:24, 93:1, 93:5, 93:9, 94:14, 94:20, 95:3, 96:2, 96:4, 105:20, 108:22, 120:23, 124:5, 127:6, 127:12, 138:12, 138:14, 138:15, 138:16, 138:18, 139:7, 139:9,

139:10, 139:11, 139:13, 139:14, 139:16, 139:17, 139:20, 139:22, 141:2, 141:5, 141:6, 141:15, 141:17, 141:19, 141:21, 141:23, 141:25, 142:2, 142:4, 143:10, 143:12, 144:2, 144:3, 144:4, 144:6, 144:7
**theirs** [1] - 27:17
**themselves** [2] - 36:17, 104:10
**therefor** [1] - 52:6
**therefore** [1] - 131:13
**thereof** [1] - 113:9
**they've** [2] - 81:9, 88:21
**thinking** [3] - 111:24, 114:11, 142:19
**thinks** [1] - 129:25
**third** [9] - 33:12, 40:10, 51:3, 57:1, 60:17, 60:18, 112:24, 132:19, 133:12
**THIRTEENTH** [1] - 2:12
**THIS** [1] - 144:5
**Thompson** [7] - 44:2, 87:25, 98:11, 101:8, 106:3, 120:12, 121:11
**threaded** [6] - 5:18, 5:20, 9:23, 56:14, 56:15, 56:21, 60:21, 61:24
**threads** [5] - 5:11, 5:14, 5:21
**three** [12] - 26:1, 27:10, 27:22, 67:4, 67:15, 77:2, 98:8, 119:24, 130:15, 131:24, 133:18, 139:9
**throughout** [5] - 23:18, 66:7, 115:21, 116:7, 120:20
**THURSDAY** [2] - 1:19, 4:1
**Thursday** [2] - 93:3, 143:19
**tighten** [1] - 5:17
**tilts** [1] - 97:25
**titled** [1] - 140:4
**titles** [1] - 86:20
**today** [17] - 4:17, 18:15, 19:18, 20:5, 25:13, 41:4, 60:15, 85:6, 92:22, 93:7, 107:5, 115:2, 116:9, 116:18, 117:19, 120:20, 122:25
**together** [11] - 5:16, 6:15, 7:5, 7:6, 8:4, 8:8, 8:11, 8:16, 15:10, 15:13, 104:9
**tomorrow** [2] - 138:22
**tonight** [1] - 138:23
**took** [3] - 27:18, 30:3, 128:1
**tooled** [2] - 57:5, 57:9
**top** [10] - 52:8, 52:11, 52:18, 55:6, 61:5, 61:7, 78:21, 112:3, 113:7, 113:10
**total** [2] - 67:13

Case 2:22-cv-00050-TOR  ECF No. 72  filed 06/27/22  PageID.4584  Page 165 of 166
Transcript of Day 3 of FCA Trial    Page 165 of 166
164

touching [1] - 136:19
tough [1] - 80:25
towards [3] - 22:11, 22:12, 81:21
track [1] - 102:18
tracks [1] - 107:3
trade [3] - 18:20, 19:1, 124:12
training [14] - 18:11, 83:5, 83:19, 84:2, 84:4, 84:6, 84:10, 84:11, 84:15, 84:16, 84:20, 107:20
transaction [2] - 77:7, 78:20
TRANSCRIPT [3] - 1:16, 144:3, 144:5
transfer [2] - 83:12, 83:13
transparent [1] - 121:14
transparently [2] - 109:23, 109:24
Treasury [1] - 119:3
treat [2] - 10:15, 16:24
trial [29] - 23:14, 23:18, 28:21, 32:12, 46:22, 50:9, 53:24, 56:2, 58:21, 60:12, 64:24, 75:10, 95:6, 107:14, 108:25, 109:8, 109:14, 109:17, 110:8, 111:21, 111:23, 112:19, 113:3, 118:10, 122:17, 129:11, 136:3, 136:14, 136:24
TRIAL [1] - 1:17
trials [1] - 65:20
tricks [1] - 119:6
trouble [1] - 21:2
true [12] - 37:2, 75:21, 75:24, 76:20, 96:12, 99:21, 100:23, 115:1, 121:6, 121:19, 132:9, 132:10
TRUE [1] - 144:2
trust [1] - 109:12
truth [9] - 102:10, 103:21, 105:4, 105:18, 110:2, 120:19, 132:22, 133:18, 133:19
truthful [2] - 103:19, 134:20
try [6] - 65:22, 103:4, 110:4, 123:25, 124:2, 136:11
trying [8] - 82:15, 88:3, 91:12, 95:21, 99:18, 114:10, 114:18, 121:3
Ts [1] - 16:4
tube [5] - 9:15, 54:11, 55:5, 55:21, 60:24
Tuesday [4] - 92:21, 93:2, 109:16, 143:18
turn [1] - 136:20
turns [1] - 115:4
TV [1] - 97:13
twice [3] - 27:24, 37:22, 48:15

two [43] - 5:15, 6:17, 7:4, 7:6, 8:16, 10:21, 15:9, 20:13, 25:11, 27:25, 30:4, 33:24, 35:20, 43:9, 47:7, 52:24, 63:10, 65:5, 65:15, 66:1, 67:2, 67:9, 72:10, 72:11, 77:23, 84:12, 91:23, 92:21, 93:3, 95:12, 98:15, 99:3, 102:19, 103:10, 103:11, 104:20, 106:10, 118:6, 124:14, 130:15, 131:22, 133:17
two-day [1] - 84:12
type [10] - 7:2, 7:14, 13:21, 15:20, 41:16, 44:8, 44:23, 45:1, 58:18, 99:18
types [1] - 48:8

# U

U.S [16] - 1:23, 18:2, 26:19, 26:21, 29:3, 31:10, 38:19, 39:3, 41:13, 89:3, 109:19, 110:22, 115:15, 124:10, 124:16
ultimately [2] - 91:9, 112:1
unacceptable [1] - 106:3
unanimous [4] - 135:5, 135:10, 138:2, 138:5, 139:12, 141:11
under [22] - 4:10, 8:2, 21:19, 32:8, 33:13, 35:11, 52:2, 52:6, 53:3, 55:21, 57:7, 73:6, 75:9, 91:5, 97:17, 99:18, 111:5, 113:9, 122:23, 128:25, 131:11, 132:15
underlying [1] - 114:7
underneath [1] - 54:23
understood [3] - 28:8, 28:9, 100:20
undertake [3] - 37:1, 37:24, 87:14
undertaken [1] - 110:1
undertakes [1] - 124:10
undertook [1] - 126:12
undisputed [1] - 96:13
unequivocally [1] - 116:20
unfair [3] - 18:20, 18:25, 124:12
unfortunately [1] - 25:14
Uni [25] - 10:23, 11:4, 12:10, 16:6, 21:8, 40:3, 40:11, 40:17, 47:15, 53:7, 62:17, 67:21, 67:22, 68:9, 68:10, 75:16, 75:19, 76:1, 76:5, 76:9, 89:16, 89:19, 89:22, 114:19
Uni-Let [20] - 10:23, 11:4, 12:10, 16:6, 21:8, 40:3,

40:17, 47:15, 53:7, 67:21, 67:22, 68:9, 75:16, 75:19, 76:1, 76:9, 76:9, 89:16, 89:19, 89:22, 114:19
Uni-Lets [3] - 40:11, 62:17, 68:10
Unique [2] - 47:17, 115:10
unit [1] - 47:18
UNITED [3] - 1:1, 1:4, 144:7
United [9] - 60:24, 96:25, 113:24, 119:3, 122:1, 126:21, 131:19, 139:22, 139:24
unless [1] - 94:8
untrue [2] - 100:5, 133:2
unusual [2] - 102:7, 105:12
unwilling [1] - 135:12
up [63] - 5:13, 5:17, 8:14, 10:23, 11:6, 11:22, 17:3, 23:11, 26:11, 30:11, 31:6, 34:11, 36:19, 36:20, 37:1, 37:24, 39:19, 39:20, 46:9, 46:22, 47:4, 47:13, 48:6, 48:19, 50:6, 50:15, 53:23, 57:17, 57:25, 58:17, 58:19, 58:21, 64:23, 67:7, 69:16, 70:5, 70:17, 70:19, 73:10, 77:11, 88:22, 94:12, 96:22, 96:23, 110:8, 111:21, 112:18, 113:7, 113:17, 113:19, 114:20, 114:21, 115:19, 116:2, 116:10, 116:11, 116:12, 117:4, 121:5, 128:5, 139:17, 143:6
update [1] - 59:21
updated [7] - 44:5, 44:7, 82:23, 83:2, 90:13, 90:15, 90:23
upper [1] - 51:19
uses [1] - 52:22

# V

V-e-l-a-z-q-u-e-z [1] - 23:6
valuable [1] - 44:21
valuation [4] - 74:14, 74:16, 75:1, 76:6
value [5] - 42:21, 67:14, 77:7, 78:20, 104:2
VANDEWATER [2] - 1:10, 2:10
Vandewater [2] - 20:24, 139:25
variances [1] - 26:10
variations [1] - 44:24
Velazquez [55] - 3:5, 22:25, 23:2, 23:5, 23:11, 23:20, 28:17, 31:9, 31:23, 33:5, 33:18, 36:1, 36:7, 36:25,

40:17, 47:15, 53:7, 67:21, 67:22, 68:9, 75:16, 75:19, 76:1, 76:5, 76:9, 89:16, 89:19, 89:22, 114:19
Uni-Lets [3] - 40:11, 62:17, 68:10
Unique [2] - 47:17, 115:10
unit [1] - 47:18
UNITED [3] - 1:1, 1:4, 144:7
United [9] - 60:24, 96:25, 113:24, 119:3, 122:1, 126:21, 131:19, 139:22, 139:24
unless [1] - 94:8
untrue [2] - 100:5, 133:2
unusual [2] - 102:7, 105:12
unwilling [1] - 135:12
up [63] - 5:13, 5:17, 8:14, 10:23, 11:6, 11:22, 17:3, 23:11, 26:11, 30:11, 31:6, 34:11, 36:19, 36:20, 37:1, 37:24, 39:19, 39:20, 46:9, 46:22, 47:4, 47:13, 48:6, 48:19, 50:6, 50:15, 53:23, 57:17, 57:25, 58:17, 58:19, 58:21, 64:23, 67:7, 69:16, 70:5, 70:17, 70:19, 73:10, 77:11, 88:22, 94:12, 96:22, 96:23, 110:8, 111:21, 112:18, 113:7, 113:17, 113:19, 114:20, 114:21, 115:19, 116:2, 116:10, 116:11, 116:12, 117:4, 121:5, 128:5, 139:17, 143:6
update [1] - 59:21
updated [7] - 44:5, 44:7, 82:23, 83:2, 90:13, 90:15, 90:23
upper [1] - 51:19
uses [1] - 52:22

37:16, 37:24, 38:10, 40:13, 40:19, 43:23, 46:24, 50:18, 50:24, 51:20, 54:1, 54:9, 58:9, 58:24, 60:7, 62:9, 62:16, 63:8, 63:22, 65:1, 65:14, 66:1, 67:1, 67:20, 68:18, 69:16, 70:15, 85:25, 86:19, 90:2, 90:12, 91:5, 107:5, 111:1, 111:11, 111:24, 116:9, 117:19, 120:6, 123:1, 124:13
vendor [1] - 90:22
verdict [30] - 97:15, 98:2, 108:20, 126:16, 126:18, 126:20, 128:4, 128:11, 134:13, 135:5, 135:10, 135:16, 135:18, 138:3, 138:4, 138:5, 138:6, 139:12, 139:14, 139:20, 140:3, 141:4, 141:6, 141:9, 141:10, 141:12, 141:13, 142:5, 142:12
version [2] - 29:5, 42:3
versus [1] - 139:25
video [1] - 137:24
videos [1] - 137:21
videotape [2] - 118:9, 118:17
view [3] - 116:20, 136:12, 136:14
views [1] - 135:8
violated [2] - 126:17, 140:7
violates [1] - 136:21
violation [3] - 104:11, 133:24, 140:17
violations [1] - 134:4
visit [1] - 136:12
volunteered [1] - 87:16
vote [1] - 138:1
voting [1] - 109:3
Vs [1] - 1:8

# W

wait [4] - 53:11, 69:16, 93:18, 94:21
waiting [1] - 137:19
walk [6] - 23:11, 55:1, 97:5, 98:4, 99:6, 108:3
walked [2] - 30:15, 41:2
walking [1] - 117:24
wall [2] - 10:12, 10:13
Walter [3] - 3:3, 4:12, 116:19
wants [1] - 81:2
warning [6] - 94:5, 94:10, 94:15, 94:16, 94:18, 94:19
warnings [1] - 96:1
WASHINGTON [1] - 2:13
water [3] - 6:21, 6:22, 9:25
ways [2] - 44:1, 123:21
weak [1] - 142:22

Case 2:22-cv-00050-TOR ECF No. 87-3 filed 06/27/22 PageID.4584 Page 587 of 587
Transcript of Day 3 of FOA Trial    Page 166 of 166

165

**website** [4] - 42:1, 60:15, 86:8, 116:6
**week** [1] - 120:21
**weeks** [2] - 30:4, 96:8
**weigh** [1] - 97:22
**weight** [7] - 67:14, 129:19, 129:21, 130:23, 131:1, 131:8, 135:15
**weld** [70] - 4:24, 6:14, 6:15, 7:3, 7:4, 8:5, 8:6, 8:7, 8:22, 9:2, 9:4, 9:5, 9:6, 9:9, 9:20, 10:9, 10:16, 10:18, 12:18, 12:20, 12:24, 13:10, 13:11, 14:9, 15:10, 15:11, 15:14, 16:3, 16:8, 16:9, 16:15, 16:20, 16:25, 17:3, 19:16, 19:20, 20:8, 21:9, 21:12, 22:4, 45:2, 47:16, 53:6, 57:2, 57:24, 58:1, 58:4, 58:18, 60:22, 62:3, 62:5, 62:7, 62:11, 62:22, 64:15, 112:11, 112:15, 112:17, 115:3, 116:14, 116:22, 116:23, 117:5, 122:10, 122:23, 123:16, 123:17, 133:3
**welded** [69] - 7:5, 8:21, 9:6, 9:13, 9:15, 10:2, 10:6, 10:8, 10:9, 10:15, 12:8, 12:11, 14:2, 16:2, 16:7, 16:19, 16:24, 19:19, 20:8, 21:1, 21:4, 38:23, 40:3, 45:1, 45:2, 53:7, 53:14, 53:19, 54:15, 55:2, 57:3, 61:11, 62:3, 67:22, 68:9, 98:7, 99:23, 99:25, 100:21, 101:16, 101:21, 101:22, 102:14, 102:22, 103:1, 103:5, 103:23, 106:20, 112:15, 113:20, 114:18, 114:19, 115:2, 116:10, 116:13, 116:14, 116:21, 118:13, 118:22, 121:15, 122:12, 122:14, 123:15, 123:17, 131:23, 133:7
**welder** [1] - 14:14
**welding** [16] - 7:14, 7:19, 8:2, 8:3, 8:21, 13:24, 14:14, 14:21, 15:3, 15:4, 15:7, 15:21, 22:12, 121:16, 131:19, 131:20
**welds** [12] - 6:14, 6:18, 6:19, 6:20, 6:23, 6:25, 7:1, 7:18, 7:20, 7:21, 9:4, 10:8
**WEST** [1] - 1:24
**whim** [1] - 124:9
**white** [1] - 101:19
**WHITE** [1] - 2:12
**whole** [8] - 31:20, 49:15, 69:23, 77:15, 77:16, 87:23,

107:2, 114:17
**Williams** [1] - 36:9
**willing** [1] - 120:1
**wish** [6] - 83:12, 92:20, 92:22, 94:5, 143:6, 143:17
**wishes** [1] - 143:15
**WITH** [1] - 144:6
**Witness** [1] - 5:3
**WITNESS** [23] - 3:2, 4:11, 19:11, 21:22, 23:5, 53:11, 53:14, 54:20, 55:21, 56:4, 61:10, 63:17, 64:3, 65:10, 65:24, 66:10, 77:16, 81:4, 88:2, 88:16, 89:24, 90:7, 90:9
**witness** [28] - 3:3, 3:5, 4:7, 4:12, 11:16, 12:2, 13:3, 13:17, 14:18, 15:16, 17:14, 17:18, 22:25, 23:2, 23:12, 60:4, 65:21, 66:4, 72:23, 80:25, 122:9, 129:14, 130:10, 130:12, 130:14
**witness's** [7] - 130:15, 130:16, 130:17, 130:18, 130:19, 130:20, 131:9
**witnesses** [11] - 23:12, 109:21, 111:1, 117:2, 126:1, 128:7, 128:17, 130:24, 130:25, 131:5, 136:17
**woefully** [1] - 107:15
**Woehrel** [4] - 100:9, 107:20, 119:7, 122:9
**wonder** [1] - 125:8
**wood** [6] - 5:19, 5:20, 5:21, 5:22, 5:25
**word** [11] - 48:5, 48:24, 50:3, 55:23, 56:9, 93:24, 110:20, 110:23, 114:22, 117:2, 117:15
**words** [4] - 47:24, 48:2, 78:3, 109:17
**works** [1] - 5:18
**world** [2] - 116:21, 116:22
**writing** [3] - 92:20, 137:6, 137:7
**written** [6] - 5:8, 7:23, 45:17, 67:16, 67:17, 67:19

# X

**X-ray** [1] - 39:18

# Y

**year** [8] - 28:17, 32:22, 33:4, 38:22, 104:1, 115:17, 115:25
**year's** [1] - 29:16
**year-by-year** [1] - 104:1

**years** [13] - 17:15, 24:24, 25:2, 26:13, 28:13, 68:21, 72:12, 86:20, 89:2, 90:16, 112:23
**yes-or-no** [2] - 86:4, 86:11
**yesterday** [2] - 92:23, 93:10
**York** [1] - 24:8
**yourself** [1] - 40:8
**yourselves** [5] - 59:11, 92:7, 113:25, 114:9, 135:6

# Z

**zero** [1] - 43:5